Transcript of Electronic Recording - 8/20/2024

IN THE UNITED STATES BANKRUPTCY COURT

DISTRICT OF UTAH

                                          )

                                          )

                                          )

In re:                                    )

                                          ) Case No. 24-23041

Power Block Coin, LLC,                    )

                                          )

     Debtor.                              ) Judge Joel T. Marker

                                          )

                                          )

                                          )

August 20, 2024

TRANSCRIPT OF ELECTRONIC RECORDING

Reporter:  Lauren Shields, RPR

Page 1

Transcript of Electronic Recording - 8/20/2024

A P P E A R A N C E S

FOR THE DEBTOR:

    Brian M. Rothschild
    Darren B. Neilson
    Elliott McGill
    PARSONS BEHLE
    Attorneys at Law
    201 South Main Street
    Suite 1800
    Salt Lake City, Utah 84111
    Tel: (801) 532-1234

FOR THE UNITED STATES TRUSTEE:

    Melinda P. Wilden
    Matthew J. Burne
    UNITED STATES TRUSTEE PROGRAM
    Attorneys at Law
    405 South Main Street
    Suite 300
    Salt Lake City, Utah 84111
    Tel: (801) 524-5148

FOR THE SUB 5 TRUSTEE:

    Joli A. Lofstedt
    ONSAGER FLETCHER JOHNSON PALMER
    Attorney at Law
    600 17th Street
    Suite 425N
    Denver, Colorado 80202
    Tel: (303) 512-1123

Veritext Legal Solutions
calendar-utah@veritext.com 801-746-5080

Transcript of Electronic Recording - 8/20/2024

FOR CELSIUS LITIGATION ADMINISTRATOR:

    Annette W. Jarvis
    Carson Heninger
    GREENBERG TRAURIG
    Attorneys at Law
    222 South Main Street
    Suite 1730
    Salt Lake City, Utah 84101
    Tel: (801) 478-6900

    Samuel P. Hershey
    Attorney at Law
    WHITE & CASE
    1221 Avenue of the Americas
    New York, New York  10020
    Tel: (212) 819-2699

FOR MASON SONG:

    Mark D. Bloom
    BAKER & MCKENZIE
    Attorney at Law
    Center 1111 Brickell Avenue
    10th Floor
    Miami, Florida  33131
    Tel: (305) 789-8927

FOR BLUE CASTLE HOLDINGS:
    Michael R. Johnson
    RAY QUINNEY & NEBEKER
    Attorney at Law
    36 South State Street
    Suite 1400
    Salt Lake City, Utah  84111
    Tel: (801) 323-3363

Veritext Legal Solutions
calendar-utah@veritext.com 801-746-5080

                        I N D E X

BRAD JONES                                          PAGE
 Direct Examination by Mr. Rothschild        20
 Cross-Examination by Ms. Wilden             50
 Cross-Examination by Mr. Hershey            80
 Redirect Examination by Mr. Jones           87


AARON TILTON                                        PAGE
 Direct Examination by Mr. Rothschild        92

 Cross-Examination by Ms. Wilden             113

 Cross-Examination by Mr. Hershey            141

 Cross-Examination by Mr. Bloom              169

Veritext Legal Solutions
calendar-utah@veritext.com 801-746-5080

```
                            E X H I B I T S
    DEBTOR'S EXHIBIT NUMBER                              PAGE
     1                                                    27
     2                                                    27
     3                                                    27
     4                                                    27
     5                                                    27
     6                                                    27
     7                                                    27
     8                                                    27
     9                                                    27
    10                                                    27
    11                                                    27
    12                                                    27
    13                                                    27
    14                                                    27
    15                                                    27
    16                                                    27
    17                                                    27
    18                                                    27
    19                                                    27
    20                                                    27
    21                                                    27
    22                                                    27
    23                                                    27
    24                                                    27
    25                                                    27
    26                                                    27
    27                                                    27
    28                                                    27
    29                                                    27
    30                                                    27
    31                                                    27
    32                                                    27
    33                                                    27
    34                                                    27
    EXHIBIT NUMBER                                       PAGE
     1                                                    80
     2                                                    80
     3                                                    80
     4                                                    80
     5                                                    80
     6                                                    80
     7                                                    80
     8                                                    80
     9                                                    80
    10                                                    80
```

Page 5

Transcript of Electronic Recording - 8/20/2024

| 12 | 80 |
|----|----|
| 13 | 80 |
| 14 | 80 |
| 15 | 80 |
| 16 | 80 |
| 17 | 80 |
| 18 | 80 |
| 19 | 80 |
| 20 | 80 |
| 21 | 80 |
| 22 | 80 |
| 23 | 80 |

Page 6

Transcript of Electronic Recording - 8/20/2024

P R O C E E D I N G S

THE CLERK:  The Court resumes its session.

THE COURT:  Good afternoon.  We're here for some matters in the Power Block Coin, LLC Chapter 11 case.  Could I get appearances, please, starting with debtors counsel.

MR. ROTHSCHILD:  Good afternoon, Your Honor.  Brian Rothschild, Darren Neilson and I have with me Elliot McGill from Parsons Behle & Latimer. We also have from the debtor Aaron Tilton and Brad Jones will be introduced, I believe they'll be witnesses in this case.

THE COURT:  All right.  Let's see.  Who do we have?

Ms. Lofstedt.

MS. LOFSTEDT:  Good afternoon, Your Honor. Joli Lofstedt, the subchapter 5 trustee.

THE COURT:  Thank you.

For the U.S. Trustee's Office.

MS. WILDEN:  This is Melinda Wilden for the U.S. Trustee.

MR. BURNE:  Also, Matthew Burne on behalf of the U.S. Trustee, Your Honor.

THE COURT:  Thank you.

Page 7

Mr. Johnson.

MR. JOHNSON: Good afternoon, Your Honor. Michael Johnson on behalf of Blue Castle Holdings.

THE COURT: All right. And for the Celsius parties.

MR. HERSHEY: Yes. Good afternoon, Your Honor. Sam Hershey from White & Case for the Celsius Litigation Administrators.

THE COURT: All right. Anyone else wish to make an appearance?

MR. HENINGER: Yes. Good morning, Your Honor. Carson Heninger and currently absent is Ms. Annette Jarvis but she will be joining. She is tied up on another hearing that apparently is running a little long but she'll be in as soon as that's over.

THE COURT: Thank you. Anyone else?

MR. BLOOM: Yes. Good afternoon, Your Honor. Mark Bloom of Baker & McKenzie appearing pro hac vice on behalf of creditor Mason Song, S-O-N-G.

THE COURT: Thank you.

All right. The first matter we've got on the calendar is the debtors application to employ Parsons Behle & Latimer as counsel.

The U.S. Trustee has filed and is

prosecuting an objection.  The ultimate burden on this matter is on the debtor to show a lack of -- or no conflict or a lack of disinterest in this.

Ms. Wilden, are you ready to go?

MS. WILDEN:  Yes, Your Honor.

THE COURT:  Okay.  To say I'm unclear about the transactions that concern the U.S. Trustee would be an understatement.  So as we go through this, I think it's really important to help me connect the dots.  So just be careful as you do that.  Don't assume that I understand the underlying transactions because as of right now, I don't.

MS. WILDEN:  Thank you, Your Honor.  We'll keep that in mind.

Should we go ahead with opening statements?

Is there anything else Your Honor wants to address before we get started?

THE COURT:  Nope.  Go ahead.

MS. WILDEN:  All right.  Your Honor, one thing that's become clear as we've inquired into the finances of this debtor and its affiliated entities is that the debtor's parent, Blue Castle, has been moving the debtor's operating revenue around to fund the business activities of Blue Castle's other

Page 9

subsidiaries.

These intercompany loans were noted only on internal accounting records of Blue Castle and then much later promissory notes were signed to memorialize those intercompany loans.

MR. ROTHSCHILD:  Your Honor, I hate to interrupt.  I'm very sorry.  I've been trying to get your attention.

This is --

THE COURT:  You have my attention but she's speaking.

MR. ROTHSCHILD:  Your Honor, it's the debtor's motion.  I'm curious why Ms. Wilden is proceeding as if it's her motion.

THE COURT:  I asked her to proceed.

MR. ROTHSCHILD:  Thank you.  That's all I need to know, Your Honor.

MS. WILDEN:  From what we have seen, the business activities of the debtor's sister entities were all launched using the debtor's operating revenue.  The $17.4 million loan to Solara came from the debtor's operating revenue.  The $1.7 million that was loaned to SmartFi Lending also came from the debtor.  When RE Developers was formed, the $1 million capital infusion was made by the debtor

Page 10

and booked as such and then later that transaction was re-characterized.

So all of these business activities that are managed by Blue Castle through its various subsidiaries were funded by the debtor back when cryptocurrency was soaring.  And now that the crypto values have crashed, there's -- there's no more money for these.

So under the management agreement signed in December of 2023, Blue Castle has been responsible for paying the debtor's legal fees.  Prior to the petition date, Parsons incurred legal fees of about 200,000 and the -- Blue Castle was unable to pay that in full before the bankruptcy petition was filed. That would have depleted Blue Castle's cash reserves.

Mr. Tilton testified to that effect in his deposition last Thursday.  So the evidence will show that Tim Smith, the attorney of Parsons who had been representing Blue Castle, talked to Mr. Tilton and informed him that Parsons would set up a new matter number under Blue Castle's account number and transfer the pre-petition claim to that new sub-account.  And then Mr. Smith reminded Mr. Tilton not to offset any payments on that $200,000 pre-petition claim against the loan balances that it

Page 11

was using to fund the debtor's operating expenses.

And naturally, taking funds out of one account instead of another doesn't change the source of the payment if both of those accounts are drawing from the same source.  So the U.S. Trustee asked for information to find out if Blue Castle has any other revenue source besides the debtor.  Could this pre-petition claim be paid without relying on the debtor's revenue?

And that principle we drew from the 7677 Eastbury Avenue(ph) case, which we briefed.  It took a while to get this information.  Blue Castle didn't have its own counsel until about six weeks post-petition when it engaged Mr. Johnson.  And then our request for production was further delayed because Mr. Johnson asked us to agree to the standard district court protective order for Blue Castle's financials.  The U.S. Trustee can't agree to that.  And so in order to resolve that as quickly as possible, I suggested that we go to Ray Quinney's offices and view the documents without taking any copies back to our office.  So we saw those documents last Monday and Tuesday for the first time.

The option contract, which will be presented in evidence, was presented to our office as

Page 12

the source of funds that Blue Castle would use to pay

Parsons' pre-petition claim. That contract was

signed August 2nd, and the payee under that contract

is RE Developers.

Because RE Developers has so much

expensive property development work ahead of it, it

would make more sense for RE Developers to keep the

option funds to pay those -- pay for those operations

rather than giving them to Blue Castle to pay

Parsons' pre-petition claim.

And so from our point of view, it appears

that in order to find a way to give Blue Castle a

claim on those funds, about two weeks ago, Mr. Tilton

and Mr. Jones signed a promissory note that allegedly

memorializes a loan from April 2023 between Blue

Castle and RE Developers to make it so that RE

Developers should pay the money to Blue Castle. But

this promissory note cure the -- doesn't give Blue

Castle a legitimate claim on those funds for two

reasons.

One is that the loan it allegedly

memorializes actually came from the debtor and the

second is that it's been paid back; paid back quite a

bit more than it was originally loaned for. And the

documents that we saw for the first time last week

Page 13

also raised the suspicion that perhaps the debtor used to own RE Developers.

So when you clear away the accounting changes, the mistakes, the intercompany loans, what's left is the fact that Blue Castle has been using the debtor's operating revenue to fund all of its other subsidiaries, including RE Developers. And so if RE Developers wants to pay its option contract revenue to any entity, it should just go directly to the debtor, it doesn't need to go through Blue Castle.

And in summary, the evidence today will show that Blue Castle does not have the funds to pay that pre-petition claim. The only funds that have come into this entity in the past several years have all come from the debtor or -- no one else is generating enough operating revenue to bring any money into the debtor. So the only funds available to pay the pre-petition claim come from the debtor.

And this means that Parsons is a pre-petition creditor of the estate. They are not disinterested and are, therefore, not eligible to be employed under Section 327(a).

THE COURT: Thank you.

Mr. Rothschild.

MR. ROTHSCHILD: Thank you, Your Honor.

Page 14

I apologize to Ms. Wilden and I apologize to the judge, Your Honor, for the interruption. I was so confused.

We have the burden here and we intend to show that what -- Ms. Wilden's characterization of the transactions is simply not accurate. And there are contemporaneous documents, documentation, QuickBook entries and bank account transfers that memorialize these transactions as they are in the books in real time. That after the petition date, a few of the promissory notes were drawn up to memorialize what was already in the QuickBooks and what had already happened on the bank statements is really, fairly immaterial.

And let me -- let me back up a little tiny bit. The U.S. Trustee has conceded that we've met the elements of 7787 case except for the last one, which is the issue of where our payment or a pre-petition payment would come from.

So that's what we're talking about. That's the narrow issue that we're -- we're dealing with here at this point.

And I'll explain very briefly but we're going to present it in evidence and we can trace through the transactions step-by-step to do so and

Page 15

make sure that the Court understands them.

But a lot of what Ms. Wilden says is sort of immaterial.  For instance, anything about SmartFi Lending, SmartFi Lending is another affiliate, subsidiary of Blue Castle.  None of that money is at issue in anything to do with the payment to Parsons Behle & Latimer.  Again, the narrow issue on which we're focused.

The Solara loan, none of that is at issue in this instance with respect to this application to employ.  The only thing that is at issue is whether money that we believe will come RE Developers to the Blue Castle level is money that belongs to Blue Castle, not the debtor.

The payments -- there was a million -- one million one thousand dollars in transfers that were made from SmartFi to RE Developers; were entirely repaid in 2023.  We're talking more than a year ago, all of those amounts were completely retired and repaid and returned to the debtor.  We can show that.

And at this time, money -- the only obligation is an obligation owing from RE Developer to Blue Castle on which it intends to pay that will provide more than enough money to pay Parsons Behle.

And again, that money was not sourced from

Page 16

a transfer or related to a transfer from SmartFi to RE Developer because, again, the only transfers, one million one thousand dollars, that were paid to RE Developer from SmartFi were completely repaid.

The first chunk, $250,000, which was mistakenly transferred, was returned less than a month later. The rest of it was repaid through, as was always intended, a Blue Castle loan. And it was completely retired. And in fact, that plus more was paid back and interest was earned on that amount.

Your Honor, I think it boils down to a dispute of fact. We will happily put Mr. Jones on the stand to walk through the accounting transactions to make sure that we're able to show exactly where these fund -- these funds will come from.

The Court: The funds that RE Developers has relates to property that was purchased with Power Block Coins' money, correct.

MR. ROTHSCHILD: I would say incorrect, Your Honor. But there's a little bit -- there's a little bit of clarification. The debtor loaned the money to an entity called SmartFi Toquerville in order to fund loans that SmartFi Toquerville was making to an unrelated third party.

And that's how SmartFi Toquerville, which

became Solara, came into possession of property.  It came into possession of property because it made a loan.  That loan defaulted.  It then foreclosed on the property and -- and came to own the property.

When -- and again, that is outside of the debtor.  The debtor made a loan and that loan has been outstanding ever since.

From SmartFi's perspective, that is what happened.

THE COURT:  But the money that RE Developers is receiving on the option agreement is based upon an option to sell the property that Solara bought or foreclosed on with the debtor's money, correct?

MR. ROTHSCHILD:  Your Honor, we'll have to ask Mr. Tilton what the substance of that development agreement is.  I don't know -- I think it's an option for a development agreement.

I believe it's actually the sale of land.

THE COURT:  All right.  Mr. Hershey.

MR. HERSHEY:  Yes.  Good afternoon, Your Honor.  Sam Hershey from White & Case for --

(Multiple voices.)

MR. HERSHEY:  -- administrators.

THE COURT:  Your clients have joined in

Page 18

the U.S. Trustee's objection?

MR. HERSHEY:  That's right, Your Honor.

And I know Ms. Jarvis will make an argument after the evidence is presented.  I don't think we have an opening statement on this issue but we do intend to ask the witness some questions and then participate in argument after the evidence is in.

THE COURT:  All right.

Mr. Bloom.

MR. BLOOM:  Thank you, Your Honor.  No opening statement from us.

THE COURT:  All right.  Thank you.

Mr. Rothschild, proceed.

THE CLERK:  He's on mute.

THE COURT:  You're on mute.

MR. ROTHSCHILD:  Sorry, Your Honor.  Habit.

Your Honor, we -- we would like to call Brad Jones, please.

THE CLERK:  Would you like him sworn in?

The Court:  Yes.

THE CLERK:  Okay.

Mr. Jones, please raise your right hand.

Page 19

Transcript of Electronic Recording - 8/20/2024

BRAD JONES,

called as a witness, being first sworn,

was examined and testified as follows:

THE CLERK:  Please state and spell your full name for the record.

THE WITNESS:  Brad Jones.  B-R-A-D, J-O-N-E-S.

DIRECT EXAMINATION

BY MR. ROTHSCHILD:

Q.    Thank you, Mr. Jones.

Can you briefly describe your educational background?

A.    Graduated from Logan High School in Logan, Utah.

Went to Utah State University.  Graduated with a Bachelor of Arts in Accounting with a minor in Japanese.

Graduated from Utah State University with a Master's in Accounting and a Master's in Business Administration.

Q.    Are you a CPA?

I'm sorry, I couldn't hear you.

A.    Yes, I am.

Veritext Legal Solutions
calendar-utah@veritext.com 801-746-5080

Q.    How long have you been with SmartFi?

A.    I've been with Blue Castle, which is the parent of SmartFi, since its inception in 2017.

During that time, there was a brief time where I left the organization.  I've been an outsourced CFO for a long time; had another opportunity to rise and left for about a year and then came back and been with them since.

Q.    What is your position with SmartFi?

A.    Well, I'm -- I'm the acting CFO.  I'm the CFO of Blue Castle Holdings which, again, is the parent of debtor Power Block Coin, acting as the CFO of Power Block.

Q.    Okay.  Who's the controller for Blue Castle?

A.    I don't have a controller, per se.

Q.    Do you act as the controller?

A.    (Inaudible.)

Q.    And in that capacity, what is your day-to-day?  What do you do?

A.    Primarily oversee and -- and record all the financial transactions for the company.

Q.    Does that include establishing and monitoring bank accounts?

A.    Yes.

Page 21

Q.    Do -- does Blue Castle maintain separate bank accounts from SmartFi?

A.    Yes, it does.

Q.    Does Blue Castle maintain separate bank accounts from RE Developers?

A.    Maybe I better backtrack.

In that Power Block Coin, the debtor doesn't have a bank account currently.  Prior to its inability to have a bank account in December 2023, there were separate bank accounts.

Q.    Thank you for that clarification.

And to my next question:  Does -- does RE Developer maintain separate bank accounts?

A.    Yes, it does.

Q.    Do the other entities we've mentioned, Solara and SmartFi Lending, do they maintain separate bank accounts?

A.    Yes, they do.

Q.    Do they ever co-mingle their funds?

A.    No, they don't.

Q.    To your knowledge, do the entities have separate corporate formation?

A.    Yes, they do; my knowledge.

Q.    And are they set up or registered with the states in which they are established?

Page 22

A.    I understand that they are, yes.

Q.    They have separate EIN numbers.

A.    They do.

Q.    They maintain separate QuickBooks for each entity.

A.    Yes.  Every -- every entity has its own set of QuickBooks.

Q.    And if -- you said there was no co-mingling, so if there was a transfer between one and the other, would you record that in the QuickBooks?

A.    On both sides -- both -- both entities in which we really didn't(ph) have the corresponding entries recorded.

Q.    Do you adhere to Generally Accepted Accounting Principles?

A.    Yes.

Q.    I want to call your attention -- or your mind back to April 2023.  It's a wire transfer from the debtor's bank account to RE Developers.

Are you familiar with the transaction to which I'm referring?

A.    I am, yes.

MR. ROTHSCHILD:  And Your Honor, I'd like to show an exhibit.  Is it okay if I share my screen?

Page 23

THE COURT:  Yes.

MR. ROTHSCHILD:  Okay.  Thank you.

MR. JOHNSON:  Your Honor, while he's pulling that up, to the extent we're getting into non-debtor financial records, I'd just ask the Court under Local Rule 5003-2E to just restrict -- restrict non-debtor confidential, non-public information from public view.

THE COURT:  Let's address that on a case-by-case basis.

The issue, Mr. Johnson, is this company doesn't have its own bank account.  Everything goes through your client's bank account.

At some point, this debtor is going to be required to file a monthly operating report, which will have to have some bank information attached to it.  That bank information, sounds like it's going to be your client's bank information.

MR. JOHNSON:  Yeah.  And what -- and what I was thinking -- and this isn't the (inaudible), Your Honor.

There is a separate RE Developer bank statement, so that's not a Blue Castle bank statement.  So that's what I thought he was going to pull up.  That's what I'm talking about.

Page 24

I certainly understand that to the extent Blue Castle is maintaining -- oh, yes.  Right there.

To the extent Blue Castle is maintaining accounts for the debtor, that those records are going to be -- to be filed with the Court, I don't have an issue with.

MR. ROTHSCHILD:  And to address that further, Your Honor, the -- the debtor, under its cash management motion, which I don't know that we're addressing but there is some overlap, will have its expenses taken care of, cash expenses taken care of, through a separate Blue Castle bank account.  There will be no other Blue Castle business going through that account.

So, Your Honor, to say that if the debtor, in its monthly operating report, includes bank statements from that separate bank account and there's no other Blue Castle, I don't know that that -- there's no other Blue Castle business.  I don't know if that means that everything that has the word "Blue Castle" on it is necessarily fair game.

We want to be careful that I don't overstep our -- our welcome on getting some of these records.

Q.   (By Mr. Rothschild)  Mr. Jones, do you

Page 25

Transcript of Electronic Recording - 8/20/2024

recognize the -- the document that's in front of you,
Exhibit 21?

A.    (Inaudible.)

Q.    I'm sorry.  Mr. Jones, when you speak, I'm
having a little trouble hearing you.

A.    I'm not quite sure what to do about that.
Turn the volume all the way up.

Q.    So, did you say yes?

A.    Yes.  Yes.  I recognize the document.

Q.    All right.  Can you --

(Multiple voices.)

THE COURT:  All right.  Mr. Rothschild.

MR. ROTHSCHILD:  Yes.

THE COURT:  So, the U.S. Trustee's
Supporting Memorandum uses letters.  Yours -- your
exhibits that we received include numbered Exhibits 1
through 34.  And then the Celsius Party's exhibits
are also numbered.

So, when you say Exhibit 21, you're going
to need to be a little bit more specific as we go
through.  Okay?

MR. ROTHSCHILD:  Thank you, Your Honor.

Your Honor, I'm only going to be pulling
from the Power Block Coin debtor's exhibits today,
unless I need to, for rebuttal, look at another

Veritext Legal Solutions
calendar-utah@veritext.com 801-746-5080

party's exhibits.

So, let's start with this, which is Exhibit 21 of the debtor's exhibits.

And Your Honor, at -- at the beginning, it should have been -- I should have addressed a little bit of housekeeping, which was that the U.S. Trustee and the debtor stipulated to the admission of each other's exhibits. We did not reach that same issue with Mr. Hershey.

I don't know if Mr. Hershey has a -- a concern about this from Celsius' perspective.

MR. HERSHEY: Yeah. I have no concern, Your Honor. And I will also stipulate to admission of the debtor's exhibits.

THE COURT: All right. So the Debtor's Exhibits 1 through 34 are received. Is that in agreement by everyone?

MS. WILDEN: Yes, Your Honor.

THE COURT: All right. Exhibits 1 through 34 are received; the debtor's Exhibits 1 through 34.

(DEBTORS EXHIBITS 1-34 ARE RECEIVED.)

Q. (By Mr. Rothschild) And now turning to Exhibit 21, Mr. Jones, can you identify this exhibit for the Court?

A. This is a -- a QuickBooks-generated

Page 27

transaction report out of RE Developers' QuickBooks file detailing the original loan between RE Developers and Blue Castle Holdings.

Q.   Okay.  And let me -- let me scroll down here.  There's another document, it's not exactly the same nature, beginning on page 2 of this exhibit.

Can you identify this?

A.   This is the RE Developers bank statement with Hillcrest Bank.

Q.   And it looks like they'd be getting initial funding here.  It was opened.  And can you tell me, this wire transfer, where it came from?

A.   Power Block Coin.

Q.   And the amount?

A.   One million dollars.

Q.   And what was the understanding of, at the time, to the best of your knowledge, of where RE Developers was supposed to fit into the corporate structure?

A.   Well, RE Developers is a wholly owned subsidiary of Blue Castle Holdings.  When this transfer occurred, the intent was to set up a loan between RE Developers and Blue Castle Holdings and a corresponding loan between Power Block Coin and Blue Castle Holdings.

Veritext Legal Solutions
calendar-utah@veritext.com 801-746-5080

Q.    So, just to repeat, this was intended to be a loan from Blue Castle Holdings to RE Developers and the money for that was to come from SmartFi to Blue Castle Holdings, which would then receive the note; is that correct?

A.    That is correct.

Q.    Well, then why didn't you transfer the funds from Blue Castle Holdings?  Or -- or why didn't you transfer -- let me withdraw -- withdraw that.

Why didn't you first transfer the money from SmartFi to Blue Castle Holdings and then transfer the loaned money from Blue Castle Holdings to RE Developers?

The appropriate thing to do would have been to transfer money from Power Block Coin to Blue Castle Holdings, then from Blue Castle Holdings to RE Developers.  In order to be efficient, reduce wire fees, the money was transferred directly from Power Block Coin to RE Developers.

Q.    Is that your ordinary practice?

A.    No, not -- not typically.

Q.    And you've seen that done before?

A.    In -- in my experience as an outsourced CFO with the clients, yes, I have seen it done before.

Page 29

Q.    And -- so the transfer was made directly through SmartFi to save a few bucks on wire fees.

But tell me, was this all intended to be a loan?

A.    So the million dollars -- million one dollars that was transferred, the intention was for $750,000 of that to be a loan between RE Developers and Blue Castle Holdings.  And the difference, $250,000, was to be an equity infusion from Blue Castle Holdings to RE Developers.

Q.    So when this was discovered, what -- that this was done directly and the money had come from SmartFi and Blue Castle, did you take any steps to fix it?

A.    We did.

(Multiple voices.)

THE COURT:  Mr. Rothschild, I'd like you to rephrase that.  Instead of using a passive voice, when you said, "When it was discovered," who --

(Multiple voices.)

THE COURT:  Who -- who discovered and when and why?

THE WITNESS:  This was originally stated --

THE COURT:  Mr. -- Mr. Jones, wait for

Page 30

Mr. Rothschild to ask you a question, please.

THE WITNESS:  I'm sorry.

MR. ROTHSCHILD:  Your Honor, I'll start with:

Q.    (By Mr. Rothschild)  Did this get fixed?

A.    Yes, it did get fixed.

Q.    Okay.  How did it get fixed?

A.    So when the original million dollars was transferred from Power Block Coin to RE Developers, as the intent was to have a note payable, $751,000 and an equity infusion, it was recognized that that 250 -- $250,000 that was sent was an equity infusion, wasn't intended for Power Block Coin to be an equity participant in RE Developers.  So, at that point in time, approximately a month after the original transfer was made, the $250,000 was returned from RE Developers back to Power Block Coin.

Q.    Is that what we're looking at here on page 4 of the Exhibit 21?

A.    That's correct.  This is the RE Developers' bank statement.

If you'll scroll up a little bit, you can see the date.  May 31st bank statement at Hillcrest Bank.  We can see the $250,000 was transferred from Hillcrest Bank, RE Developers account, over to the

Page 31

Power Block Coin account.

Q.   So of the million dollars, $250,000 was immediately returned?

A.   It was immediately returned to Power Block Coin, that's correct.

Q.   Okay.  And let's go to the second part. There's still $751,000 that was -- that was paid by Power Block Coin.

Did Power Block Coin get something in return for the $750,000 that it transferred?

A.   There was a promissory note set up between Power Block Coin and Blue Castle Holdings.

MR. ROTHSCHILD:  Your Honor, I'm going to bring up Exhibit 12.

Q.   (By Mr. Rothschild)  Do you recognize this document?

A.   I do.

Q.   Can you identify it very briefly?

A.   This is a promissory note for $751,000 between Blue Castle Holdings and Power Block Coin.

Q.   And was this drafted, as Ms. Wilden said, after the bankruptcy?

A.   No, it was not.

Q.   When was this drafted?

A.   Sometime during 2023.

Page 32

Q.    Do you know who drafted this in terms of law firms?

A.    Unfortunately, I don't know who drafted it.

Q.    Okay.

And you testified that there was a corresponding obligation for $751,000.  I'm going to share Exhibit 10.

Do you recognize this document?

A.    Yes.  This is a promissory note between RE Developers and Blue Castle Holdings.

Q.    Okay.  And the amount, again, is the $751,000.

A.    That's correct.

Q.    Okay.  I'm going to go to -- back to Exhibit 21 and look at the very top page of that.

Do you see this?

THE COURT:  I'm sorry, where --

(Multiple voices.)

THE COURT:  You're back on 21.

MR. ROTHSCHILD:  Exhibit 21.

Q.    (By Mr. Rothschild)  And can you tell me what this -- this first page of Exhibit 21 shows?

A.    So this -- this is the QuickBooks file -- in RE Developers books that reflect the history of

Page 33

the note payable between RE Developers and Blue Castle Holdings.

And so you -- you can see along the debit column, multiple dates, those are payments made against that promissory note.

Q.   Were these cash payments?

A.   Yes.

Q.   And so the -- the note from RE Developers was -- was paid down.  Were there any other extensions of credit on it?

A.   There were.  As you can see, on December 19, 2023, there is an additional million dollars that was an advance from Blue Castle Holdings's bank account to RE Developers.

As you look at the promissory note, there's a -- some language that's like a line of credit.  And so on December 19, there was an additional million dollars advanced to RE Developers from Blue Castle's bank account.

Q.   And these payments, were they made as -- as of these dates that are listed here?

A.   They are.  And they're supported by the subsequent pages which show the dates the actual bank -- or actual payments left and received from the bank.

Page 34

Q.   And so these were not, as Ms. Wilden said, created after the bankruptcy was filed, correct?

A.   That is correct.  With the exception of the bottom two.

Q.   The -- oh payments on 6-24 and 7-30 that were made.

A.   Correct.

Q.   And in looking at this, can you tell me whether that $751,000 original debt has been paid off?

A.   So the original advance amount was $751,000.  An additional million dollars, it was advanced in December.  There's currently a $261,000 balance.  So on the million four, more than $751,000 has been paid back.

Q.   Thank you.

Now let's go to the other side of that transaction, which was the loan from SmartFi to BCH in the amount of $751,000.  Do you recall that?

A.   Yes, I do.

Q.   And I'm going to show you Exhibit 16 now.

Do you see this?

A.   I do.

Q.   What is -- what does this show?

A.   Again, this is a QuickBooks report out of

Page 35

Blue Castle Holdings's Books, reflecting the detail of the transactions of the $751,000 promissory note between Blue Castle and Power Block Coin.

Q.   And was it entirely paid off?

A.   Yes, it was.

Q.   So, to be -- to be succinct -- one million dollars -- one million one thousand dollars was transferred to RE Developers from Power Block Coin, correct?

A.   That is correct.

Q.   $250,000 of it was returned in cash almost immediately, correct?

A.   Correct.

Q.   And the remaining $750,000 plus -- was paid back; is that correct?

A.   That is correct.

Q.   With interest, correct?

A.   Paid to Blue Castle Holdings, that's correct.

Q.   Paid to Blue Castle Holdings.  And did Blue Castle Holdings pay it to the debtor?

A.   Well, Blue Castle Holdings paid down the debt to the debtor.

Q.   That's what -- that's what I was asking.

A.   Yes.

Page 36

Q.    Let me walk through another document to explain a few things here.

Would you take a look at Exhibit 9, please?

Recognize this document?

A.    I do, yes.

Q.    Can you identify Exhibit 9 for us, please?

A.    This is a management services agreement between Blue Castle Holdings and Power Block Coin to provide services from Blue Castle Holdings to Power Block.

Q.    (Inaudible) -- was this created after -- after the petition date?

A.    No.  No, it wasn't done.

Q.    What was the reason for the creation of the management services agreement?

A.    In December(ph) of 2023, Power Block Coin lost its bank accounts and at that point, there was still obligations to Blue Castle -- excuse me, Power Block Coin was incurring.  And as -- as Blue Castle Holdings still had banking abilities, Blue Castle Holdings paid for Power Block Coin expenses on its behalf.  And this management services agreement outlines how that would be done with -- with an additional administrative fee on top of the actual

Page 37

expenses incurred.

Q.    What's that fee?

A.    Ten percent.

Q.    Did you negotiate that?

A.    Yes, we did.

Q.    Did you shop around with other entities that would provide this type of service?

A.    We did not, no.

Q.    Are you aware of any other entities that would front(ph) a bank account for a cryptocurrency exchange's expenses?

A.    I wasn't there then and I'm not aware of any.

Q.    What are the types of expenses that Blue Castle pays on Power Block's behalf?

A.    So there's independent contractors that provide software development, IT services, accounting, human resources, customer service, management services are all software services, business subscriptions, those are all the type of expenses that Power Block Coin incurs and Blue Castle pays on their behalf.

Q.    Let me just take a few of those.

Software development, does Blue Castle have software developers for its business.

Page 38

A.    It does not.

Q.    So if it pays a fee for an independent contractor doing software development, can you tell me with certainty that that is 100 percent allocable to Power Block Coin?

A.    Yes, I can.

Q.    I think you said accounting and -- but let -- let me ask, does that include professionals and legal?

A.    Accounting services, there's internal and external.  So, yes, it would include both internal accounting personnel in addition to outsourced retained financial services.

Q.    So let me ask you, Ms. Wilden, in her opening, said that the -- that Blue Castle paid for Parsons Behle.  Do you agree with that characterization or is there another way that you -- you'd phrase that?

A.    In the period of time when Power Block Coin lost its bank account, up through the petition days, Blue Castle paid for legal services incurred by Power Block Coin.

Q.    And charged its fee, correct?

A.    That is correct.

Q.    And so I want to call you back -- your

Page 39

attention back to Exhibit 16, this ledger showing the complete payoff of the -- of the funds that were owed to Power Block Coin by Blue Castle.

Do you see this.

A.   I do, yes.

Q.   And what is your understanding of -- of these debits?

A.   So the -- the debits are -- on a monthly basis, you would go through all expenses paid for by Blue Castle Holdings and delineate the ones that related specifically to Power Block Coin and identify that amount plus the 10 percent administration fee and that amount was used to reduce the corresponding amounts payable between Blue Castle and Power Block Coin.

Q.   And in doing that, Power Block Coin's note was -- this note was entirely retired, correct?

A.   In April of 2024, that's correct.

Q.   So several months before the petition date was filed.

A.   That is correct.

Q.   Did Blue Castle make -- borrow any other funds from Power Block Coin?

A.   Yes, there was an additional note.

Q.   Is this that note?

Page 40

A.    Yes, that is the note.

Q.    And --

THE COURT:  Mr. Rothschild?

MR. ROTHSCHILD:  Yes.

THE COURT:  You're referring to an exhibit?

MR. ROTHSCHILD:  Sorry.  Exhibit 11, I put in front of the witness.

Q.    (By Mr. Rothschild)  Can you identify this document for us?

A.    This is a promissory note between Blue Castle Holdings and Power Block Coin for (inaudible).

Q.    And to your knowledge, has this been paid completely?

A.    It has not.  It's been partially paid but it has not been paid in full.

Q.    I'm going to show you Exhibit 17.

Do you recognize this document?

A.    I do, yes.

Q.    And can you explain what this document shows?

A.    Well, this is the QuickBooks detail accounting of the promissory note between Blue Castle Holdings and Power Block Coin.

Similarly, to the -- the first note we

Page 41

talked about, we paid down the first note, the $751,000 note.  Once that was paid down, as you can see, starting -- the small credit amounts are the monthly interest amounts on the note.  And then, starting in April of 2024, those intercompany payments paid for on behalf of Power Block Coin by Blue Castle Holdings were used to reduce the balance of the $1.4 million promissory note.

Q.     And the current balance remaining?

A.     Approximately 1.1 as of June 30.

Q.     And is this money owed to the debtor that the debtor is proposing to use to allow Power Block Coin to meet its expenses through Blue Castle?

A.     Can you restate that?

Q.     Sorry.  I'll make it -- I'll break it into pieces.

So there's still money that Blue Castle owes to Power Block Coin, correct?

A.     That is correct.

Q.     And under the Management Services Agreement, if the Court approves it, the Court -- Blue Castle will make payments, for example, to its employees or on an -- an approved fee application to its lawyers or otherwise.  And Blue Castle would make that payment and debit it from this note.  Is that

Page 42

your understanding?

A.    Yes, that is correct.

Q.    Okay.  So Ms. Wilden questioned whether there was money coming into Blue Castle that could be used to pay Power Block Coin.

So I'm going to go back to Exhibit 21 again.

Again, this ledger is showing what?

A.    These are -- this is the detail of the promissory note between RE Developers and Blue Castle Holdings.  All the debits down the column, in the debit column, are payments made by RE Developers back to Blue Castle Holdings.

Q.    So has RE Developers, based on your reading of this, been making sometimes two-times-a-month payments on its note?

A.    Yes, that is correct.

Q.    And do you expect RE Developers will continue paying on this note?

A.    Yes, that's my expectation.

Q.    Do you know where RE Developers will get its money to pay on this note?

A.    The development of the property that Solara Communities owns.

Q.    I'm going to show you Exhibit 2.  Can you

Page 43

identify this document?

A.   This is an option to purchase agreement or an option to purchase land, between RE Developers and VA Corp, Inc.

MR. JOHNSON:  Your Honor, this is Mr. Johnson.  Just the same request.  This is a document between, you know, RE Developers and VA Corp.  It does have some confidential information in there; option terms, payment terms, things like that.

I don't have any objection to the witness talking about it, the Court seeing it, the parties here seeing but it should be restricted from public view.

THE COURT:  And how would you suggest we do that?

MR. JOHNSON:  Well, that's a good question.

I don't think these were actually filed with any pleadings and so I don't know that the Court needs to enter or receive them, just probably note it on the -- on the -- on the docket or as part of the hearing.  And then, obviously, if a third party wanted to see the exhibits, a third party, not somebody here, we would, you know, ask the Court not to just make those available.

Page 44

THE COURT:  Well, I -- I think I'm going to rely on you to make a list of documents you think are confidential and we'll talk about that later, okay?

I'm sorry, I was making my notes.

What exhibit are we on right now, Mr. Rothschild?

MR. ROTHSCHILD:  This is Exhibit 2.

Q.   (By Mr. Rothschild)  So as not to go into too much depth on this, can you briefly describe what your -- putting on your RE Developers controller's hat, can you tell me what -- what this document says, according to your understanding?

A.   My understanding is this is an agreement that allows a third party an option to purchase land and the -- and the option payments would be made over a period of six months.

Q.   And again, this is not the sale of land, this is a sale of an option to purchase land, correct?

A.   That is correct.

THE COURT:  But this is the Solara property?

MR. ROTHSCHILD:  Mr. Jones?

THE WITNESS:  Yes, this is the option to

Page 45

purchase land, that 200 acres that's zoned by Solara Communities.

THE COURT:  A portion of it.

THE WITNESS:  That is correct.

Q.    (By Mr. Rothschild)  And the purchase price for this option, do you know how much in total RE Developers expects to earn on this option?

A.    Just north of $700,000.

Q.    Do you know the amount of Parsons Behle's prepetition fees?

A.    Just north of $200,000, I think.

Q.    And we saw on Exhibit 21 a moment ago that approximately how much is -- or how much is owed on the RE Developers note to Blue Castle?

A.    As of July 30th, 261,000.

Q.    Has money started coming in on this option agreement?

A.    Yes, there has.

MR. ROTHSCHILD:  Your Honor, I'm going to show Exhibit 19.

Q.    (By Mr. Rothschild)  Can you identify Exhibit 19 for us, please?

A.    This is a screenshot of the RE Developers checking account at Hillcrest Bank just about a week ago.

Page 46

Transcript of Electronic Recording - 8/20/2024

Q.    And -- and can you describe whether this shows what I was asking about a moment ago, money coming in on the option agreement?

A.    So, on August 7th, there's a $100,000 wire that came in from the biomedical agency that -- that relates to that option purchase (inaudible).

Q.    And do you know -- and, again, wearing your RE Developers hat, whether RE Developers intends to use some of the money coming in to pay down the Blue Castle note?

A.    Yes, that is the intention.

Q.    And will it still have additional funds left that it can use for its own operations?

A.    Yes, it will.

Q.    I'm going to show you Exhibit 20 here.  Do you recognize this document?

A.    I do, yes.

Q.    Okay.  Can you describe what -- what this report is?

A.    This is a QuickBooks report out of RE Developers books that is an audit trail report that QuickBooks generates, reflecting transactions in the books.

Q.    So using this audit trail, does it -- what does it show about when transactions are entered into

Page 47

the QuickBooks?

A.   So it -- the -- the date column there is one, two, three, four, five -- five columns over. That is the date that the transaction was originally entered.

And then the second column over is if there's any alterations or changes to those -- those originally posted entries.

Q.   Last modification to these things.

A.   That's correct(ph).

Q.   Okay.   So in your view as a CPA, were these transactions entered into the QuickBooks contemporaneous with the bank transfers or checks?

A.   Yes.   As you can see, the -- the original date the transactions were entered were May -- recent -- most recently modified in August of 2023.   And so those -- those were entered as the transaction happened and cash was actually transferred back and forth between checking.

MR. ROTHSCHILD:   Okay.   Just a moment, Your Honor.   I may -- may be done with Mr. Jones.

Q.   (By Mr. Rothschild)   Oh, putting on your Blue Castle hat for a moment.   Is -- are you aware whether Power Block Coin, the debtor, still owes Parsons Behle for pre-petition fees?

Page  48

A.    Not to my knowledge, no.

Q.    But Parsons Behle did pre-petition work for the debtor, SmartFi, correct?

A.    That is correct.

Q.    And does -- who owes Parsons Behle for those fees now?

A.    Blue Castle Holdings.

Q.    If you are instructed to pay Parsons Behle for those pre-petition fees from Blue Castle, will that amount be debited from the Blue Castle notes still outstanding to -- to Power Block Coin?

A.    No, it's unrelated to Power Block Coin.

Q.    Is it -- whose obligation is it at this point?

A.    Blue Castle Holdings's obligation.

Q.    In your position as an accountant and controller for SmartFi, does -- does Parsons Behle and Latimer have a pre-petition claim against SmartFi?

A.    Not to my knowledge, no.

Q.    Is there any accounting entry showing that Parsons Behle & Latimer is a creditor, account payable to SmartFi?

A.    No.

MR. ROTHSCHILD:  Okay.  Your Honor, I'll

Page 49

tender Mr. Jones with the right to cross-examination.

THE COURT: All right. Let's start with Ms. Wilden.

MS. WILDEN: Thank you, Your Honor.

I'm going to ask my paralegal, Rachelle Armstrong, to share these exhibits as I call them.

I'd like to start with Exhibit C, U.S. Trustees' Exhibit C.

And some of these Mr. Jones will have already seen but I'm going to present some. And I'm going to use my exhibit letters rather than the numbers because that's what's in my notes.

So, Rachelle, if you could please share Exhibit C.

CROSS-EXAMINATION

BY MS. WILDEN:

Q. Now, this is the bank statement that you've already seen for April 2023.

MS. WILDEN: Scroll down a little bit, Rachelle, so we get to the highlighted entry.

Whoops. No. Go back to page one.

Q. (By Ms. Wilden) Okay. The $1 million on April 3rd. And you testified that the intent was to have that money go through Blue Castle Holdings.

Veritext Legal Solutions
calendar-utah@veritext.com 801-746-5080

Was that intention to have that money come from Blue Castle Holdings recorded in any board meeting minutes?

A.    Not to my knowledge.

Q.    Was there any board resolution about the funding for RE developers?

A.    Not that I'm aware of.

Q.    So was there any written decision about where RE developers' initial funds would come from?

A.    Not that I'm aware of, no.

Q.    Thank you.

MS. WILDEN:  Let's go to Exhibit J.  This is the RE Developers' audit trail.

Rachelle, if you could collapse the right side, maybe that'll make this font a little bigger.

The right side.  The comments and so forth.

THE COURT:  Ms. Wilden, you said Exhibit J?

MS. WILDEN:  Exhibit J.

Q.    (By Ms. Wilden)  And this is the RE developers' audit trail that Mr. Rothschild did ask about.

Okay.  So there's a date in the top left-hand corner, 8-7-2024.  What does that date

Page 51

mean?

A.    The date that this report was generated.

Q.    Okay.  So that was just a couple weeks ago.  But the entries were entered before August 7th, is that correct?

A.    That is correct.

Q.    Okay.

MS. WILDEN:  Rachelle, if you could scroll to the second page in this exhibit, just one page down.

So -- okay.  Go back up.  Page 20.

All right, stop right there.

Q.    (By Ms. Wilden)  Okay.  So four lines up from the bottom of that document, there's a date, May 5-11-2023.  You see that date?

A.    I do.

Q.    Okay.  Going over, the next column says, "Admin prior," and then the transaction date is 4-3-23.  Do you see that?

A.    I do.

Q.    And then the next column, I'm just reading across is, "Power Block Coin, deposit initial capital infusion."  And then the next column is, "Hillcrest Bank checking loan payable for $1 million."  Is that -- is that correct?

Page 52

Transcript of Electronic Recording - 8/20/2024

A.    Yes.  I'm losing track of which line we're looking at.

Q.    Same one all the way across.

A.    I don't see the bottom of the document, so I can't tell you from the bottom.

MS. WILDEN:  Rachelle, can you --

There you go.

A.    Four up from the bottom?

Q.    Four up from the bottom.

A.    Okay.  I can see that.

Q.    Okay.  Is that April 3, 2023 date, is that the date that Power Block Coin transferred $1 million into RE Development's Hillcrest Bank account?

A.    That's correct.

Q.    And it was booked as an initial capital infusion?

A.    Is this RE Developers?

Q.    Yes.

A.    Will you scroll to the top so I can see the -- I think it's on the top of the --

Yes, this is RE Developers, so it shows the capital infusion, yeah.

Q.    Okay.  All right.  And then the next line out from that one we just looked at is, again, the date is April 3, 2023 and there's been a change made

Page 53

and now it says Hillcrest Bank MM account but it's still loan payable Power Block Coin.  What was that change -- why was that change made?

A.    Because it wasn't -- it was setting up the loan as opposed to an equity infusion.

Q.    Okay.  Next line up, the transaction date is, again, 4-3-2023 but the entry date, you'll notice there on the far left, is August 2, 2023.  Do you see that?

A.    Uh-huh (affirmative).

Q.    Okay.  And then going across, this is still Power Block Coin, initial capital infusion. And now it says, members' equity for the $1 million.

So the way I read this, on August 2, 2023, the internal accounting reflected that Power Block Coin had $1 million as members' equity in RE Development.

Is that what this is telling us?

A.    On August 3rd, that's what it's saying.

December 19th, it's changed to a loan payable Blue Castle Holdings.

Q.    Okay.  Good.

So the next line up is the first time in the internal accounting that this members -- this deposit of equity from Power Block Coin is changed to

Page 54

a loaned Blue Castle Holdings on December 19th, 2023.

Okay.  And I believe this is the --

Well, I'm -- I'm not -- Okay.

So keep that 12-19-2023 date in mind.

MS. WILDEN:  And Rachelle, just scroll back up to the first page in this same exhibit.  So just one page up.

Okay.  Stop there.

Q.    (By Ms. Wilden)  And you see four lines down, There's check 1024.  The date on that -- what's the date of that check?

A.    12-19-23.

Q.    And how much was the loan payment made that day?

A.    $80,000.

Q.    Okay.  So the internal accounting was changed to reflect this as a loan payable to Blue Castle Holdings on the same date that RE developers started making substantial loan payments.

A.    There wasn't any change to this transaction.  No.  That's how it was recorded.

Q.    I'm sorry.  Originally, it was members -- it was an initial capital contribution and then members' equity.  I --

A.    Now, this particular transaction, that's

Page 55

not correct.

Q.   Okay.

MS. WILDEN:  Rachelle, go back down to that second page again.

Okay.  Stop there.  Okay.  We --

Q.   (By Ms. Wilden)  Those four lines we just discussed, three of them said it was Power Block Coin and on December 19th the name was changed to Blue Castle.

A.   None of it has to do with check 1024 you just referred to.

Q.   That's when the debtors -- that's when RE developers started paying off a loan though, right?

A.   That's when check 1024 was cut.

Q.   Which one was being paid?

A.   The only one that RE developers has to Blue Castle Holdings.

Q.   And which one is that?

A.   A loan for $751,000.

Q.   Okay.  And that is -- is that not the -- the loan that's on this -- we're looking at it right now, date's 12-19-2023.  Loan payable, $750,000.  Is that not this loan?

A.   It is, yes.

Q.   Okay.  So check 1024 was being used to pay

Page 56

this loan.

        A.    That is correct.

        Q.    Okay.

              MS. WILDEN:  Go back up to that first page, Rachelle.

        Q.    (By Ms. Wilden)  All right.  So there are 15 lines in this audit report showing check payments. And Mr. Rothschild showed us a -- a list of the loan payable.  So, anyway, this is just an expansion of that where we see the check numbers where the loan payments are made to Blue Castle Holdings.

              Now, was any of this money that has been paid back on the loan produced by RE Developments operating revenue?

        A.    No.  At that point in time, there wasn't any inflowing cash into RE Development.

        Q.    Okay.  So this money that's being used to make payments on the loan is simply the money that was deposited into the bank account by another entity, correct?

        A.    Correct.

        Q.    Okay.  Why isn't RE Development keeping the money to use for developing the property?

        A.    There were also payments made throughout this -- I don't know about this specific period of

Page 57

time but for various other development expenses.

Q.   So RE Development has so much money that it could pay back most of the loan and pay its operating expenses?

A.   It had adequate money to do both, yes.

Q.   Okay.  Okay.  But just -- the point is that these loan repayments came from the loan proceeds; is that correct?

A.   It came from the money that was in the account, yes.

Q.   Yes.  And what was in the account was the loan proceeds.  Okay.

MS. WILDEN:  Let's go to Exhibit D, please, Rachelle.

Q.   (By Ms. Wilden)  And Brian has already showed -- I'm sorry.  Mr. Rothschild has already showed you this exhibit.  This is the promissory note for $751,000 between Blue Castle and RE Development.

Do you know when this --

A.   That is incorrect.

Q.   I'm sorry.  Say that again.

A.   That is incorrect.

Q.   Go ahead then.

Oh, that's Power Block Coin.  Excuse me, I mislabeled my exhibits.

Page 58

Just one second. Let me find the one I'm supposed to be on.

MS. WILDEN: Exhibit G. G as in golf.

Rachelle?

Give her just a minute and then I'll do a screen share on my own.

MS. ARMSTRONG: I'm trying to get it. Sorry. That was just one that we didn't pull, so I had to go in and get it.

MS. WILDEN: Thank you.

Okay. I found it, so I'm just going to do a screen share here. Okay.

That's not the one we're supposed to be looking at.

Rachelle, that's the wrong screen.

Thank you.

Okay. Rachelle, I'm going to do -- you work on that.

I'm going to -- I've shared -- no, I didn't. Sorry about this.

There it is. Okay. Perfect.

Q. (By Ms. Wilden) All right. So, Mr. Jones, do you recognize this document?

A. Yes, I do.

Q. Okay. Mr. Rothschild already asked you

Page 59

Transcript of Electronic Recording - 8/20/2024

about this.  The effective date is April 3rd, 2023.

Do you know when this document was created?

THE COURT:  Ms. Wilden, let's, just for the record, identify Exhibit G.

MS. WILDEN:  Sorry.

Q.   (By Ms. Wilden)  Exhibit G is the promissory note for $751,000 between RE Developers and Blue Castle Holdings.  The effective date is April 3rd, 2023.

Okay.  Mr. Jones, do you know when this document was created?

A.   A couple of weeks ago.

Q.   I'm sorry.

A.   A couple of weeks ago.

Q.   A couple of weeks ago.  Why was this document created?

A.   To memorialize the loan between RE Developers and Blue Castle Holdings.

Q.   Thank you.

MS. WILDEN:  Rachelle, scroll down just a couple paragraphs.  Let's look at the maturity date.

All right.  Stop there.

Q.   (By Ms. Wilden)  The maturity date is April 2nd, 2030.  So, does RE Developers have any

Veritext Legal Solutions
calendar-utah@veritext.com 801-746-5080

legal obligation to pay this loan off before 2030?

A.    No.

Q.    So, any prepayment would be entirely voluntary; is that correct?

A.    Yes.

Q.    Thank you.

Was there a reason the loan -- this promissory note was not written directly between Power Block Coin and RE Developers?

A.    That was never the intention.

Q.    But that intention was not written down anywhere, correct?

A.    It was added in spite of payments that were made.

Q.    After this was done.  Okay.  Thank you.

(Multiple voices.)

A.    All those payments were done before this promissory note.

Q.    Okay.  So you -- you created a promissory note about two weeks ago for a loan that's already been paid off; is that correct?

A.    Yes.

Q.    Okay.

A.    No, that's not correct.  The loan hasn't been paid off.  There's still an outstanding balance

Page 61

on this loan.

Q.   Okay.

All right.  So, let's go to -- let's go to debtor's Exhibit 15 and talk about that outstanding balance.

Okay.  So this is one that Mr. Rothschild has already shown you.

MS. WILDEN:  Rachelle, if you could just increase that, resize that a little bit, make it easier to read.

Q.   (By Ms. Wilden)  Now, the 8-7-2024 date in the top left corner is the date this document was created, correct?

A.   Yes.  This is when it was generated out of QuickBooks, yes.

Q.   Okay.  Were all of these entries already in QuickBooks or did you have to go through and put these entries in?

A.   As evidenced by the audit report, they were already -- they were in there and done contemporaneously.

Q.   Okay.  Thank you.

Okay.  So, this first line that Mr. Rothschild walked you through is the note payable for $751,000.  And then the second line is for

Page 62

$250,000 and I believe you testified that that was the return of the equity to Power Block Coin, the debtor; is that correct?

A.    That is correct.

Q.    Why does the return of the equity reduce this $751,000 loan between Blue Castle and RE Developers?

A.    That note was paid -- or that amount was paid back to Power Block Coin.  It appears that maybe it shouldn't reduce the note value.

Q.    Okay.  So that may have been an error.  Okay.

And then the third line we have on December 8, 2023 a transfer of funds for $1 million.  Is this a new loan?

A.    No.

Q.    This was -- explain to me how this relates to the $751,000 promissory note.

A.    Inside the documents -- the promissory note, the language is that it can act as, essentially, a line of credit where additional funds can be advanced to RE Developers.  That's what happened here on December 8, 2023.  Additional funds of $1 million from Blue Castle Holdings was sent from Blue Castle Holdings bank account to RE Developers.

Page 63

Increasing the amount of the loan by $1 million.

Q.    Okay.  Thank you.

And do you know where Blue Castle got the $1 million in funds that it loaned on December 8?

A.    Out of its bank account?

Q.    Okay.  And how -- where did the $1 million come from that was in the bank account?

A.    There was in excess of $1 million in the Blue Castle bank account for a couple of consecutive months prior to that.

Q.    Okay.  Was the -- that money from the $1.4 million loan previously extended by the debtor?

A.    That's (inaudible).

THE COURT:  I didn't hear the answer.

A.    I can't speak to that.  I don't know for sure, not without looking at the details of the bank account and seeing what the transactions were months before that, I can't speak to that.

Q.    Okay.  It doesn't look like we have the bank accounts going that far back.  So -- okay. Let's go to Debtor's Exhibit 21.

And again, this is one that Mr. Rothschild had shown you.  And this is the other side of this loan proceeds.  This is from the books of RE Developers, correct?

Page 64

A.    Yes.

Q.    Okay.  So, again, we see the -- the opening loans.  One is $1,000 just to open the account.  And then $750,000.  And then on May 2nd, again, we see the wire to Power Block Coin.  It's -- here it's booked as a loan payment although you testified it was a return of equity.  And then it looks like this $250,000, again, reduced that $751,000 loan balance because that was equity, is your testimony.

I mean, it would be the same as the last document where that was not supposed to reduce the -- the loan amounts, correct?

A.    Yes.  That's correct.

Q.    Okay.  Okay.

Okay.  That's all on that one.

Let's go to Debtor's Exhibit 17.

All right.  And this is another one that you have seen from Mr. Rothschild.  And this is the $1.4 million loan that the debtor made to Blue Castle in August of 2023, correct?

A.    Yes.

Q.    Okay.  So if you look at the balance on the -- the side, you can see that there was over a million dollars from this note available for -- you

Page 65

know, if -- if Wells Fargo transferred money out of its bank account for that new December 8th million dollar transfer into RE Developers, it very well could have come from these loan proceeds, correct?

MR. ROTHSCHILD:  Objection.  Calls for speculation.  Facts not in evidence.  Foundation.

THE COURT:  Yeah.  The main thing is I don't understand the question.

So, why don't you back up and try it again.

MS. WILDEN:  Okay.

Q.    (By Ms. Wilden)  I'm getting at the source of the $1 million that Blue Castle Holdings transferred into RE Developers' bank account on December 8th, 2023.  And on this -- this document shows that on August 7th, 2023, the debtor transferred $1.4 million to Blue Castle Holdings, correct?

A.    Yes.

Q.    Okay.  And as of December 2023, Blue Castle Holdings still had the full balance of that money, correct?

A.    You'd have to show me a bank statement.  I don't know.

Q.    Okay.  Well, on this loan -- on this

Page 66

Case 24-23041   Doc 155   Filed 08/29/24   Entered 08/29/24 09:14:40   Desc Main
Document      Page 67 of 237
Transcript of Electronic Recording - 8/20/2024

transaction report, it shows that there was the payment and then there was interest and the loan hasn't been paid back.

A.    That doesn't reflect the balance in Blue Castle's bank account.

Q.    Okay.

A.    That's the balance in the note.

Q.    Okay.

Yeah.  Yeah.  The -- some of these other transactions included the supporting bank statements and this one did not and I don't know why but you're correct, we can't see that bank account balance.

Okay.  Mr. Rothschild covered some of this stuff so I'm just going through to see if I still have questions.  I apologize for the delay.

Okay.  All right.  So the -- the other thing I want to draw your attention to on this is the journal -- general journal entry data June 30th, 2024 and the debit amount is $138,000 in change.

Do you see that?

A.    I do.

Q.    Okay.  We're going to go to another document to kind of break that out.  So let's go to Exhibit I.

Okay.  Very small print.

Page 67

Veritext Legal Solutions
calendar-utah@veritext.com 801-746-5080

MS. WILDEN:  Rachelle, to the extent you can make that a little bit bigger, that would be great.

Okay.  And then go to -- Rachelle, go to page 39 out of 116.  This is the audit file for Blue Castle Holdings.

THE COURT:  I'm sorry.  These are Bates stamped.  Which -- which page are we on?

MS. WILDEN:  We are on 93.  Oh, that's a good -- okay.

THE COURT:  That's the first page of Exhibit I.

MS. WILDEN:  Yes.  The first page of Exhibit I is 93.

One second.  I'm just trying to get to that easiest way to get to that.  Yeah.  It'll be page 16 out of 33 now that you've got them.

So page 16.  And then if you could increase the size of it and go down to that highlighted line.

THE COURT:  I'm sorry, Ms. Wilden.  When you say page 16, what are you referring to?  Sorry.  I'm looking at the PDF.

It's Bates stamped 108.

MS. WILDEN:  Okay.  Stop right there,

Page 68

Rachelle.  Thank you.

Q.    (By Ms. Wilden)  Okay.  So, Mr. Jones, you see this entry I've highlighted?  This first date, July 25, 2024, is that the date that you made the change in the -- in the bookkeeping?

A.    Yes.

Q.    And it's as of June 30, 2024.

A.    Yes.  Correct.

Q.    All right.  I've highlighted the professional and legal fees.  The amount is $35,370.  So did that amount actually leave Blue Castle's bank account and go to another entity?

A.    Yes, it did.

Q.    And who would Blue Castle have paid?

A.    Ampleo.

Q.    And what does the PVC 2 mean?

A.    Apply towards the -- there's a PVC 1 note for 751 and PVC 2 is the $1.4 million note.

Q.    Okay.  Okay.  So let's just look at the other expenses that made up that $138,000 for June.  And the first line in that little segment is development stage expenses management fees for $25,500.

Who was that paid to?

A.    I'm going to speculate a little bit

Page 69

Transcript of Electronic Recording - 8/20/2024

because I can't see the detail of that but I think that was to Aaron Tilton.

Q.    To Aaron Tilton?

A.    Yes.

Q.    So that would have gone to AT Management.

A.    Yes.

Q.    Aaron Tilton receives his distributions through AT Management, correct?

A.    That is correct.

Q.    Okay.  And then below the highlighted line is professional fees, accounting and audits.

MS. WILDEN:  And Rachelle, go over -- let's look at the amount for that.

Q.    (By Ms. Wilden)  Okay.  It's $12,500. Would that amount have left the bank account?

A.    Yes.

Q.    Who would that have been paid to?

A.    Me and another accounting clerk at Blue Castle Holding.

Q.    So, is this a salary?

A.    No.  I'm paid as an independent contractor as well and so is that other individual.

Q.    Okay.  Consulting fees for $8,250, did that leave the bank account?

A.    No, it didn't.

Page 70

Q.    Who was it paid to?

A.    Likely Tom Retson and Rob Draper. Although, Tom Retson is paid through Energy Path, (inaudible) Energy Path and Rob Draper.

MALE SPEAKER:  Your Honor, I hate to interrupt but, you know, Ms. Wilden is asking Mr. Jones about payments to unrelated -- to -- to other people out of the Blue Castle bank account.  I don't really understand what that has to do with the Parsons Behle fee appli -- or employment application.

MS. WILDEN:  May I answer that, Your Honor?

THE COURT:  This is a debit on the Blue Castle obligation to the debtor, correct?

Somebody answer me.

MS. WILDEN:  Yes, Your Honor.

MR. ROTHSCHILD:  Your Honor, we stipulate this is relevant.  It just shows the amount you were debited from the --

THE COURT:  All right.

MS. WILDEN:  Mr. Rothschild, I can't hear you.

MALE SPEAKER:  Understood.  I'll withdraw my objection, Your Honor, now that I understand.

MS. WILDEN:  Your Honor, we're also

Page 71

presenting the evidence about the banking motion and Mr. Burne is going to be handling that.  But some of this breakdown on what's being withdrawn from the -- what the debtor's operating expenses are is going to be relevant for our ongoing objection to the banking motion.  So some of this is --

THE COURT:  Let's -- let's hold it until then.

MS. WILDEN:  Okay.  Okay.

Q.    (By Ms. Wilden)  So, just one other question on this one.

The management service fee income for $12,599, does that leave the bank account?

A.    No.

Q.    That stays -- that's Blue Castle's money, correct?

A.    That -- that is just applied towards the note.

Q.    All right.  Thank you.

MS. WILDEN:  All right.  Okay.  So Rachelle, scroll up to page 12 and just a minute, I will give you the Bates number.

It's Bates number 104.

And again, we're looking at an entry made July 27th, so just a couple weeks ago.  I've

Page 72

highlighted the line for professional and legal fees for $29,143.

Did that go out the door to Ampleo?  Do you know who received that?

A.   Probably a combination of multiple professional providers.

Q.   I'm sorry, a combination of what?

A.   Multiple professional providers, service providers.

Q.   Okay.  Which would be Ampleo and who else might have received some of that?

A.   Potentially Parsons Behle.

Q.   Anyone else that you know of?

A.   I don't know.  I'd have to look at the books and see.

Q.   All right.  Thank you.  That's all on this one.

Let's go to Debtors Exhibit 19.

All right.  And you're the Chief Financial Officer of RE Developers, correct?

A.   I'm the Chief Financial Officer (inaudible).

(Multiple voices.)

THE COURT:  Your -- your response was muddled there, Mr. Jones.  Can you state it again?

Page 73

THE WITNESS:  (Inaudible.)

THE COURT:  Your microphone is not working very well.

THE WITNESS:  I'm not sure what you want me to do, Your Honor.

MS. WILDEN:  That was clear.

I apologize, Your Honor.

THE COURT:  All right.  Could you answer the question, Mr. Jones?

A.    I'm the Chief Financial Officer of Blue Castle Holdings and act in that capacity for its subsidiaries.

Q.    (By Ms. Wilden)  Thank you.

All right.  So can you describe to us what are the general monthly operating expenses of RE Developers?

A.    It just varies depending upon what activity is going on in developing the land.

Q.    Is it currently grading roads?

A.    No.

Q.    Is it installing infrastructure?

A.    No.

Q.    Is it -- do you know -- has it secured water rights for that development?

A.    In the process.

Page 74

Q.    What does in the process mean?

A.    Again, I'm -- I'm responsible for recording the transactions.  I'm not responsible to participate in the development of the land.  So, I'm only going to have visibility to the invoices that come in.

Q.    Okay.

A.    Those questions are probably better directed towards Mr. Tilton.

Q.    Thank you.  I will direct those to Mr. Tilton.

All right.  I was going to note that the -- before this $100,000 payment on the auction came in, there's only about $11,000 in the operating -- in the bank account.

Do you know if that's sufficient to meet RE Development's operating expenses for July?

A.    I don't think there's a lot of development activity going on in July, so I would say yes, but again, I -- I don't have visibility to where -- where that is.  That's probably better suited for Mr. Tilton.

Q.    All right.

MS. WILDEN:  Thank you, Your Honor. That's all the questions I have for this witness.

Page 75

THE COURT:  All right.  Let's take a 10-minute break before -- I'm sorry, is it Mr. Hershey or Ms. Jarvis is going to take over?

MR. HERSHEY:  Your Honor, it's Sam Hershey, I'll take over.  And I probably have five or ten minutes of questions I would estimate.

THE COURT:  All right.  Let's take a brief recess and we'll come back in about 10 minutes.

MS. WILDEN:  Thank you, Your Honor.

MR. HERSHEY:  Thank you, Your Honor.

(Brief recess.)

THE CLERK:  The Court resumes its session.

THE COURT:  Welcome back.  I think I -- before we get into the further cross-examination by the other parties, I think I understand the debtor's explanation.  I appreciate Mr. Jones' testimony in that regard.

But Mr. Jones, one question I have for you longer term before I make a decision on the issues that are in front of me today, longer term, when is the last time this company, Power Block Coin, other than engaging in intercompany transfers, sold goods or services to anyone out in the world?

THE WITNESS:  As you might suspect, Your Honor, with -- with the inability to have a U.S. --

Page 76

THE COURT:  It's --

THE WITNESS:  -- bank account.

THE COURT:  It's just -- yeah.  You can have your -- your attorney can help you clean it up but just answer the question.

THE WITNESS:  Last month.

THE COURT:  And what did it do?

THE WITNESS:  (Inaudible.)

THE COURT:  Okay.  Your microphone, again, it cuts in and out.

Start that again.

THE WITNESS:  Transacted in cryptocurrency on its platform.

THE COURT:  Explain that.

THE WITNESS:  The assets that are on the platform, cryptocurrency, our clients have the ability to continue to transact in cryptocurrency on the platform, in which when those transactions occur, generates transaction fees on behalf of Power Block Coin.

THE COURT:  Okay.  That's not as helpful as you might think it is to me.

What happened?

THE WITNESS:  We -- we had a client that requested to have part of his cryptocurrency

Veritext Legal Solutions
calendar-utah@veritext.com 801-746-5080

withdrawn off of the platform, in which they can make that request and you process that transaction, they can withdraw cryptocurrency or, candidly, they can deposit cryptocurrency on the platform.

THE COURT:  All right.  And when you say, "Withdraw cryptocurrency," this is not cryptocurrency that Power Block Coin owns.

THE WITNESS:  That is correct.

THE COURT:  And so, when the customer withdraws their cryptocurrency, Power Block Coin earns some sort of commission.

THE WITNESS:  Transaction fee, yes.

THE COURT:  All right.  And so, for the month of July 2024, what was the total amount of transaction fees that this company recognized?

THE WITNESS:  I don't know the answer off the top of my head.  I can try to pull it up and see.

So, transaction fees, January through July of '24, is $10,828.

THE COURT:  For the entire seven months.

THE WITNESS:  Yes.  Specifically to the month of July, I don't have that in front of me.

THE COURT:  All right.  Any other revenue recognized by this company during that seven-month period besides the transaction fees of about $10,000?

Page 78

THE WITNESS:  Outside of the intercompany transactions, that's -- that's correct.

THE COURT:  Thank you.

All right.  Mr. Hershey, you're going to do it for your side?

MR. HERSHEY:  Yes, Your Honor, I am.

Good afternoon again.  Sam Hershey, White & Case Litigation Administrator.

Your Honor, before I ask the questions, I should probably do the same housekeeping that Mr. Rothschild did earlier and move the litigation administrator's exhibit into evidence.  Those are on our exhibit list at docket number 127.

THE COURT:  All right.  The binder that your co-counsel delivered has Exhibits 1 through 23; is that correct?

MR. HERSHEY:  That's correct, Your Honor.

THE COURT:  All right.  Without getting into the weeds, does anyone object to any of these exhibits?

MR. ROTHSCHILD:  (Inaudible), Your Honor.

MS. WILDEN:  No, Your Honor.

THE COURT:  I'm sorry, Mr. Rothschild, you said no or yes?

MR. ROTHSCHILD:  I'm objecting.  There are

Page 79

a number of declarations and pleadings that are
not -- for instance, Mr. Tilton's declaration, that
is hearsay, it's on the initial(ph) exhibit, that's
number 5.

THE COURT:  That's your client principal's
declaration.

MR. ROTHSCHILD:  Certainly, Your Honor.
It's fine for impeachment, you can cross-examine them
on it.  It's not -- it's not admissible evidence.

THE COURT:  It's on the docket.

MR. ROTHSCHILD:  I have no problem with
him using it that way.  There are other pleadings,
for instance, Exhibit 23 is a reply on the docket.
Generally, we don't admit pleadings that are on the
docket as evidence.

THE COURT:  All right.  Thank you, Mr.
Rothschild.

Exhibits 1 through 23 are received.

(EXHIBIT NUMBERS 1 THROUGH 23 ARE

RECEIVED.)

THE COURT:  Go ahead, Mr. Hershey.

MR. ROTHSCHILD:  Thank you, Your Honor.


CROSS-EXAMINATION

BY MR. HERSHEY:

Page 80

Q.   Good afternoon, Mr. Jones.  I know we've met before for your deposition.  I'm going to ask you a few more questions now.

Do you recall being asked some questions by Mr. Rothschild about Debtor's Exhibit Number 9, which is the Management Services Agreement between Power Block Coin and Blue Castle?

A.   Yes, I do.

Q.   And to your knowledge, does Blue Castle have management services agreements with any of its other subsidiaries besides the debtor?

A.   No, it does not.

Q.   Okay.  But to be clear, Blue Castle does provide certain services for those other subsidiaries, right?

A.   Yes.

Q.   Okay.  You testified earlier to Mr. Rothschild that under the Management Services Agreement, at the end of the month, you run a report and identify all the expenses that have been paid on behalf of Power Block Coin through that month, right?

A.   That is correct, yes.

Q.   Okay.  And to be clear, Power Block does not have any W-2 employees of its own, right?

A.   That is correct.

Page 81

Q.   So the employees who are deciding what expenses to allocate to Power Block are all Blue Castle employees, right?

A.   Yes.

Q.   And the employees who review whether that allocation is appropriate are also Blue Castle employees, right?

A.   No, they're not W-2 employees but --

Q.   I'm sorry, did you finish your answer?

A.   That's the end.

Q.   I asked if they were Blue Castle employees.  Is that -- is that a yes?

A.   No.

Q.   Okay.  Whose employees are they?  Well, you said the employees that are making decisions as to the allocation are Blue Castle employees.  That's not the case.

        The employees of Blue Castle don't perform that function.

        (Multiple voices.)

A.   By employees, I'm referring to W-2 employees.

Q.   Are you a W-2 employee of Blue Castle?

A.   I am not.

Q.   Okay.  To be clear, you -- you are paid

Page 82

out of a Blue Castle's payroll account, right?

A.   No -- well, they don't have a payroll account per se, it's an operating account.

Q.   Does Power Block Coin have a payroll account?

A.   It does not.

Q.   Okay.  Blue Castle charges a 10 percent administrative fee on top of all the expenses that it pays on behalf of Power Block, right?

A.   That is correct.

Q.   Okay.  And I think you just testified to Mr. Rothschild that you negotiated that fee, right?

A.   The 10 percent fee.

Q.   Yes.

A.   Yeah.  We -- we agreed to that as an -- as an executive team coming up with that agreement, yes.

Q.   Okay.  Would you say that you negotiated that fee?

A.   No, I wouldn't say it was negotiated.

Q.   Okay.

A.   The term "negotiation," I guess, is at play here.

Q.   Yeah.  And so, when you say you agreed to it as an executive team, who's on that executive team?

Veritext Legal Solutions
calendar-utah@veritext.com 801-746-5080

A.    Me, Tom Retson and Aaron Tilton.

Q.    Okay.  And to be clear, you, Mr. Retson and Mr. Tilton are all directors of Blue Castle, right?

A.    That is correct.

Q.    Okay.  And in connection with the decision you made to charge the 10 percent fee, did you rely on advice of counsel?

A.    Not that I recall, no.

Q.    And I take it that there was no counsel representing Power Block -- and so in making a decision for Power Block, so I'm making a decision for Blue Castle, right?

A.    You say counsel?  There's no counsel --

(Multiple voices.)

A.    -- because, no there was no counsel (inaudible).

Q.    How about financial advisors?  Did you rely on the advice of financial advisors for making that decision?

A.    No.

Q.    Okay.  You got some questions earlier about certain promissory notes between Blue Castle and Power Block Coin.

Do you recall that testimony?

Page 84

A.    I do.

Q.    Okay.  And were those Power Block --
excuse me.  Were those promissory notes agreed the
same way in -- in arrangement among the management
team?

A.    Yes, that's correct.

Q.    Okay.  And again, there was no counsel
representing Power Block and no counsel representing
Blue Castle in that discussion, right?

A.    That is correct.

Q.    Okay.  And there were no financial
advisors advising parties to that agreement, right?

A.    That's correct.

Q.    You received some questions earlier about
work that Parsons did pre-petition for the debtors,
that it was not paid for.  To be clear, was Parsons
paid for any of its services to Power Block from
before the petition date?

A.    Yes, it was.

Q.    Okay.  Do you know how much?

A.    I don't off the top of my head, no.

Q.    Well, were those fees paid pursuant to the
management services agreement?

A.    Some were.  You know, prior to December
when Power Block Coin had its own bank account, legal

Page 85

fees were paid out of Power Block Coin.

After it no longer had a bank account, after December, they were paid for out of Blue Castle Holdings.

Q.   Okay.  And did Blue Castle charge a 10 percent fee for those payments to Parsons under the management services agreement?

A.   Yes.  The 10 percent was applied to all incurred expenses for (inaudible) of Power Block.

Q.   Okay.  So just to be clear, for every dollar Parsons was paid in connection with preparing the debtor for Chapter 11, pursuant to the management services agreement, Blue Castle was paid an additional 10 cents; is that right?

A.   That's correct.  Well, paid -- the cash was not transferred.  It was a reduction in the note between the two (inaudible).

Q.   All right.  Okay.  Thank you.

MR. HERSHEY:  I have no further questions.

THE COURT:  Anyone else wish to cross-examine Mr. Jones?

Mr. Rothschild, any redirect?

MR. ROTHSCHILD:  Yes, Your Honor, very briefly.

Veritext Legal Solutions
calendar-utah@veritext.com 801-746-5080

REDIRECT EXAMINATION

BY MR. JONES:

Q.    Mr. Jones, we earlier went over that one million one hundred -- or $1,001,000 was paid from Power Block Coin to RE Developers.  Do you recall that?

A.    I do, yes.

Q.    Was any other amount ever paid from Power Block Coin to RE Developers, to the best of your knowledge?

A.    Not to the best of my knowledge, no.

Q.    Ms. Wilden pointed out something that I think was going to require you to go through the books and see whether it was correct or not, that $250,000 was debited off of the note, the second note -- actually, the first note that Blue Castle owed to Power Block Coin that seems to correspond to the return of the equity manage(ph).  Do you recall that?

A.    I do.

Q.    And is the effect -- suppose that is removed from repayment and so that $250,000 line is taken off.  What would the effect be?

Let me know if you need to see the exhibit.

Page 87

A.   It would increase the amount owed from RE Developers to Blue Castle Holdings.

Q.   So in other words -- if you don't mind, I'll share with you Exhibit 17 here.

This balance here on the second note would be -- I'm sorry, I'm -- I'm sharing with you the wrong exhibit.

This is Exhibit 21.  See this here?

A.   I do, yes.

Q.   And so this balance here, are you saying that this balance would be increased?

A.   The balance -- the far balance in the far right column would go from $261 increased by $250,000.

Q.   So to $511,000, correct?

A.   That's correct, yes.

Q.   And so, therefore, in your judgment, wouldn't BCH have even more money to pay Parsons Behle's fees because it will get paid even more money on its note obligation?

A.   That's correct.

Q.   We were speaking with Ms. Wilden on Exhibit I regarding split payments that were being charged to the second note and going through some of those items.  Do you recall that?

Page 88

A.    I do.

Q.    And there was a question on -- on those about the legal fees that had been paid to Parsons Behle.  Do you recall that?

A.    I do.

Q.    Can you tell me whether following the petition date, any amounts have been paid to Parsons Behle?

A.    Cannot, no.

MR. ROTHSCHILD:  Your Honor, that -- that is what I have for this witness.

THE COURT:  All right.  Mr. Jones, thank you for your testimony.  You're excused.

THE WITNESS:  (Inaudible) should leave the -- leave the Zoom call?

Anyone have an objection if he stays on?

MR. BURNE:  Your Honor, Matthew Burne on behalf of the U.S. Trustee.  I just wanted to make sure, the testimony was taken thus far as just pertaining to the objection to the employment application, correct?

THE COURT:  Yeah.  Do you want him to stick around for your questions on the other matter?

MR. BURNE:  Yeah, we may.  Especially because he is the signatory on behalf of the debtor

Page 89

on the management service agreement.

THE COURT:  Yeah.  Well -- -

MR. BURNE:  So it may be necessary.

THE COURT:  So I may short circuit that particular matter.  But Mr. Jones, why don't you stick around in case we need to talk to you again.

THE WITNESS:  Okay.  Sounds good.

THE COURT:  Thank you.

Mr. Rothschild.

MR. ROTHSCHILD:  Your Honor, we would call Mr. Aaron Tilton.

But I would like to emphasize that the narrow issue here in -- in my view is whether the debtor has the right -- or I'm sorry, that Blue Castle Holdings has sufficient funds to pay Parsons Behle from another source.  And I (inaudible) that we've established that.

I have Mr. Tilton prepared to talk about where all these entities came from, what they have done, Blue Castle's sort of extensive history long before the debtor was ever established and to sort of further bolster the corporate separateness of these entities because there seems to be some argument or something related to -- related to entity separateness.  But I recognize the Court's time is

Page 90

precious and all these parties on -- on here are also

billing at -- at some very large number of dollars

per hour.

If the Court would direct that it -- that

it's satisfied in that regard, I won't put Mr. Tilton

on and we can be done.

But if the Court believes that there's

further information regarding the debtor and how it's

established and all corporate separateness and all

those other things, I can put Mr. Tilton on and go

through that.

THE COURT:  Well, I'm -- I'm going to let

you make the decision about whether you want to rest

or not.

The other parties may have some questions

of Mr. Tilton on this particular issue.  So it's your

decision.

MR. ROTHSCHILD:  I'll put Mr. Tilton on

the stand.

THE CLERK:  Please raise your right hand.


AARON TILTON,

called as a witness, being first sworn,

was examined and testified as follows:

THE CLERK:  You're on mute.

Okay.  Please state and spell your name for the record.

THE WITNESS:  Aaron Tilton, A-A-R-O-N, T-I-L-T-O-N.


                    DIRECT EXAMINATION

BY MR. ROTHSCHILD:

Q.    Thank you, Mr. Tilton.

Can you tell me briefly what your educational background is?

A.    I graduated from high school.

Q.    Where?

A.    Springville High, Utah.

Q.    And do you have any accounting background?

A.    I do not.

Q.    Legal background?

A.    No, I do not.

Q.    Do you ever enter transactions into QuickBooks?

A.    I do not.

Q.    What is your position at Blue Castle?

A.    Chief executive officer and president and I'm also a board member, chairman of the board.

Q.    Are you personally an owner of Blue Castle


                                        Page 92

Holdings?

A.   I am not.

Q.   Who are the owners of Blue Castle Holdings?

A.   Transition Power Development, LLC.

Q.   And it's the sole owner?

A.   It is the sole owner.

Q.   And who are the owners -- or members, I suppose, of Transition Power?

A.   Myself, individually, and then Energy Path, which is made up of Tom Retson and Rob Draper.

Q.   And Blue Castle Holdings, in turn, is the 100 percent equity owner of any -- of any entities?

A.   Yes.

Q.   What entities?

A.   Power Block Coin; Solara Communities, LLC; SmartFi Lending and RE Developers.

Q.   Solara Communities, has that always been that entity's name?

A.   It has not.

Q.   Back to BCH -- and I'll call BCH Blue Castle Holdings?

Do you understand that?

A.   Yes.

Q.   Who are its manager -- or who are its,

Page 93

start with managers?

A.    Of Blue Castle Holdings?

Q.    Yes?

A.    Brad Jones, Tom Retson, and myself.

Q.    Did it have any other officers or directors previously?

A.    About two years ago, Dr. Nils Diaz.

Q.    And when did he leave?

A.    Roughly two years ago.

Q.    When was Blue Castle Holdings founded?

A.    2008.

Q.    And what was its purpose at that time?

A.    Its purpose was to develop a new power plant site in Green River, Utah.

Q.    Did it develop that site?

A.    It -- it did not.  It spent several years developing that site or characterizing that site.  We -- Blue Castle Holdings had an MOU with Westinghouse to enter into the development of two AP1000s.  And when Westinghouse was unable to perform on those AP1000s, the project was suspended.

Q.    What kind of power plants?

A.    AP1000s.  It's an acronym advanced pressurized reactor.  One thousand is the megawatt rating.

Page 94

Q.    And by "reactor," what do you mean?

A.    Nuclear reactor.

Q.    Does it -- what -- what does the debtor currently own?

A.    The debtor of Blue Castle --

Q.    Sorry.  With -- withdrawn.

What does Blue Castle currently own?

A.    It currently owns land at that site, roughly 120 acres there.  The membership interests of each of the subsidiaries.

Q.    What's being done with that real property now?

A.    We're repurposing it for industrial development.  There are several components that are critical infrastructure that are helpful in industrial sites that use high voltage electricity, roads, you know, power, supply and other things.  And we're going to repurpose that.

Q.    Does any of that involve debtor?

A.    No, it does not.

Q.    And Blue Castle acquired that property before or after it established its subsidiary SmartFi?

A.    Before; about 10 years before, maybe a little bit more than that.

Page 95

Q.    Who represents Blue Castle Holdings in this case?

A.    Ray Quinney.

Q.    There's some criticism that Ray Quinney wasn't retained at the time that SmartFi filed bankruptcy?

Why didn't Blue Castle file prior to Ray Quinney?

A.    Because Blue Castle was not the debtor, according to the -- the filing of the petition.

Q.    Was Ray Quinney -- was Ray Quinney hired for the first time only a few weeks ago?

A.    Yes.

Q.    For the bankruptcy?

A.    That's correct.

Q.    Did the debtor have a prior relationship -- did Blue Castle Holding have a prior relationship with Ray Quinney?

A.    We did.

Q.    Describe that, please.

A.    Around 2011, 2012 there had been -- there was (inaudible) on a tax matter on an appeal through the IRS.  They represented us through these appeals and then an eventual court case at the federal tax court which we -- we were successful at winning.

Page 96

Q.    And has Blue Castle had other counsel?

A.    Yes.

Q.    Can you describe -- can you tell me what other firms Blue Castle has used for its operations?

A.    Pillsbury Winthrop Shaw Pittman, Stoel Rives, (inaudible).

Q.    What did Pillsbury do for Blue Castle Holdings?

A.    Pillsbury represented us in our interactions and proceedings at the Nuclear Regulatory Commission and contractually with some arrangements and discussions at the Westinghouse and a variety of things; anything that really touched anything nuclear that was a legal concern, we would get advice from them.

Q.    What about -- I think you mentioned Hansen.

A.    (Inaudible) Hansen Black Ashcroft was -- was Power Block Coin's attorneys.

Q.    And Stoel Rives, correct?

A.    Stoel Rives, yes.

Q.    When was Power Block Coin established as a subsidiary?

A.    2017 -- at the end of 2017, I believe, around December.

Page 97

Q. Did it have an operating agreement at that time?

A. It did not.

Q. And what was your understanding of -- of whether an operating agreement was required?

A. It is not required by the state of Utah.

Q. Did it subsequently draft an operating agreement?

A. It did.

Q. Who drafted that operating agreement for Power Block Coin?

A. Parsons Behle.

Q. Notwithstanding that it didn't have an operating agreement, was Power Block Coin registered with the State of Utah?

A. Yes.

Q. To your understanding, has it maintained corporate separateness from its parent?

A. Yes.

Q. How about corporate separateness from its other affiliates?

A. Yes.

Q. What business was Power Block Coin established to engage in?

A. Power Block Coin's original purpose was to

Page 98

facilitate the development of digital asset mining facilities.  Those facilities require a substantial amount of electricity.  And in that process of helping other customers establish facilities and develop those commercial industrial sites, Power Block Coin determined that the greater opportunity versus developing sites was actually in lending capital to our customers who -- who were typically at that time digital asset mining companies which basically means they build computer centers that do calculations that provide security and accounting for a digital asset network like the Bitcoin network.

So they basically build big computations that are not a data center -- data companies put computers in a facility to record or capture information.  Digital asset companies build computer centers to do math calculations and report ledgers of the network transactions.

So we determined that -- that Power Block Coin determined that it was more expedient and a better business model to get into the lending side of the business by holding digital asset collateral for loans.

And Power Block Coin would then engage with other financial institutions to develop the

Page 99

capital and liquidity to make loans to other cryptocurrency digital asset network operators.

Q.    And so is the business that it's in now lending?

A.    Yes.  And it has been quite some time.

The platform that was discussed earlier was built as an expansion to its lending business to really expand its lending profile to do more loans on a broader basis.

The previous lending was typically limited to -- to the customers I mentioned before in mining and anybody who had a cryptocurrency business.  These are all commercial loans.  There's no consumer loans at all in our process.

But the platform, we -- we added some ancillary services, as Mr. Jones was talking about. And so people could buy or sell digital assets for a fee.

But historically, the largest source of revenue for us has been on the lending side.  Their loan portfolio far outweighs any of the digital asset buying and selling side or -- or fees.

And currently, we still are -- with Power Block Coin, the interest on loans is still accruing. It's still in the business of lending and you know,

Page 100

generating the revenue sources from its loan

portfolio.

That's less the -- the larger component of

the business.

Q.    So let me -- let me understand.

You said that SmartFi does not engage in

consumer lending, correct?

A.    That's correct.

Q.    And so it, nevertheless, lends money to

SmartFi lending; is that correct?

A.    That's correct.

Q.    And SmartFi lending, which business you're

involved in as well, correct?

A.    When you say, "You're involved in,"

meaning from SmartFi lending?

(Multiple voices.)

A.    -- speaking of SmartFi lending, yes.

Q.    Yeah.  You have -- you have a position as

a manager of SmartFi lending, correct?

A.    Yes.

Q.    And SmartFi lending, therefore, you are

aware that it engages in consumer-level loans,

correct?

A.    They're not consumer level because

everything is commercial, right?  So everything is a

Page 101

commercial-related transaction or business transaction.  We don't do consumer debt.

It's highly regulated and, you know, does a bunch of different things like credit cards.  We don't do that.

We -- at SmartFi Lending, we fund small businesses who need a new truck for their construction company or a new -- you know, to remodel their kitchen for a restaurant or a car for an Uber company.

So all these loans typically are between, you know, $50,000 to maybe $200,000 at the very high end.  And we fund companies that have been in business for at least three years, have a certain FICA score, go through this -- and we have a partner dedicated to funding Imperial Capital that underwrites these loans, originates those loans, service those loans, and SmartFi, in cooperation with that vendor, funds those loans.

Q.    And the debtor in turn -- is -- the debtor is not involved in any of that; is that correct?

A.    That's correct.

Q.    But the debtor made a loan to its affiliate to establish that business, correct?

A.    That's correct.

Page 102

Q.    And the debtor is going to earn interest and repayment on its loan to SmartFi Lending, correct?

A.    Yeah.  That's correct.  We -- we just recently acquired -- when I say, "we," SmartFi Lending just recently partnered with a bank that expanded the -- the lending line for SmartFi Lending by another $5 million.

And so they work in concert with SmartFi Lending so that -- this new capital, separate from Power Block Coin, from this other bank is now expanding or building more portfolio and that those loans and the cash flows of those loans will be the source of repayment back to SmartFi Lending -- all of those --

(Multiple voices.)

A.    Go ahead.

Q.    I'm sorry.  I didn't mean to interrupt you.  But --

A.    Those loans that are originated by SmartFi Lending and by dedicated funding do not have anything to do with Power Block Coin or SmartFi.

Q.    So Smart -- the debtor's role in this whole thing is that it provided a line of credit to SmartFi Lending, correct?

Page 103

A.    It provided a block loan and -- and started that process and then, in turn, SmartFi Lending built that portfolio in conjunction with a separate bank.

Q.    Okay.  Let's turn to --

Let me ask you a question here.  You mentioned that there's no -- there was initially no LLC operating agreement but the entities were registered with the state.  Do you recall that?

A.    Yes.

Q.    Do you recall who registered Power Block Coin with the state originally?

A.    I do not.

Q.    Okay.  Do you recall who -- who registered RE Developer?

A.    I do not.  There -- in some instances -- before, we had attorneys that have done that and we've had to correct some of those things that they presented or done, you know, just errors or they're not knowing exactly -- but I don't remember exactly who registered those entities.

Q.    Let's -- let me ask you about Solara or SmartFi Toquerville.  You're aware of -- that that entity is the same entity, correct?

A.    Yes.

Page 104

Q.   And let's start with your SmartFi hat on. What was SmartFi's role in that loan initially?

A.   SmartFi --

THE COURT:  Gentlemen, can we just say Power Block?

THE WITNESS:  Okay.

MR. ROTHSCHILD:  Okay.  Sorry, Your Honor.

Q.   (By Mr. Rothschild)  Power Block Coin, what did Power Block Coin have to do with Solara?

A.   Power Block Coin's role with Solara was -- was to provide the capital to establish basically a revolving account for new real estate loans to be made.  And over the previous several years before SmartFi Toquerville was formed, Power Block Coin undertook research to look at what it would take Power Block Coin to expand into real estate lending and other asset lending instead of just digital asset lending.

And we determined that Power Block Coin didn't.  It would be a distraction.  It didn't have the personnel needed at that time to manage a real estate portfolio.

So Blue Castle Holdings established SmartFi Toquerville when a loan presented itself that looked like it would be a good opportunity to

Page 105

diversify the portfolio.

As you can imagine, from 2017 until that timeframe, 2022, the digital asset market is high volatile and has gone, you know, up significantly and then gone down significantly.

We recognized, as Power Block Coin, the need to diversify the loans that Power Block Coin would -- the funds that Power Block Coin would put into different types of loans and that digital assets are highly volatile, so we took the step to try to establish a new line of loans in a more stable asset base in real estate and small business equipment, like we mentioned before with SmartFi.

So Power Block Coin provided a loan directly to SmartFi Toquerville that -- that had a 10-year note to act as, basically, a source of capital that SmartFi Toquerville could then make loans to developers with other real estate projects that were shorter in duration and continued to revolve that capital in multiple loans, that was the intent and that's where SmartFi Toquerville came from.

Q.   So I'm showing you Exhibit 13.  Do you see this?

A.   Yes.

Page 106

Q.    Do you recognize this document?

A.    I do.

Q.    And can you tell me, is this the loan that you're referring to in your previous answer?

A.    Yes.

Q.    And I'm looking at the bottom here.  Do you know what these are?

A.    I think those are (inaudible) numbers.

Q.    Okay.  Do you know -- can you tell me, was SmartFi represented in the drafting of this document?

A.    Power Block Coin was.  Sorry.

Q.    Let me -- let me be on point with that.
      Was Power Block Coin represented?

A.    Yes.

Q.    By whom?

A.    Parsons Behle.

Q.    And was SmartFi Toquerville represented?

A.    Yes.

Q.    By whom?

A.    At Cohne Kinghorn.

Q.    Specifically whom over at Cohne Kinghorn?

A.    Matt Boley.

Q.    And I want to call your attention to the interest rate here.

A.    Yes.

Page 107

Q.   We'll start with the amount -- the principal amount of the note.  Do see this?

A.   Yes.

Q.   Why -- why that amount?

A.   Because it's the amount required to fund a loan that was -- that SmartFi Toquerville originated with a third party.

Q.   And why this percentage rate?

A.   Power Block Coin --

Q.   Sorry.  So sorry.

Can you tell me what the percentage rate is and then tell me why?

A.   It's 5 percent.

And Power Block Coin consistently has a rate of return target for its portfolio whether it was cryptocurrencies or digital assets or other loans of a 4 percent rate of return.

Q.   Do recall where in terms of interest the interest rates -- do you recall consulting where prevailing interest rates were in 2022?

A.   Yes.

Q.   And what do you recall about that?

A.   The interest rates, depending on which market you are in, again, if you are in a cryptocurrency market, digital asset market, the

Page 108

returns or the interest rate was a lot higher but there's more risk, right?  As you -- as evidenced by collapse in March of 2022, the first collapse of the -- the markets for the digital asset market.  Celsius was on -- on -- you know, party to this -- this hearing.  This case experienced significant declines in their value.  Power Block Coin -- one more reason that Power Block Coin decided to not lend in those markets, it's capital it had had, was to go to something more stable, more secure that had real assets like real estate.

But those rates in -- in real estate were sufficiently low to mid ranges, you know the mid-single digits of -- at that time frame.

Q.    Can you tell me, was this promissory note secured by the real property that -- in Toquerville?

A.    It was not.

Q.    Why?

A.    Because SmartFi Toquerville did not own the property.  It was, itself, a lender.

Q.    So this was a loan for SmartFi Toquerville to make a loan?

A.    Yes.

Q.    And who did Smart Fi Toquerville make a loan to?  Was it another affiliate?

Page 109

A.    (Inaudible.)

Q.    Who was it?

A.    Zion's Landing Development Group.

Q.    And were any of the owners the same or is there any connection?

A.    There's no common ownership, no connection to any operating, nothing.

Q.    Was the loan brokered, administered by -- by SmartFi Toquerville?

A.    The initial contact came to me and we turned that over.  The underwriting, the due diligence, all of the -- all of the work to an entity called Dedicated Funding, which has a loan servicing platform that does this for multiple entities, that audit banks and they undertook this transaction on behalf of us.  They also received all the payments associated with this loan.

Q.    And they forwarded the payments, I'm assuming, to SmartFi Toquerville?

A.    No.  Because SmartFi Toquerville, again, at that time, hired him as a third-party recipient for the transaction.  So, Dedicated Funding would receive the payments.  It's a loan servicing company.  They receive payments directly from the -- the borrower and then they pay for -- for SmartFi

Page 110

Toquerville on behalf -- they paid it to Power Block Coin against that note.

Q.    And what happened to the SmartFi Toquerville loan with Zions Glamping?

A.    Basically, after a year, they defaulted. They were unable to recapitalize their loan with another loan. The initial loan was to be for six months. We extended it for another six months to allow them time to go find another lender. We were really just a bridge loan facility for them.

They were unable to do that. And so SmartFi Toquerville foreclosed on the collateral in March of 2023.

Q.    And so now who owns the real property?

A.    Solara Communities, formerly SmartFi Toquerville.

Q.    Is Solara developing the property?

A.    Solara is not developing the property. Solara hired RE Developers to develop the property.

Q.    Why?

A.    There are a few reasons. One significant one is that tax considerations to utilize the 1031 exchange require that Solara not operate other businesses or operate the development. It has to -- that development has to take place at an arm's

Page 111

length, third party to develop that.  That's the primary --

And it's standard practice in the development industry to have the development group and the owner of the property separate certain functions.

Q.   And you preempted my next question:  What is RE Developers?

A.   It's the entity that has a development agreement with Solara.

Q.   And from Power Block Coin's perspective, is this note still outstanding?

A.   Yes.

Q.   Is it in default?

A.   No.

I might add one thing to that component that Power Block Coin has received over $1 million in payments related to this transaction.  The interest collected -- while the first developer, the first borrower had that property and continued to make interest payments and Power Block Coin was the recipient of those payments.

Q.   I don't have anything further.

Well, let me ask briefly.  I don't want to retread too much of what Mr. Jones said but is your

Page 112

understanding -- what is your understanding of whether Power Block Coin has any obligation to pay Parsons Behle & Latimer?

A.    It does not have any obligations to pay any pre-petition fees.

Q.    And has any other entity undertaken that obligation?

A.    Blue Castle Holdings has that obligation.

Q.    And when Blue Castle Holdings pays Parsons Behle, will it debit it from the obligations that Blue Castle owes to Power Block Coin?

A.    It will not.

MR. ROTHSCHILD:  I have nothing further for Mr. Tilton.

THE COURT:  Ms. Wilden, any cross-examination?

If we could hear you, that would be helpful.

MS. WILDEN:  Of course, Your Honor.  Thank you.

CROSS-EXAMINATION

BY MS. WILDEN:

Q.    Mr. Tilton, I'd like to go back to the first things you talked about.  You mentioned this

Page 113

other land owned by Blue Castle Holdings that was eventual -- that was supposed to be a nuclear site but that didn't work out.

Do you know how much that property is worth?

A. I don't know that we've had it appraised. Lately -- it's 120 acres, probably a couple hundred thousand dollars.

Q. Have you tried to sell it recently?

A. We have not.

Q. Is it owned by Blue Castle directly or through another subsidiary?

A. Blue Castle directly.

Q. And how long do you think it will be before that property could be repurposed for an industrial site?

A. Over the last two years, we've had other people approach us about doing other things with it, other locations, truck stops or electric vehicle stations because of the electrical infrastructure that's near -- nearby. So I'm -- I'm not sure what that length of time would be but it would be -- these projects, typically, commercial, industrial projects, are years long.

Q. Are you marketing the property?

Page 114

A.     We have not because, specifically, we're working with Green River City on the development plans that they have.  They recently -- well, I want to say the last five years, they annexed the property in just recently.  That was in the last couple of years.

Previous to that time frame, it was with the county, so all of our agreements were with the county before that.  So, subsequently, we're working with Green River City.

There's still some infrastructure that needs to be accounted for, some roads and other things, so the funding mechanisms for those things are being worked on.

There are other plans and -- and Green River City hired a consultant to help them with expansion of their city boundaries in this process.  So whenever Green River City receives interest from a company or a location, we're made aware and we work with them.

There was also an agreement that we have with what's called the RC&D Castle Lands.  And that's an NGO or non-profit organization comprised of seven counties in that region that we have basically escrow open on an additional 1,500 acres there.  So, we're

Page 115

working through whether or not we're going to be able to borrow that additional 1,500 acres but in that agreement, it's still in effect.  And we're working through that process.

But we invested on that location about $10 million in geotechnical, hydrological, seismology, all the characterizations in that tower(ph). Collected, you know, multiple seasons' worth of data. At one point, we probably had 100 contractors on site characterizing the site.

So, we collected all of that data for -- and are going to use that data for other industrial purposes to see what we can repurpose it for.  So, there's a lot of information to sift through and determine -- one point in this discussion --

Go ahead.

Q.    That's probably enough information on that.  Thank you.  That was a good explanation.

So, you mentioned you would need to get funding to build roads and infrastructure and so forth.  So, is development on this property currently at a standstill until you get that funding?

A.    No, because those -- those funding sources, typically, you can develop through the public infrastructure districts and solicit municipal

Page 116

bonds for that and the future revenues of that

tax-base pays for the infrastructure.  So, that's not

-- that's not the significant issue.

What the significant issue is identifying

the use or appropriate use of the site because then

you would know what infrastructure has to be built.

But as it is now, current loans and

conditions are not sufficient for a future purpose,

we can assume.

Q.    Do you expect that property to be ready to

sell or develop within the next calendar year?

A.    No.

Q.    Thank you.

A.    It's not typical of the industry.

Q.    Thank you.

Okay.  You had answered some questions

about SmartFi lending and its loan portfolio that it

was -- it received a loan from Power Block Coin in

order to make more loans.

Do you know how much revenue SmartFi

lending brings in on a monthly basis in interest

payments on those loans?

A.    On the first portfolio -- and I'm going to

have to go back and look exactly on QuickBooks

because I don't know.

Page 117

I know what -- what the bottom line is on that but I don't know the total gross because there's principal repayments and we -- we recycle the capital and continually make new loans once some loans are paid off and then other loans are originated again.

But, you know, the top line, if I were to guess, I think it's about $50,000 or maybe $70,000 a month and the interest on it is $25,000 if I remember correctly.  But don't quote me, it's roughly -- Brian would be the better person to discuss that with.

Q.    Has SmartFi lending made any payments to Power Block Coin on that note?

A.    It has not.

Q.    Does it plan to start making those payments?

A.    Yes.  As we've expanded the portfolio now through the -- the partnership with another bank, the portfolio now will be, effectively, $7 million.  The original portfolio was $1.7 million, now it's $7 million.  And that will provide what we feel is an opportunity to start to return some of that principal and interest back to Power Block Coin.  But we want to be careful to make sure we have sufficient capital to continue to grow the portfolio.

The due date on that note is, I think,

Page 118

2028, if I remember correctly.  Don't quote me, but it's in the loan.

Q.    Thank you.

Okay.  You -- Mr. Rothschild asked you about who registered Power Block Coin with the state and you mentioned you didn't remember.  I have a document to refresh your memory.

MS. WILDEN:  Rachelle, could you bring up Exhibit M?  M as in Molly.

Q.    (By Ms. Wilden)  All right.  Mr. Tilton, do you recognize this certificate of organization?

A.    I would assume so.  Is there a date on this or --

MS. WILDEN:  Rachelle, scroll down just a bit.  The date's at the bottom of the page.

A.    Yes, I recall.

Q.    (By Ms. Wilden)  Okay.  Thank you.

And then as you can see on the next --

MS. WILDEN:  Woah.  Rachelle, go to the second page of this.

Q.    (By Ms. Wilden)  As you can see on the next page, there's an Article 4, Main Street Address and Signature of All Members and Managers.  And then Blue Castle Holdings is identified as the manager.

Who was the member of this LLC?

A.    Blue Castle Holdings is the owner.  If you're talking about the member -- owner of the Power Block Coin.

Q.    Okay.  So what's your understanding of the difference between --

(Multiple voices.)

A.    I'm not able to see the bottom half of that page that you're referring to.

MS. WILDEN:  Scroll down, Rachelle.

That's the end of it.  It's --

A.    I'm sorry.  I thought you were referring to something on the document when you talked about Blue Castle Holdings.

Q.    (By Ms. Wilden)  No.  No.  I -- okay.  So what -- what's your understanding of the difference between a member and a manager in an LLC?

A.    Depending on their -- you know, the different formations of manager-managed or member-managed LLCs, from what I understand, there's a distinction that one may or may not have ownership.

A member can also be a manager of the LLC, so it can own it and manage it.

And then manager-managed means that a manager may not own it but is only the manager of it.

Q.    Okay.  So this one, you can see Article 5,

Page 120

"The Limited Liability Company will be managed by its managers."

So, looking back at Article 4, is Blue Castle Holdings both the member and the manager of Power Block Coin?

A.   It appears so.

Q.   Okay.  Thank you.

And when Mr. Rothschild was asking you some questions, I think you talked about the members of Blue Castle Holdings.

As you can see right here, Blue Castle Holdings, Inc., is a corporation and not an LLC.  So, just to correct that, Blue Castle Holdings would not have members and managers, it would have stockholders and a board of directors.

A.   Are you asking me a question, or --

Q.   No, I'm just correcting the record, because Blue Castle Holdings was -- is not an LLC.

THE COURT:  Well, you're correcting the record, Ms. Wilden, unless the document is incorrect.

MS. WILDEN:  I apologize, Your Honor.

Okay.  Yeah, there wasn't -- that document wasn't put into evidence, the formation document.

Okay.  So, Rachelle, let's go to Exhibit B.

Page 121

Q.     (By Ms. Wilden)  All right.  As you can see, this is the Certificate of Organization of RE Developers.

Do you recognize this?

A.     I believe so.

MS. WILDEN:  Okay.  Rachelle, can you scroll down to show him the date at the bottom of the page?

Okay.  March 27, 2023.

And -- okay, scroll down to the top of the next page, Rachelle.

Q.     (By Ms. Wilden)  And who is the member and manager of RE Developers?

A.     It doesn't say who the member is.  It says who the manager is.

Q.     Who's the manager?

A.     Power Block Coin.

Q.     And who was the member of RE Developers?

A.     It was intended to be Blue Castle Holdings.

Q.     Okay.  Was there a board resolution about Blue Castle Holdings owning RE Developers?

A.     I don't recall.

Q.     Minutes of a board meeting, perhaps?

A.     I don't recall.

Page 122

Q.    Okay.  Was there anything in writing that would have reflected that Blue Castle was the member of RE Development when it was formed?

A.    There may have been.

One thing that I am aware of that is in evidence now is the transactions were reversed. When, initially, it seemed as if the contribution came from Power Block Coin but then was reversed back out.

And then the loan agreements and the payment evidence that Blue Castle Holdings was to be the owner or the member of RE Developers is evidenced by the loan agreement and the payment.

MS. WILDEN:  Rachelle, let's go to Exhibit J.

All right.  And then scroll down to the second page.

Q.    (By Ms. Wilden)  This is RE Developers' audit trail, which Mr. Jones explained to us.  And I want to draw your attention --

MS. WILDEN:  Right there, Rachelle.

Q.    (By Ms. Wilden)  I want to draw your attention to the deposit line in the middle of the page?

The second line down there is stated,

Page 123

August 2nd, 2023.  Do you see that line?

A.   Can you count down for me how many --

Q.   Let's see.  There's check, check, deposit, deposit.  And under that second one, there's an entry dated August 2nd, 2023.  Second line down under the second deposit.

A.   August 2nd.  Okay.

Q.   Okay.  And then go over to the right and you'll see that the date on that is April 3rd, 2023.  And the name is Power Block Coin.  The memo is initial capital infusion.  And then under the account, it says, "Member's equity."

Now, does the member of an LLC own the LLC, Mr. Tilton?

A.   The member owns it.

Q.   Okay.  So does this internal accounting document seem to say that Power Block Coin was the member of RE Development?

A.   I think, initially, yes.  But then the reversal of those contributions below and -- and the other transactions that are recorded advents that Blue Castle is the owner.

Q.   Okay.  So is that the next line up where the Blue Castle loan to BCH, loan payable -- so that was dated December 19th, 2023.

Page 124

A.    The loan repayment and the loan structure
and the reversal of the contribution from RE
Developer back to Power Block Coin, I think is what
(inaudible).

MS. WILDEN:  Okay.  Scroll go back to the
first page of Exhibit J, Rachelle.

Okay.  So you see the -- whoops.  Right
there.

Scroll up just a little bit so we can see
the top of the document.

Perfect.

Q.    (By Ms. Wilden)  Okay.  So on August 2nd,
2023, as the second transaction down, you can see
that Power Block Coin took a member's draw of
$250,000?

Does that look about right?

A.    I would assume so but I don't do any of
these entries and so you can ask me but I don't know
that I can make -- form an opinion on --
specifically.

Q.    Okay.

A.    I think Brad Jones is the better one to
discuss the accounting with because I don't handle
the accounting.

Q.    Okay.  Let's go to Exhibit F.

Page 125

Now, this document, our office obtained from the Utah Department of Commerce Division of Corporations.  And you can see that this document was filed August 8th, 2024, which was just a couple weeks ago.  Do you see that date?  It's in the --

A.    Yes.  On the date of filing?

Q.    Yes.  Date of filing.

A.    Yes.

MS. WILDEN:  Okay.  Scroll down a little bit, Rachelle.

Q.    (By Ms. Wilden)  Did you direct somebody to file this document?

A.    I did.

Q.    Who did you tell to file it?

A.    Casey Conger(ph).

Q.    Okay.  And this next question I want you to answer just yes or no, don't elaborate.

Did you speak to an attorney about doing this before you filed it?

A.    No, I don't think so.

Q.    Okay.  And can you summarize the change made on this document?

A.    Yeah.  The changes were to make the registration consistent with the accounting that in May of 2023, the reversal of that $250,000 equity

Page 126

contribution were intended to demonstrate that Blue Castle was the contributor to that capital and that it was the owner of Power Block Coin.

And then, again, in December of 2023, there were a change to the accounting records to reflect or correct the error or the correction to the record.  So this was one more piece of information that we discovered that was incorrect.

So it's consistent with the changes that were made in 2023 to correct the record that Power Block Coin is not the owner of RE Developers and Blue Castle Holdings is.

Q.   What was the purpose for putting Blue Castle Holdings in?  I mean, was Power Block Coin not doing a good job?

A.   Power Block Coin had never done anything for the -- the management of RE Developers.  It's always been Blue Castle Holdings.

Q.   Okay.  Aren't the managers of both LLCs the same three people?

A.   Which LLCs are you talking about?

Q.   I'm sorry, RE Development and Power Block Coin.  Are the same three people the managers of both of those entities?

A.   From the -- the formal manager position,

Page 127

yes.  But RE Developers has a separate project development manager that is contracted that runs the day-to-day business of RE Developers that is not part of Power Block Coin.

Q.    Okay.  Thank you.

I want to move on to just ask another question about the Solara loan that Mr. Rothschild had you describe.  And you had testified that you wanted to diversify the debtor's portfolio with real estate lending.

Did you look at investing in real estate with any other unrelated entities?

A.    From time to time, we were looking at opportunities to fund new loans; some were homes.

And of course, we had our equipment lending side of the business.  Every once in a while, someone would bring another, you know, some real estate for their small business loan but it didn't fit into that -- that portfolio for the SmartFi Lending side of the business.

But, yes, we looked at some other homes in Florida.  Also, a development in Las Vegas for a -- I think it was a medical office.  And then also a development in Georgia for residential homes.

Q.    Okay.  What's the name of the principal of

Page 128

Zion's Landing Development Group?

A. Frank. And I can never pronounce his last name, it's Polynesian. I think it's Tunesia(ph).

Q. Okay.

A. I don't know.

Q. Is Mike Morley involved with Zion's Landing?

A. I think he was involved in one component of developing a school in that development. So it was a smaller component but Frank was the principal in Zion's Landing Development. There are two different entities.

Q. Okay. Okay. Okay. So Mr. Rothschild had you look at the Solara promissory note and you testified that Power Block Coin was represented by Parsons when that note was drafted.

Do you remember when that note was drafted?

A. I don't remember when exactly that note was drafted, no.

Q. Was it more than one month before the bankruptcy petition was filed?

A. Yes.

Q. Was it more than a year before the bankruptcy petition was filed?

Page 129

Transcript of Electronic Recording - 8/20/2024

A.    I really don't remember that (inaudible) exactly.

(Inaudible), contemporaneously, when we do a note or do something like that, we look at certain factors on when it's finalized.  So I don't remember exactly when that was.

Q.    When that was finalized.

You testified that Power Block Coin has received over $1 million in payments related to the Solara loan.

When did those interest payments come in?

A.    At the time that they were made, roughly.

Q.    When was that?

A.    2022.

Q.    All right.  Thank you.

And did those funds go right into Power Block Coin's bank account?

A.    Now, they first were received by our loan processing third party that serviced that loan for us as SmartFi Toquerville engaged dedicated funding to be its representative for payments and processing and underwriting all those things and they did that process to make sure that it was legally correct.  And so the payments went from the borrower to dedicated funding and then back to Power Block.

Page 130

Dedicated funding acted as SmartFi Toquerville's agent for the transfer of payments.

Q.   Okay.  Thank you.

All right, let's go talk about the option contract for a minute.

This is Exhibit E.  E is in Echo.

And I started asking Mr. Jones some questions about this and he said you might be the better party to ask.

So, this option contract offers Mr. Jonathan Bao(ph) an option to purchase property sometime in the next year; is that correct?

A.   That's correct.

Q.   Do you know Jonathan Bao(ph)?

A.   I do.

Q.   Is he a friend of yours?

A.   He is.

Q.   Did you contact him to see if he wanted to enter into an option contract or --

A.   We'd been talking about the opportunity for him to develop a medical facility since last year.  So, the previous -- you know, I think last fall, there were some discussions with an investment group.  And the medical facility -- the group that was involved in that or looking to be involved in

Page 131

that, was not ready to undertake a formal process. And frankly, I don't think we were ready to be able to offer -- when I say "we," talking as RE Developer, was not ready to offer a transaction at this point.

There was a need to get further along in some engineering studies, applications and other resources, the critical infrastructure off-sites for the project, to make sure the feasibility was completed before we offered anybody any participation in the project.

That milestone has since been hit. Some of the discussions have been ongoing since last year and have culminated in this agreement.

Q. Okay. So did you talk to him within the last month and say, "Hey, we're ready for this option"?

A. Yeah. And probably before that, letting him know that we -- you know, updates on it, where we are, what we're doing, results of some of the studies and the engineering and the layout.

There were subsequent parties who were involved in -- in building facilities there in commercial residential, primary residential. And we needed to have a good understanding of what they want to do on the project.

Page 132

So we're negotiating LOIs and other things with other home builders and determine how much they're gonna take of the project and what was available for any work to take in the project. So it's been, you know, since last year to kind of get that all developed.

Q. Okay. So I noticed in this option agreement, the option has to be exercised sometime after the property is subdivided and before the one year date, so before August 2nd, 2025.

So has -- so I want to ask a few questions to see whether or not the property is close to being subdivided.

Have you obtained water rights for this development?

A. We've received -- I'm gonna say "we," the Water Conservancy District applied for a grant in the state of Utah to receive funding for this project specifically that those funds were received. And we have a development agreement that is being finalized with the Water Conservancy District to secure the -- the water rights. But $2 million has been funded to build the infrastructure for this project.

So -- and subsequent to that, the Water Conservancy District does not issue will-serve

Page 133

letters on any project that forecasts a water use or a water service longer than 12 months.  So at the appropriate time, they will provide the will-serve letter along with the development agreement that they've already received funding to build some of those facilities.

Q.   How long do you estimate it will take to build that infrastructure?

A.   Depending on certain applications for facilities -- these are off-site facilities.  And so there are other cooperation that is needed with other landowners to put pipe in and have some utilities and some other things.  But it appears like it'll be anywhere from about 12 months to 18 months.

Q.   And do the water rights have to be settled before you can legally subdivide property?

MR. JOHNSON:  Your Honor, I'm going to -- why is she asking all these questions about RE Developers, LLC's future plans?  This option to purchase is, to my understanding, going to be the -- the funding source to pay the VCH note.

I -- RE Developers, isn't in bankruptcy.  This isn't a judgment --

THE COURT:  Mr. Johnson, if that's an objection, the objection is overruled.

Page 134

Q.    (By Ms. Wilden)  So, let's go back.  Do the water rights -- does the water infrastructure need to be built before you can subdivide the lots?

A.    (Inaudible.)

Q.    Okay.  Has this property been annexed -- earlier you -- or I've heard that you wanted this property annexed by the City of Leeds or the City of Toquerville (inaudible).  Has that -- has that gone through?

A.    There's no annexation needed.  In fact, we prefer not to have annexation.

Q.    Okay.  And how long do you estimate it's going to be until the lots are subdivided?  What needs to take --

Sorry.  One at a time.

What else needs to happen before the lots can be subdivided?

A.    It's a two-step process.  The first is the plan development agreement is accepted and approved by planning and zoning and the commission.

The second process is the final plat or the final design of the finished lots of the second part of the application where the actual design is approved.

The first phase is about zoning and

Page 135

changing the zoning.  The second phase is about actual design that gives -- leads to construction drawings that are approved and then permission for the -- the residences and the buildings to be built.

Q.    And about how long do you estimate that will take?

A.    I think the project -- so the first phase -- is up to four phases, five phases.

(Multiple voices.)

A.    Typical home builder, large-scale home builder --

Q.    You cut out for most of that answer.  At least I didn't hear it.

How long do you expect this to take before you can subdivide the lots?

A.    Subdividing the lots, probably about six more months.  There's a -- and again, let me just be clear.  It's not a linear process that you might think of just -- you know, there's 200 acres, which is about 1,300 units.

It's not feasible to build all the units at one time.

Q.    Right.

A.    Right.  So there are phases that you go through and it's going to be a multi-year process.

Page 136

But the first, initial phases of the first 150, 200 units can be done within the next 12 months.

THE COURT:  Ms. Wilden, I think -- I think it's time to move on.

MS. WILDEN:  Yes, Your Honor.

Q.    (By Ms. Wilden)  Okay.  Let's go to Debtor's Exhibit 19.

Whoops.  All right.

Well, I will describe for you Debtor's Exhibit 19.  It's a screenshot of RE Developers's checking account that shows the $100,000 deposit from Ms. -- Dr. Bao(ph).  And prior to that, the balance in the account was about $11,000.  So I want to know if that $11,000 is enough to cover RE Developers operating expenses for the next month, for example. What -- what expenses does RE Developers have right now?

MR. ROTHSCHILD:  Objection.  False hypothetic --

MS. WILDEN:  That was -- okay.  I withdraw the question.  Let me rephrase that.

THE COURT:  No, you don't -- it's one of Mr. Rothschild's favorite objections.

Q.    (By Ms. Wilden)  Well, in the past month, Mr. Tilton, can you estimate RE Developers operating

Page 137

expenses through the month of July 2024?

A. Can I -- can you say that one more time. I do what?

Q. What -- can you estimate RE Developers operating expenses in July 2024?

A. Yeah. I think I can give you a rough estimation that the -- there's one last final piece of engineering required for the PD, the design development, it goes in and that was roughly about I think -- I think, don't quote me on it, about $15,000.

RE Developers does not use debt in this process and so it pays for its expenses. It spent roughly, you know, half a million dollars in engineering studies, legal fees to prepare the application and so we're at the very tail end of those expenses. There'll be minor (inaudible), so going forward, the expenses on it are going to be some other additional legal fees. But the -- the goal here for RE Developers was about this point, once the development will be entitled to spend, to recapitalize the -- the process through the revenues of -- of the activities like the selling of the option. We're very close on securing the finished, what's called finished lot sales through LOIs of

Page 138

other builders.  It will secure a multi-year demand for lots.

And -- and again, I don't want to go into a lot of detail here because these are preliminary discussions with the -- with the developers but this first developer certainly represents a cash flow that's more than sufficient to provide the remaining, you know, maybe $200,000 or so in legal fees and other engineering and other things that's required to get the zoning approved and then finish the plat recording on the final plats which then can result in (inaudible) sales.  And then the plate sales -- and then the improvements to the finished lots, which is where homebuilders take down those lots in a sequential phasing.

Q.   Okay.  Thank you.

MS. WILDEN:  Rachelle, you can stop screen sharing, I'm done with exhibits.

Q.   (By Ms. Wilden)  Mr. Tilton, why didn't Blue Castle pay that $200,000 pre -- claim to Parsons before the debtor filed bankruptcy?

A.   We weren't really aware that that might be something we had to do until the day of the filing of the petition.

MS. WILDEN:  Okay.  So, I apologize,

Page 139

Rachelle, I actually do have one more.

This is -- this is my last exhibit and last question.

Rachelle, I need you to show Exhibit H.

MS. ARMSTRONG:  It's taking a minute, just one second.  I'm sorry.  It's coming.

MS. WILDEN:  All right.  Thank you.

Q.   (By Ms. Wilden)  Mr. Tilton, do you recognize this e-mail?

And Rachelle will slowly scroll down so you can see the whole thing.

A.   Yes, I recognize it.

Q.   Okay.  So, was this the first time that Parsons told you about the issue with the prepetition fees that were due?

A.   To my recollection, yes.

Q.   Okay.  And if they had asked, would Blue Castle have been able to pay off that $200,000 claim?

A.   No, because we haven't planned for these expenses.

Q.   Okay.  Thank you.

And you'll notice that Mr. Smith's e-mail mentions setting up a new matter number under the Blue Castle client number.  Was Blue Castle, at some point, a client of Parsons Behle?

Page 140

A.    Yes, previously.

Q.    All right.  Thank you.

MS. WILDEN:  I have no further questions, Your Honor.

THE COURT:  All right.  Thank you.

We've lost Mr. Hershey.

Oh, there he is.

MR. HERSHEY:  Yes.  Sorry, Your Honor.  I just had my camera off for a minute.  I apologize.

THE COURT:  Do you have any questions for Mr. Tilton related to the employment motion?

MR. HERSHEY:  Yes, Your Honor, I do.

Do I proceed?

THE COURT:  Yes.

MR. HERSHEY:  Thank you very much.


CROSS-EXAMINATION

BY MR. HERSHEY:

Q.    Mr. Tilton, Sam Hershey from White & Case on behalf of the Celsius Litigation Administrator.

I am going to ask my team to put back on the screen what I believe is Debtor's Exhibit 13. It's the promissory note between Power Block and SmartFi Toquerville.

And perhaps we need just a little bit

Page 141

bigger.

While we're doing that, I'll ask you some questions.

So, do you recall, Mr. Tilton --

Thank you very much.

Do you recall, Mr. Tilton, being asked some questions about this document?

A.    On multiple occasions.  I'm not sure which one you're referring to but --

(Multiple voices.)

Q.    Do you see the document in front of you Mr. Tilton, that we pulled up?

A.    I do.

Q.    Okay.  Do you recall being asked some questions by Mr. Rothschild during this hearing about this document.

A.    Yes, in general.  Yeah.

Q.    Okay.  Great.

So, let's look at the terms of this loan. So, you agree with me that this is a loan at 5 percent interest, right?

A.    It appears to say that it's 5 percent interest.

Q.    Okay.  And this loan was given on an unsecured basis, right?

A.   That's correct.

Q.   And the interest on the loan accrues and is not payable until the loan matures; is that right?

A.   That's correct.

Q.   And that maturity date was 10 years away, right, from the time the loan was entered into?

A.   That's correct.

Q.   Okay.  So this loan was loan was to SmartFi Toquerville.  That entity is 100 percent owned by Blue Castle, right?

A.   That's correct.

Q.   And what did SmartFi Toquerville do with this loan from Power Block?

A.   It was a subscript loan to a developer.

Q.   What was the name of the developer?

A.   Zion's Landing Development Group.

THE COURT:  Mr. Hershey, this is already -- we've gone through this already.

MR. HERSHEY:  Well, let me -- I'm going to -- I think it's something different right now, Your Honor.  I just wanted to lay the groundwork.

Q.   (By Mr. Hershey)  Were the terms of the loan to that third party similar to the terms of this loan between Power Block and SmartFi Toquerville?

A.   No.

Page 143

Q.    Okay.  So was there a 5 percent interest rate on the loan?

A.    No.

Q.    Was the interest rate higher or lower?

A.    Much higher.

Q.    Okay.  Was that loan secure?

A.    Yes.

Q.    And do you recall whether the interest on that loan accrued and was only payable on maturity?

A.    No.  It had interest payments due immediately.

Q.    Right.  Okay.  So why not just have Power Block --

(Multiple voices.)

Q.    -- make the loan --

A.    The interest payments were due, according to the schedule of the loan immediate -- it was immediate effect of the loan.

Q.    But just to be clear, there were interest payments due before maturity, right?

A.    Yes.

Q.    Okay.  Why not just have Power Block issue a loan directly to the entity that SmartFi Toquerville lends the money on to?

A.    Because Power Block Coin didn't have the

Page 144

capacity or the ability to service this type of loan.

Q.    Well, doesn't Blue Castle provide management services to Power Block?

A.    It does.

Q.    So Blue Castle couldn't assist Power Block in providing the services necessary for that loan?

A.    A third party provided these services, so Blue Castle didn't provide the services to SmartFi Toquerville or any other subsidiary dedicated funding -- an independent third party contractor engaged with SmartFi Toquerville to help do the loan underwriting and servicing and processing and collect payments, all of that.

Q.    And that -- that independent contractor couldn't provide those services to Power Block?

A.    Power Block Coin's focus was digital asset lending, not real estate lending.

Q.    Okay.  Why not make SmartFi Toquerville a subsidiary of Power Block for purposes of this loan structure?

A.    Because it was determined that Power Block -- or that SmartFi Toquerville would be better as a subsidiary of the past loans.

Q.    And why was the interest rate for this loan, the one we're looking at, fixed at 5 percent?

Page 145

Transcript of Electronic Recording - 8/20/2024

A.      What was the thinking behind that?  Power Block Coin typically tried to achieve a 4 percent spread on its return and so 5 percent was 1 percent over its targeted goals at the time.

Q.      When you're referring to the targeted goals for its spread, what do you mean?

A.      Power Block coin tried to achieve a 4 percent rate of return on capital.

Q.      In what concepts?  What loans?

A.      Typically, all of the loans that it engaged in.

Q.      And -- and who set that goal of 5 percent?

A.      The managers determined from previous experience with other lending -- and I'll give you an example of the digital asset lending.  Typically, Power Block Coin could form capital sometimes at a cost of single digit percentages, multiple digit percentages, you know, 7 or 8 percent, sometimes 9 or 10 percent.  And so it would, in turn, need to charge its borrowers a 4 percent spread.

So if its capital -- cost of capital was, let's say, 10 percent, it would need to charge 14 percent to maintain profitability in its ongoing enterprise on that total loan.

Q.      Okay.  I think you've gone far beyond my

Page 146

question.

My question was:  When you talk about targeting 4 percent, what would be the type of loan for which that was the target?

A.     The one I just discussed would be a digital asset loan.

Q.     Okay.  So it was your belief that because Power Block received a certain interest rate on one type of loan, it was appropriate to target that interest rate on any type of loan that it might participate in?  Is that your testimony?

A.     That's not my testimony.  My testimony --

Q.     What did I get wrong?

A.     Power Block Coin internally, regardless of the customer type, targeted the 4 percent rate return on capital.

Q.     Okay.  Exactly.  And you believe that this is the most profitable deployment of Power Block's $17.4 million in capital.

A.     Profitability isn't the only criteria that determines whether we fund a loan or not.

Q.     Okay.  Well, did you consider this a low-risk deployment of Power Block's $17.4 million capital?

A.     This had a better risk profile than

Page 147

putting capital back into the cryptocurrency or digital asset market.  Owing to the fact that in March, there was a significant downturn and continuation of that downturn which your company experienced as well.  And so the -- the first buying from the digital asset world into more stable assets was determined to be a significant factor in making sure that the capital had less risk.

Q.   Okay.  I'd just -- I'd like you to focus on my question which is simply that:  Did you consider this a low-risk deployment of Power Block's $17.4 million in capital.

A.   I would say -- again, you're characterizing our conclusions as.

THE COURT:  Mr. Tilton, he's asked you a question that requires a yes or no answer.

A.   Can you rephrase the question one more time please?

Q.   (By Mr. Hershey)  Yeah, sure.

You testified there were other considerations besides profitability that went into making this loan.  So my question to you was:  Do you -- did you consider this loan a low-risk deployment of Power Block's $17.4 million in capital?  Yes or no.

Page 148

A.    Yes.

Q.    Okay.  But to be clear, the loan that this loan was then turned into, defaulted, right?

A.    Yes.

Q.    And that has an impact on the collectability for Power Block on the underlying loan (inaudible), right?

A.    Yes.

Q.    Okay.  Did you consider any, I guess, lower-risk alternatives to this loan?

A.    At the time, Power Block Coin's market was very narrow in the digital asset market and SmartFi Lending business already had as much capital as it could deploy.  So this was one of the few options that was available.

Q.    Okay.  Did you consider, say, investing in treasury bills?

A.    No.

Q.    Or, like, a high-interest savings account?

A.    From time to time, we've done those activities and -- and received interest but they are not a long-term solution or model for our revenue. We have to engage in loans.

We don't -- our model for Power Block Coin does not consider leaving funds in an interest

Page 149

account -- an interest-bearing account for a longer term because it doesn't develop enough cash flows to support Power Block Coin as a loan company.

Q.    So just to be clear, you -- you felt that a loan with 10 percent maturity with interest-only payable on the maturity date would generate cash flow for Power Block.

A.    Can you say that again?

Q.    So you just said that Power Block -- you testified that Power Block's business model revolves around generating cash flow.  I just want to understand that you thought this loan with a 10 percent maturity with all interest and principle due at -- on -- excuse me, 10 year maturity with all interest and principle due at that maturity was a good way to generate cash flow for Power Block.

A.    Yes.

Q.    Okay.  Let me ask you some more questions about this agreement.  And I think that --

THE COURT:  Mr. Hershey --

(Multiple voices.)

THE COURT:  Mr. Hershey.

MR. HERSHEY:  Yes, Your Honor.

THE COURT:  We're getting late in the afternoon here.  I know it's even later where you

Page 150

are.

But what I want you to concentrate on is the employment motion and how this line of questions relates to that.

MR. HERSHEY:  Yes, Your Honor.  I'm going to go down a different path regarding the document that I think does relate to the motion because -- well, if Your Honor disagrees, please --

THE COURT:  Why don't you give me a preview.

MR. HERSHEY:  Sure.  Absolutely.

So, Mr. Rothschild said that he was going to ask some questions about corporate separateness and use this document as an example of that.

I think that goes to the disinterestedness prong of the analysis.  And so I wanted to test how corporate separateness is represented on this document.

THE COURT:  I understand your argument and you can go on.  Go on, I mean --

MR. HERSHEY:  Okay.

THE COURT:  -- to another topic because I understand your point very clearly.

MR. HERSHEY:  Thank you, Your Honor.  I will move on then.

Page 151

Q.     (By Mr. Hershey)  Mr. Tilton, you gave some testimony regarding your role at Blue Castle.  I just want to talk about this.

So, in addition to being an officer of the debtor and an officer of Blue Castle, you're also the debtor's indirect majority equity holder; is that right?

A.     Blue Castle Holdings is the majority -- the 100 percent owner of Power Block Coin, if that's what you're asking.

Q.     Well, yes, that's right.  But then you own a majority interest in Transition Power Development, right?

A.     That's correct.

Q.     And Transition Power Development owns 100 percent of the equity in Blue Castle, right?

A.     That's correct.

Q.     Okay.  You recognize that at least sometimes the interest of Power Block's creditors diverge from the interest of Power Block's equity holders, right?

A.     That could be the case.

Q.     Okay.  But despite that fact, you don't recall ever seeking any advice regarding whether, in connection with bankruptcy, you should appoint an

Page 152

independent manager of Power Block's, right?

MR. ROTHSCHILD:  Objection to the extent that it calls for attorney -- or what attorney/client advice he's soliciting.  Shouldn't answer.

MR. HERSHEY:  So, Your Honor, I'll just note that he answered this question in his deposition without -- without an objection or instruction not to answer.

THE COURT:  Go ahead, Mr. Tilton.

A.    Can you repeat the question?

Q.    (By Mr. Hershey)  Yes.

So, despite recognizing that there could be a conflict between equity holders' interest and creditors of the debtor, you don't recall seeking any advice regarding whether, in connection with the bankruptcy, you should appoint an independent manager of Power Block, right?

A.    I don't recall that that was the case.

Q.    Okay.

(Multiple voices.)

Q.    Okay.  So Power Block retained Parsons in connection with the Chapter 11 filing and Blue Castle did not retain counsel to provide advice in connection with the Chapter 11 until a few weeks ago, right?

Page 153

A.     That's correct.

Q.     Okay.  Just to be clear, I think you gave some testimony that you believe Blue Castle is a non-party to this action.  It was Blue Castle that passed the resolution that authorized Power Block to declare bankruptcy, right?

A.     That is correct.

Q.     And we've discussed that Blue Castle is the 100 percent equity owner for Power Block, right?

A.     That's correct.

Q.     And Blue Castle continued to perform services for Power Block under the management services agreement, right?

A.     That's correct.

Q.     Okay.  So, just to be clear, until a few weeks ago, you were receiving advice from Parsons regarding the bankruptcy without having any separate counsel for Blue Castle, right?

MR. ROTHSCHILD:  Objection, ambiguous.

THE COURT:  It's not.

Go ahead and answer, Mr. Tilton.

A.     We didn't have counsel to represent Blue Castle Holdings in this matter but Blue Castle Holdings has legal counsel for a variety of things.

Q.     (By Mr. Hershey)  Right.  But not in

Page 154

Transcript of Electronic Recording - 8/20/2024

connection with the Chapter 11 case until a few weeks ago, right?

A.    That's correct.

Q.    Okay.  And you couldn't state that the advice you received from Parsons was given just to Power Block and not to Blue Castle, right?

A.    Except that as we were being advised that implications to Blue Castle Holdings were -- were enough to inform the decision.

Q.    Okay.  But just to be clear, you considered Parsons' legal advice in your capacity as manager of Power Block Coin and then you considered the advice in your capacity as a director of Blue Castle; is that right?

A.    I believe so.

Q.    Okay.  And when you received legal advice from Parsons, you were thinking about both the debtor's and Blue Castle needs, right?

A.    Yes.

Q.    Okay.  Now, Parsons is a creditor of Blue Castle, right?

A.    Yes.

Q.    And that's because the debtor, as we've discussed, did not pay Parsons in full for the services that Parsons performed before the petition

Page 155

date, right?

A.    I believe (inaudible) and some other matters and other things related to billing but I can't believe, in general, that that's true.

Q.    But just sticking with this matter, Parsons agreed that Power Block would transfer the balance that it was owed to Blue Castle for payment, right?

A.    Yeah.  I think it released Power Block Coin and then BCH agreed they did that.

Q.    Right.  And so just to be clear, the debtor is also a creditor of Blue Castle, right?

A.    The debtor is also a creditor --

Q.    Let me -- let me ask the question a little more clearly.

Power Block is a creditor of Blue Castle, meaning that there -- meaning that there is money that Blue Castle owes to Power Block, right?

A.    Correct.

Q.    Okay.  Have you been part of any discussions regarding whether it poses a conflict of interest for persons to compete with Power Block for payments from Blue Castle?

A.    I think that would require me to divulge legal counsel that we received to -- that might be

Page 156

privileges.

MR. HERSHEY:  Your Honor, I think he can answer yes or no.

THE COURT:  Mr. Tilton, please answer.

A.    Can you state the questions again? Because maybe I don't understand.

Q.    (By Mr. Hershey)  No, I'm happy to, of course.

Have you been part of any discussions regarding whether it poses a conflict of interest for Parsons to compete with the debtor for payments from Blue Castle?

MR. ROTHSCHILD:  I will object to the extent it calls for attorney/client privilege, noting the Court has already instructed me to answer.

A.    I believe we received some legal advice regarding that topic.

Q.    (By Mr. Hershey)  Okay.  Are you aware of whether the debtor may have litigation claims against Blue Castle?

A.    Whether the -- the debtor may --

Q.    Yeah.  Sorry.  Are you aware of whether Power Block may have litigation claims against Blue Castle?

A.    I'm not aware.

Page 157

Q. Okay. Have you received any advice regarding whether the debtor may have legal claims against Blue Castle?

A. Again, I don't know.

Q. Okay. Well, I think --

(Multiple voices.)

Q. I take it then, Mr. Tilton, that you've not been part of any discussion regarding whether it poses a conflict to Parsons advising the debtor on positive actions that will deplete Blue Castle dollars that Parsons is also pursuing, right?

A. I would say that there have been discussions that make sure that -- that the separation between the businesses and the relationships that are there are maintained and that conflicts are contained or not exacerbated or -- or, you know, kind of -- (inaudible) by the action that we took. On the petition date, we were advised that there's a conflict. So, we've received some counsel relating to those kinds of conflicts.

THE COURT: Mr. Hershey -- Mr. Hershey, can you take down the exhibit?

MR. HERSHEY: Oh, yes. I'm sorry, Your Honor. Please take that down, guys.

THE COURT: Thank you.

Page 158

Q.    (By Mr. Hershey)  if I may, Mr. Tilton --
I appreciate that answer.  I'm glad that conversation
occurred but that's not my question.  I'm asking you
a specific questions, which is:  Have you been part
of any discussion regarding whether it poses a
conflict to have Parsons advising the debtor on
causes of action that will deplete Blue Castle
dollars that Parsons is also pursuing.  Have you been
part of that conversation?

A.    You're going to have to give me that one
more time.

Q.    Okay.  Have you been part --

(Multiple voices.)

THE COURT:  Yeah.  Mr. Hershey, I can
understand the question.

MR. HERSHEY:  Okay.

THE COURT:  And I can anticipate the
answer, so just move on.

MR. ROTHSCHILD:  I'll move on.  Thank you,
Your Honor.

Your Honor, I only have a few more
questions left.

I wanted to ask about the Management
Services Agreement, which is Exhibit 10 on the
debtor's list.

Page 159

THE COURT:  I had the same --

MR. ROTHSCHILD:  And I'm conscious of the fact, Your Honor --

(Multiple voices.)

THE COURT:  Yeah.  No, go ahead.

MR. HERSHEY:  Okay.

THE COURT:  The questions I have are -- If you can pull up -- I want to -- this leads into the next motion but I want to have a clear understanding of the debtor's Exhibits 16 and 17.

Mr. Rothschild, can you pull those up?

And Mr. Hershey, I -- I apologize for the interruption.  I'll get right back to you.

MR. HERSHEY:  Of course.

MR. ROTHSCHILD:  This is Exhibit -- debtor's Exhibit 16.

I also have debtor's Exhibit 17 here.

THE COURT:  All right.  Exhibit 16 looks like offsets for the -- under the Management Services Agreement against the Power Block note 1 down to zero for the first part of this year.

Is that correct, Mr. Tilton?

THE WITNESS:  I believe so.

THE COURT:  And Exhibit 17 is a drawdown on the balance owed against a Power Block note 2 owed

Page 160

by Blue Castle for, it looks like, April, May, and June; is that right?

THE WITNESS:  I believe so.  I'm still seeing Exhibit 17 -- or 16 not 17.  Exhibit 17.

THE COURT:  There's 17 for you.

THE WITNESS:  Yeah, I believe so.

THE COURT:  All right.  So, Mr. Jones testified earlier that Power Block Coin has had about $10,000 in revenue in the first seven months of this year.  Do you agree with that?

THE WITNESS:  In terms of cash flow or revenue, I believe we're also still accruing or receiving interest, you know, primarily Power Block Coin.

(Multiple voices.)

THE COURT:  Cash.  Cash.

THE WITNESS:  I believe that's correct.

THE COURT:  Okay.  And so what we've got for the first seven months of this year is a million two offset against Blue Castle's obligations to the debtor against $10,000 in income under the Management Services Agreement; is that correct?

THE WITNESS:  I believe that also the payment -- these represent payments.  If there was a bank account that PBC had to receive payments,

Page 161

payments could have been received in -- in cash but it doesn't have a bank account to receive those.

So the -- the reason that there's $10,000 in the revenue of Power Block Coin is because they're digital assets and they don't require a bank account.

If Power Block Coin had a bank account, its receipts and its -- its revenues would be represented here, not as offsets but as actual cash being paid.

THE COURT: What I'm trying to figure out, Mr. Tilton, is why this company has paid a million four to Blue Castle over the last seven months, an average of $200,000 a month, when it hasn't really been doing any business.

THE WITNESS: Well, primarily, the operations of the platform are being preserved for the future date that we would be able to operate this -- this Power Block Coin in the past has generated substantial revenues, billions of, you know -- in some years as high as $6 million, $7 million a year. There have been software development activities that have been occurring to enhance the platform, to do a new version.

And as we emerge from bankruptcy and emerge from this short-term requirement in our cash

Page 162

flow and closing of our bank account, we believe that we would be able to re-establish and re-operate the business.  So that the investment to preserve the platform and to be able to continue to collect the interest is what we're working on and what the cash flow has been, a lot of it has been on software development.

THE COURT:  Thank you.

Mr. Hershey, do you want to finish up?

MR. HERSHEY:  Yes.  Sure.

THE COURT:  And again, I apologize for the interruption, but I --

MR. HERSHEY:  Yes, Your Honor.

THE COURT:  -- that issue has been bothering me and I wanted to get to it.  So thank you for your indulgence.

MR. ROTHSCHILD:  No.  Thank you, Your Honor.  I appreciate your attention to these matters.

And I will finish up as quickly as I can. I think I only have a few more minutes.

Why don't I have my team pull up -- I believe this is Exhibit 10, I think on our list, the Management Services Agreement.

Q.   (By Mr. Hershey)  Okay.  Mr. Tilton, I'll -- I'll be quick because I think you may have already

Page 163

been asked questions about this.  I know you're familiar with the document.

Let's turn to the third to last page with the signatures.

Okay.  And Mr. Tilton, that's your signature for Blue Castle Holdings, correct?

A.    That's correct.

Q.    And as we scroll down, that's Mr. Jones' signature for Power Block, correct?

A.    That's correct.

Q.    Okay.  And Parsons was consulted in the drafting of this agreement, right?

A.    That's correct.

Q.    But you don't recall whether any counsel was involved for Blue Castle, right?

A.    I don't recall but I don't believe that there was.

Q.    Right.  Okay.

And I think you heard Mr. Jones's testimony that this was not a negotiated agreement and that drafts were not exchanged by -- between you and Mr. Jones, right?

A.    Yes, I heard that testimony.

Q.    Okay.  Do you agree with that?

A.    I don't think -- if the word "negotiation"

Page 164

means that we argued or, you know, wrestled over this for weeks at a time to negotiate something, I don't believe that there was.  There was no negotiation.  Okay.

Q.    Yeah.  Thank you.

Let's turn to the last page, which sets forth that services fees will be equal to Power Block Coin, LLC expenses incurred plus the 10 percent administrative fee.  See that?

A.    Yes.

Q.    Okay.  And just to be clear, when you were drafting this document, you didn't discuss any percentages other than 10 percent when you decided on that number, right?

A.    No.  I believe that we did discuss what would be an appropriate fee instead of on 10 percent.  Okay.

Q.    But just to be clear, did you discuss other possible percentages?

A.    We may have.  And I think we may have modeled it out a little bit.  There may have been some calculations on our spreadsheets there -- what -- what that result in -- so, I believe that there was some basic modeling done.

Q.    All right.  Why don't we go to your

Page 165

deposition transcript and we can pull that out.

But you recall, Mr. Tilton, that I took your deposition a few days ago?

A.    Yes.

Q.    And you were under oath in that deposition to tell the truth, right?

A.    Yes.

Q.    And that's the same oath that you're under today, right?

A.    Yes.

Q.    In fact, you did tell the truth in that deposition, right?

A.    Yes, I believe so.

Q.    Okay.  So, let's turn to page 163 and let's go to -- okay, let's go to line 22.

You see that?  Do you see where I am?

A.    Yes.

Q.    Okay.  You see it says, "Were any other percentages discussed?"  That was my question.  See that?

A.    Yes.

Q.    And you said, "Not that I recall," right?

A.    Yes.

Q.    Okay.  Let me go back to my question.

To be clear, you did no market testing as

Page 166

to whether a 10 percent administrative fee was reasonable, right?

A.    That's correct.

Q.    You didn't do any market testing to determine whether any administrative fees were charged in similar circumstances, right?

A.    That's correct.

Q.    And you didn't look at other management services agreements drafted in similar circumstances to see if they also involved a 10 percent administrative fee, right?

A.    Okay.  We weren't aware of any other services or service providers of this sort to actually look at another agreement so, yes, that's correct.

Q.    Okay.  And you didn't do any research to determine whether there was another entity who could provide these same services for a smaller administrative fee, right?

A.    No, that's not true because one of the services would be payment transfers.  We have banking relationships that previously served as this function.  They certainly charge less but they're not available to us now because the banking industry is not banking cryptocurrency companies.

Page 167

So, banking was the biggest -- a big part of this process and we're unable to find anybody else that actually would offer that service.

Q. Okay. Let's just do this. Let's just -- this will be my last point.

Let's just go back to your deposition transcripts, page 165. And I'm going to go to line 8 on page 165. Okay.

And you see I asked you, "So did you do any research to determine whether there's another entity who could provide those services and would do it for less, let's say 5 percent?"

See that question?

A. Yes.

Q. And you answered, "No, we didn't do any research." You see that?

A. Yes.

Q. Okay. I have no further questions. Thank you.

THE COURT: All right. Mr. Bloom, you've been very patient. Do you have any questions?

MR. BLOOM: I do have a few, Your Honor. And please understand when I say that the last thing I want to do at 4:35 in the Court's afternoon or 6:35 in mine is to go over old ground. But there are one

Page 168

or two points that I'd like to tie up very briefly, if I might.

THE COURT:  Please.

MR. BLOOM:  Thank you, Your Honor.

CROSS-EXAMINATION

BY MR. BLOOM:

Q.    Mr. Tilton, let me go back to discussing the Blue Castle assumption of the Power Block payable owed to Parsons.  I believe it's been your testimony consistently that each time Blue Castle pays or makes an advance on behalf of Power Block, it debits the note owned -- the note from Blue Castle to Power Block in a corresponding amount; is that right?

A.    In general, I believe so.  I know that there are payments during that time frame when Power Block Coin had stable coins or other assets that it would use to transfer that.  So --

Q.    I'm talking -- sorry.

A.    Not always but, in general, yes.

Q.    And I'm talking about today.  If Blue Castle were to make a payment for the benefit of Power Block, it would debit the note in an amount that corresponds to that payment.

A.    If it was a Power Block Coin expense, yes.

Page 169

Q.    Okay.  So if Blue Castle then decided that it needed to pay Parsons and it paid Parsons the $203,000 that Blue Castle assumed as an obligation to pay, then it would look to debit that note by $200,000; is that right?

A.    No.  That's the exception, as pointed out in the e-mail that the -- that the U.S. Trustee showed that we are not allowed to do that and we would not do that.  We agreed not to do that.

Q.    Okay.  Okay.  Let me go on to another subject then.

MR. BLOOM:  May I ask if the U.S. Trustee could please quickly pull up that Exhibit E that I think reflected the re-registration of the RE Holding's[sic] ownership?

MS. WILDEN:  Yes.  Just one second.

MR. BLOOM:  Thank you, Ms. Wilden.

MS. WILDEN:  Can you see that?

MR. BLOOM:  No, it's not up here.

MS. WILDEN:  Okay.  Now can you see it?

MR. BLOOM:  Yes.

Q.    (By Mr. Bloom)  Okay.  I believe that you testified, Mr. Tilton, that -- that Power Block took steps after the bankruptcy filing to correct the record as the ownership.

Page 170

A.    Yes.

Q.    Of the -- okay.  So as of the Chapter 11 filing date, just to be clear, the record owner of RE Developers, LLC was Power Block?

MR. ROTHSCHILD:  Objection, mischaracterizes exhibit.

Q.    (By Mr. Bloom)  The principals, registered principals of RE Developers, LLC was Power Block; is that right?

A.    This document says that the previous registered principal was Power Block Coin.  The updated registered principal is Blue Castle Holdings.

Q.    Right.  And that was -- I believe you testified, if I have it right, to correct the record as to ownership to reflect that Blue Castle Holdings was, in fact, the owner and not Power Block Coin?

A.    That's correct.

Q.    As of the date you filed bankruptcy, it was Power Block Coin that was registered as the owner; is that correct?

A.    That's correct.

Q.    I also believe you were asked whether you consulted with counsel in respect of this transfer of ownership.  And you said you did not recall?

A.    I know there's a discussion about

Page 171

generally updating multiple filings.  This is something that we're doing for another entity.  And in going -- coming across this, this Ms. Conger(ph), our admin, I asked her to check all the entities, look at everything, make sure everything was up to date as we did from time to time.  And she provided this information to me and showed me that that was not correct.

But it was in concert with the discussion of another law firm representing the -- one of the other entities that this came up.

It was not about this filing specifically, but it was about one of the other entities making sure that we were transferring -- I think they were the registered agent at the time when we were transferring that to Casey Conger(ph) to be the registered agent.

Q.    But as of the date of this filing on August 8, twelve days ago, you don't recall whether you discussed it with Parsons?

A.    We may have.  I don't recall exactly.  I know there was a discussion.  But I don't remember if that was -- exactly when that time was.

MR. BLOOM:  Nothing further, Your Honor.

THE COURT:  Thank you, Mr. Bloom.

Page 172

All right.  I'm hesitant to ask but: Anything else from anyone?

All right.  I understand the concerns expressed by both the Celsius Administrative Parties and the United States trustee and Mr. Bloom to the, at best, sloppy record keeping by Mr. Tilton and Mr. Jones and the companies that they have operated.  But I'm satisfied from the testimony of Mr. Jones and, less so by Mr. Tilton, that there has been no manipulation of documents or backdating of documents, that they believe the transaction.

And again, I'm not making a determination about the estate's interest in RE Developers but for the limited purpose, because that may be an issue for a third-party fiduciary in the future to take a look at.  So I'm not making any determination on that.

But as to the limited issue of the debtor's employment of Parsons Behle & Latimer, I think at this point the firm is disinterested.  It does not have a hold at this point of pre-petition claim.  I'm going to overrule the objections, grant the application to employ.

And then moving on to the -- the cash management matter, I have a definite and firm conviction from the testimony provided today and the

Page 173

exhibits that this debtor has not received, and I won't use the term "reasonably equivalent value" because that has a serious ramification in some -- some matters. But what I will say is, I don't think it's reasonable for Blue Castle to be offsetting its substantial obligation to this affiliate in the way that it has over the last seven months.

And I'm not going to approve that management services agreement. I'm going to allow the debtor to actually negotiate something with Blue Castle, if that's the only party you can find to fund this case, and come back to the table with something for the creditors and the U.S. Trustee to take a look at.

But just looking at the composition, just the detail provided in the audit trail of the composition of the $138,000 figure from, I think that was the either February or March offset, this company is not engaging in any serious business right now. And those expenses are not appropriate and they won't be approved by me.

So if you want to go and negotiate something else and come back, I'm even going to give you a chance, I'm going to give you something to shoot for.

Page 174

I'm going to have a placeholder on Wednesday the 28th at 2:00 p.m.  If you want to notice up some sort of a resolution of that motion, by noon on Monday the 26th, I'll hear you then.

But otherwise, that motion is not going to be approved at this time.

MR. ROTHSCHILD:  Your Honor, may I ask who we need to get into agreement with?  The only opposition to that specific motion, I'll note, was with the U.S. Trustee, I believe.

THE COURT:  Anyone else want to be heard on that issue?

MS. JARVIS:  Yes, Your honor.

THE COURT:  Ms. Jarvis -- Ms. Jarvis, you're coming out of your chair.

MR. JARVIS:  Yeah, that's because both Mr. Song and the associates and administrators also joined in and objected to that motion as well.

THE COURT:  All right.  There you have it.

I just don't think it's fair right now.

All right.  Anybody want to have a status conference?

MR. ROTHSCHILD:  Your Honor, I believe we're required to, statutorily.

MS. WILDEN:  We have a couple of comments

Page 175

for a status conference too, your honor.

THE COURT:  Go ahead, Ms. Wilden.

MS. WILDEN:  Oh, two matters.  First, we still don't have the six-month cash flow projections that were supposed to come in with the initial financial report.  First monthly operating report is due tomorrow, so thanks to Your Honor's questions, we now know that the debtor has had a couple thousand dollars in transactional fees but we don't know any -- we don't have any information about what this debtor is doing and what money it's bringing in, so that's our first issue.

The second issue regards the claims bar date.  And I know Your Honor wants to hear the sub 5 objection after the plan deadline and so forth but we're concerned that the consumer creditors listed on Schedule E/F may not realize that the effect of their claims being marked contingent and unliquidated means that they have to file a claim.  So by the claims bar date, it's quite possible that only Celsius and Song will have filed claims and then the debtor could say that they don't have to pay the consumer creditors anything and that the debtor has shifted the burden to liquidate their claims to the customers and creditors, whereas if Your Honor were to determine

Page 176

that the amount of those claims is actually

liquidated and determinable, then the debtor would,

you know, know the amount of the claim, would

schedule those allowed amounts and consumer debtors

would -- maybe would get something under the plan.

THE COURT: Well, unfortunately, I -- you

know, unfortunately I got a business degree in

undergrad and I didn't take any philosophy or logics

classes. But again, it seems to me -- and this is

something we'll have to talk about in this case. It

seems to me that an obligation either for a consumer,

borrower, or for Mr. Song to say that their claim is

contingent when the debtor has no possibility as of

the petition date of fulfilling that obligation, I

don't know that that's what a contingent claim is.

MS. WILDEN: Ms. Lofstedt also had a

comment on perhaps how to treat those claims that --

it was original, (inaudible) listening to.

MS. LOFSTEDT: Thank you, Your Honor. I

guess I'm still in the process. After we get through

these preliminary matters, I'll jump in a lot more

here but everybody's been busy with depositions and

so forth.

But in terms of some of the claims, in

particular, the token claims, I'm still trying to

Page 177

understand those.  I know that the customers purchased the tokens and then there's this obligation to buy back the tokens if they meet certain conditions.

I'm -- I'm wrestling whether that's an executory contract, if there's performance on both sides and whether the obligation arose as of the petition date or whether the obligation would arise at a later date upon assumption or rejection.  And I just have to preface that I'm at the National Association of Bankruptcy Trustees and this issue has come up in terms of the lease obligations and I know there's a split of authorities on -- on that type of issue, so --

THE COURT:  All right.  Thank you for your input.

Anything else?

I'm sorry, Mr. Rothschild, we've all had a chance to review your report.  Do you have anything else you wish to add to it?

MR. ROTHSCHILD:  Just a few things, Your Honor.

And let me first address Ms. Wilden's concern about proper notice to -- and she's used the word "consumers."  To be clear, the debtor does not

Veritext Legal Solutions
calendar-utah@veritext.com 801-746-5080

make consumer loans or even a smart interest product was only either QIBs, Qualified Institutional Buyers, or other folks.  And so, they're not consumers.

But I'll note that there was a notice sent out to the entire creditor matrix that sent a notice of claims bar date.  It's the same in every case and that puts an obligation on the creditors to participate, to show up, file a  proof of claim.  It's not unusual.  It's not different than any other case. And I don't think that that -- this is unfair or a surprise or anything else.  They also receive e-mails with the same notice and they also have it published and posted on the website as approved by the Court.

So I don't think there's any -- or there shouldn't be any concern from the U.S. Trustee or the Court that creditors are not having a fair shake and don't have the ability to participate in the case and file proofs of claim.

I don't think any of it is germane to the issue of eligibility under Subchapter 5 and I don't believe we need to get into that in this case.  It's going to be teed up, argued, evidence, all of that on a later date.  So I won't address any of that right now.

As for the status report, Your Honor, I

Veritext Legal Solutions
calendar-utah@veritext.com 801-746-5080

will report that the -- the debtor is going to be able to propose its Chapter 11 plan.  We anticipate putting a plan on file, Your Honor, that has adequate information and could be solicited -- as required under Subchapter 5 but that it could also qualify as a disclosure statement and we'll be filing a motion to waive the disclosure statement requirement, as we've done in a lot of, you know, medium and small cases, to allow solicitation of the plan that includes adequate information in order to save time and funds at the debtor, all in one fell swoop.  And I'll cite Vector Arms(ph) where we did this with Your Honor.

THE COURT:  Yeah.  Mr. Rothschild, this is not Vector Arms(ph).

MR. ROTHSCHILD:  Well, Your Honor, that was not a small business case either, because there was no Subchapter 5 at the time.  Okay.

Well, Your Honor, this is -- as Your Honor said, this debtor doesn't appear to be doing a lot of complex business right now and so maybe it is a rather simple amount of information that is required and we believe we can provide it.

We will upload those orders, Your Honor.

And unless there's any other questions on

Page 180

the status conference, we believe we've met that requirement.

THE COURT:  Ms. Wilden, any other input?

MS. WILDEN:  Nothing from the U.S. Trustee, Your Honor.

THE COURT:  All right.  Ms. Jarvis or Mr. Hershey?

MR. JARVIS:  Yeah.  Your Honor, I would just like to follow up on the claims issue.  And I think the real issue is that, as Your Honor has noted, to say these are all contingent claims, they've all been listed as zero because -- you know, what the claim is that this -- they can't be liquidated and yet they can -- you know, they can state their assets in, you know, in cryptocurrency, but they're not stating their liabilities.  That while we're only one -- one, you know, group of claimants, it's really not -- not fair to require all these 200, you know, plus individuals to have to file proofs of claim when if the schedules were properly filled out, they would have claims.

And that's what our concern is, that, you know, to kind of allow the bar date to go forward without the schedules being corrected is really not fair to the process.

Page 181

THE COURT:  Well, we have representatives from the United States here, Department of Justice. If they think there's something that needs to be done, they can do it.

MR. JARVIS:  Thank you, Your Honor.

MS. LOFSTEDT:  Your Honor, I had just one other issue.  I did discover a -- a connection in terms of my firm and I'll be filing a supplemental disclosure.  I've discussed that issue with the U.S. Trustee's Office.  And so I'll be filing a further disclosure.  And I can go through it now or that should be filed today or tomorrow.

THE COURT:  Thank you.

All right.  Does anybody have a problem with Wednesday at 2:00?

MR. ROTHSCHILD:  I'm sorry, Your Honor, for this Wednesday, tomorrow?

THE COURT:  The 28th, I'm sorry.  I'm trying to give you time to negotiate.

MR. ROTHSCHILD:  Your Honor, that works for debtor's counsel.

MS. WILDEN:  The U.S. Trustee will have a representative there, Your Honor.

MALE SPEAKER:  We will also.

THE COURT:  All right.  Thank you all for

Page 182

your patience and efforts.

The Court is in recess.

(End of transcription.)

Veritext Legal Solutions
calendar-utah@veritext.com 801-746-5080

REPORTER'S CERTIFICATE

I, Lauren Shields, Registered Professional Reporter and Notary Public in and for the State of Utah, do hereby certify:

That on August 28, 2024, I produced a transcript from electronic media at the request of Attorney Carson Heninger;

That the testimony of all speakers was reported in stenotype and thereafter transcribed, and that a full, true, and correct transcription of said testimony is set forth in the preceding pages, according to my ability to hear and understand the tape provided;

That the original transcript was sealed and delivered to Carson Heninger for safekeeping.

I further certify that I am not kin or otherwise associated with any of the parties to said cause of action and that I am not interested in the outcome thereof.

WITNESS MY SIGNATURE this 28th day of August, 2024.

Lauren Shields, RPR

Page 184

**[& - 2012]**

| & | | | |
|---|---|---|---|
| **&**  3:7,12,17 7:10 8:7,19,24 16:7 18:22 49:22 79:8 113:3 141:19 173:18 | 95:24 106:16 116:5 143:5 146:19,22 150:5,12,14 159:24 163:22 165:8,13,16 167:1,10 | **12,500**  70:14 **12,599**  72:13 **12-19-2023** 55:4 56:22 **12-19-23**  55:12 **120**  95:9 114:7 **1221**  3:8 | 148:12,24 **1730**  3:4 **17th**  2:17 **18**  5:11 6:4 134:14 **1800**  2:6 |

| 1 | | | |
|---|---|---|---|
| **1**  5:2,20 10:25 26:16 27:16,19 27:20 50:23 52:24 53:12 54:13,16 63:14 63:24 64:1,4,6 64:8 66:13 69:17 79:15 80:18,19 112:17 130:9 146:3 160:20 | **10,000**  78:25 161:9,21 162:3 **10,828**  78:19 **100**  39:4 93:13 116:9 143:9 152:9,15 154:9 **100,000**  47:4 75:13 137:11 **10020**  3:8 | **127**  79:13 **13**  5:8 6:1 106:23 141:22 **138,000**  67:19 69:20 174:17 **14**  5:9 6:2 146:22 **1400**  3:19 **141**  4:10 | **19**  5:11 6:4 34:12,17 46:20 46:22 73:18 137:7,10 **19th**  54:20 55:1 56:8 124:25 |

| | | | 2 |
|---|---|---|---|
| **1,000**  65:3 **1,001,000**  87:4 **1,300**  136:20 **1,500**  115:25 116:2 **1-34**  27:21 **1.1**  42:10 **1.4**  42:8 64:11 65:20 66:17 69:18 **1.7**  10:22 118:19 **10**  5:7,25 33:8 40:12 76:2,8 83:7,13 84:7 86:5,8,14 | **1024**  55:10 56:10,14,25 **1031**  111:22 **104**  72:23 **108**  68:24 **10th**  3:13 **11**  5:7 7:6 41:7 86:12 153:22 153:24 155:1 171:2 180:2 **11,000**  75:14 137:13,14 **1111**  3:13 **113**  4:9 **116**  68:5 **12**  5:8 6:1 32:14 72:21 134:2,14 137:2 | **15**  5:9 6:2 57:7 62:4 **15,000**  138:11 **150**  137:1 **16**  5:10 6:3 35:21 40:1 68:17,18,22 160:10,16,18 161:4 **163**  166:14 **165**  168:7,8 **169**  4:11 **17**  5:10 6:3 41:17 65:17 88:4 160:10,17 160:24 161:4,4 161:4,5 **17.4**  10:21 147:19,23 | **2**  5:3,21 28:6 43:25 45:8 54:8,14 69:16 69:18 81:24 82:8,21,23 133:22 160:25 **20**  1:17 4:3 5:12 6:5 47:15 52:11 **200**  46:1 136:19 137:1 181:19 **200,000**  11:13 11:24 46:11 102:12 139:8 139:20 140:18 162:13 170:5 **2008**  94:11 **201**  2:5 **2011**  96:21 **2012**  96:21 |

Veritext Legal Solutions
calendar-utah@veritext.com 801-746-5080

**[2017 - 532-1234]**

**2017**   21:3 97:24,24 106:2
**2022**   106:3 108:20 109:3 130:14
**2023**   11:10 13:15 16:18 22:9 23:19 32:25 34:12 37:17 48:16 50:19 53:11,25 54:8,14 55:1 60:1,10 63:14 63:23 65:21 66:15,16,20 111:13 122:9 124:1,5,9,25 125:13 126:25 127:4,10
**2024**   1:17 40:18 42:5 67:18 69:4,7 78:14 126:4 138:1,5 184:5 184:16
**2025**   133:10
**2028**   119:1
**203,000**   170:3
**2030**   60:25 61:1
**21**   5:12 6:5 26:2,19 27:3 27:23 31:19 33:16,20,21,23 43:6 46:12

64:21 88:8
**212**   3:9
**22**   5:13 6:6 166:15
**222**   3:4
**23**   5:13 6:6 79:15 80:13,18 80:19
**24**   5:14 78:19
**24-23041**   1:7
**25**   5:14 69:4
**25,000**   118:8
**25,500**   69:23
**250**   31:12
**250,000**   17:5 30:9 31:12,16 31:24 32:2 36:11 63:1 65:8 87:15,22 88:14 125:15 126:25
**26**   5:15
**261**   88:13
**261,000**   35:13 46:15
**26855**   184:23
**26th**   175:4
**27**   5:2,3,3,4,4,5 5:5,6,6,7,7,8,8 5:9,9,10,10,11 5:11,12,12,13 5:13,14,14,15 5:15,15,16,16 5:17,17,18,18 5:19 122:9

**27th**   72:25
**28**   5:16 184:5
**28th**   175:2 182:18 184:16
**29**   5:16
**29,143**   73:2
**2:00**   175:2 182:15
**2nd**   13:3 60:25 65:4 124:1,5,7 125:12 133:10

**3**

**3**   5:3,21 53:11 53:25
**30**   5:17 42:10 69:7
**300**   2:12
**303**   2:18
**305**   3:14
**30th**   46:15 67:18
**31**   5:17
**31st**   31:23
**32**   5:18
**323-3363**   3:20
**327**   14:22
**33**   5:18 68:17
**33131**   3:14
**34**   5:19 26:17 27:16,20,20
**35,370**   69:10
**36**   3:18
**39**   68:5
**3rd**   50:24 54:19 60:1,10

124:9

**4**

**4**   5:4,22 31:19 108:17 119:22 121:3 146:2,7 146:20 147:3 147:15
**4-3-2023**   54:7
**4-3-23**   52:19
**405**   2:11
**425n**   2:17
**478-6900**   3:5
**4:35**   168:24

**5**

**5**   2:14 5:4,22 7:18 80:4 103:8 108:13 120:25 142:20 142:22 144:1 145:25 146:3 146:12 168:12 176:14 179:20 180:5,18
**5-11-2023**   52:15
**50**   4:4
**50,000**   102:12 118:7
**5003-2e**   24:6
**511,000**   88:15
**512-1123**   2:18
**524-5148**   2:13
**532-1234**   2:7

Veritext Legal Solutions
calendar-utah@veritext.com 801-746-5080

[6 - act]

| 6 | | | |
|---|---|---|---|
| **6** 5:5,23 162:20 | **8,250** 70:23 | **able** 17:14 | **accountant** |
| **6-24** 35:5 | **8-7-2024** 51:25 | 116:1 120:7 | 49:16 |
| **600** 2:17 | 62:11 | 132:2 140:18 | **accounted** |
| | **80** 4:5 5:20,21 | 162:17 163:2,4 | 115:12 |
| **7** | 5:21,22,22,23 | 180:2 | **accounting** |
| | 5:23,24,24,25 | **absent** 8:12 | 10:3 14:3 |
| **7** 5:5,23 118:18 | 6:1,1,2,2,3,3,4 | **absolutely** | 17:13 20:18,21 |
| 118:19 146:18 | 6:4,5,5,6,6 | 151:11 | 23:16 38:18 |
| 162:20 | **80,000** 55:15 | **accepted** 23:15 | 39:7,10,12 |
| **7-30** 35:5 | **801** 2:7,13 3:5 | 135:19 | 41:23 49:21 |
| **70,000** 118:7 | 3:20 | **account** 11:21 | 54:15,24 55:16 |
| **700,000** 46:8 | **80202** 2:18 | 11:23 12:3 | 70:11,18 92:15 |
| **750,000** 30:7 | **819-2699** 3:9 | 15:8 22:8,9 | 99:11 124:16 |
| 32:10 36:14 | **84101** 3:5 | 23:20 24:12,13 | 125:23,24 |
| 56:22 65:4 | **84111** 2:6,12 | 25:12,14,17 | 126:24 127:5 |
| **751** 69:18 | 3:19 | 31:25 32:1 | **accounts** 12:4 |
| **751,000** 31:10 | **87** 4:6 | 34:14,19 38:10 | 21:24 22:2,5 |
| 32:7,19 33:7 | **8th** 66:2,15 | 39:20 46:24 | 22:10,13,17 |
| 33:13 35:9,12 | 126:4 | 49:22 53:13 | 25:4 37:18 |
| 35:14,19 36:2 | | 54:1 57:19 | 64:20 |
| 42:2 56:19 | **9** | 58:10,11 63:25 | **accrued** 144:9 |
| 58:18 60:8 | | 64:5,7,9,17 | **accrues** 143:2 |
| 62:25 63:6,18 | **9** 5:6,24 37:3,7 | 65:4 66:2,14 | **accruing** |
| 65:9 | 81:5 146:18 | 67:5,12 69:12 | 100:24 161:12 |
| **7677** 12:10 | **92** 4:8 | 70:15,24 71:8 | **accurate** 15:6 |
| **7787** 15:17 | **93** 68:9,14 | 72:13 75:15 | **achieve** 146:2,7 |
| **789-8927** 3:14 | | 77:2 83:1,3,3,5 | **acquired** 95:21 |
| **7th** 47:4 52:4 | **a** | 85:25 86:2 | 103:5 |
| 66:16 | | 105:12 124:12 | **acres** 46:1 95:9 |
| | **aaron** 4:8 7:11 | 130:17 137:11 | 114:7 115:25 |
| **8** | 70:2,3,7 84:1 | 137:13 149:19 | 116:2 136:19 |
| | 90:11 91:22 | 150:1,1 161:25 | **acronym** 94:23 |
| **8** 5:6,24 63:14 | 92:4 | 162:2,5,6 | **act** 21:17 63:20 |
| 63:23 64:4 | **abilities** 37:21 | 163:1 | 74:11 106:16 |
| 146:18 168:7 | **ability** 77:17 | | |
| 172:19 | 145:1 179:17 | | |
| | 184:10 | | |

Veritext Legal Solutions
calendar-utah@veritext.com 801-746-5080

**[acted - agreements]**

| | | | |
|---|---|---|---|
| **acted** 131:1 | **address** 9:18 | **advanced** | 61:20 72:25 |
| **acting** 21:10,12 | 24:9 25:7 | 34:18 35:13 | 94:7,9 96:12 |
| **action** 154:4 | 119:22 178:23 | 63:22 94:23 | 126:5 153:24 |
| 158:17 159:7 | 179:23 | **advents** 124:21 | 154:16 155:2 |
| 184:14 | **addressed** 27:5 | **advice** 84:8,19 | 166:3 172:19 |
| **actions** 158:10 | **addressing** | 97:15 152:24 | **agree** 12:16,18 |
| **activities** 9:25 | 25:10 | 153:4,15,23 | 39:16 142:20 |
| 10:19 11:3 | **adequate** 58:5 | 154:16 155:5 | 161:10 164:24 |
| 138:23 149:21 | 180:3,10 | 155:11,13,16 | **agreed** 83:15 |
| 162:22 | **adhere** 23:15 | 157:16 158:1 | 83:23 85:3 |
| **activity** 74:18 | **admin** 52:18 | **advised** 155:7 | 156:6,10 170:9 |
| 75:19 | 172:4 | 158:18 | **agreement** 11:9 |
| **actual** 34:23,24 | **administered** | **advising** 85:12 | 18:11,17,18 |
| 37:25 135:23 | 110:8 | 158:9 159:6 | 27:17 37:8,16 |
| 136:2 162:8 | **administration** | **advisors** 84:18 | 37:23 42:21 |
| **actually** 13:22 | 20:22 40:12 | 84:19 85:12 | 44:2 45:14 |
| 18:19 44:18 | **administrative** | **affiliate** 16:4 | 46:17 47:3 |
| 48:18 69:11 | 37:25 83:8 | 102:24 109:25 | 81:6,19 83:16 |
| 87:16 99:7 | 165:9 167:1,5 | 174:6 | 85:12,23 86:7 |
| 140:1 167:14 | 167:11,19 | **affiliated** 9:22 | 86:13 90:1 |
| 168:3 174:10 | 173:4 | **affiliates** 98:21 | 98:1,5,8,10,14 |
| 177:1 | **administrator** | **affirmative** | 104:8 112:10 |
| **add** 112:16 | 3:1 79:8 | 54:10 | 115:21 116:3 |
| 178:20 | 141:20 | **afternoon** 7:4,8 | 123:13 132:13 |
| **added** 61:13 | **administrator's** | 7:17 8:2,6,18 | 133:8,20 134:4 |
| 100:15 | 79:12 | 18:21 79:7 | 135:19 150:19 |
| **addition** 39:12 | **administrators** | 81:1 150:25 | 154:13 159:24 |
| 152:4 | 8:8 18:24 | 168:24 | 160:20 161:22 |
| **additional** | 175:17 | **agency** 47:5 | 163:23 164:12 |
| 34:12,18 35:12 | **admissible** 80:9 | **agent** 131:2 | 164:20 167:14 |
| 37:25 40:24 | **admission** 27:7 | 172:15,17 | 174:9 175:8 |
| 47:12 63:21,23 | 27:13 | **ago** 13:13 | **agreements** |
| 86:14 115:25 | **admit** 80:14 | 16:18 46:12,25 | 81:10 115:8 |
| 116:2 138:19 | **advance** 34:13 | 47:2 52:4 | 123:10 167:9 |
| | 35:11 169:12 | 60:13,15,16 | |

Veritext Legal Solutions
calendar-utah@veritext.com 801-746-5080

**[ahead - arm's]**

**ahead** 9:15,19 13:6 58:23 80:21 103:17 116:16 153:9 154:21 160:5 176:2
**allegedly** 13:14 13:21
**allocable** 39:4
**allocate** 82:2
**allocation** 82:6 82:16
**allow** 42:12 111:9 174:9 180:9 181:23
**allowed** 170:8 177:4
**allows** 45:15
**alterations** 48:7
**alternatives** 149:10
**ambiguous** 154:19
**americas** 3:8
**amount** 17:10 28:14 33:12 35:11,19 40:12 40:13 46:9 49:10 63:8 64:1 67:19 69:10,11 70:13 70:15 71:18 78:14 87:8 88:1 99:3

108:1,2,4,5 169:14,23 177:1,3 180:22
**amounts** 16:19 40:14 42:3,4 65:13 89:7 177:4
**ampleo** 69:15 73:3,10
**analysis** 151:16
**ancillary** 100:16
**annette** 3:2 8:13
**annexation** 135:10,11
**annexed** 115:4 135:5,7
**answer** 64:14 71:11,15 74:8 77:5 78:16 82:9 107:4 126:17 136:12 148:16 153:4,8 154:21 157:3,4 157:15 159:2 159:18
**answered** 117:16 153:6 168:15
**anticipate** 159:17 180:2
**anybody** 100:12 132:9 168:2 175:21

182:14
**anyway** 57:9
**ap1000s** 94:19 94:21,23
**apologize** 15:1 15:1 67:15 74:7 121:21 139:25 141:9 160:12 163:11
**apparently** 8:14
**appeal** 96:22
**appeals** 96:23
**appear** 180:20
**appearance** 8:10
**appearances** 7:6
**appearing** 8:19
**appears** 13:11 63:9 121:6 134:13 142:22
**appli** 71:10
**application** 8:23 16:10 42:23 71:10 89:21 135:23 138:16 173:22
**applications** 132:6 134:9
**applied** 72:17 86:8 133:17
**apply** 69:17
**appoint** 152:25 153:16

**appraised** 114:6
**appreciate** 76:16 159:2 163:18
**approach** 114:18
**appropriate** 29:14 82:6 117:5 134:3 147:9 165:16 174:20
**approve** 174:8
**approved** 42:23 135:19 135:24 136:3 139:10 174:21 175:6 179:13
**approves** 42:21
**approximately** 31:15 42:10 46:13
**april** 13:15 23:19 40:18 42:5 50:19,24 53:11,25 60:1 60:10,25 124:9 161:1
**argued** 165:1 179:22
**argument** 19:4 19:7 90:23 151:19
**arm's** 111:25

Veritext Legal Solutions
calendar-utah@veritext.com 801-746-5080

## [arms - balance]

**arms** 180:12,15
**armstrong** 50:6
59:7 140:5
**arose** 178:7
**arrangement**
85:4
**arrangements**
97:12
**article** 119:22
120:25 121:3
**arts** 20:18
**ashcroft** 97:18
**asked** 10:15
12:5,16 59:25
81:4 82:11
119:4 140:17
142:6,14
148:15 164:1
168:9 171:22
172:4
**asking** 36:24
47:2 71:6
121:8,16 131:7
134:18 152:10
159:3
**asset** 99:1,9,12
99:16,22 100:2
100:21 105:17
105:17 106:3
106:11 108:25
109:4 145:16
146:15 147:6
148:2,6 149:12
**assets** 77:15
100:17 106:9

108:16 109:11
148:6 162:5
169:17 181:15
**assist** 145:5
**associated**
110:17 184:13
**associates**
175:17
**association**
178:11
**assume** 9:11
117:9 119:12
125:17
**assumed** 170:3
**assuming**
110:19
**assumption**
169:9 178:9
**attached** 24:16
**attention** 10:8
10:10 23:18
40:1 67:17
107:23 123:20
123:23 163:18
**attorney** 2:16
3:7,12,18
11:18 77:4
126:18 153:3,3
157:14 184:6
**attorneys** 2:5
2:11 3:3 97:19
104:17
**auction** 75:13
**audit** 47:21,24
51:13,22 57:7

62:19 68:5
110:15 123:19
174:16
**audits** 70:11
**august** 1:17
13:3 47:4
48:16 52:4
54:8,14,19
65:21 66:16
124:1,5,7
125:12 126:4
133:10 172:19
184:5,16
**authorities**
178:13
**authorized**
154:5
**available** 14:17
44:25 65:25
133:4 149:15
167:24
**avenue** 3:8,13
12:11
**average** 162:13
**aware** 38:9,12
48:23 51:7,10
101:22 104:23
115:19 123:5
139:22 157:18
157:22,25
167:12

**b**

**b** 2:3 5:1 20:7
121:25

**bachelor** 20:18
**back** 11:5
12:22 13:23,23
15:15 17:10
21:8 23:19
31:17 33:15,20
35:15 36:15
39:25 40:1
43:6,12 48:18
50:22 52:11
55:6 56:3 57:4
57:13 58:3
63:9 64:20
66:9 67:3 76:8
76:13 93:21
103:14 113:24
117:24 118:22
121:3 123:8
125:3,5 130:25
135:1 141:21
148:1 160:13
166:24 168:6
169:8 174:12
174:23 178:3
**backdating**
173:10
**background**
20:14 92:11,15
92:17
**backtrack** 22:6
**baker** 3:12 8:19
**balance** 35:14
42:7,9 61:25
62:5 65:9,23
66:21 67:4,7

Veritext Legal Solutions
calendar-utah@veritext.com 801-746-5080

**[balance - black]**

| | | | |
|---|---|---|---|
| 67:12 88:5,10 | **bankruptcy** 1:1 | **behalf** 7:23 8:3 | 175:23 179:21 |
| 88:11,12,12 | 11:14 32:22 | 8:20 37:23 | 180:23 181:1 |
| 137:12 156:7 | 35:2 96:6,14 | 38:15,22 42:6 | **believes** 91:7 |
| 160:25 | 129:22,25 | 77:19 81:21 | **belongs** 16:13 |
| **balances** 11:25 | 134:22 139:21 | 83:9 89:18,25 | **benefit** 169:22 |
| **bank** 15:8,13 | 152:25 153:16 | 110:16 111:1 | **best** 28:17 87:9 |
| 21:24 22:2,4,8 | 154:6,17 | 141:20 169:12 | 87:11 173:6 |
| 22:9,10,13,17 | 162:24 170:24 | **behle** 2:4 7:10 | **better** 22:6 |
| 23:20 24:12,13 | 171:18 178:11 | 8:24 16:7,24 | 75:8,21 99:21 |
| 24:16,17,18,22 | **banks** 110:15 | 39:16 48:25 | 118:10 125:22 |
| 24:23 25:12,16 | **bao** 131:11,14 | 49:2,5,8,17,22 | 131:9 145:22 |
| 25:17 28:8,9 | 137:12 | 71:10 73:12 | 147:25 |
| 31:21,23,24,25 | **bar** 176:13,19 | 89:4,8 90:16 | **beyond** 146:25 |
| 34:13,19,23,25 | 179:6 181:23 | 98:12 107:16 | **big** 99:13 168:1 |
| 37:18 38:10 | **base** 106:12 | 113:3,10 | **bigger** 51:15 |
| 39:20 46:24 | 117:2 | 140:25 173:18 | 68:2 142:1 |
| 48:13 50:18 | **based** 18:12 | **behle's** 46:9 | **biggest** 168:1 |
| 52:24 53:13 | 43:14 | 88:19 | **billing** 91:2 |
| 54:1 57:19 | **basic** 165:24 | **belief** 147:7 | 156:3 |
| 63:25 64:5,7,9 | **basically** 99:10 | **believe** 7:12 | **billions** 162:19 |
| 64:16,20 66:2 | 99:13 105:11 | 16:12 18:19 | **bills** 149:17 |
| 66:14,23 67:5 | 106:16 111:5 | 55:2 63:1 | **binder** 79:14 |
| 67:10,12 69:11 | 115:24 | 97:24 122:5 | **biomedical** |
| 70:15,24 71:8 | **basis** 24:10 | 141:22 147:17 | 47:5 |
| 72:13 75:15 | 40:9 100:9 | 154:3 155:15 | **bit** 13:24 15:16 |
| 77:2 85:25 | 117:21 142:25 | 156:2,4 157:16 | 17:20,21 26:20 |
| 86:2 103:6,11 | **bates** 68:7,24 | 160:23 161:3,6 | 27:6 31:22 |
| 104:4 118:17 | 72:22,23 | 161:12,17,23 | 50:20 62:9 |
| 130:17 161:25 | **bch** 35:18 | 163:1,22 | 68:2 69:25 |
| 162:2,5,6 | 88:18 93:21,21 | 164:16 165:3 | 95:25 119:15 |
| 163:1 | 124:24 156:10 | 165:15,23 | 125:9 126:10 |
| **banking** 37:21 | **bearing** 150:1 | 166:13 169:10 | 141:25 165:21 |
| 72:1,5 167:21 | **beginning** 27:4 | 169:15 170:22 | **bitcoin** 99:12 |
| 167:24,25 | 28:6 | 171:13,22 | **black** 97:18 |
| 168:1 | | 173:11 175:10 | |

Veritext Legal Solutions
calendar-utah@veritext.com 801-746-5080

**[block - blue]**

| | | | |
|---|---|---|---|
| **block**   1:8 7:5 | 106:8,14 | 169:14,17,23 | 32:20 33:11 |
| 17:18 21:12,13 | 107:11,13 | 169:25 170:23 | 34:1,13,19 |
| 22:7 26:24 | 108:9,14 109:7 | 171:4,8,11,16 | 36:1,3,18,20,21 |
| 28:13,24 29:15 | 109:8 111:1 | 171:19 | 36:22 37:9,10 |
| 29:19 31:9,13 | 112:11,17,21 | **block's**   38:15 | 37:19,20,21 |
| 31:17 32:1,4,8 | 113:2,11 | 147:18,23 | 38:14,21,24 |
| 32:9,12,20 | 117:18 118:12 | 148:11,24 | 39:15,21 40:3 |
| 36:3,8 37:9,11 | 118:22 119:5 | 150:10 152:19 | 40:10,14,22 |
| 37:17,20,22 | 120:3 121:5 | 152:20 153:1 | 41:11,23 42:7 |
| 38:21 39:5,19 | 122:17 123:8 | **bloom**   3:11 | 42:13,17,22,24 |
| 39:22 40:3,11 | 124:10,17 | 4:11 8:18,19 | 43:4,10,13 |
| 40:14,16,23 | 125:3,14 127:3 | 19:10,11 | 46:14 47:10 |
| 41:12,24 42:6 | 127:11,14,16 | 168:20,22 | 48:23 49:7,9 |
| 42:12,18 43:5 | 127:22 128:4 | 169:4,7 170:12 | 49:10,15 50:25 |
| 48:24 49:11,12 | 129:15 130:8 | 170:17,19,21 | 51:2 54:21 |
| 52:22 53:12 | 130:17,25 | 170:22 171:7 | 55:1,17 56:8 |
| 54:2,12,15,25 | 141:23 143:13 | 172:24,25 | 56:17 57:11 |
| 56:7 58:24 | 143:24 144:13 | 173:5 | 58:18 60:9,19 |
| 61:9 63:2,9 | 144:22,25 | **blue**   3:16 8:3 | 63:6,24,25 |
| 65:5 76:21 | 145:3,5,15,16 | 9:23,25 10:3 | 64:3,9 65:20 |
| 77:19 78:7,10 | 145:19,21 | 11:4,10,13,15 | 66:13,17,20 |
| 81:7,21,23 | 146:2,7,16 | 11:19,21 12:6 | 67:4 68:5 |
| 82:2 83:4,9 | 147:8,14 149:6 | 12:12,17 13:1 | 69:11,14 70:18 |
| 84:11,12,24 | 149:11,24 | 13:9,12,15,17 | 71:8,13 72:15 |
| 85:2,8,17,25 | 150:3,7,9,16 | 13:18 14:5,10 | 74:10 81:7,9 |
| 86:1,9 87:5,9 | 152:9 153:17 | 14:12 16:5,13 | 81:13 82:2,6 |
| 87:17 93:16 | 153:21 154:5,9 | 16:13,23 17:8 | 82:11,16,18,23 |
| 97:19,22 98:11 | 154:12 155:6 | 21:2,11,14 | 83:1,7 84:3,13 |
| 98:14,23,25 | 155:12 156:6,9 | 22:1,4 24:23 | 84:23 85:9 |
| 99:6,19,24 | 156:16,18,22 | 25:2,3,12,13,18 | 86:3,5,13 |
| 100:24 103:11 | 157:23 160:20 | 25:19,21 28:3 | 87:16 88:2 |
| 103:22 104:1 | 160:25 161:8 | 28:21,23,24 | 90:14,20 92:22 |
| 104:11 105:5,8 | 161:13 162:4,6 | 29:2,4,8,11,12 | 92:25 93:3,12 |
| 105:9,10,14,16 | 162:18 164:9 | 29:15,16 30:8 | 93:21 94:2,10 |
| 105:19 106:6,7 | 165:7 169:9,12 | 30:9,13 32:12 | 94:18 95:5,7 |

Veritext Legal Solutions
calendar-utah@veritext.com 801-746-5080

**[blue - buying]**

| | | | |
|---|---|---|---|
| 95:21 96:1,7,9 96:17 97:1,4,7 105:23 113:8,9 113:11 114:1 114:11,13 119:24 120:1 120:13 121:3 121:10,11,13 121:18 122:19 122:22 123:2 123:11 124:22 124:24 127:1 127:11,13,18 139:20 140:17 140:24,24 143:10 145:2,5 145:8 152:2,5 152:8,16 153:22 154:3,4 154:8,11,18,22 154:23 155:6,8 155:13,18,20 156:7,12,16,18 156:23 157:12 157:20,23 158:3,10 159:7 161:1,20 162:12 164:6 164:15 169:9 169:11,13,21 170:1,3 171:12 171:15 174:5 174:10 **board** 51:2,5 92:24,24 | 121:15 122:21 122:24 **boils** 17:11 **boley** 107:22 **bolster** 90:22 **bonds** 117:1 **booked** 11:1 53:15 65:6 **bookkeeping** 69:5 **books** 15:10 33:25 36:1 47:21,23 64:24 73:15 87:14 **borrow** 40:22 116:2 **borrower** 110:25 112:20 130:24 177:12 **borrowers** 146:20 **bothering** 163:15 **bottom** 35:4 52:14 53:4,5,8 53:9 107:6 118:1 119:15 120:7 122:7 **bought** 18:13 **boundaries** 115:17 **brad** 4:2 7:11 19:20 20:1,7 94:4 125:22 | **break** 42:15 67:23 76:2 **breakdown** 72:3 **brian** 2:3 7:9 58:15 118:9 **brickell** 3:13 **bridge** 111:10 **brief** 21:4 76:7 76:11 **briefed** 12:11 **briefly** 15:23 20:13 32:18 45:10 86:24 92:10 112:24 169:1 **bring** 14:16 32:14 119:8 128:17 **bringing** 176:11 **brings** 117:21 **broader** 100:9 **brokered** 110:8 **bucks** 30:2 **build** 99:10,13 99:16 116:20 133:23 134:5,8 136:21 **builder** 136:10 136:11 **builders** 133:2 139:1 **building** 103:12 132:22 | **buildings** 136:4 **built** 100:7 104:3 117:6 135:3 136:4 **bunch** 102:4 **burden** 9:1 15:4 176:23 **burne** 2:10 7:23,23 72:2 89:17,17,24 90:3 **business** 9:25 10:19 11:3 20:21 25:13,19 38:20,25 98:23 99:21,22 100:3 100:7,12,25 101:4,12 102:1 102:14,24 106:12 128:3 128:16,18,20 149:13 150:10 162:14 163:3 174:19 177:7 180:17,21 **businesses** 102:7 111:24 158:14 **busy** 177:22 **buy** 100:17 178:3 **buyers** 179:2 **buying** 100:22 148:5 |

Veritext Legal Solutions
calendar-utah@veritext.com 801-746-5080

**[c - castle]**

| c | | castle 3:16 8:3 | 66:13,17,21 |
|---|---|---|---|
| **c** 2:1 7:1 50:7,8 50:14 | 148:1,8,12,24 149:13 | 9:23 10:3 11:4 11:10,13,19 | 68:6 69:14 70:19 71:8,14 |
| **calculations** 99:11,17 165:22 | **capture** 99:15 **car** 102:9 | 12:6,12 13:1,9 13:12,16,17,19 | 74:11 81:7,9 81:13 82:3,6 |
| **calendar** 8:23 117:11 | **cards** 102:4 **care** 25:11,11 | 14:5,10,12 16:5,13,14,23 | 82:11,16,18,23 83:7 84:3,13 |
| **call** 19:19 23:18 39:25 50:6 89:15 90:10 93:21 107:23 | **careful** 9:10 25:22 118:23 **carson** 3:2 8:12 184:6,12 | 17:8 21:2,11 21:15 22:1,4 24:23 25:2,3 25:12,13,18,19 | 84:23 85:9 86:3,5,13 87:16 88:2 90:15 92:22,25 |
| **called** 17:22 20:2 91:23 110:13 115:22 138:25 | **case** 1:7 3:7 7:6 7:13 8:7 12:11 15:17 18:22 24:10,10 79:8 | 25:21 28:3,21 28:23,25 29:2 29:4,8,11,12,16 29:16 30:8,10 | 93:3,12,22 94:2,10,18 95:5,7,21 96:1 96:7,9,17 97:1 |
| **calls** 66:5 153:3 157:14 | 82:17 90:6 96:2,24 109:6 | 30:13 32:12,20 33:11 34:2,13 | 97:4,7 105:23 113:8,9,11 |
| **camera** 141:9 | 141:19 152:22 153:18 155:1 | 36:1,3,18,20,21 36:22 37:9,10 | 114:1,11,13 115:22 119:24 |
| **candidly** 78:3 | 174:12 177:10 179:6,9,17,21 | 37:19,20,21 38:15,21,24 | 120:1,13 121:4 121:10,11,13 |
| **capacity** 21:19 74:11 145:1 155:11,13 | 180:17 **cases** 180:9 | 39:15,21 40:3 40:10,14,22 | 121:18 122:19 122:22 123:2 |
| **capital** 10:25 52:22 53:15,22 54:12 55:23 99:8 100:1 102:16 103:10 105:11 106:17 106:20 109:9 118:3,23 124:11 127:2 146:8,16,21,21 147:16,19,24 | **casey** 126:15 172:16 **cash** 11:15 25:9 25:11 34:6 36:11 48:18 57:16 86:15 103:13 139:6 150:2,6,11,16 161:11,16,16 162:1,8,25 163:5 173:23 176:4 | 41:12,23 42:7 42:13,17,22,24 43:4,10,13 46:14 47:10 48:23 49:7,9 49:10,15 50:25 51:2 54:21 55:1,18 56:9 56:17 57:11 58:18 60:9,19 63:6,24,25 64:3,9 65:20 | 123:11 124:22 124:24 127:2 127:12,14,18 139:20 140:18 140:24,24 143:10 145:2,5 145:8 152:2,5 152:8,16 153:22 154:3,4 154:8,11,18,23 154:23 155:6,8 155:14,18,21 |

Veritext Legal Solutions
calendar-utah@veritext.com 801-746-5080

**[castle - client]**

| | | | |
|---|---|---|---|
| 156:7,12,16,18 | 167:23 | **characterizing** | 179:8,18 |
| 156:23 157:12 | **certainty** 39:4 | 94:17 116:10 | 181:13,20 |
| 157:20,24 | **certificate** | 148:14 | **claimants** |
| 158:3,10 159:7 | 119:11 122:2 | **charge** 84:7 | 181:18 |
| 161:1 162:12 | 184:1 | 86:5 146:19,22 | **claims** 157:19 |
| 164:6,15 169:9 | **certify** 184:4,13 | 167:23 | 157:23 158:2 |
| 169:11,13,22 | **cfo** 21:6,10,11 | **charged** 39:23 | 176:13,18,19 |
| 170:1,3 171:12 | 21:12 29:24 | 88:24 167:6 | 176:21,24 |
| 171:15 174:5 | **chair** 175:15 | **charges** 83:7 | 177:1,17,24,25 |
| 174:11 | **chairman** | **check** 55:10,11 | 179:6 181:9,11 |
| **castle's** 9:25 | 92:24 | 56:10,14,25 | 181:21 |
| 11:15,21 12:17 | **chance** 174:24 | 57:7,10 124:3 | **clarification** |
| 34:19 67:5 | 178:19 | 124:3 172:4 | 17:21 22:11 |
| 69:11 72:15 | **change** 12:3 | **checking** 46:24 | **classes** 177:9 |
| 83:1 90:20 | 53:25 54:3,3 | 48:19 52:24 | **clean** 77:4 |
| 161:20 | 55:20 67:19 | 137:11 | **clear** 9:21 14:3 |
| **cause** 184:14 | 69:5 126:21 | **checks** 48:13 | 74:6 81:13,23 |
| **causes** 159:7 | 127:5 | **chief** 73:19,21 | 82:25 84:2 |
| **celsius** 3:1 8:5 | **changed** 54:20 | 74:10 92:23 | 85:16 86:10 |
| 8:7 26:17 | 54:25 55:17 | **chunk** 17:5 | 136:18 144:19 |
| 27:11 109:4 | 56:8 | **circuit** 90:4 | 149:2 150:4 |
| 141:20 173:4 | **changes** 14:4 | **circumstances** | 154:2,15 |
| 176:20 | 48:7 126:23 | 167:6,9 | 155:10 156:11 |
| **center** 3:13 | 127:9 | **cite** 180:12 | 160:9 165:11 |
| 99:14 | **changing** 136:1 | **city** 2:6,12 3:5 | 165:18 166:25 |
| **centers** 99:10 | **chapter** 7:5 | 3:19 115:2,10 | 171:3 178:25 |
| 99:17 | 86:12 153:22 | 115:16,17,18 | **clearly** 151:23 |
| **cents** 86:14 | 153:24 155:1 | 135:7,7 | 156:15 |
| **certain** 81:14 | 171:2 180:2 | **claim** 11:22,25 | **clerk** 7:3 19:15 |
| 84:23 102:14 | **characterizati...** | 12:8 13:2,10 | 19:21,23 20:5 |
| 112:5 130:4 | 15:5 39:17 | 13:13,19 14:13 | 70:18 76:12 |
| 134:9 147:8 | **characterizati...** | 14:18 49:18 | 91:20 92:1 |
| 178:3 | 116:7 | 139:20 140:18 | **client** 77:24 |
| **certainly** 25:1 | **characterized** | 173:21 176:19 | 80:5 140:24,25 |
| 80:7 139:6 | 11:2 | 177:3,12,15 | 153:3 157:14 |

Page 11

**[client's - completely]**

| | | | |
|---|---|---|---|
| **client's** 24:13 24:18 | 103:22 104:12 105:8,9,14,16 105:19 106:6,7 106:8,14 107:11,13 108:9,14 109:7 109:8 111:2 112:17,21 113:2,11 117:18 118:12 118:22 119:5 120:3 121:5 122:17 123:8 124:10,17 125:3,14 127:3 127:11,14,16 127:23 128:4 129:15 130:8 144:25 146:2,7 146:16 147:14 149:24 150:3 152:9 155:12 156:10 161:8 161:14 162:4,6 162:18 165:8 169:17,25 171:11,16,19 | **collapse** 51:14 109:3,3 | **comments** 51:16 175:25 |
| **clients** 18:25 29:24 77:16 | | **collateral** 99:22 111:12 | **commerce** 126:2 |
| **close** 133:12 138:24 | | **collect** 145:12 163:4 | **commercial** 99:5 100:13 101:25 102:1 114:23 132:23 |
| **closing** 163:1 | | **collectability** 149:6 | |
| **cohne** 107:20 107:21 | | **collected** 112:19 116:8 116:11 | **commission** 78:11 97:11 135:20 |
| **coin** 1:8 7:5 21:12 22:7 26:24 28:13,24 29:15,19 31:9 31:13,17 32:1 32:5,8,9,12,20 36:3,8 37:9,17 37:20,22 38:21 39:5,20,22 40:3,11,15,23 41:12,24 42:6 42:13,18 43:5 48:24 49:11,12 52:22 53:12 54:2,12,16,25 56:7 58:24 61:9 63:2,9 65:5 76:21 77:20 78:7,10 81:7,21 83:4 84:24 85:25 86:1 87:5,9,17 93:16 97:22 98:11,14,23 99:6,20,24 100:24 103:11 | | **colorado** 2:18 | **common** 110:6 |
| | | **column** 34:4 43:11,12 48:2 48:6 52:17,21 52:23 88:13 | **communities** 43:24 46:2 93:16,18 111:15 |
| | | **columns** 48:3 | **companies** 99:9 99:14,16 102:13 167:25 173:7 |
| | | **combination** 73:5,7 | |
| | | **come** 14:14,15 14:18 15:19 16:12 17:15 29:3 30:12 51:1,9 64:7 66:4 75:6 76:8 130:11 174:12 174:23 176:5 178:12 | **company** 21:22 24:11 76:21 78:15,24 102:8 102:10 110:23 115:19 121:1 148:4 150:3 162:11 174:18 |
| | **coin's** 40:16 97:19 98:25 105:10 112:11 130:17 145:16 149:11 | | **compete** 156:22 157:11 |
| | | **coming** 43:4 46:16 47:3,9 83:16 140:6 172:3 175:15 | **complete** 40:2 |
| | **coins** 17:18 169:17 | | **completed** 132:9 |
| | | **comment** 177:17 | **completely** 16:19 17:4,9 41:14 |

**[complex - conversation]**

| | | | |
|---|---|---|---|
| **complex** 180:21 | **conference** 175:22 176:1 181:1 | **considered** 155:11,12 | **continuation** 148:4 |
| **component** 101:3 112:16 129:8,10 | **confidential** 24:7 44:8 45:3 | **consistent** 126:24 127:9 | **continue** 43:19 77:17 118:24 163:4 |
| **components** 95:14 | **conflict** 9:3 153:13 156:21 157:10 158:9 158:19 159:6 | **consistently** 108:14 169:11 | **continued** 106:19 112:20 154:11 |
| **composition** 174:15,17 | **conflicts** 158:16,20 | **construction** 102:8 136:2 | **contract** 12:24 13:2,3 14:8 131:5,10,19 178:6 |
| **comprised** 115:23 | **confused** 15:3 | **consultant** 115:16 | **contracted** 128:2 |
| **computations** 99:13 | **conger** 126:15 172:3,16 | **consulted** 164:11 171:23 | **contractor** 39:3 70:21 145:10 145:14 |
| **computer** 99:10,16 | **conjunction** 104:3 | **consulting** 70:23 108:19 | **contractors** 38:16 116:9 |
| **computers** 99:15 | **connect** 9:10 | **consumer** 100:13 101:7 101:22,24 102:2 176:16 176:22 177:4 177:11 179:1 | **contractually** 97:11 |
| **conceded** 15:16 | **connection** 84:6 86:11 110:5,6 152:25 153:15,22,24 155:1 182:7 | **consumers** 178:25 179:3 | **contribution** 55:23 123:7 125:2 127:1 |
| **concentrate** 151:2 | **conscious** 160:2 | **contact** 110:10 131:18 | **contributions** 124:20 |
| **concepts** 146:9 | **consecutive** 64:9 | **contained** 158:16 | **contributor** 127:2 |
| **concern** 9:7 27:11,12 97:14 178:24 179:15 181:22 | **conservancy** 133:17,21,25 | **contemporan...** 15:7 48:13 | **contributor** 127:2 |
| **concerned** 176:16 | **consider** 147:22 148:11 148:23 149:9 149:16,25 | **contemporan...** 62:21 130:3 | **controller** 21:14,16,17 49:17 |
| **concerns** 173:3 | | **contingent** 176:18 177:13 177:15 181:11 | **controller's** 45:11 |
| **concert** 103:9 172:9 | | | |
| **conclusions** 148:14 | **considerations** 111:22 148:21 | **continually** 118:4 | **conversation** 159:2,9 |
| **conditions** 117:8 178:4 | | | |

Veritext Legal Solutions
calendar-utah@veritext.com 801-746-5080

**[conviction - court]**

| | | | |
|---|---|---|---|
| **conviction** | 66:4,18,22 | **correcting** | **course** 113:19 |
| 173:25 | 67:12 69:8 | 121:17,19 | 128:15 157:8 |
| **cooperation** | 70:8,9 71:14 | **correction** | 160:14 |
| 102:18 134:11 | 72:16 73:20 | 127:6 | **court** 1:1 7:3,4 |
| **copies** 12:22 | 78:8 79:2,16 | **correctly** 118:9 | 7:14,19,25 8:4 |
| **corner** 51:25 | 79:17 81:22,25 | 119:1 | 8:9,17,21 9:6 |
| 62:12 | 83:10 84:5 | **correspond** | 9:19 10:10,15 |
| **corp** 44:4,7 | 85:6,10,13 | 87:17 | 12:17 14:23 |
| **corporate** | 86:15 87:14 | **corresponding** | 16:1 17:16 |
| 22:22 28:18 | 88:15,16,21 | 23:13 28:24 | 18:10,20,25 |
| 90:22 91:9 | 89:21 96:15 | 33:7 40:13 | 19:9,13,16,22 |
| 98:18,20 | 97:20 101:7,8 | 169:14 | 24:1,5,9 25:5 |
| 151:13,17 | 101:10,11,13 | **corresponds** | 26:12,14 27:15 |
| **corporation** | 101:19,23 | 169:24 | 27:19,24 30:17 |
| 121:12 | 102:21,22,24 | **cost** 146:17,21 | 30:21,25 33:18 |
| **corporations** | 102:25 103:3,4 | **counsel** 7:7 | 33:20 41:3,5 |
| 126:3 | 103:25 104:18 | 8:24 12:13 | 42:21,21 44:11 |
| **correct** 17:18 | 104:24 121:13 | 79:15 84:8,10 | 44:14,19,24 |
| 18:14 29:5,6 | 127:6,10 | 84:14,14,16 | 45:1,22 46:3 |
| 31:20 32:5 | 130:23 131:12 | 85:7,8 97:1 | 50:2 51:18 |
| 33:14 35:2,3,7 | 131:13 143:1,4 | 153:23 154:18 | 60:4 64:14 |
| 36:9,10,12,13 | 143:7,11 | 154:22,24 | 66:7 68:7,11 |
| 36:15,16,17,19 | 152:14,17 | 156:25 158:19 | 68:21 71:13,20 |
| 39:23,24 40:17 | 154:1,7,10,14 | 164:14 171:23 | 72:7 73:24 |
| 40:18,21 42:18 | 155:3 156:19 | 182:21 | 74:2,8 76:1,7 |
| 42:19 43:2,17 | 160:22 161:17 | **count** 124:2 | 76:12,13 77:1 |
| 45:20,21 46:4 | 161:22 164:6,7 | **counties** 115:24 | 77:3,7,9,14,21 |
| 48:10 49:3,4 | 164:9,10,13 | **county** 115:8,9 | 78:5,9,13,20,23 |
| 52:5,6,25 | 167:3,7,15 | **couple** 52:3 | 79:3,14,18,23 |
| 53:14 56:1 | 170:24 171:14 | 60:13,15,16,22 | 80:5,10,16,21 |
| 57:2,20,21 | 171:17,20,21 | 64:9 72:25 | 86:20 89:12,22 |
| 58:8 61:4,12 | 172:8 184:9 | 114:7 115:5 | 90:2,4,8 91:4,7 |
| 61:21,24 62:13 | **corrected** | 126:4 175:25 | 91:12 96:24,25 |
| 63:3,4 64:25 | 181:24 | 176:8 | 105:4 113:15 |
| 65:13,14,21 | | | 121:19 134:24 |

Page 14

**[court - debits]**

137:3,22 141:5
141:10,14
143:17 148:15
150:20,22,24
151:9,19,22
153:9 154:20
157:4,15
158:21,25
159:14,17
160:1,5,7,18,24
161:5,7,16,18
162:10 163:8
163:11,14
168:20 169:3
172:25 175:11
175:14,19
176:2 177:6
178:15 179:13
179:16 180:14
181:3,6 182:1
182:13,18,25
183:2
**court's** 90:25
168:24
**cover** 137:14
**covered** 67:13
**cpa** 20:23
48:11
**crashed** 11:7
**created** 35:2
37:12 60:3,12
60:17 61:19
62:13
**creation** 37:15

**credit** 34:10,17
42:3 63:21
102:4 103:24
**creditor** 8:20
14:20 49:22
155:20 156:12
156:13,16
179:5
**creditors**
152:19 153:14
174:13 176:16
176:22,25
179:7,16
**criteria** 147:20
**critical** 95:15
132:7
**criticism** 96:4
**cross** 4:4,5,9,10
4:11 50:1,16
76:14 80:8,24
86:21 113:16
113:22 141:17
169:6
**crypto** 11:6
**cryptocurren...**
108:16
**cryptocurrency**
11:6 38:10
77:12,16,17,25
78:3,4,6,6,10
100:2,12
108:25 148:1
167:25 181:15
**culminated**
132:13

**cure** 13:18
**curious** 10:13
**current** 42:9
117:7
**currently** 8:12
22:8 35:13
74:19 95:4,7,8
100:23 116:21
**customer** 38:18
78:9 147:15
**customers** 99:4
99:8 100:11
176:24 178:1
**cut** 56:14
136:12
**cuts** 77:10

**d**

**d** 3:11 4:1 7:1
20:7 58:13
**darren** 2:3 7:9
**data** 67:18
99:14,14 116:8
116:11,12
**date** 11:12
15:10 31:23
37:13 40:19
48:2,4,15
51:24,25 52:2
52:14,15,18
53:11,12,25
54:6,7 55:4,10
55:11,18 60:1
60:9,22,24
62:11,12 69:3
69:4 85:18

89:7 118:25
119:12 122:7
124:9 126:5,6
126:7 133:10
143:5 150:6
156:1 158:18
162:17 171:3
171:18 172:6
172:18 176:14
176:20 177:14
178:8,9 179:6
179:23 181:23
**date's** 56:22
119:15
**dated** 124:5,25
**dates** 34:4,21
34:23
**day** 21:20,20
55:14 128:3,3
139:23 184:16
**days** 39:21
166:3 172:19
**deadline**
176:15
**dealing** 15:21
**debit** 34:3
42:25 43:12
67:19 71:13
113:10 169:23
170:4
**debited** 49:10
71:19 87:15
**debits** 40:7,8
43:11 169:12

Veritext Legal Solutions
calendar-utah@veritext.com 801-746-5080

**[debt - details]**

| | | | |
|---|---|---|---|
| **debt** 35:9 36:23 102:2 138:12 | **debtor's** 5:2 9:23,24 10:13 10:19,20,22 | 84:12,20 91:13 91:17 155:9 | **depleted** 11:15 |
| **debtor** 1:10 2:2 | 11:11 12:1,9 | **decisions** 82:15 | **deploy** 149:14 |
| 7:11 9:2,22 | 14:6 18:13 | **declaration** | **deployment** |
| 10:24,25 11:5 | 23:20 26:24 | 80:2,6 | 147:18,23 |
| 12:7 13:22 | 27:3,14,15,20 | **declarations** | 148:11,23 |
| 14:1,10,15,17 | 62:4 64:21 | 80:1 | **deposit** 52:22 |
| 14:18 16:14,20 | 65:17 72:4 | **declare** 154:6 | 54:25 78:4 |
| 17:21 18:6,6 | 76:15 81:5 | **declines** 109:6 | 123:23 124:3,4 |
| 21:12 22:7 | 103:23 128:9 | **dedicated** | 124:6 137:11 |
| 24:5,7,14 25:4 | 137:7,9 141:22 | 102:16 103:21 | **deposited** |
| 25:8,15 27:7 | 152:6 155:18 | 110:13,22 | 57:19 |
| 36:21,23 42:11 | 159:25 160:10 | 130:20,25 | **deposition** |
| 42:12 48:24 | 160:16,17 | 131:1 145:9 | 11:17 81:2 |
| 49:3 63:3 | 173:18 182:21 | **default** 112:14 | 153:6 166:1,3 |
| 64:12 65:20 | **debtors** 7:7 | **defaulted** 18:3 | 166:5,12 168:6 |
| 66:16 71:14 | 8:23 27:21 | 111:5 149:3 | **depositions** |
| 81:11 86:12 | 56:12 73:18 | **definite** 173:24 | 177:22 |
| 89:25 90:14,21 | 85:15 177:4 | **degree** 177:7 | **depth** 45:10 |
| 91:8 95:3,5,19 | **december** | **delay** 67:15 | **describe** 20:13 |
| 96:9,16 102:20 | 11:10 22:9 | **delayed** 12:15 | 45:10 47:1,18 |
| 102:20,23 | 34:11,17 35:13 | **delineate** 40:10 | 74:14 96:20 |
| 103:1 139:21 | 37:17 54:20 | **delivered** 79:15 | 97:3 128:8 |
| 152:5 153:14 | 55:1 56:8 | 184:12 | 137:9 |
| 155:23 156:12 | 63:14,23 64:4 | **demand** 139:1 | **design** 135:22 |
| 156:13 157:11 | 66:2,15,20 | **demonstrate** | 135:23 136:2 |
| 157:19,21 | 85:24 86:3 | 127:1 | 138:8 |
| 158:2,9 159:6 | 97:25 124:25 | **denver** 2:18 | **despite** 152:23 |
| 161:21 174:1 | 127:4 | **department** | 153:12 |
| 174:10 176:8 | **decided** 109:8 | 126:2 182:2 | **detail** 36:1 |
| 176:11,21,23 | 165:13 170:1 | **depending** | 41:22 43:9 |
| 177:2,13 | **deciding** 82:1 | 74:17 108:23 | 70:1 139:4 |
| 178:25 180:1 | **decision** 51:8 | 120:17 134:9 | 174:16 |
| 180:11,20 | 76:19 84:6,12 | **deplete** 158:10 159:7 | **detailing** 28:2 |
| | | | **details** 64:16 |

Page 16

**[determinable - discovered]**

| | | | |
|---|---|---|---|
| **determinable** 177:2 | 28:18,20,23 29:2,13,17,19 | 94:17 99:7 111:17,18 | 151:6 179:9 **digit** 146:17,17 |
| **determination** 173:12,16 | 30:7,10 31:9 31:14,17,21,25 | 129:9 **development** | **digital** 99:1,9 99:12,16,22 |
| **determine** 116:15 133:2 | 33:11,25 34:1 34:8,14,18 | 13:6 18:16,18 38:17,24 39:3 | 100:2,17,21 105:17 106:3,9 |
| 167:5,17 168:10 176:25 | 36:8 38:25 43:10,12,14,18 | 43:23 54:17 57:16,22 58:1 | 108:16,25 109:4 145:16 |
| **determined** 99:6,19,20 | 43:21 44:3,7 45:11 46:7,14 | 58:2,18 69:22 74:24 75:4,18 | 146:15 147:6 148:2,6 149:12 |
| 105:19 145:21 146:13 148:7 | 46:23 47:8,8 47:21 51:6,9 | 93:5 94:19 95:14 99:1 | 162:5 **digits** 109:14 |
| **determines** 147:21 | 51:13,22 53:17 53:21 55:18 | 110:3 111:24 111:25 112:4,4 | **diligence** 110:12 |
| **develop** 94:13 94:15 99:5,25 | 56:13,16 60:8 60:19,25 61:9 | 112:9 115:2 116:21 123:3 | **direct** 4:3,8 20:10 75:10 |
| 111:19 112:1 116:24 117:11 | 63:7,22,25 64:25 66:3,14 | 124:18 127:22 128:2,22,24 | 91:4 92:7 126:11 |
| 131:21 150:2 **developed** | 73:20 74:16 87:5,9 88:2 | 129:1,9,11 133:15,20 | **directed** 75:9 **directly** 14:9 |
| 133:6 **developer** | 93:17 106:18 111:19 112:8 | 134:4 135:19 138:9,21 | 29:18 30:1,12 61:8 106:15 |
| 16:22 17:2,4 22:13 24:22 | 122:3,13,18,22 123:12,18 | 143:16 152:12 152:15 162:21 | 110:24 114:11 114:13 144:23 |
| 104:15 112:19 125:3 132:3 | 127:11,17 128:1,3 134:19 | 163:7 **development's** | **director** 155:13 **directors** 84:3 |
| 139:6 143:14 143:15 | 134:22 137:14 137:16,25 | 53:13 75:17 **developments** | 94:6 121:15 **disagrees** 151:8 |
| **developers** 10:24 13:4,5,7 | 138:4,12,20 139:5 171:4,8 | 57:13 **diaz** 94:7 | **disclosure** 180:6,7 182:9 |
| 13:16,17 14:2 14:7,8 16:12 | 173:13 **developers's** | **difference** 30:8 120:5,15 | 182:11 **discover** 182:7 |
| 16:17 17:16 18:11 22:5 | 137:10 **developing** | **different** 102:4 106:9 120:18 | **discovered** 30:11,19,21 |
| 23:20 28:1,3,8 | 57:23 74:18 | 129:12 143:20 | 127:8 |

Veritext Legal Solutions
calendar-utah@veritext.com 801-746-5080

**[discuss - eastbury]**

**discuss** 118:10 125:23 165:12 165:15,18
**discussed** 56:7 100:6 147:5 154:8 155:24 166:19 172:20 182:9
**discussing** 169:8
**discussion** 85:9 116:15 158:8 159:5 171:25 172:9,22
**discussions** 97:12 131:23 132:12 139:5 156:21 157:9 158:13
**disinterest** 9:3
**disinterested** 14:21 173:19
**disinterested...** 151:15
**dispute** 17:12
**distinction** 120:20
**distraction** 105:20
**distributions** 70:7
**district** 1:2 12:17 133:17 133:21,25

**districts** 116:25
**diverge** 152:20
**diversify** 106:1 106:7 128:9
**division** 126:2
**divulge** 156:24
**docket** 44:21 79:13 80:10,13 80:15
**document** 26:1 26:9 28:5 32:16 33:9 37:1,5 41:10 41:18,20 44:1 44:6 45:12 47:16 52:14 53:4 59:23 60:2,12,17 62:12 65:12 66:15 67:23 107:1,10 119:7 120:12 121:20 121:22,23 124:17 125:10 126:1,3,12,22 142:7,11,16 151:6,14,18 164:2 165:12 171:10
**documentation** 15:7
**documents** 12:21,22 13:25 15:7 45:2 63:19 173:10

173:10
**doing** 39:3 40:16 114:18 126:18 127:15 132:19 142:2 162:14 172:2 176:11 180:20
**dollar** 66:3 86:11
**dollars** 16:16 17:3 28:15 30:5,6 31:8 32:2 34:12,18 35:12 36:7,7 65:25 91:2 114:8 138:14 158:11 159:8 176:9
**door** 73:3
**dots** 9:10
**downturn** 148:3,4
**dr** 94:7 137:12
**draft** 98:7
**drafted** 32:21 32:24 33:1,3 98:10 129:16 129:18,20 167:9
**drafting** 107:10 164:12 165:12
**drafts** 164:21
**draper** 71:2,4 93:11

**draw** 67:17 123:20,22 125:14
**drawdown** 160:24
**drawing** 12:4
**drawings** 136:3
**drawn** 15:11
**drew** 12:10
**due** 110:11 118:25 140:15 144:10,16,20 150:13,15 176:7
**duration** 106:19

**e**

**e** 2:1,1 4:1 5:1 7:1,1 20:8 131:6,6 140:9 140:22 170:7 170:13 176:17 179:11
**earlier** 79:11 81:17 84:22 85:14 87:3 100:6 135:6 161:8
**earn** 46:7 103:1
**earned** 17:10
**earns** 78:11
**easier** 62:10
**easiest** 68:16
**eastbury** 12:11

Page 18

**[echo - estate]**

echo   131:6
educational
   20:13 92:11
effect   11:16
   87:21,23 116:3
   144:18 176:17
effective   60:1,9
effectively
   118:18
efficient   29:17
efforts   183:1
ein   23:2
either   174:18
   177:11 179:2
   180:17
elaborate
   126:17
electric   114:19
electrical
   114:20
electricity
   95:16 99:3
electronic   1:21
   184:6
elements   15:17
eligibility
   179:20
eligible   14:21
elliot   7:10
elliott   2:4
emerge   162:24
   162:25
emphasize
   90:12

employ   8:23
   16:11 173:22
employed
   14:22
employee   82:23
employees
   42:23 81:24
   82:1,3,5,7,8,12
   82:14,15,16,18
   82:21,22
employment
   71:10 89:20
   141:11 151:3
   173:18
energy   71:3,4
   93:10
engage   98:24
   99:24 101:6
   149:23
engaged   12:14
   130:20 145:11
   146:11
engages   101:22
engaging   76:22
   174:19
engineering
   132:6,20 138:8
   138:15 139:9
enhance   162:22
enter   44:20
   92:19 94:19
   131:19
entered   47:25
   48:5,12,15,17
   52:4 143:6

enterprise
   146:24
entire   78:20
   179:5
entirely   16:17
   36:4 40:17
   61:3
entities   9:22
   10:19 22:15,21
   23:12 38:6,9
   90:19,23 93:13
   93:15 104:8,21
   110:14 127:24
   128:12 129:12
   172:4,11,13
entitled   138:21
entity   14:9,14
   17:22 23:5,6
   57:20 69:12
   90:24 104:24
   104:24 110:12
   112:9 113:6
   143:9 144:23
   167:17 168:11
   172:2
entity's   93:19
entries   15:8
   23:14 48:8
   52:4 62:16,18
   125:18
entry   49:21
   50:21 54:7
   67:18 69:3
   72:24 124:4

equal   165:7
equipment
   106:12 128:15
equity   30:9
   31:11,12,13
   54:5,13,16,25
   55:24 63:2,5
   65:7,9 87:18
   93:13 124:12
   126:25 152:6
   152:16,20
   153:13 154:9
equivalent
   174:2
error   63:11
   127:6
errors   104:19
escrow   115:24
especially
   89:24
essentially
   63:21
establish   99:4
   102:24 105:11
   106:11 163:2
established
   22:25 90:17,21
   91:9 95:22
   97:22 98:24
   105:23
establishing
   21:23
estate   14:20
   105:12,16,22
   106:12,18

Page 19

**[estate - experienced]**

| | | | |
|---|---|---|---|
| 109:11,12 | 80:24 87:1 | 33:21,23 35:21 | **expand** 100:8 |
| 128:10,11,18 | 92:7 113:16,22 | 37:3,7 40:1 | 105:16 |
| 145:17 | 141:17 169:6 | 41:6,7,17 43:6 | **expanded** |
| **estate's** 173:13 | **examine** 80:8 | 43:25 45:6,8 | 103:7 118:16 |
| **estimate** 76:6 | 86:21 | 46:12,20,22 | **expanding** |
| 134:7 135:12 | **examined** 20:3 | 47:15 50:7,8 | 103:12 |
| 136:5 137:25 | 91:24 | 50:11,14 51:12 | **expansion** 57:9 |
| 138:4 | **example** 42:22 | 51:18,20 52:9 | 100:7 115:17 |
| **estimation** | 137:15 146:15 | 55:6 58:13,17 | **expect** 43:18 |
| 138:7 | 151:14 | 59:3 60:5,7 | 117:10 136:14 |
| **eventual** 96:24 | **except** 15:17 | 62:4 64:21 | **expectation** |
| 114:2 | 155:7 | 65:17 67:24 | 43:20 |
| **everybody's** | **exception** 35:3 | 68:12,14 73:18 | **expects** 46:7 |
| 177:22 | 170:6 | 79:12,13 80:3 | **expedient** |
| **evidence** 11:17 | **excess** 64:8 | 80:13,19 81:5 | 99:20 |
| 12:25 14:11 | **exchange** | 87:25 88:4,7,8 | **expense** 169:25 |
| 15:24 19:4,7 | 111:23 | 88:23 106:23 | **expenses** 12:1 |
| 66:6 72:1 | **exchange's** | 119:9 121:24 | 25:11,11 37:22 |
| 79:12 80:9,15 | 38:11 | 123:14 125:6 | 38:1,11,14,21 |
| 121:23 123:6 | **exchanged** | 125:25 131:6 | 40:9 42:13 |
| 123:11 179:22 | 164:21 | 137:7,10 140:2 | 58:1,4 69:20 |
| **evidenced** | **excuse** 37:19 | 140:4 141:22 | 69:22 72:4 |
| 62:19 109:2 | 58:24 85:3 | 158:22 159:24 | 74:15 75:17 |
| 123:12 | 150:14 | 160:15,16,17 | 81:20 82:2 |
| **exacerbated** | **excused** 89:13 | 160:18,24 | 83:8 86:9 |
| 158:16 | **executive** 83:16 | 161:4,4 163:22 | 137:15,16 |
| **exactly** 17:14 | 83:24,24 92:23 | 170:13 171:6 | 138:1,5,13,17 |
| 28:5 104:20,20 | **executory** | **exhibits** 26:16 | 138:18 140:20 |
| 117:24 129:19 | 178:6 | 26:16,17,24 | 165:8 174:20 |
| 130:2,6 147:17 | **exercised** 133:8 | 27:1,3,8,14,16 | **expensive** 13:6 |
| 172:21,23 | **exhibit** 5:2,20 | 27:19,20,21 | **experience** |
| **examination** | 23:25 26:2,19 | 44:23 50:6 | 29:23 146:14 |
| 4:3,4,5,6,8,9,10 | 27:3,23,23 | 58:25 79:15,20 | **experienced** |
| 4:11 20:10 | 28:6 31:19 | 80:18 139:18 | 109:6 148:5 |
| 50:1,16 76:14 | 32:14 33:8,16 | 160:10 174:1 | |

Veritext Legal Solutions
calendar-utah@veritext.com 801-746-5080

**[explain - first]**

| | | | |
|---|---|---|---|
| **explain**  15:23 | **facts**  66:6 | 73:1 77:19 | 182:8,10 |
| 37:2 41:20 | **fair**  25:21 | 78:15,18,25 | **filings**  172:1 |
| 63:17 77:14 | 175:20 179:16 | 85:22 86:1 | **filled**  181:21 |
| **explained** | 181:18,25 | 88:19 89:3 | **final**  135:21,22 |
| 123:19 | **fairly**  15:14 | 100:22 113:5 | 138:7 139:11 |
| **explanation** | **fall**  131:23 | 138:15,19 | **finalized**  130:5 |
| 76:16 116:18 | **false**  137:18 | 139:8 140:15 | 130:7 133:20 |
| **expressed** | **familiar**  23:21 | 165:7 167:5 | **finances**  9:22 |
| 173:4 | 164:2 | 176:9 | **financial**  21:22 |
| **extended**  64:12 | **far**  54:8 64:20 | **fell**  180:11 | 24:5 39:13 |
| 111:8 | 88:12,12 89:19 | **felt**  150:4 | 73:19,21 74:10 |
| **extensions** | 100:21 146:25 | **fi**  109:24 | 84:18,19 85:11 |
| 34:10 | **fargo**  66:1 | **fica**  102:15 | 99:25 176:6 |
| **extensive**  90:20 | **favorite**  137:23 | **fiduciary** | **financials** |
| **extent**  24:4 | **feasibility** | 173:15 | 12:18 |
| 25:1,3 68:1 | 132:8 | **figure**  162:10 | **find**  12:6 13:12 |
| 153:2 157:14 | **feasible**  136:21 | 174:17 | 59:1 111:9 |
| **external**  39:11 | **february** | **file**  24:15 28:2 | 168:2 174:11 |
| **f** | 174:18 | 33:24 68:5 | **fine**  80:8 |
| **f**  125:25 176:17 | **federal**  96:24 | 96:7 126:12,14 | **finish**  82:9 |
| **facilitate**  99:1 | **fee**  37:25 38:2 | 176:19 179:8 | 139:10 163:9 |
| **facilities**  99:2,2 | 39:2,23 40:12 | 179:18 180:3 | 163:19 |
| 99:4 132:22 | 42:23 71:10 | 181:19 | **finished**  135:22 |
| 134:6,10,10 | 72:12 78:12 | **filed**  8:25 11:14 | 138:24,25 |
| **facility**  99:15 | 83:8,12,13,18 | 25:5 35:2 | 139:13 |
| 111:10 131:21 | 84:7 86:6 | 40:20 44:18 | **firm**  172:10 |
| 131:24 | 100:18 165:9 | 96:5 126:4,19 | 173:19,24 |
| **fact**  14:5 17:9 | 165:16 167:1 | 129:22,25 | 182:8 |
| 17:12 135:10 | 167:11,19 | 139:21 171:18 | **firms**  33:2 97:4 |
| 148:2 152:23 | **feel**  118:20 | 176:21 182:12 | **first**  8:22 12:23 |
| 160:3 166:11 | **fees**  11:11,12 | **filing**  96:10 | 13:25 17:5 |
| 171:16 | 29:18 30:2 | 126:6,7 139:23 | 20:2 29:10 |
| **factor**  148:7 | 46:10 48:25 | 153:22 170:24 | 33:23 41:25 |
| **factors**  130:5 | 49:6,9 69:10 | 171:3 172:12 | 42:1 54:23 |
| | 69:22 70:11,23 | 172:18 180:6 | 55:6 57:4 |

Veritext Legal Solutions
calendar-utah@veritext.com 801-746-5080

**[first - generated]**

| | | | |
|---|---|---|---|
| 62:23 68:11,13 | **following** 89:6 | **frame** 109:14 | 14:12,13,17 |
| 69:3,21 87:16 | **follows** 20:3 | 115:7 169:16 | 17:15,16 22:19 |
| 91:23 96:12 | 91:24 | **frank** 129:2,10 | 29:8 40:2,23 |
| 109:3 112:19 | **font** 51:15 | **frankly** 132:2 | 47:12 51:9 |
| 112:19 113:25 | **forecasts** 134:1 | **friend** 131:16 | 63:14,21,23 |
| 117:23 125:6 | **foreclosed** 18:3 | **front** 26:1 | 64:4 90:15 |
| 130:18 135:18 | 18:13 111:12 | 38:10 41:8 | 102:19 106:8 |
| 135:25 136:7 | **form** 125:19 | 76:20 78:22 | 130:16 133:19 |
| 137:1,1 139:6 | 146:16 | 142:11 | 149:25 180:11 |
| 140:13 148:5 | **formal** 127:25 | **fulfilling** | **further** 12:15 |
| 160:21 161:9 | 132:1 | 177:14 | 25:8 76:14 |
| 161:19 176:3,6 | **formation** | **full** 11:14 20:6 | 86:19 90:22 |
| 176:12 178:23 | 22:22 121:23 | 41:16 66:21 | 91:8 112:23 |
| **fit** 28:18 128:19 | **formations** | 155:24 184:9 | 113:13 132:5 |
| **five** 48:3,3 76:5 | 120:18 | **function** 82:19 | 141:3 168:18 |
| 115:4 136:8 | **formed** 10:24 | 167:23 | 172:24 182:10 |
| **fix** 30:14 | 105:14 123:3 | **functions** 112:6 | 184:13 |
| **fixed** 31:5,6,7 | **formerly** | **fund** 9:24 12:1 | **future** 117:1,8 |
| 145:25 | 111:15 | 14:6 17:15,23 | 134:19 162:17 |
| **fletcher** 2:16 | **forth** 48:19 | 102:6,13 108:5 | 173:15 |
| **floor** 3:13 | 51:17 116:21 | 128:14 147:21 | |
| **florida** 3:14 | 165:7 176:15 | 174:11 | **g** |
| 128:22 | 177:23 184:9 | **funded** 11:5 | **g** 7:1 8:20 59:3 |
| **flow** 139:6 | **forward** 138:18 | 133:22 | 59:3 60:5,7 |
| 150:6,11,16 | 181:23 | **funding** 28:11 | **game** 25:21 |
| 161:11 163:1,6 | **forwarded** | 51:6 102:16 | **general** 67:18 |
| 176:4 | 110:18 | 103:21 110:13 | 74:15 142:17 |
| **flows** 103:13 | **found** 59:11 | 110:22 115:13 | 156:4 169:15 |
| 150:2 | **foundation** | 116:20,22,23 | 169:20 |
| **focus** 145:16 | 66:6 | 130:20,25 | **generally** 23:15 |
| 148:9 | **founded** 94:10 | 131:1 133:18 | 80:14 172:1 |
| **focused** 16:8 | **four** 35:14 48:3 | 134:5,21 | **generate** 150:6 |
| **folks** 179:3 | 52:13 53:8,9 | 145:10 | 150:16 |
| **follow** 181:9 | 55:9 56:6 | **funds** 12:2 13:1 | **generated** |
| | 136:8 162:12 | 13:8,13,19 | 27:25 52:2 |
| | | | 62:14 162:19 |

Veritext Legal Solutions
calendar-utah@veritext.com 801-746-5080

**[generates - hand]**

| | | | |
|---|---|---|---|
| **generates** 47:22 77:19 | 56:3 57:4 58:13,23 59:9 62:3,3,17 64:21 65:17 67:22,23 68:4 68:4,19 69:12 70:12 73:3,18 80:21 87:13 88:13 91:10 102:15 103:17 109:9 111:9 113:24 116:16 117:24 119:19 121:24 123:14 124:8 125:5,25 130:16 131:4 135:1 136:24 137:6 139:3 151:6,20,20 153:9 154:21 160:5 165:25 166:15,15,24 168:6,7,25 169:8 170:10 174:22 176:2 181:23 182:11 | 33:7,15 35:21 41:17 43:6,25 45:1 46:19 47:15 50:5,10 50:11 52:17 54:11 59:11,17 59:19 64:20 67:14,22 69:25 72:2,4 74:18 75:5,12,19 76:3 79:4 81:2 87:13 88:24 91:12 95:18 103:1 116:1,12 117:23 134:17 134:20 135:13 136:25 138:18 138:18 141:21 143:19 151:5 151:12 159:10 168:7 172:3 173:21 174:8,9 174:23,24 175:1,5 179:22 180:1 | **goods** 76:22 **grading** 74:19 **graduated** 20:15,17,20 92:12 **grant** 133:17 173:21 **great** 68:3 142:18 **greater** 99:6 **green** 94:14 115:2,10,15,18 **greenberg** 3:3 **gross** 118:2 **ground** 168:25 **groundwork** 143:21 **group** 110:3 112:4 129:1 131:24,24 143:16 181:17 **grow** 118:24 **guess** 83:21 118:7 149:9 177:20 |
| **generating** 14:16 101:1 150:11 | | | |
| **gentlemen** 105:4 | | | |
| **georgia** 128:24 | | | |
| **geotechnical** 116:6 | | | |
| **germane** 179:19 | | | |
| **getting** 24:4 25:23 28:10 66:12 79:18 150:24 | | | |
| **give** 13:12,18 59:5 72:22 138:6 146:14 151:9 159:10 174:23,24 182:19 | | | |
| **given** 142:24 155:5 | | | **guys** 158:24 |
| **gives** 136:2 | | **golf** 59:3 | **h** |
| **giving** 13:9 | | **gonna** 133:3,16 | **h** 5:1 140:4 |
| **glad** 159:2 | **goal** 138:20 146:12 | **good** 7:4,8,17 8:2,6,11,18 18:21 44:16 54:22 68:10 79:7 81:1 90:7 105:25 116:18 127:15 132:24 150:16 | **habit** 19:18 |
| **glamping** 111:4 | **goals** 146:4,6 | | **hac** 8:20 |
| **go** 9:4,8,15,19 12:20 14:9,10 26:20 32:6 33:15 35:17 40:9 43:6 45:9 50:22,25 51:12 52:11 53:7 | **goes** 24:12 138:9 151:15 **going** 15:24 24:14,17,24 25:4,13 26:19 26:23 32:13 | | **half** 120:7 138:14 **hand** 19:24 51:25 91:20 |

Veritext Legal Solutions
calendar-utah@veritext.com 801-746-5080

**[handle - honor]**

| | | | |
|---|---|---|---|
| **handle** 125:23 | 184:12 | **highly** 102:3 | 51:2 54:21 |
| **handling** 72:2 | **hershey** 3:6 4:5 | 106:10 | 55:1,18 56:17 |
| **hansen** 97:17 | 4:10 8:6,7 | **hillcrest** 28:9 | 57:11 60:9,19 |
| 97:18 | 18:20,21,22,24 | 31:23,25 46:24 | 63:24,25 66:13 |
| **happen** 135:16 | 19:2 27:9,10 | 52:23 53:13 | 66:17,21 68:6 |
| **happened** | 27:12 76:3,4,5 | 54:1 | 74:11 86:4 |
| 15:13 18:9 | 76:10 79:4,6,7 | **hired** 96:11 | 88:2 90:15 |
| 48:18 63:23 | 79:17 80:21,25 | 110:21 111:19 | 93:1,4,12,22 |
| 77:23 111:3 | 86:19 141:6,8 | 115:16 | 94:2,10,18 |
| **happily** 17:12 | 141:12,15,18 | **historically** | 96:1 97:8 |
| **happy** 157:7 | 141:19 143:17 | 100:19 | 105:23 113:8,9 |
| **hat** 45:12 47:8 | 143:19,22 | **history** 33:25 | 114:1 119:24 |
| 48:23 105:1 | 148:19 150:20 | 90:20 | 120:1,13 121:4 |
| **hate** 10:6 71:5 | 150:22,23 | **hit** 132:11 | 121:10,12,13 |
| **head** 78:17 | 151:5,11,21,24 | **hold** 72:7 | 121:18 122:20 |
| 85:21 | 152:1 153:5,11 | 173:20 | 122:22 123:11 |
| **hear** 20:24 | 154:25 157:2,7 | **holder** 152:6 | 127:12,14,18 |
| 64:14 71:21 | 157:18 158:21 | **holders** 152:21 | 152:8 154:23 |
| 113:17 136:13 | 158:21,23 | 153:13 | 154:24 155:8 |
| 175:4 176:14 | 159:1,14,16 | **holding** 70:19 | 164:6 171:12 |
| 184:10 | 160:6,12,14 | 96:17 99:22 | 171:15 |
| **heard** 135:6 | 163:9,10,13,24 | **holding's** | **holdings's** |
| 164:19,23 | 181:7 | 170:15 | 34:13 36:1 |
| 175:11 | **hesitant** 173:1 | **holdings** 3:16 | 49:15 |
| **hearing** 8:14 | **hey** 132:15 | 8:3 21:11 28:3 | **home** 133:2 |
| 26:5 44:22 | **high** 20:15 | 28:21,23,25 | 136:10,10 |
| 109:6 142:15 | 92:12,14 95:16 | 29:2,4,8,11,12 | **homebuilders** |
| **hearsay** 80:3 | 102:12 106:3 | 29:16,16 30:8 | 139:14 |
| **help** 9:9 77:4 | 149:19 162:20 | 30:10 32:12,20 | **homes** 128:14 |
| 115:16 145:11 | **higher** 109:1 | 33:11 34:2 | 128:21,24 |
| **helpful** 77:21 | 144:4,5 | 36:18,20,21,22 | **honor** 7:9,17 |
| 95:15 113:18 | **highlighted** | 37:9,10,21,22 | 7:24 8:2,7,12 |
| **helping** 99:4 | 50:21 68:20 | 40:10 41:12,24 | 8:19 9:5,13,17 |
| **heninger** 3:2 | 69:3,9 70:10 | 42:7 43:11,13 | 9:20 10:6,12 |
| 8:11,12 184:6 | 73:1 | 49:7 50:25 | 10:17 14:25 |

Page 24

**[honor - industrial]**

| | | | |
|---|---|---|---|
| 15:2 17:11,20 18:15,22 19:2 19:11,17,19 23:24 24:3,21 25:8,15 26:22 26:23 27:4,13 27:18 31:3 32:13 44:5 46:19 48:21 49:25 50:4 71:5,12,16,17 71:24,25 74:5 74:7 75:24 76:4,9,10,25 79:6,9,17,21,22 80:7,22 86:23 89:10,17 90:10 105:7 113:19 121:21 134:17 137:5 141:4,8 141:12 143:21 150:23 151:5,8 151:24 153:5 157:2 158:24 159:20,21 160:3 163:13 163:18 168:22 169:4 172:24 175:7,13,23 176:1,14,25 177:19 178:22 179:25 180:3 180:13,16,19 180:19,24 181:5,8,10 | 182:5,6,16,20 182:23 **honor's** 176:7 **hour** 91:3 **housekeeping** 27:6 79:10 **huh** 54:10 **human** 38:18 **hundred** 87:4 114:7 **hydrological** 116:6 **hypothetic** 137:19 **i** **identified** 119:24 **identify** 27:23 28:7 32:18 37:7 40:11 41:9 44:1 46:21 60:5 81:20 **identifying** 117:4 **imagine** 106:2 **immaterial** 15:14 16:3 **immediate** 144:17,18 **immediately** 32:3,4 36:12 144:11 **impact** 149:5 | **impeachment** 80:8 **imperial** 102:16 **implications** 155:8 **important** 9:9 **improvements** 139:13 **inability** 22:9 76:25 **inaudible** 21:18 24:20 26:3 37:12 41:12 47:6 64:13 71:4 73:22 74:1 77:8 79:21 84:17 86:9,17 89:14 90:16 96:22 97:6,18 107:8 110:1 125:4 130:1,3 135:4 135:8 138:17 139:12 149:7 156:2 158:17 177:18 **inception** 21:3 **include** 21:23 26:16 39:8,11 **included** 67:10 **includes** 25:16 180:10 **including** 14:7 | **income** 72:12 161:21 **incorrect** 17:19 58:20,22 121:20 127:8 **increase** 62:9 68:19 88:1 **increased** 88:11,13 **increasing** 64:1 **incurred** 11:12 38:1 39:21 86:9 165:8 **incurring** 37:20 **incurs** 38:21 **independent** 38:16 39:2 70:21 145:10 145:14 153:1 153:16 **indirect** 152:6 **individual** 70:22 **individually** 93:10 **individuals** 181:19 **indulgence** 163:16 **industrial** 95:13,16 99:5 114:16,23 116:12 |

Page 25

**[industry - it'll]**

| | | | |
|---|---|---|---|
| **industry** 112:4 117:14 167:24 | **input** 178:16 181:3 | 42:5 76:22 79:1 | **interruption** 15:2 160:13 163:12 |
| **inflowing** 57:16 | **inquired** 9:21 | **interest** 17:10 36:17 42:4 | **introduced** 7:12 |
| **inform** 155:9 | **inside** 63:19 | 67:2 100:24 | **invested** 116:5 |
| **information** 12:6,12 24:7 24:16,17,18 44:8 91:8 99:16 116:14 116:17 127:7 172:7 176:10 180:4,10,22 | **installing** 74:21 | 103:1 107:24 108:18,19,20 108:23 109:1 112:18,21 115:18 117:21 118:8,22 130:11 142:21 142:23 143:2 144:1,4,8,10,16 144:19 145:24 147:8,10 149:19,21,25 150:1,5,13,15 152:12,19,20 153:13 156:22 157:10 161:13 163:5 173:13 179:1 | **investing** 128:11 149:16 |
| | **instance** 16:3 16:10 80:2,13 | | **investment** 131:23 163:3 |
| | **instances** 104:16 | | **invoices** 75:5 |
| | **institutional** 179:2 | | **involve** 95:19 |
| | **institutions** 99:25 | | **involved** 101:13,14 102:21 129:6,8 131:25,25 132:22 164:15 167:10 |
| **informed** 11:20 | **instructed** 49:8 157:15 | | |
| **infrastructure** 74:21 95:15 114:20 115:11 116:20,25 117:2,6 132:7 133:23 134:8 135:2 | **instruction** 153:7 | | **irs** 96:23 |
| | **intend** 15:4 19:6 | | **issue** 15:18,21 16:6,7,9,11 19:5 24:11 25:6 27:8 90:13 91:16 117:3,4 133:25 140:14 144:22 163:14 173:14 173:17 175:12 176:12,13 178:11,14 179:20 181:9 181:10 182:7,9 |
| | **intended** 17:8 29:1 30:3 31:13 122:19 127:1 | | |
| **infusion** 10:25 30:9 31:11,12 52:23 53:16,22 54:5,12 124:11 | **intends** 16:23 47:8 | **interested** 184:14 | |
| **initial** 28:11 51:9 52:22 53:15 54:12 55:23 80:3 110:10 111:7 124:11 137:1 176:5 | **intent** 28:22 31:10 50:24 106:21 | **interests** 95:9 | |
| | **intention** 30:6 47:11 51:1 61:10,11 | **internal** 10:3 39:10,11 54:15 54:24 55:16 124:16 | |
| **initially** 104:7 105:2 123:7 124:19 | **interactions** 97:10 | **internally** 147:14 | |
| | **intercompany** 10:2,5 14:4 | **interrupt** 10:7 71:6 103:18 | **issues** 76:19 |
| | | | **it'll** 68:16 134:13 |

**[items - large]**

**items** 88:25

**j**

**j** 2:10 20:8
51:12,19,20
123:15 125:6
**january** 78:18
**japanese** 20:19
**jarvis** 3:2 8:13
19:3 76:3
175:13,14,14
175:16 181:6,8
182:5
**job** 127:15
**joel** 1:10
**johnson** 2:16
3:17 8:1,2,3
12:14,16 24:3
24:11,19 44:5
44:6,16 134:17
134:24
**joined** 18:25
175:18
**joining** 8:13
**joli** 2:15 7:18
**jonathan**
131:11,14
**jones** 4:2,6 7:12
13:14 17:12
19:20,24 20:1
20:7,12 25:25
26:4 27:23
30:25 45:24
48:21 50:1,9
59:23 60:11
69:2 71:7

73:25 74:9
76:16,18 81:1
86:21 87:2,3
89:12 90:5
94:4 100:16
112:25 123:19
125:22 131:7
161:7 164:8,22
173:7,8
**jones's** 164:19
**journal** 67:18
67:18
**judge** 1:10 15:2
**judgment**
88:17 134:23
**july** 46:15 69:4
72:25 75:17,19
78:14,18,22
138:1,5
**jump** 177:21
**june** 42:10
67:18 69:7,20
161:2
**justice** 182:2

**k**

**keep** 9:14 13:7
55:4
**keeping** 57:22
173:6
**kin** 184:13
**kind** 67:23
94:22 133:5
158:17 181:23
**kinds** 158:20

**kinghorn**
107:20,21
**kitchen** 102:9
**know** 10:17
18:17 19:3
25:9,18,20
27:10 33:1,3
43:21 44:7,19
44:24 46:6,9
47:7 57:25
58:19 60:2,11
64:3,15 66:1
66:24 67:11
71:6 73:4,13
73:14 74:23
75:16 78:16
81:1 85:20,24
87:24 95:17
100:25 102:3,8
102:12 104:19
106:4 107:7,9
109:5,13 114:4
114:6 116:8
117:6,20,25
118:1,2,6
120:17 125:18
128:17 129:5
131:14,22
132:18,18
133:5 136:19
137:13 138:14
139:8 146:18
150:25 158:4
158:17 161:13
162:20 164:1

165:1 169:15
171:25 172:22
176:8,9,14
177:3,3,7,15
178:1,12 180:8
181:12,14,15
181:17,19,23
**knowing**
104:20
**knowledge**
22:21,23 28:17
41:13 49:1,20
51:4 81:9
87:10,11

**l**

**l** 92:5
**lack** 9:2,3
**lake** 2:6,12 3:5
3:19
**land** 18:19 44:3
45:15,18,19
46:1 74:18
75:4 95:8
114:1
**landing** 110:3
129:1,7,11
143:16
**landowners**
134:12
**lands** 115:22
**language** 34:16
63:20
**large** 91:2
136:10

Veritext Legal Solutions
calendar-utah@veritext.com 801-746-5080

**[larger - loan]**

**larger** 101:3
**largest** 100:19
**las** 128:22
**late** 150:24
**lately** 114:7
**latimer** 7:10
  8:24 16:7
  49:18,22 113:3
  173:18
**launched** 10:20
**lauren** 1:25
  184:3,24
**law** 2:5,11,16
  3:3,7,12,18
  33:2 172:10
**lawyers** 42:24
**lay** 143:21
**layout** 132:20
**leads** 136:2
  160:8
**lease** 178:12
**leave** 69:11
  70:24 72:13
  89:14,15 94:8
**leaving** 149:25
**ledger** 40:1
  43:8
**ledgers** 99:17
**leeds** 135:7
**left** 14:5 21:5,7
  34:24 47:13
  51:25 54:8
  62:12 70:15
  159:22

**legal** 11:11,12
  39:9,21 61:1
  69:10 73:1
  85:25 89:3
  92:17 97:14
  138:15,19
  139:8 154:24
  155:11,16
  156:25 157:16
  158:2
**legally** 130:23
  134:16
**legitimate**
  13:19
**lend** 109:8
**lender** 109:20
  111:9
**lending** 10:23
  16:4,4 22:16
  93:17 99:7,21
  100:4,7,8,10,20
  100:25 101:7
  101:10,12,15
  101:17,19,21
  102:6 103:2,6
  103:7,7,10,14
  103:21,25
  104:3 105:16
  105:17,18
  117:17,21
  118:11 128:10
  128:16,20
  145:17,17
  146:14,15
  149:13

**lends** 101:9
  144:24
**length** 112:1
  114:22
**letter** 134:4
**letters** 26:15
  50:11 134:1
**letting** 132:17
**level** 16:13
  101:22,24
**liabilities**
  181:16
**liability** 121:1
**likely** 71:2
**limited** 100:10
  121:1 173:14
  173:17
**line** 34:16 53:1
  53:23 54:6,23
  62:23,25 63:13
  63:21 68:20
  69:21 70:10
  73:1 87:22
  103:7,24
  106:11 118:1,6
  123:23,25
  124:1,5,23
  151:3 166:15
  168:7
**linear** 136:18
**lines** 52:13 55:9
  56:6 57:7
**liquidate**
  176:24

**liquidated**
  177:2 181:14
**liquidity** 100:1
**list** 45:2 57:8
  79:13 159:25
  163:22
**listed** 34:21
  176:16 181:12
**listening**
  177:18
**litigation** 3:1
  8:8 79:8,11
  141:20 157:19
  157:23
**little** 8:15 15:15
  17:20,21 26:5
  26:20 27:5
  31:22 50:20
  51:15 62:9
  68:2 69:21,25
  95:25 125:9
  126:9 141:25
  156:14 165:21
**llc** 1:8 7:5 93:5
  93:16 104:8
  119:25 120:16
  120:21 121:12
  121:18 124:13
  124:14 165:8
  171:4,8
**llc's** 134:19
**llcs** 120:19
  127:19,21
**loan** 10:21
  11:25 13:15,21

Veritext Legal Solutions
calendar-utah@veritext.com 801-746-5080

**[loan - made]**

| | | | |
|---|---|---|---|
| 16:9 17:8 18:3 | 144:23 145:1,6 | 182:6 | 174:15 |
| 18:3,6,6 28:2 | 145:11,19,25 | **logan** 20:15,15 | **looks** 28:10 |
| 28:22,24 29:2 | 146:24 147:3,6 | **logics** 177:8 | 65:8 160:18 |
| 30:4,7 35:18 | 147:9,10,21 | **lois** 133:1 | 161:1 |
| 52:24 54:2,5 | 148:22,23 | 138:25 | **losing** 53:1 |
| 54:20 55:13,17 | 149:2,3,6,10 | **long** 8:15 21:1 | **lost** 37:18 |
| 55:19 56:13,19 | 150:3,5,12 | 21:6 90:20 | 39:20 141:6 |
| 56:21,22,23 | **loaned** 10:23 | 114:14,24 | **lot** 16:2 75:18 |
| 57:1,8,10,13,18 | 13:24 17:21 | 134:7 135:12 | 109:1 116:14 |
| 58:3,7,7,12 | 29:12 55:1 | 136:5,14 | 138:25 139:4 |
| 60:18 61:1,7 | 64:4 | 149:22 | 163:6 177:21 |
| 61:20,24 62:1 | **loans** 10:2,5 | **longer** 76:19,20 | 180:8,20 |
| 63:6,15 64:1 | 14:4 17:23 | 86:2 134:2 | **lots** 135:3,13,16 |
| 64:12,24 65:6 | 65:3 99:23 | 150:1 | 135:22 136:15 |
| 65:9,13,20 | 100:1,8,13,13 | **look** 26:25 | 136:16 139:2 |
| 66:4,25 67:2 | 100:24 101:22 | 33:16 34:15 | 139:13,14 |
| 100:21 101:1 | 102:11,17,17 | 37:3 60:22 | **low** 109:13 |
| 102:23 103:2 | 102:18,19 | 64:19 65:23 | 147:23 148:11 |
| 104:1 105:2,24 | 103:13,13,20 | 69:19 70:13 | 148:23 |
| 106:14 107:3 | 105:12 106:7,9 | 73:14 105:15 | **lower** 144:4 |
| 108:6 109:21 | 106:11,18,20 | 117:24 125:16 | 149:10 |
| 109:22,25 | 108:16 117:7 | 128:11 129:14 | |
| 110:8,13,17,23 | 117:19,22 | 130:4 142:19 | **m** |
| 111:4,6,7,7,10 | 118:4,4,5 | 167:8,14 170:4 | **m** 2:3 119:9,9 |
| 117:17,18 | 128:14 145:23 | 172:5 173:15 | **made** 10:25 |
| 119:2 123:10 | 146:9,10 | 174:13 | 16:17 18:2,6 |
| 123:13 124:24 | 149:23 179:1 | **looked** 53:24 | 30:1 31:16 |
| 124:24 125:1,1 | **local** 24:6 | 105:25 128:21 | 34:4,20 35:6 |
| 128:7,18 | **location** 115:19 | **looking** 31:18 | 43:12 45:16 |
| 130:10,18,19 | 116:5 | 35:8 53:2 | 53:25 54:3 |
| 142:19,20,24 | **locations** | 56:21 59:14 | 55:13 57:11,24 |
| 143:2,3,6,8,8 | 114:19 | 64:16 68:23 | 61:14 65:20 |
| 143:13,14,23 | **lofstedt** 2:15 | 72:24 107:6 | 69:4,20 72:24 |
| 143:24 144:2,6 | 7:16,17,18 | 121:3 128:13 | 84:7 93:11 |
| 144:9,15,17,18 | 177:16,19 | 131:25 145:25 | 102:23 105:13 |
| | | | 115:19 118:11 |

Page 29

Veritext Legal Solutions
calendar-utah@veritext.com 801-746-5080

**[made - meet]**

| | | | |
|---|---|---|---|
| 126:22 127:10 | **makes** 169:11 | 153:1,16 | **matters** 7:5 |
| 130:12 | **making** 17:24 | 155:12 | 156:3 163:18 |
| **mail** 140:9,22 | 43:15 45:5 | **managers** 94:1 | 174:4 176:3 |
| 170:7 | 55:19 82:15 | 119:23 121:2 | 177:21 |
| **mails** 179:11 | 84:11,12,19 | 121:14 127:19 | **matthew** 2:10 |
| **main** 2:5,11 3:4 | 118:14 148:7 | 127:23 146:13 | 7:23 89:17 |
| 66:7 119:22 | 148:22 172:13 | **manipulation** | **matures** 143:3 |
| **maintain** 22:1 | 173:12,16 | 173:10 | **maturity** 60:22 |
| 22:4,13,16 | **male** 71:5,23 | **march** 109:3 | 60:24 143:5 |
| 23:4 146:23 | 182:24 | 111:13 122:9 | 144:9,20 150:5 |
| **maintained** | **manage** 87:18 | 148:3 174:18 | 150:6,13,14,15 |
| 98:17 158:15 | 105:21 120:22 | **mark** 3:11 8:19 | **mcgill** 2:4 7:10 |
| **maintaining** | **managed** 11:4 | **marked** 176:18 | **mckenzie** 3:12 |
| 25:2,3 | 120:18,19,23 | **marker** 1:10 | 8:19 |
| **majority** 152:6 | 121:1 | **market** 106:3 | **mean** 52:1 |
| 152:8,12 | **management** | 108:24,25,25 | 65:11 69:16 |
| **make** 8:10 13:7 | 11:9 25:9 37:8 | 109:4 148:2 | 75:1 95:1 |
| 13:16 16:1 | 37:16,23 38:19 | 149:11,12 | 103:18 127:14 |
| 17:14 19:3 | 42:20 69:22 | 166:25 167:4 | 146:6 151:20 |
| 40:22 42:15,22 | 70:5,8 72:12 | **marketing** | **meaning** |
| 42:24 44:25 | 81:6,10,18 | 114:25 | 101:15 156:17 |
| 45:2 51:15 | 85:4,23 86:7 | **markets** 109:4 | 156:17 |
| 57:18 62:9 | 86:12 90:1 | 109:9 | **means** 14:19 |
| 68:2 76:19 | 127:17 145:3 | **mason** 3:10 | 25:20 99:10 |
| 78:1 89:18 | 154:12 159:23 | 8:20 | 120:23 165:1 |
| 91:13 100:1 | 160:19 161:21 | **master's** 20:21 | 176:18 |
| 106:17 109:22 | 163:23 167:8 | 20:21 | **mechanisms** |
| 109:24 112:20 | 173:24 174:9 | **math** 99:17 | 115:13 |
| 117:19 118:4 | **manager** 93:25 | **matrix** 179:5 | **media** 184:6 |
| 118:23 125:19 | 101:19 119:24 | **matt** 107:22 | **medical** 128:23 |
| 126:23 130:23 | 120:16,18,21 | **matter** 8:22 9:2 | 131:21,24 |
| 132:8 144:15 | 120:23,24,24 | 11:20 89:23 | **medium** 180:8 |
| 145:18 158:13 | 121:4 122:13 | 90:5 96:22 | **meet** 42:13 |
| 169:22 172:5 | 122:15,16 | 140:23 154:23 | 75:16 178:3 |
| 179:1 | 127:25 128:2 | 156:5 173:24 | |

Veritext Legal Solutions
calendar-utah@veritext.com 801-746-5080

**[meeting - month]**

| | | | |
|---|---|---|---|
| **meeting**  51:3 122:24 | 116:19 119:6 | 148:24 161:19 162:11,20,21 | **modification** 48:9 |
| **megawatt** 94:24 | **mentions** 140:23 | **mind**  9:14 23:19 55:4 88:3 | **modified**  48:16 |
| **melinda**  2:9 7:21 | **met**  15:16 81:2 181:1 | **mine**  168:25 | **molly**  119:9 |
| **member**  92:24 119:25 120:2 120:16,19,21 121:4 122:12 122:14,18 123:2,12 124:13,15,18 | **miami**  3:14 | **mingle**  22:19 | **moment**  46:12 47:2 48:20,23 |
| | **michael**  3:17 8:3 | **mingling**  23:9 | **monday**  12:23 175:4 |
| | **microphone** 74:2 77:9 | **mining**  99:1,9 100:11 | **money**  11:7 13:17 14:17 16:5,12,13,21 16:24,25 17:18 17:22 18:10,13 29:3,10,12,15 29:18 30:12 42:11,17 43:4 43:22 46:16 47:2,9 50:25 51:1 57:12,17 57:18,23 58:2 58:5,9 64:11 66:1,22 72:15 88:18,19 101:9 144:24 156:17 176:11 |
| | **mid**  109:13,14 | **minor**  20:18 138:17 | |
| **member's** 124:12 125:14 | **middle**  123:23 | **minute**  59:5 72:21 76:2 131:5 140:5 141:9 | |
| | **mike**  129:6 | | |
| **members**  54:13 54:16,24 55:22 55:24 93:8 119:23 121:9 121:14 | **milestone** 132:11 | | |
| | **million**  10:21 10:22,25 16:15 16:16 17:3 28:15 30:5,5 31:8 32:2 34:12,18 35:12 35:14 36:6,7 42:8 50:23 52:24 53:12 54:13,16 63:14 63:24 64:1,4,6 64:8,12 65:20 65:25 66:2,13 66:17 69:18 87:4 103:8 112:17 116:6 118:18,19,20 130:9 133:22 138:14 147:19 147:23 148:12 | **minutes**  51:3 76:6,8 122:24 163:20 | |
| **membership** 95:9 | | **mischaracteri...** 171:6 | **monitoring** 21:24 |
| **memo**  124:10 | | **mislabeled** 58:25 | **month**  17:7 31:15 43:16 77:6 78:14,22 78:24 81:19,21 118:8 129:21 132:15 137:15 137:24 138:1 162:13 176:4 |
| **memorandum** 26:15 | | **mistakenly** 17:6 | |
| **memorialize** 10:5 15:9,12 60:18 | | **mistakes**  14:4 | |
| | | **mm**  54:1 | |
| | | **model**  99:21 149:22,24 150:10 | |
| **memorializes** 13:15,22 | | **modeled** 165:21 | |
| **memory**  119:7 | | **modeling** 165:24 | |
| **mentioned** 22:15 97:16 100:11 104:7 106:13 113:25 | | | |

Veritext Legal Solutions
calendar-utah@veritext.com 801-746-5080

**[monthly - note]**

**monthly**  24:15
  25:16 40:8
  42:4 74:15
  117:21 176:6
**months**  40:19
  45:17 64:10,17
  78:20 111:8,8
  134:2,14,14
  136:17 137:2
  161:9,19
  162:12 174:7
**morley**  129:6
**morning**  8:11
**motion**  10:13
  10:14 25:9
  72:1,6 141:11
  151:3,7 160:9
  175:3,5,9,18
  180:6
**mou**  94:18
**move**  79:11
  128:6 137:4
  151:25 159:18
  159:19
**moving**  9:24
  173:23
**muddled**  73:25
**multi**  136:25
  139:1
**multiple**  18:23
  26:11 30:16,20
  33:19 34:4
  61:16 73:5,8
  73:23 82:20
  84:15 101:16

103:16 106:20
  110:14 116:8
  120:6 136:9
  142:8,10
  144:14 146:17
  150:21 153:20
  158:6 159:13
  160:4 161:15
  172:1
**municipal**
  116:25
**mute**  19:15,16
  92:1

**n**

**n**  2:1 4:1 7:1
  8:20 20:8 92:4
  92:5
**name**  20:6 56:8
  92:2 93:19
  124:10 128:25
  129:3 143:15
**narrow**  15:21
  16:7 90:13
  149:12
**national**  178:10
**naturally**  12:2
**nature**  28:6
**near**  114:21
**nearby**  114:21
**nebeker**  3:17
**necessarily**
  25:21
**necessary**  90:3
  145:6

**need**  10:17
  14:10 26:20,25
  87:24 90:6
  102:7 106:7
  116:19 132:5
  135:3 140:4
  141:25 146:19
  146:22 175:8
  179:21
**needed**  105:21
  132:24 134:11
  135:10 170:2
**needs**  44:20
  115:12 135:14
  135:16 155:18
  182:3
**negotiate**  38:4
  165:2 174:10
  174:22 182:19
**negotiated**
  83:12,17,19
  164:20
**negotiating**
  133:1
**negotiation**
  83:21 164:25
  165:3
**neilson**  2:3 7:9
**network**  99:12
  99:12,18 100:2
**never**  61:10
  127:16 129:2
**nevertheless**
  101:9

**new**  3:8,8 11:20
  11:22 63:15
  66:2 94:13
  102:7,8 103:10
  105:12 106:11
  118:4 128:14
  140:23 162:23
**ngo**  115:23
**nils**  94:7
**non**  24:5,7,7
  115:23 154:4
**noon**  175:4
**nope**  9:19
**north**  46:8,11
**notary**  184:3
**note**  13:14,18
  29:5 31:10
  32:11,19 33:10
  34:1,5,8,15
  36:2 40:16,17
  40:24,25 41:1
  41:11,23,25
  42:1,2,4,8,25
  43:10,16,19,22
  44:20 46:14
  47:10 58:17
  60:8 61:8,18
  61:20 62:24
  63:8,10,18,20
  65:25 67:7
  69:17,18 72:18
  75:12 86:16
  87:15,16,16
  88:5,20,24
  106:16 108:2

Veritext Legal Solutions
calendar-utah@veritext.com 801-746-5080

[note - okay]

109:15 111:2
112:12 118:12
118:25 129:14
129:16,17,19
130:4 134:21
141:23 153:6
160:20,25
169:13,13,23
170:4 175:9
179:4
**noted** 10:2
181:11
**notes** 10:4
15:11 45:5
49:10 50:12
84:23 85:3
**notice** 54:7
140:22 175:3
178:24 179:4,5
179:12
**noticed** 133:7
**noting** 157:14
**notwithstandi...**
98:13
**nuclear** 95:2
97:10,14 114:2
**number** 5:2,20
11:21,21 72:22
72:23 79:13
80:1,4 81:5
91:2 140:23,24
165:14
**numbered**
26:16,18

**numbers** 23:2
50:12 57:10
80:19 107:8

**o**

**o** 7:1 8:20 20:8
92:4,5
**oath** 166:5,8
**object** 79:19
157:13
**objected**
175:18
**objecting** 79:25
**objection** 9:1
19:1 44:10
66:5 71:24
72:5 89:16,20
134:25,25
137:18 153:2,7
154:19 171:5
176:15
**objections**
137:23 173:21
**obligation**
16:22,22 33:7
49:13,15 61:1
71:14 88:20
113:2,7,8
170:3 174:6
177:11,14
178:2,7,8
179:7
**obligations**
37:19 113:4,10
161:20 178:12

**obtained** 126:1
133:14
**obviously**
44:22
**occasions** 142:8
**occur** 77:18
**occurred** 28:22
159:3
**occurring**
162:22
**offer** 132:3,4
168:3
**offered** 132:9
**offers** 131:10
**office** 7:20
12:22,25 126:1
128:23 182:10
**officer** 73:20,21
74:10 92:23
152:4,5
**officers** 94:5
**offices** 12:21
**offset** 11:24
161:20 174:18
**offsets** 160:19
162:8
**offsetting** 174:5
**oh** 25:2 35:5
48:22 58:24
68:9 141:7
158:23 176:3
**okay** 9:6 19:23
21:14 23:25
24:2 26:21
28:4 31:7 32:6

33:5,12,15
43:3 45:4
47:18 48:11,20
49:25 50:23
51:24 52:3,7
52:11,13,17
53:10,11,23
54:6,11,22
55:2,3,8,16
56:2,5,5,20,25
57:3,17,22
58:6,6,12
59:11,12,17,21
59:25 60:11
61:15,19,23
62:2,6,16,22,23
63:11,12 64:2
64:6,11,19,20
65:2,15,15,16
65:23 66:11,20
66:25 67:6,8
67:13,16,22,25
68:4,10,25
69:2,19,19
70:10,14,23
72:9,9,20
73:10 75:7
77:9,21 81:13
81:17,23 82:14
82:25 83:7,11
83:17,20 84:2
84:6,22 85:2,7
85:11,20 86:5
86:10,18 90:7
92:2 104:5,14

Veritext Legal Solutions
calendar-utah@veritext.com 801-746-5080

**[okay - overrule]**

| | | | |
|---|---|---|---|
| 105:6,7 107:9 | 164:5,11,18,24 | 137:25 138:5 | **organization** |
| 117:16 119:4 | 165:4,11,17 | 176:6 | 21:5 115:23 |
| 119:17 120:4 | 166:14,15,18 | **operations**  13:8 | 119:11 122:2 |
| 120:14,25 | 166:24 167:12 | 47:13 97:4 | **original**  28:2 |
| 121:7,22,24 | 167:16 168:4,8 | 162:16 | 31:8,15 35:9 |
| 122:6,9,10,21 | 168:18 170:1 | **operators** | 35:11 48:14 |
| 123:1 124:7,8 | 170:10,10,20 | 100:2 | 98:25 118:19 |
| 124:16,23 | 170:22 171:2 | **opinion**  125:19 | 177:18 184:11 |
| 125:5,7,12,21 | 180:18 | **opportunities** | **originally** |
| 125:25 126:9 | **old**  168:25 | 128:14 | 13:24 30:23 |
| 126:16,21 | **once**  42:2 118:4 | **opportunity** | 48:4,8 55:22 |
| 127:19 128:5 | 128:16 138:21 | 21:7 99:6 | 104:12 |
| 128:25 129:4 | **ones**  40:10 | 105:25 118:21 | **originated** |
| 129:13,13,13 | **ongoing**  72:5 | 131:20 | 103:20 108:6 |
| 131:3 132:14 | 132:12 146:23 | **opposed**  54:5 | 118:5 |
| 133:7 135:5,12 | **onsager**  2:16 | **opposition** | **originates** |
| 137:6,20 | **open**  65:3 | 175:9 | 102:17 |
| 139:16,25 | 115:25 | **option**  12:24 | **outcome** |
| 140:13,17,21 | **opened**  28:11 | 13:8 14:8 | 184:14 |
| 142:14,18,24 | **opening**  9:15 | 18:11,12,17 | **outlines**  37:24 |
| 143:8 144:1,6 | 19:5,12 39:15 | 44:2,3,9 45:15 | **outside**  18:5 |
| 144:12,22 | 65:3 | 45:16,19,25 | 79:1 |
| 145:18 146:25 | **operate**  111:23 | 46:6,7,16 47:3 | **outsourced** |
| 147:7,17,22 | 111:24 162:17 | 47:6 131:4,10 | 21:6 29:23 |
| 148:9 149:2,9 | 163:2 | 131:11,19 | 39:12 |
| 149:16 150:18 | **operated**  173:7 | 132:16 133:7,8 | **outstanding** |
| 151:21 152:18 | **operating**  9:24 | 134:19 138:24 | 18:7 49:11 |
| 152:23 153:19 | 10:20,22 12:1 | **options**  149:14 | 61:25 62:4 |
| 153:21 154:2 | 14:6,16 24:15 | **order**  12:17,19 | 112:12 |
| 154:15 155:4 | 25:16 57:14 | 13:12 17:23 | **outweighs** |
| 155:10,16,20 | 58:4 72:4 | 29:17 117:19 | 100:21 |
| 156:20 157:18 | 74:15 75:15,17 | 180:10 | **overlap**  25:10 |
| 158:1,5 159:12 | 83:3 98:1,5,7 | **orders**  180:24 | **overrule** |
| 159:16 160:6 | 98:10,14 104:8 | **ordinary**  29:20 | 173:21 |
| 161:18 163:24 | 110:7 137:15 | | |

Veritext Legal Solutions
calendar-utah@veritext.com 801-746-5080

**[overruled - partnered]**

| | | | |
|---|---|---|---|
| **overruled** 134:25 | **ownership** 110:6 120:20 170:15,25 171:15,24 | 40:9 41:13,15 41:16 42:1,2,6 56:15 57:13 | 154:16 155:5 155:11,17,20 155:24,25 |
| **oversee** 21:21 | | | |
| **overstep** 25:23 | **owning** 122:22 | 61:21,25 63:8 63:9 67:3 | 156:6 157:11 158:9,11 159:6 |
| **owed** 40:2 42:11 46:13 87:17 88:1 156:7 160:25 160:25 169:10 | **owns** 43:24 78:7 95:8 111:14 124:15 152:15 | 69:14,24 70:17 70:21 71:1,3 81:20 82:25 85:16,17,22 | 159:8 164:11 169:10 170:2,2 172:20 173:18 |
| | **p** | 86:1,3,11,13,15 87:4,8 88:19 89:3,7 111:1 | **part** 32:6 44:21 77:25 128:3 135:23 156:20 157:9 158:8 159:4,9,12 160:21 168:1 |
| **owes** 42:18 48:24 49:5 113:11 156:18 | **p** 2:1,1,9 3:6 7:1 | 118:5 162:9,11 170:2 | |
| **owing** 16:22 148:2 | **p.m.** 175:2 | **palmer** 2:16 | **partially** 41:15 |
| **own** 12:13 14:2 18:4 23:6 24:12 47:13 59:6 81:24 85:25 95:4,7 109:19 120:22 120:24 124:13 152:11 | **page** 4:2,8 5:2 5:20 28:6 31:18 33:16,23 50:22 52:9,9 52:11 55:6,7 56:4 57:5 68:5 68:8,11,13,17 68:18,22 72:21 119:15,20,22 120:8 122:8,11 123:17,24 125:6 164:3 165:6 166:14 168:7,8 | **paragraphs** 60:22 | **participant** 31:14 |
| | | **paralegal** 50:5 | **participate** 19:7 75:4 147:11 179:8 179:17 |
| | | **parent** 9:23 21:3,12 98:18 | |
| | | **parsons** 2:4 7:10 8:24 11:12,18,20 13:2,10 14:19 16:6,24 39:16 46:9 48:25 49:2,5,8,17,22 71:10 73:12 85:15,16 86:6 86:11 88:18 89:3,7 90:15 98:12 107:16 113:3,9 129:16 139:20 140:14 140:25 153:21 | **participation** 132:9 |
| **owned** 28:20 114:1,11 143:10 169:13 | | | **particular** 55:25 90:5 91:16 177:25 |
| **owner** 92:25 93:6,7,13 112:5 120:1,2 123:12 124:22 127:3,11 152:9 154:9 171:3,16 171:20 | | | **parties** 8:5 44:11 76:15 85:12 91:1,15 132:21 173:4 184:13 |
| | **pages** 34:23 184:9 | | |
| | **paid** 12:8 13:23 13:23 17:3,10 32:7 34:9 35:9 35:15 36:4,15 36:18,20,22 37:22 39:15,21 | | **partner** 102:15 |
| **owners** 93:3,8 110:4 | | | **partnered** 103:6 |

Veritext Legal Solutions
calendar-utah@veritext.com 801-746-5080

**[partnership - petition]**

| | | | |
|---|---|---|---|
| **partnership** 118:17 | 49:23 52:24 54:2,21 55:17 56:22 57:9 62:24 124:24 143:3 144:9 150:6 169:9 | 145:13 156:23 157:11 161:24 161:25 162:1 169:16 | **percentage** 108:8,11 |
| **party** 17:24 44:22,23 45:15 108:7 109:5 110:21 112:1 130:19 131:9 143:23 145:7 145:10 154:4 173:15 174:11 | **payee** 13:3 | **payoff** 40:2 | **percentages** 146:17,18 165:13,19 166:19 |
| **party's** 26:17 27:1 | **paying** 11:11 43:19 56:13 | **payroll** 83:1,2 83:4 | **perfect** 59:21 125:11 |
| **passed** 154:5 | **payment** 12:4 15:18,19 16:6 42:25 44:9 55:13 65:6 67:2 75:13 123:11,13 156:7 161:24 167:21 169:22 169:24 | **pays** 38:15,22 39:2 83:9 113:9 117:2 138:13 169:11 | **perform** 82:18 94:20 154:11 |
| **passive** 30:18 | | **pbc** 161:25 | **performance** 178:6 |
| **past** 14:14 137:24 145:23 162:18 | | **pd** 138:8 | **performed** 155:25 |
| **path** 71:3,4 93:11 151:6 | | **pdf** 68:23 | **period** 39:19 45:17 57:25 78:25 |
| **patience** 183:1 | **payments** 11:24 16:15 34:4,6,20,24 35:5 42:6,22 43:12,16 45:16 55:19 57:7,11 57:18,24 61:13 61:17 71:7 86:6 88:23 110:16,18,23 110:24 112:18 112:21,22 117:22 118:11 118:15 130:9 130:11,21,24 131:2 144:10 144:16,20 | **people** 71:8 100:17 114:18 127:20,23 | **permission** 136:3 |
| **patient** 168:21 | | **percent** 38:3 39:4 40:12 83:7,13 84:7 86:6,8 93:13 108:13,17 142:21,22 143:9 144:1 145:25 146:2,3 146:3,8,12,18 146:19,20,22 146:23 147:3 147:15 150:5 150:13 152:9 152:16 154:9 165:8,13,16 167:1,10 168:12 | **person** 118:10 |
| **pay** 11:13 13:1 13:8,8,9,17 14:8,12,18 16:23,24 36:21 43:5,22 47:9 49:8 56:25 58:3,3 61:1 88:18 90:15 110:25 113:2,4 134:21 139:20 140:18 155:24 170:2,4 176:22 | | | **personally** 92:25 |
| | | | **personnel** 39:12 105:21 |
| | | | **persons** 156:22 |
| | | | **perspective** 18:8 27:11 112:11 |
| | | | **pertaining** 89:20 |
| **payable** 31:10 34:1 40:14 | | | **petition** 11:12 11:14,22,25 12:8,14 13:2 13:10 14:13,18 14:20 15:10,19 |

Page 36

**[petition - power]**

| | | | |
|---|---|---|---|
| 37:13 39:20 40:19 48:25 49:2,9,18 85:15,18 89:7 96:10 113:5 129:22,25 139:24 155:25 158:18 173:20 177:14 178:8 | **placeholder** 175:1 | 170:13 | **possession** 18:1 18:2 |
| **ph** 12:11 23:13 37:17 38:10 48:10 80:3 87:18 116:7 126:15 129:3 131:11,14 137:12 172:3 172:16 180:12 180:15 | **plan** 118:14 135:19 176:15 177:5 180:2,3 180:9 | **plus** 17:9 36:14 40:12 165:8 181:19 | **possibility** 177:13 |
| | **planned** 140:19 | **point** 13:11 15:22 24:14 31:14 37:18 49:14 57:15 58:6 107:12 116:9,15 132:4 138:20 140:25 151:23 168:5 173:19,20 | **possible** 12:20 165:19 176:20 |
| | **planning** 135:20 | | **post** 12:14 |
| | **plans** 115:3,15 134:19 | | **posted** 48:8 179:13 |
| | **plant** 94:14 | | **potentially** 73:12 |
| | **plants** 94:22 | **pointed** 87:12 170:6 | **power** 1:8 7:5 17:17 21:12,13 22:7 26:24 28:13,24 29:15 29:18 31:9,13 31:17 32:1,4,8 32:9,12,20 36:3,8 37:9,10 37:17,19,22 38:15,21 39:5 39:19,22 40:3 40:11,14,16,23 41:12,24 42:6 42:12,18 43:5 48:24 49:11,12 52:22 53:12 54:2,12,15,25 56:7 58:24 61:9 63:2,9 65:5 76:21 77:19 78:7,10 81:7,21,23 82:2 83:4,9 84:11,12,24 |
| | **plat** 135:21 139:10 | **points** 169:1 | |
| **phase** 135:25 136:1,7 | **plate** 139:12 | **polynesian** 129:3 | |
| | **platform** 77:13 77:16,18 78:1 78:4 100:6,15 110:14 162:16 162:23 163:4 | **portfolio** 100:21 101:2 103:12 104:3 105:22 106:1 108:15 117:17 117:23 118:16 118:18,19,24 128:9,19 | |
| **phases** 136:8,8 136:24 137:1 | | | |
| **phasing** 139:15 | **plats** 139:11 | | |
| **philosophy** 177:8 | **play** 83:22 | | |
| **phrase** 39:18 | **pleadings** 44:19 80:1,12 80:14 | **portion** 46:3 | |
| **piece** 127:7 138:7 | **please** 7:6 19:20,24 20:5 31:1 37:4,7 46:22 50:13 58:14 91:20 92:2 96:20 148:18 151:8 157:4 158:24 168:23 169:3 | **poses** 156:21 157:10 158:9 159:5 | |
| **pieces** 42:16 | | **position** 21:9 49:16 92:22 101:18 127:25 | |
| **pillsbury** 97:5 97:7,9 | | | |
| **pipe** 134:12 | | | |
| **pittman** 97:5 | | **positive** 158:10 | |
| **place** 111:25 | | | |

Veritext Legal Solutions
calendar-utah@veritext.com 801-746-5080

**[power - proceed]**

| | | | |
|---|---|---|---|
| 85:2,8,17,25 | 149:6,11,24 | **prepare** 138:15 | **primary** 112:2 |
| 86:1,9 87:5,8 | 150:3,7,9,10,16 | **prepared** 90:18 | 132:23 |
| 87:17 93:5,9 | 152:9,12,15,19 | **preparing** | **principal** 108:2 |
| 93:16 94:13,22 | 152:20 153:1 | 86:11 | 118:3,21 |
| 95:17 97:19,22 | 153:17,21 | **prepayment** | 128:25 129:10 |
| 98:11,14,23,25 | 154:5,9,12 | 61:3 | 171:11,12 |
| 99:5,19,24 | 155:6,12 156:6 | **prepetition** | **principal's** |
| 100:23 103:11 | 156:9,16,18,22 | 46:10 140:14 | 80:5 |
| 103:22 104:11 | 157:23 160:20 | **present** 15:24 | **principals** |
| 105:5,8,9,10,14 | 160:25 161:8 | 50:10 | 171:7,8 |
| 105:16,19 | 161:13 162:4,6 | **presented** | **principle** 12:10 |
| 106:6,7,8,14 | 162:18 164:9 | 12:25,25 19:4 | 150:13,15 |
| 107:11,13 | 165:7 169:9,12 | 104:19 105:24 | **principles** |
| 108:9,14 109:7 | 169:13,16,23 | **presenting** 72:1 | 23:16 |
| 109:8 111:1 | 169:25 170:23 | **preserve** 163:3 | **print** 67:25 |
| 112:11,17,21 | 171:4,8,11,16 | **preserved** | **prior** 11:11 |
| 113:2,11 | 171:19 | 162:16 | 22:8 52:18 |
| 117:18 118:12 | **practice** 29:20 | **president** 92:23 | 64:10 85:24 |
| 118:22 119:5 | 112:3 | **pressurized** | 96:7,16,17 |
| 120:2 121:5 | **pre** 11:22,25 | 94:24 | 137:12 |
| 122:17 123:8 | 12:8 13:2,10 | **prevailing** | **privilege** |
| 124:10,17 | 14:13,18,20 | 108:20 | 157:14 |
| 125:3,14 127:3 | 15:19 48:25 | **preview** 151:10 | **privileges** |
| 127:10,14,16 | 49:2,9,18 | **previous** | 157:1 |
| 127:22 128:4 | 85:15 113:5 | 100:10 105:13 | **pro** 8:19 |
| 129:15 130:8 | 139:20 173:20 | 107:4 115:7 | **probably** 44:20 |
| 130:16,25 | **preceding** | 131:22 146:13 | 73:5 75:8,21 |
| 141:23 143:13 | 184:9 | 171:10 | 76:5 79:10 |
| 143:24 144:12 | **precious** 91:1 | **previously** | 114:7 116:9,17 |
| 144:22,25 | **preempted** | 64:12 94:6 | 132:17 136:16 |
| 145:3,5,15,16 | 112:7 | 141:1 167:22 | **problem** 80:11 |
| 145:19,21 | **preface** 178:10 | **price** 46:6 | 182:14 |
| 146:1,7,16 | **prefer** 135:11 | **primarily** | **proceed** 10:15 |
| 147:8,14,18,23 | **preliminary** | 21:21 161:13 | 19:14 141:13 |
| 148:11,24 | 139:4 177:21 | 162:15 | |

Page 38

**[proceeding - puts]**

**proceeding**
  10:14
**proceedings**
  97:10
**proceeds**  58:8
  58:12 64:24
  66:4
**process**  74:25
  75:1 78:2 99:3
  100:14 104:2
  115:17 116:4
  130:23 132:1
  135:18,21
  136:18,25
  138:13,22
  168:2 177:20
  181:25
**processing**
  130:19,21
  145:12
**produced**
  57:13 184:5
**product**  179:1
**production**
  12:15
**professional**
  69:10 70:11
  73:1,6,8 184:3
**professionals**
  39:8
**profile**  100:8
  147:25
**profit**  115:23
**profitability**
  146:23 147:20

148:21
**profitable**
  147:18
**program**  2:10
**project**  94:21
  128:1 132:8,10
  132:25 133:3,4
  133:18,23
  134:1 136:7
**projections**
  176:4
**projects**  106:18
  114:23,23
**promissory**
  10:4 13:14,18
  15:11 32:11,19
  33:10 34:5,15
  36:2 41:11,23
  42:8 43:10
  58:17 60:8
  61:8,18,19
  63:18,19 84:23
  85:3 109:15
  129:14 141:23
**prong**  151:16
**pronounce**
  129:2
**proof**  179:8
**proofs**  179:18
  181:20
**proper**  178:24
**properly**
  181:20
**property**  13:6
  17:17 18:1,2,4

18:4,12 43:23
  45:23 57:23
  95:11,21
  109:16,20
  111:14,17,18
  111:19 112:5
  112:20 114:4
  114:15,25
  115:4 116:21
  117:10 131:11
  133:9,12
  134:16 135:5,7
**propose**  180:2
**proposing**
  42:12
**prosecuting**  9:1
**protective**
  12:17
**provide**  16:24
  37:10 38:7,17
  81:14 99:11
  105:11 118:20
  134:3 139:7
  145:2,8,15
  153:23 167:18
  168:11 180:23
**provided**
  103:24 104:1
  106:14 145:7
  172:6 173:25
  174:16 184:10
**providers**  73:6
  73:8,9 167:13
**providing**
  145:6

**public**  24:7,8
  44:12 116:25
  184:3
**published**
  179:12
**pull**  24:25 59:8
  78:17 160:8,11
  163:21 166:1
  170:13
**pulled**  142:12
**pulling**  24:4
  26:23
**purchase**  44:2
  44:3 45:15,19
  46:1,5 47:6
  131:11 134:20
**purchased**
  17:17 178:2
**purpose**  94:12
  94:13 98:25
  117:8 127:13
  173:14
**purposes**
  116:13 145:19
**pursuant**  85:22
  86:12
**pursuing**
  158:11 159:8
**put**  17:12 41:7
  62:17 91:5,10
  91:18 99:14
  106:8 121:23
  134:12 141:21
**puts**  179:7

Veritext Legal Solutions
calendar-utah@veritext.com 801-746-5080

**[putting - recall]**

| | | | |
|---|---|---|---|
| **putting** 45:11 48:22 127:13 148:1 180:3 | 142:15 150:18 151:3,13 157:5 159:4,22 160:7 164:1 168:18 168:21 176:7 180:25 | 58:14 59:4,15 59:17 60:21 62:8 68:1,4 69:1 70:12 72:21 119:8,14 119:19 120:9 | **read** 54:14 62:10 |
| **pvc** 69:16,17,18 | | | **reading** 43:15 52:21 |
| **q** | **quick** 163:25 | 121:24 122:6 | **ready** 9:4 117:10 132:1,2 132:4,15 |
| **qibs** 179:2 | **quickbook** 15:8 | 122:11 123:14 | **real** 15:10 |
| **qualified** 179:2 | **quickbooks** | 123:21 125:6 | 95:11 105:12 |
| **qualify** 180:5 | 15:12 23:4,7 | 126:10 139:17 | 105:16,21 |
| **question** 22:12 | 23:11 27:25 | 140:1,4,10 | 106:12,18 |
| 31:1 44:17 | 28:1 33:24 | **raise** 19:24 | 109:10,11,12 |
| 66:8 72:11 | 35:25 41:22 | 91:20 | 109:16 111:14 |
| 74:9 76:18 | 47:20,22 48:1 | **raised** 14:1 | 128:9,11,17 |
| 77:5 89:2 | 48:12 62:15,17 | **ramification** | 145:17 181:10 |
| 104:6 112:7 | 92:20 117:24 | 174:3 | **realize** 176:17 |
| 121:16 126:16 | **quickly** 12:19 | **ranges** 109:13 | **really** 9:9 15:14 |
| 128:7 137:21 | 163:19 170:13 | **rate** 107:24 | 23:13 71:9 |
| 140:3 147:1,2 | **quinney** 3:17 | 108:8,11,15,17 | 97:13 100:8 |
| 148:10,16,17 | 96:3,4,8,11,11 | 109:1 144:2,4 | 111:10 130:1 |
| 148:22 153:6 | 96:18 | 145:24 146:8 | 139:22 162:13 |
| 153:10 156:14 | **quinney's** | 147:8,10,15 | 181:18,24 |
| 159:3,15 | 12:20 | **rates** 108:19,20 | **reason** 37:15 |
| 166:19,24 | **quite** 13:23 | 108:23 109:12 | 61:7 109:7 |
| 168:13 | 26:6 100:5 | **rather** 13:9 | 162:3 |
| **questioned** | 176:20 | 50:11 180:22 | **reasonable** |
| 43:3 | **quote** 118:9 | **rating** 94:25 | 167:2 174:5 |
| **questions** 19:6 | 119:1 138:10 | **ray** 3:17 12:20 | **reasonably** |
| 67:15 75:8,25 | **r** | 96:3,4,7,11,11 | 174:2 |
| 76:6 79:9 81:3 | | 96:18 | **reasons** 13:20 |
| 81:4 84:22 | **r** 2:1 3:17 7:1 | **rc&d** 115:22 | 111:21 |
| 85:14 86:19 | 20:7 92:4 | **reach** 27:8 | **rebuttal** 26:25 |
| 89:23 91:15 | **rachelle** 50:5 | **reactor** 94:24 | **recall** 35:19 |
| 117:16 121:9 | 50:13,21 51:14 | 95:1,2 | 81:4 84:9,25 |
| 131:8 133:11 | 52:8 53:6 55:5 | | 87:5,18 88:25 |
| 134:18 141:3 | 56:3 57:5 | | |
| 141:10 142:3,7 | | | |

Veritext Legal Solutions
calendar-utah@veritext.com 801-746-5080

**[recall - relationships]**

89:4 104:9,11
104:14 108:18
108:19,22
119:16 122:23
122:25 142:4,6
142:14 144:8
152:24 153:14
153:18 164:14
164:16 166:2
166:22 171:24
172:19,21
**recapitalize**
111:6 138:22
**receipts** 162:7
**receive** 29:4
44:20 110:23
110:24 133:18
161:25 162:2
179:11
**received** 26:16
27:16,20,21
34:24 73:4,11
80:18,20 85:14
110:16 112:17
117:18 130:9
130:18 133:16
133:19 134:5
147:8 149:21
155:5,16
156:25 157:16
158:1,19 162:1
174:1
**receives** 70:7
115:18

**receiving** 18:11
154:16 161:13
**recent** 48:15
**recently** 48:16
103:5,6 114:9
115:3,5
**recess** 76:8,11
183:2
**recipient**
110:21 112:22
**recognize** 26:1
26:9 32:15
33:9 37:5
41:18 47:16
59:23 90:25
107:1 119:11
122:4 140:9,12
152:18
**recognized**
31:11 78:15,24
106:6
**recognizing**
153:12
**recollection**
140:16
**record** 20:6
21:21 23:10
60:5 92:3
99:15 121:17
121:20 127:7
127:10 170:25
171:3,14 173:6
**recorded** 23:14
51:2 55:21
124:21

**recording** 1:21
75:3 139:11
**records** 10:3
24:5 25:4,24
127:5
**recycle** 118:3
**redirect** 4:6
86:22 87:1
**reduce** 29:17
40:13 42:7
63:5,10 65:12
**reduced** 65:8
**reduction**
86:16
**referred** 56:11
**referring** 23:22
41:5 68:22
82:21 107:4
120:8,11 142:9
146:5
**reflect** 33:25
55:17 67:4
127:6 171:15
**reflected** 54:15
123:2 170:14
**reflecting** 36:1
47:22
**refresh** 119:7
**regard** 76:17
91:5
**regarding**
88:23 91:8
151:6 152:2,24
153:15 154:17
156:21 157:10

157:17 158:2,8
159:5
**regardless**
147:14
**regards** 176:13
**region** 115:24
**registered**
22:24 98:14
104:9,11,14,21
119:5 171:7,11
171:12,19
172:15,17
184:3
**registration**
126:24 170:14
**regulated**
102:3
**regulatory**
97:11
**rejection** 178:9
**relate** 151:7
**related** 17:1
40:11 90:24,24
102:1 112:18
130:9 141:11
156:3
**relates** 17:17
47:6 63:17
151:4
**relating** 158:20
**relationship**
96:16,17
**relationships**
158:15 167:22

**[released - revenue]**

released   156:9
relevant   71:18
  72:5
rely   45:2 84:7
  84:19
relying   12:8
remaining
  36:14 42:9
  139:7
remember
  104:20 118:8
  119:1,6 129:17
  129:19 130:1,5
  172:22
reminded
  11:23
remodel   102:8
removed   87:22
repaid   16:18,20
  17:4,7
repayment
  87:22 103:2,14
  125:1
repayments
  58:7 118:3
repeat   29:1
  153:10
rephrase   30:18
  137:21 148:17
reply   80:13
report   24:15
  25:16 28:1
  35:25 47:19,20
  47:21 52:2
  57:7 62:19

67:1 81:19
  99:17 176:6,6
  178:19 179:25
  180:1
reported   184:8
reporter   1:25
  184:3
reporter's
  184:1
represent
  154:22 161:24
representative
  130:21 182:23
representatives
  182:1
represented
  96:23 97:9
  107:10,13,17
  129:15 151:17
  162:8
representing
  11:19 84:11
  85:8,8 172:10
represents   96:1
  139:6
repurpose
  95:18 116:13
repurposed
  114:15
repurposing
  95:13
request   12:15
  44:6 78:2
  184:6

requested
  77:25
require   87:13
  99:2 111:23
  156:24 162:5
  181:18
required   24:15
  98:5,6 108:5
  138:8 139:9
  175:24 180:4
  180:22
requirement
  162:25 180:7
  181:2
requires
  148:16
research
  105:15 167:16
  168:10,16
reserves   11:15
residences
  136:4
residential
  128:24 132:23
  132:23
resize   62:9
resolution   51:5
  122:21 154:5
  175:3
resolve   12:19
resources
  38:18 132:7
respect   16:10
  171:23

response   73:24
responsible
  11:10 75:2,3
rest   17:7 91:13
restate   42:14
restaurant
  102:9
restrict   24:6,6
restricted
  44:12
result   139:11
  165:23
results   132:19
resumes   7:3
  76:12
retain   153:23
retained   39:13
  96:5 153:21
retired   16:19
  17:9 40:17
retread   112:25
retson   71:2,3
  84:1,2 93:11
  94:4
return   32:10
  63:2,5 65:7
  87:18 108:15
  108:17 118:21
  146:3,8 147:15
returned   16:20
  17:6 31:16
  32:3,4 36:11
returns   109:1
revenue   9:24
  10:21,22 12:7

Veritext Legal Solutions
calendar-utah@veritext.com 801-746-5080

**[revenue - rough]**

| | | | |
|---|---|---|---|
| 12:9 14:6,8,16 | 78:23 79:4,14 | 167:2,6,11,19 | 26:12,13,22 |
| 57:14 78:23 | 79:18 80:16 | 168:20 169:14 | 27:22 30:17 |
| 100:20 101:1 | 81:15,21,24 | 170:5 171:9,13 | 31:1,3,5 32:13 |
| 117:20 149:22 | 82:3,7 83:1,9 | 171:14 173:1,3 | 32:15 33:21,22 |
| 161:9,12 162:4 | 83:12 84:4,13 | 174:19 175:19 | 41:3,4,7,9 45:7 |
| **revenues** 117:1 | 85:9,12 86:14 | 175:20,21 | 45:8,9,24 46:5 |
| 138:22 162:7 | 86:18 88:13 | 178:15 179:23 | 46:19,21 48:20 |
| 162:19 | 89:12 90:14 | 180:21 181:6 | 48:22 49:25 |
| **reversal** 124:20 | 91:20 101:25 | 182:14,25 | 51:22 57:8 |
| 125:2 126:25 | 109:2 119:10 | **rights** 74:24 | 58:16 59:25 |
| **reversed** 123:6 | 121:11 122:1 | 133:14,22 | 62:6,24 64:22 |
| 123:8 | 123:16,21 | 134:15 135:2 | 65:19 66:5 |
| **review** 82:5 | 124:8 125:7,16 | **rise** 21:7 | 67:13 71:17,21 |
| 178:19 | 130:15,16 | **risk** 109:2 | 79:11,21,23,25 |
| **revolve** 106:20 | 131:4 136:23 | 147:23,25 | 80:7,11,17,22 |
| **revolves** 150:10 | 136:24 137:8 | 148:8,11,23 | 81:5,18 83:12 |
| **revolving** | 137:16 140:7 | 149:10 | 86:22,23 89:10 |
| 105:12 | 141:2,5 142:21 | **river** 94:14 | 90:9,10 91:18 |
| **right** 7:14 8:4,9 | 142:25 143:3,6 | 115:2,10,16,18 | 92:8 105:7,8 |
| 8:22 9:12,20 | 143:10,20 | **rives** 97:6,20 | 113:13 119:4 |
| 18:20 19:2,9 | 144:12,20 | 97:21 | 121:8 128:7 |
| 19:13,24 25:2 | 149:3,7 152:7 | **roads** 74:19 | 129:13 137:18 |
| 26:10,12 27:15 | 152:11,13,16 | 95:17 115:12 | 142:15 151:12 |
| 27:19 45:6 | 152:21 153:1 | 116:20 | 153:2 154:19 |
| 50:1,2 51:14 | 153:17,25 | **rob** 71:2,4 | 157:13 159:19 |
| 51:16 52:12,12 | 154:6,9,13,18 | 93:11 | 160:2,11,15 |
| 53:23 56:13,21 | 154:25 155:2,6 | **role** 103:23 | 163:17 171:5 |
| 57:6 59:22 | 155:14,18,21 | 105:2,10 152:2 | 175:7,23 |
| 60:23 62:3 | 156:1,8,11,12 | **rothschild** 2:3 | 178:18,21 |
| 65:18 67:16 | 156:18 158:11 | 4:3,8 7:8,9 | 180:14,16 |
| 68:25 69:9 | 160:13,18 | 10:6,12,16 | 182:16,20 |
| 71:20 72:19,20 | 161:2,7 164:12 | 14:24,25 17:19 | **rothschild's** |
| 73:16,19 74:8 | 164:15,18,22 | 18:15 19:14,17 | 137:23 |
| 74:14 75:12,23 | 165:14,25 | 20:11 23:24 | **rough** 138:6 |
| 76:1,7 78:5,13 | 166:6,9,12,22 | 24:2 25:7,25 | |

Veritext Legal Solutions
calendar-utah@veritext.com 801-746-5080

**[roughly - separate]**

**roughly** 94:9
95:9 118:9
130:12 138:9
138:14
**rpr** 1:25 184:24
**rule** 24:6
**run** 81:19
**running** 8:14
**runs** 128:2

**s**

**s** 2:1 5:1 7:1
8:20 20:8
**safekeeping**
184:12
**salary** 70:20
**sale** 18:19
45:18,19
**sales** 138:25
139:12,12
**salt** 2:6,12 3:5
3:19
**sam** 8:7 18:22
76:4 79:7
141:19
**samuel** 3:6
**satisfied** 91:5
173:8
**save** 30:2
180:10
**savings** 149:19
**saw** 12:22
13:25 46:12
**saying** 54:19
88:10

**says** 16:2 45:12
52:17 54:1,13
122:14 124:12
166:18 171:10
**scale** 136:10
**schedule**
144:17 176:17
177:4
**schedules**
181:20,24
**school** 20:15
92:12 129:9
**score** 102:15
**screen** 23:25
59:6,12,15
139:17 141:22
**screenshot**
46:23 137:10
**scroll** 28:4
31:22 50:20
52:8 53:19
55:5 60:21
72:21 119:14
120:9 122:7,10
123:16 125:5,9
126:9 140:10
164:8
**se** 21:16 83:3
**sealed** 184:11
**seasons** 116:8
**second** 13:23
32:6 48:6 52:9
56:4 59:1
62:25 68:15
87:15 88:5,24

119:20 123:17
123:25 124:4,5
124:6 125:13
135:21,22
136:1 140:6
170:16 176:13
**section** 14:22
**secure** 109:10
133:21 139:1
144:6
**secured** 74:23
109:16
**securing**
138:24
**security** 99:11
**see** 7:14 31:23
31:24 33:17
34:3,11 35:22
40:4 42:3
44:23 48:14
52:15,19 53:4
53:10,19 54:8
55:9 57:10
65:2,5,24
67:12,14,20
69:3 70:1
73:15 78:17
87:14,24 88:8
106:23 108:2
116:13 119:18
119:21 120:7
120:25 121:11
122:2 124:1,3
124:9 125:7,9
125:13 126:3,5

131:18 133:12
140:11 142:11
165:9 166:16
166:16,18,19
167:10 168:9
168:13,16
170:18,20
**seeing** 44:11,12
64:17 161:4
**seeking** 152:24
153:14
**seem** 124:17
**seemed** 123:7
**seems** 87:17
90:23 177:9,11
**seen** 10:18
29:22,24 50:10
50:19 65:19
**segment** 69:21
**seismology**
116:6
**sell** 18:12
100:17 114:9
117:11
**selling** 100:22
138:23
**sense** 13:7
**sent** 31:12
63:24 179:4,5
**separate** 22:1,4
22:10,13,16,22
23:2,4 24:22
25:12,17
103:10 104:4
112:5 128:1

Veritext Legal Solutions
calendar-utah@veritext.com 801-746-5080

**[separate - six]**

| | | | |
|---|---|---|---|
| 154:17 | **servicing** | **short** 90:4 | **sift** 116:14 |
| **separateness** | 110:13,23 | 162:25 | **signatory** 89:25 |
| 90:22,25 91:9 | 145:12 | **shorter** 106:19 | **signature** |
| 98:18,20 | **session** 7:3 | **show** 9:2 11:17 | 119:23 164:6,9 |
| 151:13,17 | 76:12 | 14:12 15:5 | 184:16,23 |
| **separation** | **set** 11:20 22:24 | 16:20 17:14 | **signatures** |
| 158:14 | 23:7 28:22 | 23:25 34:23 | 164:4 |
| **sequential** | 32:11 146:12 | 35:21,24 41:17 | **signed** 10:4 |
| 139:15 | 184:9 | 43:25 46:20 | 11:9 13:3,14 |
| **serious** 174:3 | **sets** 165:6 | 47:15,25 66:23 | **significant** |
| 174:19 | **setting** 54:4 | 122:7 140:4 | 109:6 111:21 |
| **serve** 133:25 | 140:23 | 179:8 | 117:3,4 148:3 |
| 134:3 | **settled** 134:15 | **showed** 57:8 | 148:7 |
| **served** 167:22 | **seven** 78:20,24 | 58:16,17 170:8 | **significantly** |
| **service** 38:7,18 | 115:23 161:9 | 172:7 | 106:4,5 |
| 72:12 73:8 | 161:19 162:12 | **showing** 40:1 | **similar** 143:23 |
| 90:1 102:18 | 174:7 | 43:8 49:21 | 167:6,9 |
| 134:2 145:1 | **several** 14:14 | 57:7 106:23 | **similarly** 41:25 |
| 167:13 168:3 | 40:19 94:16 | **shown** 62:7 | **simple** 180:22 |
| **serviced** 130:19 | 95:14 105:13 | 64:23 | **simply** 15:6 |
| **services** 37:8 | **shake** 179:16 | **shows** 33:23 | 57:18 148:10 |
| 37:10,16,23 | **share** 23:25 | 41:21 47:2 | **single** 109:14 |
| 38:17,19,19 | 33:8 50:6,13 | 53:21 66:16 | 146:17 |
| 39:10,13,21 | 59:6,12 88:4 | 67:1 71:18 | **sister** 10:19 |
| 42:20 76:23 | **shared** 59:19 | 137:11 | **site** 94:14,15,17 |
| 81:6,10,14,18 | **sharing** 88:6 | **sic** 170:15 | 94:17 95:8 |
| 85:17,23 86:7 | 139:18 | **side** 35:17 | 114:2,16 116:9 |
| 86:13 100:16 | **shaw** 97:5 | 51:15,16 64:23 | 116:10 117:5 |
| 145:3,6,7,8,15 | **she'll** 8:15 | 65:24 79:5 | 134:10 |
| 154:12,13 | **shields** 1:25 | 99:21 100:20 | **sites** 95:16 99:5 |
| 155:25 159:24 | 184:3,24 | 100:22 128:16 | 99:7 132:7 |
| 160:19 161:22 | **shifted** 176:23 | 128:20 | **six** 12:13 45:17 |
| 163:23 165:7 | **shoot** 174:25 | **sides** 23:12 | 111:7,8 136:16 |
| 167:9,13,18,21 | **shop** 38:6 | 178:7 | 176:4 |
| 168:11 174:9 | | | |

Veritext Legal Solutions
calendar-utah@veritext.com 801-746-5080

**[size - spread]**

| | | | |
|---|---|---|---|
| **size** 68:19 | 130:20 131:1 | **somebody** | 103:14 106:16 |
| **sloppy** 173:6 | 141:24 143:9 | 44:24 71:15 | 134:21 |
| **slowly** 140:10 | 143:12,24 | 126:11 | **sourced** 16:25 |
| **small** 42:3 | 144:23 145:8 | **song** 3:10 8:20 | **sources** 101:1 |
| 67:25 102:6 | 145:11,18,22 | 175:17 176:20 | 116:24 |
| 106:12 128:18 | 149:12 | 177:12 | **south** 2:5,11 |
| 180:8,17 | **smartfi's** 18:8 | **soon** 8:15 | 3:4,18 |
| **smaller** 129:10 | 105:2 | **sorry** 10:7 | **speak** 26:4 |
| 167:18 | **smith** 11:18,23 | 19:17 20:24 | 64:15,18 |
| **smart** 103:23 | **smith's** 140:22 | 26:4 31:2 | 126:18 |
| 109:24 179:1 | **soaring** 11:6 | 33:18 41:7 | **speaker** 71:5 |
| **smartfi** 10:23 | **software** 38:17 | 42:15 45:5 | 71:23 182:24 |
| 16:3,4,17 17:1 | 38:19,24,25 | 55:22 58:16,21 | **speakers** 184:8 |
| 17:4,22,23,25 | 39:3 162:21 | 59:8,20 60:6 | **speaking** 10:11 |
| 21:1,3,9 22:2 | 163:6 | 60:14 68:7,21 | 88:22 101:17 |
| 22:16 29:3,11 | **solara** 10:21 | 68:22 73:7 | **specific** 26:20 |
| 30:2,13 35:18 | 16:9 18:1,12 | 76:2 79:23 | 57:25 159:4 |
| 49:3,17,19,23 | 22:16 43:24 | 82:9 88:6 | 175:9 |
| 93:17 95:23 | 45:22 46:1 | 90:14 95:6 | **specifically** |
| 96:5 101:6,10 | 93:16,18 | 103:18 105:7 | 40:11 78:21 |
| 101:12,15,17 | 104:22 105:9 | 107:11 108:10 | 107:21 115:1 |
| 101:19,21 | 105:10 111:15 | 108:10 120:11 | 125:20 133:19 |
| 102:6,18 103:2 | 111:17,18,19 | 127:22 135:15 | 172:12 |
| 103:5,7,9,14,20 | 111:23 112:10 | 140:6 141:8 | **speculate** 69:25 |
| 103:22,25 | 128:7 129:14 | 157:22 158:23 | **speculation** |
| 104:2,23 105:1 | 130:10 | 169:19 178:18 | 66:6 |
| 105:3,14,24 | **sold** 76:22 | 182:16,18 | **spell** 20:5 92:2 |
| 106:13,15,17 | **sole** 93:6,7 | **sort** 16:2 78:11 | **spend** 138:21 |
| 106:21 107:10 | **solicit** 116:25 | 90:20,21 | **spent** 94:16 |
| 107:17 108:6 | **solicitation** | 167:13 175:3 | 138:13 |
| 109:19,21 | 180:9 | **sounds** 24:17 | **spite** 61:13 |
| 110:9,19,20,25 | **solicited** 180:4 | 90:7 | **split** 88:23 |
| 111:3,12,15 | **soliciting** 153:4 | **source** 12:3,5,7 | 178:13 |
| 117:17,20 | **solution** 149:22 | 13:1 66:12 | **spread** 146:3,6 |
| 118:11 128:19 | | 90:16 100:19 | 146:20 |

Veritext Legal Solutions
calendar-utah@veritext.com 801-746-5080

**[spreadsheets - support]**

| | | | |
|---|---|---|---|
| **spreadsheets** 165:22 | **stated** 30:23 123:25 | **stoel** 97:5,20,21 | **subsidiaries** 10:1 11:5 14:7 |
| **springville** 92:14 | **statement** 19:5 19:12 24:23,24 | **stop** 52:12 55:8 56:5 60:23 68:25 139:17 | 74:12 81:11,15 95:10 |
| **stable** 106:11 109:10 148:6 169:17 | 28:8 31:21,23 50:18 66:23 180:6,7 | **stops** 114:19 | **subsidiary** 16:5 28:21 95:22 97:23 114:12 |
| **stage** 69:22 | **statements** 9:16 15:13 | **street** 2:5,11,17 3:4,18 119:22 | 145:9,19,23 |
| **stamped** 68:8 68:24 | 25:17 67:10 | **structure** 28:19 125:1 145:20 | **substance** 18:16 |
| **stand** 17:13 91:19 | **states** 1:1 2:8 2:10 22:25 | **studies** 132:6 132:19 138:15 | **substantial** 55:19 99:2 162:19 174:6 |
| **standard** 12:16 112:3 | 173:5 182:2 | **stuff** 67:14 | **successful** 96:25 |
| **standstill** 116:22 | **stating** 181:16 | **sub** 2:14 11:23 176:14 | **succinct** 36:6 |
| **start** 27:2 31:3 50:2,7 77:11 | **stations** 114:20 | **subchapter** 7:18 179:20 180:5,18 | **sufficient** 75:16 90:15 117:8 118:23 139:7 |
| 94:1 105:1 108:1 118:14 | **status** 175:21 176:1 179:25 181:1 | **subdivide** 134:16 135:3 136:15 | **sufficiently** 109:13 |
| 118:21 | **statutorily** 175:24 | **subdivided** 133:9,13 | **suggest** 44:14 |
| **started** 9:18 46:16 55:19 | **stays** 72:15 89:16 | 135:13,17 | **suggested** 12:20 |
| 56:13 104:2 131:7 | **stenotype** 184:8 | **subdividing** 136:16 | **suite** 2:6,12,17 3:4,19 |
| **starting** 7:6 42:3,5 | **step** 15:25,25 106:10 135:18 | **subject** 170:11 | **suited** 75:21 |
| **state** 3:18 20:5 20:17,20 73:25 | **steps** 30:13 170:24 | **subscript** 143:14 | **summarize** 126:21 |
| 92:2 98:6,15 | **stick** 89:23 90:6 | **subscriptions** 38:20 | **summary** 14:11 |
| 104:9,12 119:5 133:18 155:4 | **sticking** 156:5 | **subsequent** 34:23 132:21 | **supplemental** 182:8 |
| 157:5 181:15 | **stipulate** 27:13 71:17 | 133:24 | **supply** 95:17 |
| 184:3 | **stipulated** 27:7 | **subsequently** 98:7 115:9 | **support** 150:3 |
| | **stockholders** 121:14 | | |

**[supported - thank]**

| | | | |
|---|---|---|---|
| **supported** 34:22 | 133:3,4 134:7 135:14 136:6 136:14 139:14 158:7,22,24 173:15 174:13 177:8 | **tell** 28:12 30:3 33:22 35:8 39:3 45:12 53:5 89:6 92:10 97:3 107:3,9 108:11 108:12 109:15 126:14 166:6 166:11 | 147:11,12,12 152:2 154:3 164:20,23 169:10 173:8 173:25 184:8,9 |
| **supporting** 26:15 67:10 | | | **testing** 166:25 167:4 |
| **suppose** 87:21 93:9 | | | **thank** 7:19,25 8:17,21 9:13 |
| **supposed** 28:18 59:2,13 65:12 114:2 176:5 | **taken** 25:11,11 87:23 89:19 | **telling** 54:18 | 10:16 14:23,25 19:11,13 20:12 |
| **sure** 16:1 17:14 26:6 64:16 74:4 89:19 114:21 118:23 130:23 132:8 142:8 148:8,19 151:11 158:13 163:10 172:5 172:14 | **talk** 45:3 62:4 90:6,18 131:4 132:14 147:2 152:3 177:10 | **ten** 38:3 76:6 | 22:11 24:2 |
| | | **tender** 50:1 | 26:22 35:16 |
| | | **term** 76:19,20 83:21 149:22 150:2 162:25 174:2 | 50:4 51:11 59:10,16 60:20 61:6,15 62:22 64:2 69:1 72:19 73:16 74:13 75:10,24 |
| | **talked** 11:19 42:1 113:25 120:12 121:9 | | |
| | **talking** 15:20 16:18 24:25 44:11 100:16 120:2 127:21 131:20 132:3 169:19,21 | **terms** 33:1 44:9 44:9 108:18 142:19 143:22 143:23 161:11 177:24 178:12 182:8 | 76:9,10 79:3 80:16,22 86:18 89:12 90:8 92:9 113:19 116:18 117:13 117:15 119:3 |
| **surprise** 179:11 | | | |
| **suspect** 76:24 | | | |
| **suspended** 94:21 | | | |
| **suspicion** 14:1 | **tape** 184:10 | **test** 151:16 | 119:17 121:7 |
| **swoop** 180:11 | **target** 108:15 147:4,9 | **testified** 11:16 20:3 33:6 50:24 63:1 65:7 81:17 83:11 91:24 128:8 129:15 130:8 148:20 150:10 161:8 170:23 171:14 | 128:5 130:15 131:3 139:16 140:7,21 141:2 141:5,15 142:5 151:24 158:25 159:19 163:8 163:15,17 165:5 168:18 169:4 170:17 |
| **sworn** 19:21 20:2 91:23 | **targeted** 146:4 146:5 147:15 | | |
| **t** | **targeting** 147:3 | | |
| **t** 1:10 5:1 92:5 92:5 | **tax** 96:22,24 111:22 117:2 | | |
| **table** 174:12 | **team** 83:16,24 83:25 85:5 141:21 163:21 | | |
| **tail** 138:16 | **teed** 179:22 | **testimony** 65:10 76:16 84:25 89:13,19 | |
| **take** 30:13 37:3 38:23 76:1,3,5 76:7 84:10 105:15 111:25 | **tel** 2:7,13,18 3:5,9,14,20 | | |

Veritext Legal Solutions
calendar-utah@veritext.com 801-746-5080

**[thank - took]**

| | | | |
|---|---|---|---|
| 172:25 177:19 | 136:7,19 137:3 | **tie** 169:1 | 109:14 110:21 |
| 178:15 182:5 | 137:3 138:6,10 | **tied** 8:14 | 111:9 114:22 |
| 182:13,25 | 138:10 143:20 | **tilton** 4:8 7:11 | 115:7 128:13 |
| **thanks** 176:7 | 146:25 150:19 | 11:16,19,23 | 128:13 130:12 |
| **thereof** 184:14 | 151:7,15 154:2 | 13:13 18:16 | 134:3 135:15 |
| **thing** 9:21 | 156:9,24 157:2 | 70:2,3,7 75:9 | 136:22 137:4 |
| 16:11 29:14 | 158:5 163:20 | 75:11,22 84:1 | 138:2 140:13 |
| 66:7 67:17 | 163:22,25 | 84:3 90:11,18 | 143:6 146:4 |
| 103:24 112:16 | 164:19,25 | 91:5,10,16,18 | 148:18 149:11 |
| 123:5 140:11 | 165:20 170:14 | 91:22 92:4,9 | 149:20,20 |
| 168:23 | 172:14 173:19 | 113:14,24 | 159:11 165:2 |
| **things** 37:2 | 174:4,17 | 119:10 124:14 | 169:11,16 |
| 44:9 48:9 | 175:20 179:10 | 137:25 139:19 | 172:6,6,15,23 |
| 91:10 95:17 | 179:14,19 | 140:8 141:11 | 175:6 180:10 |
| 97:13 102:4 | 181:10 182:3 | 141:19 142:4,6 | 180:18 182:19 |
| 104:18 113:25 | **thinking** 24:20 | 142:12 148:15 | **timeframe** |
| 114:18 115:13 | 146:1 155:17 | 152:1 153:9 | 106:3 |
| 115:13 130:22 | **third** 17:24 | 154:21 157:4 | **times** 43:16 |
| 133:1 134:13 | 44:22,23 45:15 | 158:7 159:1 | **tiny** 15:15 |
| 139:9 154:24 | 63:13 108:7 | 160:22 162:11 | **today** 14:11 |
| 156:3 178:21 | 110:21 112:1 | 163:24 164:5 | 26:24 76:20 |
| **think** 9:9 17:11 | 130:19 143:23 | 166:2 169:8 | 166:9 169:21 |
| 18:17 19:5 | 145:7,10 164:3 | 170:23 173:6,9 | 173:25 182:12 |
| 39:7 44:18 | 173:15 | **tilton's** 80:2 | **token** 177:25 |
| 45:1,2 46:11 | **thought** 24:24 | **tim** 11:18 | **tokens** 178:2,3 |
| 53:20 70:1 | 120:11 150:12 | **time** 12:23 | **told** 140:14 |
| 75:18 76:13,15 | **thousand** 16:16 | 13:25 15:10 | **tom** 71:2,3 84:1 |
| 77:22 83:11 | 17:3 36:7 | 16:21 21:4,4,6 | 93:11 94:4 |
| 87:13 97:16 | 94:24 114:8 | 28:17 31:15 | **tomorrow** |
| 107:8 114:14 | 176:8 | 39:19 54:23 | 176:7 182:12 |
| 118:7,25 121:9 | **three** 48:3 56:7 | 57:15 58:1 | 182:17 |
| 124:19 125:3 | 102:14 127:20 | 76:21 90:25 | **took** 12:11 |
| 125:22 126:20 | 127:23 | 94:12 96:5,12 | 106:10 125:14 |
| 128:23 129:3,8 | **thursday** 11:17 | 98:2 99:9 | 158:18 166:2 |
| 131:22 132:2 | | 100:5 105:21 | 170:23 |

Page 49

**[top - two]**

| | | | |
|---|---|---|---|
| **top** 33:16 37:25 51:24 53:19,20 62:12 78:17 83:8 85:21 118:6 122:10 125:10 | 123:19 174:16 | **transfer** 11:22 17:1,1 23:9,19 28:12,22 29:7 29:9,10,12,15 30:1 31:16 63:14 66:3 131:2 156:6 169:18 171:23 | **trustee** 2:8,10 2:14 7:18,22 7:24 8:25 9:7 12:5,18 15:16 27:6 89:18 170:7,12 173:5 174:13 175:10 179:15 181:5 182:22 |
| **topic** 151:22 157:17 | **transact** 77:17 | | |
| | **transacted** 77:12 | | |
| **toquerville** 17:22,23,25 104:23 105:14 105:24 106:15 106:17,21 107:17 108:6 109:16,19,21 109:24 110:9 110:19,20 111:1,4,12,16 130:20 135:8 141:24 143:9 143:12,24 144:24 145:9 145:11,18,22 | **transaction** 11:1 23:21 28:1 35:18 48:4,17 52:18 54:6 55:21,25 67:1 77:19 78:2,12,15,18 78:25 102:1,2 110:15,22 112:18 125:13 132:4 173:11 | **transferred** 17:6 29:18 30:6 31:9,24 32:10 36:8 48:18 53:12 66:1,14,17 86:16 | **trustee's** 7:20 19:1 26:14 182:10 |
| | | | **trustees** 50:8 178:11 |
| | | **transferring** 172:14,16 | **truth** 166:6,11 |
| | **transactional** 176:9 | | **try** 66:9 78:17 106:10 |
| | **transactions** 9:7,12 15:6,9 15:25 17:13 21:22 36:2 47:22,25 48:12 48:15 64:17 67:10 75:3 77:18 79:2 92:19 99:18 123:6 124:21 | **transfers** 15:8 16:16 17:2 48:13 76:22 167:21 | **trying** 10:7 59:7 68:15 162:10 177:25 182:19 |
| | | **transition** 93:5 93:9 152:12,15 | **tuesday** 12:23 |
| **toquerville's** 131:1 | | | **tunesia** 129:3 |
| | | **traurig** 3:3 | **turn** 26:7 93:12 102:20 104:2,5 146:19 164:3 165:6 166:14 |
| **total** 46:6 78:14 118:2 146:24 | | **treasury** 149:17 | |
| | | | |
| **touched** 97:13 | | **treat** 177:17 | **turned** 110:11 149:3 |
| **towards** 69:17 72:17 75:9 | **transcribed** 184:8 | **tried** 114:9 146:2,7 | |
| | | | **turning** 27:22 |
| **tower** 116:7 | **transcript** 1:21 166:1 184:6,11 | **trouble** 26:5 | **twelve** 172:19 |
| **trace** 15:24 | | **truck** 102:7 114:19 | **two** 13:13,19 35:4 43:16 48:3 61:20 86:17 94:7,9 |
| **track** 53:1 | **transcription** 183:3 184:9 | | |
| | | **true** 156:4 167:20 184:9 | |
| **trail** 47:21,24 51:13,22 | **transcripts** 168:7 | | |

Page 50

**[two - variety]**

94:19 114:17
129:11 135:18
161:20 169:1
176:3
**type**  38:7,20
145:1 147:3,9
147:10,15
178:13
**types**  38:14
106:9
**typical**  117:14
136:10
**typically**  29:21
99:8 100:10
102:11 114:23
116:24 146:2
146:10,15

**u**

**u.s.**  7:20,22,24
8:25 9:7 12:5
12:18 15:16
19:1 26:14
27:6 50:7
76:25 89:18
170:7,12
174:13 175:10
179:15 181:4
182:9,22
**uber**  102:9
**uh**  54:10
**ultimate**  9:1
**unable**  11:13
94:20 111:6,11
168:2

**unclear**  9:6
**under**  11:9,21
13:3 14:22
24:6 25:8
42:20 81:18
86:6 124:4,5
124:11 140:23
154:12 160:19
161:21 166:5,8
177:5 179:20
180:5
**undergrad**
177:8
**underlying**
9:11 149:6
**understand**
9:11 23:1 25:1
66:8 71:9,24
76:15 93:23
101:5 120:19
150:12 151:19
151:23 157:6
159:15 168:23
173:3 178:1
184:10
**understanding**
28:16 40:6
43:1 45:13,14
98:4,17 113:1
113:1 120:4,15
132:24 134:20
160:10
**understands**
16:1

**understatement**
9:8
**understood**
71:23
**undertake**
132:1
**undertaken**
113:6
**undertook**
105:15 110:15
**underwrites**
102:17
**underwriting**
110:11 130:22
145:12
**unfair**  179:10
**unfortunately**
33:3 177:6,7
**united**  1:1 2:8
2:10 173:5
182:2
**units**  136:20,21
137:2
**university**
20:17,20
**unliquidated**
176:18
**unrelated**
17:24 49:12
71:7 128:12
**unsecured**
142:25
**unusual**  179:9
**updated**  171:12

**updates**  132:18
**updating**  172:1
**upload**  180:24
**use**  13:1 42:12
47:9,13 50:11
57:23 95:16
116:12 117:5,5
134:1 138:12
151:14 169:18
174:2
**used**  14:2 40:13
42:7 43:5
56:25 57:17
97:4 178:24
**uses**  26:15
**using**  10:20
12:1 14:5
30:18 47:24
80:12
**utah**  1:2 2:6,12
3:5,19 20:16
20:17,20 92:14
94:14 98:6,15
126:2 133:18
184:4
**utilities**  134:12
**utilize**  111:22

**v**

**va**  44:4,7
**value**  63:10
109:7 174:2
**values**  11:7
**varies**  74:17
**variety**  97:13
154:24

Page 51

**[various - wilden]**

| | | | |
|---|---|---|---|
| **various** 11:4 58:1 | **w** | **way** 13:12 26:7 39:17 53:3 | **went** 20:17 87:3 130:24 |
| **vch** 134:21 | **w** 3:2 81:24 82:8,21,23 | 54:14 68:16 80:12 85:4 | 148:21 |
| **vector** 180:12 180:15 | **wait** 30:25 | 150:16 174:6 | **westinghouse** 94:18,20 97:12 |
| **vegas** 128:22 | **waive** 180:7 | **we've** 8:22 9:21 15:16 22:15 | **white** 3:7 8:7 18:22 79:7 |
| **vehicle** 114:19 | **walk** 17:13 37:1 | 81:1 90:17 104:18 114:6 | 141:19 |
| **vendor** 102:19 | **walked** 62:24 | 114:17 118:16 | **wholly** 28:20 |
| **version** 162:23 | **want** 23:18 | 133:16 141:6 | **whoops** 50:22 |
| **versus** 99:7 | 25:22 39:25 | 143:18 149:20 | 125:7 137:8 |
| **vice** 8:20 | 67:17 74:4 | 154:8 155:23 | **wilden** 2:9 4:4 |
| **view** 12:21 | 89:22 91:13 | 158:19 161:18 | 4:9 7:21,21 9:4 |
| 13:11 24:8 | 107:23 112:24 | 178:18 180:8 | 9:5,13,20 |
| 44:13 48:11 | 115:3 118:22 | 181:1 | 10:13,18 15:1 |
| 90:13 | 123:20,22 | **wearing** 47:7 | 16:2 27:18 |
| **visibility** 75:5 | 126:16 128:6 | **website** 179:13 | 32:21 35:1 |
| 75:20 | 132:24 133:11 | **wednesday** | 39:14 43:3 |
| **voice** 30:18 | 137:13 139:3 | 175:2 182:15 | 50:3,4,17,20,23 |
| **voices** 18:23 | 150:11 151:2 | 182:17 | 51:12,18,20,21 |
| 26:11 30:16,20 | 152:3 160:8,9 | **weeds** 79:19 | 52:8,13 53:6 |
| 33:19 61:16 | 163:9 168:24 | **week** 13:25 | 55:5,9 56:3,6 |
| 73:23 82:20 | 174:22 175:2 | 46:24 | 57:4,6 58:13 |
| 84:15 101:16 | 175:11,21 | **weeks** 12:13 | 58:15 59:3,10 |
| 103:16 120:6 | **wanted** 44:23 | 13:13 52:3 | 59:22 60:4,6,7 |
| 136:9 142:10 | 89:18 128:9 | 60:13,15,16 | 60:21,24 62:8 |
| 144:14 150:21 | 131:18 135:6 | 61:20 72:25 | 62:11 66:11,12 |
| 153:20 158:6 | 143:21 151:16 | 96:12 126:4 | 68:1,9,13,21,25 |
| 159:13 160:4 | 159:23 163:15 | 153:24 154:16 | 69:2 70:12,14 |
| 161:15 | **wants** 9:17 | 155:1 165:2 | 71:6,11,16,21 |
| **volatile** 106:4 | 14:8 176:14 | **welcome** 25:23 | 71:25 72:9,10 |
| 106:10 | **water** 74:24 | 76:13 | 72:20 74:6,13 |
| **voltage** 95:16 | 133:14,17,21 | **wells** 66:1 | 75:24 76:9 |
| **volume** 26:7 | 133:22,24 | | 79:22 87:12 |
| **voluntary** 61:4 | 134:1,2,15 | | 88:22 113:15 |
| | 135:2,2 | | |

Page 52

**[wilden - zoom]**

| | | | |
|---|---|---|---|
| 113:19,23 | 31:2 41:8 | **writing** 123:1 | 95:24 102:14 |
| 119:8,10,14,17 | 44:10 45:25 | **written** 51:8 | 105:13 114:17 |
| 119:19,21 | 46:4 74:1,4 | 61:8,11 | 114:24 115:4,6 |
| 120:9,14 | 75:25 76:24 | **wrong** 59:15 | 143:5 162:20 |
| 121:20,21 | 77:2,6,8,12,15 | 88:7 147:13 | **york** 3:8,8 |
| 122:1,6,12 | 77:24 78:8,12 | | |
| 123:14,18,21 | 78:16,21 79:1 | **x** | **z** |
| 123:22 125:5 | 89:11,14 90:7 | **x** 4:1 5:1 | **zero** 160:20 |
| 125:12 126:9 | 91:23 92:4 | | 181:12 |
| 126:11 135:1 | 105:6 160:23 | **y** | **zion's** 110:3 |
| 137:3,5,6,20,24 | 161:3,6,11,17 | **yeah** 24:19 | 129:1,6,11 |
| 139:17,19,25 | 161:23 162:15 | 27:12 53:22 | 143:16 |
| 140:7,8 141:3 | 184:16 | 66:7 67:9,9 | **zions** 111:4 |
| 170:16,17,18 | **witnesses** 7:13 | 68:16 77:3 | **zoned** 46:1 |
| 170:20 175:25 | **woah** 119:19 | 83:15,23 89:22 | **zoning** 135:20 |
| 176:2,3 177:16 | **word** 25:20 | 89:24 90:2 | 135:25 136:1 |
| 181:3,4 182:22 | 164:25 178:25 | 101:18 103:4 | 139:10 |
| **wilden's** 15:5 | **words** 88:3 | 121:22 126:23 | **zoom** 89:15 |
| 178:23 | **work** 13:6 49:2 | 132:17 138:6 | |
| **winning** 96:25 | 59:18 85:15 | 142:17 148:19 | |
| **winthrop** 97:5 | 103:9 110:12 | 156:9 157:22 | |
| **wire** 23:19 | 114:3 115:19 | 159:14 160:5 | |
| 28:12 29:17 | 133:4 | 161:6 165:5 | |
| 30:2 47:4 65:5 | **worked** 115:14 | 175:16 180:14 | |
| **wish** 8:9 86:20 | **working** 74:2 | 181:8 | |
| 178:20 | 115:2,9 116:1 | **year** 16:18 21:7 | |
| **withdraw** 29:9 | 116:3 163:5 | 106:16 111:5 | |
| 29:9 71:23 | **works** 182:20 | 117:11 129:24 | |
| 78:3,6 137:20 | **world** 76:23 | 131:12,22 | |
| **withdrawn** | 148:6 | 132:12 133:5 | |
| 72:3 78:1 95:6 | **worth** 114:5 | 133:10 136:25 | |
| **withdraws** | 116:8 | 139:1 150:14 | |
| 78:10 | **wrestled** 165:1 | 160:21 161:10 | |
| **witness** 19:6 | **wrestling** 178:5 | 161:19 162:21 | |
| 20:2,7 30:23 | | **years** 14:14 | |
| | | 94:7,9,16 | |

Page 53