**This order is SIGNED.**

**Dated: October 9, 2024**

_/s/ JT Marker_
**JOEL T. MARKER**
U.S. Bankruptcy Judge



# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF UTAH
### CENTRAL DIVISION

| | |
|---|---|
| In re: | Bankruptcy Case No. 24-23041 |
| POWER BLOCK COIN, LLC, | Chapter 11 |
| Debtor. | Judge Joel T. Marker |

## MEMORANDUM DECISION SUSTAINING OBJECTIONS
## TO DEBTOR'S SUBCHAPTER V ELECTION

With less than three hours to spare before the Subchapter V debt limit dropped from $7,500,000 to $3,024,725, the above-captioned Debtor filed a chapter 11 petition on June 20, 2024 electing to proceed under Subchapter V as an entity "that ha[d] aggregate noncontingent liquidated secured and unsecured debts" of less than $7,500,000 on the petition date. On July 4, the Debtor filed its schedules listing the vast majority of its hundreds of debts as contingent, unliquidated, or both, and with unknown amounts. On August 1, the U.S. Trustee objected to the Debtor's Subchapter V election, followed later the same day by a combined joinder and objection from Zhouyang "Mason" Song; Blockchain Recovery Investment Consortium, LLC, as Representative for the Post-Effective Date Celsius Debtors; and Mohsin Y. Meghji, Litigation Administrator, as Representative for the Post-Effective Date Celsius Debtors (collectively, the "Objecting Creditors"). The Court conducted a scheduling conference on August 19, which was followed by

1

a Zoom evidentiary hearing on August 20 focused on the Debtor's employment of counsel (along with a payment systems motion and status conference), another Zoom hearing regarding the payment systems motion on September 12, and an in-person evidentiary hearing on September 17 focused on the objections to the Debtor's Subchapter V election, and all of those hearing records are incorporated herein by reference.[1]  After thorough consideration of the parties' submissions, oral arguments, evidence, and other matters of record, as well as an independent review of applicable law, the Court now issues this Memorandum Decision to explain why the objections to the Debtor's Subchapter V election will be sustained.[2]

## I. BACKGROUND

The Debtor, its parent Blue Castle Holdings, Inc. ("BCH") formed in 2008, its grandparent Transition Power Development, LLC ("TPD"), and its several sister entities have engaged in a number of businesses over the years with the involvement of Aaron Tilton.[3]  The Debtor was formed in December 2017 with the original purpose of helping digital asset mining customers develop commercial industrial sites, with the Debtor then deciding that the better opportunity was in lending capital to digital asset mining companies.  The Debtor eventually created the SmartFi cryptocurrency platform as an extension of its lending business while adding certain ancillary services, and it also engaged in transactions with affiliated entities SmartFi Lending, LLC and Solara Communities, LLC involving small business and real estate loans.  And since becoming

---

[1] The U.S. Trustee made an opening statement at the September 17 hearing but allowed the Objecting Creditors to take the lead on the presentation of evidence and argument.  The Objecting Creditors also briefly addressed their Motion for Immediate Appointment of Official Committee of Unsecured Creditors (docket #92) at the end of the September 17 hearing, in addition to relevant evidence and argument presented at the August 20 hearing.

[2] Since the September 17 hearing, the Clerk's office has received approximately 27 broadly similar emails from ostensible parties in interest expressing their support for Mr. Tilton, the Debtor, and the Subchapter V process as well as their displeasure with the Celsius parties in particular.  These emails were not filed on the docket in accordance with Local Rule 5005-1 and are not part of the record, nor do they present any relevant material on the eligibility issue in any event.

[3] Among other roles, Mr. Tilton is the CEO, president, and chairman of the board of BCH; a co-member with Energy Path of TPD; and the co-founder and CEO of the Debtor.

"unbanked" in December 2023, the Debtor has had no accounts of its own and no employees; "rather, all work necessary for the operation of [the Debtor] is provided by [BCH] employees under the [Management] Services Agreement."[4]

The Debtor lists no secured claims on Schedule D, and it lists four main types of general unsecured claims on Schedule E/F—(1) SMTF token buyback guarantees that were exercised prepetition (denoted with "BB"); (2) SMTF token buyback guarantees there were not exercised prepetition (denoted with "BG"); (3) SmartINTEREST accounts involving the Debtor's obligation to pay interest to qualifying customers who placed cryptocurrency on the Debtor's platform (denoted with "IP"); and (4) crypto-backed loans involving qualifying customers who borrowed dollars from the Debtor and secured their loans with cryptocurrency (denoted with "CP").[5] There is no dispute about the first of the four categories, as all parties agree that the exercised buyback claims constitute noncontingent liquidated claims totaling $1,679,551 (rounded to the nearest dollar), and all such claims were listed accordingly on Schedule E/F. The other three categories are disputed as to contingency and/or liquidation, with all of those claims listed in "unknown" amounts (while the Debtor's March 2024 balance sheet shows more than $69 million in total liabilities[6]), but the nature of the disputes remains confusing.

To this day, the Debtor's Schedule E/F lists all BG, IP, and CP claims as unliquidated but only lists the BG claims as also being contingent. This sworn filing was echoed by Debtor's counsel in his opening statement at the September 17 hearing: "There was some issue about the .

---

[4] Tilton Declaration, docket #8, ¶ 15.
[5] Objecting Creditors' Exhibit 5, pp. 12-71; Supplement at docket #43. The Celsius-related Objecting Creditors have asserted over $133 million in preference claims against the Debtor in connection with the pending bankruptcy case of *Celsius Network LLC et al.* (case #22-10964) pending in the Bankruptcy Court for the Southern District of New York. In their initial objections, both the U.S. Trustee and the Objecting Creditors suggested that these preference claims should also be considered in determining the Debtor's Subchapter V debt-limit eligibility, but they effectively abandoned that argument both in subsequent filings and at the September 17 evidentiary hearing.
[6] Objecting Creditors' Exhibit 3, p. 4.

. . contingent claims. There's only one category of claims here that, Your Honor, we suggest are contingent. It's not the SmartINTEREST accounts . . . . There's one category of debts that are contingent in this case, and that is the SmartFi buyback guarantee."[7] In its response to the U.S. Trustee and Objecting Creditors' objections, the Debtor asserted (with a supporting declaration from Mr. Tilton) that the IP and CP claims were both contingent and unliquidated, while the BG claims were now only contingent. But then in his closing statement at the September 17 hearing, Debtor's counsel again suggested that the Debtor's original characterization of the BG, IP, and CP claims was correct.

## II. DISCUSSION

The parties agree on the guiding principles of the debt-limit analysis. To qualify for Subchapter V on June 20, 2024, the Debtor must have had "aggregate noncontingent liquidated secured and unsecured debts . . . in an amount not more than $7,500,000 (excluding debts owed to 1 or more affiliates or insiders)," and the Debtor bears the ultimate burden of proof by a preponderance of the evidence.[8] "In considering eligibility, it is appropriate for a court to rely primarily upon a debtor's schedules and proofs of claim, checking only to see if these documents were filed in good faith. In so doing, however, the court should neither place total reliance upon a debtor's characterization of a debt nor rely unquestionably on a creditor's proof of claim, for to do so would place eligibility in control of either the debtor or the creditor. Therefore, at a hearing on eligibility, the court should canvass and review the debtor's schedules and proofs of claim, as

---

[7] September 17 Hearing Recording at 10:47:08-10:48:04 AM.
[8] *In re Bridle Path Partners, LLC*, Case No. 23-23960, 2024 WL 86601, at *3 (Bankr. D. Utah Jan. 8, 2024) (Anderson, C.J.) (citing *In re Offer Space, LLC*, 669 B.R. 299, 304 (Bankr. D. Utah 2021) (Thurman, J.))

4

well as other evidence offered by a debtor or the creditor to decide only whether the good faith, facial amount of the debtor's liquidated and non-contingent debts exceed statutory limits."[9]

"A debt is noncontingent when all events giving rise to liability occurred prior to the debtor's filing for bankruptcy. Only if liability relies on some future extrinsic event which may never occur will the debt be held to be contingent."[10] In turn, "whether a debt is liquidated turns on whether the amount is readily determinable . . . . The amount of debt is readily determinable only if the process of determining the claim is fixed, certain, or otherwise determined by a specific standard. On the other hand, if the value of the claim depends on a future exercise of discretion, not restricted by specific criteria, the claim is unliquidated . . . . The key factor for determining whether a debt is liquidated or unliquidated is whether the debt is subject to a simple mathematical computation or ascertainable by reference to an agreement."[11] A dispute about a claim is generally insufficient to render it contingent or unliquidated.[12] And a creditor's subsequent failure to file a proof of claim is irrelevant to the petition date eligibility of a Subchapter V debtor.[13]

### A. Buyback Guarantees

Here, the eligibility analysis begins with an agreed noncontingent liquidated debt amount of $1,679,551 based on the BB claims for exercised SMTF token buyback guarantees, and the Court can quickly dispose of the Objecting Creditors' argument on the BG claims for unexercised buyback guarantees. Although the Debtor conceded at certain points that some or all of the BG claims could be liquidated with extensive effort, the Debtor presented sufficient evidence and

---

[9] *In re Adams*, 373 B.R. 116, 121 (10th Cir. BAP 2007) (internal quotes and citations omitted); *In re Heart Heating and Cooling, LLC*, Case No. 23-13019, 2024 WL 1228370, at *10-11 (Bankr. D. Colo. Mar. 21, 2024) (McNamara, J.); *In re Salazar*, 348 B.R. 559, 564-66 (Bankr. D. Colo. 2006) (Tallman, J.). For this reason, the Court rejects the Objecting Creditors' argument that the Debtor's failure to object to filed claims is dispositive on the eligibility issue.
[10] *Heart Heating*, 2024 WL 1228370 at *9 (internal quotes and citations omitted).
[11] *Adams*, 373 B.R. at 119-20 (internal quotes and citations omitted).
[12] *Id.* at 120.
[13] *Heart Heating*, 2024 WL 1228370 at *19-20.

5

argument regarding the unique nature of the BG claims to overcome the Objecting Creditors' objection and meet its burden of proof. In particular, on top of the general SmartFi Terms of Use in Debtor's Exhibit 4, Debtor's Exhibit 3 lays out several restrictions on the buyback guarantee program that go well beyond the simple requirement for some type of demand, including that the claimant must be an original purchaser from specified exchanges, must register the purchase from a partner exchange within 10 days, and must hold the token on SmartFi's platform for at least a year. So while some or potentially even all of the BG claims might be considered liquidated, the Objecting Creditors did not develop this point regarding which claimants might qualify for the buyback guarantee or the amount of claims that they might hold. For similar reasons on the issue of contingency, there is also no meaningful way on this record to distinguish between the claimants who may not even qualify for the buyback guarantee versus those who may have simply failed to make a formal buyback request via the filing of a proof of claim or otherwise. As such, the Court finds that the BG claims do not count toward the Debtor's debt limit.[14] This only leaves the IP claims for SmartINTEREST accounts and the CP claims for crypto-backed loans—including Mr. Song's unique claim in this category—and the Court will address each in turn.

**B.    SmartINTEREST Accounts**

Even now, the precise nature and terms of the SmartINTEREST accounts are unclear. At various times the Debtor has generally described its view of the SmartINTEREST accounts,[15] but unlike the buyback guarantees and the crypto-backed loans,[16] the Court was never presented with any specific terms or "agreement governing the SmartINTEREST accounts" (as referenced in the

---

[14] Although the Debtor's plan was not filed until September 18 (docket #184 as corrected on September 19 at docket #185) and was thus not discussed on the record except in broad strokes, the Court notes that the Debtor proposes to allow potentially eligible BG claimants to vote on the plan and either keep their tokens or, after an eligibility analysis, receive an allowed general unsecured claim in exchange for their tokens.

[15] *See, e.g.*, Debtor's Response at docket #125, ¶¶ 5-6.

[16] *See, e.g.*, Debtor's Exhibit 3 (SmartFi Buy Back Guarantee terms) and Objecting Creditors' Exhibit 28 (Mr. Song's January 2, 2023 crypto-backed loan agreement).

Debtor's response) beyond certain parts of the SmartFi Terms of Use—which, according to Mr. Tilton's testimony, broadly govern "virtually everything that can be transacted" with the Debtor.[17] And in his opening statement at the September 17 hearing, Debtor's counsel curiously referred to both the SmartINTEREST accounts and the crypto-backed loans as "demand account[s] with a big asterisk" as well as "absolute obligation[s] but . . . not absolute in time."[18]

Taking the Debtor's sworn Schedule E/F at face value, the Debtor asserts only that the SmartINTEREST accounts (*i.e.*, the IP claims) are unliquidated, but a demand account is not unliquidated regardless of any alleged asterisk, and an absolute obligation is precisely that. The Debtor's argument is primarily based on the SmartFi Terms of Use, which not only allow the Debtor to use SmartINTEREST account and crypto-backed loan cryptocurrency for its own purposes subject to potential gain or loss, but also purport to allow the Debtor to delay the return of cryptocurrency "almost indefinitely" based on its own assessment of available liquidity and other factors.[19] Simply put, the Debtor has to hope that it has the ability to go back into the market and purchase the relevant cryptocurrency at any particular point in time. But regardless of when the Debtor is obligated to return the cryptocurrency, the underlying obligation is readily determinable by simple mathematical computation on the petition date by multiplying the amount of the relevant cryptocurrency by the appropriate spot price on the petition date. In fact, the Debtor did precisely this in its proposed plan, arriving at nearly the exact same aggregate claim amount as proposed by the Objecting Creditors ($28,435,325 vs. $28,313,975).

The result is the same even if the Court considers the Debtor's subsequent contingency argument. Again, no SmartINTEREST agreement has been presented to the Court, there was no

---

[17] September 17 Hearing Recording at 12:44:35-12:44:40 PM.
[18] *Id.* at 10:53:43-10:54:30 AM.
[19] *Id.*

7

evidence or argument regarding any special restrictions or requirements for return of the SmartINTEREST account holders' cryptocurrency, and the only apparent "contingency" relates to the Debtor's ability and willingness to actually return the cryptocurrency rather than any future extrinsic event that is necessary to establish the Debtor's liability. The Debtor has accordingly failed to meet its burden to show that these debts were unliquidated on the petition date, and they alone push the Debtor well over the applicable debt limit.

C.     **Crypto-Backed Loans**

As previously discussed, the 16 outstanding crypto-backed loans (*i.e.*, the CP claims) have many of the same features as the SmartINTEREST accounts, namely the Debtor's ability to use borrowers' cryptocurrency for its own purposes, its purported ability to defer the return of cryptocurrency, and its listing of the CP claims on Schedule E/F only as unliquidated but not contingent. All of the 16 remaining loans are in default, and most of the loan balances are in relatively modest four- and five-figure amounts.[20] The only twist is that the borrowers are allegedly required to pay off their loans before the Debtor is required to return their cryptocurrency.[21] Viewed in this frame, the Court has little trouble concluding for similar reasons that the CP claims are liquidated. The loan balances and cryptocurrency spot prices on the petition date are known, the Debtor's acting CFO Brad Jones testified that the Debtor has not demanded the repayment of any of the defaulted loans (with the apparent exception of suing Mr. Song),[22] and the net amount owed to CP claimants is readily determinable via mathematical computation and the relevant loan agreements. In fact, the Debtor did precisely this in its proposed plan, arriving at an aggregate claim amount of $28,499,416 (83% of which consists of Mr. Song's claim) versus

---

[20] Objecting Creditors' Exhibit 50.
[21] *See, e.g.*, Objecting Creditors' Exhibit 28 at p. 13 of 24, ¶ 4 ("Upon Borrower's repayment of this Note in full, Lender will deliver the Collateral to Borrower's Wallet.").
[22] September 17 Hearing Recording at 2:01:33-2:01:40 PM.

8

the Objecting Creditors' proposed $33,950,275. This amount also pushes the Debtor well over the applicable debt limit.

The more interesting question involves the Debtor's subsequent argument that the Debtor's obligation to return cryptocurrency is contingent upon the borrowers' loan repayment, but again the result is the same. Whatever merit the argument may have with respect to the 15 other borrowers who neither repaid their loans nor were pursued by the Debtor between their loans' maturity dates and the Debtor's petition date, the argument holds less sway with the uniquely positioned Mr. Song, and the Objecting Creditors focused the bulk of their presentation on Mr. Song's claim specifically. After a years-long relationship between the Debtor and Mr. Song involving around 30 new or rolled-over loans, the Debtor promptly sued him in state court in February 2023 after his most recent loan had defaulted on February 2 (and after he had paid $1 million to the Debtor on January 30). Mr. Song removed the action to federal court and asserted various counterclaims, and on December 5, 2023, U.S. District Judge Tena Campbell issued an Order and Memorandum Decision Denying in Part Plaintiff's Motion to Dismiss Counterclaims and Denying Defendant's Motion for Preliminary Injunction that contains helpful background along with certain findings and conclusions that are relevant to the Debtor's eligibility inquiry.[23]

This Court is accordingly not writing on a clean slate, and this Court's role is to canvass the available evidence rather than to resolve any underlying dispute. Although some of the District Court's discussion came in the context of a motion to dismiss under Rule 12(b)(6) for failure to state a claim, which obviously assumes the truth of well-pled factual allegations and heavily favors the non-moving party, the District Court stated in the less hospitable preliminary injunction portion of the ruling that "[m]ost importantly, the court finds that Mr. Song has shown a substantial

---

[23] Objecting Creditors' Exhibit 27.

likelihood of success on his assertion of the equitable right of setoff.  Even if the court finds for [the Debtor] on its breach of contract claim and against Mr. Song on all his counterclaims, the judgment for damages will likely be the same (other than potential differences in the awards for interest, attorney's fees, and costs).  The court will set off the outstanding loan balance of $3.4 million that Mr. Song owes [the Debtor]—and which [the Debtor] may claim as damages for Mr. Song's breach of contract—against the value of the collateral that [the Debtor] must return to Mr. Song, as required under the contract and as a matter of equity.  Therefore, unless the value of Bitcoin drops substantially, the judgment award will be in favor of Mr. Song."[24]

Although obviously not a final determination of the parties' respective claims on the merits, this is nevertheless a meaningful statement of the District Court's view of the dispute, and more to the immediate point, an indication that some amount of Mr. Song's claim is neither contingent nor unliquidated.  The District Court indicated that Mr. Song is likely to be a net winner even if all of his counterclaims fail and established a simple computation rubric for that number well before the petition date.  The main remaining variable is thus the valuation date for Mr. Song's Bitcoin collateral, but the evidence presented at the September 17 hearing indicates that all of the possible dates suggested by Debtor's counsel—the February 2, 2023 default date; March 10, 2023 demand date; June 20, 2024 petition date; and August 27, 2024 proof of claim filing date—would result in a net award that would exceed the Subchapter V eligibility cap.[25]

---

[24] *Id.* at p. 24.

[25] The value of Bitcoin on the default date is referenced in Objecting Creditors' Exhibit 29, and Debtor's counsel referred to the proof of claim filing date value as likely the "high point."  The Debtor also conceded that setting off Mr. Song's loan against the petition date value of Bitcoin would also exceed the debt limit, and no evidence or argument was presented that the demand date value was meaningfully different from the default date value.  As discussed at the September 17 hearing, the possible amounts for Mr. Song's claim using these values range from approximately $7 million to $26.5 million.

10

### III. CONCLUSION

For the reasons discussed above, the Court determines that the Debtor is not eligible to proceed under Subchapter V because the Debtor's aggregate noncontingent liquidated debts as of the petition date exceeded $7,500,000.  Accordingly, the Court strikes the Debtor's Subchapter V designation, and this case will proceed as a standard Chapter 11 case.  The Objecting Creditors' Motion for Immediate Appointment of Official Committee of Unsecured Creditors is denied as moot.  The Court will enter a separate Order in accordance with this Memorandum Decision.

---------------------------------------------END OF DOCUMENT---------------------------------------------

_____ooo0ooo_____
**SERVICE LIST**

Service of the foregoing **MEMORANDUM DECISION SUSTAINING OBJECTIONS TO DEBTOR'S SUBCHAPTER V ELECTION** will be effected only via ECF.