Brian M. Rothschild, USB #15316
Darren Neilson, USB #15005
Alexander S. Chang, USB #18879
**PARSONS BEHLE & LATIMER**
201 South Main Street, Suite 1800
Salt Lake City, UT 84111
Telephone:  801.532.1234
Facsimile:  801.536.6111
BRothschild@parsonsbehle.com
DNeilson@parsonsbehle.com
AChang@parsonsbehle.com

*Attorneys for Debtor Power Block Coin, L.L.C.*

# IN THE UNITED STATES BANKRUPTCY COURT

# FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| In re: | Case No. 24-bk-23041-JTM |
| POWER BLOCK COIN, L.L.C. | Chapter 11 |
| Debtor | Judge Joel T. Marker |

## DEBTOR'S FIRST AMENDED PLAN OF REORGANIZATION

Power Block Coin, L.L.C., a Utah limited liability company dba SmartFi ("**SmartFi**" or the "**Debtor**"), the above-captioned prospective debtor and debtor in possession under Chapter 11 of Title 11 of the United States Code (the "**Bankruptcy Code**"), submits its First Amended Plan of Reorganization (this "**Plan**").

## <u>SUMMARY</u>

**THE FOLLOWING SUMMARY IS FOR CONVENIENCE ONLY AND IS QUALIFIED ENTIRELY BY THE TERMS OF THIS PLAN.**

By this Plan, the Debtor in the above-captioned case under Chapter 11 of the Bankruptcy Code (the "**Chapter 11 Case**") proposes to give the creditors a choice as to whether the Debtor

4882-5409-9703

should (1) restructure and repay Claims over time in such a way as to maximize the value of its estate for the benefit of the Holders of General Unsecured Claims or, if all classes do not vote in favor of the Plan; (2) to liquidate the Debtor's assets and pay Creditors according to their priority under the supervision of a neutral, third-party liquidating trustee.  The Debtor believes that reorganizing under this Plan will result in a higher return to its Creditors than a liquidation.  If all classes vote in favor of the Plan, the Debtor will reorganize, resulting in approximately **$20,683,775** in proceeds over five years for distribution to Creditors.  If, however, one or more classes does not vote in favor of the Plan, the Debtor will liquidate its assets under this Plan in chapter 11, resulting in approximately **$2,365,728** in proceeds to its creditors.  Either scenario is better than a conversion to and liquidation under Chapter 7, which will result in only approximately **$2,168,796** in proceeds to Creditors.  Accordingly, the Debtor believes that it is in all parties' best interest to vote in favor of the Plan.

**SOLICITATION OF THE PLAN WILL ONLY BE UNDER THE APPROVED DISCLOSURE STATEMENT, APPROVED BALLOTS, AND APPROVED FORMS OF NOTICE ACCOMPANYING AN ORDER BY THE BANKRUPTCY COURT APPROVING SOLICITATION OF YOUR VOTE ON THE PLAN.**

**Scenario 1: Consensual Chapter 11 Reorganization**

If all classes of creditors vote in favor of the Plan and the Plan is confirmed as a consensual plan by the Bankruptcy Court (a "**Reorganization**"), the Debtor will do the following:

(1) pay the Holders of Priority Claims in full in accordance with applicable law and the terms of this Plan, either payment in full on the Effective Date, or regular cash payments equal to the present value of the Allowed Amount of their Priority Claim, as applicable;

(2) pay Holders of General Unsecured Claims increasing quarterly cash payments of their Pro Rata share of the General Unsecured Claims Cash Distribution;

4882-5409-9703

(3)     pay Holders of Convenience Claims 50% the Allowed Amount of their Convenience Claim on the Effective Date; and

(4)     reinstate the existing Equity Interests of the Debtor, with no distributions allowed to the Equity Interest Holder unless and until all payments under the Plan are made in full.

Under section 1141 of the Bankruptcy Code, all pre-Petition Date claims will be extinguished, discharged, and replaced by the obligations under the Plan. The Debtor will fund regular payments under this Plan using the Debtor's existing assets, collection on the Debtor's existing loan portfolio, proceeds from Debtor Causes of Action, and revenue from Debtor's lending business. Further, in the case of a Reorganization, certain of the Debtor's affiliates have agreed that they will modify existing debt instruments and settle potential causes of action to ensure that the Debtor has enough funds to pay the periodic payments. **The Debtor urges each Creditor to vote in favor of a Reorganization because a Reorganization will result in a higher payout for Creditors as shown by the comparative Liquidation Analysis, attached as Exhibit A hereto.**

**Scenario 2: Non-Consensual Plan Resulting in Liquidation**

If not all classes of creditors vote in favor of the Plan, the Debtor will liquidate its assets by doing the following:

(1)     pay the Holders of Priority Claims in full in accordance with applicable law and the terms of this Plan, either payment in full on the Effective Date, or regular cash payments equal to the present value of the Allowed Amount of their Priority Claim, as applicable;

(2)     contribute all assets of the Debtor to a Liquidating Trust to be administered by a neutral, third-party Liquidating Trustee, who will liquidate and distribute the proceeds to pay (a) Holders of Allowed Convenience Claims 50% the Allowed Amount of their Convenience Claim on the Effective Date and (b) General Unsecured Claims their Pro Rata share of remaining assets until such proceeds run out; and

(3)     cancel the existing Equity Interests of the Debtor.

4882-5409-9703

The Liquidating Trust will be administered by a third-party trustee with no prior connections to or affiliations with the Debtor or any insider. The Liquidating Trustee will not hire any of the Debtor's current professionals. Under section 1141 of the Bankruptcy Code, all pre-Petition Date Claims will be extinguished, discharged, and replaced by the obligations under the Plan. **The Debtor and its professional advisors believe that the amounts realized under this non-consensual Plan (a Liquidation) are significantly lower than those that would be realized in a consensual confirmation (a Reorganization), and therefore urge Creditors to vote in favor of the Plan.**

If no class consents, then the most likely scenario is conversion to a case under chapter 7 of the Bankruptcy Code, which the Debtor believes would result in still less value for Creditors. See Liquidation Analysis attached as Exhibit A hereto.

**Summary of Plan Treatment**

The treatment of Claims and Equity Interests in each class are summarized as follows:

**SUMMARY OF CLAIMS AGAINST THE DEBTOR**

| Class | Type of Allowed Claim or Equity Interest: Holders Name | Impairment/Voting | Recovery/Treatment |
|---|---|---|---|
| 1 | Priority Claims | Unimpaired<br>Not Entitled to Vote<br>Deemed to Accept | Holders will receive payment in full in cash the later of 20 days after the Effective Date or when Allowed, or regular cash payments equal to the present value of the Allowed Amount of their Priority Claim, as applicable. |
| 2 | General Unsecured Claims | Impaired<br>Entitled to Vote | In a **Reorganization**, Holders will receive increasing cash payments quarterly beginning on the later of the last day of the quarter that begins 90 days after the Effective Date or when Allowed equal to their Pro Rata share of the General Unsecured Claims Cash Distribution after payment in full of all Priority Claims.<br><br>In a **Liquidation**, Holders will |

4

4882-5409-9703

| | | | receive their pro rata distributions from the Liquidating Trust when such proceeds become available, after all costs of administration of the Liquidating Trust are paid until no further proceeds are available. |
|---|---|---|---|
| 3 | Convenience Claims | Impaired Entitled to Vote | In a **Reorganization**, Holders of Convenience Claims will receive payment equal to 50 percent of the Allowed Amount of their Convenience Claim on the later of the last day of the quarter that begins 90 days after the Effective Date or the date their Convenience Claim is Allowed.<br><br>In a **Liquidation**, Holders of Convenience Claims will receive payment equal to 50 percent of the Allowed Amount of their Convenience Claim from the Liquidating Trust on the later of the last day of the quarter that begins 90 days after the Effective Date or the date their Convenience Claim is Allowed. |
| 4 | Equity Interests in the Debtor | **Reorganization**: Unimpaired, deemed to accept<br><br>**Liquidation**: Impaired, deemed to reject | In a **Reorganization**, the existing Equity Interest will be reinstated, but no distributions will be allowed unless and until all payments required by the Plan have been paid in full.<br><br>In a **Liquidation**, the existing Equity Interest will be cancelled. |

**All Holders of Claims and Equity Interests should refer to Articles III through VI of this Plan for information regarding their precise treatment**.  The Debtor is seeking confirmation of the Plan.  The Debtor will only solicit acceptance of the Plan from all Holders of Class 2 General Unsecured Claims and Class 3 Convenience Claims, but any party in interest may object or voice their support for the Plan by filing a pleading voicing their objection or support in the Bankruptcy Court.  The Debtor will distribute this Plan with the approved

5

4882-5409-9703

Disclosure Statement to all parties in interest on the Solicitation Date, which will be used in support of confirmation at a hearing scheduled by the Bankruptcy Court (the "**Confirmation Hearing**").

**YOUR RIGHTS MAY BE AFFECTED.  YOU SHOULD READ THESE PAPERS CAREFULLY AND DISCUSS THEM WITH YOUR ATTORNEY, IF YOU HAVE ONE. IF YOU DO NOT HAVE AN ATTORNEY, YOU MAY WISH TO CONSULT ONE.**

## ARTICLE 1
## DEFINITIONS

Capitalized words not otherwise defined in this Plan have the following meanings:

1.1     **Administrative Expense Claim** means any Claim arising from the administration of the Debtor's Chapter 11 Case as provided in section 503 of the Bankruptcy Code or that is entitled to priority under section 507(a)(1) of the Bankruptcy Code, including, without limitation, (a) fees and expenses of the Debtor's professionals Allowed pursuant to an order of the Bankruptcy Court, and (b) all Allowed fees and expenses of any Subchapter V Trustee or Committee professionals.

1.2     **Allowed** or **Allowance** means with respect to Claims, (a) any Claim (i) for which a Proof of Claim has been timely filed on or before the applicable Claims Bar Date or (ii) that is listed in the Debtor's schedules (as amended and on file on the docket as of the Effective Date) as not disputed, not contingent, and not unliquidated whether or not a Proof of Claim has been timely filed; provided that, in each case, any such Claim shall be considered Allowed only if and to the extent that no objection to the Allowance thereof has been filed by the Claims Objection Deadline or such an objection has been withdrawn or the Claim has been thereafter; (b) any Claim Allowed by a final non-appealable order; or (c) any Claim Allowed pursuant to the Plan (see Section 2.4 of this Plan) if not otherwise subject to an objection filed prior to the Claims Objection Deadline.  Claims allowed solely for the purpose of voting to accept or reject the Plan pursuant to an order of the Bankruptcy Court shall not be considered "Allowed Claims" hereunder.

1.3     **Avoidance Action** means all avoidance, recovery, subordination or other actions or remedies that may be brought on behalf of the Debtor or its estate (or any one of them) under the Bankruptcy Code or applicable non-bankruptcy law, including, without limitation, actions or remedies under sections 510, 542, 543, 544, 545, 547, 548, 549, 550, 551, 553(b) and 724(a) of the Bankruptcy Code and other similar state law claims and causes of action.

1.4     **Bankruptcy Code** means title 11 of the United States Code as in effect on the Petition Date.

1.5     **Bankruptcy Court** means the United States Bankruptcy Court for the District of Utah, Central Division.

4882-5409-9703

1.6     **Blue Castle** means Blue Castle Holdings, Inc., a Delaware corporation, which is the Debtor's sole holder of its Equity Interests.

1.7     **Blue Castle Note** means that certain promissory note dated August 8, 2023, by and between Debtor as holder, and Blue Castle, as maker, in the principal amount of $1,400,000.00 with a Maturity Date of August 6, 2028.

1.8     **Celsius** means Celsius Network LLC and its affiliated debtors, including and as applicable, Mohsin Y. Meghji, as Litigation Administrator for Celsius Network LLC and its affiliated debtors on behalf of Celsius Network LLC and its affiliated post-effective date debtors in the jointly-administered chapter 11 cases with lead Case No. 22-10964 (MG) (Bankr. S.D.N.Y.), whether before or after the petition date in those cases.

1.9     **Chapter 11 Case** means the case under Chapter 11 of the Bankruptcy Code in the Bankruptcy Court.

1.10    **Claim** has the meaning set forth in section 101(5) of the Bankruptcy Code, the value of which is determined as of the Petition Date.

1.11    **Claims Bar Date** means, with respect to the Debtor, the last dates for filing Proofs of Claims for the applicable Creditor as established by the Bankruptcy Court, specifically December 17, 2024, for Claims held by a government unit and August 29, 2024, for all other Claims.

1.12    **Claims Objection Deadline** means the date that is 90 days after the Effective Date of the Plan.

1.13    **Committee** means the statutory committee appointed under section 1102(a) of the Bankruptcy Code.

1.14    **Confirmation Date** means the date that the Confirmation Order becomes a final, non-appealable order and on which no stay of the Confirmation Order is in effect.

1.15    **Confirmation Hearing** means the hearing that is scheduled by the Bankruptcy Court to consider confirmation of the Plan as it may be convened and continued by the Bankruptcy Court from time to time.

1.16    **Confirmation Order** means the order entered by the Bankruptcy Court confirming the Plan.

1.17    **Convenience Claim** means any Claim that would be a General Unsecured Claim but for the fact that it (i) is scheduled or asserted as a fixed, liquidated, and non-contingent Claim in the amount of $5000 or less, or (ii) at the election of the Holder of any General Unsecured Claim in such Holder's ballot, agrees to reduce its claim to the offered amount and reduced to a fixed, liquidated, and non-contingent Claim in the face amount of $5000 or less; provided, however, that no holder of a General Unsecured Claim may subdivide or sell portions of its Claim into multiple Claims for purposes of receiving treatment as a Convenience Claim.

1.18    **Creditor** means a Holder of a Claim.

4882-5409-9703

1.19     **Debtor** means Power Block Coin, L.L.C., a Utah limited liability company dba SmartFi, which serves as the debtor in possession in the Chapter 11 Case, with "Debtor" referencing the Debtor irrespective of whether the reference is to a time that is either before or after the Effective Date and, to the extent applicable, the successor of the Debtor including the Liquidating Trustee.

1.20     **Debtor Available Cash** means the net proceeds of the Debtor's collections, operations, litigations, and other business activities after payment of expenses on any given date.

1.21     **Debtor Causes of Action** means all claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action and liabilities, arising on, prior to, or after the Petition Date, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising in law, equity or otherwise, including Avoidance Actions, asserted, or which may be asserted, by or on behalf of the Debtor and/or its estate, as the case may be, whether or not pending on the Effective Date or prosecuted thereafter against any Person, based in law or equity, including, without limitation, under the Bankruptcy Code, whether direct, indirect, derivative, or otherwise and whether asserted or unasserted; provided, further, that for the avoidance of doubt, Debtor Causes of action include all claims asserted in any pending adversary proceeding, including all causes of action or counterclaims or potential causes of action against Song.

1.22     **Disallowed** means a Claim (a) with respect to which the Bankruptcy Court has entered a final non-appealable order that such Claim is disallowed or (b) for which neither a Proof of Claim was filed by the Claims Bar Date nor was listed in the Debtor's schedules as of the Confirmation Date.

1.23     **Disputed** means a Claim for which a Proof of Claim was filed prior to the Claims Bar Date or which was marked "Disputed" in the Debtor's schedules that has not been Allowed or Disallowed by a final non-appealable order and as to which the Debtor or another party in interest has filed an objection or commenced an adversary proceeding prior to the Claims Objection Deadline.

1.24     **Effective Date** means the first business day fourteen (14) days after the Confirmation Date, provided that the Confirmation Order is not stayed or reversed.

1.25     **Equity Interest** means the common stock of the Debtor, which is 100 percent owned by Blue Castle.

1.26     **General Unsecured Claim** means any Claim that is not an Administrative Expense Claim, Priority Claim, Secured Claim, and that is not given priority under section 507(a) of the Bankruptcy Code or otherwise is subject to subordination under section 510 of the Bankruptcy Code.

1.27     **General Unsecured Claims Cash Distribution** means, in a Reorganization, the cash paid in increasing quarterly payments by the Debtor beginning on the later of the last day of the quarter that begins 90 days after the Effective Date or when Allowed, which cash amount shall be equal to the Debtor Available Cash less the payment of Administrative Priority Claims, Priority Tax Claims, and U.S. Trustee's Fees and which shall be used first to pay the distibutions to each Holder of Convenience Claims in the amount of 50 percent of their Allowed

4882-5409-9703

Convenience Claim, and second, the remainder Pro Rata to fund the scheduled payments to each Holder of Class 2 General Unsecured Claims.

1.28 **Holder** means the holder of a Claim or Equity Interest of the Debtor on the Voting Record Date, or, in the case of an Administrative Expense Claim, such later date on which such Administrative Expense Claim is Allowed.

1.29 **Liquidating Trust** shall mean the Liquidating Trust established pursuant to the Liquidating Trust Agreement.

1.30 **Liquidating Trust Agreement** shall mean the Liquidating Trust Agreement submitted as Exhibit C hereto.

1.31 **Liquidating Trustee** shall mean (a) initially, Steve Sala of Solution Advisors, (b) any successor or replacement Liquidating Trustee, as set forth in Section 8.2 of the Plan; or (c) such other Liquidating Trustee as approved by the Bankruptcy Court at the Confirmation Hearing.

1.32 **Liquidating Trust Expenses** shall mean the expenses of the Liquidating Trustee in accordance with the Liquidating Trust Agreement.

1.33 **Plan** means this Plan of Reorganization under Chapter 11 of the Bankruptcy Code.

1.34 **Plan Supplement** means the exhibits and supporting documents to this Plan, which shall be filed on the Bankruptcy Court docket and which are incorporated in this Plan by reference.

1.35 **Plan Support Agreement** means that certain agreement, which is included in the Plans Supplement, between the Debtor, on the one hand, and certain of the Debtor's affiliates to restructure the parties' respective obligations to enable the Debtor to meet its obligations under the Plan in the event of a Reorganization.

1.36 **Person** means an individual, corporation, business trust, estate, trust (including a statutory trust), partnership, limited liability company, or association.

1.37 **Petition Date** means June 20, 2024, the date on which the Debtor filed its petition for relief under chapter 11 commencing the Debtor's Chapter 11 Case.

1.38 **Priority Claim** means a Claim that is entitled to priority in payment under section 507(a) of the Bankruptcy Code that is not an Administrative Expense Claim or a Priority Tax Claim.

1.39 **Priority Tax Claim** means a Claim that is entitled to priority in payment under section 507(a)(8) of the Bankruptcy Code; provided, however, that any Claim on account of any penalty arising with respect to or in connection with a Priority Tax Claim that does not compensate the Holder for actual pecuniary loss shall be treated as a General Unsecured Claim.

1.40 **Proof of Claim** means a proof of claim filed with the Bankruptcy Court.

4882-5409-9703

1.41    **Pro Rata** means a proportionate share of the total distribution made at any particular time under this Plan to the holders of Allowed Claims in a Class, such that the ratio of the consideration distributed on account of an Allowed Claim in a Class to the amount of such Allowed Claim is the same as the ratio of the amount of the consideration distributed on account of all Allowed Claims in such Class to the total of all Allowed Claims in such Class.

1.42    **Revised Solara Note** means that certain proposed promissory note between Solara and the Debtor.

1.43    **Secured** or **Security Interest** means a lien on property in which the Debtor has an interest or that is subject to a valid right of setoff under section 553 of the Bankruptcy Code, which secures a Claim, to the extent of the value of the Claim Holder's interest in the Debtor's interest in such property or to the extent of the amount subject to such valid right of setoff, as applicable, as determined under section 506 of the Bankruptcy Code.

1.44    **SmartFi Lending Note** means that certain promissory note dated September 30, 2023 by and between Debtor as holder, and Smartfi Lending, LLC, a Utah limited liability company, as maker, in the principal amount of $1,768,830.05 with a Maturity Date of September 29, 2028.

1.45    **Solara** means Solara Communities, LLC fka SmartFi Toquerville, LLC, a Utah limited liability company.

1.46    **Solara Note** means that certain promissory note dated March 17, 2022 by and between Debtor as holder, and Solara, as maker, in the principal amount of $17,400,000.00 with a Maturity Date of March 17, 2032.

1.47    **Solicitation Date** means [●], 2025, the date on which the Plan, Ballots, and Plan Supplement was mailed to Holders of Claims and Interests to solicit their votes on the Plan.

1.48    **Song** means Zhouyang Song, an individual, who is currently engaged in the Song Lawsuit (defined in Section 2.2) against the Debtor, United States District Court for the District of Utah, Civil No. 2:23-cv-00175-TC-JCB.

1.49    **Subchapter V Trustee** means the trustee in the Debtor's Chapter 11 Case appointed under section 1183 of the Bankruptcy Code.

1.50    **Unsecured** means a Claim that is not Secured.

1.51    **U.S. Trustee** means the United States Trustee for the District of Utah.

1.52    **U.S. Trustee's Fees** means all fees required to be paid to the United States Trustee under 28 U.S.C. § 1930(a)(6), if any, that accrue until the case is closed, dismissed, or converted to another chapter of the Bankruptcy Code.

1.53    **Voting Record Date** means the date that is fourteen (14) days before the first date scheduled by the Bankruptcy Court for the Confirmation Hearing.

4882-5409-9703

**ARTICLE 2**
**HISTORY OF THE DEBTOR AND EVENTS LEADING UP TO CHAPTER 11**

### 2.1    Nature of SmartFi's Business and Operations

SmartFi is a Utah limited liability company providing crypto-based financial services, which historically have included cryptocurrency exchange, savings, crypto-based lending, crypto information, token creation and offering, alternative currencies, and crypto investment.  Prior to the Petition Date, SmartFi attempted to diversify its assets and businesses into more traditional lending, including lending on real-estate development, small business loans, and other types of financial services.

SmartFi operated a platform for its clients through its website portal at www.smartfi.com.  It generates revenue through interest on loans denominated in dollars and cryptocurrencies, trading and hedging, and fees assessed on certain transactions on its platform.

A portion of SmartFi's loan portfolio had been loans to holders of cryptocurrencies, including cryptocurrency mining operations, that borrowed US dollars from SmartFi and secured the loans with the borrower's cryptocurrencies ("**Crypto-Backed Loans**").  By contract, SmartFi would maintain possession and control over the cryptocurrency collateral in its own cryptocurrency wallets, and would use the collateral for investment, liquidity, hedges, crypto-denominated loans, and other financial services.  Upon repayment of a Crypto-Backed Loans, SmartFi would use its liquidity to repurchase the same amount of cryptocurrency collateral from the market and return the cryptocurrency collateral to the borrower.  If SmartFi and the borrower consented, borrowers of Crypto-Backed Loans would "roll over" their Crypto-Backed Loans into new Crypto-Backed Loans at the maturity date.  However, under the agreements governing the Crypto-Backed Loans, SmartFi always maintained the ability to require repayment from all borrowers in US dollars upon each Crypto-Backed Loan's maturity.

### 2.2    Events Leading to Filing of the Debtor's Chapter 11 Case

### (a)    Volatility in the Crypto Markets and Illiquidity

Beginning in 2022, the worldwide cryptocurrency markets experienced a rapid collapse and have been in a period of high instability ever since.  SmartFi had de-risked some of its holdings prior to the collapse.  For example, SmartFi did not do business or had ceased doing business with certain large cryptocurrency exchanges that collapsed such as CoinBase, FTX, and Celsius, but was still reliant on certain cryptocurrencies in its portfolio for liquidity.

The Debtor had (and still has) significant, although illiquid, loans in its portfolio, including a large real-estate loan to Solara, an affiliate that is developing real property in Toquerville, Utah.  Solara originally funded a loan to an unrelated third party, Zion's Landing, that owned the real property it was developing.  SmartFi loaned Solara the funds to make the loan to Zion's Landing (the "**Solara Note**").  The Solara Loan has an original principal balance of $17,400,000.00, an interest rate of 5 percent, and a maturity date of March 17, 2032.  Following a default by the third-party borrower that owned the real property, Solara foreclosed on the real property, and it is now developing the real property.  The Solara Loan, which is arguably the Debtor's largest assets, is illiquid and not in default and so not collectible until its maturity date.

4882-5409-9703

The Debtor also loaned money to another affiliate, SmartFi Lending.  SmartFi Lending, with the assistance of its loan originating and servicing providers, in small business loans

With a significant amount of SmartFi's assets tied up in illiquid, long-term instruments, and the cryptocurrencies it normally relied on for liquidity experiencing collapse or instability, SmartFi struggled to maintain liquidity necessary to continue its operations.

### (b)      Cash Management and Banking Difficulties

Following the failures of other cryptocurrency exchanges such as CoinBase, FTX, and Celsius Network, many traditional banking institutions ceased providing business banking services to crypto-related businesses.  In approximately December of 2023, SmartFi's banking institutions closed its accounts, which complicated SmartFi's ability to manage its cash and payments.  While SmartFi continued to hold and exchange cryptocurrencies on its platform, it had to establish new mechanisms to pay its dollar-denominated operational expenses and take payments of dollar-denominated assets such as loans.

As a workaround, SmartFi entered into a Management Services Agreement dated as of December 1, 2023, with Blue Castle (the "**Management Services Agreement**") whereby Blue Castle, using its own bank accounts, paid for certain SmartFi obligations such as professionals' fees, utilities attributable to SmartFi, and third-party payables on behalf of SmartFi whenever U.S. dollars are required.  Further, Blue Castle also provided certain goods and services such as management services, utilities, office space, internet server hosting costs for SmartFi's cryptocurrency platform and website, and the like.

SmartFi has no employees, but rather, all work necessary for the operation of SmartFi was historically provided by Blue Castle employees under the Management Services Agreement.  Blue Castle manages SmartFi through its own employees.  Blue Castle likewise paid these employees' benefits, payroll taxes, workers' compensation insurance premiums, and other costs of employment.

SmartFi and Blue Castle strictly accounted for the expenses charged to SmartFi in both entities' books.  In exchange for facilitating payments, management of SmartFi, and the other services under the Management Service Agreement, Blue Castle charged SmartFi 10 percent of the disbursements as a fee.  To pay the expenses, allocated costs, and 10 percent fee, SmartFi either transfers cryptocurrencies to Blue Castle or reduces the balances of the Blue Castle Loan (described below) to account for its payment obligations under the Management Services Agreement.  Without the Management Services Agreement, SmartFi would have been unable to operate after it became unbanked following the divestiture by banks of their cryptocurrency businesses.

### (c)      Song Lawsuit

During this period of illiquidity, SmartFi began to require repayment of some of its Crypto-Backed Loans to bolster its liquidity.  One such borrower, Zhouyang Song ("**Song**"), had a Crypto-Backed Loan with an original principal balance of $4,378,094.40 and a maturity date of February 2, 2023 (the "**Song Loan**").  Song failed to repay the Song Loan on its maturity date, despite SmartFi's written demand, and SmartFi commenced a collection lawsuit in the Third District, Utah State Court.  Song removed the case to the United States District Court for the

12

4882-5409-9703

District of Utah (Case 2:23-cv-00175-TC-JCB) (the "**Song Lawsuit**") and, despite conceding that he breached his agreement by failing to repay the Song Loan, nevertheless filed numerous counterclaims, including fraud, conversion, breach of contract, equitable recoupment, setoff, and trespass. SmartFi obtained dismissal of the fraud counterclaim, but the Song Lawsuit remains pending, and Song has never repaid the principal balance of the Song Loan. Nevertheless, Song has insisted on extensive discovery and deposing numerous witnesses, ballooning the cost of litigating the Song Lawsuit for SmartFi. The value of Song's collateral, which was denominated in Bitcoin ("**BTC**"), has risen significantly since Song's default. SmartFi asserts that it was only prevented from returning the BTC to Song because of Song's default, and therefore the value of Song's offset for the return of his collateral should be at the lower price at the time of Song's default. Song, however, is attempting to use his strategic default as a hedge and insists that he is entitled to return of the BTC collateral at the much current higher market price. If Song was entitled to return of his BTC collateral at the current price and all other clients similarly situated were to also demand simultaneous return of BTC at the current price, SmartFi would be unable to return all such clients' collateral, particularly if they do not first repay their loans in USD.

### (d)      Albers Arbitration

Prior to the Petition Date, Michael Alber sued SmartFi in a AAA arbitration alleging causes of action including breach of contract, fraud in the inducement, negligent misrepresentation, and securities claims relating to Mr. Alber's purchase or holding of SMTFs. Mr. Alber already exercised, in full, his buyback guarantee for all SMTF tokens he purchased on SmartFi's website, and so he has no contractual claims. The remaining SMTF tokens held by Mr. Alber were purchased on the secondary market, and thus SmartFi has no contractual obligations to Mr. Alber. The arbitrator nevertheless allowed discovery on the securities claims, which was ongoing prior to the Petition Date.

### (e)      Brown Lawsuit

On April 3, 2023, four SMTF holders (Jason Brown, Daniel Stadelmann, Lynn Brown, and Robert L. Brown) filed Case No. 2:23-cv-00554 against SmartFi and Aaron Tilton personally in the Western District of Pennsylvania (the "**Brown Lawsuit**"). The plaintiffs in the Brown Lawsuit assert causes of action against SmartFi related to their the SMTF tokens, including alleged contractual obligations under the buyback guarantees, fraud in the inducement, negligent misrepresentation, alleged securities violations, unjust enrichment, conversion, and declaratory relief. The same claims, word-for-word, are made against SmartFi's principal, Aaron Tilton, with no effort to distinguish between Tilton in his personal capacity and Tilton in his capacity as an agent of SmartFi. The parties are still in the process of litigating motions to dismiss and amending the complaint, and plaintiffs' opposition to the pending motion to dismiss was filed on June 30, 2024. Because the Court denied without prejudice SmartFi's Motion to Stay (ECF 11), SmartFi and Mr. Tilton are required to continue defending the Brown Lawsuit.

Before the Petition Date, the Debtor commenced suit on a breached contract in the Fourth District Court, State of Utah against UTXO B.V. After the Petition Date, the Debtor obtained a default judgment in the amount of $3,294,812.50 (the "**UTXO Judgment**"). The Debtor has been unable to collect on the UTXO Judgment. Two of the plaintiffs in the Brown Lawsuit – Jason Brown and Daniel Stadelmann – are principals of UTXO. UTXO and these plaintiffs are alter egos or, in the alternative, UTXO's corporate form should be pierced to hold these plaintiffs

4882-5409-9703

liable for the UTXO Judgment and/or disallow their claims. Accordingly, the Debtor commenced an adversary proceeding (the "**Brown Adversary Proceeding**") seeking to hold the Jason Brown and Stadelmann liable for the UTXO Judgment on theories of alter ego, direct liability, piercing the corporate veil, and successor liability and, as an alternative, to disallow their claims. The outcome of the Brown Adversary Proceeding and whether it will generate any net recovery is at this time uncertain.

### (f)    Celsius Demands

Also prior to the Petition Date, Celsius sent demand letters to the Debtor demanding return of certain transferred cryptocurrencies. On March 20, 2024, Celsius made a demand for return of $4,218,580.17. The demand referenced a previous demand in the amount of $8,437,160.34. While the Debtor responded to and began discussions with Celsius, including providing certain financial information, the Debtor was compelled to file its Chapter 11 Case before the discussions progressed.

With the assistance of Amplēo and restructuring counsel, SmartFi approached its clients and significant Creditors and proposed a consensual restructuring of its obligations into long-term repayment over a period of approximately 8 years. Such repayment was reliant, for the most part, on the repayment of the Solara Note. The substantial supermajority by number of SmartFi's Creditors and clients agreed to the restructuring proposal with the notable exception of Song, who continued to litigate, and Celsius, with whom discussions had insufficient time to progress prior to the Petition Date. Because the restructuring proposal requires substantially all of the clients and stakeholders to agree in order to be successful, SmartFi was unable to consummate a consensual restructuring outside of bankruptcy and was compelled on the Petition Date to file the Chapter 11 Case.

### (a)    Decision to Reorganize in Chapter 11

SmartFi hired outside financial and legal experts, including CFO Solutions, Inc., dba Amplēo ("**Amplēo**") and undersigned restructuring counsel, Parsons Behle & Latimer ("**Parsons Behle**") to assess options, including restructuring its obligations with its clients and Creditors to prevent an uneconomic liquidation of its assets. Amplēo concluded that the alternative to the long-term restructuring contemplated in this Plan would be an uneconomic liquidation that would yield comparatively little value for SmartFi's stakeholders because, among other things, (1) the market for SmartFi's operating assets is extremely depressed due to current worldwide concern over cryptocurrency financial services businesses; (2) SmartFi's operating assets require the continued services of SmartFi's principals to operate, and those principals would not continue to provide those services in a forced liquidation; (3) the value of the Solara Note, SmartFi Lending Note, and Blue Castle Note, non-traditional loans at low interest rates with long-term balloon maturity dates of 2032, 2028, and 2028, respectively, is extremely low and would have to be severely discounted if a market for them exists at all; and (4) the cessation of SmartFi's operations and default on obligations to its clients would give rise to significant additional liabilities, including defaults on pending and potential litigations, which, while meritless, are expensive to defend.

14

4882-5409-9703

### 2.3 Events During the Chapter 11 Case

**(a) Debtor's Election to Proceed under Subchapter V, Objections, and Conversion to Chapter 11**

The Debtor filed its Chapter 11 Case on the Petition Date and elected to proceed under Subchapter V of the Bankruptcy Code, a sub-type of chapter 11 for small business debtors. At the time of filing, the Debtor believed it had an indeterminate amount of liquidated, unliquidated, contingent, noncontingent, disputed, and undisputed debts. Many of the Debtor's obligations, including obligations to return cryptocurrency collateral upon repayment of loans it had made, were denominated in cryptocurrencies, the dollar value of which is volatile, contingent, and/or uncertain as to time. While the Debtor was able to estimate its liabilities at approximately as of any given time on its balance sheet using GAAP, it believed that its liquidated, noncontingent liabilities were less than $7,500,000 as of the Petition Date. Unliquidated liabilities, however, were many times higher than this.[1] Nevertheless, the Debtor believed that it was qualified to proceed under subchapter V of the Bankruptcy Code as a "small business debtor" under the definition in Section 1182 of the Bankruptcy Code because it believed its total liquidated, noncontingent debts were less than $7,500,000 on the Petition Date.

The U.S. Trustee and Certain Creditors, including Song and Celsius (the "**Objecting Creditors**"), filed objections to the Debtor's election to proceed under Subchapter V, asserting that the Debtor's total liquidated, noncontingent liabilities were greater than $7,500,000 as of the Petition Date. (ECF 85, 88.) The Debtor responded to the objections, and the Court took evidence and argument on the controversy at a hearing on September 17, 2024.

In a Memorandum Decision and Order entered on October 9, 2024, the Court sustained the objection to the Debtor's subchapter V election. (ECF 190, 191.) Thereafter, the Debtor has proceeded under chapter 11.

**(b) Employment of Debtor's Professional Advisors**

On the Petition Date, the Debtor moved to employ and retain Amplēo and Parsons Behle as its financial advisors and attorneys, respectively, in the Chapter 11 Case. (ECF 2, 5.) The Court granted the Application to Employ Amplēo on July 31, 2024. (ECF 83.) The Objecting Creditors and the U.S. Trustee objected to the Application to Employ Parsons Behle. (ECF 34, 65, 124.) After hearings at which the Court heard argument and evidence, on August 21, 2024, the Court granted the Application to Employ Parsons Behle. (ECF 143.)

Parsons Behle and Amplēo have continued to provide services to the Debtor as authorized by the Court during the Chapter 11 Case. The Allowed fees and expenses of Parsons Behle and Amplēo will constitute administrative expense claims of the estate. As of the filing of this Plan, no fee applications have been filed or approved. The estimated amounts of fees and expenses that are or will be allowed are included in the Liquidation Analysis attached as Exhibit A hereto.

---

[1] A discussion of the Claims against the Debtor is found in Section 2.4, below.

4882-5409-9703

**(c)      Appointment of the Official Committee of Unsecured Creditors and its Professional Advisors**

On October 24, 2024, the U.S. Trustee appointed the Official Committee of Unsecured Creditors (the "**Committee**").  (ECF 199.)  The U.S. Trustee appointed Celsius, Jason Brown (plaintiff in the Brown Lawsuit), David M. Carlson, Chieli Dustin, Douglas J. Scribner, Song, and Daniel Spisso (plaintiff in the Albers arbitration) to serve as members of the Committee. The Committee hired the law firm of Greenberg Traurig, LLP to represent it, and hired Huron Consulting Service, LLC, as Financial Advisor.

**(d)      Filing of Celsius Adversary Proceedings**

After the Petition Date, on July 12, 2024, Celsius commenced two adversary proceedings in the Court against the Debtor based on alleged preferential transfers made in the 90 days prior to Celsius' own petition date.  *See Meghji v. Power Block Coin, LLC*, Case No. 24-02093 (Bankr. D. Utah) and *Celsius Network LLC, et al. v. Power Block Coin, LLC*, Case No. 24-02094 (Bankr. D. Utah) (the "**Celsius Adversary Proceedings**").  The Debtor believes that the filing of the Celsius Adversary Proceedings violated the automatic stay of section 362(a) of the Bankruptcy Code in particular because Celsius requested relief that included taking control of property of the Debtor's estate and they were continuations of an action to establish and collect on pre-Petition Date liabilities, clear violations of the plain language of section 362(a) of the Bankruptcy Code.  Further, Congress in enacting section 362(a) articulated the clear policy that the Debtor is entitled to a breathing spell and not to be harangued by litigation while it attempts to formulate, propose, and solicit a plan to pay its creditors.  *See* S.R. no. 95-989 ("The automatic stay is one of the fundamental debtor protections provided by the bankruptcy laws. It gives the debtor a breathing spell from his creditors. It stops all collection efforts, all harassment, and all foreclosure actions. It permits the debtor to attempt a repayment or reorganization plan, or simply to be relieved of the financial pressures that drove him into bankruptcy.")  Section 362(a) provides no exception for actions commenced in the Bankruptcy Court.

The filing of the Celsius Adversary Proceedings caused the Debtor to have to shift its focus to analyzing and defending against these allegations, causing the expenditure of significant professional time and resources of the estate and the time and distraction of the Debtor's employees and management.  Accordingly, the Debtor filed a Motion for Contempt Sanctions against Celsius.  (ECF 129.)  The Court stayed both the Motion for Contempt Sanctions and the Celsius Adversary Proceedings.  The Court has not indicated when or if it will take up either issue.

2.4      **Claims Against the Debtor**

Because of the fluctuating values of each of cryptocurrencies, the varying dates that SmartFi's obligation to return these arise (or arose, if the obligation to return them or loan default occurred prior to the Petition Date), and the lack of an authoritative source for the value, it is not possible to determine the individual or total amount of most General Unsecured Claims against the Debtor.  It is, however, possible to treat all Creditors equally and give them equal treatment (*i.e.*, their Pro Rata share) that they are entitled to as a class following the Claims Allowance Procedures as set forth in Article 6 of this Plan.

The Claims against the Debtor are as follows.

### (a) Obligations to Return Cryptocurrency

SmartFi believes that substantially all of the General Unsecured Claims against it are unliquidated because they arise from obligations (i) under loan agreements under which SmartFi is the lender and the borrower gave SmartFi cryptocurrency as collateral, which SmartFi must return on repayment ("**Crypto-Backed Loans**"); or (ii) SmartINTEREST agreements under which a counterparty gave SmartFi cryptocurrency and SmartFi is obligated to return it at some future date ("**SmartINTEREST Accounts**"). SmartFi's obligation (*i.e.*, the Claim) is to obtain and transfer cryptocurrency to the counterparty, after repayment of the Crypto-Backed Loan or, in the case of SmartINTEREST Accounts, after demand for return.

Both types of obligations are governed by SmartFi's Terms of Use. Under the Terms of Use, the timing of SmartFi's obligation to return cryptocurrency is subject to SmartFi's having sufficient liquidity to return the cryptocurrency. At the time most of the Crypto-Backed Loans matured, SmartFi lacked sufficient liquidity to return the cryptocurrency, and thus its obligation, was not matured as of the Petition Date. Nevertheless, SmartFi still has obligations to return the cryptocurrency under both types of agreements. The amounts in U.S. dollars of such obligation was not fixed as of the Petition Date because the obligations are denominated in various cryptocurrencies, which U.S. dollar value fluctuates constantly, and the date the obligations needed to be fulfilled was not determinable as of the Petition Date. It is only once the Court, either by order Allowing a Claim under section 502 of the Bankruptcy Code or under the Confirmation Order determines the amounts of these Claims will these Claim amounts be fixed.

The Debtor, by this Plan and as required by section 502 of the Bankruptcy Code, proposes to use the Petition Date to Allow Claims for SmartINTEREST Accounts and Crypto Backed Loans as follows.

### (b) Claims for Return of Collateral on Crypto-Backed Loans

By this Plan and upon entry of the Confirmation Order, the Debtor proposes to Allow Claims for Crypto-Backed Loans by taking the outstanding balance in U.S. dollars owed to the Debtor on the Petition Date and subtracting that amount from the product of the U.S. dollar value of the cryptocurrency collateral (using the value of $3,511.09 per ETH and $64,828.66 per BTC) securing each Crypto-Backed Loan. Using this methodology, the Allowed Claims for the Crypto-Backed Loans will be Allowed as General Unsecured Claims as follows:

| Creditor Name | Crypto-Currency | Amount Held | Value of Collateral | Less Loan Balance | Allowed Claim |
|---|---|---|---|---|---|
| Wade, Anna | BTC | 0.955256 | $61,927.97 | $11,400.77 | $50,527.20 |
| Pangman, William | BTC | 6.298567 | $408,327.66 | $74,257.00 | $334,070.66 |
| Spisso, Gonzales D | ETH | 712.5166462 | $2,501,710.07 | $469,038.62 | $2,032,671.45 |
| Aguirre, David | ETH | 1.132343 | $3,975.76 | $1,140.00 | $2,835.76 |
| Haiek, Alex | BTC | 0.431228 | $27,955.93 | $5,663.79 | $22,292.14 |
| Rodriguez, Gabriel | BTC | 19.745846 | $1,280,096.74 | $223,890.51 | $1,056,206.23 |
| Haiek, Alex | BTC | 1.53815205 | $99,716.34 | $25,392.40 | $74,323.94 |
| Haiek, Alex | ETH | 15.98659571 | $56,130.38 | $14,326.00 | $41,804.38 |

4882-5409-9703

| | | | | | |
|---|---|---|---|---|---|
| **Gay, Nissa** | BTC | 3.915543 | $253,839.41 | $64,785.60 | $189,053.81 |
| **Pangman, William** | BTC | 5.602821 | $363,223.38 | $56,529.87 | $306,693.51 |
| **Bjorkman, Michael** | ETH | 59.816015 | $210,019.41 | $69,497.28 | $140,522.13 |
| **Godfrey, Ashton** | ETH | 38.054819 | $133,613.89 | $23,708.15 | $109,905.74 |
| **Sanders, Timmy** | BTC | 0.05138746 | $3,331.38 | $1,160.00 | $2,171.38 |
| **Bjorkman, Michael** | BTC | 2.806593 | $181,947.66 | $58,896.00 | $123,051.66 |
| **Song, Zhuoyang** | BTC | 433.9274 | $28,130,931.88 | $3,407,408.17 | $23,723,523.71 |
| **Bjorkman, Michael** | BTC | 6.014099 | $389,885.98 | $100,123.20 | $289,762.78 |
| | | | $34,106,633.83 | **Total:** | **$28,499,416.47** |

Notwithstanding this procedure, the Debtor and any party in interest will have the right to object to any Claim until the expiration of the Claims Objection Deadline.

### (c)      Claims for Return of Assets on SmartINTEREST Accounts

Similarly, by this Plan and upon entry of the Confirmation Order, the Debtor proposes to Allow Claims for SmartINTEREST Accounts by taking the outstanding balance in U.S. dollars owed to the Debtor on the Petition Date and subtracting that amount from the product of the U.S. dollar value of the cryptocurrency collateral (using the value of $3,511.09 per ETH and $64,828.66 per BTC and $1.00 for stablecoins) securing each Crypto-Backed Loan. Using this methodology, the Allowed Claims for the Crypto-Backed Loans will be as General Unsecured Claims as follows:

| Creditor | Crypto-currency | Amount Held | Allowed USD Claim |
|---|---|---|---|
| **USDC** | Aguirre, David | 0.03823315 | $0.04 |
| **ETH** | Aguirre, David | 0.0000191 | $0.07 |
| **USDT** | Aguirre, David | 0.06948966 | $0.07 |
| **BTC** | Aguirre, David | 0.00348825 | $226.14 |
| **BTC** | Alekoglou, Konstantinos | 0.00005257 | $3.41 |
| **USDT** | Alekoglou, Konstantinos | 2327.123953 | $2,327.12 |
| **BTC** | Altman, Cynthia | 0.000015 | $0.97 |
| **USDC** | Bhagwat, Ravindra | 1.05 | $1.05 |
| **ETH** | Bhagwat, Ravindra | 0.000765 | $2.69 |
| **BTC** | Bhagwat, Ravindra | 0.0000895 | $5.80 |
| **USDT** | Blomberg, Jens | 1.228069 | $1.23 |
| **BTC** | Broekemeier, Pamela | 0.00100021 | $64.84 |
| **USDT** | Brown, Jason | 0.001 | $0.00 |
| **BTC** | Carabott, Daniel | 0.00000047 | $0.03 |
| **USDC** | Carlson, David | 950008.3991 | $950,008.40 |
| **BTC** | Carlson, David | 66.07235617 | $4,283,382.31 |
| **BTC** | Daily, Linda | 3.948674 | $255,987.24 |
| **USDC** | Douglas, Robert | 0.00203362 | $0.00 |
| **USDC** | Dustin, Chieli | 331656.0171 | $331,656.02 |
| **USDC** | Dustin, David | 17761.51162 | $17,761.51 |

| | | | |
|---|---|---|---|
| **USDC** | Fischer, Carol | 62628.28294 | $62,628.28 |
| **USDT** | Fish, Ryan | 0.15093448 | $0.15 |
| **USDT** | Fourney, William | 50.06729611 | $50.07 |
| **BTC** | Galle, Jordy | 0.000017 | $1.10 |
| **BTC** | Gerritse, Chris | 0.07429298 | $4,816.31 |
| **BTC** | Goretzki, Oliver | 0.00005292 | $3.43 |
| **ETH** | Hall, Robyn | 0.03146599 | $110.48 |
| **USDC** | Hefner, Jake | 2.16 | $2.16 |
| **ETH** | Hemmert, Dan | 0.00057943 | $2.03 |
| **BTC** | Hemmert, Dan | 0.26061855 | $16,895.55 |
| **USDT** | Jackson, Benjamin | 66.54410105 | $66.54 |
| **USDT** | Jenkins, Justin | 15.762 | $15.76 |
| **USDC** | Jones, Brad | 25750.0087 | $25,750.01 |
| **BTC** | Lambert, Lance | 0.00029565 | $19.17 |
| **ETH** | Lee, Michael | 0.00034536 | $1.21 |
| **USDC** | Leyba, James | 90.71704282 | $90.72 |
| **ETH** | Moroz, Tatiana | 0.0348837 | $122.48 |
| **BTC** | Moroz, Tatiana | 0.00296518 | $192.23 |
| **USDC** | Nelson, Mark | 54072.9701 | $54,072.97 |
| **ETH** | Pellegrino, Nicolas | 0.00000093 | $0.00 |
| **USDT** | Pingle, Kanchan | 1.08816155 | $1.09 |
| **BTC** | Rajput, Dina | 0.00000001 | $0.00 |
| **USDT** | Retson, Tom | 75.80068905 | $75.80 |
| **USDC** | Retson, Tom | 21388.281 | $21,388.28 |
| **ETH** | Schenone, Bruno | 0.00053034 | $1.86 |
| **ETH** | Scribner, Douglas | 26.1205308 | $91,711.53 |
| **USDC** | Scribner, Douglas | 108086.3865 | $108,086.39 |
| **BTC** | Scribner, Douglas | 4.3480919 | $281,880.97 |
| **USDC** | Scribner, Douglas | 2723015.647 | $2,723,015.65 |
| **ETH** | Scribner, Douglas | 1600.191907 | $5,618,417.80 |
| **BTC** | Scribner, Douglas | 163.3021247 | $10,586,657.92 |
| **USDC** | Smith, Mark | 23453.7772 | $23,453.78 |
| **USDT** | Unruh, Jason | 0.21364953 | $0.21 |
| **BTC** | Wagoner Jr, Bradley | 0.00000001 | $0.00 |
| **BTC** | Watson, Breyon | 0.00243042 | $157.56 |
| **USDC** | Zilka, Amy | 20534.66213 | $20,534.66 |
| **BTC** | Zilka, Amy | 45.56120383 | $2,953,671.79 |
| | | **Total:** | **$28,435,324.88** |

Notwithstanding this procedure, the Debtor and any party in interest will have the right to object to any Claim until the expiration of the Claims Objection Deadline.

4882-5409-9703

### (d)    SMTF Buyback Guarantee Claims

The Debtor is party to certain repurchase agreements in connection with the sale of digital tokens known as SmartFi Tokens ("**SMTFs**"). The repurchase obligations arise from the agreement, contained in the online terms of the Debtor's SMTF Buy Back Guarantee (the "**BBGs**"). The BBGs extend only to the original SMTF purchasers, repurchase must be requested by that original purchaser during certain time periods, the original purchaser must have registered the SMTF within 10 days of original purchase, and the original purchaser must have maintained its SMTF on SmartFi's cryptocurrency platform through the date that it made its request. Further, the BBG requires the SMTF purchaser to surrender its SMTFs to SmartFi in exchange for their money back. In total, SmartFi sold or gave away $5,904,907 of SMTFs with a total potential repurchase obligation of that same amount. Prior to the Petition Date, the Debtor paid $1,445,359 in BBGs, leaving a potential liability of $4,459,548 in BBG obligations.

Prior to the Petition Date, a total of $1,679,550.68 worth of SMTF BBGs had been validly exercised and had not been paid by SmartFi. (Schedule E/F, ECF 39.) Under the terms of this Plan, these claims, as set forth in the Schedules in this amount will be Allowed as General Unsecured Claims.

The Brown and Albers plaintiffs purchased in the secondary market or obtained for services (some of which were never provided), and thus are not eligible for return under the BBG. (*See* Section 2.2, above.) The Brown plaintiffs filed Proofs of Claim Nos. 4 and 5 in the amount of $10,000 and $1,858,261.46, respectively. The Debtor will object to the Brown plaintiffs' Claims and anticipates that they will be disallowed. To the extent that they are Allowed, they will be properly classified and treated under the Plan.

Michael Alber filed Proof of Claim No. 6 in the amount of $370,120.73. The Debtor will object to the Alber Claim and anticipates that it will be Disallowed. To the extent that it is Allowed, it will be properly classified and treated under the Plan.

After accounting for the BBGs that were repaid pre-Petition Date ($1,445,359), the validly exercised BBGs that were listed in the Debtor's Schedule E/F ($1,679,550.68), and the SMTFs allegedly held by the Brown and Alber plaintiffs ($10,000, $1,858,261.46, and $370,120.73, respectively), the remaining total potential BBGs is only $911,735.86.

It is unknown whether the remaining approximately $911,735.86 in SMTFs are eligible for the BBG. Only one such holder, Michelle Newman, filed a Proof of Claim (No. 7) before the Claims Bar Date for a BBG in the amount of $4,435.04. The Debtor will solicit acceptances of the Plan from all holders of the SMTFs on the platform (which are the only ones that would be eligible anyway) and give them an option to elect to have a Claim for their BBG in exchange for their SMTF. If they so choose to exercise the BBG, SmartFi will determine whether they are eligible and, if so, they will have an Allowed General Unsecured Claim in such amount. If they do not qualify or are not eligible, the BBGs will be rejected pursuant to Article 7 of the Plan rejecting all remaining Executory Contracts of the Debtor not otherwise assumed. Such SMTF holders that do not elect will keep their SMTF tokens and have no further Claim against the Debtor.

4882-5409-9703

**(e)   Celsius Claims**

Despite Celsius's pre-Petition Date demand for $4,218,580.17, after the Petition Date, Celsius filed Proofs of Claim nos. 1 and 2 in the amount of $79,032,563.75 and $54,256,669.86, respectively, for a total potential claim of $133,289,233.61 (together, the "**Celsius Claim**").  The Debtor will object to Celsius Claim.  The Debtor believes that it has meritorious defenses to the extent that the pre-petition transfers to the Debtor were made in the ordinary course of business between the Debtor and Celsius or made according to ordinary business terms under 11 U.S.C. § 547(c)(2), and defenses to the extent that the Debtor gave new value after any such transfers under 11 U.S.C. § 547(c)(4).  The Debtor may have further defenses under section 546, 547, 550, or otherwise.  The Debtor believes that its defenses are meritorious and that it will be successful in Disallowing or significantly reducing the Allowed amount of the Celsius Claim.

**(f)   Other Obligations**

SmartFi may also have miscellaneous accounts payable, including payments to its vendors, utilities, contractors, and service providers, employees, and affiliates that are regularly incurred in the course of its business.  The Claims that fall into this category are likely *de minimis* compared to its other obligations.  Specifically, Buchanan Ingersoll & Rooney PC, filed Proof of Claim Nos. 8 and 9 in the amount of $21,990 for professionals' fees incurred prior to the Petition Date.

**(g)   Priority and Administrative Expense Claims**

The Debtor does not believe that there are any Priority Claims asserted against it.

The Debtor estimates that Administrative Expense Claims on the Effective Date, which will be paid from the General Unsecured Claims Cash Distribution first, will be approximately $175,000, depending on, among other things, the duration of the Debtor's Chapter 11 Case.

Following the conversion of the Debtor's Chapter 11 Case under Subchapter V to Chapter 11, the rate of accrual of Administrative Expense Claims increased substantially due to (1) the addition of the Committee and its professionals; and (2) significant additional costs for U.S. Trustee's Fees (which are not owed in a Subchapter V case), resulting in an additional approximately $18,231 of Administrative Expense Claims against the Debtor.  As illustrated in the Operating Budget attached as Exhibit B hereto, the Debtor will pay Administrative Expense Claims first as set forth in Section 4.2 of the Plan.

2.5   **SmartFi's Assets**

**(a)   Cryptocurrencies**

As of the Petition Date, SmartFi had cryptocurrencies worth approximately $27,860.57.  The U.S. dollar value of these cryptocurrencies fluctuates significantly, and so the value of these assets on the Solicitation Date and the date of any sale could be higher or lower.

**(b)      Affiliate Loans Receivable**

The Debtor's most valuable assets are three notes receivable made by its affiliates as follows:

| Asset | Face Balance as of 6/20/2024 | APR | Maturity Date | Liquidation Value |
|---|---|---|---|---|
| Solara Note | $18,302,985.51 | 5.0 | March 17, 2032 | $128,945.15 |
| Blue Castle Note | 1,074,542.93 | 4.0 | August 6, 2028 | 214,387.07 |
| SmartFi Lending Note | 1,786,558.87 | 4.0 | Sept. 29, 2028 | 2,196,358.14 |
| Total: | $21,164,087.31 | | | $2,539,690.36 |

(the "**Affiliate Loans Receivable**").

The Affiliate Loans Receivable were made at favorable interest rates to the Debtor's affiliates. They are all unsecured obligations with no payments due until their respective maturity dates, and none are in default according to their terms. According to their terms, therefore, the Debtor cannot demand payment on any of the Affiliate Loans Receivable until their maturity dates.

However, the Debtor has negotiated with its affiliates who are willing to modify their Affiliate Loans Receivable in such a way as to require periodic payments under modified promissory notes (the "**Modified Affiliate Notes**"), effective if and only upon the successful confirmation of the Plan and in the case of a Reorganization. The periodic payment obligations under the Modified Affiliate Notes will enable the Debtor to make all payments under the Plan. Under the Modified Affiliate Notes, the Debtor will receive approximately $21,170,491 in payments over the 5-year Plan period. For further information, see Means for Implementation of the Plan, Article 8, below.

If, however, the Affiliate Loans Receivable are not consensually modified under a Reorganization, the terms of the Affiliate Loans Receivable will remain as they are now. The Debtor has approached multiple purchasers of commercial paper and received estimates, but no offer, to purchase the Affiliate Loans Receivable at between 0.8 percent of face value and 24 percent of face value. The Debtor believes that a chapter 7 trustee or the Liquidating Trustee would receive somewhere between these amounts in a liquidation. The result of a liquidation of these instruments at a midpoint – 12 percent – would yield approximately $2,539,690.63. The effect of the difference in value in the Affiliate Loans Receivable and the Modified Affiliate Noters, which is the largest difference between a Reorganization and a Liquidation, is shown in the Debtor's Liquidation Analysis attached as Exhibit A hereto.

**(a)      Crypto-Backed Loans Receivable**

The Debtor's portfolio of Crypto-Backed Loans are described in Section 2.4(b), above. Under the terms of the agreements governing the Crypto-Backed Loans, the repayment of a Crypto-Backed Loan triggers an obligation (upon available liquidity) to return the cryptocurrency collateral previously given to the Debtor to secure the Crypto-Backed Loan. Since in every case, the value of the cryptocurrency collateral to be returned is significantly higher than the amount due on each Crypto-Backed Loan, pursuing collection on the Crypto-

Backed Loans is uneconomic and would result in more liability to the Debtor than collected. Stated differently, each borrower under a Crypto-Backed Loans has a right of setoff under applicable law for return of its cryptocurrency collateral in excess of such borrower's U.S. dollar loan amount. Accordingly, except as a means of reducing the claim amounts, the Crypto-Backed Loans receivable have no value to the Debtor's estate. They will be treated as offsets to the Claims held by the borrowers under the Crypto-Backed Loans in accordance with Section 2.4(b), above.

### (b)   Business Operations as an Asset

SmartFi has a website URL, software, contracts, and a cryptocurrency trading and investment platform. While SmartFi could operate its platform in a reorganization and earn some income therefrom, the cost of operating and maintaining the platform since 2023 has far exceeded the revenues and, in fact, has cost the Debtor millions of dollars. Further, the Debtor would be unable to realize any value for its platform if it made an attempt to sell it to the open market at this time. Currently, cryptocurrency investment and trading platforms are under extreme regulatory scrutiny, are experiencing substantial instability in currency values and customer deposit amounts, and are either marginally profitable or unprofitable. There is no viable market for these assets, and no one would be willing to purchase and operate them for any substantial purchase price. Further, the software platform, while highly customized, is built on licensed architecture that prohibits sale without paying exorbitant fees to the licensor.

Accordingly, the Debtor's plan does not rely on the operation or sale for value of the cryptocurrency trading platform. SmartFi will no longer maintain or service the platform. If no one purchases the platform, the potential to later sell or revive the platform and its associated intellectual property will vest in the reorganized Debtor or Liquidating Trust. However, at this time, there is no plan to revive the platform, and the Debtor's operations expend only minimal amounts for hosting to maintain the records of the platform.

### (c)   Avoidance Actions/Causes of Action

In the Chapter 11 Case, the Debtor may have certain Avoidance Actions, including causes of action for return of preference payments, fraudulent transfer, or otherwise under chapter 5 of the Bankruptcy Code. The amounts recoverable for the Debtor's Avoidance Actions is highly dependent on the amount of prepetition transfers, any unauthorized post-petition transfers, the ability of Avoidance Action defendants to pay any judgment (*i.e.*, collectability), and the amount it would cost in legal fees and experts to pursue, litigate, and collect such Avoidance Actions.

### (i)   90-Day Transfers

In the 90 days prior to the Petition Date, the Debtor, through its intermediary, Blue Castle, caused to be paid the following amounts:

| Recipient | Amount | Reason |
|---|---|---|
| Mikhail Sergeevich | $15,000.00 | Services |
| Muchnoy Mikhail Fedorov | 16,845.66 | Services |
| Paul Rodgers & Associates LLC | 30,000.00 | Services |

4882-5409-9703

| Robert B Graber | 13,500.00 | Services |
|---|---|---|
| Brad Jones Consulting | 22,500.00 | Accountant |
| Microsoft Corporation | 9,372.60 | Software/Services |
| James Graham | 26,875.0 | Services |
| Amplēo | 67,452.50 | Professional Retainer |
| Parsons Behle & Latimer | 54,340.10 | Professional Retainer |
| Sinan Causevic | 15,000.00 | Services |
| Top Deals Investments, Inc. | 9,999.00 | Services |
| **Total:** | **$280,884.86** | |

The Debtor believes that most if not all of these transfers are insulated from recovery as preferences under section 547 of the Bankruptcy Code. The largest amounts, which were paid to Amplēo and Parsons Behle as professional retainers were done to secure services later provided, providing new value under section 547(c)(4) and constitute secured claims under applicable law, rendering them unavoidable. The remaining payments were regular periodic payments to service providers that provided value and continued to provide value to the Debtor in goods and services after the payments and even after the Petition Date, rendering them unavoidable as payments made in the ordinary course of business between the Debtor and the transferee or made according to ordinary business terms under 11 U.S.C. § 547(c)(2), and unavoidable to the extent that the transferee gave new value after any such transfers under 11 U.S.C. § 547(c)(4). Finally, certain of these payments, if avoided, would result in Priority Claims under section 507(a)(4) in the up to the statutory priority amount of $15,150 because they were payments made to individuals or entities for wages and salaries of the individuals and entities who performed services for the Debtor. Thus, they would be entitled to payment in full in any event. Accordingly, these payments are unavoidable under section 547(b) because the payment of these amounts prior to the Petition Date did not cause the transferee to receive more than it would in a liquidation under chapter 7. Finally, the transfer received in each case above was made not from the Debtor, but rather, from Blue Castle. The transferee would also have a defense that the transfer received was not "property of the Debtor," rendering the transfer unavoidable.

Accordingly, the Debtor believes that the realizable value from any Avoidance Action against the above-listed transferees is zero, especially taking into account the cost of professionals' fees to pursue such Avoidance Actions. However, the Debtor or the Liquidating Trustee as applicable will retain the exclusive ability to pursue all Avoidance Actions and will, in their sole discretion, pursue such Avoidance Actions if in their judgment in consultation with their professional advisors it is economically viable to do so.

(ii)     One-Year Insider Transfers

In the one year prior to the Petition Date, the Debtor, through its intermediary, Blue Castle, caused to be paid the following amounts to insiders:

| Recipient | Amount | Reason |
|---|---|---|
| Aaron Tilton | $385,000.00 | Regular Salary |
| Thomas P. Retson | 41,250.00 | Regular Salary |
| **Total:** | **$426,250.00** | |

24

The Debtor believes that Avoidance Actions for the recovery of the above amounts would be subject to most of the same defenses as articulated immediately above with respect to the 90-day transfers.  In the case of Tilton and Retson, these payments were payment of regular salary at the same rate and timing, without variation, as had been paid in the years before this one-year period.  Accordingly, the Debtor believes that the realizable value from these Avoidance Action against insiders is likely *de minimis* or zero, especially taking into account the cost of professionals' fees to pursue such Avoidance Actions, and, given the size of the Claims pool, would not result in a meaningful difference in distributions to the Creditors.  However, the Debtor or the Liquidating Trustee as applicable will retain the exclusive ability to pursue all Avoidance Actions and will, in their sole discretion, pursue such Avoidance Actions if in their judgment in consultation with their professional advisors it is economically viable to do so.

(iii)   Post-Petition Transfers

After the Petition Date, the Debtor continued operating as it had since December 2023 under the terms of the Management Services Agreement (as described in detail in Section 2.2(b), above).  Under the Management Services Agreement, Blue Castle paid all U.S. dollar-denominated obligations of the Debtor, which had all of its bank accounts closed, using its own bank account and charged the Debtor a 10 percent fee for the services.  Blue Castle offset all such payments from amounts owed under the Blue Castle Note.  After the Petition Date, the Debtor continued to operate under the Management Services Agreement in order to meet its U.S. dollar-denominated obligations, including payments to programmers, service providers, utilities, employees, and other vendors.

In an effort to ensure transparency, on the Petition Date, the Debtor filed a Motion to allow the Debtor to continue paying its obligations under the Management Services Agreement and to modify the chapter 11 reporting requirements to allow it to make its disclosures using the Blue Castle account.  (ECF 7.)  The Court granted in part and denied in part this Motion, allowing the Debtor to continue using Blue Castle's bank account, modifying the reporting requirements, but restricting the payments that could be made to certain subscriptions, fees, and professionals' fees when and if allowed by the Court.  The order, which was negotiated and stipulated between the Debtor and the U.S. Trustee and approved by the Court, neither ratified nor ruled on the propriety of the payments that had been made under the Management Services Agreement between the Petition Date and the date of the Order.  The post-Petition Date payments were made by Blue Castle from Blue Castle funds, but under the Management Services Agreement, accounting entries were made offsetting the obligations in the Blue Castle Note for all of these amounts.

Under section 549 of the Bankruptcy Code, the Debtor can avoid any transfer made after the Petition Date that is not made in the ordinary course of the Debtor's business within the meaning of section 363(c)(1) of the Bankruptcy Code.  Blue Castle and the Debtor have asserted that these transactions, which were part of the Debtor's and Blue Castle's ordinary business practices since at least December 2023, were in the ordinary course of the Debtor's business. The Objecting Creditors have argued that these transfers were made to insiders.

The Debtor believes that, at least as to the amount of these transfers that were made to third parties for services in the regular amounts that they ordinarily charged for such services are

25

4882-5409-9703

unavoidable.  Blue Castle made payments on the Debtor's behalf to the following individuals and entities for goods and services:

| Recipient | Amount | Reason |
|---|---|---|
| AT Manager | $36,000.00 | Wages paid 1099 |
| EnergyPath Corporation | 7,500.00 | Management Services |
| James Kalani Graham | 12,100.00 | Contract Labor/Software Engineer |
| Mikhail Sergeevich Tikhomirov | 4,000.00 | Contract Labor/Web Development |
| Robert B. Graber | 4,500.00 | Consultant |
| Sinan Causevic | 7,500.00 | Share of Consolidated Accounting Services |
| Top Deals Investments, Inc. | 5,999.00 | Contract Labor |
| Brad Jones Consulting PLLC | 7,500.00 | Wages paid 1099 |
| Cloudflare, Inc. | 1,500.00 | Dues and Subscriptions |
| Appriver LLC | 950.65 | Dues and Subscriptions |
| Microsoft Corporation | 9,405.67 | Software and Subscriptions |
| Mikhail Fedorov | 8,688.33 | Contract Labor |
| Charles D. Tilton | 16,000.00 | Wages |
| Dustin Meecham | 5,480.80 | Wages |
| Kathleen Conger | 7,875.00 | Wages |
| Michelle Ray | 11,833.32 | Wages |
| Samuel Tilton | 10,612.50 | Wages |
| Total: | $105,643.65 | |

The Debtor believes that Blue Castle was a "mere conduit,"[2] for these transfers, and therefore the question is whether these transferees were providing goods, services, and labor in the ordinary course of the Debtor's business.  Because these persons and entities were providing goods, services, and labor in the ordinary course of the Debtor's business and in the same manner as they had prior to the Petition Date, these transfers are unlikely to be avoidable.  Further, these transfers would also be insulated under section 550 of the Bankruptcy Code because they were made in good faith and for value actually received in every case.  Further, to the extent that these goods and services were provided to or for the Debtor after the Petition Date and they remained unpaid, each of these transferees would have an Administrative Priority Claim entitled to payment in full on the Effective Date or when due.  Thus, avoiding them would not be a net benefit to the Debtor.

In addition to the above amounts, which were deducted from the Blue Castle Note, Blue Castle charged a 10 percent fee for its services.  The total charged for this fee after the Petition Date is $23,294.55.  Unlike the passthrough amounts above, Blue Castle is the transferee of this amount.  The Debtor believes that this amount is likely avoidable and recoverable and it is treated as such in the Liquidation Analysis attached as Exhibit A hereto.  While the amount is avoidable and recoverable, the professionals' fees required to avoid and recover this amount may be prohibitive.  Nevertheless, the Debtor intends to negotiate for consensual recovery of these amounts, *i.e.*, to have them added back to the balance of the Blue Castle Note.

---

[2] *See Rupp v. Markgraf*, 95 F. 3d 936, 939 (10th Cir. 1996) (holding that an intermediary that exercises no dominion or control over funds transferred is not a transferee subject to avoidance, but rather, the ultimate recipient is the initial transferee of the transfer.

In any event, the Debtor or the Liquidating Trustee as applicable will retain the exclusive ability to pursue all Avoidance Actions and will, in their sole discretion, pursue such Avoidance Actions if in their judgment in consultation with their professional advisors it is economically viable to do so.

(iv)     Other Avoidance Actions

The Debtor has potential causes of action for fraudulent transfer under section 548 of the Bankruptcy Code for transfers made in the two years prior to the Petition Date.  The Objecting Creditors have alleged that the loans to the affiliates in exchange for the Affiliate Loans Receivable could be set aside as fraudulent transfers.  However, the Debtor believes that pursuing those as Avoidance Actions would be costly and risky.  By unwinding those transfers, the Debtor would likely also avoid the Affiliate Loans Receivable that it received in exchange for those transfers.  The payments expected on the Affiliate Loans Receivable, as modified by the Modified Affiliate Notes, for the basis of the Plan in a Reorganization scenario and will yield approximately $21,203,164 in value for the Creditors.

In the Debtor's judgment, the best that could be achieved by suing to avoid the Affiliate Loans Receivable would be the same amount ($21,203,164) or less and would also be greatly reduced by the professionals' fees and costs of suit to bring such causes of action.  There is also a significant risk of losing in such a cause of action as the making of a promissory note in the same amount as the transfer received is likely reasonable equivalent value even if made under favorable terms.

Accordingly, in a Reorganization, the Debtor believes the value of these Avoidance Actions is greatly outweighed by the additional value that will be realized under the Modified Affiliate Notes.  In a Liquidation scenario, the Liquidating Trustee or chapter 7 trustee will have to decide whether to bring such causes of action.  The likely value of these causes of action is, in the Debtor's estimation, negligible.  However, the Debtor has attributed value to these in a liquidation as set forth in the Liquidation Analysis attached as Exhibit A hereto.

In any event, the Debtor or the Liquidating Trustee as applicable will retain the exclusive ability to pursue all Avoidance Actions and will, in their sole discretion, pursue such Avoidance Actions if in their judgment in consultation with their professional advisors it is economically viable to do so.

**(d)     Other Assets**

The Debtor has the following miscellaneous assets:

| Asset Category | Approximate Liquidation Value |
| --- | --- |
| SmartFi-branded promotional motorcycle | $2,652.00 |
| Default judgment against UTXO B.V. | unknown |
| **Total Estimated Assets:** | $2,652.00 |

The Debtor's branded motorcycle likely has limited resale value.  The above amount is based on a "blue book" value for similarly used make and model with a discount for cost of sale.

The judgment against UTXO, B.V. is at this time believed to be an uncollectible judgment against a foreign corporation. The Debtor or the Liquidating Trust, as applicable, will nevertheless retain and own the judgment and pursue it if in their judgment in consultation with their professional advisors it is economically viable to do so.

### (e)     Total Assets in Liquidation

The Debtor believes that the total amount of its assets realizable in a liquidation is therefore as set forth in the Liquidation Analysis attached as Exhibit A hereto.

## ARTICLE 3
## CLASSIFICATION OF DEBTOR'S CLAIMS AND INTERESTS

3.1     **Class 1. Priority Claims**

Class 1 consists of all Priority Claims.

3.2     **Class 2. General Unsecured Claims**

Class 2 consists of all General Unsecured Claims and Claims arising from agreements that were Secured prior to the Petition Date but not properly perfected or unperfected as of the Petition Date.

3.3     **Class 3. Convenience Claims**

Class 3 consists of all Convenience Claims.

3.4     **Class 4. Equity Interests**

Class 4 consists of all Equity Interests.

## ARTICLE 4
## TREATMENT OF DEBTOR'S ADMINISTRATIVE EXPENSE CLAIMS AND
## PRIORITY TAX CLAIMS

4.1     **Unclassified Claims**

Consistent with section 1123(a)(1) of the Bankruptcy Code, Administrative Expense Claims, and Priority Tax Claims are not classified in this Plan.

4.2     **Administrative Expense Claims**

Each Holder of an Allowed Administrative Expense Claim under section 503 of the Bankruptcy Code will be paid in full in cash by the Debtor on the later of (a) the Effective Date or (b) the date that such Administrative Expense Claim becomes an Allowed Administrative Expense Claim or upon such other terms as may be agreed upon by the Holder of the Administrative Expense Claim and the Debtor.

28

4882-5409-9703

### 4.3     Priority Tax Claims

Each holder of a Priority Tax Claim will be paid in full in cash by the Debtor on the Effective Date.  The Debtor believes that it has no non-current Priority Tax Claims.

### 4.4     United States Trustee Fees

All U.S. Trustee Fees will accrue and be timely paid in full without prior approval by the Bankruptcy Court pursuant to 28 U.S.C. § 1930 until the case is closed by a final decree, dismissed, or converted to another chapter of the Bankruptcy Code.  Any U.S. Trustee Fees owed on or before the Effective Date of this Plan will be paid on the Effective Date or promptly when as billed, whichever is sooner.  The U.S. Trustee does not need to file a Proof of Claim. The Debtor will be charged and will pay all U.S. Trustee Fees.  For more information, see the Liquidation Analysis attached as Exhibit A hereto.

## ARTICLE 5
## TREATMENT OF DEBTOR'S CLAIMS AND INTERESTS UNDER THE PLAN

Claims and Equity Interests will be treated as follows under this Plan:

### 5.1     Class 1. Priority Claims

Holders of Class 1 Priority Claims will receive, in full satisfaction of their Allowed Priority Claims, cash from the Debtor on the later of (a) 20 days after the Effective Date or (b) the date that such Priority Claim becomes an Allowed Priority Claim.

#### (a)     Impairment

Class 1 is unimpaired.

#### (b)     Voting

Because Class 1 is unimpaired, the Holders of Class 1 Priority Claims will not be entitled to vote on the Plan.  Class 1 will be deemed to accept the Plan.

### 5.2     Class 2. General Unsecured Claims

In a **Reorganization**, Holders will receive increasing cash payments quarterly beginning on the later of the last day of the quarter that begins 90 days after the Effective Date or when Allowed equal to their Pro Rata share of the General Unsecured Claims Cash Distribution after payment in full of all Priority Claims and Convenience Class Claims.  The details of the amount of these payments is set forth on the Debtor's Operating Budget attached as Exhibit B hereto.

In a **Liquidation**, Holders will receive their pro rata distributions from the Liquidating Trust when such proceeds become available, after payment of all Convenience Class Claims and all costs of administration of the Liquidating Trust are paid until no further proceeds are available.  The projected amount of these payments is set forth in the Debtor's Liquidation Analysis attached as Exhibit A hereto.

4882-5409-9703

**(a)** **Impairment**

Class 2 is impaired.

**(b)** **Voting**

Because Class 2 is impaired, the Holders of Class 2 Claims will be entitled to vote on the Plan, and the Debtor will solicit votes from Class 2.

5.3 **Class 3. Convenience Class**

In a **Reorganization** or a **Liquidation**, Holders of Convenience Claims will receive in full satisfaction of their Allowed Convenience Claim, payment of 50% of the Allowed Amount of their Convenience Claim on the later of the last day of the quarter that begins 90 days after the Effective Date or the date their Convenience Claim is Allowed.

**(a)** **Impairment**

Class 3 is impaired.

**(b)** **Voting**

Because Class 3 is impaired, the Holders of Class 3 Claims will be entitled to vote on the Plan, and the Debtor will solicit votes from Class 3.

5.4 **Class 4. Equity Interests**

In a **Reorganization**, on the Effective Date, the existing Equity Interest will be reinstated; provided, however, that no value may be paid on account of the Equity Interest until all payments under the Plan are paid in full.

In a **Liquidation**, on the Effective Date, the existing Equity Interest will be cancelled.

**(a)** **Impairment**

Class 4 is unimpaired and deemed to accept in a Reorganization. Class 4 is impaired and deemed to reject in a Liquidation.

**(b)** **Voting**

Because Class 4 is deemed to accept or reject, the Debtor will not solicit votes from the Class 4 Equity Interest Holder.

## ARTICLE 6
## DISPUTED CLAIMS

6.1 **Preservation of Debtor's Rights**

After the Effective Date, the Debtor (or the Liquidating Trust) shall have and retain all rights and defenses that the Debtor had with respect to any Claim immediately prior to the

30

4882-5409-9703

Effective Date except with respect to any Claim deemed Allowed under the Plan.  To the extent that any Claims are Allowed prior to the Effective Date under a final non-appealable order of the Bankruptcy Court, via Bankruptcy Rule 9019 or otherwise, such ruling or order shall be binding on all persons.

### 6.2    Unperfected Security Interests

Any security interests that were unperfected, inadequately perfected, or improperly perfected as of the Petition Date are, in accordance with section 506(a) of the Bankruptcy Code, properly treated hereunder as General Unsecured Claims against the Debtor.  So long as this Plan remains in effect, the unperfected Creditors are hereby enjoined from taking any action to effect perfection of their security interests for any debt, including interest or other charges arising therefrom, and they will be treated and accept in full satisfaction for their Allowed Claims the treatment prescribed for Holders of Class 2 General Unsecured Claims or Convenience Claims, as applicable, hereunder.

### 6.3    Amendments to Claims/Late Claims

After the Confirmation Date, and except to the extent that the Claims Bar Date falls on a later date than the Confirmation Date, a Claim may not be filed or amended without the authorization of the Bankruptcy Court and, even with such Bankruptcy Court authorization, may be amended by the Holder of such Claim with the power solely to decrease, and not to increase, the face amount thereof.  Except as otherwise provided in this Section, any new or amended Claim filed after the Confirmation Date shall be deemed Disallowed in full and expunged without any action by the Debtor, and the Debtor will make no distribution on account thereof.

### 6.4    Objections to Claims

An objection to the Allowance of a Claim shall be in writing and must be filed by a party in interest or the Debtor by the Claims Objection Deadline.  Any objection made by any party in interest who is not the Debtor will be done at that party's own expense.  The Debtor (or the Liquidating Trust) will prosecute any objection brought by itself until it is resolved by a final non-appealable order of the Bankruptcy Court unless the Debtor (or the Liquidating Trust) (a) compromises and settles such objection to a Claim or (b) withdraws such objection.

### 6.5    Delay of Distribution on Disputed Claims

No distribution will be made on account of any Disputed Claim unless and until such Claim is Allowed.  After the Effective Date, the Debtor (or the Liquidating Trust) will nevertheless make provision and set aside any amounts necessary pending determination by the Bankruptcy Court for all Disputed Claims prior to Allowance.

### 6.6    Settlement of Disputed Claims

The Debtor (or the Liquidating Trust) will have the power and authority to settle and compromise any Disputed Claim subject to Bankruptcy Court approval under Rule 9019 of the Federal Rules of Bankruptcy Procedure.  For administrative convenience, following the Effective Date, the Debtor (or the Liquidating Trust) will have authority to settle any Disputed Claim in an

4882-5409-9703

Allowed Claim amount of $40,000 or less without approval of the Bankruptcy Court, or any Debtor Cause of Action resulting in a recovery of any amount.

6.7    **Claims Estimation**

The Debtor (or the Liquidating Trust) may at any time request that the Bankruptcy Court estimate any Claim under section 502(c) of the Bankruptcy Code for any reason, regardless of whether any party previously objected to such Claim or whether the Bankruptcy Court ruled on any such objection.

The Bankruptcy Court shall retain jurisdiction to estimate any Claim, including during the litigation of any objection to any Claim or during the appeal relating to such objection.  In the event that the Bankruptcy Court estimates any such Claim, that estimated amount shall constitute a maximum limitation on such Claim for all purposes under the Plan (including for purposes of distributions), and the Debtor (or the Liquidating Trust) may elect to pursue any supplemental proceedings to object to any ultimate distribution on such Claim.

## ARTICLE 7
## EXECUTORY CONTRACTS AND UNEXPIRED LEASES

7.1    **Assumed Executory Contracts and Unexpired Leases**

Except as otherwise set forth herein, as of the Effective Date, all executory contracts of the Debtor shall be deemed rejected unless such contract (a) was previously assumed or rejected by the Debtor; (b) previously expired or terminated pursuant to its terms or applicable law; (c) is the subject of a motion to assume or reject filed by the Debtor under section 365 of the Bankruptcy Code pending as of the Effective Date; or (d) is specifically designated on the following table of executory contracts to be assumed.  The proposed cure amount for an executory contract or unexpired lease that is assumed pursuant to the Plan shall be zero dollars unless otherwise indicated in the following schedule.  In a Liquidation, the Debtor will and is deemed to reject all contracts as of the Effective Date.  In a Reorganization, the Debtor assumes only the following executory contracts or unexpired leases effective on the Effective Date of this Plan, with the following cure amounts payable on the Effective Date of this Plan:

| Row | Name of Party | Executory Contract or Unexpired Lease | Nature of Agreement | Cure Amount |
|---|---|---|---|---|
| 1 | Blue Castle Holdings, Inc. 1145 South 800 East Suite 117 Orem, UT, 84097 | Management Services Agreement, as modified after the Petition Date | Payment Services Agreement | $0.00 |
| 2 | Parsons Behle & Latimer | Engagement Agreement | Attorneys Engagement Agreement | $0.00 |

32

4882-5409-9703

| Row | Name of Party | Executory Contract or Unexpired Lease | Nature of Agreement | Cure Amount |
|---|---|---|---|---|
| 3 | Amplēo | Engagement Agreement | Attorneys Engagement Agreement | $0.00[3] |

**ANY HOLDER OBJECTING TO THE ABOVE CURE AMOUNTS OR ASSUMPTION OF SUCH EXECUTORY CONTRACT OR UNEXPIRED LEASE MUST FILE AN OBJECTION IN THE BANKRUPTCY COURT AND SERVE IT ON THE DEBTOR PRIOR TO THE ENTRY OF THE CONFIRMATION ORDER.**

Any counterparty to the above executory contracts or unexpired leases who fails to file an objection to the proposed cure amounts or assumption prior to the entry of the Confirmation Order will be deemed to have accepted such cure amount in full satisfaction and cure of all defaults and other amounts due up to and including the Petition Date and will have no further claim against the Debtor therefor.  Further, such counterparties are deemed to accept the assumption of their executory contract or unexpired lease by the Debtor and will hereby waive all rights and defenses to assumption, adequate assurance of future performance, any default prior to the Petition Date, or otherwise.

7.2     **Rejected Executory Contracts and Unexpired Leases**

The Debtor will be conclusively deemed to have rejected all executory contracts and unexpired leases not expressly assumed under Section 7.1 above upon entry of the Confirmation Order.  Further, and for the avoidance of doubt, on the Effective date, all BBGs will be rejected by the Confirmation Order.  A Proof of Claim arising from the rejection of an executory contract or unexpired lease under this section must be filed no later than ten (10) days after the entry of the Confirmation Order.

**ARTICLE 8**
**MEANS FOR IMPLEMENTATION OF THE PLAN**

8.1     **Reorganization – Re-vesting of Property of the Estate**

In a Reorganization, on the Effective Date, all assets of the Debtor's estate, including all real and personal property, all Debtor Causes of Action, interests, claims, choses in action, and rights under any contracts (executory or otherwise, unless rejected under Article 7 of this Plan), against any Person will re-vest and be transferred to the Debtor after the Effective Date.  The Debtor will remain in possession of all its other assets.

From and after the Effective Date, the Debtor shall (a) exist and continue to exist (b) with all powers in accordance with the laws of the State of Utah, and (c) shall be governed by the Debtor's pre-Petition Date Operating Agreement.  The Debtor shall have all of the powers it retains as a limited liability company under applicable law and without prejudice to any right to alter or terminate such existence (whether by merger, conversion, dissolution or otherwise) under

---

[3] Post-petition date professionals' fees may be due but will be subject to Court approval prior to the Effective Date.

4882-5409-9703

applicable law.   Beginning on and after the Effective Date, the Debtor may freely enter into contracts, operate its business and may use, acquire, and dispose of property and compromise, or settle any Claims that may arise beginning on or after the Effective Date, all without supervision or approval by the Bankruptcy Court (except as provided in Section 6.6 hereof) free of any restrictions of the Bankruptcy Code or Bankruptcy Rules, other than those restrictions expressly imposed by the Plan or the Confirmation Order.   The managers of the Debtor shall be Aaron Tilton and Brad Jones.

8.2   **Liquidation – Contribution to the Liquidating Trust**

If each impaired Class does not vote in favor of the Plan, the Debtor will liquidate its assets for the benefit of its Creditors through a Liquidating Trust as set forth in this Section 8.2. The Liquidating Trust Agreement is attached as Exhibit C hereto.

(a)   **Establishment of Liquidating Trust and Appointment of Liquidating Trustee**

The Liquidating Trust by the Confirmation Order and execution of the Liquidating Trust Agreement is attached as Exhibit C hereto.   The Liquidating Trustee shall be (a) initially, Steve Sala of Solution Advisors, (b) any successor or replacement Liquidating Trustee; or (c) such other Liquidating Trustee as approved by the Bankruptcy Court at the Confirmation Hearing. The Liquidating Trustee shall administer the Estate on and after the Effective Date.   As of the Effective Date, all officers of the Debtor will be deemed terminated.   The Liquidating Trustee shall hold all rights, powers, and duties of a trustee of the estate under Chapter 11 of the Bankruptcy Code.   The Liquidating Trustee shall reduce all property of the Estate and Debtor Causes of Action to Cash and distribute such Cash pursuant to the provisions of this Plan.   The Liquidating Trustee shall use such Cash to pay the holders of Allowed Claims until such Cash is exhausted or, under the terms of the Liquidating Trust Agreement, abandoned.

(b)   **Vesting of Property**

On the Effective Date, all assets of the Debtor's estate, including all real and personal property, all Debtor Causes of Action, interests, claims, choses in action, and rights under any contracts (executory or otherwise, unless rejected under Article 7 of this Plan), against any Person will re-vest and be transferred to the Debtor after the Effective Date.   Without any further act or deed of the Liquidating Trustee or of the Bankruptcy Court, all assets of the Debtor's estate shall be transferred from the Debtor to the Liquidating Trust, free and clear of all liens, Claims, and interests (except to the extent the Plan specifically provides otherwise), and shall become the corpus of the Liquidating Trust. On and after the Effective Date, the Debtor shall execute and deliver such instruments and other documents as are necessary, appropriate or deemed advisable by the Liquidating Trustee, to transfer title to and ownership of the Trust Assets to the Liquidating Trust.

(c)   **Vesting of Claims and Standing**

From and after the Effective Date, Claims and Causes of Action belonging to the Debtor, whether pending on the Effective Date or otherwise, without any further act or deed of the Liquidating Trustee or of the Bankruptcy Court, shall be transferred from the Debtor to the Liquidating Trust, free and clear of all liens, Claims, and interests (except to the extent the Plan

4882-5409-9703

specifically provides otherwise), and shall become the corpus of the Liquidating Trust. Thereafter, the Liquidating Trustee will have standing to initiate, pursue, abandon, or settle all Claims and Causes of Action formerly belonging to the Debtor, including Avoidance Actions, as if the Debtor.

### (d)     Liquidation of Remaining Property of Estate

Following the Effective Date, the Liquidating Trustee shall conduct an orderly liquidation of the remaining property of the Estate consistent with the terms of the Plan and the Liquidating Trust.

### (e)     Successor Trustee

In the event that the Liquidating Trustee resigns, becomes incapacitated, is disqualified, dies, or becomes otherwise unable or unwilling to continue to serve in such capacity, then a successor shall be appointed according to the terms of the Liquidating Trust.  In the event no successor is available under the terms of the Liquidating Trust, the Court shall appoint a successor Liquidating Trustee either sua sponte or upon motion of any interested party and notice to all creditors on the Debtor's mailing matrix.

### (f)     Liquidating Trust Agreement

The Liquidating Trust Agreement, submitted as part of the Plan Supplement, is incorporated herein by reference.  The Liquidating Trust shall be established for and on behalf of holders of Allowed General Unsecured Claims and Allowed Convenience Claims and shall be treated for federal income tax purposes as a grantor trust with the Debtor being the grantor.

### (g)     Employment of Professionals

The Liquidating Trustee will be compensated for post-confirmation services at its customary hourly rate.  The Liquidating Trustee may employ attorneys, accountants, or other professionals as he may deem appropriate, provided however, that the Liquidating Trustee shall not engage Amplēo, Parsons Behle & Latimer, Greenberg Traurig, LLP, Huron Consulting Service, LLC, or any other professional representing the Debtor, the Committee, Celsius, Song, any member of the Committee, or any of the Debtor's affiliates.  The Liquidating Trustee shall hire and pay such professionals reasonable fees and expenses as Liquidating Trust Expenses. Professionals employed by the Liquidating Trustee shall not be subject to Bankruptcy Court approval, and their compensation shall not be subject to Bankruptcy Court approval.

### (h)     Termination of Liquidating Trust

Upon liquidation of all Trust Assets, payment of all fees, expenses, taxes of the Liquidating Trust, and final distributions to holders of Allowed Class 2 and Class 3 Claims, the Liquidating Trust and the responsibilities of the Liquidating Trustee shall terminate.

### (i)     Destruction of Books and Records

Upon termination of the Liquidating Trust, the Liquidating Trustee may, without further order of the Bankruptcy Court, but subject to any applicable non-bankruptcy law relating to the

35

4882-5409-9703

retention of books and records, may destroy any books and records that the Liquidating Trustee determines are no longer necessary for the implementation of the Plan.

### (j)    Dissolution of the Committee

Upon the Effective Date, whether in a Reorganization or Liquidation, the Committee will be dissolved; provided that following the Effective Date, the Committee shall continue to have standing and a right to be heard with respect to any Professional Compensation and Expense Reimbursement Claims.  After the Effective Date, neither the Debtor nor the Liquidating Trust (as applicable) shall be responsible for paying any fees or expenses incurred after the Effective Date by the Committee, the members of the Committee, or their respective professionals.

### (k)    Liquidating Trust Advisory Committee

After the Effective Date, the members of the Committee may, at their election, serve on the Liquidating Trust Advisory Committee, without compensation, and subject to the terms of the Liquidating Trust Agreement.  The Liquidating Trust Advisory Committee shall monitor and oversee the Liquidating Trustee and the implementation of the Plan, subject to the terms of the Liquidating Trust Agreement.

### (l)    Filing Final Tax Returns

After the Effective Date, the Liquidating Trustee will prepare and timely file final tax returns for the Debtor.  The Liquidating Trustee may employ professionals without further orders of the Court to assist him.

### 8.3    Retention and Re-vesting of Debtor Causes of Action

The Debtor will retain (or hereby is given) standing and authority to prosecute all Debtor Causes of Action.  Currently, the Debtor has known Debtor Causes of Action against Song aside from rights of setoff and defenses previously asserted in the Song Litigation.  The Debtor hereby expressly reserves and will retain or be re-vested with all Debtor Causes of Action, and, therefore, in each case, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, waiver, estoppels (judicial, equitable or otherwise) or laches shall apply to such Debtor Causes of Action upon or after the entry of the Confirmation Order or Effective Date based on the Plan or the Confirmation Order, except where such Debtor Causes of Action have been expressly released in the Plan or any final non-appealable order from the Bankruptcy Court.  In accordance with section 1123(b) of the Bankruptcy Code, the Debtor may enforce all rights to commence and pursue any Debtor Causes of Action, and the Debtor's rights to commence, prosecute, or settle any such Debtor Causes of Action shall be preserved, notwithstanding entry of the Confirmation Order or the occurrence of the Effective Date.  No Person may rely on the absence of a specific reference in the Plan or the Disclosure Statement to any Debtor Cause of Action against him, her, or it as any indication that the Debtor will not pursue any available Debtor Causes of Action against such Person.  In accordance with section 1123(b)(3) of the Bankruptcy Code, any Debtor Causes of Action that the Debtor may hold against any Person shall vest in the Debtor.  The Debtor may bring all such Debtor Causes of Action in the Bankruptcy Court or such other court of competent jurisdiction in its sole discretion.  The Debtor will have and is hereby given authority to settle all Debtor Causes of Action without prior approval of the Bankruptcy Court.

4882-5409-9703

8.4      **Cramdown/Non-Consensual Plan**

If each impaired Class accepts the Plan, the Debtor will proceed under the Reorganization provisions of this Plan.  If not all impaired Classes accept the Plan, the Debtor will proceed under the Liquidation Provisions of this Plan.  If any impaired Class entitled to vote shall not accept the Plan by the requisite statutory majorities provided in Sections 1126(c) or 1126(d) of the Bankruptcy Code, as applicable, or if any impaired class is deemed to have rejected the Plan, the Debtor reserves the right (i) to confirm the Plan under Section 1129(b) of the Bankruptcy Code, and (ii) to amend the Plan to the extent necessary to obtain Confirmation.

8.5      **Wherewithal to Pay Claims under the Plan in a Reorganization**

The cash necessary to make distributions by the Debtor to each Class of Claims consists of (a) cash on hand and (b) recoveries from litigation of Debtor Causes of Action, and (c) collection on the Modified Affiliate Notes all as set forth in month-by-month detail in the Debtor's Operating Budget attached as Exhibit B hereto.

The Debtor will provide additional testimony and evidence supporting its wherewithal to fulfill its obligations under this Plan at the Confirmation Hearing and as set forth in the accompanying Disclosure Statement.

8.6      **Cash Flow and Debtor Available Cash**

If the Plan is confirmed as a Reorganization, the Debtor will have a certain amount of cash available to pay the required payments under the Plan (hereinafter, "**Debtor Available Cash**") over the next five (5) years following the Effective Date as set forth in the Operating Budget attached as Exhibit B hereto.  The Operating Budget is based on the Debtor's negotiation for modifications to the Affiliate Loans Receivable into the Modified Affiliate Notes.  The Modified Affiliate Notes are in the form filed in the Plan Supplement.

As set forth in the Operating Budget, after payment of the expenditures necessary for the continuation, preservation, and operation of the Debtor, including the minimal ongoing fixed obligations assumed under the Plan, the Debtor Available Cash over the five-year period following the Effective Date will be sufficient to fund the payments under the Plan.  The Debtor shall distribute to each such Holder of Class 2 General Unsecured Claims their Pro Rata share of the General Unsecured Claims Cash Distribution from Debtor Available Cash.

At the Confirmation Hearing, the Debtor will provide evidence supporting the amount and availability of the Debtor Available Cash sufficient to satisfy its payment obligations under the Plan.

In addition to information from the Debtor, the information to be submitted at the Confirmation will demonstrate to the applicable standard that the Debtor's Affiliates will be able to pay their obligations under the Modified Affiliate Notes. *In re Pikes Peak Water Co.*, 779 F.2d 1456, 1460 (10th Cir. 1985) (articulating standard of proof for feasibility as having a "reasonable prospect of success" and "workable.").

### 8.7     Liquidation Analysis

Section 1129(a)(7) requires that each Holder of a Claim either accept the Plan, or such Holder shall receive under the Plan on account of its Claim an amount that is equal to or exceeds what such Holder would receive if the Debtor was liquidated under Chapter 7 of the Bankruptcy Code.  Here, as demonstrated by the attached Exhibit A and further described in the above Section, under the Plan each Holder of Class 2 General Unsecured Claims and Class 3 Convenience Claims will receive more than they would in a liquidation.  Conversely, if the Debtor was to liquidate under Chapter 7 of the Bankruptcy Code, each such Holder would receive significantly less.  Accordingly, the Plan satisfies section 1129(a)(7) of the Bankruptcy Code.

### 8.8     Post-Effective Date Management and Professionals

In accordance with section 1129(a)(5) of the Bankruptcy Code, from and after the Effective Date in a Reorganization, the initial officers and directors of the Debtor will be unchanged with each officer and director remaining in the same roles he or she served in prior to the Petition Date, which are as follows:

| Name | Position |
| --- | --- |
| Aaron Tilton | President |
| Brad Jones | CFO |

Each of the officers of the Debtor will be employed after the Effective Date under the same or similar terms and conditions of employment that each employee had operated under prior to the Petition Date.

The Debtor will retain Parsons Behle & Latimer as counsel after the Confirmation Date to assist the Debtor in any bankruptcy-related matters and such other matters as are appropriate. Parsons Behle & Latimer will continue to charge its customary rates as agreed upon from time to time by the Debtor and Parsons Behle & Latimer, but neither Parsons Behle & Latimer nor the Debtor will be required to submit fee applications or otherwise be employed under the Bankruptcy Code, and the Debtor may pay Parsons Behle & Latimer without notice, a hearing, or approval by the Bankruptcy Court.

After the Confirmation Date, the Debtor will hire, fire, retain, or employ such other professionals and contractors as it deems advisable in the reasonable exercise of its business judgment without the need to seek approval of the Bankruptcy Court.  The Debtor will compensate its professionals for any services provided after the Confirmation Date in the ordinary course of its business without the need for Bankruptcy Court approval.

### 8.9     Payment Flexibility for Administrative Convenience

The Debtor will pay each class of Claims Pro Rata as provided in the Plan.  However, the Debtor may pre-pay the payments due under the Plan to any class of Claims Pro Rata from available funds without prepayment penalty, which will cut off the prepaid Claim's Holder's further rights or interest in such Claim.  In addition, notwithstanding the Pro Rata payment requirement, for administrative convenience, the Debtor in its sole discretion may pre-pay the

4882-5409-9703

remaining balance on any payments due to the Holder of a Claim if such Claim's remaining balance of payments due under the Plan is less than $5,000. Any prepayments under this section will constitute satisfaction in full of such Holder's Claims, and such Holder will be deemed to be paid in full with no remaining right to payment under the Plan or otherwise.

## ARTICLE 9
## MISCELLANEOUS AND GENERAL PROVISIONS

### 9.1    Definitions and Rules of Construction

Except as otherwise provided in this Plan, the definitions and rules of construction set forth in sections 101 and 102 of the Bankruptcy Code apply when terms defined or construed in the Bankruptcy Code are used in this Plan. Interest shall be calculated at the specified rate in simple interest accruing on a yearly basis only on outstanding principal.

### 9.2    Severability

If any provision in this Plan is determined to be unenforceable, then such determination will in no way limit or affect the enforceability and operative effect of any other provision of this Plan.

### 9.3    Binding Effect

The rights, obligations, limitations, and injunctions of, for, or against any Person named or referred to in this Plan will be binding upon and will inure to the benefit of the successors or assigns of such Person.

### 9.4    Controlling Law

Unless a different rule of law or procedure is supplied by federal law (including the Bankruptcy Code or the Federal Rules of Bankruptcy Procedure) or in the subject instrument, the laws of the State of Utah govern this Plan and any agreements, documents, and instruments executed in connection with this Plan.

### 9.5    Retention of Bankruptcy Court Jurisdiction

The Bankruptcy Court will retain and have exclusive jurisdiction over any matter arising under the Bankruptcy Code arising in or related to the Debtor's Chapter 11 Case or the Plan, or that relates to any of the following:

(i)    consistent with Article 7, hereof, to resolve any matter related to the assumption or rejection of any executory contract or unexpired lease to which the Debtor is a party or with respect to which the Debtor may be liable and to hear and determine any Claim arising therefrom;

(ii)    to enter such orders as may be necessary or appropriate to implement or consummate the provisions of the Plan;

39

4882-5409-9703

(iii)    to determine all motions, adversary proceedings, applications, and contested or litigated matters related to the Debtor's Chapter 11 Case or arising therefrom, that may be pending on the Effective Date or that, pursuant to the Plan, may be instituted by the Debtor prior to or after the Effective Date, including resolution of all Debtor Causes of Action, including Avoidance Actions;

(iv)    to ensure that distributions to Holders of Allowed Claims are accomplished as provided in the Plan;

(v)    to hear and determine any timely objection to a Claim or Proof of Claim;

(vi)    to enter and implement such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, revoked, modified, reversed, or vacated;

(vii)    to issue such orders in aid of execution of the Plan, to the extent authorized by section 1142 of the Bankruptcy Code;

(viii)    to consider any modification of the Plan, to cure any defect or omission, or reconcile any inconsistency in any order of the Bankruptcy Court, including the Confirmation Order;

(ix)    to hear and determine all applications for awards of compensation for services rendered and reimbursement of expenses incurred by the Debtor's professionals, the Subchapter V Trustee, and any other timely filed applications filed with the Court for allowance of Administrative Expense Claims;

(x)    to hear and determine disputes arising in connection (i) with or relating to the Plan; (ii) the interpretation, implementation, or enforcement of the Plan; or (iii) the extent of any Person's obligations incurred in connection with or released under the Plan; but notwithstanding the preceding, if the Court's potential resolution of any issues arising under this subsection (x) is otherwise governed by an express enforcement or dispute resolution provision in an agreement or contract that already exists by and between the Debtor and such party, then such provisions should govern;

(xi)    to issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any entity with consummation or enforcement of the Plan;

(xii)    to determine any other matter that may arise in connection with or that is related to the Plan, the Confirmation Order, or any contract, instrument, release, or other agreement or document created in connection therewith, unless such agreements or documents contain express enforcement or dispute resolution provisions, in which case, such provisions should govern;

(xiii)    to hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code (including, without limitation, any matter relating to tax refunds, and any request by the Debtor for an

4882-5409-9703

expedited determination of tax liability under section 505(b) of the Bankruptcy Code with respect to the Debtor);

(xiv)   to hear any other matter or for any purpose specified in the Confirmation Order that is not inconsistent with the Bankruptcy Code; and

(xv)   to enter a final decree closing the Chapter 11 Case.

9.6   **Inconsistencies**

In the event of any inconsistency between and among the Plan, the Confirmation Order, the Disclosure Statement, or the Plan Supplement, the documents shall control in the following order: (a) the Confirmation Order; (b) the Plan; (c) the Plan Supplement; and (d) the Disclosure Statement.

9.7   **Unclaimed Distributions**

For any property to be distributed pursuant to the Plan, if such distributed property is not claimed by the distributee within one (1) year after the payment, then such distributed property shall be returned to the Debtor and become the property of the Debtor free and clear of any claims of any Person.

**ARTICLE 10**
**DISCHARGE AND RELATED MATTERS**

10.1   **Discharge of Claims**

If the Plan is confirmed under section 1129(a) or 1129(b) of the Bankruptcy Code, on the Confirmation Date, except as specifically provided in the Plan, the Debtor and all of its property will be discharged from any interest, claim, or debt that arose before confirmation of the Plan, subject to the occurrence of the Effective Date, to the full extent specified in section 1141(d)(1)(A) of the Bankruptcy Code, except that the Debtor will not be discharged of any debt (a) imposed by the Plan; (b) of a kind specified in section 1141(d)(6)(A) of the Bankruptcy Code if a timely complaint is filed in accordance with Rule 4007(c) of the Federal Rules of Bankruptcy Procedure; or (c) of a kind specified in section 1141(d)(6)(B) of the Bankruptcy Code.  Pending execution of this Plan and unless (i) the Court has otherwise expressly ordered; or (ii) this Plan otherwise expressly provides, all Creditors will continue to be stayed from proceeding against the Debtor or its assets on account of any debt arising prior to the Effective Date.

10.2   **Exculpation**

Neither the Debtor, the Subchapter V Trustee, the Committee, nor any of their respective officers, directors, employees, representatives, professionals, or agents, will have or incur any liability to any party in interest or any other Person for any act or omission in connection with or arising out of the Chapter 11 Case, including, without limitation, prosecuting confirmation of this Plan, consummation of this Plan, or the administration of this Plan or the property to be distributed under this Plan, except for gross negligence, willful misconduct, or fraud.

4882-5409-9703

10.3    **Injunction**

FROM AND AFTER THE EFFECTIVE DATE, ALL ENTITIES ARE PERMANENTLY ENJOINED FROM COMMENCING OR CONTINUING IN ANY MANNER, ANY CAUSE OF ACTION TREATED, RELEASED, OR TO BE RELEASED PURSUANT TO THE PLAN OR THE CONFIRMATION ORDER.

FROM AND AFTER THE EFFECTIVE DATE, TO THE EXTENT OF THE RELEASES AND EXCULPATION GRANTED HEREIN, ALL ENTITIES SHALL BE PERMANENTLY ENJOINED FROM COMMENCING OR CONTINUING IN ANY MANNER AGAINST THE DEBTOR AND ITS ASSETS AND PROPERTIES, AS THE CASE MAY BE, ANY SUIT, ACTION OR OTHER PROCEEDING, ON ACCOUNT OF OR RESPECTING ANY CLAIM, DEMAND, LIABILITY, OBLIGATION, DEBT, RIGHT, CAUSE OF ACTION, INTEREST OR REMEDY TREATED, RELEASED, OR TO BE RELEASED PURSUANT TO THIS PLAN.

EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN THE PLAN, THE PLAN SUPPLEMENT, OR THE CONFIRMATION ORDER, ALL ENTITIES WHO HAVE HELD, HOLD OR MAY HOLD CLAIMS OR INTERESTS THAT HAVE BEEN RELEASED PURSUANT TO OR DISCHARGED UNDER THE PLAN OR ARE SUBJECT TO EXCULPATION PURSUANT TO SECTION 10.2, ARE PERMANENTLY ENJOINED, FROM AND AFTER THE EFFECTIVE DATE, FROM TAKING ANY OF THE FOLLOWING ACTIONS: (1) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS; (2) ENFORCING, ATTACHING, COLLECTING OR RECOVERING BY ANY MANNER OR MEANS ANY JUDGMENT, AWARD, DECREE OR ORDER AGAINST SUCH ENTITIES ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS; (3) CREATING, PERFECTING OR ENFORCING ANY ENCUMBRANCE OF ANY KIND AGAINST SUCH ENTITIES OR THE PROPERTY OR ESTATE OF SUCH ENTITIES ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS; AND (4) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS RELEASED, SETTLED OR DISCHARGED PURSUANT TO THE PLAN.

THE RIGHTS AFFORDED IN THE PLAN AND THE TREATMENT OF ALL CLAIMS AND INTERESTS HEREIN SHALL BE IN EXCHANGE FOR AND IN COMPLETE SATISFACTION OF ALL CLAIMS AND INTERESTS OF ANY NATURE WHATSOEVER, INCLUDING ANY INTEREST ACCRUED ON CLAIMS FROM AND AFTER THE PETITION DATE, AGAINST THE DEBTOR OR ANY OF ITS ASSETS, PROPERTY, OR ESTATE. ON THE EFFECTIVE DATE, ALL SUCH CLAIMS AGAINST THE DEBTOR SHALL BE FULLY RELEASED AND DISCHARGED, AND THE INTERESTS SHALL BE CANCELLED.

EXCEPT AS OTHERWISE EXPRESSLY PROVIDED FOR HEREIN OR IN OBLIGATIONS ISSUED PURSUANT HERETO, FROM AND AFTER THE EFFECTIVE

42

DATE, ALL CLAIMS AGAINST THE DEBTOR SHALL BE FULLY RELEASED AND DISCHARGED, AND ALL INTERESTS SHALL BE CANCELLED, AND THE DEBTOR'S LIABILITY WITH RESPECT THERETO SHALL BE EXTINGUISHED COMPLETELY, INCLUDING ANY LIABILITY OF THE KIND SPECIFIED UNDER SECTION 502(G) OF THE BANKRUPTCY CODE.

## ARTICLE 11
## MODIFICATION OF PLAN

Subject to the restrictions on modifications set forth in section 1127 of the Bankruptcy Code, the Debtor reserves the right to alter, amend or modify the Plan before or after its substantial consummation.  Prior to the Effective Date, the Debtor may make appropriate technical adjustments and modifications to the Plan without further order or approval of the Bankruptcy Court.  Holders of Claims that have accepted the Plan shall be deemed to have accepted the Plan, as amended, modified, or supplemented, if the proposed amendment, modification, or supplement does not materially and adversely change the treatment of the Claim of such Holder; provided, however, that any Holders of Claims who were deemed to accept the Plan because such Claims were unimpaired shall continue to be deemed to accept the Plan only if, after giving effect to such amendment, modification, or supplement, the treatment of such unimpaired Claims continue to be unimpaired.

## ARTICLE 12
## CONFIRMATION OF PLAN

The Debtor respectfully requests Confirmation of the Plan under section 1129(a) of the Bankruptcy Code.  In the event that any impaired class of Claims (or class of Claims that the Court determines is impaired) fails to accept or is deemed to reject the Plan in accordance with section 1129(a) of the Bankruptcy Code, then the Debtor hereby requests that the Bankruptcy Court confirm the Plan in accordance with section 1129(b) of the Bankruptcy Code and/or amend the Plan, including amendments as needed at the Confirmation Hearing.  In such event, the Debtor respectfully requests Confirmation of the Plan under section 1129(b) of the Bankruptcy Code.

## ARTICLE 13
## REMEDIES UPON DEFAULT

If the Debtor becomes delinquent in a duty or obligation under the Plan, then the affected party in interest shall provide written notice of such default to the Debtor and its counsel.  The Debtor shall thereafter have 20 business days from receipt of said notice in which to cure the default and, if so cured, will not be considered to be in default.  In the event such default remains uncured for the requisite 20 days, then the affected Creditor or Creditors shall be required to bring the issue of default before the Bankruptcy Court, which shall have exclusive jurisdiction over the dispute and remedy.  In the event the Debtor is deemed to have breached its obligations under this Plan to the affected party in interest, the Court may fashion a remedy with respect to such party; provided, however, that such default shall not be considered a default with respect to all other parties in interest under this Plan, and the provisions of this Plan, including the Debtor's discharge and any injunctions contained herein shall remain in effect with respect to all other parties unless otherwise ordered by the Court.

4882-5409-9703

Respectfully submitted,


Dated: December 16, 2024.

**Power Block Coin, L.L.C.**, a Utah
limited liability company dba SmartFi


/s/Aaron Tilton*

By: Aaron Tilton
Title: President
*signed with permission


Dated: December 16, 2024.

**PARSONS BEHLE & LATIMER**


/s/ Brian M. Rothschild

By: BRIAN M. ROTHSCHILD

*Attorneys for the Debtor*

1

4882-5409-9703

## LIST OF EXHIBITS

| Ex No. | Document Name |
|--------|---------------|
| A | Liquidation Analysis |
| B | Operating Budget |
| C | Liquidation Trust Agreement |

4882-5409-9703

# EXHIBIT A

## LIQUIDATION ANALYSES

4882-5409-9703

**Power Block Coin, LLC ("PBC")**
**Liquidation Analysis**
**Projected as of 07/01/2025**

| | Estimated Recovery | Liquidation in Ch. 7 | Estimated Recovery | Liquidation in Ch. 11 | Estimated Recovery | Reorganization in Ch. 11 Plan payments over 5 yrs. |
|---|---|---|---|---|---|---|
| | % | $ | % | $ | % | $ |
| **I. Liquidation of Assets** | | | | | | |
| Cash On Hand | | - | | - | | - |
| Crypto Inventory Assets | 90% | 32,864 | 90% | 32,864 | 100% | 36,515 |
| Note Receivable - Blue Castle Holdings, Inc. | 12% | 128,945 | 12% | 128,945 | 100% | 1,074,543 |
| Note Receivable - Smartfi Lending, LLC | 12% | 214,387 | 12% | 214,387 | 100% | 1,786,559 |
| Note Receivable - Solara Communities, LLC | 12% | 2,196,358 | 12% | 2,196,358 | 100% | 18,302,985 |
| Loans Receivable (Cash due on Crypto Loans) | 0% | - | 0% | - | | - |
| Promotional Motorcycle | 35% | 2,989 | 75% | 6,405 | 75% | 6,405 |
| Litigation and Preference / Avoidance Actions | | 100,000 | | 200,000 | | - |
| Power Block Coin adverse to UTXO B.V. | 0% | - | 0% | - | | - |
| **Total Estimated Proceeds from Asset Liquidation** | | **$2,675,543** | | **$2,778,959** | | **21,207,007** |
| **II. Administrative Claims & Liquidation Costs** | | | | | | |
| Operational Expenses | | - | | - | | 60,000 |
| Remaining Legal Fees Payable on Effective Date | | 100,000 | | 100,000 | | 100,000 |
| Debtors Counsel and Financial Advisor Fees (reorg) | | | | | | 270,000 |
| Chapter 7 Trustee Fees | | 103,516 | | - | | - |
| Chapter 7 Trustee Professionals' Fees (FA and legal) | | 150,000 | | | | |
| U.S. Trustee Fees Payable on Effective Date | | 18,231 | | 18,231 | | 18,231 |
| Chapter 11 Liquidating Trustee Fees | | - | | 60,000 | | |
| Chapter 11 Liquidating Trustee Professionals' Fees | | | | 100,000 | | |
| Creditor Committee Fees Payable on Effective Date | | 75,000 | | 75,000 | | 75,000 |
| Liquidation Costs | | 60,000 | | 60,000 | | - |
| **Total Administrative Claims & Liquidation Costs** | | **$506,747** | | **$413,231** | | **$523,231** |
| **Net Proceeds Available for Unsecured Creditors** | | **$2,168,796** | | **$2,365,728** | | **$20,683,775** |
| **III. Unsecured Claims** | | | | | | |
| Convenience Class Claims >$5,000 | 50.0% | 26,949 | 50.0% | 26,949 | 50.0% | 26,949 |
| General Unsecured Claims | 1.1% | 62,432,361 | 1.2% | 62,405,412 | 10.4% | 62,405,412 |
| Celsius Preference Claim | 1.0% | 133,289,234 | 1.2% | 133,289,234 | 10.4% | 133,289,234 |
| Brown and Albers Litigation Claims | 1.0% | 2,238,382 | 1.2% | 2,238,382 | 10.4% | 2,238,382 |
| **Total Unsecured Claims** | | **$197,986,925** | **1.1%** | **$197,959,977** | | **$197,959,977** |
| **Estimated General Unsecured Creditor's Claims Recovery %** | **1.1%** | **$2,168,796** | **1.2%** | **$2,365,728** | **10.4%** | **$20,683,775** |

**Notes**

1 Crypto inventory assets held by PBC, adjusted to respective 6/20/24 market rates. Excludes PBC-proprietary tokens ("SMTF")

2 Unsecured note receivable from BCH, dated 8/8/23. $1,400,000 principal, 5-year term, 4% interest; All principal and interest due at maturity.
Interest accruals from origination through 6/20/24, less note offsets under PBC-BCH Management Services Agreement

3 Unsecured note receivable from Smartfi Lending LLC, 9/30/23. 5-year term; 5% interest, All principal and interest due at maturity.
Interest accruals from origination through 6/20/24.

4 Unsecured note receivable from Solara Communities, LLC, dated 3/17/22; 10-year term, 5% interest. All principal and interest due at maturity.
Accruals through 6/20/24, less $1,132,037 interest received in 2022. Liquidation calculations are based off 3rd party Debt Investors current rates for Performing and N

5 Loans receivable from short-term lending operations; principal and accrued interest through 6/20/24. Loans collateralized by borrower crypto assets.

6 Smart-fi-branded promotional use motorcycle

7 Default judgement against UTXO. Only liquidation opportunity is from successful clawbacks from debtor's estate

8 Post-petition operating expenses - 3 month (low) and 6 month (high) estimates

9 Fees incurred from debtors counsel, creditors committee and financial advisors up to the effective date of the plan

10 Legal and Financial Advisor Fees after the effective date of the plan

11 Standard Chapter 7 trustee liquidation fees (based on gross liquidation estimates) under 11 U.S.C. § 326(a)

12 Liquidation-related costs

14 Defense actions and preference items (see Other Claims tab)

15 Customer claims with balance of less than $500, no convenience class in Chapter 7 liquidation

16 General Unsecured Claims include, customer initiated and PBC-Validated Buy Back Guarantee claims, potential BBG claims and Smart Interest crypto deposit claims.

17 Standard Chapter 11 trustee liquidation fees (based on gross liquidation estimates)

18 Estimated fees for Creditors Committee

19 Total Asserted Claims, Allowed Claims may be lower based on claims objections

Disclaimer: Ampleo has not independently verified the existence or value of assets to be administered, and makes no warranty or representation in support of such. Information presented has been provided by the client.

# <u>EXHIBIT B</u>

## <u>OPERATING BUDGET</u>

4882-5409-9703

**Power Block Coin, LLC**
**Report of Cash Sources and Uses**
**5 Year Projections**

| July 1, 2025 Effective Date | Q3 2025 Forecast | Q4 2025 Forecast | Year 2025 Forecast | Q1 2026 Forecast | Q2 2026 Forecast | Q3 2026 Forecast | Q4 2026 Forecast | Year 2026 Forecast | Q1 2027 Forecast | Q2 2027 Forecast | Q3 2027 Forecast | Q4 2027 Forecast |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Beginning Cash Balance** | $0 | $40,269 | $0 | $98,769 | $157,269 | $215,769 | $274,269 | $98,769 | $332,769 | $391,269 | $449,769 | $1,483,269 |
| **Cash Sources** | | | | | | | | | | | | |
| **Interest on Notes Receivable** | | | | | | | | | | | | |
| Note Receivable - Blue Castle Holdings, Inc. | $ 3,808 | $ 3,808 | $ 7,616 | $ 3,808 | $ 3,808 | $ 3,808 | $ 3,808 | $ 15,232 | $ 3,808 | $ 3,808 | $ 53,311 | $ 89,460 |
| Note Receivable - Smartfi Lending, LLC | $ 6,331 | $ 6,331 | $ 12,662 | $ 6,331 | $ 6,331 | $ 6,331 | $ 6,331 | $ 25,324 | $ 6,331 | $ 6,331 | $ 88,635 | $ 148,739 |
| Note Receivable - Solara Communities, LLC | $ 58,456 | $ 28,346 | $ 86,802 | $ 64,861 | $ 64,861 | $ 64,861 | $ 64,861 | $ 259,444 | $ 64,861 | $ 64,861 | $ 908,054 | $ 1,523,802 |
| **Other Receipts** | $ 181,405 | $ 36,515 | $ 217,920 | | | | | | | $ - | | |
| **TOTAL SOURCES** | $ 250,000 | $ 75,000 | $ 325,000 | $ 75,000 | $ 75,000 | $ 75,000 | $ 75,000 | $ 300,000 | $ 75,000 | $ 75,000 | $ 1,050,000 | $ 1,762,001 |
| **Cash Uses** | | | | | | | | | | | | |
| Contract Labor | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| Payroll Expenses | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| Dues & Subscriptions | $ 1,500 | $ 1,500 | $ 3,000 | $ 1,500 | $ 1,500 | $ 1,500 | $ 1,500 | $ 6,000 | $ 1,500 | $ 1,500 | $ 1,500 | $ 1,500 |
| Computer & Internet | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| Shared Services Fees | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| Management Fees | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| Accounting & Audit Fees | $ 1,500 | $ 1,500 | $ 3,000 | $ 1,500 | $ 1,500 | $ 1,500 | $ 1,500 | $ 6,000 | $ 1,500 | $ 1,500 | $ 1,500 | $ 1,500 |
| Consulting Fees | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| Financial Advisor Fee | $ 3,000 | $ 3,000 | $ 6,000 | $ 3,000 | $ 3,000 | $ 3,000 | $ 3,000 | $ 12,000 | $ 3,000 | $ 3,000 | $ 3,000 | $ 3,000 |
| Legal Fees | $ 203,731 | $ 10,500 | $ 214,231 | $ 10,500 | $ 10,500 | $ 10,500 | $ 10,500 | $ 42,000 | $ 10,500 | $ 10,500 | $ 10,500 | $ 10,500 |
| **Total Operating Uses** | $209,731 | $16,500 | $226,231 | $16,500 | $16,500 | $16,500 | $16,500 | $66,000 | $16,500 | $16,500 | $16,500 | $16,500 |
| **Net change in Cash** | $40,269 | $58,500 | $98,769 | $58,500 | $58,500 | $58,500 | $58,500 | $234,000 | $58,500 | $58,500 | $1,033,500 | $1,745,501 |
| **Proceeds Available for Distribution to Creditors** | $40,269 | $98,769 | $98,769 | $157,269 | $215,769 | $274,269 | $332,769 | $332,769 | $391,269 | $449,769 | $1,483,269 | $3,228,770 |

***Due to the complexity of the Debtor's financial situation, certain items are still under review and may be amended at a later date.**

**Disclaimer:** Ampleo has not independently verified the existence or value of assets to be administered, and makes no warranty or representation in support of such. Information presented has been provided by the client.

| | Year 2027 | Q1 2028 | Q2 2028 | Q3 2028 | Q4 2028 | Year 2028 | Q1 2029 | Q2 2029 | Q3 2029 | Q4 2029 | Year 2029 | Q1 2030 | Q2 2030 | Year 2030 | 5 Year Totals |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast |
| | $332,769 | $3,228,770 | $4,974,270 | $6,719,771 | $8,465,271 | $3,228,770 | $10,210,772 | $11,956,273 | $13,701,773 | $15,447,274 | $10,210,772 | $17,192,774 | $18,938,275 | $17,192,774 | $0 |
| | $ 150,387 | $ 89,460 | $ 89,460 | $ 89,460 | $ 89,460 | $ 357,841 | $ 89,460 | $ 89,460 | $ 89,460 | $ 89,460 | $ 357,841 | $ 89,460 | $ 89,460 | $ 178,921 | $ 1,067,837 |
| | $ 250,036 | $ 148,739 | $ 148,739 | $ 148,739 | $ 148,739 | $ 594,955 | $ 148,739 | $ 148,739 | $ 148,739 | $ 148,739 | $ 594,955 | $ 148,739 | $ 148,739 | $ 297,477 | $ 1,775,409 |
| | $ 2,561,578 | $ 1,523,802 | $ 1,523,802 | $ 1,523,802 | $ 1,523,802 | $ 6,095,207 | $ 1,523,802 | $ 1,523,802 | $ 1,523,802 | $ 1,523,802 | $ 6,095,207 | $ 1,523,802 | $ 1,523,802 | $ 3,047,603 | $ 18,145,840 |
| | | | $ - | | | | | $ - | | | | | | $ - | $ 217,920 |
| | $ 2,962,001 | $ 1,762,001 | $ 1,762,001 | $ 1,762,001 | $ 1,762,001 | $ 7,048,002 | $ 1,762,001 | $ 1,762,001 | $ 1,762,001 | $ 1,762,001 | $ 7,048,002 | $ 1,762,001 | $ 1,762,001 | $ 3,524,001 | $ 21,207,007 |
| | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| | $ 6,000 | $ 1,500 | $ 1,500 | $ 1,500 | $ 1,500 | $ 6,000 | $ 1,500 | $ 1,500 | $ 1,500 | $ 1,500 | $ 6,000 | $ 1,500 | $ 1,500 | $ 3,000 | $ 30,000 |
| | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| | $ 6,000 | $ 1,500 | $ 1,500 | $ 1,500 | $ 1,500 | $ 6,000 | $ 1,500 | $ 1,500 | $ 1,500 | $ 1,500 | $ 6,000 | $ 1,500 | $ 1,500 | $ 3,000 | $ 30,000 |
| | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| | $ 12,000 | $ 3,000 | $ 3,000 | $ 3,000 | $ 3,000 | $ 12,000 | $ 3,000 | $ 3,000 | $ 3,000 | $ 3,000 | $ 12,000 | $ 3,000 | $ 3,000 | $ 6,000 | $ 60,000 |
| | $ 42,000 | $ 10,500 | $ 10,500 | $ 10,500 | $ 10,500 | $ 42,000 | $ 10,500 | $ 10,500 | $ 10,500 | $ 10,500 | $ 42,000 | $ 10,500 | $ 10,500 | $ 21,000 | $ 403,231 |
| | $66,000 | $16,500 | $16,500 | $16,500 | $16,500 | $66,000 | $16,500 | $16,500 | $16,500 | $16,500 | $66,000 | $16,500 | $16,500 | $33,000 | $523,231 |
| | $2,896,001 | $1,745,501 | $1,745,501 | $1,745,501 | $1,745,501 | $6,982,002 | $1,745,501 | $1,745,501 | $1,745,501 | $1,745,501 | $6,982,002 | $1,745,501 | $1,745,501 | $3,491,001 | $20,683,776 |
| | $3,228,770 | $4,974,270 | $6,719,771 | $8,465,271 | $10,210,772 | $10,210,772 | $11,956,273 | $13,701,773 | $15,447,274 | $17,192,774 | $17,192,774 | $18,938,275 | $20,683,776 | $20,683,776 | $20,683,776 |

# EXHIBIT C

## LIQUIDATING TRUST AGREEMENT

4882-5409-9703

## LIQUIDATING TRUST AGREEMENT
## PBC LIQUIDATING TRUST

THIS LIQUIDATING TRUST AGREEMENT (this "Agreement") is established pursuant to the Debtor's Chapter 11 Plan (the "Plan") filed by Power Block Coin, LLC, dba SmartFi (the "Debtor"), debtor and debtor in possession in Case no. 24-bk-23041-JTM and is accepted by the Trustee for the benefit of the Beneficiaries and shall be effective upon entry of the Confirmation Order.

WHEREAS, on _____, 2025, the Plan was confirmed by the United States Bankruptcy Court for the District of Utah (the "Bankruptcy Court") under Title 11 of the United States Code (the "Bankruptcy Code");

WHEREAS, the Plan provides for, among other things, the creation of a liquidating trust for the sole and exclusive benefit of the Beneficiaries;

WHEREAS, the Trust is created pursuant to and to effectuate the Plan;

WHEREAS, the Plan provides for and requires the appointment of the Trustee to carry out this Agreement as set forth in section 5.1 of the Plan;

WHEREAS, the Trust is established for the purpose of collecting, holding, administering, distributing, and liquidating the Trust Assets for the Beneficiaries and to object to and liquidate claim amounts and priorities in accordance with the terms of this Agreement and the Plan and with no objective to continue or engage in the conduct of a trade or business, except to the extent necessary to, and consistent with, the Plan and the liquidating purpose of the Trust; and

WHEREAS, pursuant to the Plan, the Trust is intended to be treated as a grantor trust for federal income tax purposes within the meaning of Sections 671-677 of the Internal Revenue Code of 1986, as amended (the "IRC" or "Tax Code" and applicable Treasury Regulations "Tax Regulations");

NOW, THEREFORE, in consideration of the promises and mutual covenants herein contained and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto do hereby covenant and agree as follows:

1.    Definitions. For purposes of this agreement, all capitalized terms shall have the meanings ascribed to them in the Plan, and in addition thereto, the following terms shall have the following meanings:

1.1    Beneficiaries. "Beneficiary" or "Beneficiaries," as used herein, shall mean the holders of Allowed Claims under the Plan.

1.2    Cash Available for Distribution. "Cash Available for Distribution," as used herein, shall mean all proceeds of collections, sale or settlement with respect to the Trust Assets following

4871-0417-5334

payment of (i) expenses of administration of the Trust Assets as appropriate or as required by the Plan, including the establishment of the Disputed Claims Reserve as required by the Plan; (ii) expenses associated with the disposition, collection, sale, or liquidation of the Trust Assets; (iii) all taxes, fees, levies, assessments, or other governmental charges incurred by the Trust and not otherwise paid out of a reserve; (iv) fees, expenses, and other compensation of the Trustee or Trustee's assistants or professionals engaged by the Trust in connection with the administration of the Trust Assets or as permitted in the Plan; and (v) a reserve, if and to the extent deemed necessary by the Trustee to pay future expenses of the Trust, the Trustee and professionals engaged by the Trust.

1.3     <u>Liquidating Trust Advisory Committee</u>. "Liquidating Trust Advisory Committee," as used herein, shall mean the advisory committee composed of members of the Official Committee of Unsecured Creditors of Power Block Coin, LLC (the "Committee") to monitor and oversee the Liquidating Trustee and the implementation of the Plan.

1.4     <u>Permitted Investment</u>. "Permitted Investment," as used herein, shall mean any of the following: (i) marketable direct obligations issued or unconditionally guaranteed by the United States of America or any agency thereof maturing within ninety (90) days from the date of acquisition thereof; (ii) certificates of deposit, maturing no more than ninety (90) days from the date of creation thereof, issued by commercial banks incorporated under the laws of the United States of America, each having combined capital, surplus and undivided profits of not less than $200,000,000 and having a rating of "A" or better by a nationally recognized rating agency; (iii) time deposits, maturing no more than thirty (30) days from the date of creation thereof with commercial banks or savings banks each having membership in the Federal Deposit Insurance Corporation; and (iv) revenue and tax anticipation bonds and notes issued by states of the United States of America.

1.5     <u>Trust</u>. "Trust," as used herein, shall mean the Liquidating Trust established pursuant to the terms of this Agreement and the Plan.

1.6     <u>Trust Assets</u>. "Trust Assets," as used herein, shall mean all of the following assets conveyed by the Debtor and the Estate to the Trust on the Effective Date of the Plan, including the proceeds and/or income related thereto:

         (a)     All Cash of the Debtor or the Estate;

         (b)     All Causes of Action of the Debtor or the Estate;

         (c)     All books and records of the Debtor or the Estate;

         (d)     All bank accounts, merchant accounts, and other accounts of the Debtor or the Estate;

(e)      All rights of the Debtor or the Estate under any agreements, settlement agreements, Court orders, or other documents to the extent still in effect immediately prior to the Effective Date; and

(f)      All other property of the Debtor and the Estate of any nature and kind whatsoever wherever situated.

1.7      Trustee. "Trustee" or "Liquidating Trustee," as used herein, shall mean (a) initially, Steve Sala of Solution Advisors, and (b) any successor or replacement Liquidating Trustee, as that term is defined under the Plan and pursuant to Section 8.2 of the Plan.

2.      Creation of the Trust.

2.1      Purpose of the Trust.  The Debtor and the Trustee hereby constitute and create the Trust for the sole purpose of (i) administering the Trust Assets of the Trust in an orderly fashion, including liquidating and reducing to cash the Trust Assets, litigating in an orderly fashion the Causes of Action and distributing the proceeds therefrom and any other Cash Available for Distribution pursuant to the Plan; (ii) resolving Disputed Claims; and (iii) distributing cash from the Disputed Claims Reserve, pursuant to the Plan.

2.2      Acceptance by Trustee.  The Trustee is willing, and does hereby accept the appointment, to serve as Trustee, and to hold and administer the Trust Assets in trust for the sole benefit of the Beneficiaries pursuant to the terms of this Agreement.  In accepting the trust hereby created, the Trustee acts solely as trustee hereunder, not in his individual capacity, and will serve without bond.

2.3      Name of the Trust. The Trust established hereby shall bear the name PBC Liquidating Trust.  In connection with the exercise of the powers as Trustee, the Trustee shall use this name, or such variation thereon, as he sees fit.

2.4      Vesting of Trust Assets. Upon the Confirmation Date, without further order of the Bankruptcy Court, the Trust Assets shall automatically be deemed transferred to the Trust for and on behalf of the Beneficiaries.  Upon transfer to the Liquidating Trust, all property of the Estate of the Debtor shall be consolidated into one corpus, and all Allowed Claims against the Debtor shall be deemed to be Claims against the Liquidating Trust.  On and after the Effective Date, the Debtor shall execute and deliver to the Trustee any assignment and/or other instruments that may be necessary to convey the Trust Assets to the Trust pursuant to the terms of the Plan.  The Trust Assets shall be deemed vested in the Trust free and clear of all Claims and Equity Interests, except as specifically provided in the Plan.

3.      Rights, Powers and Duties of Trustee.

3.1      Declaration Acknowledging Beneficial Interest.  The Trustee hereby acknowledges that, upon creation of the Trust, the Beneficiaries and their successors and assigns, as their interests may appear, shall have the beneficial interest in all Trust Assets as described in the Plan.

3

4871-0417-5334

3.2     Trustee's Rights and Powers.  The Trustee shall have such powers and authority as set forth in this Agreement and in the Plan.  Without limiting the foregoing, the Trustee shall have the power (but not the obligation) to take the following actions in addition to the powers granted in the Plan, and any powers reasonably incidental thereto, that the Trustee in his reasonable discretion deems necessary or appropriate to fulfill the liquidating purpose of the Trust, unless otherwise specifically limited or restricted by the Plan or this Agreement:

(a)     hold legal title to any and all rights of the Debtor and the Beneficiaries in or arising from the Trust Assets;

(b)     maintain on the Trustee's books and records a register evidencing the beneficial interest herein held by each Beneficiary;

(c)     protect and enforce the rights to the Trust Assets (including any Causes of Action) vested in the Trustee by this Agreement by any method deemed appropriate, including, without limitation, by judicial proceedings, settlement, or otherwise;

(d)     make all distributions to the Beneficiaries provided for in, or contemplated by, the Plan and this Agreement;

(e)     establish the Disputed Claims Reserve and open and maintain bank or other accounts for holding Permitted Investments on behalf of or in the name of the Trust;

(f)     make all tax withholdings, file tax information returns, make tax elections by and on behalf of the Trust and file tax returns for the Trust as a grantor trust under IRC Section 671 and Treasury Income Tax Regulation Section 1.671-4 pursuant to and in accordance with the Plan;

(g)     establish such reserves for taxes, assessments, and other expenses of administration of the Trust as may be necessary and appropriate for the proper operation of matters incident to the Trust;

(h)     pay all expenses and make all other payments relating to the Trust Assets;

(i)     make distributions permitted or required by the Plan;

(j)     carry insurance coverage and obtain any bond required under the Plan as an expense of the Trust; and

(k)     exercise all powers provided under the Plan, including the right to pursue and settle Causes of Action and object to and settle objections to Claims.

3.3     Exercise of Power.  Except as otherwise specifically set forth herein or in the Plan, the Trustee shall not be required to procure authorization from the Bankruptcy Court in the exercise of any power conferred upon him by this Agreement.

4

3.4     <u>Management of Trust</u>.  Subject to the terms hereof and the Plan, the Trustee shall take charge of the Trust Assets and shall endeavor to collect, conserve, protect, and administer all Causes of Action and other assets which constitute the Trust Assets and all such other property incidental thereto as may hereafter be acquired from time to time under this Trust.  The Trustee shall manage the affairs of the Trust and execute, acknowledge and deliver any and all instruments which are necessary, required or deemed by the Trustee to be advisable in connection with the performance of the Trustee's duties hereunder and shall have full power and authority to take any action consistent with the purpose and provisions of the Plan.  Except as otherwise provided in this Agreement and in the Plan, without prior or further authorization of the Bankruptcy Court, the Trustee may control and exercise authority over the Trust Assets, the acquisition, management, and disposition thereof, and the management and conduct of the business of the Trust to the same extent as if the Trustee were the sole legal and beneficial owner thereof in his own right.  No person dealing with the Trust shall be obligated to inquire into the authority of the Trustee in connection with the acquisition, management, or disposition of Trust Assets.  In connection with the management and use of the Trust Assets, and subject to the Plan and this Agreement, the Trustee may do the following:

(a)     Accept the assets vested, transferred and provided to the Trust pursuant to this Agreement and the Plan;

(b)     Distribute Cash Available for Distribution and other assets to the Beneficiaries in accordance with the terms of this Agreement and the Plan;

(c)     Endorse the payment of notes or other obligations of any person or make contracts with respect thereto;

(d)     Engage in all acts that would constitute ordinary course of business in performing the obligations of a trustee under a trust of this type;

(e)     Invest Trust Assets in Permitted Investments;

(f)     Execute deeds, bills of sale and other instruments of transfer in connection with the sale, assignment or transfer of Trust Assets; and

(g)     Establish and maintain such bank accounts as the Trustee may deem necessary or appropriate, draw checks on such bank accounts and perform such other necessary and appropriate duties with respect to such accounts, or designate individuals as signatories to draw checks on such bank accounts and to perform such other duties as the Trustee may direct and authorize.

3.5     <u>Limitations on Investment</u>.  The Trustee may invest and reinvest all Cash held by the Trust (subject to the distribution requirements set forth in this Agreement), including cash held in any reserve maintained for the Trust, in any Permitted Investment.

4871-0417-5334

3.6     Distributions. The Trustee shall distribute the Cash Available for Distribution, as specifically provided for herein or pursuant to the Plan.

3.7     Delivery of Distributions. Distributions shall be made to Beneficiaries pursuant to Section 6.1 of the Plan.

3.8     Unclaimed Distributions and Uncashed Checks. Unclaimed distributions and uncashed checks shall be treated pursuant to Section 9.7 of the Plan.

3.9     Disputed Claims Reserve. The Trustee shall establish the Disputed Claims Reserve as provided in Section 6.4 of the Plan. Each such reserve established by the Trustee pursuant to the terms of the Plan shall be contributed to as provided for in the Plan. Each reserve may be established by an accounting entry on the books of the Trust. The Trustee shall not be required to establish or maintain separate bank accounts for each reserve. Distributions from the Disputed Claims Reserve shall be made in accordance with Section 6.5 of the Plan.

3.10     Prosecution of Objections. In accordance with Section 6.2 of the Plan, the Trustee may litigate to judgment, settle, or withdraw objections to Disputed Claims.

3.11     Liability of Trustee.

(a)     Standard of Care. Except in the case of willful misconduct, gross negligence, knowing violations of the law or the terms of this Agreement, or transactions from which the Trustee directly or indirectly derived improper personal benefit, the Trustee shall not be personally liable for any loss or damage by reason of action or inaction pursuant to the discretion, powers, and authority conferred on such person or persons by this Agreement.

(b)     No liability for Acts of Predecessor. No successor Trustee shall be in any way responsible for the acts or omissions of any Trustee in office prior to the date on which any such person becomes a Trustee unless a successor Trustee expressly assumes such responsibility.

(c)     Reliance by Trustee on Documents or Advice of Professionals. Except as otherwise provided herein, the Trustee may rely and shall be protected in acting upon any resolution, certificate, statement, instrument, opinion, report, notice, request, consent, other, or other paper or document believed by him to be genuine and to have been signed or presented by the proper party or parties. The Trustee may also engage and consult with legal and accounting professionals to be selected by the Trustee in accordance with the terms hereof and shall not be liable for any action taken or suffered by the Trustee in reliance upon the advice of such professionals.

(d)     No Personal Obligation for Trust Liabilities. Except as to Beneficiaries in the case of a breach of the standard of care set forth above in Section 3.11(a), persons dealing with the Trustee shall look only to the Trust Assets to satisfy any liability incurred by the Trustee to such person in carrying out the terms of this Trust, and the Trustee shall not have any personal, individual obligation to satisfy any such liability.

6

4871-0417-5334

3.12    Agents and Professionals.  The Trustee may, but shall not be required to, consult with and retain attorneys, accountants, appraisers, or other parties deemed by the Trustee to have qualifications necessary to assist in the proper administration of the Trust, including professionals previously retained by the Debtor.  The Trustee may pay the reasonable salaries, fees and expenses of such persons out of the Trust Assets in the ordinary course of business.

3.13    Action by Trust in Case of Conflict.  In the case of any conflict of interest possessed by the Trustee with respect to the exercise of any rights, powers, duties and privileges under this Agreement, the Trustee shall seek Bankruptcy Court approval for another Person to be authorized to take any such action in his place and stead, including without limitation the retention of professionals (which may include professionals retained by the Trustee) for the purpose of taking such actions.

3.14    Compensation of Trustee.  The Trustee shall receive compensation for his post-confirmation services at his customary hourly rate, plus reimbursement for any actual and necessary expenses incurred in performing his duties under this Agreement.

3.15    Removal of Trustee.  A Trustee appointed pursuant to this Agreement may be removed upon notice and hearing in the Bankruptcy Court.

3.16    Successor Trustee.  In the event that the Trustee is removed, resigns or otherwise ceases to serve as Trustee, which may be appointed by the Trustee or the Liquidating Trust Advisory Committee in their reasonable discretion, provided that, in the event of any dispute or failure of the foregoing to appoint a Successor Trustee, the Bankruptcy Court may appoint a Successor Trustee who shall become the Trustee.

3.17    Indemnification of Trustee.  The Trustee shall be indemnified by and receive reimbursement from the Trust Assets against and from any and all loss, liability, claim, expense or damage (including, without limitation, legal fees) which he may incur or sustain, in good faith and without gross negligence or willful misconduct in the exercise and performance of any of his or her powers and duties under this Agreement or in connection with any matter arising out of or related to the Plan, this Agreement or the affairs of the Trust.

4.    Tax and Income Allocation Provisions of the Trust.

4.1    Treatment of Trust.  Unless the Trustee determines in his reasonable discretion that such treatment is not appropriate, (i) the Trust shall be treated as a grantor trust for all federal income tax purposes, all of the assets of which are owned by the holders of vested beneficial interests therein pursuant to Section 671 of the Tax Code and Treasury Regulations issued thereunder and (ii) all federal, state and local income tax returns required on behalf of the Trust shall be prepared and filed by the Trustee in a manner that is consistent with the grantor trust.

4.2    Treatment of Disputed Claims Reserve.  Unless the Trustee determines, in his reasonable discretion, that such treatment is not appropriate, for example, if otherwise taxed, pursuant to Section 468B of the Tax Code, each reserve established pursuant to the Plan may be

4871-0417-5334

treated as a trust, separate and distinct from the Trust and all other reserves, which is subject to taxation under Section 641 of the Tax Code for each calendar year during which such reserve is maintained.  Any federal, state or local income tax required to be paid with respect to the taxable income of any reserve, shall be paid exclusively out of the Cash credited to such reserve.

4.3    Allocation of Income or Loss.  Unless the Trustee determines in his reasonable discretion that such assumptions are not appropriate, the Trustee shall assume that (i) the adjusted basis of each asset held by the Trust equals the initial basis (fair market value) of such asset on the Effective Date, subject to any adjustments to such initial basis required to be made under the Tax Code to reflect allowable depreciation, amortization or depletion deductions; and (ii) the calendar year is the taxable year of each record holder of vested beneficial interests in the Trust.  On the basis of such assumptions, (i) the Trustee shall compute the gross income and net income or loss of the Trust for each taxable year; (ii) the Trustee shall assume that such gross income and net income or loss is recognized for tax purposes by the Beneficiaries based on their period of ownership of vested beneficial interests in the Trust during the calendar year; and (iii) the Trustee shall provide each Beneficiary receiving an allocation of income or loss, and shall file with the appropriate taxing authorities, a K-l or other income tax return or report containing sufficient data to enable the holder to complete his income tax return(s).

(a)    Allocation on Change in Beneficial Interests.  If, during a calendar year, the ownership of beneficial interests in the Trust changes, the assets and income or loss for the entire calendar year shall be prorated and allocated among the Beneficiaries therein.

(b)    Delivery of Statements to Beneficiary of Record.  To the extent required by law, written statements or notices reflecting a Beneficiary's share of the income or loss, if any, of the Trust shall be delivered by the Trustee to the Beneficiary.  The Trustee shall have no obligation to deliver any such statements to a transferee of a Beneficiary unless, thirty (30) days prior to the date on which the statement is required to be delivered, a written request executed by the Beneficiary of record and the transferee is received by the Trustee.

4.4    Tax Treatment and Obligation to File Returns.  The Trust shall be considered a "grantor" trust, and the Beneficiaries shall be treated as the grantors and deemed owners of the Trust. The Trustee shall file tax returns for the Trust as a grantor trust pursuant to Section 1.671-4(a) of the Tax Regulations. All earnings of the Trust, including earnings or income retained in reserve accounts or as reserves to the extent consistent with Section 4.2 above, shall be allocated to the Beneficiaries on an annual basis, and each Beneficiary shall be responsible to report and pay the taxes due on its proportionate share of the Trust's income whether or not amounts are actually distributed by the Trustee to the Beneficiaries to pay the tax.  As a grantor trust, the Trust shall not have any separate liability for federal income taxes relating to or arising from, the conveyance, preservation or administration of Trust Assets.  However, if it is later determined that a tax liability of the Trust arises, the Trustee shall be responsible for withholding all taxes required by law, and shall timely file all required federal, state or local tax returns, including information reporting returns, and shall promptly pay all taxes determined to be due.  If it is determined that any taxes are owed by the Trust, the Trustee may pay from the Trust Assets any such tax liability arising out

8

4871-0417-5334

of the operation s of the Trust or ownership of Trust Assets.  The Trustee may establish a reserve sufficient to pay any accrued or potential tax liability arising out of the operations of the Trust or ownership of Trust Assets.  Notwithstanding anything herein to the contrary, in calculating and making the payments due to Allowed Claims under the Plan, the Trustee shall be authorized to deduct from such payments any necessary withholding amount.  The Trustee may in his discretion make any elections available under the Tax Code.  The Trustee may also prepare and file a final tax return for the Debtor.

4.5     Tax Treatment of Vesting of Assets in the Trust.  For federal income tax purposes, the vesting of Trust Assets to the Trust will be treated as a vesting in the Beneficiaries for all purposes of the Tax Code (*e.g.*, Sections 61(a), 483, 1001, 1012, and 1274) followed by a deemed vesting of the Trust Assets in the Trust.

4.6     Valuation of Trust Assets.  The Trustee or Bankruptcy Court, upon motion filed, may value the property vested in the Trust and notify in writing the Beneficiaries of such valuations. The Trust Assets shall be valued consistently by the Trustee and the Beneficiaries and these valuations will be used for all federal income tax purposes.

5.     Liquidating Trust Advisory Committee.

5.1     Creation of the Liquidating Trust Advisory Committee. A Liquidating Trust Advisory Committee shall be and is hereby created as a special advisory board to confer with and advise the Liquidating Trustee regarding liquidation of the Trust Assets and distributions to Beneficiaries under the Plan, the Confirmation Order, and this Agreement.  The Liquidating Trust Advisory Committee shall be composed of such members of the Committee as are willing to serve from time to time.

5.2     Members. As of the Effective Date, the members of the Liquidating Trust Advisory Committee shall be composed of members of the Official Committee of Unsecured Creditors of Power Block Coin, LLC who desire to serve on the Liquidating Trust Advisory Committee.  Upon inquiry to the Liquidating Trustee and with the approval of the Liquidating Trustee, other Beneficiaries may, from time to time, elect to serve as members of the Liquidating Trust Advisory Committee.  Each member of the Liquidating Trust Advisory Committee may designate in writing to the Liquidating Trustee one or more designees to fulfill such member's duties under this Agreement.  Any members of the Liquidating Trust Advisory Committee may resign from the Liquidating Trust Advisory Committee at any time by written notice of resignation to the Liquidating Trustee.  A member of the Liquidating Trust Advisory Committee shall be deemed to be immediately removed as a member of the Liquidating Trust Advisory Committee in the event that (A) a Liquidating Trust Advisory Committee member or the company for which it is a representative (i) sells, transfers, or assigns all of that member's rights to or interest in that member's General Unsecured Claim and no longer holds such General Unsecured Claim, or (ii) receives payment of its Allowed General Unsecured Claim in full; or (B) such Liquidating Trust Advisory Committee member (i) dies, resigns, or becomes incapacitated, or (ii) otherwise fails or refuses to serve.  In the event of a Liquidating Trust Advisory Committee member's resignation or removal, the Liquidating Trustee shall have the right to nominate, and the remaining

9

4871-0417-5334

Liquidating Trust Advisory Committee members, if any, shall have the right to approve, a substitute member of the Liquidating Trust Advisory Committee holding a General Unsecured Claim (unless all such General Unsecured Claims have been paid in full).  In the event that there are no members of the Liquidating Trust Advisory Committee, the Liquidating Trustee may, but is not required to, appoint a Person to serve as a member of the Liquidating Trust Advisory Committee.  There shall be no minimum number of members of the Liquidating Trust Advisory Committee to retain its function; provided, however, if there shall have been no Liquidating Trust Advisory Committee for a period of thirty (30) consecutive days, then the Liquidating Trustee may, during such vacancy, and thereafter, ignore any reference in the Plan, the Confirmation Order or this Agreement to the Liquidating Trust Advisory Committee, and all such references in the Plan, the Confirmation Order or this Agreement shall be null and void.

5.3     Liquidating Trustee Reports to the Liquidating Trust Advisory Committee. The Liquidating Trustee shall provide the Liquidating Trust Advisory Committee members with such reports as the members shall reasonably request from time to time.  Members of the Liquidating Trust Advisory Committee shall not be entitled to receive compensation for their service but shall be entitled to reimbursement of reasonable out of pocket expenses approved in advance (but not including attorneys' fees) incurred in connection with and related to serving on the Liquidating Trust Advisory Committee solely from the Trust Assets.

5.4     Conflicts of Interest.

(a)     Liquidating Trust Advisory Committee members shall be required to disclose any actual and potential conflicts of interest in connection with any matter arising during the administration of the Trust. The existence of a conflict of interest shall be determined by the affirmative vote of a majority (in number) of members of the Liquidating Trust Advisory Committee, excluding the member(s) having the apparent conflict of interest.  Any member with a conflict of interest will be recused from participation in meetings regarding, or from voting on, such matters.

(b)     The Liquidating Trustee shall disclose to the Liquidating Trust Advisory Committee any conflicts of interest that the Liquidating Trustee has with respect to any matter arising during administration of the Trust. In the event that the Liquidating Trustee cannot take any action by reason of an actual or potential conflict of interest, the Liquidating Trust Advisory Committee acting by majority (in number) shall (i) be authorized to take any such action(s) in the Liquidating Trustee's place and stead, including without limitation the retention of professionals (which may include professionals retained by the Liquidating Trustee) for the purpose of taking such actions, or (ii) appoint a disinterested person to take such action.

6.     Rights, Powers and Duties of Beneficiaries.

6.1     Interests of Beneficiaries.  The Beneficiaries shall have a beneficial interest in the Trust Assets as specified herein. The ownership of a beneficial interest hereunder shall not entitle any Beneficiary to any title in or to the Trust Assets as such or to any right to call for a partition

10

4871-0417-5334

or division of the same or to require an accounting except as specifically required by the terms hereof.

      6.2    Effect of Death, Incapacity, Insolvency, or Bankruptcy of Beneficiary. The death, incapacity, insolvency or bankruptcy of a Beneficiary during the term of this Agreement shall not operate to terminate the Trust, nor shall it entitle the representatives or creditors of the deceased, incapacitated, insolvent, or bankrupt Beneficiary to an accounting, or to take any action in the courts or elsewhere for the distribution of the Trust Assets or for a partition thereof, nor shall it otherwise affect the rights and obligations of any Beneficiary.

7.    Amendment of Agreement. This Agreement may be amended, modified, or altered only upon approval of the Bankruptcy Court.

8.    Conflicting Claims. In the event the Trustee becomes aware of any disagreement or conflicting claims with respect to the Trust Assets, or if the Trustee in good faith is in doubt as to any action which should be taken under this Agreement, the Trustee shall have the option to do any or all of the following:

      (a)    File a suit in interpleader or in the nature to interpleader in the Bankruptcy Court and obtain an order requiring all persons and parties involved to litigate their respective claims arising out of or in connection with this Agreement; or

      (b)    File any other appropriate motion for relief in the Bankruptcy Court.

9.    Effect of Trust on Third Parties. There is no obligation on the part of any Person dealing with the Trustee or any agent of the Trustee to see the application of any consideration passing to the Trustee or any agent of the Trustee, or to inquire into the validity, expediency or propriety of any such transaction by the Trustee or any agent of the Trustee.

10.    Waiver. No failure or delay of any party to exercise any right or remedy pursuant to this Agreement shall affect such right or remedy or constitute a waiver by such party of any right or remedy pursuant thereto. Resort to one form of remedy shall not constitute a waiver of alternative remedies.

11.    Termination of This Trust. Upon (i) the Bankruptcy Court's entry of a Final Order closing the Debtor's Chapter 11 cases pursuant to Bankruptcy Code § 350(a) and (ii) the payment of all costs, expenses, and obligations incurred in connection with administering the Trust, and the distribution of all Trust Assets in accordance with the provisions of the Plan, the Confirmation Order and this Agreement, the Trust shall terminate and the Trustee shall have no further responsibility in connection therewith except as may be required to effectuate such termination under relevant law.

12.    Construction of This Instrument.

11

4871-0417-5334

12.1   <u>Applicable Law</u>.  The Trust shall be construed, regulated and administered under the internal laws of the State of Utah and the United States of America.

12.2   <u>Relationship Created</u>.  The only relationship created by this Agreement is the relationship between the Trustee and the Beneficiaries.  No other relationship or liability is created. Nothing contained herein shall be construed so as to constitute the Beneficiaries or their successors in interest as creating an association, partnership or joint venture of any kind.

12.3   <u>Interpretation</u>.  The enumeration and headings contained in this Agreement are for convenience of reference only and are not intended to have any substantive significance in interpreting the same.  Unless the context otherwise requires, whenever used in this Agreement the singular shall include the plural and the plural shall include the singular.

12.4   <u>Partial Invalidity</u>.  If any provision of this Agreement shall for any reason be held invalid or unenforceable by any court, governmental agency or arbitrator of competent jurisdiction, such invalidly or unenforceability shall not affect any other provision hereof, but this Agreement shall be construed as if such invalid or unenforceable provision had never been contained herein.

12.5   <u>The Plan</u>.  If any inconsistencies exist between the Plan and this Agreement, the terms of the Plan shall control.

12.6   <u>Notices</u>.  All notices, requests, consents and other communications which may be or is required to be given, served, or sent to the Trustee shall be in writing and shall be sent by registered or certified United States mail, return receipt requested, postage prepaid, or transmitted by hand delivery or facsimile (if receipt is confirmed) or sent by electronic mail, as follows:

> Steve Sala
> Solution Advisors
> 9876 E Gamble Ln.
> Scottsdale, AZ 85262
> ssala@solutionadvisors.net

with a copy to (which shall not constitute notice):

> Brian M. Rothschild
> **PARSONS BEHLE & LATIMER**
> 201 South Main Street, Suite 1800
> Salt Lake City, Utah 84111

or to such other address as may from time to time be provided in written notice on the docket of the Bankruptcy Case by the Trustee.

12.7   <u>Successors and Assigns</u>.  This Agreement shall be binding upon, and shall inure to the benefit of, the parties hereto and their respective heirs, administrators, executors, successors and assigns.

12

4871-0417-5334

12.8     Tax Identification Numbers.  The Trustee may require any Beneficiary to furnish to the Trustee its employer or taxpayer identification number as assigned by the Internal Revenue Service and the Trustee may condition any distribution to the Beneficiary upon receipt of such identification number.

12.9     Compliance with All Applicable Laws.  If notified by any governmental authority that the Trust is in violation of any applicable law, rule, regulation or order of such governmental authority relating to its businesses, the Trustee shall comply with such law, rule, regulation or order; provided that nothing contained herein shall require such compliance if the legality or applicability of any such requirement is being contested in good faith in appropriate proceedings and, if appropriate, for which an adequate reserve has been set aside on the books of the Trust.

12.10   Jurisdiction.  Subject to Section 9.5 of the Plan, the Bankruptcy Court shall retain jurisdiction over this Agreement and the Trust.

12.11   Bond.  The Trustee shall not be required to post a bond.

IN WITNESS WHEREOF, the undersigned have caused this instrument to be executed as of the day and year first above written to evidence their consent and agreement with the terms and provisions of this Agreement.

[*REMAINDER OF PAGE INTENTIONALLY LEFT BLANK; SIGNATURE PAGE FOLLOWS*]

13

4871-0417-5334

## SIGNATURE PAGE

POWER BLOCK COIN, LLC                    STEVE SALA, TRUSTEE

_____          _____

By:  Aaron Tilton
Its:  President

14

4871-0417-5334