**GREENBERG TRAURIG, LLP**
Annette W. Jarvis (Utah #1649)
Michael F. Thomson (Utah #9707)
Carson Heninger (Utah #17410)
Abigail J. Stone (Utah #19083)
222 South Main Street, Suite 1730
Salt Lake City, UT 84101
Telephone: (801) 478-6900
Email: jarvisa@gtlaw.com
thomsonm@gtlaw.com
carson.heninger@gtlaw.com
abigail.stone@gtlaw.com

*Counsel for the Official Committee of Unsecured Creditors*

# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| In re: | Case No. 24-bk-23041-JTM |
|---|---|
| POWER BLOCK COIN, L.L.C. | Chapter 11 |
| Debtor | Judge Joel T. Marker |

## DISCLOSURE STATEMENT PROPOSED BY THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS

The Official Committee of Unsecured Creditors (the "Committee") files the following proposed disclosure statement ("Disclosure Statement") in support of the Committee's First Amended Chapter 11 Plan (the "Plan") for the Debtor Power Block Coin, L.L.C. (the "Debtor").

# DISCLOSURE STATEMENT[1]

## I. DEBTOR'S HISTORY AND BANKRUPTCY FILING

### A. The Debtor's Business

The Debtor has asserted the following regarding its business, and the Committee neither adopts nor admits these statements due to lack of information:

Power Block Coin, d/b/a SmartFi, is a Utah limited liability company that provided crypto-based financial services, which historically have included cryptocurrency exchange, savings, crypto-based lending, crypto information, token creation and offering, alternative currencies, and cryptocurrency investment. The Debtor asserts that it operated a platform for its clients through its website portal at (smartfi.com). The Debtor also asserts that it generated revenue through interest on loans denominated in dollars and cryptocurrencies, trading and hedging, and fees assessed on certain transactions on its platform.

The Debtor states that it has more recently diversified into more traditional lending, including lending on real estate development and other types of financial services. However, as explained more fully below, this "traditional lending" has been to the Debtor's insiders at below-market rates and does not appear to be sustainable as a business model.

### B. Events Precipitating this Bankruptcy Proceeding

The Debtor has asserted the following regarding its business, and the Committee neither adopts nor admits these statements due to lack of information:

Beginning in 2022, the worldwide cryptocurrency markets experienced a rapid collapse and have been in a period of high instability ever since. The Debtor asserts that it had de-risked some of its holdings prior to the collapse. For example, the Debtor asserts that it did not do business or had ceased doing business with certain large cryptocurrency exchanges and lending companies that collapsed such as FTX, Genesis Global Capital, Voyager Digital, and Celsius, but was still reliant on certain cryptocurrencies in its portfolio for liquidity.

The Debtor states that it had (and still has) significant, although illiquid, loans in its portfolio, including a large real estate loan and outstanding note to Solara Communities, LLC fka SmartFi Toquerville, LLC, ("Solara"), an affiliate that is developing real property in Toquerville, Utah. This note (the "Solara Note") has an original principal balance of $17,400,000.00, an interest rate of 5 percent, and a maturity date of March 17, 2032. Following a default by the third-party borrower that owned the real property, Solara foreclosed on the real property, and it is now developing the real property. The Solara Note, which is arguably one of the Debtor's largest

---

[1] As a preliminary matter, while the Debtor and the Debtor's affiliates have produced certain records and documents to the Committee, there are still documents that either allegedly do not exist or have not been provided to the Committee. Thus, this Disclosure Statement contains the information that the Committee has been able to ascertain, and that the Debtor and its affiliates have been willing to provide.

known assets, is illiquid and not in default. More details on the Solara Note and property are set forth below.

The Debtor also loaned money to another affiliate, SmartFi Lending, which then loaned that money out to various individuals and small businesses.

The Debtor asserts that, with a significant amount of the Debtor's assets tied up in illiquid, long-term instruments, and the cryptocurrencies it normally relied on for liquidity experiencing collapse or instability, the Debtor struggled to maintain liquidity necessary to continue its operations.

On June 20, 2024, the Debtor filed a petition for relief under chapter 11 of the Bankruptcy Code, commencing this Chapter 11 Case. The Debtor remains in possession of its Estate. However, it has ceased to operate its cryptocurrency platform.

### C. Debtor's Banking Issues

The Debtor has asserted the following regarding its business, and the Committee neither adopts nor admits these statements due to lack of information:

In approximately December of 2023, the Debtor's banking institutions closed the Debtor's accounts, which complicated the Debtor's ability to manage its cash and payments. The Debtor further asserts that while the Debtor continued to hold and exchange cryptocurrencies on its platform, it had to establish new mechanisms to pay its dollar-denominated operational expenses and take payments of dollar-denominated assets such as loans.

As a workaround, the Debtor asserts that it entered into a Services Agreement dated as of December 1, 2023, with Blue Castle Holdings, Inc ("Blue Castle"), the Debtor's parent company, whereby Blue Castle, using its own bank accounts, pays for certain of the Debtor's obligations such as professionals' fees, utilities attributable to the Debtor, and third-party payables on behalf of the Debtor whenever U.S. dollars are required. Further, the Debtor states that Blue Castle also provides certain goods and services such as management services, utilities, office space, internet server hosting costs for the Debtor's cryptocurrency exchange platform and website, and the like.

The Debtor asserts that it has no employees, but rather, all work necessary for the operation of the Debtor is provided by Blue Castle employees under the Services Agreement. According to the Debtor, Blue Castle manages the Debtor through its employees. Blue Castle likewise pays these employees' benefits, payroll taxes, workers' compensation insurance premiums, and other costs of employment.

According to the Debtor, in exchange for facilitating payments, management of the Debtor, and the other services under the Service Agreement, Blue Castle charges the Debtor 10 percent of the disbursements as a fee. To pay the expenses, allocated costs, and 10 percent fee, the Debtor

either transfers cryptocurrencies to Blue Castle or reduces the balance of the Blue Castle Loan to account for its payment obligations under the Services Agreement.

### D. The Debtor's Assets

Based on investigation by the Committee's financial advisor and the documents and information produced by the Debtor, it appears that the Debtor's assets include (a) the outstanding notes owed to the Debtor based on various loans made by the Debtor and (b) cryptocurrency inventory. These assets, and their outstanding amounts and terms, are outlined below:

| Notes Receivable | Amount (USD) |
|---|---:|
| Blue Castle Holdings Inc | 1,161,249 |
| Solara Communities LLC | 18,232,018 |
| Smartfi Lending LLC | 1,819,617 |
| David Aguirre | 1,253 |
| Zhuoyang (Mason) Song | 3,786,505 |
| Joseph Haiek | 5,924 |
| Nissa Gay | 67,572 |
| Wiliam Pangman | 143,961 |
| Gabriel Rodriguez | 260,879 |
| Michael Bjorkman | 238,220 |
| Ashton Godfrey | 26,846 |
| Alex Haiek | 40,233 |
| Timmy Sanders | 1,212 |
| Daniel Spisso | 527,080 |
| Anna Wade | 12,788 |
| **Total Notes Receivable** | **$ 26,325,360** |

| Crypto Inventory | Amount (USD) |
|---|---:|
| Crypto - BCH | 1,670 |
| Crypto - LTC | 5,514 |
| Crypto - LINK | 1,424 |
| Crypto - DOGE | 2,117 |
| Crypto - USD Stable Coins | 5,548 |
| Crypto - ETH | 562 |
| Crypto - BTC | 11,026 |
| **Total Crypto Inventory** | **$27,861** |
| **Total Assets** | **$26,353,220** |

*Based on Statements of Assets & Liabilities, as of 6/20/24*

4

E. **The Debtor's Liabilities and Claims Against the Debtor**

**Liabilities reported by Debtor:**

| Nonpriority Unsecured Claims | Amount (USD) |
|---|---:|
| Banks, Timothy James | 53,596 |
| Brewer, Michael D | 74,650 |
| Brewer, Song | 304,869 |
| Buttell, Jeremy | 55,416 |
| Miller, Kevin | 58,105 |
| Morley, McKay | 176,734 |
| Nuttall, Christopher Scott | 61,857 |
| Oster, Ryan | 187,106 |
| Peterson, Andrew Dodd | 268,648 |
| All others (265 claimants) | 438,570 |
| **Total** | **$1,679,551** |

*Based on Statements of Assets & Liabilities, as of 6/20/24*

**Claims submitted by creditors post-petition:**

| Creditor | Amount Claimed (USD) | Secured Claimed (USD) |
|---|---:|---:|
| Celsius Network LLC and its affiliated debtors | 79,032,564 | |
| Celsius Network LLC and its affiliated debtors | 54,256,670 | |
| Song, Zhouyang | 28,248,674 | 3,378,094 |
| Brown, Lynn | 10,000 | |
| Jason Brown, Daniel Stadelmann, Lynn Brown | 1,858,261 | |
| Michael Alber | 370,121 | |
| NEWMAN, MICHELE | 4,435 | |
| Buchanan Ingersoll & Rooney PC | 21,990 | |
| Buchanan Ingersoll & Rooney PC | 21,990 | |
| Gay, Nissa | 253,480 | |
| Hemmert, Dan | 71,263 | |
| Artur Machalski | 6,055 | |
| Scribner, Douglas | 19,412,751 | |
| Fish, Ryan | 100,000 | |
| CARLSON, DAVID | 5,233,342 | |
| DUSTIN, CHIELI | 338,981 | |
| Dominic Baker | 68,864 | |
| Timothy James Banks | 53,596 | |
| Daniel Spisso Gonzalez | 2,536,096 | |
| Dominic Baker | 68,864 | |

5

| Bjorkman, Michael | 553,337 | |
|---|---|---|
| **Total** | **$192,521,332** | **$3,378,094** |

*Based on PBC Claims Register 24-23041 as of 12/17/24*

### F. Pending Litigation

Celsius Network LLC and its affiliated debtors ("Celsius") filed two adversary proceedings against the Debtor for preferential transfers. *See Meghji v. Power Block Coin, LLC*, Case No. 24-02093 (Bankr. D. Utah) and *Celsius Network LLC, et al. v. Power Block Coin, LLC*, Case No. 24-02094 (Bankr. D. Utah) (the "Celsius Adversary Proceedings"). These adversary proceedings have been stayed for the time being.

The Debtor also has a pending lawsuit against creditor Mason Song in the United States District Court for the District of Utah (Case 2:23-cv-00175-TC-JCB) (the "Song Lawsuit"). The Debtor alleges that Mr. Song owes the Debtor money for failing to repay a loan on its maturity date, while Mr. Song contends that the Debtor violated its duty to him by failing to return his Bitcoin and by failing to simply offset the outstanding balance of his loan against the Bitcoin held by the Debtor for Mr. Song. This litigation was stayed on the Petition Date.

Additionally, there is an ongoing litigation against the Debtor and Aaron Tilton being litigated in U.S. District Court for the Western District of Pennsylvania, stylized as *Jason Brown, et al., v. Power Block Coin, LLC d/b/a Smartfi and Aaron Tilton,* Case No. 2:23-CV-00554-WSH-CBB. While this litigation has been stayed as to the Debtor, it is ongoing as to Mr. Tilton.

On January 2, 2025, the Debtor filed an adversary proceeding against Jason Brown and others in the U.S. Bankruptcy Court for the District of Utah, Case No. 25-02000.

### II. BANKRUPTCY PROCEEDINGS

On June 20, 2024 (the "Petition Date"), the Debtor commenced this proceeding by filing for bankruptcy under Chapter 11 of the Bankruptcy Code, improperly electing to proceed under Subchapter V. [Doc. No. 1].

On August 1, 2024, the United States Trustee filed an objection to the Debtor's election to proceed under Subchapter V. [Doc. No. 85].

On August 1, 2024, certain creditors, including Mason Song and Celsius, filed a joinder to the United States Trustee's objection and added their own objection to the Debtor's election to proceed under Subchapter V. [Doc. No. 88].

On September 18, 2024, the Debtor filed a Plan of Reorganization under Chapter 11, Subchapter V. [Doc. No. 184, amended at Doc. No. 185].

On October 9, 2024, the Court sustained objections to the Debtor's election to proceed under Subchapter V, thus rendering this case a traditional Chapter 11 proceeding. [Doc. No. 190].

On October 24, 2024, the United States Trustee appointed the Committee to serve as the Official Committee of Unsecured Creditors for the Debtor. [Doc. No. 199].

On November 18, 2024, the Debtor filed a motion to extend the exclusivity period for it to file and solicit support for a plan. [Doc. No. 213].

On December 11, 2024, the Committee filed an objection to the Debtor's exclusivity motion. [Doc. No. 237].

On December 16, 2024, the Debtor filed its First Amended Plan of Reorganization (the "Amended Plan"). [Doc. No. 242].

After a hearing held on December 17, 2024, the Court denied the Debtor's exclusivity motion and terminated exclusivity, thus authorizing other parties to file proposed plans in this proceeding. An order to this effect was entered on December 19, 2024. [Doc. No. 245].

## III.  DEBTOR'S CONDUCT DURING THIS BANKRUPTCY PROCEEDING

### A.  Outstanding Questions About Debtor's Financials

During the Committee's investigations, it has uncovered many issues that raise concerns about the Debtor's management of this case and the Debtor's ability to finance and successfully reorganize under its proposed Amended Plan.

First, there are factual questions and concerns regarding the Debtor's loss/failure to account for millions of dollars in cryptocurrency assets. For example, as set forth in the *Objecting Creditors' (I) Joinder to the United States Trustee's Objection and (II) Objection To Debtor's Designation as a Debtor Under 11 U.S.C. § 1182 and Election to Proceed Under Subchapter V* [Doc. No. 88], as of January 2, 2023, the Debtor held at least 434 Bitcoin belonging to creditor Mason Song. Further, the lawsuits filed by Celsius allege the receipt by the Debtor of assets now worth $133,289,233.61 in the 90-day period leading up to July 13, 2022. [Doc. Nos. 50, 51]. Despite these massive inflows of cryptocurrency, the Debtor's Balance Sheet reports only $164,043.00 in "Crypto Inventory" as of March 31, 2024, and the Debtor's Statements and Schedules claim that the Debtor had only $27,860.57 of cryptocurrency as of the Petition Date. [Doc. No. 39].

The Debtor and its parent, Blue Castle, have yet to provide a fulsome or satisfying explanation for this drastic dissipation of assets.

In conjunction with this unexplained loss of assets, the Debtor has also failed to identify and preserve avoidance claims for the benefit of creditors. The assets, identified above, were presumably transferred to someone within the two years preceding the Debtor's bankruptcy filing. However, the Debtor has yet to identify or take any action to pursue any avoidance claims for the recovery of these assets and has made no indication that it intends to do so.

Finally, the Debtor is essentially "negotiating" with itself with respect to the assets it has available to fund its Amended Plan, meaning there is a complete lack of disinterestedness in the transactions. The key assets that the Debtor lists are notes owed to the Debtor by affiliates and

insiders. However, SmartFi Lending, Solara Communities, LLC, and Blue Castle are all affiliates and insiders of the Debtor, and are controlled, to one extent or another, by Mr. Tilton. Mr. Tilton is an officer and director of Blue Castle Holdings, Inc., and the Debtor, SmartFi Lending, and Solara Communities LLC are all sub-entities of Blue Castle. Thus, the Debtor is negotiating with itself on both sides of these outstanding loans and notes, which raises significant questions of the Debtor's objectivity and disinterestedness.

The Debtor's notes and loans that it has with its insiders and affiliates are also not market rate loans. They are on terms that are not market and not protective of the Debtor's rights and raise concerns about possible fraudulent transfer claims. For example, in the Debtor's Amended Plan, the Debtor lists the face value of its three biggest notes receivable as approximately $21 million; however, the Debtor lists the liquidation value of these same three notes as only approximately $2.5 million. *See* Debtor's Amended Plan, [Doc. No. 242] at 22. The Debtor's Amended Plan also states that the Debtor made these loans "at favorable interest rates to the Debtor's affiliates." *Id.* This large discrepancy between face and liquidation value, as well as the lower interest rates, raise serious concerns about whether the value the Debtor is receiving in return from these notes and loans is reasonable.

### B. The Solara Note and Related Real Property

The Debtor has also not been forthright about its primary known asset—namely, a loan made to its affiliate Solara to lend to a purchaser of a piece of real property in Southern Utah (the "Real Property").

As mentioned above, the Debtor loaned Solara the funds to make the loan (the "Solara Note") which was then used to purchase and develop the Real Property. *See* [Doc. No. 185] at 11. Despite being used to purchase and develop the Real Property, the Debtor's loan to its affiliate Solara is unsecured. As stated above, Solara is an affiliate of the Debtor and is controlled by Mr. Tilton.

The Debtor's affiliate and owner of the Real Property, Solara, recently authorized a $2,000,000 deed of trust on the Real Property on November 19, 2024, for the benefit of Silverback Capital Partners, LLC. The Debtor was clearly aware of this deed of trust, as Mr. Tilton executed the deed of trust on behalf of Blue Castle Holdings, Inc. This very recent encumbrance shows that the Debtor has not taken preemptive steps to protect the Debtor's interest in the Real Property, and by extension, the interests of creditors, as the Debtor has never secured its interest in the Real Property or in the Solara Note. Further, the Debtor did not give notice of this deed of trust to the Committee, and the Committee again discovered this information on its own by doing a title search on the Real Property.

In sum, the Debtor's various actions (or inactions) raise significant concerns about allowing the Debtor to control its reorganization process. Thus, the Committee's Plan proposes a liquidation process conducted by a disinterested Liquidating Trustee, which the Committee believes will be in the best interest of creditors.

## IV. SUMMARY OF COMMITTEE'S PLAN

In order to facilitate an orderly and equitable resolution for all creditors, the Debtor's assets and operations would be placed into a Liquidating Trust. A disinterested, qualified trustee will be engaged, selected in accordance with the Plan, and will serve in a fiduciary capacity to protect the interests of all creditors while maximizing recoveries.

The Liquidating Trust will include an initial board which shall be comprised of 3-7 members appointed in accordance with the terms of this Plan. The Liquidating Trustee shall be required to consult with and obtain the approval of this Liquidating Trust Advisory Board for all major decisions, including any litigation, settlements, asset sales, and any other actions outside the ordinary course of business. Terms of the Liquidating Trust (including governance protocols and decision-making authority) will be determined, in consultation with the trustee, to ensure appropriate oversight by the Liquidating Trust Advisory Board.

The Liquidating Trustee will have the right to operate the Debtor's business and to pursue all causes of action held by the Debtor, including all claims available under Ch. 5 of the Bankruptcy Code, all analogous state law claims, avoidance claims, claims against insiders (actual fraud, gross negligence, willful misconduct, violation of fiduciary duties, etc.), and claims for substantive consolidation. Additionally, the Liquidating Trustee may settle any and all claims held by the Debtor against third parties, including Insiders. While the Committee does not yet have the documents necessary to enable it to propose any such settlements, the Liquidating Trustee will be authorized to investigate and pursue such settlements, to the extent that they are in the best interests of creditors.

The Liquidating Trustee will have the power to object to any claims and litigate/settle any claim disputes to determine the final allowable value of a claim.

All Administrative Expense Claims[2] and Priority Claims will be Paid In Full. All Holders of General Unsecured Claims and Subordinated Claims will receive their pro rata distributions from the Liquidating Trust when such proceeds become available, after all costs of administration of the Liquidating Trust, including Liquidating Trust Expenses, are paid until no further proceeds are available. The existing Equity Interests of the Debtor shall be cancelled.

The Liquidating Trustee will be vested with all Retained Assets and have full authority to liquidate or operate the business of the Debtor, thus succeeding to all rights, claims, and interests of the Debtor. The Liquidating Trustee shall have no obligation to pay any expenses of the Debtor incurred after the Effective Date and no such expenses shall be paid by the Retained Assets, including post-Effective Date expenses of the Debtor's counsel and professionals.

The Liquidating Trustee will have discretion to retain Committee's professionals and any professional retained by a member of the Committee. After the Effective Date, the Liquidating Trustee will also be authorized to hire and employ other outside professionals and experts to assist in the administration of the Liquidating Trust without requiring the approval of the Bankruptcy Court. The Liquidating Trustee shall pay all such professionals pursuant to the terms set forth in

---

[2] Any capitalized terms not otherwise defined herein shall have the meaning assigned to them in the Plan.

the applicable professional's engagement letter, which shall be payable from the Retained Assets, without requiring the approval of the Bankruptcy Court.

The Bankruptcy Court will retain authority over any causes of action or disputes associated with the Plan and the efforts of the Liquidating Trustee.

The Liquidating Trustee will set aside additional money in a "Disputed Claims Reserve" for those claims that are currently being disputed, above and beyond the known and approved claims. If these claims are allowed, the reserve money will be paid out to those claimants. If the claims are not allowed, the reserve money will be paid out pro rata to the general unsecured creditors. Procedures will be put in place to allow for partial payments of claims.

The Committee has continued to negotiate with the Debtor and the Debtor Affiliates. During the pendency of this proposed Plan, the Committee will continue to have ongoing discussions with the Debtor and the Debtor Affiliates regarding the Solara Note and other estate assets to see if a settlement can be reached as to these assets that the Committee believes is in the best interest of creditors. Accordingly, the Committee reserves the right to amend this Plan in accordance with 11 U.S.C. § 1127 in the event a settlement the Committee supports can be reached.

**The Plan provides for releases and exculpations for the Committee and its professionals. The Plan also enjoins any further claims or causes of action by any parties against the Retained Assets after the Effective Date, pursuant to the terms of this Plan.**

The Plan does not, however, provide any releases for the Debtor or the Debtor's officers, directors, and affiliates.

The initial funding of the Liquidating Trust will be determined after further investigation into the Debtor's financial situation. However, one source of funding is that the remaining amount on the Blue Castle Note will be turned over to the Liquidating Trust. Based on the Debtor's December 2024 monthly operating report, there is approximately $1.11 million remaining in the Blue Castle Note. There are also outstanding notes receivable due from some of the Debtor's lending customers, but these notes may be subject to objections or other legal encumbrances that may make them difficult to collect. Additionally, Committee counsel will defer the payment of their fees if necessary to enable confirmation of the Plan and to ensure that the Liquidating Trust is appropriately funded. If such deferment is necessary, Committee counsel will be paid from the assets of the Liquidating Trust, including without limitation, recoveries obtained by the Liquidating Trustee after plan confirmation.

## V. LIQUIDATION ANALYSIS

The Committee has repeatedly asked the Debtor and the Debtor's affiliates for business plans, financial records, and other documentation to help the Committee's financial advisors calculate a Liquidation Analysis of the Plan versus a Chapter 7 liquidation. While the Debtor has produced certain financial records, this selection has been selective and does not create a fulsome picture to allow the Committee to make accurate financial projections. Additionally, although the Debtor's financials are integrally connected to those of the Affiliates, the Affiliates have largely failed to provide relevant financial records to help flesh out the Debtor's financial records. As a

result, the Committee's financial advisors have not been able to create or calculate a full liquidation analysis at this time. However, because this is a liquidating plan that does not require the payment of a Chapter 7 Trustee's fees, the Committee has a good faith belief that this Plan will provide at least as much recovery on General Unsecured Claims as a Chapter 7 liquidation.

Respectfully submitted,

Dated: March 7, 2025

**The Official Committee of Unsecured Creditors**

*/s/ David Carlson*
*(signed with permission)*
By: David Carlson
Title: Chairman

Dated: March 7, 2025

**GREENBERG TRAURIG, LLP**

*/s/ Annette W. Jarvis*
By: Annette W. Jarvis

*Attorneys for the Committee*

## CERTIFICATE OF SERVICE – BY NOTICE OF ELECTRONIC FILING (CM/ECF)

I hereby certify that on this 7th day of February 2025, I electronically filed the foregoing **DISCLOSURE STATEMENT PROPOSED BY THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS** with the United States Bankruptcy Court for the District of Utah by using the CM/ECF system. I further certify that the parties of record in this case, as identified below, are registered CM/ECF users and will be served through the CM/ECF system.

- James W. Anderson    jwa@clydesnow.com, gmortensen@clydesnow.com
- Laura Elizabeth Baccash    laura.baccash@whitecase.com, mco@whitecase.com
- Mark D. Bloom    mark.bloom@bakermckenzie.com
- Simeon J Brown    sbrown@parsonsbehle.com
- Matthew James Burne    matthew.burne@usdoj.gov, James.Gee@usdoj.gov;Lindsey.Huston@usdoj.gov;Rinehart.Peshell@usdoj.gov;Rachelle.D.Hughes@usdoj.gov;Brittany.Dewitt@usdoj.gov
- Deborah Rae Chandler    dchandler@aklawfirm.com
- Carson Heninger    heningerc@gtlaw.com, carson-heninger-5642@ecf.pacerpro.com,Candy.Long@gtlaw.com
- Samuel P. Hershey    sam.hershey@whitecase.com, mco@whitecase.com
- Annette W. Jarvis    jarvisa@gtlaw.com, longca@gtlaw.com
- Michael R. Johnson    mjohnson@rqn.com, docket@rqn.com;ASanchez@rqn.com;RQN@ecfalerts.com
- Peter J. Kuhn    Peter.J.Kuhn@usdoj.gov, James.Gee@usdoj.gov;Lindsey.Huston@usdoj.gov;Rinehart.Peshell@usdoj.gov;Rachelle.D.Hughes@usdoj.gov;Brittany.Dewitt@usdoj.gov
- Joli A. Lofstedt    joli@jaltrustee.com, ecf.alert+LofstedtUTB@titlexi.com,brenda@jaltrustee.com
- Artur Machalski    artur.machalski@gmail.com
- Elliott D. McGill    emcgill@parsonsbehle.com
- Darren B. Neilson    dneilson@parsonsbehle.com
- Christopher L. Perkins    cperkins@eckertseamans.com
- Gregory F. Pesce    gregory.pesce@whitecase.com, mco@whitecase.com
- Walter A Romney    war@clydesnow.com, gmortensen@clydesnow.com
- Brian M. Rothschild    brothschild@parsonsbehle.com, ecf@parsonsbehle.com;docket@parsonsbehle.com
- Jeffrey Weston Shields    jshields@rqn.com, 5962725420@filings.docketbird.com;docket@rqn.com;ecasaday@rqn.com
- Abigail Jennifer Stone    abigail.stone@gtlaw.com
- Landon S. Troester    lst@clydesnow.com, rcondos@clydesnow.com
- United States Trustee    USTPRegion19.SK.ECF@usdoj.gov
- Melinda Willden tr    melinda.willden@usdoj.gov, James.Gee@usdoj.gov;Lindsey.Huston@usdoj.gov;Rinehart.Peshell@usdoj.gov;Rachelle.D.Hughes@usdoj.gov;Brittany.Dewitt@usdoj.gov

*/ s / Candy Long*

## CERTIFICATE OF SERVICE BY MAIL OR OTHER MEANS

I further certify that on the 7th of March, 2025, I caused to be served a true and correct copy of the foregoing document as follows:

**Nikita Ash**
1221 Avenue of the Americas
New York, NY 10020-1095

**CFO Solutions, LLC dba Amplo**
13601 W McMillan Rd
#102 PMB 320
Boise, ID 83713

**Alexander S Chang**
201 S. Main St Ste 1800
Salt Lake City, UT 84111

**Kyle Ferrier**
300 South Biscayne Blvd.
Suite 4900
Miami, FL 33131

**Nicholas Kennedy**
1900 N. Pearl Street
Suite 1500
Dallas, TX 75201

            　　　　　　　　　　　　　　　　　　*/ s / Candy Long*