**GREENBERG TRAURIG, LLP**
Annette W. Jarvis (Utah #1649)
Carson Heninger (Utah #17410)
Abigail J. Stone (Utah #19083)
222 South Main Street, Suite 1730
Salt Lake City, UT 84101
Telephone: (801) 478-6900
Email: jarvisa@gtlaw.com
carson.heninger@gtlaw.com
abigail.stone@gtlaw.com

*Counsel for the Official Committee of Unsecured Creditors*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| In re: | Case No. 24-bk-23041 |
| POWER BLOCK COIN, L.L.C. | Chapter 11 |
| Debtor | Judge Cathleen D. Parker |

## MOTION TO APPOINT CHAPTER 11 TRUSTEE

Pursuant to 11 U.S.C. § 1104(a), the Official Committee of Unsecured Creditors (the "Committee") of the Debtor Power Block Coin, L.L.C. (the "Debtor"), by and through counsel, files this motion ("Motion") seeking an order from the Court appointing a Chapter 11 trustee in this case. In support hereof, the Committee respectfully states as follows:

### I.    INTRODUCTION

Since the Petition Date nearly 18 months ago, this case has been fraught with issues related to the Debtor's fraud, dishonesty, mismanagement, and incompetence as a debtor in possession. The Committee has spent months trying to reach a consensual settlement or solution with the Debtor, but with no success. Now, with a quickly approaching statute of limitations, and

no more time to waste, the Committee recognizes that, given the Debtor's conflicts, misconduct, and lack of transparency, the only effective way forward is to appoint an independent trustee.

Among its other misconduct, the Debtor has knowingly pursued faulty or pointless actions that are not in the best interest of creditors, such as improperly filing the case under Subchapter V in an effort to avoid the appointment of a creditor committee and allow for confirmation of a plan without the affirmative votes of creditors. The Debtor, through its officers and affiliates, has also asserted false and untrue claims, such as that there were hundreds of thousands of dollars available to pay administrative expenses in this proceeding, which it now says is not the case.

In a showing of gross mismanagement and incompetence, the Debtor has also, among other things, repeatedly filed inaccurate monthly operating reports; failed to keep accurate accounting of its assets through the Blue Castle Note based on these payments; commingled its assets with those of its customers and affiliates; and failed to accurately explain or account for pre- and post-petition cryptocurrency transfers.

In sum, the Debtor has failed to exhibit the transparency expected in a bankruptcy case, which has led to a lack of trust between the creditors and the Debtor. The Debtor's misstatements, misguided or undisclosed transactions, conflicts of interest, and inadequate accounting records demonstrate fraud, dishonesty, incompetence, and gross mismanagement of the Debtor's estate. These factors all indicate the pressing need for the appointment of a Chapter 11 trustee to remove the Debtor, and specifically Mr. Tilton, from control; obtain access to all of the Debtor's records that have been and continue to be withheld from the Committee; and have the power to investigate and pursue avoidance claims for preferences and fraudulent transfers

and other causes of action on an independent and rational basis, including considering possible settlements on a fully informed basis—put simply, to act in the best interests of creditors as the Debtor and Mr. Tilton have proven themselves to be unwilling and incapable of doing.

## II.　JURISDICTION AND VENUE

1.　The United States Bankruptcy Court for the District of Utah (the "Court") has jurisdiction over this Motion pursuant to 28 U.S.C. § 1334.

2.　This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

3.　Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

## III.　RELIEF SOUGHT AND GROUNDS FOR RELIEF

Pursuant to 11 U.S.C. § 1104(a), the Committee seeks the appointment of a Chapter 11 trustee over the Debtor's estate (1) for cause due to the Debtor's fraud, dishonesty, incompetence, and gross mismanagement of the estate, and (2) because such appointment is in the best interest of creditors due to myriad conflicts of interest and a lack of transparency, which have resulted in distrust between the Debtor and creditors.

## IV.　STATEMENT OF FACTS

### A.　The Debtor's Improper Subchapter V Election

1.　On June 20, 2024 (the "Petition Date"), the Debtor commenced this proceeding by filing for bankruptcy under Chapter 11 of the Bankruptcy Code, improperly electing to proceed under Subchapter V despite the existence of claims against it in excess of $192 million.[1] [Doc. No. 1]. In defense of that election, the Debtor fraudulently asserted the unsustainable

---

[1] A recent filing by the Debtor states that "the total value of claims . . . asserted" in this case is $192,521,332.36. ([Doc. No. 350] at 5).

position, in direct contravention to section 502(a), that it was not possible to determine the dates on which the many cryptocurrency-based claims would be valued,[2] and also falsely contended that the value for any of the leading cryptocurrencies was difficult to determine on any given date.[3]

2. On October 9, 2024, the Court sustained objections to the Debtor's election to proceed under Subchapter V, thus rendering this case a traditional Chapter 11 proceeding. [Doc. No. 190].

3. On October 24, 2024, the U.S. Trustee appointed the Committee to serve as the Official Committee of Unsecured Creditors for the Debtor. [Doc. No. 199].

### B. The Unorthodox Cash Management Motion and Affiliate Loans

4. On June 20, 2024, as part of its first day motions, the Debtor filed a motion (the "Cash Management Motion") in which it asked the Court to allow the Debtor (which had allegedly become unbanked in late 2023) to pay its operating expenses through a so-called Services Agreement with Blue Castle. [Doc. No. 7]. Under the Services Agreement, Blue Castle uses money from its bank accounts to pay for the Debtor's obligations. In exchange, the Debtor either transfers cryptocurrency to Blue Castle or "applies a credit against the balances of the Blue Castle Loan, a loan it has made to Blue Castle." *Id.* at 3.

---

[2] "[T]he court . . . shall determine the amount of such claim in lawful currency of the United States as of the date of the filing of the petition, and shall allow such claim in such amount . . . ." 11 U.S.C. § 502(b).

[3] Surely the Debtor knew this statement was patently and demonstrably false, in that the operation of its own cryptocurrency business required that it know the value of the leading cryptocurrencies traded on its platform and pledged to it as security for customer loans on an ongoing basis. Cryptocurrency values are readily available and constantly updated on multiple sources and websites. *See, e.g.,* https://www.coinbase.com/explore; https://finance.yahoo.com/markets/crypto/all/.

5.      The Debtor made the Blue Castle Loan on August 8, 2023, in the principal amount of $1,400,000.00 with a maturity date of August 6, 2028, and an APR of 4%— below market rates and on below market terms. [Doc. No. 242] at 7, 22. Upon information and belief, the Blue Castle Loan was funded from the money of investors on the Debtor's cryptocurrency platform.

6.      Notably, while the Debtor allegedly moved its liquid assets to Blue Castle when it became unbanked, the Committee has not seen an accounting of this money being transferred to Blue Castle. Thus, it is unclear how much money, if any, the Debtor transferred from its own bank accounts to Blue Castle in late 2023 and what impact this transfer had on the balance of the Blue Castle Note.[4]

7.      On September 16, 2024, the Court issued the Cash Management Order approving the Debtor's Cash Management Motion, with certain strict conditions, including that the Debtor must "continue to maintain *strict records* with respect to all transfers" and "file statements from the bank account used by Blue Castle, which will show all payments being made on the Debtor's behalf and an accounting of the amount remaining due under the Blue Castle Loan." [Doc. No. 181] at ¶¶ 5, 6 (emphasis added).

8.      As noted in the Debtor's own plan, the Blue Castle Note is one of "three notes receivable made by [the Debtor's] affiliates"—Solara, Blue Castle, and SmartFi Lending—which notes constitute the Debtor's primary assets (the "Affiliate Notes"). [Doc. No. 242] at 22. *All of*

---

[4] In its first monthly operating report ("MOR"), the Debtor provided an accounting showing the change in balance of the Blue Castle Note from August 2023 through July 2024. [Doc. No. 145] at 18. There is no indication in this accounting of the Debtor's funds from its bank accounts being transferred to Blue Castle or being added to the balance of the Blue Castle Note. *Id.*

*these Notes arise from pre-petition insider transfers of the Debtor's funds* (the "Affiliate Loans") and were "made at favorable interest rates to the Debtor's affiliates" and are "unsecured obligations with no payments due until their respective maturity dates" that do not come due until August 2028, September 2028, and March 2032, respectively. *Id.* SmartFi Lending, Solara Communities, LLC, and Blue Castle (the "Affiliates") are all affiliates of the Debtor and are controlled, to one extent or another, by Mr. Tilton. Mr. Tilton is an officer and director of Blue Castle Holdings, Inc., and the Debtor, SmartFi Lending, and Solara Communities LLC are all sub-entities of Blue Castle. *See* [Doc. No. 237] at 6.

### C. Competing Plans and Mediation Efforts

9.      On September 18, 2024, the Debtor filed a Plan of Reorganization under Chapter 11, Subchapter V. [Doc. No. 184, amended at Doc. No. 185].

10.     On November 18, 2024, the Debtor filed a motion to extend the exclusivity period for it to file and solicit support for a plan. [Doc. No. 213].

11.     On December 11, 2024, the Committee filed an objection to the Debtor's exclusivity motion. [Doc. No. 237]. In its objection, the Committee raised several concerns, including an undisclosed lien and ongoing lawsuit related to the Solara Property, a piece of land in Southern Utah that the Debtor, through its affiliate, Solara, is proposing to develop and sell to fund the Debtor's estate and provide recovery to creditors.

12.     On December 16, 2024, the Debtor filed its First Amended Plan of Reorganization. [Doc. No. 242].

13.     On December 17, 2024, at the hearing on the Debtor's motion to extend exclusivity, the Honorable Judge Marker denied the Debtor's motion largely because of the

Debtor's failure to disclose or address the ongoing litigation on the Solara Property and the $2 million lien placed on the Solara Property, as well as Mr. Tilton acting on both sides of the Solara transaction. The Court stated that the Debtor's failure to disclose or address those issues in its reply brief or in its plan "is a lack of good faith and a lack of transparency that, to me, is the key to this issue, which causes me to deny the debtor's motion to extend the exclusivity period." [Doc. No. 243], audio file at 21:06. The Court further noted that "the Debtor has not shown that it has the ability to operate this estate in a way that's beneficial to creditors with transparency and good faith." [Doc. No. 243], audio file at 21:45.

14.     On January 30, 2025, the Committee filed its own plan [Doc. No. 254], followed by an amended version of that plan on March 7, 2025 [Doc. No. 273, 274].

15.     On June 27, 2025, the Debtor, Blue Castle,[5] the Committee, and other affiliates of the Debtor engaged in a mediation before the Honorable Judge Peggy Hunt to see if the parties could negotiate terms for a consensual joint plan, as direct negotiations between the parties had not been productive. At the mediation, the parties reached tentative agreement on some, but not all, of the issues between the Committee on the one hand and the Debtor and Blue Castle on the other, subject to agreement on all outstanding issues.

16.     However, during negotiations after the mediation to resolve the critical outstanding issues, the Committee and the Debtor came to an impasse on many key points. While the mediation privilege precludes disclosure of these outstanding issues, suffice it to say that the impasse has required the Committee to obtain no less than nine Rule 2004 orders in

---

[5]   While Blue Castle has retained separate counsel from the Debtor as directed by Judge Marker, both counsel continue to be instructed by Mr. Tilton.

pursuit of information the Debtor and Affiliates have refused to provide, and which has ended joint plan efforts between the parties.

### D. Conflicts of Interest

17.     In addition to the conflicts of interest that exist between the Debtor and its Affiliates, there are also conflicts between the Debtor and Mr. Tilton. In the early days of the case, the Debtor moved to extend the automatic stay to Mr. Tilton to protect him in a case pending against him personally in Pennsylvania [Doc. No. 11]. When that motion was denied, the Debtor later filed a motion to lift the automatic stay to allow the Debtor to participate in the Pennsylvania litigation to protect Mr. Tilton's interests. [Doc. No. 299].

18.     In addition to the entanglement of the Debtor and Mr. Tilton, the conflicts of interest between the Debtor and the various Affiliates have made it difficult for the Committee to understand the Debtor's financial reports.

19.     For example, certain of the Committee's requests for information to the Debtor have been met with the argument that there is an alleged joint defense agreement between the Debtor and its Affiliates. *See* email from Debtor's counsel at **Exhibit A**.[6] Leaving aside that the Committee has yet to see a copy of this agreement, it is a fundamental breach of fiduciary duty for a debtor to enter into a joint defense agreement with insiders or affiliates against which the estate has potential transfer and other claims that need to be investigated and pursued.

20.     Other information requests by the Committee to the Debtor have been denied because the requested documents are allegedly records of Affiliates, not the Debtor itself. This

---

[6] The email featured at Exhibit A is authenticated by the *Declaration* set forth as **Exhibit D**.

shell game exercise has made it very difficult for the Committee to fully understand the Debtor's

financial situation.

### E. The Debtor's Accounting and MOR Reporting Issues

21.     The events and facts noted above—including the conflicts of interest among the

Debtor, its Affiliates, and the Debtor's officers—have led to a plethora of disclosure, accounting,

and reporting issues. First, and most glaring, is the Debtor's repeated failure to adequately

account in its MORs for the changes in the Blue Castle Note through the Services Agreement.

22.     The Debtor has utterly failed to comply with the Court's strict requirements for

accounting and record-keeping related to the Blue Castle Note. Its records and MORs are rife

with accounting errors and issues that create more questions than answers and make it very

difficult to monitor the estate's assets, as was highlighted in the Committee's *Motion to Compel*

*Accounting* [Doc. No. 353].[7]

23.     Several glaring issues from the MORs highlight this problem. The Debtor's

August 2024 MOR showed the transfer of nearly $240,000 USD of stablecoin cryptocurrency to

Blue Castle, thereby increasing the balance of the Blue Castle Note without explanation ($90,000

on June 19, 2024, the day before the Petition Date, and $150,000 *after the Petition Date* on July

24, 2024)—this despite the Debtor's assertion that, on the Petition Date, it held only $27,000 of

cryptocurrency. [Doc. No. 187] at 10; [Doc. No. 39] at 10.[8]

---

[7] The Court's order for the Debtor to provide a clearer document showing how the Debtor's expenses affect the balance of the Blue Castle Note is indicative of this issue.

[8] At the barest minimum, the $150,000 transfer is an unauthorized post-petition transfer subject to claw back and recovery under sections 549 and 550 of the Bankruptcy Code.

24.     After the Committee raised this issue with the Court, the Debtor's counsel later informed the Committee that this was allegedly the transfer of an unnamed customer's cryptocurrency, and thus, did not belong to the estate and allegedly should not have been included on the MOR. A true and accurate copy of this communication from Debtor's counsel is attached hereto as **Exhibit B**.

25.     Even if this is true (which the Committee has no efficient way of verifying), it still evidences a significant error in the Debtor's accounting by erroneously increasing the balance of the Blue Castle Note by nearly a quarter of a million dollars, which the Debtor reported not only on that August 2024 MOR but also in its September, October, November, and December 2024 and February 2025 MORs without remedying the error. [Doc. Nos. 196-4 at 2; 216-3 at 2; 247-3 at 2; 253-6 at 2; 281-3 at 2].

26.     Other significant reporting and accounting issues exist in:

a.   the December 2024 MOR (payment of $27,052.50 to the Debtor's financial advisor, Ampleo, but no matching change in balance of Blue Castle Note) [Doc. No. 253-7] at 2–3; [253-6] at 2;

b.   the January 2025 MOR (Debtor recorded a $73,000 increase to the balance of the Blue Castle Note for first time, asserting that an asset had been purchased with Debtor funds *back in 2022*, but was actually intended to be an asset of Blue Castle) [Doc. No. 272-1]; [Doc. No. 281-3] at 2;

c.   the February 2025 MOR (Ampleo refunded $10,157.50 back to Blue Castle's Hillcrest bank account, but no corresponding change in balance of Blue Castle Note) [Doc. No. 281-7] at 1; [Doc. No. 281-3] at 2; and

10

d.  the August 2025 MOR (Debtor reported $190,970.46 payment of fees to Parsons, but no corresponding change in Blue Castle Note balance) [Doc. No. 369-6] at 1; [Doc. No. 369-5] at 2.[9]

27.     Finally, there is the issue of the false Blue Castle Declaration. On December 10, 2024, Brad Jones, the CFO of both the Debtor and Blue Castle, filed a declaration in support of Parsons' First Fee Application (the "Jones Declaration") in which he provided a screenshot showing that Blue Castle held $512,153.75 in a Wells Fargo bank account and stated that "[t]his amount is available to be paid to [Blue Castle's] account that is separately maintained for the payment of the Debtor's administrative expenses as approved by the [Cash Management Order]." [Doc. No. 234] at 2. Mr. Jones further stated that on the basis of these holdings "[Blue Castle] has the wherewithal to pay the allowed fees and expenses of the Debtor's counsel," and that "[Blue Castle] will be able to pay other allowed administrative claims of the Debtor's chapter 11 case as and when they are allowed and come due." *Id.*

28.     However, after the Committee filed the Motion to Compel Accounting, it learned that there was only approximately $17,000 remaining in the Wells Fargo bank account, despite the fact that administrative expenses approved for payment in this case thus far only total approximately $320,000.

29.     The foregoing examples are not isolated discrepancies that can be explained away but instead reveal a pattern and practice of accounting and recordkeeping that is at best slapdash and fails to meet the standard required of a debtor in possession. At worst, these issues indicate a

---

[9] Perplexingly, it appears that this payment to Parsons came through a wire transfer from an unknown bank account. [Doc. No. 369-6]. This also raises questions about the Debtor's assets and a lack of disclosure regarding those assets.

11

shell-game cover-up of ongoing improprieties in the business dealings between the Debtor, the

Affiliates, and, potentially, other third parties yet to be identified.

### F. The Debtor's Cryptocurrency Asset Issues

30.    The commingling of the Debtor's and Affiliates' assets is not the end, however, of

the Debtor's accounting, reporting, and transparency issues. The Debtor has also commingled its

own assets with what it alleges are customer assets, leading to various tracing and verification

issues.

31.    As set forth in the Committee's Motion to Compel Accounting, as of the Petition

Date the Debtor claimed to only hold approx. $27,000 in cryptocurrency. [Doc. No. 353] at ¶ 11.

However, the Debtor later provided the Committee with a spreadsheet on December 14, 2024,

listing "Digital Assets held on PBC 3rd Party Wallets as of 6/20/2024" worth more than

$700,000, and the balance of the Debtor's Fireblocks account as of January 24, 2025, was listed

as $274,142.70. [Doc. No. 365-1] at 4.

32.    The Debtor has asserted that these differences and discrepancies are due to

customer cryptocurrency holdings and transfers, [Doc. No. 362] at 6, and has further stated that

the Debtor's cryptocurrency is held in the same Fireblocks wallet as its customers'

cryptocurrency, meaning that these holdings are commingled. *See* email attached hereto as

**Exhibit B**. However, the Debtor's current ledgers and records make it nearly impossible to verify

whether the Debtor's assertions are accurate. [Doc. No. 365-1] at 4.

33.    Another issue that adds to the accounting confusion is that the Debtor closed its

cryptocurrency platform on or around December 2024 and, upon information and belief, has had

no ongoing business since then. [Doc. No. 229].

34.     Additionally, the Debtor has been reticent to pursue potential cryptocurrency recovery claims on behalf of the estate. For example, when Huron Consulting Group ("Huron"), the Committee's financial advisor, identified a potential claim for nearly $52 million in cryptocurrency that the Debtor could assert against Gold Standard Corporation AG ("GSB") as part of GSB's settlement with various investors (including those in Utah), the Debtor dragged its feet on filing the claim, even if just to preserve the estate's rights. It was not until the last day of the claims period, after much prompting from the Committee, that the Debtor finally filed a claim with the GSB claims agent, using information gathered and provided by Huron.

35.     The Debtor's reluctance to investigate and file the GSB claim raises serious concerns that the Debtor is not acting in the best interests of creditors.

### G. Distrust Between Creditors and Debtor

36.     In summary, the facts above detail months of conflicts and issues between the creditors and the Debtor. The Committee files this motion now as its last resort after trying multiple other paths for a cooperative resolution, including mediation, a motion to compel accounting, and various 2004 examination motions.

37.     The Committee continues to discover and identify further discrepancies in the Debtor's accounting, including its incomplete cryptocurrency records. This has finally led the Committee to the conclusion that there is no other way to end this case in the best interests of creditors but to remove the Debtor, and Mr. Tilton, from control of the Debtor's estate. With Mr. Tilton controlling the Debtor, Blue Castle, and the many Debtor Affiliates who are the primary potential targets of litigation, it is incredibly difficult to get unbiased, full accounting that is not colored by the conflicts of interest at play in this case.

13

38.     In sum, the Committee has tried many other avenues to resolve this case but has finally come to the conclusion that only an independent trustee will be effective in administering this estate fairly and transparently in the best interests of creditors.

## V.     ARGUMENT

### A.     Legal Standard

Section 1104(a) of the Bankruptcy Code states as follows:

> (a) At any time after the commencement of the case but before confirmation of a plan, on request of a party in interest or the United States trustee, and after notice and a hearing, the court shall order the appointment of a trustee—
>
>> (1) for cause, including fraud, dishonesty, incompetence, or gross mismanagement of the affairs of the debtor by current management, either before or after the commencement of the case, or similar cause . . . ; or
>>
>> (2) if such appointment is in the interest of creditors . . . .

"The decision whether the facts establish cause under § 1104(a)(1) is vested in the court's discretion and will be reviewed under an abuse of discretion standard." *In re Celeritas Techs., LLC*, 446 B.R. 514, 518 (Bankr. D. Kan. 2011). In determining whether "cause" exists under § 1104(a)(1), courts may consider prepetition activity. *In re Oklahoma Ref. Co.*, 838 F.2d 1133, 1136 (10th Cir. 1988). Additionally, "[t]he inquiry into whether 'cause' exists for [the appointment of a trustee] is not limited to the enumerated list of fraud, dishonesty, incompetency or gross mismanagement, but extends to 'similar cause.'" *In re Nartron Corp.*, 330 B.R. 573, 592 (Bankr. W.D. Mich. 2005).

The "language of the statute and established case law [make clear] that the court need not find any of the enumerated wrongs [under section 1104(a)(1)] in order to find cause for appointing a trustee. It is sufficient that the appointment be in the interest of creditors [under

14

section 1104(a)(2)]." *In re Oklahoma Ref. Co.* 838 F.2d at 1136 (internal citations omitted). "Once the court has found that cause exists under § 1104, it has no discretion but must appoint a trustee." *Id.*

Courts are split on whether the standard of proof for appointment of a trustee is clear and convincing evidence or preponderance of the evidence, and the Tenth Circuit has yet to take a position. *See In re Celeritas Techs., LLC*, 446 B.R. at 519. However, the burden is met here under either standard.

**B.      Cause Exists to Appoint a Trustee Under § 1104(a)(1)**

As stated above, cause exists to appoint a Chapter 11 trustee under § 1104(a)(1) for "fraud, dishonesty, incompetence, or gross mismanagement of the affairs of the debtor by current management, either before or after the commencement of the case, or similar cause." Here, the Debtor's long history of ineptitude in managing its business affairs rises above just simple mismanagement and into the realm of incompetence and gross mismanagement. Its various false statements, including those regarding its Subchapter V eligibility and the availability of certain assets to fund the bankruptcy estate, also demonstrate fraud and dishonesty in this case.

**i.      Gross Mismanagement and Fraud through Affiliate Loans**

Questionable business transactions with related or affiliated companies may create cause for the appointment of a trustee. *See Oklahoma Ref.,* 838 F.2d at 1135, 1136. Here, the Debtor's insider transactions with its Affiliates through the Affiliate Loans are a flagrant example of gross mismanagement of Debtor assets. The Debtor took the bulk of its assets and diverted them through a series of "loans" to Affiliates, all under the common control of Mr. Tilton, at what the Debtor itself admits were "favorable rates" for the Affiliates.  These loans were unsecured, with

15

no payments due for years. It is hard to imagine that any competent business would extend such sums of money in an arms' length transaction with such low interest rates, no security, and no payments due for years.

This is not to mention the Debtor's failure to preserve its rights in the Solara Property (purchased through funds from the Solara Loan), on which Solara allowed a $2 million dollar lien to be placed post-petition. Mr. Tilton, as head of Solara, failed to inform the Court, the Committee, or creditors about that lien, which weakened the Debtor's potential for recovery from the Solara Property. These events are all indicative of incompetence and gross mismanagement—if not outright fraud—by prioritizing the Debtor's Affiliates and Mr. Tilton's other companies over the Debtor.

    ii.  **Gross Mismanagement, Incompetence, and Dishonesty by Commingling of Assets and Accounting Issues with Blue Castle**

The commingling of Debtor assets with Blue Castle assets, to the point of incomprehensibility, is another example of the Debtor's gross mismanagement. "[W]hen a debtor fails to maintain complete and accurate financial records, or fails to substantiate undocumented transactions, so that there appears to be a confusion in the debtor's accounting system, the courts have viewed these facts as gross mismanagement and have directed the appointment of a Chapter 11 trustee." *In re U.S. Commc'ns of Westchester, Inc.,* 123 B.R. 491, 495–96 (Bankr. S.D.N.Y. 1991) (quoting *In re McCorhill Pub., Inc.,* 73 B.R. 1013, 1017 (Bankr. S.D.N.Y. 1987).

This gross mismanagement is evidenced by many instances, including (1) the Debtor's failure to notice a $73,000 payment that was made with Debtor funds and deducted from the Blue Castle Note, but that should have been paid for with Blue Castle funds, until nearly two years after the transaction; (2) repeated instances of the Debtor's expenses not being deducted

16

from the balance of the Blue Castle Note, as with Ampleo and Parsons' fees, leaving a question as to the sources of these payments; and (3) alleged customer cryptocurrency being transferred from the Debtor to Blue Castle and being recorded on the Debtor's MORs and books as a payment increasing the balance of the Blue Castle Loan. These factors all support cause for appointing a Chapter 11 trustee due to gross mismanagement and incompetence.

There are also misstatements and dishonesty in the Jones Declaration that funds in the Blue Castle Wells Fargo account would be available to fund the Debtor's administrative expenses in this case, only for Blue Castle to spend those funds, presumably on its own business expenses.[10] This dishonesty, in addition to the mismanagement outlined above, illustrates the desperate need for an independent trustee.

### iii. Gross Mismanagement, Incompetence, and Dishonesty in Commingling of Cryptocurrency Assets and Failure to Accurately Account for Such Assets and Transfers

The Debtor has not only commingled its assets with those of its Affiliates (particularly Blue Castle, as noted above), but also with those of its customers. This commingling and lack of adequate records raises significant tracing issues and confusion in the Debtor's accounting records and transfers, indicative of fraud and dishonesty at worst, and incompetence and gross mismanagement at best.

The Debtor's counsel admitted to this commingling, stating in an email that "the Debtor's cryptocurrency [is] being held on the same Fireblocks wallet as its customers' cryptocurrency." *See* **Exhibit B**. While admitting the cryptocurrency was commingled, the Debtor has asserted,

---

[10] Although Mr. Jones made the declaration in his role as the CFO of Blue Castle, he is also the CFO of the Debtor. [Doc. No. 155] at 21.

without furnishing any traceable records or offering anything other than its questionable word, that those additional cryptocurrencies it holds in this commingled account are not assets of the estate but are customer funds. *See* **Exhibit B.**

This commingling raises significant concerns that these "customer" funds—both those still in the Debtor's cryptocurrency wallets and those that have left the Debtor's account post-petition—are actually estate assets. *See In re Prime Core Techs. Inc.*, 2025 WL 2027499, at *2 (Bankr. D. Del. July 18, 2025) (finding that the cryptocurrency held by Debtors that ran cryptocurrency trading platform—including cryptocurrency transferred in by Debtors' customers—was property of the Debtors' estate because "the Debtors hopelessly commingled [both cryptocurrency and USD] such that the Currency is not traceable").[11] It is for an independent fiduciary like a Chapter 11 trustee, and ultimately the Court, to determine whether the cryptocurrency holdings are property of the estate or belong to customers. The Debtor cannot unilaterally make such a call itself and certainly should not allow the transfer of cryptocurrency from its wallets post-petition without at least notice to or permission from the Court.

In addition to these issues, the Committee has concerns about the Debtor's assertion that customers control their cryptocurrency held by the Debtor, [Doc. No. 362] at 6–7. This seems

---

[11] The Debtor's situation is much like the situation of the Debtor in Prime Core; like Prime Core, the Debtor ran a cryptocurrency and digital assets platform. *Prime Core Techs. Inc.*, 2025 WL 2027499, at *3. And like the debtor in Prime Core, it appears that the Debtor "did not maintain segregated digital wallets for each of its customers and the crypto of the same type it held was commingled." *Id.* *17. Finally, like Prime Core, it appears that the Debtor's internal ledger does not and cannot track which cryptocurrency in the wallets belongs to which customers and which belongs to the Debtor. *Id.* As the court noted in *Prime Core*, "is impossible to identify a specific Cryptocurrency that was owned and transferred by a specific customer to Prime once there is commingling simply by looking at the blockchain—the tokens are fungible, just like fiat, and do not have identifying characteristics." *Id.* at *8. The court in *Prime Core* ultimately held because "the Debtors hopelessly commingled assets" and because "[m]oney paid from a bank account containing commingled funds under a debtor's control is presumptively property of the debtor," the cryptocurrency held in the debtors' wallets "is property of the Debtors' Estates." *Id.* at *14.

18

unlikely, given that the alleged customer cryptocurrency appears to be held in the Debtor's

Fireblocks wallets.[12] It therefore seems unlikely that customers could transfer the cryptocurrency

in these accounts, held under Debtor login credentials, without some assistance or approval from

the Debtor's team. This seems especially true for transfers of alleged customer cryptocurrency

after the Debtor closed its cryptocurrency platform. This contradiction raises more questions

about the Debtor's competence in managing its cryptocurrency assets and honesty in telling the

Court, and the Committee, that customers are in full control of their assets held by the Debtor.

*See* Declaration of Huron Consulting Services, attached hereto as **Exhibit C**.

Finally, the Debtor's reluctance to pursue potential cryptocurrency claims, such as the

GSB claim for nearly $52 million, even if solely to preserve the estate's rights, has been alarming

and shows both incompetence and gross mismanagement. The Debtor's apathy cannot be

categorized as anything other than incompetence, and together with the facts above, illustrates

the need for the review of an independent Chapter 11 trustee.

### iv. Incompetence Through Inaccurate Reporting, Records, and MORs

Additionally, the Debtor's incomprehensible accounting records and inaccurate MORs

are evidence of incompetence and gross mismanagement. *See In re Peak Serum, Inc*., 623 B.R.

609, 632–33 (Bankr. D. Colo. 2020) (debtor's "perpetually inaccurate and untimely amended

monthly operating reports" were factor in finding incompetence and gross mismanagement); *see*

*also In re Oklahoma Ref. Co.,* 838 F.2d at 1136 ("It is also established that failure to keep

---

[12] When the Debtor showed Huron its Fireblocks account page in January 2025, the full $274,000 cryptocurrency balance was held in the Debtor's Fireblock vault and external exchanges. [Doc. No. 365-1], Exhibit 1, ¶ 9. This was echoed by the Debtor's admission that "the Debtor's cryptocurrency [is] being held on the same Fireblocks wallet as its customers' cryptocurrency." *See* **Exhibit B.**

adequate records and make prompt and complete reports justifies the appointment of a trustee.").
The Court previously noted that the record keeping by Mr. Tilton and Mr. Jones was "at best, sloppy." [Doc. No. 155] at 173. There are also many issues with the Debtor's cryptocurrency platform records, as outlined above. Finally, the Debtor's MORs have been riddled with issues, from failures to deduct payments from the balance of the Blue Castle Note to adding assets to increase the value of the Blue Castle Note years after the fact, leaving the Committee with complete uncertainty as to the true assets of the estate and their value.

Where this has left the Committee is that, nearly a year after its appointment, and after months of trying to work with the Debtor, the Committee still has no effective way to ensure that assets are not leaving the estate, and the Debtor's monthly records do not allow for effective oversight.[13] The Debtor's historic pattern of failing to keep the creditors informed about key updates concerning the estate's interests, including liens on the Solara Property and the potential GSB claim, illustrate that this oversight is very needed. The Court itself noted, when it denied exclusivity, that the Debtor has not shown that it has the ability to operate this estate in a way that is beneficial to creditors with transparency and good faith.

Further, because of the Debtor's improper election to initially proceed under Subchapter V, the Committee's time to act before the upcoming statute of limitations has been cut short. The Committee was not appointed until October 24, 2024—approximately a year ago—and the two-year statute of limitations on fraudulent transfer claims set forth under 11 U.S.C. § 546(a) is set to run on June 20, 2026, which is approximately 8 months from now. However, the Committee

---

[13] The Court's ruling at the Motion to Compel Accounting hearing on September 24, 2025, that the Debtor must file a clearer document showing the effect of payments from the Hill Crest bank account changing the value of the Blue Castle Note going forward is evidence of this rampant ambiguity in the MORs.

lacks the information it needs to fully investigate whether there are sufficient grounds to pursue certain fraudulent transfer claims. A trustee must be appointed quickly so he or she can obtain full access to the Debtor's records and pursue any viable claims before the expiration of the statute of limitations.

All of this is more than sufficient to show incompetence and gross mismanagement of the Debtor by its current management. This has not only hurt creditors but also jeopardized the assets that are available for the estate. Thus, cause exists to appoint a trustee under § 1104(a)(1).

**C.      Appointment of a Trustee is in the Best Interest of Creditors Under § 1104(a)(2)**

The facts and arguments above also establish that grounds exist to appoint a trustee under § 1104(a)(2)—namely, because it is in the best interest of creditors. In making this determination, courts may consider factors such as: (i) questionable inter-company financial transfers, (ii) if the principals of the debtor occupy conflicting positions, and (iii) acrimony between the creditors and the debtor's management. *See, e.g., In re U.S. Commc'ns of Westchester, Inc.,* 123 B.R. at 495–96; *In re Eurospark Indus., Inc.,* 424 B.R. 621, 630 (Bankr. E.D. Md. 2010). All of these factors are present here.

**i.      Conflicts of Interest with Affiliates and Tilton**

Replacing the Debtor's current management with a Chapter 11 trustee is in the best interest of creditors because the Debtor and its Affiliates—all under the control of Mr. Tilton— were and are entangled to the point of enmeshment, such that the Debtor's management has taken many actions for the benefit of Affiliates over the benefit of the estate and creditors. These acts include (1) apparently entering into a joint defense agreement with Affiliate litigation targets, (2) failing to properly account for changes in the balance of the Blue Castle Note,

21

(3) misrepresenting the availability of funds from Blue Castle to fund administrative expenses in this case, and (4) failing to protect the Debtor's interest in the Solara Property. These conflicts of interest extend not only to the Affiliates, but to Mr. Tilton himself. Indeed, "[a]n independent trustee should be appointed under § 1104(a)(2) when [the Debtor's management] suffer from material conflicts of interest, and cannot be counted on to conduct independent investigations of questionable transactions in which they were involved." *In re Ridgemour Meyer Props., LLC*, 413 B.R. 101, 113 (Bankr. S.D.N.Y. 2008). Additionally, the fact that the Debtor has no ongoing business negates the need to have the Debtor stay in control and opens up the way for an appointment of an independent trustee to liquidate and wind up the Debtor's estate.

These instances of questionable inter-company financial transfers and conflicts of interest, as well as Mr. Tilton's control of all of the Affiliates, indicate that the appointment of a Chapter 11 trustee would be in the best interests of creditors.

ii.      **Acrimony and Distrust Between Creditors and Debtor**

Finally, "acrimony between the creditors and the debtor's management, standing alone, has been found to be a basis to appoint a chapter 11 trustee under § 1104(a)(2)." *In re Eurospark Indus., Inc.*, 424 B.R. at 630. This is true here. Echoing the Court's previous statements, the Committee has no faith in the Debtor's ability to operate this estate in a way that is beneficial to creditors with transparency and good faith.

The appointment of a trustee would remedy these issues. A trustee would get full access to the Debtor's records and files and would not have to work through the intermediary of the Debtor's current management or counsel to view, access, and interpret records. A trustee would also be an independent party without personal ties to Mr. Tilton or the other Affiliates and could

22

review transactions and potential causes of action independently. Finally, with full access to the Debtor's information and records, a Chapter 11 trustee could potentially evaluate and, with the best interests of creditors in mind, potentially find solutions to resolve the remaining issues that have created an impasse on a potential settlement regarding the claims against Affiliates. While the Committee has negotiated a settlement with the Debtor as far as it can, a trustee could take up those settlement efforts (including the potential settlement involving the Solara Property) and have a fully informed negotiating position to pursue potential settlement of the Solara Property and Affiliate Notes if that made sense for creditors. These efforts would have much better odds of success because the trustee would have full access to the Debtor's records and would remove Mr. Tilton from both sides of the negotiation.

## VI.    CONCLUSION

Appointment of a Chapter 11 trustee is warranted in this case (1) for cause due to the Debtor's fraud, dishonestly, incompetence and gross mismanagement, and (2) because it is in the best interest of creditors due to the Debtor's conflicts of interest and acrimony between the creditors and the Debtor.

WHEREFORE, the Committee respectfully requests that the Court grant the Motion and appoint a Chapter 11 trustee in this case, along with such other and further relief as is just and equitable.

[*Signature Page Follows*]

Dated: October 21, 2025

Respectfully submitted,

**GREENBERG TRAURIG, LLP**

 _/s/ Abigail Stone_ 
Annette W. Jarvis
Carson Heninger
Abigail J. Stone

*Attorneys for the Committee*

24

**CERTIFICATE OF SERVICE BY NOTICE OF ELECTRONIC FILING (CM/ECF)**

I hereby certify that on this 21st day of October, 2025, I electronically filed the **MOTION TO APPOINT CHAPTER 11 TRUSTEE** with the United States Bankruptcy Court for the District of Utah by using the CM/ECF system. I further certify that the parties of record in this case, as identified below, are registered CM/ECF users and will be served through the CM/ECF system.

- James W. Anderson jwa@clydesnow.com, gmortensen@clydesnow.com
- Laura Elizabeth Baccash laura.baccash@whitecase.com, mco@whitecase.com
- Mark D. Bloom mark.bloom@bakermckenzie.com
- Simeon J Brown sbrown@parsonsbehle.com
- Matthew James Burne matthew.burne@usdoj.gov, James.Gee@usdoj.gov;Lindsey.Huston@usdoj.gov;Rinehart.Peshell@usdoj.gov;Rachelle.D.Hughes@usdoj.gov;Brittany.Dewitt@usdoj.gov
- Deborah Rae Chandler dchandler@aklawfirm.com
- Carson Heninger heningerc@gtlaw.com, carson-heninger-5642@ecf.pacerpro.com,Candy.Long@gtlaw.com
- Samuel P. Hershey sam.hershey@whitecase.com, mco@whitecase.com
- Annette W. Jarvis jarvisa@gtlaw.com, longca@gtlaw.com
- Michael R. Johnson mjohnson@rqn.com, docket@rqn.com;ASanchez@rqn.com;RQN@ecfalerts.com
- Peter J. Kuhn Peter.J.Kuhn@usdoj.gov, James.Gee@usdoj.gov;Lindsey.Huston@usdoj.gov;Rinehart.Peshell@usdoj.gov;Rachelle.D.Hughes@usdoj.gov;Brittany.Dewitt@usdoj.gov
- Joli A. Lofstedt joli@jaltrustee.com, ecf.alert+LofstedtUTB@titlexi.com,brenda@jaltrustee.com
- Artur Machalski artur.machalski@gmail.com
- Elliott D. McGill emcgill@parsonsbehle.com
- Darren B. Neilson dneilson@parsonsbehle.com
- Christopher L. Perkins cperkins@eckertseamans.com
- Gregory F. Pesce gregory.pesce@whitecase.com, mco@whitecase.com
- Walter A Romney war@clydesnow.com, gmortensen@clydesnow.com
- Brian M. Rothschild brothschild@parsonsbehle.com, ecf@parsonsbehle.com;docket@parsonsbehle.com
- Jeffrey Weston Shields jshields@rqn.com, 5962725420@filings.docketbird.com;docket@rqn.com;ecasaday@rqn.com
- Abigail Jennifer Stone abigail.stone@gtlaw.com
- Landon S. Troester lst@clydesnow.com, rcondos@clydesnow.com
- United States Trustee USTPRegion19.SK.ECF@usdoj.gov
- Melinda Willden tr melinda.willden@usdoj.gov, James.Gee@usdoj.gov;Lindsey.Huston@usdoj.gov;Rinehart.Peshell@usdoj.gov;Rachelle.D.Hughes@usdoj.gov;Brittany.Dewitt@usdoj.gov

*/ s / Abigail Stone*

## CERTIFICATE OF SERVICE – MAIL, OTHER

I further certify that I caused to be served a true and correct copy of the Notice as follows:

**Mail Service** – By regular first-class United States Mail, postage fully pre-paid, addressed to:

Nikita Ash
1221 Avenue of the Americas
New York, NY 10020-1095

CFO Solutions, LLC dba Amplo
13601 W McMillan Rd
#102 PMB 320
Boise, ID 83713

Alexander S Chang
201 S. Main St Ste 1800
Salt Lake City, UT 84111

Kyle Ferrier
300 South Biscayne Blvd.
Suite 4900
Miami, FL 33131

Nicholas Kennedy
1900 N. Pearl Street
Suite 1500
Dallas, TX 75201

Colonel Michael D. Brewer
8901 Beauchamp Dr
Alexandria, VA 2230

*/ s / Abigail Stone*