Brian M. Rothschild, USB #15316
Darren Neilson, USB #15005
Simeon J. Brown, USB #17951
Alexander S. Chang, USB #18879
**PARSONS BEHLE & LATIMER**
201 South Main Street, Suite 1800
Salt Lake City, UT 84111
Telephone: 801.532.1234
Facsimile: 801.536.6111
BRothschild@parsonsbehle.com
DNeilson@parsonsbehle.com
SBrown@parsonsbehle.com
AChang@parsonsbehle.com

*Attorneys for Debtor Power Block Coin, L.L.C.*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| In re: | Case No. 24-bk-23041-JTM |
| POWER BLOCK COIN, L.L.C. | Chapter 11 |
| Debtor | Judge Joel T. Marker |

**DEBTOR'S MOTION FOR AN ORDER (1) AUTHORIZING CONTINUED USE OF DEBTOR'S PAYMENT SYSTEM THROUGH SERVICES AGREEMENT WITH BLUE CASTLE HOLDINGS INC., (2) WAIVING CERTAIN INVESTMENT AND DEPOSIT GUIDELINES, AND (3) GRANTING RELATED RELIEF**

Debtor POWER BLOCK COIN, L.L.C. d/b/a "SMARTFI" ("**SmartFi**" or the "**Debtor**"), debtor and debtor in possession, by and through its undersigned proposed counsel, hereby moves (this "**Motion**") for entry of an order substantially in the form attached as <u>Exhibit A</u> hereto, (1) authorizing but not directing the Debtor to continue using its existing cash management system through the Management Services Agreement with Blue Castle Holdings, Inc., a Delaware corporation ("**Blue Castle**"), (2) waiving certain investment and deposit guidelines of the Office

4884-2529-7097



EXHIBIT
3

of the United States Trustee (the "**Guidelines**"), and (3) granting such further relief as is required

to effectuate the foregoing.  In support, the Debtor respectfully states as follows.

## I.    <u>SUMMARY OF RELIEF REQUESTED</u>

U.S Trustee Guidelines require that a debtor in possession, among other things, (a) close

all existing bank accounts, (b) open new debtor-in-possession bank accounts, (c) establish one

debtor-in-possession account for the payment of taxes, including payroll taxes, and (d) obtain

checks and other forms bearing the designation "Debtor in Possession," the case number, and the

type of account.  Through this Motion, the Debtor requests that the Court waive certain of these

and other requirements as specified herein.

The Debtor has no cash at this time.  The Debtor's assets are comprised of Crypto-Backed

Loan receivables, choses in action, some digital asset cryptocurrencies, a software platform,

technology, a website (smartfi.com), loan receivables, and other non-cash assets.  Therefore, it

does not have any cash with which to open a debtor-in-possession account, nor does it have a need

at this time to open a debtor-in-possession account.

Instead of cash, the Debtor procures services and meets its payment obligations through a

Management Services Agreement with Blue Castle (the "**Services Agreement**"), attached as

<u>Exhibit B</u> hereto.  Following the failures of other cryptocurrency exchanges, many traditional

banking institutions ceased providing business banking services to crypto-related businesses like

SmartFi.  As a workaround, SmartFi entered into the Services Agreement whereby Blue Castle,

using its own bank accounts, pays for certain SmartFi obligations such as professionals' fees, and

third-party payables owed by SmartFi whenever U.S. dollars are required.

4884-2529-7097

Because the Debtor has no employees, Blue Castle employees provide services and manage the Debtor, for which SmartFi pays certain agreed-upon amounts under the Services Agreement. These fees include the allocated costs of such employees, including benefits, payroll, insurance, withholding, and the like. Blue Castle also provides certain shared goods and services such as management services, utilities, office space, and internet server services for SmartFi's cryptocurrency exchange platform. Blue Castle passes through these obligations and charges a ten percent (10%) fee. Amounts owed by SmartFi to Blue Castle are strictly accounted for in both entities' books. To pay its obligations under the Services Agreement, SmartFi either transfers cryptocurrencies to Blue Castle or applies a credit against the balances of the Blue Castle Loan, a loan it has made to Blue Castle. Because of this, the Debtor's "cash management system" as contemplated herein is effectively an asset management system, whereby the Debtor leverages its non-cash assets to function as its cash management system.

Without the Services Agreement and the relief requested in this Motion, SmartFi would become unable to operate, meet its expense, pay its professionals, maintain its platform, or pay for its share of the employees and managers who run its businesses.

## II.      JURISDICTION

1.      The Court has jurisdiction over this matter under 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

2.      The Debtor's principal offices and principal place of business are in the District of Utah, and therefore venue is proper in this District under 28 U.S.C. §§ 1408(1) and 1409.

3.      The bases for the relief requested herein are section 105(a) of title 11 of the United States Code (the "**Bankruptcy Code**") and rules 6003 and 6004 of the Federal Rules of

4884-2529-7097

Bankruptcy Procedure (the "**Bankruptcy Rules**"). Under section 105(a) of the Bankruptcy Code, this Court has the authority to "issue any order . . . that is necessary or appropriate to carry out the provisions of" chapter 11 of the Bankruptcy Code. 11 U.S.C. § 105(a).

### A. General Background

4. SmartFi is a Utah limited liability company that provides crypto-based financial services, which historically have included cryptocurrency exchange, savings, crypto-based lending, crypto information, token creation and offering, alternative currencies, and cryptocurrency investment. SmartFi has more recently diversified into more traditional lending, including lending on real-estate development and other types of financial services.

5. SmartFi operates a platform for its clients through its website portal at (smartfi.com). It generates revenue through interest on loans denominated in dollars and cryptocurrencies, trading and hedging, and fees assessed on certain transactions on its platform.

6. On June 20, 2024 (the "**Petition Date**"), SmartFi filed a petition for relief under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**"), commencing this case (the "**Chapter 11 Case**"), and elected to proceed under Subchapter V. The Debtor remains in possession of its estate and is operating its business.

7. Further factual support for the Motion is in the *Declaration of Aaron Tilton in Support of First Day Motions* filed on the Petition Date, the statements and arguments of counsel before the Court, and the entire docket and record of the Chapter 11 Case.

### B. Background Specific to the Motion.

8. Following the failures of other cryptocurrency exchanges such as CoinBase, FTX, and Celsius Network, many traditional banking institutions ceased providing business banking

4884-2529-7097

services to crypto-related businesses.  In approximately December of 2023, SmartFi's banking institutions closed its accounts, which complicated SmartFi's ability to manage its cash and payments.  While SmartFi continued to hold and exchange cryptocurrencies on its platform, it had to establish new mechanisms to pay its dollar-denominated operational expenses and take payments of dollar-denominated assets such as loans.

9.  As a workaround, SmartFi entered into the Services Agreement (Exhibit B hereto) dated as of December 1, 2023, with Blue Castle whereby Blue Castle, using its own bank accounts, pays for certain SmartFi obligations such as professionals' fees, utilities attributable to SmartFi, and third-party payables on behalf of SmartFi whenever U.S. dollars are required.  Further, Blue Castle also provides certain goods and services such as management services, utilities, office space, internet server hosting costs for SmartFi's cryptocurrency exchange platform and website, and the like.

10.  SmartFi has no employees, but rather, all work necessary for the operation of SmartFi is provided by Blue Castle employees under the Services Agreement.  Blue Castle manages SmartFi through its employees.  Blue Castle likewise pays these employees' benefits, payroll taxes, workers' compensation insurance premiums, and other costs of employment.

11.  SmartFi and Blue Castle strictly account for the expenses charged to SmartFi in both entities' books.  In exchange for facilitating payments, management of SmartFi, and the other services under the Service Agreement, Blue Castle charges SmartFi 10 percent of the disbursements as a fee.  To pay the expenses, allocated costs, and 10 percent fee, SmartFi either transfers cryptocurrencies to Blue Castle or reduces the balances of the Blue Castle Loan (described below) to account for its payment obligations under the Services Agreement.  Without

4884-2529-7097

the Services Agreement, SmartFi would have been unable to operate after it became unbanked following the divestiture by banks of their cryptocurrency businesses.

## III.     BASIS FOR RELIEF

Absent a court order to the contrary, the U.S. Trustee Guidelines require a chapter 11 debtor-in-possession to (a) close all existing bank accounts and open new accounts, designated as debtor-in-possession accounts, in financial institutions authorized as depositories by the U.S. Trustee, (b) establish separate debtor-in-possession accounts for the payment of taxes and for cash collateral, and (c) dispose of old checks, business forms, advertisements, etc., and obtain and use new checks and business forms for all debtor-in-possession accounts bearing the designation "Debtor in Possession."  The Debtor's brokerage platform would also be required to change all their designed promotional materials, sales platforms, and graphics, and other materials to indicate SmartFi's "Debtor in Possession" status.

Notwithstanding these Guidelines, this Court has the authority to "issue any order . . . that is necessary or appropriate to carry out the provisions of" Chapter 11 of the Bankruptcy Code. 11 U.S.C. § 105(a).

The Court should exercise its authority in this Chapter 11 Case because "[a] debtor in possession under Chapter 11 is generally authorized to continue operating its business." *In re Amdura Corp.*, 75 F.3d 1447, 1453 (10th Cir. 1996) (citing 11 U.S.C. §§ 363(c)(1), 1107, 1108). Here, an order waiving the above requirements of the Guidelines is both necessary and appropriate to ensure the efficient post-petition administration of the Debtor's estate and to mitigate the risk of counterproductive harm to the value of the estate. In situations where, as here, SmartFi's brand

6

reputation is its most valuable asset, the "debtor in possession" label could cause immediate and irreparable harm to the Debtor's brand and its viability.

The Debtor does not even have a bank account at this time to close. Further, the Debtor's assets are at this time not assets that need to be deposited or protected in a collateralized bank account. Rather, the URL, website, software, technology, loan receivables, and a small amount of cryptocurrency are safe and not subject to bank failures.

## IV.   ARGUMENT

### A.   Maintenance of the Debtor's Existing Cash Management System Through the Services Agreement Is in the Best Interests of the Estate.

The Debtor seeks an order waiving the requirement that it close its existing cash management system and open a collateralized debtor-in-possession account. As set forth above, The Debtor does not even have a bank account at this time to close. Nevertheless, the Debtor is able to pay its ordinary-course expenses such as the allocated costs of its employees and their benefits, insurance premiums, withholdings, etc., plus the costs of contractors, and legal professionals by using Blue Castle as an intermediary under the Services Agreement. Currently, Blue Castle is paying these expenses and deducting the actual cash payments amount plus ten percent (10%) percent from the balance of a loan payable due from Blue Castle to SmartFi (the "**Blue Castle Note**"). The current balance on the Blue Castle Note as of the Petition Date is approximately $1,161,248.94. Therefore, the Debtor's expenses can be paid entirely from the balance of the Blue Castle Note for some time, alleviating any need for the Debtor to liquidate any of its assets to fund its operations or the Chapter 11 Case.

Under this Motion, the Debtor would continue its current practice of using Blue Castle as an intermediary for payment of its dollar-denominated obligations. The Debtor will nevertheless

7

use best efforts to open a collateralized DIP account, but, given that no bank was willing to open one for the Debtor prior to the Petition Date, it is skeptical that it can find a bank willing to open a collateralized DIP account now that it is a debtor in possession and yet still a cryptocurrency business.

To ensure transparency, the Debtor would file with its monthly operating reports statements showing its cryptocurrency holdings, which, as noted above, are not expected to be used to fund operations during the Chapter 11 Case. Further, the Debtor will file statements from Blue Castle detailing all payments being made on the Debtor's behalf and an accounting of the amount remaining due under the Blue Castle Loan. If the Court does not allow the Debtor to continue procuring services and making payments via Blue Castle under the Services Agreement, the Debtor's employees, insurance premiums, vendors, web services, independent contractors, and other obligations will go unpaid, and the Debtor's operations will collapse.

The Debtor's cash management system through the Services Agreement allows it to (a) control and monitor corporate assets; (b) ensure availability of cash (via Blue Castle) to meet dollar-denominated expenses; and (c) reduce administrative expenses by facilitating the movement of funds and the development of timely and accurate balance and presentment information. Permitting the Debtor to continue using its existing cash management system will assist the Debtor in its effort to maintain its operations and the value of its estate as a going concern.

Conversely, requiring the Debtor to close its existing cash management system immediately will render the Debtor unable to operate. It would have to fire-sale and liquidate its assets to generate cash to pay expenses, and, even if it did, there is likely no banking institution that would open an account to hold the cash proceeds. This would unnecessarily disrupt the

4884-2529-7097

Debtor's business operations, force the Debtor's limited and already overburdened staff to re-create an already functioning system, burden the estate with additional post-petition professionals' expenses in order to comply, all at a potentially high cost to its estate. In addition to the likely confusion associated with the adoption of a new cash management system, the burden of taking this step would increase the work required of the Debtor's small staff, who already must deal with the many and varied issues and information requests related to this Chapter 11 Case. This additional burden, expense, and risk of harm to the Debtor's estate would not be attended in this Chapter 11 Case by any discernible benefit to the Debtor's estate or its creditors, vendors, or customers.

**B.     The Order Should Be Immediately Effective.**

Although it most likely does not apply to the relief sought in this Motion, Bankruptcy Rule 6003 provides that "[e]xcept to the extent that relief is necessary to avoid immediate and irreparable harm, the court shall not, within 21 days after the filing of the petition, issue an order granting . . . a motion to use, sell, lease, or otherwise incur an obligation regarding property of the estate, including a motion to pay all or part of a claim that arose before the filing of the petition . . . ." For the reasons discussed herein, if the Debtor is not able to continue using its existing Cash Management System on an uninterrupted basis, the result would be immediate and irreparable harm to the Debtor and its business operations. Significant changes to the Debtor's cash management system would needlessly cost the Debtor time and money with no discernable benefit. Accordingly, the relief requested herein is consistent with Bankruptcy Rule 6003, to the extent Rule 6003 even applies.

9

4884-2529-7097

Further, to implement the foregoing successfully, the Debtor seeks a waiver of the notice requirements under Bankruptcy Rule 6004(a) and the fourteen-day stay of an order authorizing the use, sale, or lease of property under Bankruptcy Rule 6004(h), to the extent these rules are applicable.

## V. __NOTICE__

The Debtor provided an advanced courtesy copy of this Motion to the U.S. Trustee prior to filing the Motion and sought the input of the U.S. Trustee. No trustee or examiner has been appointed in the Chapter 11 Case. The Debtor has provided notice of this Motion to (a) the Subchapter V Trustee appointed to this Case, (b) the Office of the United States Trustee for the District of Utah; (c) the parties listed on the List of Creditors Holding the 20 Largest Unsecured Claims for the Debtor; (d) all ECF notice parties; (e) the United States Internal Revenue Service; and (f) the Utah State Tax Commission. The Debtor has also provided notice of this Motion on its website at the webpage www.smartfi.com/bankruptcy.[1] In light of the nature of the relief requested in this Motion, the Debtor respectfully submits that no further notice is necessary.

No prior application for the relief sought in this Motion has been made to this Court or any other court in connection with this Chapter 11 Case.

## VI. __CONCLUSION__

WHEREFORE, for the reasons set forth herein, the Debtor respectfully requests the Court grant the Motion and enter the proposed order substantially in the form attached as Exhibit A hereto, (1) authorizing but not directing the Debtor to continue using its existing cash management

---

[1] The Debtor has a pending motion to limit notice to its numerous customer-creditors filed concurrently herewith which, if granted, would permit the Debtor to provide future notices in the case on its website under a dedicated link and webpage.

10

4884-2529-7097

system through the Services Agreement with Blue Castle, (2) waiving the U.S. Trustee Guidelines

as described herein, and (3) granting such further relief as is required to effectuate the foregoing

and for such other relief as is just and proper under the circumstances.

DATED June 20, 2024.

PARSONS BEHLE & LATIMER

_/s/ Brian M. Rothschild_
Brian M. Rothschild
Darren Neilson
Simeon J. Brown
Alexander S. Chang

_Attorneys for Debtor Power Block Coin, L.L.C._

11

4884-2529-7097

Case 24-23041 Doc 44 Filed 06/20/25 Entered 06/20/25 21:47:21 Desc Main
Document Page 12 of 25

Case 24-23041 Doc 44-3 Filed 06/20/25 Entered 06/20/25 21:44:21 Desc Exhibit
Exhibit 3. Case Management Motion Page 12 of 25

**EXHIBIT A**

**PROPOSED ORDER**

*Order Prepared By:*
Brian M. Rothschild, USB #15316
Darren Neilson, USB #15005
Simeon J. Brown, USB # 17951
Alexander S. Chang, USB #18879
**PARSONS BEHLE & LATIMER**
201 South Main Street, Suite 1800
Salt Lake City, UT 84111
Telephone: 801.532.1234
Facsimile: 801.536.6111
BRothschild@parsonsbehle.com
DNeilson@parsonsbehle.com
SBrown@parsonsbehle.com
AChang@parsonsbehle.com

*Attorneys for Debtor Power Block Coin, L.L.C.*

---

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| In re: | Case No. 24-bk-23041-JTM |
| POWER BLOCK COIN, L.L.C. | Chapter 11 |
| Debtor | Judge Joel T. Marker |

---

### ORDER (1) AUTHORIZING CONTINUED USE OF DEBTOR'S CASH MANAGEMENT SYSTEM THROUGH SERVICES AGREEMENT WITH BLUE CASTLE HOLDINGS INC., (2) WAIVING CERTAIN INVESTMENT AND DEPOSIT GUIDELINES, AND (3) GRANTING RELATED RELIEF

---

4884-2529-7097

Upon the motion (the "**Motion**")[2] filed by the above-captioned debtor and debtor-in-possession (the "**Debtor**") seeking entry of an order (1) authorizing but not directing the Debtor to continue using its existing cash management system through the Services Agreement with Blue Castle Holdings Inc. ("**Blue Castle**"), (2) waiving certain investment and deposit guidelines of the Office of the United States Trustee (the "**Guidelines**"), and (3) granting such further relief as is required to effectuate the foregoing, and the Court, having reviewed the Motion and having heard the statements of counsel in support of the relief requested in the Motion at the hearing before the Court (the "**Hearing**"), and upon the *Declaration of Aaron Tilton in Support of Chapter 11 Petition and First Day Motions*, and upon the record of the proceedings before this Court, and the Court finding that it has jurisdiction over this matter under 28 U.S.C. §§ 157 and 1334, that this is a core matter under 28 U.S.C. § 157(b)(2), that notice of the Motion and the Hearing were sufficient under the circumstances and that no further notice need be given for the relief sought herein; and the legal and evidentiary bases set forth in the Motion and at the Hearing establish just cause for the relief granted herein and that such relief is necessary to avoid immediate and irreparable harm to the Debtor's estate,

**THEREFORE, IT IS HEREBY ORDERED THAT:**

1.      The Motion is GRANTED.

2.      The Debtor is authorized, but not required, to maintain and use its existing cash management system through the Services Agreement with Blue Castle, as more fully set forth in the Motion.  In connection with the ongoing utilization of the cash management system, the Debtor shall continue to maintain strict records with respect to all transfers so that all transactions may be

---

[2] Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Motion.

4884-2529-7097

readily ascertained, traced, recorded properly, and distinguished between pre-petition and post-petition transactions, and to provide same to the U.S. Trustee on a monthly basis.

3. The Debtor is authorized to continue using its existing brokerage platform to hold its cryptocurrency digital assets for its ongoing business operations.

4. The Debtor shall file with its monthly operating reports statements showing its cryptocurrency holdings. Further, the Debtor will file statements from Blue Castle detailing all payments being made on the Debtor's behalf and an accounting of the amount remaining due under the Blue Castle Loan.

5. The requirement in the Guidelines that the Debtor establish debtor-in-possession bank accounts is waived. The Debtor shall use best efforts to open a collateralized DIP account, but if unable to do so, may continue to operate under the Services Agreement with Blue Castle.

6. The Debtor is authorized to continue to use its existing business forms and brokerage platform without alteration to indicate its status as a debtor in possession.

7. The Debtor is authorized and empowered to take all actions necessary to implement the relief granted in this Order.

8. Rule 6003 of the Bankruptcy Rules has been satisfied to the extent applicable.

9. Notwithstanding the potential applicability of Bankruptcy Rules 6003, 6004, 7062, or 9014, the terms and conditions of this Order shall be immediately effective upon its entry.

10. The Court retains jurisdiction with respect to all matters arising from or related to the implementation of this Order.

4884-2529-7097

# EXHIBIT B

**SERVICES AGREEMENT WITH BLUE CASTLE HOLDINGS**

4884-2529-7097

## MANAGEMENT SERVICES AGREEMENT

**THIS MANAGEMENT SERVICES AGREEMENT** (this "*Agreement*") is made and effective as of the 1st day of December, 2023 (the "*Effective Date*"), by and between **BLUE CASTLE HOLDINGS, INC.**, a Delaware corporation ("*Manager*"), and **POWER BLOCK COIN, LLC**, dba **SMARTFI** a Utah limited liability company ("*Company*").

### RECITALS

**WHEREAS,** the Company is engaged in business of providing a cryptocurrency monetary system (the "*Business*");

**WHEREAS,** Manager has extensive knowledge and experience in providing oversight, management and support of certain administrative services, and Company is desirous of retaining Manager to provide such services, as hereinafter defined, to Company in support of the Business.

**NOW, THEREFORE,** in consideration of the mutual provisions set forth herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby agree as follows:

1. <u>Appointment and Grant of Rights</u>.

(a) Subject to the terms and conditions set forth herein (the "*Terms*"), Company hereby appoints and grants Manager the exclusive right to provide and perform, for and on behalf of Company, and Manager agrees to provide and perform, on behalf of Company, the oversight and management services generally provided by executive management. Consistent with the provisions of this Agreement, Manager shall have the responsibility and commensurate authority to provide the business services Manager reasonably determines appropriate to meet the day-to-day business functions of the foregoing personnel all as more specifically described in **Exhibit A** hereof (the "*Services*").

(b) A service or task not included in **Exhibit A** shall not be deemed part of the services to be performed by Manager hereunder, unless such service or task is reasonably necessary to accomplish the Services.

2. <u>Manager' Obligations</u>. Manager shall:

(a) before the date on which the Services are to start, obtain, and at all times during the term of this Agreement, maintain, all necessary licenses and consents and comply with all relevant laws applicable to the provision of the Services;

(b) maintain complete and accurate records relating to the provision of the Services under this Agreement, including records of the time spent and materials used by Manager in providing the Services. During the term of this Agreement, and for a period of two (2) years thereafter, upon Company's reasonable request, Manager shall allow Company to inspect and make copies of such records and interview Manager personnel in connection with the provision of the Services;

(c) obtain Company's written consent, which consent shall not be unreasonably withheld, prior to entering into agreements with or otherwise engaging any person or entity, including all subcontractors, other than Manager' employees or affiliates, to provide any Services to Company (each such approved subcontractor or other third party, a **"*Permitted Subcontractor*"**). Company's approval shall not relieve Manager of its obligations under the Agreement, and Manager shall remain fully responsible for

**Error! Unknown document property name.**

the performance of each such Permitted Subcontractor and its employees and affiliates and for their compliance with all of the terms and conditions of this Agreement as if they were Manager' own employees. Nothing contained in this Agreement shall create any contractual relationship between Company and any Manager subcontractor or supplier;

(d)     ensure that all persons, whether employees, agents, subcontractors, or anyone acting for or on behalf of Manager, are properly licensed, certified, or accredited as required by applicable law and are suitably skilled, experienced, and qualified to perform the Services;

(e)     devote and cause its employees and other representatives to devote, such time, attention and effort to the provisions of this Agreement as is necessary to perform the Services in a matter reasonably acceptable to Company;

(f)     faithfully comply with all the terms and conditions of this Agreement.

3.     Company's Obligations.  Company shall:

(a)     pay Manager the Service Fees specified in and in accordance with the manner and schedule set forth herein and in **Exhibit B** hereof;

(b)     provide Manager access to Company's staff and relevant information to enable it to perform the Services;

(c)     provide Manager with and allow it to use Company's specialized software and/or hardware system, if any;

(d)     cooperate with and support Manager in its efforts to comply with and perform its obligations hereunder; and

(e)     faithfully comply with all the terms and conditions of this Agreement.

4.     Fees and Expenses; Payment Terms.

(a)     In consideration for the satisfactory provision of the Services by Manager, Company agrees to pay the fees set forth on **Exhibit B** (the "***Service Fees***").

(b)     Company shall pay the Service Fees to Manager within thirty (30) days of June 30 and December 31 of each fiscal year.

(c)     The Service Fees and Services are subject to review by both parties annually from the Effective Date of this Agreement.

5.     Intellectual Property.

(a)     All intellectual property rights, including copyrights, patents, patent disclosures, and inventions (whether patentable or not), trademarks service marks, trade secrets, know-how and other confidential information, trade dress, trade names, logos, corporate names and domain names, together with all of the goodwill associated therewith, derivative works and all other rights (collectively, "***Intellectual Property Rights***") in and to all documents, work product, and other materials that are delivered to a party under this Agreement or prepared by or on behalf of the other party in the course of performing the Services shall be owned exclusively by the party who first owned or created the Intellectual Property Rights.

**Error! Unknown document property name.**

Case 24-30304 Doc 4473 Filed 06/20/25 Entered 06/20/25 21:47:21 Desc Exhibit
Exhibit 3. Cash Management Motion Page 19 of 25

*Management Services Agreement*

(b)     The party providing the Services and its licensors are, and shall remain, the sole and exclusive owners of all right, title and interest in and to all documents, data, know-how, methodologies, software and other materials, including computer programs, reports and specifications, provided by or used by it in connection with performing the Services.

6.     <u>Confidential Information.</u>

(a)     All non-public, confidential or proprietary information of Company, including, but not limited to, trade secrets, technology, information pertaining to business operations and strategies, and information pertaining to customers, pricing, and marketing (collectively, "***Confidential Information***"), disclosed by Company to Manager, whether disclosed orally or disclosed or accessed in written, electronic, or other form or media, and whether or not marked, designated, or otherwise identified as "confidential," in connection with the provision of the Services and this Agreement is confidential, and shall not be disclosed or copied by Manager without the prior written consent of Company. Confidential Information does not include information that is:

(i)     in the public domain;

(ii)     known to Manager at the time of disclosure; or

(iii)     rightfully obtained by Manager on a non-confidential basis from a third party.

(b)     Manager shall use the Confidential Information only for the purpose of providing Services under this Agreement.

(c)     Without limiting any remedies at law or equity to which it may otherwise be entitled, Company shall be entitled to injunctive relief for any violation of this Section.

(d)     The parties hereby acknowledge that in the event a party breaches the provisions of this Section 6, the burden of proof shall lie with the breaching party to show that the breaching party did not use any Confidential Information to the detriment of the party to which such Confidential Information belongs.

7.     <u>Representations and Warranties.</u>

(a)     Manager represents and warrants to Company that:

(i)     It is duly authorized to enter into this Agreement and that this Agreement represents obligations of the Manager and are enforceable hereunder.

(ii)     It shall perform the Services using personnel of required skill, experience, and qualifications and in a professional and workmanlike manner in accordance with customary industry standards for similar services and shall devote adequate resources to meet its obligations under this Agreement.

(iii)     It is in compliance with, and shall perform the Services in compliance with, all applicable laws.

(iv)     The Services will be in conformity in all respects with all requirements or specifications stated in this Agreement.

- 3 -

*Management Services Agreement*

(b)     Company represents and warrants to Manager that:

(i)     It is duly authorized to enter into this Agreement and that this Agreement represents obligations of the Company and are enforceable hereunder.

(ii)     It has all rights, authorizations and capacity to enter into this Agreement and to carry out any and all duties, responsibilities and activities hereunder and that it owns or holds any and all applicable licenses, permits and other authorizations and consents (including but not limited to any government authorizations and consents) in respect of the Business.

8.     <u>Warranties Cumulative</u>.  The warranties set forth in Section 7 above are cumulative and in addition to any other warranty provided by law or equity. These warranties survive any acceptance of or payment for the Services by Company. Any applicable statute of limitations runs from the date of Company's discovery of the noncompliance of the Services with the foregoing warranties.

9.     <u>General Indemnification</u>.

(a)     Manager shall defend, indemnify, and hold harmless Company and its subsidiaries, affiliates, successors, or assigns and its respective directors, officers, shareholders, and employees (collectively, "***Company Indemnitees***") against any and all loss, injury, death, damage, liability, claim, deficiency, action, judgment, interest, award, penalty, fine, cost or expense, including reasonable attorney and professional fees and costs, and the cost of enforcing any right to indemnification hereunder and the cost of pursuing any insurance providers (collectively, "***Losses***") arising out of or related to (i) any gross negligence or willful misconduct of Manager or its employees, agents and representatives; (ii) any uncured material breach of this Agreement by Manager or (iii) any violation of any law, rule, ordinance or regulation by Manager.

(b)     Company shall defend, indemnify, and hold harmless Manager and its subsidiaries, affiliates, successors, or assigns and its respective directors, officers, shareholders, and employees (collectively, "***Manager Indemnitees***") against any and all loss, injury, death, damage, liability, claim, deficiency, action, judgment, interest, award, penalty, fine, cost or expense, including reasonable attorney and professional fees and costs, and the cost of enforcing any right to indemnification hereunder and the cost of pursuing any insurance providers (collectively, "***Losses***") arising out of or related to (i) any gross negligence or willful misconduct of Company or its employees, agents and representatives; (ii) any uncured material breach of this Agreement by Company or (iii) any violation of any law, rule, ordinance or regulation by Company.

10.     <u>Intentionally left blank</u>

11.     <u>Termination</u>.

(a)     Either party may terminate this Agreement by written notice to the other party for any reason or no reason. Such termination shall be effective upon delivery of such written notice to the non-terminating party.

(b)     After the issuance of the termination notice by any party, the parties shall begin making their respective plans for the termination, and, prior to the effective date of the termination, the parties shall meet to discuss their respective plans and reasonably cooperate with each other to minimize the adverse impact of the termination on the businesses of the parties.

- 4 -

12. <u>Waiver</u>.  No waiver by any party of any of the provisions of this Agreement is effective unless explicitly set forth in writing and signed by the other party. No failure to exercise, or delay in exercising, any rights, remedy, power or privilege arising from this Agreement operates or may be construed as a waiver thereof. No single or partial exercise of any right, remedy, power, or privilege hereunder precludes any other or further exercise thereof or the exercise of any other right, remedy, power, or privilege.

13. <u>Force Majeure</u>.  Neither party shall be liable or responsible to the other party, nor be deemed to have defaulted or breached this Agreement, for any failure or delay in fulfilling or performing any term of this Agreement when and to the extent such failure or delay is caused by or results from acts or circumstances beyond the reasonable control of the impacted party, including, without limitation, acts of God, flood, fire, earthquake, war, embargo, invasion or hostilities, terrorist acts, riot, national emergency, revolution, insurrection, epidemic, or strike (each a "***Force Majeure Event***"). Manager's economic hardship or changes in market conditions are not considered Force Majeure Events. Manager shall use all diligent efforts to end the failure or delay of its performance, ensure that the effects of any Force Majeure Event are minimized, and resume performance under this Agreement. If a Force Majeure Event prevents Manager from carrying out its obligations under this Agreement for a continuous period of more than thirty (30) business days, Company may terminate this Agreement immediately by giving written notice to Manager.  During any Force Majeure Event when Manager cannot supply the Services, Company shall be permitted to secure third party services on an interim basis.

14. <u>Assignment</u>.  Manager shall not assign any of its rights or delegate any of its obligations under this Agreement except to an affiliate without the prior written consent of Company, which consent shall not be unreasonably withheld, or as contemplated by Section 2(c) above. Any purported assignment or delegation in violation of this Section shall be null and void. No assignment or delegation relieves Manager of any of its obligations under this Agreement.

15. <u>Relationship of the Parties</u>.  Nothing contained in this Agreement shall be construed as creating any agency, partnership, joint venture, or other form of joint enterprise, employment, or fiduciary relationship between the parties, and neither party shall have authority to contract for or bind the other party in any manner whatsoever. By virtue hereof, neither party assumes, directly or by implication, the debts, obligations, taxes or liabilities of the other party.

16. <u>No Third-party Beneficiaries</u>.  This Agreement is for the sole benefit of the parties hereto and their respective successors and permitted assigns and nothing herein, express or implied, is intended to or shall confer upon any other person or entity any legal or equitable right, benefit, or remedy of any nature whatsoever under or by reason of these Terms.

17. <u>Governing Law</u>.  This Agreement shall be governed by and construed in accordance with the laws of the State of Utah without regard to any otherwise applicable choice of laws principles and rules.

18. <u>Entire Agreement</u>.  This Agreement sets forth the entire agreement between the parties and fully supersedes any and all prior agreements or understandings, written or oral, between the parties pertaining to the subject matter of this Agreement.

19. <u>Severability</u>.  Should any provision of this Agreement be declared or be determined by any court of competent jurisdiction to be illegal, invalid, or unenforceable, the legality, validity and enforceability of the remaining parts, terms, or provisions shall not be affected, and the illegal, unenforceable, or invalid part, term or provision shall be deemed not to be a part of this Agreement.

**Error! Unknown document property name.**

- 6 -

20.     <u>Binding Effect</u>.  This Agreement shall be binding upon and shall inure to the benefit of the parties and their respective heirs, successors, and assigns.

21.     <u>Counterparts</u>.  This Agreement may be executed by signatures delivered electronically and in one or more counterparts, each of which shall be considered an original, and all of which together shall be deemed one and the same instrument.

*[Signatures on the Following Page]*

**Error! Unknown document property name.**

IN WITNESS WHEREOF, the undersigned has caused its authorized representative to set his hand to this Agreement as of the date hereof.

MANAGER:

BLUE CASTLE HOLDINGS, INC., a
Delaware corporation

By: _*Aaron Tilton*_____

Name:__Aaron Tilton_____

Title:___President and CEO_____

COMPANY:

POWER BLOCK COIN, LLC, dba
SMARTFI, a Utah limited liability company

By:_*Brad L. Jones*_____

Name:__Brad L. Jones_____

Title:___Manager_____

*[Signature Page to Management Services Agreement]*

Error! Unknown document property name.

## EXHIBIT A

### *Services*

Unless otherwise agreed by the parties, the services generally performed by a company's executive management, including but not limited to the following: administration, accounting, actuarial, legal, compliance, information systems, and human resources.

Exhibit A-1

**Error! Unknown document property name.**

## EXHIBIT B

### *Service Fees*

Services fees will be equal to Power Block Coin, LLC expenses incurred plus a 10% administrative fee.

Exhibit B-1

**Error! Unknown document property name.**