Brian M. Rothschild, USB #15316
**PARSONS BEHLE & LATIMER**
201 South Main Street, Suite 1800
Salt Lake City, Utah 84111
Telephone:  801.532.1234
Facsimile:  801.536.6111
BRothschild@parsonsbehle.com
ecf@parsonsbehle.com

*Proposed Attorneys for the Debtor*
*Power Block Coin, L.L.C.*

---

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| In re:<br><br>POWER BLOCK COIN, L.L.C.<br><br>Debtor | Case No. 24-bk-23041-JTM<br><br>Chapter 11<br><br>Judge Joel T. Marker |

### DECLARATION OF AARON TILTON IN SUPPORT OF FIRST DAY RELIEF

---

I, Aaron Tilton, being duly sworn, declare as follows:

1. I am the co-founder and CEO of Power Block Coin, L.L.C., d/b/a "SmartFi" ("**SmartFi**" or the "**Debtor**"), the above-captioned debtor and debtor in possession.

2. I am over the age of 18 and competent to testify as to the matters set forth herein. Unless otherwise indicated, the facts set forth herein are based upon my personal knowledge or the knowledge of the Debtor's personnel and based on information learned in my capacity as CEO.

3. I submit this declaration (this "**Declaration**") in support of the Debtor's petition for relief under title 11, chapter 11 of the United States Code (the "**Bankruptcy Code**"), and in support of the relief requested in certain "first day" applications and motions (the "**First Day Motions**")

4871-9391-3277

EXHIBIT
4

filed on or shortly after the Debtor filed its petition for relief commencing this case (this "**Chapter 11 Case**") on the date hereof (the "**Petition Date**").

## I. NATURE OF SMARTFI'S BUSINESS AND OPERATIONS

4.      SmartFi is a Utah limited liability company wholly owned by Blue Castle Holdings Inc. ("**Blue Castle**").  SmartFi provides crypto-based financial services, which historically have included cryptocurrency exchange, savings, crypto-based lending, crypto information, token creation and offering, alternative currencies, and cryptocurrency investment.  SmartFi has more recently diversified into more traditional lending, including lending on real-estate development and other types of financial services.

### A.      SmartFi Platform

5.      SmartFi operates a platform (the "**Platform**") for its clients through its website portal at [www.smartfi.com](www.smartfi.com).  SmartFi earns fees from transactions made using its Platform. Specifically, SmartFi's platform allows its customers to manage their digital currency wallets. SmartFi's Platform (which is akin to a messaging system) facilitates customers' trades and withdrawals, and SmartFi earns fees on certain transactions.  The wallets are at all times owned by the customers (even though they show on SmartFi's balance sheet), but the digital currencies remain property of and under control of the customers.  SmartFi does not own the cryptocurrency traded on its Platform and thus has no obligation to return it or do anything with it.  Likewise, the customers using its Platform to trade have no claims against SmartFi, secured, unsecured, or otherwise.  They are simply customers who use SmartFi's Platform, from which activity SmartFi earns income.

### B.      SmartINTEREST Accounts

6.      SmartFi also allows customers to transfer use and ownership of cryptocurrencies to SmartFi and in exchange, earn interest on the transferred cryptocurrency ("**SmartINTEREST**

**Accounts**"). Unlike the customers' cryptocurrency wallets that are managed by SmartFi's Platform, cryptocurrencies transferred to SmartFi for SmartINTEREST Accounts become property of SmartFi. SmartFi, under its terms of use, may trade, hypothecate, and do what it wishes with the SmartINTEREST Account holders' cryptocurrencies:

### 3.2 Consent for us to use your Digital Assets

You hereby grant the Company for the duration of the period during which the Digital Assets are in your SmartFi Wallet for any purpose, including as collateral for loans or otherwise, all right and title to such Digital Assets, including ownership rights, and the right, without further notice to you, to hold such Digital Assets in the Company's' own virtual wallet or elsewhere, and to trade, loan, sell, pledge, re-pledge, hypothecate, rehypothecate, sell, lend, or otherwise transfer or use any amount of such Digital Assets, separately or together with other property, with all attendant rights of ownership, and for any period of time, and without retaining in the Company's possession and/or control a like amount of Digital Assets or any other monies or assets, and to use or invest such Digital Assets.

You acknowledge that with respect to Digital Assets used by the Company pursuant to this paragraph:

i. You may not be able to exercise certain rights of ownership;

ii. The Company may receive compensation in connection with lending or otherwise using Digital Assets in its business to which you have no claim or entitlement;

iii. The Company borrowers may default partially or entirely, which can result in partial or total loss of your Digital Assets. In that event, you authorize the Company to use Digital Assets to absorb the losses;

iv. The Company may use your Digital Assets as collateral to borrow other digital or fiat assets in different jurisdictions around the world. While such borrowings are for the purpose of optimizing the returns to all members, the Company may experience losses or partial recovery of such collateral in certain situations, pursuant to which you may experience losses; and

v. The Company may lend your coins to exchanges, hedge and other counterparties, which may provide full or partial collateral for any coin or fiat loan.

(SmartFi Terms of Use § 3.2 (the "**Consent to Use**").)

3

7.       Unlike customers who merely trade their own currency on the Platform, holders of SmartINTEREST Accounts put their cryptocurrency at risk and agree that SmartFi need not hold it.  Further, the relationship creates a claim against SmartFi for the return of the transferred cryptocurrency and payment of interest in accordance with the agreement governing the SmartINTEREST Accounts.

### C.       Crypto-Backed Loans

8.       A portion of SmartFi's loan portfolio had been loans to holders of cryptocurrencies, including cryptocurrency mining operations, that borrowed U.S. dollars from SmartFi and secured the loans with the borrower's cryptocurrencies ("**Crypto-Backed Loans**").  Like SmartINTEREST Accounts, borrowers would transfer possession and control over the cryptocurrency collateral, hold it in its own cryptocurrency wallets, and would use the collateral for investment, liquidity, hedges, crypto-denominated loans, and other financial services.  Crypto-Backed Loans, like SmartINTEREST Accounts, are subject to the same Consent to Use contained within SmartFi's Terms of Use.  Thus, the obligation to return the cryptocurrency transferred to SmartFi as "collateral" is a claim, though it is contingent upon repayment of the Crypto-Backed Loan in U.S. dollars by the borrower.

9.       Upon repayment of a Crypto-Backed Loans, to the extent necessary to return the collateral, SmartFi would use its liquidity to repurchase the required amount of cryptocurrency collateral from the market and return the cryptocurrency collateral to the borrower.  At other times, if SmartFi and the borrower both agreed, the parties would roll over Crypto-Backed Loans into new Crypto-Backed Loans with new maturity dates and new terms.  However, under the agreements governing the Crypto-Backed Loans, SmartFi always maintained the ability to require repayment from all borrowers in U.S. dollars upon each Crypto-Backed Loan's maturity date.

4

## II.    EVENTS LEADING TO FILING OF THE DEBTOR'S CHAPTER 11 CASE

### A.    The Effects of Cryptocurrency Business Instability on SmartFi

10.    Beginning in 2022, the worldwide cryptocurrency markets experienced a period of instability followed by rapid collapse and have been in a period of high instability ever since. Fortunately, SmartFi had de-risked some of its holdings prior to the collapse. For example, SmartFi did not do business or had ceased doing business with certain large cryptocurrency exchanges that collapsed such as CoinBase, FTX, and Celsius Network, but was still reliant on certain cryptocurrencies in its portfolio for liquidity.

11.    With a significant amount of SmartFi's assets tied up in illiquid, long-term instruments (loans), and the cryptocurrencies it normally relied on for liquidity experiencing collapse or instability, SmartFi struggled to maintain liquidity necessary to continue its operations.

12.    Further and as set forth in more detail, below, SmartFi has also been inundated with litigations and demands that, if SmartFi were required to immediately pay, would render SmartFi illiquid and likely insolvent.

### B.    Becoming Unbanked and the Blue Castle Services Agreement

13.    Following the failures of other cryptocurrency exchanges such as CoinBase, FTX, and Celsius Network, many traditional banking institutions ceased providing business banking services to crypto-related businesses. In approximately December of 2023, SmartFi's banking institutions closed its accounts, which complicated SmartFi's ability to manage its cash and payments. While SmartFi continued to hold and exchange cryptocurrencies on its platform, it had to establish new mechanisms to pay its dollar-denominated operational expenses and take payments of dollar-denominated assets such as loans.

14.    As a workaround, SmartFi entered into a Management Services Agreement dated as of December 1, 2023, with Blue Castle (the "**Services Agreement**") whereby Blue Castle, using

5

its own bank accounts, pays for certain SmartFi obligations such as professionals' fees, utilities attributable to SmartFi, and third-party payables on behalf of SmartFi whenever U.S. dollars are required. Further, Blue Castle also provides certain goods and services such as management services, utilities, office space, internet server hosting costs for SmartFi's cryptocurrency exchange Platform and website, and the like.

15. SmartFi has no employees, but rather, all work necessary for the operation of SmartFi is provided by Blue Castle employees under the Services Agreement. Blue Castle manages SmartFi through its employees. Blue Castle likewise pays these employees' benefits, payroll taxes, workers' compensation insurance premiums, and other costs of employment.

16. SmartFi and Blue Castle strictly account for the expenses charged to SmartFi in both entities' books. In exchange for facilitating payments, management of SmartFi, and the other services under the Service Agreement, Blue Castle charges SmartFi 10 percent of the disbursements as a fee. To pay the expenses, allocated costs, and 10 percent fee, SmartFi either transfers cryptocurrencies to Blue Castle or reduces the balances of the Blue Castle Loan (described below) to account for its payment obligations under the Services Agreement. Without the Services Agreement, SmartFi would have been unable to operate after it became unbanked following the divestiture by banks of their cryptocurrency businesses.

### C. The Solara Loan

17. The Debtor had (and still has) significant, though illiquid, loans in its portfolio, including a large real-estate-secured loan to Solara Communities, LLC ("**Solara**").[1] Solara is a wholly owned subsidiary of Blue Castle:

---

[1] Solara was previously called "SmartFi Toquerville."



18.     On March 15, 2022, Solara retained Imperial Capital, LLC ("**IC**") to underwrite, close, and service a $17,400,000 short-term bridge loan secured by approximately 200 acres of land located in an unincorporated area of Washington County Utah, just west of the City of Leeds and Toquerville, Utah.  The Borrower was Zions Landing Development Group, LLC ("**Zion's Landing**").  On behalf of Solara, IC engaged Steve Tumblin, Bennett, Tueller, Johnson & Deere LLC, as legal counsel to document the loan.  IC established Solara, a single purpose Utah limited liability company, as the lending entity and led the review of the loan documentation and discussions with area stakeholders about the development.

19.     To fund the loan, Solara borrowed $17,400,000 from SmartFi and executed and delivered a long-term promissory note with an interest rate of 5 percent, and a maturity date of March 17, 2032 (the "**Solara Loan**").

20.     IC serviced the Zion's Landing Loan on behalf of Solara.  However, Zion's Landing defaulted and, on October 6, 2022, Solara recorded a Notice of Default.  After multiple failed attempts to negotiate a forbearance extension, Solara initiated foreclosure proceedings using its law firm, Cohne Kinghorn, which continues to represent Solara.  The foreclosure sale was scheduled and concluded on March 31, 2023.  Solara took ownership of the property and engaged

with a real estate development firm to develop the property.  The Solara Loan remains outstanding and not in default.  The Solara Loan receivable, while illiquid, comprises one of SmartFi's largest assets.

## III.    CLAIMS AGAINST THE DEBTOR

21.    All of the claims against the Debtor are unsecured.  The claims against SmartFi can be separated into claims for return of cryptocurrencies, alleged buyback claims for holders of SMTFs (as defined below), and litigation claims.

### A.    Obligations to Return Cryptocurrency

22.    Substantially all of the General Unsecured Claims against SmartFi are unliquidated because they arise from Crypto-Backed Loans in which SmartFi is the lender or SmartINTEREST Accounts, both of which are obligations at different times and under different circumstances to return a specified amount of cryptocurrency to the contract counterparty.  Other obligations are litigation claims, which are either disputed and/or contingent, *e.g.*, upon a contract counterparty making a valid election to trade in its cryptocurrency.

23.    Under SmartFi's loan agreements governing Crypto-Backed Loans, SmartFi's obligation (*i.e.*, the "claim") is to return digital assets (cryptocurrency) to the borrower upon repayment of the loan.  Under the SmartINTEREST Accounts, SmartFi's obligation is to return the transferred cryptocurrency and any interest to the customer upon the customer's valid request to withdraw the digital assets. The value of the digital assets securing each loan fluctuates minute by minute and is not a value that can be agreed upon from any definitive source.  Further, the date for return of the cryptocurrency is not fixed until a valid demand is made, the loan is repaid, or a contractual obligation requires return, as applicable.  Because cryptocurrencies are a commodity that can be obtained from many sources at whatever price the parties are willing to trade in an

arms' length transaction, the amount of the obligation is also unliquidated by its nature even when a date is fixed.

24.  In total, as of the Petition Date, the cryptocurrencies that are collateral to be returned upon repayment of Crypto-Backed Loans and the cryptocurrencies that SmartFi has to return to its SmartINTEREST Account holders, which it may at some point be obligated to return (at some date depending on the contract, loan, or other agreement) is estimated as follows:

| Cryptocurrency | Amount |
| --- | --- |
| BTC | 764.8646 |
| ETH | 2453.8858 |
| USDC | 4,388,423.6767 |
| USDT | 2,537.9879 |

25.  Because of the fluctuating values of each of these cryptocurrencies, the varying dates that SmartFi's obligation to return these assets may arise (or arose, if the obligation to return them or loan default occurred prior to the Petition Date), and the lack of an authoritative source for the value, it is not possible to determine either the individual or total amount of these General Unsecured Claims against the Debtor as of the Petition Date in U.S. dollars.

**B.**     **Contingent SMTF Buyback Guarantees**

26.  The Debtor is party to executory contracts for the purchase of its own digital tokens know as SmartFi Tokens ("**SMTFs**").  At this time and unless and until a SMTF purchaser makes a qualifying demand and returns its SMTFs to SmartFi for exchange, there is no obligation for SmartFi to repurchase any SMTF.  The agreements by which certain SMTF purchasers bought their SMTFs from SmartFi gave limited buyback guarantees that extend only to the original SMTF purchasers under certain conditions, including that the buyback request must be validly invoked within a certain amount of time.

27. In total, SmartFi sold SMTFs with a total potential repurchase obligation at time of issuance of $4,582,295. The potential dollar amount is possibly subject to calculation based on the purchase price of SMTFs, the purchase price of SMTFs outstanding, and whether the buyback would still be valid under all contractual conditions. The amount is also subject to uncertainty because there is no way of knowing how many of the original holders (who are the only ones who have the right to request repurchase) still hold the SMTFs versus how many have sold their SMTFs into the secondary market. But even if it could be calculated, the obligation to make good on the buyback guarantee is contingent. Further, all SMTFs-related obligations are contingent upon receipt of a valid repurchase request, which may never be made. Thus, these potential liabilities are in the nature of a contingent guarantee, the conditions for which have not occurred as of the Petition Date.

### C. Ordinary Course Payables

28. SmartFi may also have miscellaneous accounts payable, including payments to its vendors, utilities, contractors, and service providers, employees, and affiliates that regularly arise in the course of its business. All of these are paid by Blue Castle through the Services Agreement and, thus, are not obligations of SmartFi. Rather, there is a single consolidated monthly balance owed to Blue Castle that reflects these amounts.

### D. Litigation Claims

29. **Song Lawsuit**. During the period of illiquidity and instability in the crypto markets beginning in 2022, SmartFi began to require repayment of some of its Crypto-Backed Loans to bolster its liquidity. One such borrower, Zhouyang Song ("**Song**"), had a Crypto-Backed Loan with an original principal balance of $4,378,094.40 and a maturity date of February 2, 2023 (the "**Song Loan**").

10

30.    Song failed to repay the Song Loan on its maturity date, despite SmartFi's written demand, and SmartFi commenced a collection lawsuit in the Third District, Utah State Court. Song removed the case to the United States District Court for the District of Utah (Case 2:23-cv-00175-TC-JCB) (the "**Song Lawsuit**") and, despite conceding that he breached his agreement by failing to repay the Song Loan, nevertheless filed numerous counterclaims, including fraud, conversion, breach of contract, equitable recoupment, setoff, and trespass.  SmartFi obtained dismissal of the fraud counterclaim, but the Song Lawsuit remains pending.  Song deposited $1,000,000 into his SmartFi account, but he has never repaid the principal balance of the Song Loan.  Nevertheless, Song has insisted on extensive discovery and deposing numerous witnesses, ballooning the cost of litigating the Song Lawsuit for SmartFi.

31.    The value of Song's collateral, which was denominated in Bitcoin ("**BTC**"), has risen significantly since Song's default.  SmartFi was only prevented from returning the BTC to Song because of Song's default and failure to bring U.S. dollars as required in the agreement governing the Song Loan, and therefore, SmartFi contends, the value of Song's offset for the return of his collateral should be at the lower price at the time of Song's default less the cost and consequences of Song's default, including significant attorneys' fees and costs under the agreement.

32.    Song, however, is attempting to use his strategic default as a hedge and insists that he is entitled to return of the BTC collateral at the much current higher market price.  If Song was entitled to return of his BTC collateral at the current price and all other clients similarly situated were to also demand simultaneous return of BTC at the current price, SmartFi would be unable to return all such clients' collateral, particularly if they do not first repay their loans in U.S. dollars.

33. **Alber Arbitration**. Michael Alber sued SmartFi in a AAA arbitration alleging causes of action including breach of contract, fraud in the Inducement, negligent misrepresentation, and securities claims relating to Mr. Alber's purchase or holding of SMTFs. Mr. Alber already exercised, in full, his buyback guarantee for all SMTF tokens he purchased on SmartFi's website, and so he has no contractual claims. The remaining SMTF tokens held by Mr. Alber were purchased on the secondary market, and thus SmartFi has no contractual obligations to Mr. Alber. The arbitrator has nevertheless allowed discovery on the securities claims, which is ongoing.

34. **Brown Lawsuit**. On April 3, 2023, four SMTF holders (Jason Brown, Daniel Stadelmann, Lynn Brown, and Robert L. Brown) filed Case No. 2:23-cv-00554 against SmartFi and me (Aaron Tilton) personally in the Western District of Pennsylvania (the "**Brown Lawsuit**"). The plaintiffs in the Brown Lawsuit assert causes of action against SmartFi related to their the SMTF tokens, including alleged contractual obligations under the buyback guarantees (to which they may not even be parties), fraud in the inducement, negligent misrepresentation, alleged securities violations, trespass, unjust enrichment, conversion, declaratory relief. The same claims are made against Aaron Tilton, with no effort to distinguish between Tilton in his personal capacity and Tilton in his capacity as an agent of SmartFi.

35. The parties are still in the process of litigating motions to dismiss and amending the complaint, with plaintiffs' opposition to the pending motion to dismiss due June 30, 2024.

36. **Celsius Demand**. In April 2024, Mohsin Meghjik in his capacity as the Litigation Administrator for Celsius Network LLC ("**Celsius**") in chapter 11 Case No. 22-10964 (MG) sent a demand for return of an alleged preference to SmartFi demanding return of cryptocurrency transferred to SmartFi during the 90-day preference period prior to the petition date in Celsius's

chapter 11 case. The parties had engaged in numerous transactions during the period and prior, from which SmartFi has defenses under 11 U.S.C. § 547(c) including new value and ordinary course. Celsius's demands have ranged from $4,218,580.17 to $49,255,208.68 (the "**Celsius Demand**"), depending on the dates used to value of BTC and Ethereum cryptocurrency transferred at various times to SmartFi and whether Celsius included reductions for SmartFi's defenses. SmartFi and Celsius have been unable to reach an agreement, and SmartFi lacks liquidity to pay a settlement anywhere near the range in Celsius's demands. SmartFi believes that its section 547(c) defenses entirely insulate it from Celsius's demands.

IV. **THE DEBTOR'S ASSETS**

A. **Crypto, Cash, and Receivables**

37. In addition to the Solara Loan, on April 3, 2023 and August 8, 2023, SmartFi made two loans in the original principal amounts of $751,000 and $1,400,000, respectively, to Blue Castle (collectively, the "**Blue Castle Loan**"). With the accrual of interest, payments, and credits under the Services Agreement, the balance on the Blue Castle Loan as of the Petition Date is approximately $1,161,248.94.

38. Thus, as of the Petition Date, SmartFi has the following assets:

| Asset | Approximate Face Value |
|---|---|
| Cash | none |
| Digital Currencies | $27,915.35 |
| Crypto-Backed Loans Receivable | $6,225,035.30 |
| Solara Note Receivable | $18,232,017.77 |
| Blue Castle Note Receivable | $1,161,248.94 |
| SmartFi Lending Receivable | $1,819,617.28 |
| **Total Estimated Face Value of SmartFi Financial Assets:[2]** | **$27,465,834.64** |

---

[2] The realizable value for these assets, particularly the Blue Castle Note, is likely much lower than the face amounts.

**B.    Business Operations as an Asset**

39.    SmartFi has a website URL (www.smartfi.com), software, contracts, and an operating cryptocurrency trading and investment Platform, which continues and will continue to operate.  While SmartFi can operate its Platform in a reorganization and earn income therefrom, it would be unable to realize any value for its Platform if the Debtor made an attempt to sell it to the open market at this time.  Currently, cryptocurrency investment and trading platforms are under extreme regulatory scrutiny, are experiencing substantial instability in currency values and customer deposit amounts and are either marginally profitable or unprofitable.  There is no viable market for these assets, and no one aside from SmartFi's existing management would be willing to purchase and operate them for any substantial price.

**C.    UTXO Lawsuit Asset**

40.    SmartFi is the plaintiff in a lawsuit adverse to UTXO B.V., currently pending in Fourth District Court for the State of Utah, civil no. 230400154 (the "**UTXO Lawsuit**").  The case arises from UTXO's failure to perform certain services under an agreement.  SmartFi has obtained a default certificate and filed a motion for default judgment, which has been submitted for a decision.  The default judgment amount requested is $3,260,000 with attorneys' fees of $34,812.50.  It is unknown whether any judgment against UTXO will be collectible.

**V.    SMARTFI'S RESTRUCTURING EFFORTS AND PLAN**

41.    Because of its liquidity problems, litigation demands and costs, and other headwinds, SmartFi hired outside financial and legal experts, including CFO Solutions, Inc., dba Amplēo ("**Amplēo**") and Parsons Behle & Latimer as restructuring counsel to assess options, including restructuring its obligations with its clients and creditors to prevent an uneconomic liquidation of its assets.

14

42.     The Debtor's conclusion in working with its advisors is that a liquidation would yield comparatively little value for SmartFi's stakeholders because, among other things, (1) the market for SmartFi's operating assets is extremely depressed due to current worldwide concern over cryptocurrency financial services businesses; (2) SmartFi's operating assets require the continued services of SmartFi's principals to operate, and the principals would not continue to provide those services in a forced liquidation or a sale even if a buyer could be found; (3) the value of the Solara Loan, a non-traditional real estate development loan at a low interest rate with a balloon maturity date of 2032, is extremely low and would have to be severely discounted if a market for it exists at all; and (4) the cessation of SmartFi's operations and default on obligations to its clients would give rise to significant additional liabilities, including defaults on pending and potential litigations, which, while meritless, are expensive to defend.

43.     With the assistance of Amplēo and restructuring counsel, SmartFi approached its clients and undisputed creditors, and even Song and proposed a consensual restructuring of its obligations into long-term repayment over a period of approximately 8 years.  Such repayment was reliant, for the most part, on the repayment of the Solara Note.  The substantial supermajority of SmartFi's Creditors and clients agreed to the restructuring proposal with the notable exception of Song, who continued to litigate.  Further, subsequent to soliciting agreement on the restructuring proposal, Celsius made the Celsius Demand, which, if it became a litigation or an obligation, would render SmartFi's restructuring proposal unworkable.  Because the restructuring proposal requires substantially all of the clients and stakeholders to agree in order to be successful, SmartFi will solicit its restructuring proposal in chapter 11 in the form of a Plan of Reorganization (the "**Plan**").

Under the Plan, SmartFi will seek to maximize the value of its estate, pay holders of allowed claims their pro rata share of the Debtor's projected disposable income over the plan

period, and reorganize its financial affairs.  The Debtor will fund regular payments under the Plan using the Debtor's existing assets, revenue from Debtor's operations, and the Solara Loan Proceeds, as applicable.

## VI.  FACTS SUPPORTING FIRST DAY MOTIONS

44.  The Debtor has filed First Day Motions seeking relief necessary to prevent immediate and irreparable harm to the Debtor's estate.  In support, I would testify as follows:

### A.  Parsons Behle Retention and Employment Application

45.  The Debtor seeks to retain Parsons Behle & Latimer ("**Parsons Behle**") as its chapter 11 counsel in this Chapter 11 Case (the "**Parsons Behle Retention Application**") under sections 327(a) and 328(a) of the Bankruptcy Code.

46.  Prior to filing its retention application and this declaration, Parsons Behle provided me with drafts of the Application, the supporting *Declaration of Brian M. Rothschild in Support of the Parsons Behle Retention Application* (the "**Rothschild Declaration**"), and the Engagement Agreement attached to the Application (the "**Engagement Agreement**").  I have reviewed the terms of the Engagement Agreement and understand the procedures by which Parsons Behle will apply for and be paid compensation and reimbursement in the Chapter 11 Case.

47.  Parsons Behle and the Debtor have discussed staffing and anticipate that most, if not all, of the time in this Chapter 11 Case (and any litigations or other matters as necessary) will be billed primarily by six lawyers as needed and appropriate:  Brian M. Rothschild, Darren Neilson, Simeon Brown, Alexander Chang, Jonathan Bletzaker, and Timothy B. Smith, whose billing rates and practice areas are as follows:

(a)  Brian M. Rothschild (Shareholder, Bankruptcy): $490.00 per hour;

(b)  Darren Neilson (Shareholder, Bankruptcy/Litigation): $420.00 per hour;

(c)  Simeon Brown (Associate, Bankruptcy/Corporate): $350.00 per hour.

      (d)      Alexander Chang (Associate, Bankruptcy/Litigation): $325.00 per hour

      (e)      Jonathan Bletzaker (Shareholder, Litigation/Securities): $440.00 per hour

      (f)      Timothy B. Smith (Shareholder, Litigation): $555.00 per hour

48.      Parsons Behle will also use other paralegals, practice support assistance, and other professionals and paraprofessionals as appropriate to economize and provide appropriate expertise and level of service to the Debtor. The Debtor will review and approve the bills submitted by Parsons Behle, including time entries and requests for reimbursement of expenses, to ensure that the rates charged and time submitted are reasonable considering the work performed. In addition, Parsons Behle will file applications for compensation in accordance with the guidelines promulgated by the U.S. Trustee, the Bankruptcy Code, and any compensation procedures approved by the Court, which will enable the Court, the U.S. Trustee, the Subchapter V Trustee, and other interested parties to review and object to the fees and expenses.

49.      Under the Engagement Agreement, Parsons Behle will perform services (collectively, the "**Services**"), including without limitation the following:

(a) Advising the Debtor with respect to its powers and duties as debtor in possession in the continued management and operation of its businesses and properties;

(b) Advising and consulting on the conduct of the Chapter 11 Case, including all of the legal requirements of operating in chapter 11;

(c) Advising the Debtor in connection with corporate transactions and corporate governance, negotiations, consent solicitations, credit agreements, financing agreements, and other agreements with creditors, equity holders, prospective acquirers and investors, reviewing and preparing of documents and agreements, and such other actions;

(d) Reviewing and preparing pleadings in connection with the Chapter 11 Case, including motions, applications, answers, orders, reports, and papers necessary or otherwise beneficial to the administration of the Debtor's estate, and appearing in court, and taking other actions with respect to the foregoing;

(e) Attending meetings and negotiating with representatives of creditors and other parties in interest;

(f) Advising the Debtor with legal issues related to the Debtor's financial circumstances, including with respect to restructuring, financing, corporate, tax, litigation, mergers and acquisition, and employment issues, in each case as may be necessary or appropriate;

(g) Performing all other ancillary necessary legal services for the Debtor in connection with the prosecution of the Chapter 11 Case, including assisting the Debtor in (i) analyzing the legal aspects of the Debtor's leases and contracts and the assumption and assignment or rejection thereof; (ii) analyzing the validity of liens against the Debtor; and (iii) advising the Debtor on corporate and litigation matters;

(h) Taking all necessary legal actions to protect and preserve the Debtor's estates as the Debtor requests, including prosecuting actions on the Debtor's behalf, defending any action commenced against the Debtor, and representing the Debtor in negotiations concerning litigation in which the Debtor is involved, including objections to claims filed against the Debtor's estate; and

(i) Taking any necessary action on behalf of the Debtor as the Debtor requests to obtain approval of a disclosure statement and confirmation of a chapter 11 plan and all documents related thereto.

50. Because of the extensive legal services required in this Chapter 11 Case, I believe that the employment of Parsons Behle to provide the services described above and such other services as may be necessary for the Debtor is appropriate and in the best interests of the Debtor, the Debtor's estate, and its various stakeholders.

51. It is necessary for the Debtor to employ attorneys under the terms set forth in the Engagement Agreement to render the foregoing professional services. Parsons Behle has stated its desire and willingness to act in this Chapter 11 Case and render the necessary professional services as attorneys for the Debtor.

52. The Debtor selected Parsons Behle for its sophisticated chapter 11 bankruptcy practice and considerable experience before the Bankruptcy Court for the District of Utah where the Chapter 11 Case is pending. After careful consideration, the Debtor selected Parsons Behle as an appropriate professional to employ in this situation.

53.     The Debtor requests that the Court grant the Parsons Behle Employment Application as soon as possible to avoid irreparable harm to the Debtor's estate.

54.     Parsons Behle's qualifications, eligibility, and disinterestedness are set forth in greater detail in the Parsons Behle Retention Application and the Rothschild Declaration.

## B.     Amplēo Retention and Employment Application

55.     The Debtor seeks authority under sections 327(a) and 328(a) of the Bankruptcy Code to employ and retain Amplēo as its accountant and financial advisor in connection with Debtor's Chapter 11 Case, and to pay Amplēo's customary hourly rates.  All compensation will be subject to prior approval of this Court under section 330 of the Bankruptcy Code.  Amplēo will perform accounting and financial advisor services to the Debtor (collectively, the "**Accounting Services**"), including, as reasonably requested:

(a)     preparing financial disclosures, provide assistance to the Debtor on its cash flow analysis, operating budget (including any debtor-in-possession budget) and other financial analysis related thereto;

(b)     assist the Debtor in defining strategic and financial objectives;

(c)     provide assistance and support to the Debtor's other financial and legal professionals and advisors in connection with any sale transaction for some or all of the Debtor's assets, restructuring under the Bankruptcy Code or otherwise, or other transaction(s);

(d)     assist the Debtor in the preparation of analysis and reporting packages that may be required for the Debtor's creditors;

(e)     render financial advice to the Debtor and participating in meeting or negotiations with stakeholders or other appropriate parties in connection with the Debtor's restructuring; and

19

(f)     providing the Debtor with other financial restructuring advice.

(g)     update Debtor's accounting system and reconcile Debtor's bank accounts, books and records, and other financial records;

(h)     assist the Debtor with the preparation of monthly operating reports;

(i)     assist the Debtor with the preparations of a Liquidation Analysis;

(j)     assist the Debtor in administration of the bankruptcy filings;

(k)     preparing and filing of federal, state, and local taxes; and

(l)     perform any other ancillary accounting tasks necessary to the Debtor's operations;

56.     The Debtor believes that Amplēo, a professional restructuring and financial advisory firm, possesses the requisite knowledge and expertise to provide these services. Amplēo has stated its desire and willingness to act in this capacity in this case and render the necessary professional services as restructuring advisor for the Debtor.

57.     Amplēo has agreed to charge its standard hourly rates and estimates that the fees for the Accounting Services will be charged at its customary hourly rates plus reimbursement of any reimbursable expenses. The terms and conditions of Amplēo's employment are set forth in the Engagement Agreement, attached as <u>Exhibit B</u> to the Amplēo Retention and Employment Application.

58.     To the best of the Debtor's knowledge, Amplēo does not have any connection with, or any interest adverse to, the Debtor, its creditors, or any other party in interest, or their respective attorneys and accountants.

59.     In addition, to the best of the Debtor's knowledge and information, Amplēo has no connection to any employee of the Office of the United States Trustee for the District of Utah or the Office of the Clerk of the United States Bankruptcy Court for the District of Utah.

60.     The Debtor submits that Amplēo is a "disinterested person," as such term is defined in Bankruptcy Code section 101(14), as modified by section 1107(b) of the Bankruptcy Code.

61.     The Debtor requests that all fees and related costs and expenses incurred by the Debtor on account of services rendered by Amplēo in this case be paid as administrative expenses of the estate pursuant to sections 328, 330(a), 331, 503(b), and 507(a)(1) of the Bankruptcy Code.

62.     Amplēo's rate in this chapter 11 case is the same as charged to other non-bankruptcy clients and does not vary by region.  It is Amplēo's practice to perform its duties in the most prudent and efficient manner possible, and to use the associates that are best suited to do so at the most reasonable cost. In fulfilling its responsibilities, Amplēo may call upon other associates to assist as necessary, at their prevailing rates, but not to exceed $305 per hour.  The rates for the professionals likely to perform services in this case are as follows:

(a)     Matt McKinlay: $295 per hour

(b)     Sami Ibrahim: $200 per hour

(c)     Cheryl Adams: $225 per hour

The Debtor believes that these rates are consistent with market rates for comparable services from comparable professionals.

63.     The Debtor understands that Amplēo is customarily reimbursed for all expenses incurred in connection with work performed on behalf of a client in a given matter, including, without limitation, travel expenses, photocopying services, printing, delivery charges, filing fees, postage, and certain other customary expenses, and that Amplēo will apply for reimbursement of

21

these expenses in this case also. Amplēo will maintain a record of actual and necessary costs and expenses incurred in connection with the services described above.

### C. Motion to Continue Services under Services Agreement/Cash Management Motion.

64. On the Petition Date, the Debtor filed its Motion to Continue Services under Services Agreement/Cash Management Motion (the "**Cash Management Motion**").

65. As set forth above, the Debtor is currently unbanked and unable to pay its ordinary-course expenses such as employees, benefits, contractors, and professionals without using Blue Castle as an intermediary. These expenses comprise substantially all of the Debtor's operational expenses. At this time, Blue Castle is paying these expenses and deducting the actual cash payments amount plus 10 percent from the balance of the Blue Castle Loan. The current balance on the Blue Castle Loan as of the Petition Date is approximately $1,161,248.94. Therefore, the Debtor's expenses can be paid entirely from the balance of the Blue Castle Note for some time, alleviating any need for the Debtor to liquidate any of its assets to pay funds its operations or the Chapter 11 Case.

66. Under the Cash Management Motion, the Debtor would continue its current practice of using Blue Castle as an intermediary for payment of its dollar-denominated obligations. The Debtor would use best efforts to open a collateralized DIP account, but, given that no bank was willing to open one for the Debtor prior to the Petition Date, it is skeptical that it can find a bank willing to open a collateralized DIP account now that it is a debtor in possession and still a cryptocurrency business.

67. To ensure transparency, the Debtor would file with its monthly operating reports statements showing its cryptocurrency holdings, which, as noted above, are not expected to be used to fund operations during the Chapter 11 Case. Further, the Debtor will file statements from

Blue Castle detailing all payments being made on the Debtor's behalf and an accounting of the amount remaining due under the Blue Castle Loan.  If the Court does not allow the Debtor to continue procuring services and making payments via Blue Castle under the Services Agreement, the Blue Castle employees that the Debtor depends on, SmartFi's vendors, web services, independent contractors, and other obligations will go unpaid, and the Debtor's operations will collapse.

### D. Motion to Limit Notice and Establish Notice Procedures

68. On the Petition Date, the Debtor filed the Motion to Limit Notice and Establish Notice Procedures.  The Debtor has identified approximately 5,000 small-claim clients or other persons who use or have used SmartFi's platform who could be entitled to notice under the Bankruptcy Code, the Bankruptcy Rules, and/or this Court's Local Rules.  These clients (the "**Clients**") are the numerous worldwide customers of the Debtor's business, a cryptocurrency exchange platform (the "**Platform**").  Most of these Clients are known to SmartFi only by email addresses and are accustomed to receiving notices and information about their accounts and the Platform by email and on the Debtor's website, www.smartfi.com.

69. SmartFi's "Terms of Use" on its website also require its customers to consent receive all notices and communications electronically:

> **Electronic Delivery of Communications**
>
> You agree and consent to receive electronically all communications, agreements, documents, notices and disclosures (collectively, "Communications") that we provide in connection with your SmartFi Wallet(s) and your use of the SmartFi Wallet Communications include:
>
> - Terms of use and policies you agree to (e.g., the SmartFi User Agreement and Privacy Policy), including updates to these agreements or policies;

- Account details, history, transaction receipts, confirmations, and any other Account or transaction information;

- Legal, regulatory, and tax disclosures or statements we may be required to make available to you; and

- Responses to claims or customer support inquiries filed in connection with your Account.

We will provide these Communications to you by posting them on the Site, emailing them to you at the primary email address listed in your SmartFi profile, communicating to you via instant chat, and/or through other electronic communication such as text message or mobile push notification.

70.     Sending paper notices to the Clients of all of the Debtor's filings would be extremely burdensome and costly to the estate and, moreover, would be less effective notice than sending such notices by email and the website. Further, in most instances, the many procedural motions in this Chapter 11 Case would be of no interest to most of the parties receiving notice, causing such creditors to stop paying attention and, possibly, miss the more important substantive issues, such as the anticipated plan of reorganization. The procedures proposed herein will promote the Debtor's efforts in this Chapter 11 Case by preserving assets that otherwise would be consumed by unnecessary copying, postage, and other related expenses.

71.     The Debtor proposes the following notice procedures (the "**Notice Procedures**") to govern the scope, content, and means of providing notices in this Chapter 11 Case:

(a)     **Bankruptcy Rule 2002(a)(1), (2), (4), (5), and (8) Matters**. With respect to matters governed by Bankruptcy Rule 2002(a)(1), (2), (4), (5), and (8), the Debtor will provide electronic notice by ECF to all of the following: (1) the Office of the United States Trustee for the District of Utah; (2) the Subchapter V Trustee appointed in this Chapter 11 Case; and (3) any party who has formally appeared and requested service by ECF and is an ECF

24

filer in this Chapter 11 Case.  For all such matters, the Debtor would also send a paper copy by U.S. Mail, First-Class Mail, postage prepaid, to (i) all parties appearing and requesting manual notice and who are not ECF filers, (ii) any party directly affected by the paper or pleading; and (iii) all parties on the Debtor's creditor mailing matrix.  The Debtor would also post and make available all docket items on its website, www.smartfi.com under the heading "Bankruptcy Information."  Finally, the Debtor will send a notice of the filing to all Clients by email at their address of record, directing them with a link to the SmartFi website.

(b)     **All other Matters**.  For all other matters, the Debtor will provide electronic notice by ECF to all of the following: (1) the Office of the United States Trustee for the District of Utah; (2) the Subchapter V Trustee appointed in this Chapter 11 Case; and (3) any party who has formally appeared and requested service by ECF and is an ECF filer in this Chapter 11 Case.  For all such matters, the Debtor would also send a paper copy by U.S. Mail, First-Class Mail, postage prepaid, to (i) all parties appearing and requesting manual notice and who are not ECF filers, and (ii) any party directly affected by the paper or pleading, but would not mail paper copies to the mailing matrix and would not send a separate email regarding the filing so as not to inundate the Clients.  Nevertheless, all items filed on the docket will be posted on the website for any interested Clients to access at any time.

72. I believe that the Notice Procedures are in the best interest of the Debtor, its estate, its creditors, and other parties in interest as they will reduce waste, reduce expense, and provide more effective notice to parties in interest in this Chapter 11 Case.

### E. Ex Parte Motion to Shorten Time on First Day Motions

73. The Debtor filed an Ex Parte Motion to Shorten Time on First Day Motions (the "**Ex Parte Hearing Motion**"). By the Ex Parte Hearing Motion, the Debtor seeks an order of the Court (1) granting an expedited hearing on the Debtor's First Day Motions, (2) shortening time for notice and objection to the interim relief requested in the First Day Motions, and (3) scheduling a final hearing on the First Day Motions within 30 days but no sooner than 14 days following the scheduled Section 341(a) meeting of creditors.

74. The Debtor filed the First Day Motions and the Ex Parte Hearing Motion to ensure that it is in compliance with the applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, and the U.S. Trustee Guidelines and still able to maintain its operations. For the reasons described in each of the First Day Motions, the expedited relief is required if the Debtor is to operate its business, maintain its insurance coverage, have adequate (or any) representation, and perform its obligations as a debtor in possession under the Bankruptcy Code. The procedure for interim and final relief is required by the Bankruptcy Code and Bankruptcy Rules to ensure that all parties in interest have an adequate opportunity to consider, brief, and argue their positions with respect to the relief requested.

*I, Aaron Tilton, hereby declare, under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct.*

Dated: June 20, 2024

By:     _____

AARON TILTON
Co-Founder and CEO
Power Block Coin, L.L.C. dba SmartFi