**This order is SIGNED.**

**Dated: March 31, 2026**



**CATHLEEN D. PARKER**
**U.S. Bankruptcy Judge**



*rdr*

# IN THE UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF UTAH

| | |
|---|---|
| In re:<br><br>POWER BLOCK COIN, L.L.C.,<br><br><br>Debtor. | Bankruptcy Number: 24-23041<br><br>Chapter 11<br><br><br>Hon. Cathleen D. Parker |

## MEMORANDUM DECISION

The Official Committee of Unsecured Creditors ("Committee") of Debtor Power Block Coin, L.L.C. and Debtor agree that, at this stage of the proceedings, Debtor should no longer remain in possession. They disagree, however, on who should take Debtor's place. The Committee favors appointment of a Chapter 11 Trustee, while Debtor prefers that a Chapter 7 Trustee oversee Debtor's estate, and each has filed competing motions to achieve their chosen outcome. Happily, the parties concur that the pith of the issue—and the criterion that should be used to resolve their motions—is not whether there is cause to appoint, but whether appointing a Chapter 11 Trustee or converting the case to Chapter 7 is in the best interests of creditors.

After the parties fully briefed the motions, the Court conducted a hearing on the motions and took them under advisement. Having considered the parties' briefs and heard their oral argument, having reviewed the record in this case, and having conducted its own independent research of applicable law, the Court now issues this Memorandum Decision concluding the appointment of a Chapter 11 Trustee at this stage of the proceedings is in the best interests of creditors.[1]

## I.     JURISDICTION AND VENUE

The United States Bankruptcy Court for the District of Utah has jurisdiction over these contested matters pursuant to 28 U.S.C. §§ 1334 and 157(b)(1). These matters constitute core proceedings within the meaning of 28 U.S.C. § 157(b)(2)(A) and (O), and the Court may enter a final order. Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

## II.    BACKGROUND

Debtor Power Block Coin, L.L.C. d/b/a SmartFi is a Utah limited liability company that provided crypto-based financial services, which historically included a cryptocurrency exchange, savings, crypto-based lending, crypto information, token creation and offering, alternative currencies, and cryptocurrency investment. Debtor had no employees; all work necessary for operating Debtor was provided by employees through its parent, Blue Castle Holdings, Inc. under a Management Services Agreement ("MSA") executed pre-petition and

---

[1] This Memorandum Decision constitutes the Court's findings of fact and conclusions of law pursuant to Fed. R. Civ. P. 52(a), made applicable in contested matters by Fed. R. Bankr. P. 9014 and 7052. Any of the findings of fact herein are deemed, to the extent appropriate, to be conclusions of law, and any conclusions of law are similarly deemed, to the extent appropriate, to be findings of fact, and they shall be equally binding as both.

subsequently approved by the Court.[2] Blue Castle managed Debtor through its employees and paid the employees' benefits, payroll taxes, workers' compensation insurance premiums, and other costs of employment.

Per Debtor, beginning in 2022, the worldwide cryptocurrency markets experienced a rapid collapse and have been in a period of high instability ever since. Ultimately, Debtor filed for Chapter 11 protection. Debtor has now ceased operations.

Since the petition date about 21 months ago, this case has been fraught with issues and the subject of numerous hearings and orders. Thus, the Court will not recite the entire history of this case in great detail. The Committee's and Debtor's attempts to reach consensual solutions and a quickly approaching statute of limitations has forced the parties' hands to either have a Chapter 11 Trustee appointed or the case converted to Chapter 7, so no party disputes there is cause in this case.

 Debtor initially elected to proceed under Subchapter V of Chapter 11 of the Bankruptcy Code[3] despite the existence of claims against it in excess of $192 million.[4] Almost four months later, the Court sustained objections to Debtor's Subchapter V election, rendering this case a traditional Chapter 11 proceeding,[5] and the United States Trustee ("UST")

---

[2] *See* Doc. No. 181, *Order (1) Authorizing Continued Use of Debtor's Cash Management System Through Services Agreement with Blue Castle Holdings Inc. and (2) Granting Related Relief* ("Cash Management Order").

[3] All subsequent references to the "Code," "Bankruptcy Code," and particular statutes are to title 11 of the United States Code unless otherwise indicated.

[4] *See* Doc. No. 350, at 5.

[5] Doc. No. 190.

appointed the Committee to serve as the Official Committee of Unsecured Creditors for Debtor.[6]

Under the MSA, Blue Castle uses money from its bank accounts to pay Debtor's obligations. In exchange, Debtor either transfers cryptocurrency to Blue Castle or "applies a credit against the balances of the Blue Castle Loan, a loan it has made to Blue Castle."[7] While Debtor allegedly moved its liquid assets to Blue Castle when it became unbanked, the Committee had not seen an accounting of this money being transferred to Blue Castle as of the motion seeking appointment of a Chapter 11 Trustee, making it unclear how much money, if any, Debtor transferred from its own bank accounts to Blue Castle in late 2023 and what impact this transfer had on the balance of the Blue Castle Note.

The court issued the Cash Management Order with certain strict conditions, including that Debtor must "continue to maintain strict records with respect to all transfers" and "file statements from the bank account used by Blue Castle, which will show all payments being made on Debtor's behalf and an accounting of the amount remaining due under the Blue Castle Loan."[8]

In its first monthly operating report ("MOR"), Debtor accounted for the change in balance of the Blue Castle Note from August 2023 through July 2024.[9] However, subsequent MORs failed to adequately account for the changes in the Blue Castle Note through the MSA

---

[6] Doc. No. 199.
[7] Doc. No. 7, at 3. Debtor made the Blue Castle Loan on August 8, 2023, in the principal amount of $1,400,000.00 with a maturity date of August 6, 2028, and an APR of 4%.
[8] Doc. No. 181, at ¶¶ 5, 6.
[9] Doc. No. 145 at 18.

and the value of Debtor's cryptocurrency holdings. The MORs contained information that created additional confusion and included entries Debtor was unable to adequately explain at the hearing on the Committee's Motion to Compel Accounting.[10]

On November 18, 2024, Debtor filed a motion to extend the exclusivity period for it to file and solicit support for a plan, to which the Committee objected, and the Court denied.[11] On December 16, 2024, Debtor filed its First Amended Plan of Reorganization.[12] On January 30, 2025, the Committee filed its own plan, followed by an amended version of that plan on March 7, 2025.[13]

Debtor attempted to reach an agreement with the Committee for a consensual plan but was unable to do so, and the Committee filed the aforementioned plan. Debtor also continued to negotiate with its then largest creditor, Celsius, to create a term sheet for a proposed plan, but was also unsuccessful in resolving all issues. Debtor, Blue Castle, the Committee, and other Debtor affiliates then engaged in mediation to see if the parties could negotiate terms for a consensual joint plan. At the mediation, the parties reached tentative agreement on some, but not all, of the issues, and ultimately reached an impasse.

Although the parties have been unable to reach resolution on many issues, they have attempted behind the scenes to coordinate access to information. The Committee has employed financial professionals and they have coordinated directly with Debtor to obtain

---

[10] Doc. No. 353.
[11] Doc. Nos. 213, 237, 413. The court noted that Debtor had not shown the ability to operate the estate in a way that was beneficial to creditors with transparency and good faith. Audio recording of hearing on Debtor's motion to extend the exclusivity period, held before Judge Marker on December 17, 2024.
[12] Doc. No. 242.
[13] Doc. Nos. 254, 273, 274.

information, including access to Debtor's database.[14] The Committee has pursued multiple 2004 exams and still struggles to have an accurate picture of Debtor's financial situation. The Committee asserts, however, that Debtor's most important assets include insider transfers and digital assets potentially valued at over $700,000. The Court cannot determine at this time what the value of these and other assets are. The Committee has asserted that unsecured claims total approximately $200 million.

On October 21, 2025, the Committee filed its Motion to Appoint Chapter 11 Trustee ("Motion to Appoint").[15] Creditor Mason Song and the United States Trustee—at least initially—joined the Committee in the Motion to Appoint.[16] Creditors Jason Brown and Daniel Stadelmann support appointing a Chapter 11 Trustee. Following the Committee's Motion to Appoint, Debtor filed its own motion to convert the case to Chapter 7.[17] After the hearing on the Motion to Appoint and the Motion to Convert, creditors/investors Kathleen Conger, Douglas Scribner (a member of the Committee), Mark Nelson, and Michael Brewer joined Debtor in seeking conversion.[18]

III. LEGAL STANDARD

While the Motion to Appoint and Motion to Convert rely on separate sections of the Code and therefore ostensibly operate under different legal standards, in fact the legal

---

[14] It appears there is still an ongoing issue with the Committee's ability to access the database, but Debtor asserts it has all the necessary information to access and utilize the database.

[15] Doc. No. 413.

[16] Doc. Nos. 416 and 418. At the time the UST filed its joinder, Debtor had not yet sought conversion. Now that Debtor seeks conversion, it is the UST's policy to remain neutral between the two motions.

[17] Doc No. 422. Despite the Motion to Convert being styled as *ex parte*, the Court required that parties be given an opportunity to be heard and set that motion for the same date and time as the Motion to Appoint.

[18] Doc. Nos. 439, 441, 442, and 446. Of those four, Mr. Scribner also appeared at the hearing and put his position on the record.

standards applicable to both motions converge into a single criterion: the best interests of creditors.

Section 1104(a) of the Bankruptcy Code states as follows:

(a) At any time after the commencement of the case but before confirmation of a plan, on request of a party in interest or the United States trustee, and after notice and a hearing, the court shall order the appointment of a trustee—

(1) for cause, including fraud, dishonesty, incompetence, or gross mismanagement of the affairs of the debtor by current management, either before or after the commencement of the case, or similar cause . . . ; or

(2) if such appointment is in the interests of creditors, any equity security holders, and other interests of the estate . . . .

The "language of the statute and established case law [make clear] that the court need not find any of the enumerated wrongs [under section 1104(a)(1)] in order to find cause for appointing a trustee. It is sufficient that the appointment be in the interest of creditors [under section 1104(a)(2)]."[19]

In deciding whether to appoint a trustee, the Court does not adhere to "rigid absolutes" but rather employs "a flexible standard" that "look[s] to the practical realities and necessities of the record to determine whether the appointment of a trustee is in the best interest of the estate."[20]

---

[19] *Okla. Ref. Co. v. Blaik (In re Okla. Ref. Co)*. 838 F.2d 1133, 1136 (10th Cir. 1988) (internal citations omitted).
[20] *In re Sillerman*, 605 B.R. 631, 652 (Bankr. S.D.N.Y. 2019) (citations and internal quotation marks omitted).

While the Committee has asserted that cause exists under § 1104(a)(1) to appoint a Chapter 11 Trustee, the parties focused their arguments on whether appointment, as opposed to conversion to Chapter 7, is in the best interests of creditors. Accordingly, it is there that the Court will focus its efforts.

As for the Motion to Convert, § 1112(a) and (f) govern conversion of a Chapter 11 case to Chapter 7. Those provisions state:

(a) The debtor may convert a case under this chapter to a case under chapter 7 of this title unless--

(1) the debtor is not a debtor in possession;

(2) the case originally was commenced as an involuntary case under this chapter; or

(3) the case was converted to a case under this chapter other than on the debtor's request.

. . .

(f) Notwithstanding any other provision of this section, a case may not be converted to a case under another chapter of this title unless the debtor may be a debtor under such chapter.

By requiring that a Chapter 11 debtor qualify as a debtor under the chapter to which it seeks conversion, § 1112(f) limits a debtor's right to convert. One of the reasons why a debtor would not qualify as a debtor under another chapter is if the case "would be immediately

8

reconverted."[21] In other words, "if a bankruptcy court finds that it would immediately dismiss a chapter 7 case or reconvert it to chapter 11, it need not go through the 'procedural anomaly' of conversion before taking that step, but can instead deny conversion on that basis."[22]

Perhaps informed by *Marrama*, a debtor's bad faith may come to mind first as to why a debtor might not qualify under another chapter. While it is true that bad faith is one such specific ground—and therefore constitutes a basis to deny conversion in the first instance—*Kearney* took great pains to emphasize that bad faith should not be where bankruptcy courts look first or begin their analysis under § 1112(f). Instead, *Kearney* established a principle of more general application. Section 1112(f) bars conversion if "there is an express provision of the Code that would permit the bankruptcy court to . . . reconvert [a] case immediately after" converting it, and that court would, after applying such express provision correctly, choose to reconvert the case.[23]

Here, § 706(b) is the express provision that could disqualify Debtor from being a debtor under Chapter 7. It states: "[o]n request of a party in interest and after notice and a hearing, the court may convert a case under this chapter to a case under chapter 11 of this title at any time." The statute prescribes no standard for evaluating conversion requests, and the Tenth Circuit has not established one.[24] As noted in *Kearney*, other courts have fashioned a standard

---

[21] *Kearney v. Unsecured Creditors Committee (In re Kearney)*, 625 B.R. 83, 86 (B.A.P. 10th Cir. 2021).

[22] *Id.* at 97 (quoting *Marrama v. Citizens Bank of Mass.*, 549 U.S. 365, 368 (2007)).

[23] *Id.* at 98. Put another way, "bankruptcy courts are directed by § 1112(f) to look at the standards for debtors under the chapter to which the debtor is hoping to convert, and if that debtor could not be a debtor under that chapter because the bankruptcy court would exercise its discretion to immediately reconvert the case, then there is no reason to convert the chapter 11 just to . . . re-convert thereafter." *Id.* at 99.

[24] *Id.* at 99.

from the legislative history of § 706(b), and "ask what will most benefit all parties in interest."[25] "A bankruptcy court has broad discretion to make conversation decisions under § 706(b)."[26]

In the absence of binding precedent regarding the applicable standard under § 706(b), and because the interests of creditors in this case weigh the heaviest in the balance compared to those of other parties, the Court will principally evaluate the Motion to Convert according to what is in the best interests of creditors. In sum, "Section 1112 and Section 1104 read together require the court to make a finding as to what remedy is in the best interest of the creditors and the estate."[27]

While not invoked or applicable here, § 1112(b) asks a court to determine—assuming cause is found—whether conversion, dismissal, or appointment of a trustee or examiner "is in the best interests of creditors and the estate," a question substantially similar to the one the parties have presented to this Court in the Motion to Appoint and the Motion to Convert. Courts weighing that question have analyzed multiple factors, while others apply a general principle: "creditors are generally best served by the course of action that results in the largest number of them being paid the largest amount of money in the shortest amount of time. The best interest of the estate turns on whether its economic value is greater [with a Chapter 7 or Chapter 11 Trustee]."[28]

---

[25] *Id.* at 99-100 (citation and internal quotation marks omitted).
[26] *Id.* at 99 (collecting cases).
[27] *In re Sydnor*, 431 B.R. 584, 600 (Bankr. D. Md. 2010).
[28] *In re Aurora Memory Care, LLC*, 589 B.R. 631, 643 (Bankr. N.D. Ill. 2018) (citations and internal quotation marks omitted); *see also In re Kwok*, 640 B.R. 514, 521 (Bankr. D. Conn. 2022) ("In determining which option is in the best interests of creditors and the estate, a court should evaluate, among other things, the prospects

IV.   ARGUMENTS

Again, while cause is not the issue, the Court finds many of the accusations in this case are relevant to whether appointment or conversion is in the best interest of creditors. Some of the allegations from the Committee[29] include, but are not limited to:

1) Debtor improperly filed the case under Subchapter V to avoid the appointment of an unsecured creditors' committee and allow for plan confirmation without the affirmative votes of creditors typically required in a traditional Chapter 11;

2) Debtor, through its officers and affiliates, asserted false claims, including that there were hundreds of thousands of dollars available to pay administrative expenses in this proceeding, which are no longer available;

3) The Schedules and SOFA are inadequate and inaccurate;[30]

4) Debtor has grossly mismanaged the estate by repeatedly filing inaccurate monthly operating reports; failing to keep accurate accounting of its assets through the Blue Castle Note; commingling its assets with those of its customers and affiliates; and failing to accurately explain or account for pre- and post-petition cryptocurrency transfers;

---

for collection and payment of the claims of creditors." (citing *In re Corona Care Convalescent Corp.*, 527 B.R. 379, 384 (Bankr. C.D. Cal. 2015))).

[29] These assertions are generally paraphrased and included in multiple motions, replies and objections. The UST also raises and joins in many of these assertions.

[30] The UST requested in its response to the Motion to Convert that the Court order the Debtor to amend its schedules and SOFA. Doc. No. 432, at 8. Local Rule 9013-1(e)(4) prohibits motions from being made in a response or reply memorandum. The Court will therefore not entertain that request at the present moment; but the UST may bring a separate motion incorporating such request if warranted.

5) Debtor's assets have been comingled with Blue Castle's assets, to the point of incomprehensibility, resulting in an inability to account for the balance of the Blue Castle Note, cryptocurrency inventory, and funds represented as available for the payment of administrative expenses;

6) Debtor has failed to exhibit the transparency expected in a bankruptcy case, including a lack of records for affiliate and customer transactions, which has led to a lack of trust between creditors and Debtor;

7) Removing Mr. Tilton from control will allow the Committee to obtain access to all of Debtor's records that have been withheld from the Committee;

8) Removing Mr. Tilton will provide the Committee with the power to investigate and pursue avoidance claims for preferences and fraudulent transfers of both insider and non-insider transfers that Debtor has so far chosen not to pursue, while the statutes of limitation on those claims continue to run;

9) Conflicts of interest exist between Debtor and its affiliates, making it difficult for the Committee to understand Debtor's financial condition;

10) Conflicts of interest exist between Debtor and Mr. Tilton;

11) Debtor diverted the bulk of its assets through a series of "loans" to affiliates, all under the common control of Mr. Tilton, at "favorable rates" for the affiliates. These loans were unsecured, with no payments due for years;

12) Debtor failed to preserve its rights in the Solara Property (purchased through funds from the Solara Loan), on which Solara allowed a $2 million dollar lien to be placed

12

post-petition and weakened Debtor's potential for recovery from the Solara Property; and

13) Debtor's MORs show payments coming from undisclosed bank accounts, creating questions about whether Debtor has accurately disclosed its assets. The UST also identifies Debtor's failure to list any interest related to theft recovery that resulted in two large checks for which Debtor has not accounted.[31]

Because of the increasing administrative fees in this case and the inability to get the Committee to agree to any form of plan, Debtor concedes plan confirmation is not feasible and fighting to keep Debtor in possession does not benefit creditors. In fact, Debtor no longer wants to remain in possession. While it denies the Committee's allegations, Debtor chooses not to challenge them since it recognizes placement of an independent trustee is best for creditors.[32] However, Debtor objects to the Court appointing a Chapter 11 Trustee. So while the parties disagree on whether the case should be converted to Chapter 7 or remain in Chapter 11 (though under the control of a trustee), they agree on two salient points: first, a trustee of one stripe or another should be in control of this estate rather than Debtor; and second, whether that trustee should be one under Chapter 7 or 11 depends principally on which choice will be in the best interests of creditors.

---

[31] The theft claim checks also raise concerns with the UST about the unauthorized employment of professionals, mishandling of estate assets, and failure to comply with the Cash Management Order.

[32] *See Opposition to Motion to Appoint Chapter 11 Trustee*, Doc. No. 421, at 10 ("While the Debtor could disprove these allegations, the Debtor recognizes that waging an expensive battle to demonstrate to the Court that it is and always has been transparent would, even in successful, not be in the best interest of creditors.").

Debtor asserts there is no longer an operating business, which is the usual reason to remain in Chapter 11. It argues a plan cannot be confirmed because the estate is administratively insolvent and the insolvency will only grow if the case remains in Chapter 11. Debtor's primary argument is that creditors will recover more through an efficient estate administration as opposed to ongoing expensive and protracted disputes. However, Debtor acknowledges that "chapter 7 is a significantly worse outcome than the payout the Committee, Celsius, and the affiliates negotiated under the Committee's own joint plan proposal," but argues there is no indication the Committee will confirm a plan consistent with this prior agreement.[33]

## V.    ANALYSIS

There is no dispute Debtor meets all three requirements listed in § 1112(a) to convert the case. It is a debtor in possession, the case was not filed as an involuntary case, and the case has not previously been converted. But as noted in Part III, *supra*, § 1112(f) places a final limit on a debtor's ability to convert. In short, if the Court finds that it would immediately reconvert this case to Chapter 11 under § 706(b) because such a result would be in the best interest of creditors, § 1112(f) would bar conversion, and the Court may deny the Motion to Convert in the first instance.

### A.  *Best Interests of Creditors*

It is not a common scenario for parties to debate over the appointment of a Chapter 7 or a Chapter 11 Trustee, as most cases contemplate dismissal or no trustee as the alternative.

---

[33] *Id.* at 11; *see also* Doc. No. 422, at 12 (same).

14

Each case is unique, and what is in the best interests of creditors is driven by the distinctive facts of that case.[34] There is no question that both a Chapter 7 Trustee and a Chapter 11 Trustee can address and alleviate many of the concerns raised by the parties, and the choice between the two is not lopsided, but rather a close one. At the end of the day, "the Court must determine the appropriate path here given the competing requests for relief[,]"[35] and the Court concludes that appointment of a Chapter 11 Trustee is in the best interests of creditors.

The Committee asserts a Chapter 11 Trustee is of greater benefit to creditors over a Chapter 7 Trustee for three primary reasons:

1) A Chapter 11 Trustee can be appointed with more expertise in cryptocurrency than a Chapter 7 Trustee;

2) There would be less wasted time getting a Chapter 11 Trustee up to speed with the help of the Committee and its professionals; and

3) A Chapter 11 Trustee would not be as restrained by the *in pari delicto* defense as a Chapter 7 Trustee.

Regarding the first: While the Committee questions whether there exists a Chapter 7 panel Trustee in the District of Utah with the experience and capability to handle a complex cryptocurrency case, the UST has countered that any appointed Chapter 7 Trustee would have the discretion to hire professionals with the necessary cryptocurrency experience.

---

[34] *See In re Golden Park Estates, LLC*, Case No. 14-12253 t11, 2015 WL 3643479, at *6 (Bankr. D.N.M. June 11, 2015) ("The decision to appoint a trustee is fact intensive and should be made on a case by case basis." (citation omitted)).

[35] *In re Giuliani*, 661 B.R. 493, 500 (Bankr. S.D.N.Y. 2024).

Moreover, the UST did indicate it had a Chapter 7 panel Trustee with cryptocurrency experience. The UST was unsure whether it could appoint a non-panel Chapter 7 Trustee who would have the requisite cryptocurrency experience, but indicated that process would be as involved as interviewing a Chapter 11 Trustee. In addition, even if the initially appointed trustee was not to the parties' liking, the UST explained that any panel trustee serves as an interim trustee and parties could elect a different trustee.[36]

Given the ability of a Chapter 7 Trustee to hire professionals with the requisite experience, and the ability of parties to choose a trustee they believe is best suited for the case, the Court concludes that this argument does not favor appointment of a Chapter 11 Trustee over conversion to Chapter 7.[37] Nonetheless, other factors support the appointment of a Chapter 11 Trustee.

The Court will next address the third argument: whether a Chapter 7 Trustee would be subject to an *in pari delicto* defense if he or she brings actions to recover assets for the estate. "The doctrine of *in pari delicto* is an affirmative defense that generally prohibits plaintiffs from recovering damages resulting from their own wrongdoing."[38] "When . . . wrongful conduct is perpetrated by a debtor who subsequently files for bankruptcy, courts have held that the defense of *in pari delicto* is available in an action by a bankruptcy trustee against another party pursuant to 11 U.S.C. § 541(a)(1) if the defense could have been raised against the debtor."[39]

---

[36] The UST did highlight that § 321(a) does create some geographic limitations on a Chapter 7 Trustee selection.

[37] It is possible that the election process could cause some additional delay.

[38] *ShengdaTech Liquidating Trust v. Hansen, Barnett & Maxwell, P.C. (In re ShengdaTech, Inc.)*, 519 B.R. 292, 301 (D. Nev. 2014) (citation and internal quotation marks omitted).

[39] *Mosier v. Callister, Nebeker & McCullough*, 546 F.3d 1271, 1275 (10th Cir. 2008) (quoting *Grassmueck v. Am.*

Therefore, the *in pari delicto* defense "may bar an action by a bankruptcy trustee against third parties who participated in or facilitated wrongful conduct of the debtor."[40] A Chapter 7 Trustee, who stands in the debtor's shoes at least with respect to pre-petition claims of the estate incorporated through § 541, may be subject to this defense by noninsider third parties when they are asserting such claims "as successor to the debtor's interests included as property of the estate under 11 U.S.C. § 541."[41]

The Committee argues a liquidating trustee, by contrast, may be more insulated from an *in pari delicto* defense because it is acting as a representative of the estate and, unlike a Chapter 7 Trustee, derives its power from § 1123(b)(3)(B). But a liquidating trustee's insulation from the *in pari delicto* defense is by no means assured. By the Committee's own admission, it merely has a "stronger argument" to avoid the defense.[42] What's more, some courts have held the defense may apply against a liquidating trustee under a plan.[43] Ultimately, the application of the *in pari delicto* defense has more to do with what claims are brought than the identity of the person bringing them.[44] Because the Court does not have information regarding what claims a trustee might bring in this case, the Court concludes that

---

[40] *Shorthorn Ass'n*, 402 F.3d 833, 837 (8th Cir. 2005)).

[40] *Id.* at 1276 (collecting cases).

[41] *Sender v. Simon*, 84 F.3d 1299, 1304, 1305 (10th Cir. 1996).

[42] Doc. No. 433, at 12 n.12.

[43] *See Sugarman v. Taylor (In re Yellow Cab Cooperative, Inc.)*, 602 B.R. 357, 361 (Bankr. N.D. Cal. 2019) (citing cases).

[44] Claims created by the Code are not subject to the *in pari delicto* defense. *See Wagner v. Wilson (In re Vaughn Co.)*, Adv. No. 12-01142 J, 2013 WL 960143, at *6 (Bankr. D.N.M. Mar. 11, 2013) ("Sections 544(b), 547, and 548 confer avoidance powers onto the trustee that do not exist independently of or arise prior to the commencement of a bankruptcy case. As a result, such claims could not have been asserted by the pre-petition debtor. Because the bankruptcy trustee does not stand in the shoes of the pre-petition debtor as to those claims, the debtor's pre-petition wrongdoing does not taint the claims.").

the applicability of the *in pari delicto* defense to a Chapter 7 Trustee, a Chapter 11 Trustee, or a liquidating trustee is not determinative of the Court's decision here.

The Court does agree, however, that remaining in Chapter 11 is preferable because conversion to Chapter 7 may cause unnecessary and potentially harmful delay. Moreover, conversion to Chapter 7 may not fully resolve the matter. There is risk creditors could come forward and seek reconversion. As identified above, the best interests of creditors would support such reconversion. And shuttling between Chapter 7 and Chapter 11 would only place the estate at greater risk for the statutes of limitation running on potential causes of action,[45] an outcome that ought to be avoided and which counsels in favor of taking the "procedural shortcut" endorsed by *Marrama* and *Kearney* and eschewing the "procedural anomaly" of converting only to subsequently reconvert.

As for Chapter 7, a debtor has no absolute right to convert a Chapter 11 case to that chapter.[46] Instead, the question is whether conversion is in the best interests of creditors. Here, the Court agrees that moving to a Chapter 7 Trustee at this stage would be a step backwards. "A newly appointed Chapter 7 trustee would need to learn the bankruptcy case from scratch, without the assistance of the Committee that would be disbanded in any Chapter 7."[47] The Committee has committed to cooperating with any Chapter 7 Trustee but explained that their role in assisting a Chapter 7 Trustee would be limited as compared to remaining in Chapter

---

[45] Section 546(a)(1)(B); *see also In re M & L Bus. Mach. Co., Inc.*, 75 F.3d 586, 590 (10th Cir. 1996) (citing *McCuskey v. Central Trailer Services, Ltd.,* 37 F.3d 1329, 1332 (8th Cir. 1994)) (explaining the language in the statute does not suggest the clock should be reset following the appointment of another trustee later in the proceedings).

[46] *Kearney v. Unsecured Creditors Committee (In re Kearney)*, 625 B.R. 83, 97 (B.A.P. 10th Cir. 2021).

[47] *In re Giuliani*, 661 B.R. 493, 504 (Bankr. S.D.N.Y. 2024).

11. The Chapter 7 Trustee's ability to become as familiar with Debtor and the issues in this case and be prepared to timely file any necessary actions is severely hampered by the delay that has already occurred in this case and is exacerbated by the acknowledged complexity of the case. While the applicable statutes of limitation extend one year upon the appointment of a trustee, whether in Chapter 7 or Chapter 11, the Committee has already spent a great deal of time and energy investigating Debtor and its finances and still needs additional information and insight. The estate cannot afford any additional delay by a Chapter 7 Trustee, even if minimal.

Moreover, a Chapter 7 liquidation proceeding may be ill equipped to maximize value from Debtor's assets without support from informed professionals. The Committee indicates it intends to work with the appointed trustee to confirm the Committee's pending plan. An important distinguishing factor between converting to Chapter 7 and appointing a Chapter 11 Trustee "is the expanded possibility in Chapter 11 for a trustee using independent judgment and good management to direct the affairs of the estate . . . . to optimize recovery for the creditors and the estate. . . . [T]he focus of a Chapter 7 is liquidation and not operation."[48] The Committee has interviewed potential candidates for the liquidating trustee position who have experience with cryptocurrency companies and understand Debtor's financial situation, whether one of them is appointed by the UST as the Chapter 11 Trustee or appointed as the liquidating trustee under the terms of the plan.

---

[48] *In re Sydnor*, 431 B.R. 584, 600 (Bankr. D. Md. 2010). In the end, "[i]t may be that the Chapter 11 Trustee after examination of the affairs of the estates will conclude that liquidation is the appropriate denouement . . . ." *Id.*

Debtor asserts a plan cannot be confirmed because of the increased administrative expenses. However, the Committee represents that the Committee and its professionals intend to manage the administrative fees in a way that permits a Chapter 11 Trustee to recover value for the estate.[49] The Committee has agreed to defer fees so they are not due on the effective date of the plan, and both candidates the Committee has interviewed have agreed to work on a contingency basis. This efficiency and expediency should counter the increased costs in remaining in Chapter 11 as opposed to conversion.

The Committee acknowledges the plan will have to address Debtor's counsel's fees, but asserts that with trustee oversight, there are sufficient assets that can create funds to pay those fees including cryptocurrency inventory, amounts owed under the Blue Castle Note and settlement of potential claims. Debtor asserts the Committee prefers staying in Chapter 11 so it can continue to earn and incur fees. Given Debtor's arguments there are insufficient assets to pay these fees, it makes little sense for the Committee to continue to pursue the case unless they have sufficient confirmation of valuable estate assets to support these ongoing fees. The Court acknowledges there is risk that fees leave little to nothing for creditors, a fact it will be cognizant of at the time parties request fees. However, nothing in the record establishes a Chapter 7 Trustee can return more to creditors at this point.

---

[49] *See In re NOA, LLC*, 578 B.R. 534, 541 (Bankr. E.D.N.C. 2017) ("Maximizing the value of the assets and ultimate distribution to creditors will likely require patient management of its ongoing operations and renewed attempts to collect its aging receivables . . . . precisely the type of tasks amenable to a 'trustee using independent judgment and good management.'" (quoting *Sydnor*, 431 B.R. at 600)).

B. *Disclosure Statement*

While the Court finds the existence of a plan and disclosure statement allows for a quicker resolution of many issues in this case, as opposed to converting to Chapter 7, the Court does agree with Debtor that moving a disclosure statement and plan forward without approval of a yet unknown Chapter 11 Trustee would be a waste of resources for all parties. If the appointed Trustee does not approve of the proposed plan, it is very likely the process would have to be started over further increasing fees for the estate and potentially creating confusion for the unsecured creditors.

The UST expressed concern about exculpation clauses to which the parties are reaching resolution of the language, but which was not finalized or presented to the Court at the hearing. Putting the disclosure statement on hold will allow that language to be finalized and approved by any incoming Trustee. Additionally, the Court has expressed concern about whether there is sufficient information in the disclosure statement as to the assets available to pay creditors and how those relate to the current anticipated administrative fees.

If the appointed Trustee desires to move the disclosure statement forward in a significantly similar form, the Court will entertain requests for expedited consideration. If Debtor is correct that there are no means to confirm a plan because there are insignificant assets to pay administrative fees, the Court anticipates a trustee working on a contingency basis will inform the Court if liquidation through Chapter 7 is the better course.

## VI.   CONCLUSION

The decision is a close one. But at this juncture of the proceedings, remaining in Chapter 11 offers material benefits to creditors as opposed to conversion to Chapter 7. Based thereon, the Court concludes that the Motion to Convert should be denied under § 1112(f), and the Motion to Appoint should be granted under § 1104(a)(2). The separate Order and Judgment will be issued in accordance with this Memorandum Decision.

_____END OF DOCUMENT_____

_____ooo0ooo_____

## DESIGNATION OF PARTIES TO RECEIVE NOTICE

Service of the foregoing **MEMORANDUM DECISION** shall be served to the parties and in the manner designated below.

**By Electronic Service:** I certify that the parties of record in this case as identified below, are registered CM/ECF users:

| | |
|---|---|
| James W. Anderson | jwa@clydesnow.com, gmortensen@clydesnow.com |
| Laura Elizabeth Baccash | laura.baccash@whitecase.com, mco@whitecase.com |
| Mark D. Bloom | mark.bloom@bakermckenzie.com |
| Simeon J Brown | sbrown@parsonsbehle.com |
| Deborah Rae Chandler | dchandler@aklawfirm.com |
| Alexander Sun Chang | achang@parsonsbehle.com |
| Austin Egan | austin@stavroslaw.com |
| Carson Heninger | heningerc@gtlaw.com, carson-heninger-5642@ecf.pacerpro.com, Candy.Long@gtlaw.com |
| Samuel P. Hershey | sam.hershey@whitecase.com, mco@whitecase.com |
| Annette W. Jarvis | jarvisa@gtlaw.com, longca@gtlaw.com |
| Michael R. Johnson | mjohnson@rqn.com, docket@rqn.com;ASanchez@rqn.com, RQN@ecfalerts.com |
| Peter J. Kuhn | Peter.J.Kuhn@usdoj.gov, Lindsey.Huston@usdoj.gov, Rinehart.Peshell@usdoj.gov;Rachelle.D.Hughes@usdoj.gov, Brittany.Dewitt@usdoj.gov |
| Joli A. Lofstedt | joli@jaltrustee.com, ecf.alert+LofstedtUTB@titlexi.com, brenda@jaltrustee.com |
| Artur Machalski | artur.machalski@gmail.com |
| Elliott D. McGill | emcgill@parsonsbehle.com, proney@parsonsbehle.com, ecf@parsonsbehle.com |
| Darren B. Neilson | dneilson@parsonsbehle.com |
| Christopher L. Perkins | cperkins@eckertseamans.com |

| | |
|---|---|
| Gregory F. Pesce | gregory.pesce@whitecase.com, mco@whitecase.com |
| Walter A Romney, Jr. | war@clydesnow.com, gmortensen@clydesnow.com |
| Brian M. Rothschild | brothschild@parsonsbehle.com, ecf@parsonsbehle.com, docket@parsonsbehle.com |
| Jeffrey Weston Shields | jshields@rqn.com, 5962725420@filings.docketbird.com, docket@rqn.com;ecasaday@rqn.com |
| Abigail Jennifer Stone | abigail.stone@gtlaw.com |
| Landon S. Troester | lst@clydesnow.com, rcondos@clydesnow.com |
| U.S. Trustee | USTPRegion19.SK.ECF@usdoj.gov |
| Melinda Willden | melinda.willden@usdoj.gov, Lindsey.Huston@usdoj.gov, Rinehart.Peshell@usdoj.gov;Rachelle.D.Hughes@usdoj.gov, Brittany.Dewitt@usdoj.gov |

**By U.S. Mail:** In addition to the parties of record receiving notice through the CM/ECF system, the following parties should be served notice pursuant to Fed. R. Civ. P. 5(b).

- Douglas Scribner
  1717 North Bayshore Drive #2847
  Miami, FL 33132

- Colonel Michael D. Brewer
  9002 E Commanders Cir.
  Tucson, AZ 85708

- Kathleen Conger
  13819 S Vestry Rd.
  Draper, UT 84020-7531

- Mark Nelson
  14175 Golf Parkway
  Brookfield, WI 53005-7916

24