Trevor J. Lee (16703)
**HOGGAN LEE HUTCHINSON**
257 E 200 S, Suite 1050
Salt Lake City, Utah 84111
(801) 363-1900
trevor@hlh.law

*Proposed Counsel for Angela Somers, Chapter 11 Trustee*

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF UTAH

| | |
|---|---|
| In re:<br><br>**POWER BLOCK COIN, LLC**,<br><br>    *Debtor.*<br><br>---<br><br>**ANGELA J. SOMERS**, as the Chapter 11 trustee for the bankruptcy estate of POWER BLOCK COIN, LLC,<br><br>    *Plaintiff,*<br><br>v.<br><br>**COINBASE GLOBAL, INC.; COINBASE, INC.; COINBASE FINANCIAL MARKETS, INC.; AARON TILTON; and BRAD JONES.**<br><br>    *Defendants*. | Bankr. Case No. 2:24-bk-23041-CDP<br><br>Chapter 11<br><br>Hon. Cathleen D. Parker<br><br>Adversary Proceeding No. _____ |

**COMPLAINT TO AVOID AND RECOVER
UNAUTHORIZED POST-PETITION TRANSFERS**

Plaintiff Angela J. Somers, the duly appointed and acting Chapter 11 Trustee (the "**Trustee**") of the estate of Power Block Coin, LLC (the "**Debtor**" or "**PBC**"), files this Complaint against Coinbase Global, Inc., Coinbase, Inc., Coinbase Financial Markets, Inc. ("**Coinbase Defendants**"), Aaron Tilton ("**Tilton**"), and Brad Jones ("**Jones**") (collectively, "**Defendants**"), and alleges as follows:

1

## I. INTRODUCTION

This is an adversary proceeding seeking to undo an unauthorized Section 549 transfer that constituted a brazen act of insider self-dealing. Just four days after Power Block Coin, LLC (the "**Debtor**," or "**PBC**") filed for bankruptcy protection, two of the Debtor's most senior insiders—Aaron Tilton, its President and Chief Executive Officer, and Brad Jones, its Chief Financial Officer and Chief Compliance Officer—caused the Debtor to transfer approximately $240,000 of crypto[1] out of the bankruptcy estate and into accounts they controlled at Coinbase (the "**Transfers**").

Tilton and Jones did so without notice, without this Court's authorization, and without any conceivable benefit to the estate. They also did so covertly. As explained in more detail below, while transfers of crypto to customers almost always come from hot wallets, which are recorded in the general ledger, Tilton and Jones transferred approximately $240,000 to themselves from one of the Debtor's cold storage wallets, an unorthodox method of transfer that resulted in obfuscation of who actually received the transfers. Indeed, Tilton and Jones did not disclose they transferred these funds to themselves. Instead, it took forensic accounting of blockchain records and subpoenas to the Debtor and Coinbase to determine that these large unexplained transfers in fact were directed by and went to two of the people managing the Debtor.

Up to this point, the Debtor has assured the parties that the Transfers were simply return of customers' crypto, not a transfer of estate property. It is now clear that is flatly wrong—this was instead a siphoning of the last remaining assets of the Debtor to insiders while actual customers were left unpaid. Indeed, according to the Debtor's records, Mr. Tilton—who received approximately $225,000—deposited no more than $36 of crypto into the platform. Meaning this "return of crypto to customers" was in fact Mr. Tilton taking $225,000 of company assets.

---

[1] Crypto is defined and explained below.

What's more, even if the Transfers had been a return of crypto to customers who validly deposited the crypto, they would still be voidable because they were an impermissible transfer of property of the estate, as the crypto was not segregated and identifiable customer property held by the Debtor in trust for its customers but instead the Debtor's property.

*First*, when the crypto was received by the Debtor, the Debtor's own terms of use made clear that when customers deposited crypto with the Debtor, they "grant[ed] the Company . . . all right and title to such Digital Assets, including ownership rights"—meaning that crypto became property of the Estate. *Second*, the crypto that the insider Defendants received from the Debtor had been repeatedly and thoroughly commingled with crypto from other customers and with the Debtor's existing crypto in a host of shared omnibus wallets. This occurred in several different forms, from paying certain customers using the crypto of others, to sweeping crypto out of individual accounts and aggregating it in larger omnibus accounts, to mixing customer and debtor crypto. Whatever the iteration, the transferred crypto could not be traced back to the specific customer and thus became property of the Debtor.

Mr. Tilton and Mr. Jones sought and received the protections provided under the Bankruptcy Code under the conditions that the Debtor preserve all remaining assets for equitable distribution among actual customers. But they then did the opposite. They promptly turned around and drained the estate of nearly all its remaining value. These covert insider transfers are avoidable under Section 549(a) of the Bankruptcy Code. The Court should thus find the Trustee has a right to recover the Transfers together with interest and all costs permissible under the law.

## II. JURISDICTION AND VENUE

1.      This Court has jurisdiction over this adversary proceeding under 28 U.S.C. §§ 157 and 1334.

2.      This is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2). Under Federal Rule of Bankruptcy Procedure 7008, the Trustee consents to the entry of final orders and judgment by this Court.

3.      Venue is proper in this district under 28 U.S.C. §§ 1408 and 1409.

4.      The statutory predicates for the relief sought are 11 U.S.C. §§ 502, 549, and 550, and Federal Rules of Bankruptcy Procedure 7001(1) and 7001(2).

## III. PARTIES

5.      Plaintiff, Angela Somers, is the duly appointed and acting Chapter 11 Trustee of the Debtor's estate.

6.      The Coinbase Defendants are a cryptocurrency exchange, platform, or counterparty that received the Transfers described below.

7.      Tilton and Jones are parties that received the Transfers described below. Both are insiders under 11 U.S.C. § 101(31).

## IV. PROCEDURAL BACKGROUND

8.      The Debtor, doing business as "**SmartFi**," was a Utah limited liability company that operated an online platform offering cryptocurrency exchange, lending, savings, and related digital-asset financial services—somewhat similar to an online bank for cryptocurrency.

9.      Facing demands for the return of crypto by customers, among other financial challenges, on June 20, 2024 (the "**Petition Date**"), the Debtor filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") in this Court,

4

commencing the above-captioned bankruptcy case (the "**Bankruptcy Case**") (Case No. 24-23041, the "**BK Dkt.**").

10.    The Debtor's case has been adversarial, and parties-in-interest have consistently contested and objected to the actions of the Debtor and its professionals.

11.    The Debtor initially and improperly elected to proceed under subchapter V of chapter 11. On October 9, 2024, the Court sustained objections by parties-in-interest, finding the election improper, and the case has since proceeded as a traditional chapter 11 case. [Dkt. 190.] On October 24, 2024, the United States Trustee appointed an Official Committee of Unsecured Creditors. [BK Dkt. 199.]

12.    On November 18, 2024, the Debtor filed a motion to extend the exclusivity period for it to file and solicit support for a plan [BK Dkt. No. 213], to which the Creditors' Committee objected. [BK Dkt. No. 237].

13.    The Court denied the Debtor's motion because (a) the Debtor failed to disclose or address ongoing litigation involving the Solara Property and placed a $2 million lien on the Solara Property, (b) Mr. Tilton acted on both sides of the Solara transaction; and (c) "the Debtor has not shown that it has the ability to operate this estate in a way that's beneficial to creditors with transparency and good faith." [BK Dkt. No. 243], audio file at 21:45.

14.    On December 16, 2024, the Debtor filed its First Amended Plan of Reorganization (the "**Debtor's Plan**"). [BK Dkt. No. 242]. The Committee filed its own competing plan [BK Dkt. No. 254], followed by an amended version of that plan. [BK Dkt. No. 273, 274].

15.    On October 21, 2025, the Committee filed a Motion to Appoint Chapter 11 Trustee [Doc. No. 413] (the "**Motion for Chapter 11 Trustee**"). On November 7, 2025, the Debtor

responded by filing a motion to convert the case to Chapter 7 (the "**Conversion Motion**"). [BK

Dkt. No. 422, 433 at 6–7, 25].

16.    The U.S. Trustee subsequently filed a motion seeking disgorgement of the fees paid

to the Debtor's counsel based on evidence of Debtor's counsel's failure to disclose the source of

payment of attorney fees and failure to disclose a connection and potential conflict in their

representation of the Debtor. [BK Dkt. No. 448].

17.    On March 31, 2026, the Court entered a Memorandum Decision concluding that

the appointment of a chapter 11 trustee was in the best interests of creditors. [Dkt. 482.] On May 8,

2026, Angela Somers was appointed as the Chapter 11 Trustee of the Debtor's estate and is the

duly appointed and acting Trustee.

## V. BACKGROUND ON CRYPTOCURRENCY

18.    Cryptocurrency (or "**crypto**" or "**tokens**") is a form of digital money that exists

only as electronic records. The value of cryptocurrency generally rises and falls with supply and

demand.

19.    Bitcoin ("**BTC**") and Ether ("**ETH**") are two of the most widely recognized

cryptocurrencies, but many other cryptocurrencies exist. Some crypto—called "stablecoin"—is

designed to hold a steady value of approximately one U.S. Dollar per unit. Examples of these

include USD Coin ("**USDC**") and Tether ("**USDT**").

20.    Transfers of crypto are tracked on a shared electronic ledger called a "blockchain,"

which is maintained by many computers at the same time.[2] Different cryptocurrencies operate on

different blockchains. Some cryptocurrencies, for example, operate on the Bitcoin blockchain.

---

[2] A blockchain is conceptually similar to a massive public spreadsheet that anyone can read but
no one can secretly alter. Every time crypto is bought and sold, it is added as a new line, and
once lines are added they cannot be erased.

Others—like the USDT crypto at issue in this case—are issued and transferred on the Ethereum blockchain.

21.     While crypto transactions are transferred and tracked on blockchains, crypto itself is held in "digital wallets." A digital wallet is not a physical object; it is simply an electronic account used to hold, send, and receive cryptocurrency. Buyers and sellers of crypto will typically have their own personal digital wallets.

22.     Each wallet has a "public address" (sometimes called a "public key"), which is a string of letters and numbers visible to anyone on the blockchain (similar to a bank account number). This public address is how wallets are identified, and it is how users send crypto to a given wallet.

23.     Each wallet also has a "private key," which is a secret code required to move cryptocurrency out of the wallet (similar to a password used to log into a traditional bank account to send money). Whoever holds the private key controls the cryptocurrency in a given wallet. Unlike the public key, the private key[3] is not visible on the blockchain and must be kept secret.

24.     There are two types of wallets: custodial and non-custodial. A custodial wallet is held and managed by a third party, such as a centralized crypto exchange. A non-custodial wallet is held by the individual owning the crypto. As explained in more detail below, the Debtor in this case held its customers' cryptocurrency in custodial wallets that the Debtor itself controlled.

---

[3] Generally, users can transfer crypto from their wallet using their private key. But some wallets are set up to require more than one approval before cryptocurrency can be moved—a security feature called "multi-signature."

## VI. THE DEBTOR'S BUSINESS AND THIRD-PARTY PROVIDERS

### A.   *The Debtor's Business*

25.   As discussed above, SmartFi operated an online platform offering crypto financial services. The Debtor was wholly owned by Blue Castle Holdings, Inc., which also managed the Debtor's business. As a result, the Debtor had no employees, and Blue Castle performed almost all operational responsibility for the Debtor.

26.   The Debtor described itself as a "crypto-based financial services" company that had two core lines of business. First, it hosted and facilitated customers' cryptocurrency transactions through an online platform and charged fees for those transactions (the "**Hosting Business**"). Second, the Debtor took cryptocurrency from customers and lent it out or otherwise deployed it to generate a return (the "**Lending Business**").

27.   The Hosting Business was a platform for customers to deposit, trade, and withdraw crypto. The Debtor provided an integrated platform through which customers deposited crypto, engaged in spot trading or conversion transactions, and withdrew assets either to external blockchain addresses or to linked financial accounts. The Debtor had custodial wallets holding customers' crypto.

28.   The Lending Business was the more significant line of business. The goal of the Debtor was to operate similar to an online crypto bank by earning money on customers' crypto while it was holding that crypto, much like a bank loans out or invests money it is holding from other customers. Customers transferred their crypto into "SmartINTEREST" accounts held by the Debtor, and in turn earned interest (essentially a high-yield crypto savings account). Once they did, the Debtor would try to make money on that crypto by trading it or lending it out. The Debtor's profit was the money it could make trading customers' crypto, in addition to the interest customers

paid on loans, minus the interest the Debtor paid to customers who deposited into SmartINTEREST accounts.

29. In addition to offering SmartINTEREST accounts, the Lending Business also offered Crypto-Backed Loans. Customers could borrow U.S. dollars from the Debtor by depositing cryptocurrency as collateral.

30. The core product the Debtor provided was a centralized, customer-facing platform where it provided its Hosting and Lending Business. But it relied on other crypto companies to execute and facilitate other aspects of its business.

## B. Third Party Providers

31. The Debtor provided the customer-facing platform and account infrastructure, while relying on third-party liquidity providers ("**LPs**") to actually execute trades, source market liquidity, and facilitate conversions between crypto and fiat.

32. Similarly, the Debtor relied on a crypto custody provider, Fireblocks LLC ("**Fireblocks**"). A cryptocurrency custodian is the entity or infrastructure responsible for safeguarding digital assets by securing the private keys that control them. Because control of private keys equals control of the assets, institutional custodians provide not just storage but a full framework for security, governance, and transaction control.

33. Fireblocks organizes assets into vaults and vault accounts, which allow platforms like the Debtor to custody customer balances while holding assets in a unified custody environment. Each vault account can hold multiple asset wallets and addresses, enabling scalable, omnibus-style custody with internal tracking. This structure allowed the Debtors to accept deposits, process trades and withdrawals, and interact with exchanges or liquidity providers, while Fireblocks provided the secure, programmable backend.

34.     Though the Debtor used Fireblocks, the Debtor internally tracked the crypto transactions itself using a "Ledger" maintained in a SQL database—an enterprise-grade, structured data system capable of recording, organizing, querying, and analyzing transactions, substantially exceeding the functionality of a conventional spreadsheet.

## VII. THE DEBTOR'S COLLAPSE

35.     In 2022, cryptocurrency markets began fluctuating wildly. During this time, the assets the Debtor relied on for liquidity (for example, to pay out customers who wanted their money back) fell sharply in value. At the same time, much of what the Debtor held in terms of assets was long-term loans that it could not readily call.

36.     To make matters worse, much of the Debtor's "lending" was not at arm's length. The Debtor's largest loans were to its own insiders and affiliates at below-market rates. In effect, customer deposits were funneled into illiquid insider ventures, including real estate.

37.     The result was an extreme shortfall: although the Debtor owed customers the return of large amounts of crypto, the Debtor had loaned out or invested that crypto and could not return it.[4] As of the Petition Date, the Debtor held less than $30,000. But it had obligations to return over $50 million.

38.     In sum, because of the ways the Debtor was pooling and using customers' crypto to try to earn profit, because many of its deals were made with insiders, and compounded by the crypto market collapse in 2022, the Debtor was left unable to satisfy its debts.

---

[4] The Trustee has not completed her investigation of the Debtor which may reveal other causes of the Debtor's filing, including malfeasance.

## VIII. THE CRYPTO HELD BY THE DEBTOR
## WAS PROPERTY OF THE DEBTOR'S ESTATE

39.     All crypto deposited with the Debtor was property of the estate under 11 U.S.C. § 541 for two independent and alternative reasons: (1) by operation of law, the Debtor's Terms of Use established the crypto as property of the estate upon deposit with Debtor; and (2) as a practical matter, the Debtor commingled crypto in a way that rendered it property of the estate.

### A.     The Debtor's Terms of Use Render Deposited Crypto Property of the Estate

40.     Under the "Terms of Use" that governed every customer account, each customer granted the Debtor title to and ownership of the cryptocurrency the customer placed on the Debtor's platform.

41.     Specifically, PBC's "Terms of Use" granted the Debtor "all right and title to such Digital Assets, including ownership rights," together with the right to hold, pledge, lend, trade, and otherwise use those assets without retaining a like amount.[5]

42.     In other words, when a customer deposited crypto with the Debtor, the customer relinquished ownership of that crypto and received in exchange only the Debtor's contractual promise to return an equivalent amount of value on demand—much like someone who hands cash to a bank and holds a claim for repayment, not a claim to return of the specific bills deposited.

43.     Because the Debtor took ownership of all crypto deposited, the crypto eventually transferred to Defendants was property of the estate.

---

[5] While there were several versions of the Debtor's Terms of Use, all available versions have the same or similar provision.

**B.      *The Debtor Commingled Deposited Crypto***

44.      In addition to contractually agreeing that deposited cash and crypto of customers became property of the Debtor, once the customer's crypto was deposited, as a practical matter the Debtor commingled all of the funds, which rendered it property of the estate.

45.      The "estate" under the Bankruptcy Code is "all legal or equitable interest of the debtor in property." 11 U.S.C. § 541(a)(1). A customer wishing to exclude assets from the estate on the basis that the Debtor simply held the assets in trust, and that ownership at all times remained with the customer, bears the burden of identifying and tracing the specific property claimed.

46.      Where assets are commingled, however, that burden cannot be met, because commingled, fungible property loses its separate identity and cannot be traced to any particular claimant. As explained below, the deposited crypto or cash in this case cannot be traced to any particular customer because all of the Debtor's crypto was commingled.

47.      Indeed, in order to keep the customers' crypto segregated, the Debtor needed to keep crypto that customers deposited in separate digital wallets for every customer. That procedure was not followed. Instead, the Debtor pooled deposits into a limited number of large, shared wallets ("**Omnibus Digital Wallets**").

48.      As demonstrated in the chart below, each customer had its own unique digital wallet address that it used when depositing crypto with the Debtor



49.      When crypto was first deposited with the Debtor, it was deposited into a wallet associated with the customer who deposited it.

50.     But promptly after the Debtor received a customer's crypto, the crypto became commingled in several ways, starting with "sweeping." After crypto was deposited into individual customer wallets, the Debtor would sweep the crypto out of the individual customer wallets and transfer the crypto to one or more shared Omnibus Wallets controlled by the Debtor. After the crypto from individual accounts was swept into an Omnibus Wallet, the specific crypto deposited by a specific customer was no longer traceable. While the customer had the right to equivalent return of value, the precise tokens he or she had deposited could not be identified.

51.     Another way the Debtor commingled crypto was re-purposing of customer's crypto—using deposited funds from one customer to pay out another customer. Below is a visual example of this. In the example—which is a real transaction from the Debtor's books and records—Customer C (in purple) wished to withdraw 0.83 BTC. To fulfill that request, the Debtor did not pull 0.83 BTC from Customer C's personal hosted wallet (as would be required if no crypto were commingled). Instead, the Debtor funded that transaction by combining (in rough numbers) 0.395 BTC that Customer A deposited, .0017 BTC that Customer B deposited, and .505 BTC from the Debtor's Omnibus Wallet, with some change returning back to the Debtor's Omnibus Wallet:



52.    Below is another example of an actual transaction from the Debtor's books and records where funds deposited by seven different customers (Customers A through G) were commingled and used to pay out a request by Customer H (in yellow), with the remaining left over from those deposits being swept into one of the Debtor's Omnibus Wallets:



53.    This example shows two types of commingling by the Debtor: (1) the Debtor used crypto deposited by certain customers to pay out a different customer (meaning the actual tokens those customers deposited will never be returned to them), and (2) the Debtor took any remaining crypto those customers deposited into their individual wallets and swept it into an Omnibus wallet.

54.    Here is another depiction of the same transaction, showing the Debtor taking deposited BTC from seven different customers (Customers A through G) and sweeping all of that BTC into just two digital wallets (Customer H's withdrawal, and one of the Debtor's Omnibus Wallets):

| Transaction Parties | Amount of BTC Swept | UTXO Count | Amount of outgoing BTC transferred | Resulting UTXO Count |
|---|---|---|---|---|
| Customer A | 0.08668718 | 1 | 0 | 0 |
| Customer B | 3.66370347 | 3 | 0 | 0 |
| Customer C | 0.15 | 1 | 0 | 0 |
| Customer D | 5.2498 | 1 | 0 | 0 |
| Customer E | 1.42297968 | 2 | 0 | 0 |
| Customer F | 0.09486274 | 1 | 0 | 0 |
| Customer G | 0.17 | 1 | 0 | 0 |
| Customer H | 0 | 0 | 8.1385 | 1 |
| SmartFi ~ qcp2 Wallet | 0 | 0 | 2.69937491 | 1 |
| **Total** | **10.83803307** | **10** | **10.83787491** | **2** |

55. This same pooling, repeated continuously across the Debtor's operations, is what renders it impossible to conclude that any single token paid to a customer was the same token that the customer had originally deposited.

## C. SmartFi's Gas Fees

56. The charts above demonstrate that it is not simply that commingling happened to occur; rather, commingling was done by design and was inherent in the Debtor's business model.

57. One of the drivers for both types of commingling—sweeping deposited funds from individual wallets into Omnibus wallets, and using crypto from one customer to pay out another customer—was "gas fees." A "gas fee" is a processing fee charged by the Ethereum network to carry out a transfer—comparable to a postage or toll required to move something from one place to another.

58. These fees could be minimized by commingling. If the Debtor used one customer's deposited crypto to pay out another customer, it could avoid several internal steps of depositing and holding the crypto itself, which would avoid some of the associated gas fees.

59. Relatedly, efficiencies could be gained by sweeping crypto from hundreds or thousands of customer wallets into one Omnibus Wallet.

15

60.    The gas fees were not just a motivation to commingle, they were themselves another example of commingling.

61.    The Debtor set up dedicated wallets to pay these gas fees, which it called "Gas Stations."

62.    These Gas Stations held small amounts of crypto used only to pay gas fees.

63.    Below is an image showing how these Gas Stations worked. The transfers below are actual transfers from the Debtor's books and records:



64.    In this example, the three nodes on the far left depict customer wallets that are external to the Debtor (i.e., owned by the customer). Those three customers each sent crypto from their external wallets into their internal wallets with the Debtor (the "**Deposit Addresses**"). The Debtor then performed a sweep and transferred all deposited crypto from the three different customers into one Omnibus Wallet (the blue node above). Because this involved an "on-chain" transfer, the sweep incurred a gas fee imposed by the Ethereum blockchain. To pay the gas fee, the Gas Stations (the green nodes above) transferred ETH to the customer wallets in advance of the sweep to pay the fee.

65.     This, again, shows at least two different types of commingling: (1) three customers' deposits are being swept into one Omnibus Wallet; and (2) funds from other customers (or perhaps the Debtor) are being sent and mixed into customer wallets to pay the gas fee.

### D.     *Commingling of Cash and Fiat*

66.     The Debtor also did not keep each customers' cash in a separate account belonging to that customer. Instead, it pooled everyone's money together in shared accounts that also held the Debtor's own funds. Moreover, the Debtor regularly transferred funds between its various omnibus bank accounts, further commingling funds.

67.     By way of example, the Debtor held an omnibus bank account at Capital Community Bank ("**CC Bank x7870**") which was labeled as "For the Benefit of its Customers" from May 2022 through December 2023. During the same period, the Debtor held another omnibus bank account also at Capital Community Bank ("**CC Bank x7888**") which was labeled as "Operating Account." However, the Debtor regularly transferred funds between those accounts, which commingled customer-related and operating funds.[6]

### IX. TRANSFERS AT ISSUE IN THIS CASE

68.     After the Petition Date, the Debtor made the following transfers to or for the benefit of the Defendants: Between June 24, 2024, and July 25, 2024, eight transfers totaling 240,010 USDT valued at approximately $239,100 were transferred from PBC's Cold Storage Wallet 0xdc3fff26671a4b63cc2622a00cb27e3fa6d65264 ("the 5264 Wallet") to two External Withdrawal Address 0x616338f51af8d2463bbc4f2dd89176373314b41e ("the b41e Wallet") and 0x8cf04dca2171629c31802d9f93328b0f48dd0b0f ("the 0b0f Wallet") at Coinbase as detailed in the table below.

---

[6] The Trustee has many specific examples illustrating this point, though those examples have been omitted as not relevant to this complaint.

| Transaction Hash | Date & Time (UTC) | Recipient Address | Amount (USDT) | Approx. USD Value |
|---|---|---|---|---|
| 0xa980e716d240c55c6fefbd1e7b8574db 986534421c9070a2c1366b0c3076ea14 | June 24, 2024, 15:55 | 0x616338f51af8d2463bbc4 f2dd89176373314b41e | 10 | $10.07 |
| 0xc03d8d19103fd75641ee11e3ebdb4bd 37cd4d104bf9ae12e2f096cf807f7ba13 | June 24, 2024, 16:04 | 0x616338f51af8d2463bbc4 f2dd89176373314b41e | 14,990 | $15,093.44 |
| 0x761fd8137272bc6b86ba7bca84a9b00 c3c2d4259276465805d7e6a216357e052 | June 25, 2024, 13:06 | 0x8cf04dca2171629c31802 d9f93328b0f48dd0b0f | 10 | $10.06 |
| 0xee17258055638ff3dbd7020e4e7ef4f1 62113c692d4d93a307864c477165fc5a | June 25, 2024, 13:13 | 0x8cf04dca2171629c31802 d9f93328b0f48dd0b0f | 35,000 | $35,197.74 |
| 0x243ee7e7e1bb76d8943b7d5abb7a234 4832bd4abbe89be12e782c3c4345e5307 | June 26, 2024, 15:13 | 0x8cf04dca2171629c31802 d9f93328b0f48dd0b0f | 35,000 | $34,782.30 |
| 0x01a7aa0515c8c704494045a71be2c21 d1eb77293c4a5e5f3e845cd864a05f490 | July 9, 2024, 19:29 | 0x8cf04dca2171629c31802 d9f93328b0f48dd0b0f | 5,000 | $5,036.72 |
| 0xf36ea3fbbd8d6eebe7860b92ce922daf 3c7dfcc6bc0de1676f2736c067998985 | July 24, 2024, 17:54 | 0x8cf04dca2171629c31802 d9f93328b0f48dd0b0f | 75,000 | $74,535.45 |
| 0x626312c2000f7432f34c43446a56b66 e91e2f04fe23a44d316281d30856393f8 | July 25, 2024, 17:56 | 0x8cf04dca2171629c31802 d9f93328b0f48dd0b0f | 75,000 | $74,434.58 |
| | | **Total** | **240,010** | **$239,100.36** |

69.      The transaction hashes above confirm that the crypto transfers were made on-chain directly from the Debtor to the Defendants.

70.      Upon receipt, the Transfers were deposited into one or more digital wallets owned or/and controlled by the Coinbase Defendants. The Coinbase Defendants held the private keys to those wallets, pooled the transferred USDT with other digital assets in wallets it controlled, and had the right to hold, move, and use the transferred assets. Any account holder associated with the receiving address obtained only a contractual credit against the Coinbase Defendants, not control of the specific assets transferred.

71.      The Coinbase Defendants therefore took dominion and control over the Transfers upon receipt and are the initial transferees of the Transfers within the meaning of 11 U.S.C. § 550(a)(1).

18

### X. THE TRANSFERS AT ISSUE HERE WERE FROM
### COMMINGLED CRYPTO TO THE DEFENDANTS

72. When customers requested return of their crypto, the Debtor, as discussed, did not return the specific tokens that the customers had deposited. Instead, the Debtor transferred crypto from the Omnibus Wallets that held commingled crypto to satisfy the request. Below is an explanation of how that occurred for the Transfers at issue in this Complaint.

73. The following chart shows the Defendants receiving transfers after the Petition Date. The two wallets on the bottom in blue are external wallets associated with the Defendants. The wallet on the top (in red) is one of the Debtor's cold storage wallets. The eight arrows represent eight transfers of USDT (a stablecoin) from the Debtor to Defendants.



74. As shown, when the Debtor transferred estate assets to Defendants, post-petition, the Debtor did not pull from customer wallets owned by Defendants. Instead, those assets were pulled from a Debtor Omnibus Cold Storage wallet.

75. Based upon information and belief, there was no internal automated tracking when transferring crypto to customers directly from the Debtor's cold storage wallet, unlike transfers from the Fireblocks hot wallet that included an internal identifier noting which customers would have received which transfers.

76. Therefore, this routing of transfers from hot wallet to cold storage wallet resulted in obfuscating the recipient of the post-petition estate assets.

77.     Notwithstanding this lack of internal tracking, the ultimate account holder of the 0b0f Wallet as well as the b41e Wallet were identified through documents produced.

78.     As evidenced by a subpoena response from Coinbase, the 0b0f Wallet, which received 225,010 USDT, was represented by Coinbase to be the account of Tilton. This is also supported by the transfer times and amounts included in the Coinbase account statement ("**Coinbase Account Statement**") which correspond to the observed on-chain activity.

79.     The Coinbase Account Statement demonstrated that once Tilton received the USDT from SmartFi, he converted 190,000 USDT for 189,982.20 USDC (another stablecoin) and then sold the remaining 35,010 USDT along with the 189,982.20 USDC for 224,158.64 USD. The USD was then withdrawn and transferred from Coinbase to two Wells Fargo accounts with $149,979.20 going to an account ending in 3273 and $78,108.76 to account ending in 2208.

80.     Based upon information provided by the Debtor, the b41e Wallet, which received 15,000 USDT, is a Coinbase deposit address associated with Jones.

81.     Similar to Aaron Tilton, the 15,000 USDT received by Jones was first converted into 14,994.90 USDC and then sold for 14,994.90 USD before finally being withdrawn to a bank account ending in 9094 at ZIONS BANCORPORATION.

82.     As outlined above, the manner in which these transfers were executed reflects not a direct return of customer-specific assets, but rather the distribution of commingled funds drawn from centralized wallets controlled by the Debtor. This distinction is critical to understanding the nature of the transactions at issue.

83.     Below is a diagram showing, in actual transactions pulled from the Debtor's books and records, how USDT traveled through the Debtor and was eventually transferred to Defendants.

20



84.    In other words, at least three separate layers of commingling went into transferring crypto out to the Defendants in this case:

   a.    First, the USDT tokens deposited by Customers A through F were initially commingled into the Omnibus Wallet.

   b.    Second, those USDT tokens, in addition to being commingled together, were also commingled with the existing 188,228 USDT already in the Omnibus Wallet.

   c.    And finally, deposited tokens and existing USDT were further commingled when they were transferred into the omnibus cold storage wallet prior to paying out Defendants.

85.    Below is the transaction-level detail for the eight transfers at issue here.

**Sending Address: 0xdc3fff26671a4b63cc2622a00cb27e3fa6d65264**

| Txn Hash | Date | To | USDT | Approx USD |
|---|---|---|---|---|
| 0x01a7aa0515c8c704494045a71be2c21d1eb77293c4a5e5f3e845cd864a05f490 | 7/9/2024 | 0x8cf04dca2171629c31802d9f93328b0f48dd0b0f | 5,000 | $5,036.72 |
| 0x243ee7e7e1bb76d8943b7d5abb7a2344832bd4abbe89be12e782c3c4345e5307 | 6/26/2024 | 0x8cf04dca2171629c31802d9f93328b0f48dd0b0f | 35,000 | $34,782.30 |
| 0x626312c2000f7432f34c43446a56b66e91e2f04fe23a44d316281d30856393f8 | 7/25/2024 | 0x8cf04dca2171629c31802d9f93328b0f48dd0b0f | 75,000 | $74,434.58 |
| 0x761fd8137272bc6b86ba7bca84a9b00c3c2d4259276465805d7e6a216357e052 | 6/25/2024 | 0x8cf04dca2171629c31802d9f93328b0f48dd0b0f | 10 | $10.06 |
| 0xa980e716d240c55c6fefbd1e7b8574db986534421c9070a2c1366b0c3076ea14 | 6/24/2024 | 0x616338f51af8d2463bbc4f2dd89176373314b41e | 10 | $10.07 |
| 0xc03d8d19103fd75641ee11e3ebdb4bd37cd4d104bf9ae12e2f096cf807f7ba13 | 6/24/2024 | 0x616338f51af8d2463bbc4f2dd89176373314b41e | 14,990 | $15,093.44 |
| 0xee17258055638ff3dbd7020e4e7ef4f162113c692d4d93a307864c477165fc5a | 6/25/2024 | 0x8cf04dca2171629c31802d9f93328b0f48dd0b0f | 35,000 | $35,197.74 |
| 0xf36ea3fbbd8d6eebe7860b92ce922daf3c7dfcc6bc0de1676f2736c067998985 | 7/24/2024 | 0x8cf04dca2171629c31802d9f93328b0f48dd0b0f | 75,000 | $74,535.45 |
| | | **Total** | 240,010 | $239,100.36 |

86.     As these records show, the tokens received by Defendants are commingled tokens deposited by Customers A through F, other customers, the Debtor, and/or others.

21

87. In addition to the Debtor's Terms of Use (establishing that deposited crypto is property of the estate) contractually rendering these transactions a transfer of property of the estate, the various and layered ways in which the Debtor continuously commingled crypto alternatively rendered these assets property of the estate.

88. Because these transfers were property of the estate, made after the Petition Date and not authorized by the Code or the Court, they are voidable under 11 U.S.C. § 549(a).

**CLAIM I**
**Avoidance of Unauthorized Post-Petition Transfers Against Coinbase Defendants**
**(11 U.S.C. § 549)**

89. The Plaintiff repeats, realleges, and incorporates by reference each of the foregoing allegations as though fully set forth herein.

90. The Transfers were transfers of property of the Debtor's bankruptcy estate per the Terms of Use and commingling of crypto by the Debtor within the meaning of 11 U.S.C. § 541.

91. Each of the Transfers was made after the commencement of the Chapter 11 Case on the Petition Date.

92. The Transfers were not in the ordinary course of business.

93. The transfers were not withdrawals of segregated customer-owned crypto.

94. None of the Transfers was authorized under the Bankruptcy Code or by any order of this Court. In particular, no order of this Court authorized the Debtor to transfer cryptocurrency to the Defendants.

95. The Coinbase Defendants were the initial transferees of the Transfers.

96. Accordingly, the Transfers are avoidable by the Plaintiff under 11 U.S.C. § 549(a), and the Plaintiff is entitled to recover the Transfers, or the value of the Transfers, from the Coinbase Defendants under 11 U.S.C. § 550(a), together with applicable interest, attorneys' fees, and costs.

**CLAIM II**
**Avoidance of Unauthorized Post-Petition Transfers Against Defendants Tilton and Jones**
**(11 U.S.C. § 549)**

97.     The Plaintiff repeats and incorporates by reference each of the foregoing allegations as though fully set forth herein.

98.     The Transfers were transfers of property of the Debtor's bankruptcy estate per the Terms of Use and commingling of crypto by the Debtor within the meaning of 11 U.S.C. § 541.

99.     Each of the Transfers was made after the commencement of the Chapter 11 Case on the Petition Date.

100.    The Transfers were not in the ordinary course of business.

101.    The transfers were not withdrawals of segregated customer-owned crypto.

102.    None of the Transfers was authorized under the Bankruptcy Code or by any order of this Court. In particular, no order of this Court authorized the Debtor to transfer cryptocurrency to the Defendants.

103.    Tilton and Jones are the immediate transferees of the initial transferee under 11 U.S.C. § 550(a)(2), or, in the alternative, the entities for whose benefit the Transfers were made and/or the initial transferees of the Transfers within the meaning of 11 U.S.C. § 550(a)(1).

104.    Accordingly, the Transfers are avoidable by the Plaintiff under 11 U.S.C. § 549(a), and the Plaintiff is entitled to recover the Transfers, or the value of the Transfers, from Tilton and Jones under 11 U.S.C. § 550(a), together with applicable interest, attorneys' fees, and costs.

**CLAIM III**
**Disallowance of Claims (11 U.S.C. § 502(d))**

105.    The Trustee repeats and re-alleges each of the foregoing allegations as though fully set forth herein.

106.    The Defendants are transferees of transfers avoidable under the sections pleaded above and are entities or individuals from which property is recoverable under 11 U.S.C. § 550.

107.    Pursuant to 11 U.S.C. § 502(d), each and every claim of the Defendants against the Debtor or the estate must be disallowed unless and until the Defendants pay to the Trustee the amount, or turn over to the Trustee the property, for which the Defendants are liable.

## PRAYER FOR RELIEF

The Trustee respectfully requests that the Court enter judgment in her favor and against the Defendants as follows:

a. Avoiding the Post-Petition Transfers under § 549(a);

b. Awarding judgment in favor of the Trustee and against the Defendants under 11 U.S.C. § 550 for the Transfers, or the value thereof, in an amount to be proven at trial, for the benefit of the Debtor's estate;

c. Disallowing any and all claims of the Defendants against the Debtor or the estate under 11 U.S.C. § 502(d) unless and until the Defendants satisfy their liability to the estate;

d. Awarding the Trustee prejudgment and post-judgment interest, costs of suit, and, to the extent permitted by law, attorneys' fees; and

e. Granting such other and further relief as the Court deems just and proper.

June 24, 2026

HOGGAN LEE HUTCHINSON

/s/ Trevor J. Lee
_____
TREVOR J. LEE
*Proposed Counsel for Angela
Somers, Chapter 11 Trustee*