Trevor J. Lee (16703)
**HOGGAN LEE HUTCHINSON**
257 E 200 S, Suite 1050
Salt Lake City, Utah 84111
(801) 704-7272
trevor@hlh.law

*Proposed Counsel for Angela J. Somers, Chapter 11 Trustee*

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF UTAH

| | |
|---|---|
| In re:<br><br>**POWER BLOCK COIN, LLC**,<br><br>    *Debtor.* | Bankr. Case No. 2:24-bk-23041-CDP<br><br>Chapter 11<br><br>Hon. Cathleen D. Parker |
| **ANGELA J. SOMERS**, as the Chapter 11 trustee for the bankruptcy estate of POWER BLOCK COIN, LLC,<br><br>    *Plaintiff,*<br><br>v.<br><br>**COINBASE GLOBAL, INC.; COINBASE, INC.; COINBASE FINANCIAL MARKETS, INC.; and JOSE SARTI,**<br><br>    *Defendants*. | Adversary Proceeding No. _____ |

**COMPLAINT TO AVOID AND RECOVER
UNAUTHORIZED POST-PETITION TRANSFERS**

Plaintiff Angela J. Somers, the duly appointed and acting Chapter 11 Trustee (the

"**Trustee**") of the estate of Power Block Coin, LLC (the "**Debtor**" or "**PBC**"), files this Complaint

against Coinbase Global, Inc., Coinbase, Inc., Coinbase Financial Markets, Inc. ("**Coinbase**

**Defendants**"), and Jose Sarti ("**Sarti**") (collectively, "**Defendants**"), and alleges as follows:

1

## I. INTRODUCTION

This adversary proceeding seeks to avoid and recover unauthorized post-petition transfers of estate-owned cryptocurrency that were transferred by the Debtor to Sarti and the Coinbase Defendants after the Petition Date.

After the Debtor filed for bankruptcy protection, the Debtor transferred $136,439.39 of Bitcoin out of the bankruptcy estate and into a self-custody address owned or controlled by Sarti and an address hosted by Coinbase and affiliated with Sarti (the "**Transfers**").  The Transfers at issue occurred between July 23, 2024, and October 15, 2024, and were made by the Debtor to, or for the benefit of, Sarti. The crypto was property of the estate and not segregated and identifiable customer property held by the Debtor in trust for its customer.

*First*, when the crypto was received by the Debtor, the Debtor's own terms of use made clear that when customers deposited crypto with the Debtor, they "grant[ed] the Company . . . all right and title to such Digital Assets, including ownership rights"—meaning that crypto became property of the Estate. *Second*, the crypto that the Defendants received from the Debtor had been repeatedly and thoroughly commingled with crypto from other customers and with the Debtor's existing crypto in a host of shared omnibus wallets. This occurred in several different forms, from paying certain customers using the crypto of others, to sweeping crypto out of individual accounts and aggregating it in larger omnibus accounts, to mixing customer and debtor crypto. Whatever the iteration, the transferred crypto could not be traced back to the specific customer and thus became property of the Debtor. *Third*, the Debtor knew Bitcoin was not Sarti's property; Part 11 of the Debtor's Statement of Financial Affairs (the "**SOFA**") lists no "Property the Debtor Holds or Controls That the Debtor Does Not Own." Thus, there was no basis for the Transfers, nor was there any consideration paid.

Because the Transfers occurred after the Petition Date and involved property of the estate, they are avoidable under section 549(a) of the Bankruptcy Code. The Court should therefore permit the Trustee to recover the transferred property, together with interest, costs, and all other relief authorized by law.

## II. JURISDICTION AND VENUE

1. This Court has jurisdiction over this adversary proceeding under 28 U.S.C. §§ 157 and 1334.

2. This is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2). Under Federal Rule of Bankruptcy Procedure 7008, the Trustee consents to the entry of final orders and judgment by this Court.

3. Venue is proper in this district under 28 U.S.C. §§ 1408 and 1409.

4. The statutory predicates for the relief sought are 11 U.S.C. §§ 502, 549, and 550, and Federal Rules of Bankruptcy Procedure 7001(1) and 7001(2).

## III. PARTIES

5. Plaintiff, Angela J. Somers, is the duly appointed and acting Chapter 11 Trustee of the Debtor's estate.

6. The Coinbase Defendants are a cryptocurrency exchange, platform, or counterparty that received the Transfers described below.

7. Defendant Jose Sarti is an individual who received, or for whose benefit were made, the transfers that are the subject of this adversary proceeding.

## IV. PROCEDURAL BACKGROUND

8. The Debtor, doing business as "**SmartFi**," was a Utah limited liability company that operated an online platform offering cryptocurrency exchange, lending, savings, and related digital-asset financial services—somewhat similar to an online bank for cryptocurrency.

9.      Facing demands for the return of crypto by customers, among other financial challenges, on June 20, 2024 (the "**Petition Date**"), the Debtor filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") in this Court, commencing the above-captioned bankruptcy case (the "**Bankruptcy Case**") (Case No. 24-23041, the "**BK Dkt.**").

10.     On July 4, 2024, the Debtor filed its Schedules, including Schedule E/F, "Creditors Who Have Unsecured Claims," and it filed an amendment on April 6, 2026. Sarti was not listed as a creditor on any of the Schedules (including the amendments). The Debtor also filed its Statement of Financial Affairs (the "**SOFA**") on July 4, 2024. In Part 11, the Debtor indicated it had no "Property the Debtor Holds or Controls That the Debtor Does Not Own."

11.     The Debtor's case has been adversarial, and parties-in-interest have consistently contested and objected to the actions of the Debtor and its professionals.

12.     The Debtor initially and improperly elected to proceed under subchapter V of chapter 11. On October 9, 2024, the Court sustained objections by parties-in-interest, finding the election improper, and the case has since proceeded as a traditional chapter 11 case. [BK Dkt. 190.] On October 24, 2024, the United States Trustee appointed an Official Committee of Unsecured Creditors. [BK Dkt. 199.]

13.     On November 18, 2024, the Debtor filed a motion to extend the exclusivity period for it to file and solicit support for a plan [BK Dkt. No. 213], to which the Creditors' Committee objected. [BK Dkt. No. 237].

14.     On December 17, 2024, the Court denied the Debtor's motion because "the Debtor has not shown that it has the ability to operate this estate in a way that's beneficial to creditors with transparency and good faith." [BK Dkt. No. 243], audio file at 21:45.

15.     On December 16, 2024, the Debtor filed its First Amended Plan of Reorganization (the "**Debtor's Plan**"). [BK Dkt. No. 242] On January 30, 2025, the Committee filed its own competing plan [BK Dkt. No. 254], followed by an amended version of that plan on March 7, 2025 [BK Dkt. No. 273, 274].

16.     On October 21, 2025, the Committee filed a Motion to Appoint Chapter 11 Trustee [BK Dkt. 413] (the "**Motion for Chapter 11 Trustee**"). On November 7, 2025, the Debtor responded by filing a motion to convert the case to Chapter 7 (the "**Conversion Motion**"). [BK Dkt. No. 422, 433 at 6–7, 25].

17.     On December 11, 2025, the U.S. Trustee filed a motion seeking disgorgement of the fees paid to the Debtor's counsel based on evidence of Debtor's counsel's failure to disclose the source of payment of attorney fees and failure to disclose a connection and potential conflict in their representation of the Debtor. [BK Dkt. No. 448].

18.     On March 31, 2026, the Court entered a Memorandum Decision concluding that the appointment of a chapter 11 trustee was in the best interests of creditors. [BK Dkt. 482.] On May 8, 2026, Angela J. Somers was appointed as the Chapter 11 Trustee of the Debtor's estate and is the duly appointed and acting Trustee.

## V. BACKGROUND ON CRYPTOCURRENCY

19.     Cryptocurrency (or "**crypto**" or "**tokens**") is a form of digital money that exists only as electronic records. The value of cryptocurrency generally rises and falls with supply and demand.

20.     Bitcoin ("**BTC**") and Ether ("**ETH**") are two of the most widely recognized cryptocurrencies, but many other cryptocurrencies exist. Some crypto—called "stablecoin"—is designed to hold a steady value of approximately one U.S. Dollar per unit. Examples of these include USD Coin ("**USDC**") and Tether ("**USDT**").

21.     Transfers of crypto are tracked on a shared electronic ledger called a "blockchain," which is maintained by many computers at the same time.[1] Different cryptocurrencies operate on different blockchains. Some cryptocurrencies, for example, operate on the Bitcoin blockchain. Others are issued and transferred on the Ethereum blockchain.

22.     While crypto transactions are transferred and tracked on blockchains, crypto itself is held in "digital wallets." A digital wallet is not a physical object; it is simply an electronic account used to hold, send, and receive cryptocurrency. Buyers and sellers of crypto will typically have their own personal digital wallets.

23.     Each wallet has a "public address" (sometimes called a "public key"), which is a string of letters and numbers visible to anyone on the blockchain (similar to a bank account number). This public address is how wallets are identified, and it is how users send crypto to a given wallet.

24.     Each wallet also has a "private key," which is a secret code required to move cryptocurrency out of the wallet (similar to a password used to log into a traditional bank account to send money). Whoever holds the private key controls the cryptocurrency in a given wallet. Unlike the public key, the private key[2] is not visible on the blockchain and must be kept secret.

25.     There are two types of wallets: custodial and non-custodial. A custodial wallet is held and managed by a third party, such as a centralized crypto exchange. A non-custodial wallet

---

[1] A blockchain is conceptually similar to a massive public spreadsheet that anyone can read but no one can secretly alter. Every time crypto is bought and sold, it is added as a new line, and once lines are added they cannot be erased.

[2] Generally, users can transfer crypto from their wallet using their private key. But some wallets are set up to require more than one approval before cryptocurrency can be moved—a security feature called "multi-signature."

is held by the individual owning the crypto. As explained in more detail below, the Debtor in this case held its customers' cryptocurrency in custodial wallets that the Debtor itself controlled.

## VI. THE DEBTOR'S BUSINESS AND THIRD-PARTY PROVIDERS

*A.*     *The Debtor's Business*

26.     As discussed above, SmartFi operated an online platform offering crypto financial services. The Debtor was wholly owned by Blue Castle Holdings, Inc., which also managed the Debtor's business. As a result, the Debtor had no employees, and Blue Castle performed almost all operational responsibility for the Debtor.

27.     The Debtor described itself as a "crypto-based financial services"[3] company that had two core lines of business. First, it hosted and facilitated cryptocurrency transactions through an online platform and charged fees for those transactions (the "**Hosting Business**"). Second, the Debtor took cryptocurrency from customers and lent it out or otherwise deployed it to generate a return (the "**Lending Business**").

28.     The Hosting Business was a platform for customers to deposit, trade, and withdraw crypto. The Debtor provided an integrated platform through which customers deposited crypto, engaged in spot trading or conversion transactions, and withdrew assets either to external blockchain addresses or to linked financial accounts. The Debtor had custodial wallets holding customers' crypto.

29.     The Lending Business was the more significant line of business. The goal of the Debtor was to operate similar to an online crypto bank by earning money on customers' crypto while it was holding that crypto, much like a bank loans out or invests money it is holding from other customers. Customers transferred their crypto into "SmartINTEREST" accounts held by the

---

[3] Declaration of Aaron Tilton in Support of First Day Relief, dated June 20, 2024.

Debtor, and in turn earned interest (essentially a high-yield crypto savings account). Once they did, the Debtor would try to make money on that crypto by trading it or lending it out. The Debtor's profit was the money it could make trading customers' crypto, in addition to the interest customers paid on loans, minus the interest the Debtor paid to customers who deposited into SmartINTEREST accounts.

30. In addition to offering SmartINTEREST accounts, the Lending Business also offered Crypto-Backed Loans. Customers could borrow U.S. dollars from the Debtor by depositing cryptocurrency as collateral.

31. The core product the Debtor provided was a centralized, customer-facing platform where it provided its Hosting and Lending Business. But it relied on other crypto companies to execute and facilitate other aspects of its business.

**B. *Third Party Providers***

32. The Debtor provided the customer-facing platform and account infrastructure, while relying on third-party liquidity providers ("**LPs**") to actually execute trades, source market liquidity, and facilitate conversions between crypto and fiat.

33. Similarly, the Debtor relied on a crypto custody provider, Fireblocks LLC ("**Fireblocks**"). A cryptocurrency custodian is the entity or infrastructure responsible for safeguarding digital assets by securing the private keys that control them. Because control of private keys equals control of the assets, institutional custodians provide not just storage but a full framework for security, governance, and transaction control.

34. Fireblocks organizes assets into vaults and vault accounts, which allow platforms like the Debtor to custody customer balances while holding assets in a unified custody environment. Each vault account can hold multiple asset wallets and addresses, enabling scalable,

omnibus-style custody with internal tracking. This structure allowed the Debtor to accept deposits, process trades and withdrawals, and interact with exchanges or liquidity providers, while Fireblocks provided the secure, programmable backend.

35.     Though the Debtor used Fireblocks, the Debtor internally tracked the crypto transactions itself using a "Ledger" maintained in a SQL database— an enterprise-grade, structured data system capable of recording, organizing, querying, and analyzing transactions, substantially exceeding the functionality of a conventional spreadsheet.

## VII. THE DEBTOR'S COLLAPSE

36.     In 2022, cryptocurrency markets began fluctuating wildly. During this time, the assets the Debtor relied on for liquidity (for example, to pay out customers who wanted their money back) fell sharply in value. At the same time, much of what the Debtor held in terms of assets was long-term loans that it could not readily call.

37.     To make matters worse, much of the Debtor's "lending" was not at arm's length. The Debtor's largest loans were to its own insiders and affiliates at below-market rates. In effect, customer deposits were funneled into illiquid insider ventures, including real estate.

38.     The result was an extreme shortfall: although the Debtor owed customers the return of large amounts of crypto, the Debtor had loaned out or invested that crypto and could not return it.[4] As of the Petition Date, the Debtor held less than $30,000. But it had obligations to return over $50 million.

39.     In sum, because of the ways the Debtor was pooling and using customers' crypto to try to earn profit, because many of its deals were made with insiders, and compounded by the crypto market collapse in 2022, the Debtor was left unable to satisfy its debts.

---

[4] The Trustee has not completed her investigation of the Debtor which may reveal other causes of the Debtor's filing, including malfeasance.

## VIII. THE CRYPTO HELD BY THE DEBTOR
## WAS PROPERTY OF THE DEBTOR'S ESTATE

40.    All crypto deposited with the Debtor was property of the estate under 11 U.S.C. § 541 for two independent and alternative reasons: (A) by operation of law, the Debtor's Terms of Use established the crypto as property of the estate upon deposit with Debtor; and (B) as a practical matter, the Debtor commingled crypto in a way that rendered it property of the estate.

### A.    *The Debtor's Terms of Use Render Deposited Crypto Property of the Estate*

41.    Under the "Terms of Use" that governed every customer account, each customer granted the Debtor title to and ownership of the cryptocurrency the customer placed on the Debtor's platform.

42.    Specifically, PBC's "Terms of Use" granted the Debtor "all right and title to such Digital Assets, including ownership rights," together with the right to hold, pledge, lend, trade, and otherwise use those assets without retaining a like amount.[5]

43.    The Terms of Use further provided that they do "not create a fiduciary relationship between us and you," authorized the Debtor to commingle deposited assets, and disclaimed any custodial or depository obligation. A customer's sole right was a contractual claim for repayment of equivalent value—the relationship of an unsecured creditor to its debtor.

44.    In other words, when a customer deposited crypto with the Debtor, the customer relinquished ownership of that crypto and received in exchange only the Debtor's contractual promise to return an equivalent amount of value on demand—much like someone who hands cash to a bank and holds a claim for repayment, not a claim to return of the specific bills deposited.

---

[5]    While there were several versions of the Debtor's Terms of Use, all available versions have the same or similar provision.

45. Because the Debtor took ownership of all crypto deposited, the crypto eventually transferred to Defendants was property of the estate.

### B. The Debtor Commingled Deposited Crypto

46. In addition to contractually agreeing that deposited cash and crypto of customers became property of the Debtor, once the customer deposited crypto, as a practical matter the Debtor commingled all of the funds, which rendered it property of the estate.

47. The "Estate" under the Bankruptcy Code is "all legal or equitable interest of the debtor in property." 11 U.S.C. § 541(a)(1). A customer wishing to exclude assets from the Estate on the basis that the Debtor simply held the assets in trust, and that ownership at all times remained with the customer, bears the burden of identifying and tracing the specific property claimed.

48. Where assets are commingled, however, that burden cannot be met, because commingled, fungible property loses its separate identity and cannot be traced to any particular claimant. As explained below, the deposited crypto or cash in this case cannot be traced to any particular customer because all of the Debtor's crypto was commingled.

49. Indeed, in order to keep the customers' crypto segregated, the Debtor needed to keep crypto customers deposited in separate digital wallets for every customer. That procedure was not followed. Instead, the Debtor pooled deposits into a limited number of large, shared wallets ("**Omnibus Digital Wallets**").

50. As demonstrated in the chart below, each customer had its own unique digital wallet address that it used when depositing crypto with the Debtor.



0.08674429 BTC (3 transfers)
May 9, 2022 3:01:05 PM

0.08668718 BTC
May 9, 2022 3:01:05 PM

**Customer A External Address**

**Customer A Deposit Address ~vam7**

51.     When crypto was first deposited with the Debtor, it was deposited into a wallet associated with the customer who deposited it.

52.     But promptly after a customer deposited crypto, the crypto became commingled in several ways, starting with "Sweeping." After crypto was deposited into individual customer wallets, the Debtor would "sweep" the crypto out of the individual customer wallets and transfer the crypto to one or more shared Omnibus Wallets controlled by the Debtor. After the crypto from individual accounts was swept into an Omnibus Wallet, the specific crypto deposited by a specific customer was no longer traceable. While the customer had the right to equivalent return of value, the precise tokens he or she had deposited could not be identified.

53.     Another way the Debtor commingled crypto was re-purposing of crypto that customers deposited—using deposited funds from one customer to pay out another customer. Below is a visual example of this. In the example—which is a real transaction from the Debtor's books and records—Customer C (in purple) wished to withdraw 0.83 BTC. To fulfill that request, the Debtor did not pull 0.83 BTC from Customer C's personal hosted wallet (as would be required if no crypto were commingled). Instead, the Debtor funded that transaction by combining (in rough numbers) 0.395 BTC that Customer A deposited, .0017 BTC that Customer B deposited, and .505 BTC from the Debtor's Omnibus Wallet, with some change returning back to the Debtor's Omnibus Wallet:



54.     Below is another example of an actual transaction from the Debtor's books and records where funds deposited by seven different customers (Customers A through G) were commingled and used to pay out a request by Customer H (in yellow), with the remaining left over from those deposits being swept into one of the Debtor's Omnibus Wallets:



55.     This example shows two types of commingling by the Debtor: (1) the Debtor used crypto deposited by certain customers to pay out a different customer (meaning the actual tokens those customers deposited will never be returned to them), and (2) the Debtor took any remaining crypto those customers deposited into their individual wallet and swept it into an Omnibus wallet.

56.     Here is another depiction of the same transaction, showing the Debtor taking deposited BTC from seven different customers (Customers A through G) and sweeping all of that BTC into just two digital wallets (Customer H's withdrawal, and one of the Debtor's Omnibus Wallets):

| Transaction Parties | Amount of BTC Swept | UTXO Count | Amount of outgoing BTC transferred | Resulting UTXO Count |
|---|---|---|---|---|
| Customer A | 0.08668718 | 1 | 0 | 0 |
| Customer B | 3.66370347 | 3 | 0 | 0 |
| Customer C | 0.15 | 1 | 0 | 0 |
| Customer D | 5.2498 | 1 | 0 | 0 |
| Customer E | 1.42297968 | 2 | 0 | 0 |
| Customer F | 0.09486274 | 1 | 0 | 0 |
| Customer G | 0.17 | 1 | 0 | 0 |
| Customer H | 0 | 0 | 8.1385 | 1 |
| SmartFi ~ qcp2 Wallet | 0 | 0 | 2.69937491 | 1 |
| **Total** | **10.83803307** | **10** | **10.83787491** | **2** |

57.     This same pooling, repeated continuously across the Debtor's operations, is what renders it impossible to conclude that any single token paid to a customer was the same token that the customer had originally deposited.

## C.     SmartFi's Gas Fees

58.     The charts above demonstrate that it is not simply that commingling happened to occur; rather, commingling was done by design and was inherent in the Debtor's business model.

59.     One of the drivers for both types of commingling—sweeping deposited funds from individual wallets into Omnibus wallets, and using crypto from one customer to pay out another

customer—was "gas fees." A "gas fee" is a processing fee charged by the Ethereum network to carry out a transfer—comparable to a postage or toll required to move something from one place to another.

60.     These fees could be minimized by commingling. If the Debtor used crypto deposited by one customer to pay out another customer, it could avoid several internal steps of depositing and holding the crypto itself, which would avoid some of the associated gas fees.

61.     Relatedly, efficiencies could be gained by sweeping crypto from hundreds or thousands of customer wallets into one Omnibus Wallet.

62.     The gas fees were not just a motivation to commingle, they were themselves another example of commingling.

63.     The Debtor set up dedicated wallets to pay these gas fees, which it called "Gas Stations."

64.     These Gas Stations held small amounts of crypto used only to pay gas fees.

65.     Below is an image showing how these Gas Stations worked. The transfers below are actual transfers from the Debtor's books and records:



66.     In this example, the three nodes on the far left depict customer wallets that are external to the Debtor (i.e., owned by the customer). Those three customers each sent crypto from their external wallets into their internal wallets with the Debtor (the "**Deposit Addresses**"). The

Debtor then performed a sweep and transferred all deposited crypto from the three different customers into one Omnibus Wallet (the blue node above). Because this involved an "on-chain" transfer, the sweep incurred a gas fee imposed by the Ethereum blockchain. To pay the gas fee, the Gas Stations (the green nodes above) transferred ETH to the customer wallets in advance of the sweep to pay the fee.

67.     This, again, shows at least two different types of commingling: (1) three customers' deposits are being swept into one Omnibus Wallet; and (2) funds from other customers (or perhaps the Debtor) are being sent and mixed into customer wallets to pay the gas fee.

### D.     *Commingling of Cash and Fiat*

68.     The Debtor also did not keep the cash each customer deposited in a separate account belonging to that customer. Instead, it pooled all deposited money together in shared accounts that also held the Debtor's own funds. Moreover, the Debtor regularly transferred funds between its various omnibus bank accounts, further commingling funds.

69.     By way of example, the Debtor held an omnibus bank account at Capital Community Bank ("**CC Bank x7870**") which was labeled as "For the Benefit of its Customers" from May 2022 through December 2023. During the same period, the Debtor held another omnibus bank account also at Capital Community Bank ("**CC Bank x7888**") which was labeled as "Operating Account." However, the Debtor regularly transferred funds between those accounts, which commingled customer-related and operating funds.[6]

## IX. TRANSFERS AT ISSUE

70.     Records show that beginning in 2021, Sarti deposited about $200,000 in fiat with the Debtor.

---

[6] The Trustee has many specific examples illustrating this point, though those examples have been omitted as not relevant to this complaint.

71.     That fiat was later converted to BTC.

72.     In May 2024, shortly before the Debtor filed for bankruptcy protection, the BTC was liquidated into $147,641.

73.     After the Petition Date, the $147,641 was again converted to BTC. Sarti then actively sought to transfer the BTC to his Coinbase account.

74.     On or about July 23, 2024, a Debtor representative indicated that Sarti had asked "what needs to happen for him to be able to transfer that bitcoin to his Coinbase wallet." On or about July 24, 2024, Sarti was "wanting to withdraw a bitcoin" but could not submit the request through the Debtor's portal because the Debtor's withdrawal limit was set to approximately $10,000. The Debtor found a way to get it done, and caused the Transfers to be made to Sarti in parts to avoid the limitation.

75.     Sarti obtained the BTC in a series of transfers from July 23, 2024 through October 15, 2024. The Debtor transferred a total of 2.15671497 BTC in eleven separate transactions from the commingled SmartFi Omnibus Wallet bc1q80n9shen0vez5n3x6ugc5y2vg3xq3yjmk5qcp2 ("SmartFi Omnibus Wallet ~qcp2") to Defendants. At the time of the Transfers, the transferred Bitcoin had an aggregate value of approximately $136,439.39.

76.     Eight of the transfers were made directly from SmartFi Omnibus Wallet ~qcp2 to Coinbase address 38gaUMWwGua15pGkwhD7BvgFxEQr8tvRC7 ("Coinbase ~vRC7"). Those eight transfers are referred to as the "**Direct Transfers**." The remaining three transfers were sent to bc1qtrmq2y4yrudllakmgpcrs94mu5n02ff66nw0wj, a self-custody address owned or controlled by Sarti (the **"Self-Custody Transfers"**), from which, upon information and belief, the funds were

subsequently transferred by Sarti to Coinbase ~vRC7. The table below details these transfers from

SmartFi Omnibus Wallet ~qcp2.

| Transaction Hash | Date & Time (UTC) | Recipient Address | Amount BTC | Approx. USD Value |
|---|---|---|---|---|
| fffca55a83c710b3862f34029a1bb99c72fb9ab32772fb02b2058dcccd6f55d2 | 7/23/2024 12:51 | bc1qtrmq2y4yrudllakmgpcrs94mu5n02ff66nw0wj (Self Custody) | 0.14782973 | $9,817.57 |
| ac34ca13ddf210de77e7ea2fa814fce50959165374b539990a5aaf348866e487 | 7/24/2024 19:07 | bc1qtrmq2y4yrudllakmgpcrs94mu5n02ff66nw0wj (Self Custody) | 0.15051226 | $9,825.28 |
| 3dfdec8a9a0f2da9822dd4372ed70521c89dcb6064bc3aa00b10e572dd5c4089 | 7/25/2024 19:04 | bc1qtrmq2y4yrudllakmgpcrs94mu5n02ff66nw0wj (Self Custody) | 0.54948774 | $36,076.89 |
| 126ee5e503a53e7c8c334d5527f06e40b1aefdd868680c60b2c774f5d0fa715c | 8/23/2024 18:59 | 38gaUMWwGua15pGkwhD7BvgFxEQr8tvRC7 (Coinbase) | 0.16386938 | $10,596.87 |
| 3b45c2e88212de115858646aa89563eb1d558aeff75263b2aaec4d03bcf41d4a | 9/2/2024 17:25 | 38gaUMWwGua15pGkwhD7BvgFxEQr8tvRC7 (Coinbase) | 0.17100284 | $10,086.44 |
| c7ae42c096bf28385f554089119a0ae8914356a15cdb7b4d50fb50fdf3270af5 | 9/9/2024 10:13 | 38gaUMWwGua15pGkwhD7BvgFxEQr8tvRC7 (Coinbase) | 0.18380489 | $10,239.90 |
| 70e19a591e145bf7613534121a8b952cb48ffde6a5e5eecfb0e4c845699b6459 | 9/18/2024 10:35 | 38gaUMWwGua15pGkwhD7BvgFxEQr8tvRC7 (Coinbase) | 0.16695207 | $9,954.54 |
| ca0aebe35f45d095b8a523bc8b4c1138fc05308310f80ac47e0a79f64909f5f5 | 9/25/2024 9:54 | 38gaUMWwGua15pGkwhD7BvgFxEQr8tvRC7 (Coinbase) | 0.15683184 | $9,963.42 |
| 80b05def9a1592760212fa66c2cebc1bc993c073fd883b74fb8c1924f1b5e00c | 10/1/2024 9:51 | 38gaUMWwGua15pGkwhD7BvgFxEQr8tvRC7 (Coinbase) | 0.15768034 | $9,995.99 |
| a581f708c9b8d0578ad39976a411df2429d2d9f7ded6d8d3f12b29696d261e3c | 10/7/2024 9:50 | 38gaUMWwGua15pGkwhD7BvgFxEQr8tvRC7 (Coinbase) | 0.15865569 | $10,010.61 |
| f382f2dce0f1b558e7682a3ca19989135876dbe9448648302cd7c4547355f89b | 10/15/2024 9:12 | 38gaUMWwGua15pGkwhD7BvgFxEQr8tvRC7 (Coinbase) | 0.15008819 | $9,871.88 |
|  |  | Total | 2.15671497 | $136,439.39 |

77.     The transaction hashes above confirm that the crypto transfers were made on-chain

directly from the Debtor to the Defendants.

78.     Blockchain analytics databases and publicly available sources show the receiving address, Coinbase ~vRC7, is a Coinbase-controlled address.[7] The account holder of Coinbase ~vRC7 thus had a contractual claim against the Coinbase Defendants with respect to the credited value of those assets.

79.     The Coinbase Defendants therefore took dominion and control over the Direct Transfers upon receipt and are the initial transferees of the Direct Transfers within the meaning of 11 U.S.C. § 550(a)(1). With respect to the Self-Custody Transfers, Sarti took dominion and control of the transferred Bitcoin upon receipt and is the initial transferee of the Self-Custody Transfers. Upon information and belief, the Coinbase Defendants are immediate or mediate transferees of the Self-Custody Transfers within the meaning of 11 U.S.C. § 550(a)(2).

80.     At best, the Transfers were made on account of Sarti's pre-petition claim against the Debtor arising from his account balance. No order of this Court authorized the Debtor to pay pre-petition claims of its customers, and the post-petition payment of a pre-petition unsecured claim is not a transfer in the ordinary course of business.

81.     Through the Transfers, Sarti received approximately 92% of his account balance in a series of transfers over approximately twelve weeks at a time when real creditors, or to the extent Sarti even had a claim, similarly situated customers of the Debtor holding unsecured claims, received nothing.

### X. THE CRYPTO TRANSFERS AT ISSUE WERE COMMINGLED BY THE DEBTOR

82.     When customers requested return of crypto, the Debtor, as discussed, did not return the specific tokens that the customers had deposited. Instead, the Debtor transferred crypto from

---

[7] Arkham Intelligence is a blockchain analytics platform that identifies and attributes cryptocurrency wallet addresses to individuals, organizations, and services using on-chain and other publicly available data. https://arkm.com/explorer/address/38gaUMWwGua15pGkwhD7BvgFxEQr8tvRC7

the Omnibus Wallets that held commingled crypto to satisfy the request. Below is an explanation

of how that occurred for the Transfers at issue in this Complaint.

83.     The chart below depicts transfers received by Defendants after the Petition Date.

The wallet shown on the bottom in blue, Coinbase ~vRC7, is associated with Sarti. The wallet

shown at the top in red is one of the Debtor's omnibus wallets. The wallets shown in yellow

represent intermediary addresses through which funds passed before ultimately reaching Coinbase

~vRC7 in three of the transfers originating from SmartFi Omnibus Wallet ~qcp2. The arrows

depict the flow of BTC in the eleven post-petition transfers from the Debtor to Defendants.



84.     As shown, when the Debtor transferred estate assets to Defendants, post-petition, the Debtor did not pull from customer wallets owned by Sarti. Instead, those assets were pulled from a commingled Debtor omnibus wallet.

85.     The manner in which these transfers were executed reflects not a direct return of customer-specific assets, but rather the distribution of commingled funds drawn from centralized wallets controlled by the Debtor. This distinction is critical to understanding the nature of the transactions at issue.

86.     As described in paragraph 54 above, the assets contained in the SmartFi Omnibus Wallet ~qcp2 were derived from commingled transfers with other centrally controlled omnibus addresses and, therefore, were not attributable to any specific customer, account holder, or account.

87.     Therefore, the digital assets received by Defendants were commingled assets originating from numerous SmartFi customers and addresses, rather than assets belonging to any specific customer or account.

88.     In addition to the Debtor's Terms of Use (establishing that deposited crypto is property of the Estate) contractually rendering these transactions a transfer of property of the estate, the various and layered ways in which the Debtor continuously commingled crypto alternatively rendered these assets property of the estate.

89.     Because these transfers were property of the estate, made after the Petition Date and not authorized by the Code or the Court, they are voidable under 11 U.S.C. § 549(a).

**CLAIM I**
**Avoidance of Unauthorized Post-Petition Transfers Against Coinbase Defendants**
**(11 U.S.C. § 549)**

90.     The Plaintiff repeats, realleges, and incorporates by reference each of the foregoing allegations as though fully set forth herein.

91. The Transfers were transfers of property of the Debtor's bankruptcy estate per the Terms of Use and commingling of crypto by the Debtor within the meaning of 11 U.S.C. § 541.

92. Each of the Transfers was made after the commencement of the Chapter 11 Case on the Petition Date.

93. The Transfers were not in the ordinary course of business.

94. The Transfers were not withdrawals of segregated customer-owned crypto.

95. None of the Transfers was authorized under the Bankruptcy Code or by any order of this Court. In particular, no order of this Court authorized the Debtor to transfer cryptocurrency to the Defendants.

96. The Coinbase Defendants were the initial transferees of the Direct Transfers and, upon information and belief, immediate or mediate transferees of the Self-Custody Transfers.

97. Accordingly, the Transfers are avoidable by the Plaintiff under 11 U.S.C. § 549(a), and the Plaintiff is entitled to recover the Transfers, or the value of the Transfers, from the Coinbase Defendants under 11 U.S.C. § 550(a), together with applicable interest, attorneys' fees, and costs.

**CLAIM II**
**Avoidance of Unauthorized Post-Petition Transfers Against Sarti**
**(11 U.S.C. § 549)**

98. The Plaintiff repeats and incorporates by reference each of the foregoing allegations as though fully set forth herein.

99. The Transfers were transfers of property of the Debtor's bankruptcy estate per the Terms of Use and commingling of crypto by the Debtor within the meaning of 11 U.S.C. § 541.

100. Each of the Transfers was made after the commencement of the Chapter 11 Case on the Petition Date.

101. The Transfers were not in the ordinary course of business.

102. The Transfers were not withdrawals of segregated customer-owned crypto.

103. None of the Transfers was authorized under the Bankruptcy Code or by any order of this Court. In particular, no order of this Court authorized the Debtor to transfer cryptocurrency to the Defendants.

104. Sarti is the entity for whose benefit the Transfers were made within the meaning of 11 U.S.C. § 550(a)(1). Sarti is also the initial transferee of the Self-Custody Transfers within the meaning of 11 U.S.C. § 550(a)(1) and, in the alternative, an immediate or mediate transferee of the initial transferee of the Direct Transfers within the meaning of 11 U.S.C. § 550(a)(2).

105. Accordingly, the Transfers are avoidable by the Plaintiff under 11 U.S.C. § 549(a), and the Plaintiff is entitled to recover the Transfers, or the value of the Transfers, from Sarti under 11 U.S.C. § 550(a), together with applicable interest, attorneys' fees, and costs.

**CLAIM III**
**Disallowance of Claims (11 U.S.C. § 502(d))**

106. The Trustee repeats and re-alleges each of the foregoing allegations as though fully set forth herein.

107. The Defendants are transferees of transfers avoidable under the sections pleaded above and are entities or individuals from which property is recoverable under 11 U.S.C. § 550.

108. Pursuant to 11 U.S.C. § 502(d), each and every claim of the Defendants against the Debtor or the estate must be disallowed unless and until the Defendants pay to the Trustee the amount, or turn over to the Trustee the property, for which the Defendants are liable.

**PRAYER FOR RELIEF**

109. The Trustee respectfully requests that the Court enter judgment in her favor and against the Defendants as follows:

a. Avoiding the Post-Petition Transfers under § 549(a);

b.  Awarding judgment in favor of the Trustee and against the Defendants under 11 U.S.C. § 550 for the Transfers, including return of the 2.15671497 BTC transferred or, if the Court so orders, the value of the Transfers measured as of the date of judgment or recovery, in an amount to be proved at trial, for the benefit of the Debtor's estate;

c.  Disallowing any and all claims of the Defendants against the Debtor or the estate under 11 U.S.C. § 502(d) unless and until the Defendants satisfy their liability to the estate;

d.  Awarding the Trustee prejudgment and post-judgment interest, costs of suit, and, to the extent permitted by law, attorneys' fees; and

e.  Granting such other and further relief as the Court deems just and proper.

July 23, 2026

HOGGAN LEE HUTCHINSON

/s/ Trevor J. Lee
_____
TREVOR J. LEE

*Proposed Counsel for Angela J. Somers, Chapter 11 Trustee*