**This order is SIGNED.**

**Dated: October 29, 2026**

**CATHLEEN D. PARKER**
**U.S. Bankruptcy Judge**

rdr

**IN THE UNITED STATES BANKRUPTCY COURT**

**FOR THE DISTRICT OF UTAH**

| | |
|---|---|
| In re:<br><br>POWER BLOCK COIN, L.L.C.,<br><br>Debtor. | Bankruptcy Number: 24-23041<br><br>Chapter 11<br><br>Hon. Cathleen D. Parker |

**MEMORANDUM DECISION**

The matter before the Court is the Sale Motion[1] filed by Angela J. Somers, the Chapter 11 Trustee ("Trustee") of Debtor Power Block Coin, L.L.C. d/b/a SmartFi. The Court previously ruled on a portion of the Sale Motion, approving the bidding procedures and bid protections proposed by the Trustee and leaving for a subsequent hearing consideration of any transaction brought before the Court by the Trustee for approval.[2] The Court conducted that hearing on October 20, 2026, at which it received evidence and took the matter under

[1] The full title of the Sale Motion is *Trustee's Motion for Entry of (I) An Order (A) Approving Bidding Procedures and Bid Protections, (B) Scheduling a Sale Hearing, and (C) Approving the Form and Manner of Notice; and (II) An Order (A) Authorizing the Sale of the Purchaser Interest Free and Clear Pursuant to 11 U.S.C. §§ 105(a), 363(b), (f) and (m), or in the Alternative Authorizing the Trustee to Obtain Credit Pursuant to 11 U.S.C. § 364(b) and (c), (B) Authorizing Entry Into and Approving the Definitive Agreement, and (C) Granting Related Relief.* Doc No. 539.
[2] Doc. No. 591.

advisement. After weighing the evidence, considering the oral arguments of counsel, reviewing the record in this case, including the briefs filed in opposition to and in support of the relief requested in the Sale Motion, and conducting its own independent research of applicable law, the Court now issues this Memorandum Decision granting the Sale Motion.[3]

## I. JURISDICTION AND VENUE

The United States Bankruptcy Court for the District of Utah has jurisdiction over this contested matter pursuant to 28 U.S.C. §§ 1334 and 157(b)(1). This matter constitutes a core proceeding within the meaning of 28 U.S.C. § 157(b)(2)(A),[4] (M),[5] (N),[6] and (O),[7] and the Court may enter a final order. Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

## II. BACKGROUND

The Court will not repeat here the entire history of this case; it is set forth in detail in multiple pleadings and the Court's prior Memorandum Decision appointing a Chapter 11 Trustee.[8] For the sake of brevity, the Court incorporates the facts in that decision by reference and states the following facts relevant to the matter now before the Court.

---

[3] This Memorandum Decision constitutes the Court's findings of fact and conclusions of law pursuant to Fed. R. Civ. P. 52(a), made applicable in contested matters by Fed. R. Bankr. P. 9014 and 7052. Any of the findings of fact herein are deemed, to the extent appropriate, to be conclusions of law, and any conclusions of law are similarly deemed, to the extent appropriate, to be findings of fact, and they shall be equally binding as both.

[4] "[M]atters concerning the administration of the estate[.]"

[5] "[O]rders approving the use or lease of property. . . ."

[6] "[O]rders approving the sale of property. . . ."

[7] "[O]ther proceedings affecting the liquidation of the assets of the estate. . . ."

[8] Doc. No. 482.

On June 20, 2024 (the "Petition Date"), Debtor filed a voluntary petition for relief under Chapter 11 of Title 11 of the United States Code in this Court, commencing the above-captioned bankruptcy case. Debtor's case has been adversarial, and parties-in-interest have consistently contested and objected to Debtor's actions and those of its professionals.

On March 31, 2026, the Court entered its above-referenced Memorandum Decision, concluding the appointment of a Chapter 11 Trustee was in the best interests of creditors. On May 8, 2026, the Trustee was appointed.[9] After her appointment, the Trustee began her investigation and determined that she needed a cryptocurrency and financial advisor to trace transfers and assess Debtor's financial condition over time and legal professionals to assist in the investigation and, if appropriate, identify and pursue claims. But Debtor was administratively insolvent, and a large portion of the professionals' fees incurred by the Debtor in possession and the Official Committee of Unsecured Creditors ("Committee") had not been paid.[10]

Professionals hesitated to accept retention because they would share available funds ratably with professionals who served before the Trustee's appointment—foreclosing their ability to receive full payment. The professionals therefore requested, and the Trustee proposed in various applications to employ those professionals, certain conditions of retention, including a carve-out from any estate financing for their fees.[11] The Court approved these applications at a hearing held on September 16, 2026.

---

[9] Doc. No. 504.
[10] These fees are estimated to be close to $2 million.
[11] Doc. No. 514, at 6; Doc. No. 516, at 6; Doc. No. 527, at 6; Doc. No. 535, at 6.

Through the investigation of the Committee and the Trustee's professionals, she has identified valuable estate assets. These consist of causes of action, including pre-petition avoidance actions, post-petition unauthorized transfer claims, state-law tort and breach of fiduciary duty claims, and possible malpractice claims against Debtor's former insiders and various third parties, among others. Potential estate assets also include significant claims relating to cryptocurrency transfers.[12]

The Trustee determined that she could not move forward with the further investigation and pursuit of claims without additional funding. Shortly after her appointment, Debtor's counsel turned over approximately $6,000 to the Trustee, which constituted all of the funds in the estate's account at that time and which, in the Trustee's words, was insufficient to even request the Debtor's books and records.[13] After assessing the estate's financing options, the Trustee determined that because the estate has no ongoing business operations, no cash flow, and no unencumbered hard assets to serve as collateral, it could not obtain unsecured credit allowable as an administrative expense under 11 U.S.C. § 503(b)(1).[14] She concluded the only viable option to pursue the estate's causes of action was to market an interest in them to third-

---

[12] Working initially on a temporary basis, the Trustee's professionals have already achieved results, including identifying approximately $880,000 of estate assets. The Trustee and her financial advisor secured cryptocurrency worth approximately $200,000 in a Fireblocks account. The Trustee also filed an adversary proceeding against Aaron Tilton, Brad Jones, and certain Coinbase entities in this Court on June 24, 2026 to avoid and recover unauthorized post-petition transfers. Adv. Pro. No. 26-2122, Doc. No. 1. Mr. Tilton and Mr. Jones agreed to return the $240,000 transferred as set forth in the Notice of Dismissal filed in connection with that case. Adv. Pro. No. 26-2122, Doc. No. 2, ¶ 3.

[13] At its own expense, J.S. Held, LLC, the Trustee's financial advisor, has taken control of complex books and records in an attempt to trace cryptocurrency inflows, outflows, and uses. While necessary to bring timely claims, these investigations require funding.

[14] All subsequent references to the "Code," "Bankruptcy Code," and particular statutes are to title 11 of the United States Code unless otherwise indicated.

party litigation funders. The Trustee therefore began the process of gathering information to see if claims existed that would entice lenders to provide the necessary funding.

The Trustee first approached traditional litigation funders, whose response would indicate how marketable the estate's claims were. The response was not enthusiastic.[15] After traditional litigation funders expressed little interest, the Trustee looked for funding in more unusual areas, but there too, the response was similar—the entities indicated that the estate's claims were too embryotic to fund against. Eventually, an entity named Wealth Union expressed interest in funding the litigation. Then, after inquiring whether members of the Committee had an interest in providing funding, the Trustee received an offer from MetaGate LLC ("MetaGate"), an entity owned and controlled by Zhouyang "Mason" Song, a SmartFi creditor, member of the Committee, and defendant/counterclaimant in pre-petition litigation commenced by the Debtor.[16] In July 2026, the Trustee determined that MetaGate's offer was superior to Wealth Union's, and it is MetaGate's offer the Trustee now presents for Court approval through the Sale Motion.

Under the terms of its offer, MetaGate will provide up to $2.25 million in funding in exchange for a defined percentage interest in the estate's future litigation proceeds. The funding occurs in four tranches according to the achievement of certain benchmarks, though MetaGate retains discretion to withhold funds in certain tranches.[17] In exchange for the

[15] The Trustee was aware that the lack of assets and the lack of identified claims would make traditional funding less suitable.

[16] Mr. Song has been involved in this case for some time and is familiar with the issues. He has filed the single largest claim against the estate (the "Song Claim") and has recused himself from all Committee deliberations concerning MetaGate's offer and his claim.

[17] MetaGate's counsel stated at the sale hearing that MetaGate would fund tranches one and two—

funding, MetaGate acquires a non-recourse ownership interest in a defined percentage of the gross proceeds recovered from the estate's causes of action—between 30% and 40% depending on the amount of funding deployed.[18] The Trustee retains control over the prosecution, settlement, and abandonment of the estate's claims. MetaGate cannot approve or veto those decisions, although it may object to a proposed settlement as a party in interest.

The agreement with MetaGate requires the Trustee to use the funding only for non-contingent fees of professionals, quarterly fees under 28 U.S.C. § 1930, and the premium for a trustee liability insurance policy, while prohibiting her from using the funding to pay professional fees of the Debtor in possession or Committee. Disbursement of any recovered proceeds will be paid in the following order of priority:

(i) First, to pay contingency counsel their approved contingency fees and out-of-pocket expenses.

(ii) Second, to pay any non-contingent professional fees and expenses incurred in connection with the particular claim, which are capped at 30% of the proceeds.

(iii) Third, to satisfy MetaGate's percentage interest in the proceeds.

(iv) Fourth, to cover MetaGate's approved transaction costs.

(v) Fifth, to the estate for distribution.

---

totaling $1 million—within two business days of an order granting the Sale Motion, which represents a minor acceleration of tranche one and a significant acceleration of tranche two.

[18] Prior to the October 20 hearing, the Trustee, MetaGate, and the Committee negotiated a carve-out agreement—which they presented to the Court at that hearing—regarding MetaGate's recovery on proceeds resulting from the estate's claims against GS Partners. Under that agreement, if the Trustee recovers on the claims against GS Partners without further effort, MetaGate's recovery on those proceeds will be capped at twice the amount of funding MetaGate had provided to that point in time.

As part of the approval of this litigation funding, and as a condition for it, the Trustee stipulated to the validity and allowance of the Song Claim, which will be bifurcated and allowed as: (i) a claim secured to the extent of a right of setoff or recoupment for $3,378,094.40, and (ii) a general unsecured claim of $22,383,494.37, which includes a 10% reduction from the original claim.[19] J.S. Held determined Mr. Song's claim was consistent with the information the professionals saw in Debtor's books and records, the on-chain data, and the bank statements and concluded that those sources supported Mr. Song's entitlement to payment.

After the Court approved the bidding procedures, the Trustee received a competing offer from Douglas Scribner, who had previously objected to the Sale Motion.[20] Mr. Scribner is an unsecured creditor and member of the Committee who previously diverged from the Committee over its request to appoint a Chapter 11 Trustee and instead independently wrote a letter to the Court supporting the Debtor's motion to convert this case to Chapter 7.[21] Here, too, Mr. Scribner and the Committee are at odds over the Sale Motion. The Committee supports MetaGate's offer and requests that the Court approve it over Mr. Scribner's, characterizing the latter as an attempt by a potential target of litigation to buy claims against himself and insiders.

---

[19] Multiple *pro se* unsecured creditors filed identical objections to the Song Claim as part of their objections to Sale Motion, Doc. Nos. 557-567, but none of those parties prosecuted its objection at the October 20 hearing. Parsons Behle & Latimer, former counsel for Debtor, which had filed its own objection to the Sale Motion, Doc. No. 572, withdrew that objection insofar as it related to the Song Claim. Doc. No. 622.

[20] Doc. No. 573.

[21] Doc. No. 441.

Mr. Scribner's offer proposes an outright purchase of certain estate claims as opposed to a sale of proceeds.[22] The Trustee values these claims at over $44 million but did not provide any analysis of their collectability outside of the Solara claim that is potentially secured by real property. In exchange for these claims, Mr. Scribner would pay the estate $550,000 up front with installments over three and one-half years for a total of $5 million and would also subordinate his claim for $19,412,750.52 below all unsecured creditors.[23]

The Trustee had concerns about Mr. Scribner's ability to make the payments, so she requested additional financial information and a letter of credit. Mr. Scribner declined to present a letter of credit and was in the process of gathering financial information, but the Trustee declared the MetaGate proposal the accepted offer before Mr. Scribner could provide the information.[24]

After reviewing the two offers presented to her, the Trustee determined MetaGate's was the highest and best offer and further determined an auction was not necessary to reach this conclusion. This was due to a number of reasons, including multiple concerns with Mr. Scribner's proposal. First, the Scribner bid would shut down the Trustee's efforts to pursue the claims in their entirety. Second, the Scribner bid contained no carve-out for the Trustee's professionals, diluting their claims. Third, the second installment payment would come only

[22] The claims to be purchased include Chapter 5 avoidance claims, claims on promissory notes, and state law claims that the estate may have against Mr. Scribner himself and a host of other entities. Doc. No. 600, ¶ 9.

[23] No party has objected to Mr. Scribner's proof of claim, but the Trustee believes he has no claim and in fact owes Debtor's estate over $12 million.

[24] The Trustee expedited her decision to allow Mr. Scribner enough time to file an objection under the expedited timeline.

one month before the § 546(a) deadline, and the Trustee's professionals would not continue their service under those terms. Finally, the proposal had broad setoff rights. In the end, the Trustee believed, despite litigation's inherent uncertainty, that pursuing the claims under MetaGate's offer would produce greater value for the estate than selling them directly to Mr. Scribner.

The Trustee contends that MetaGate's offer was negotiated at arm's length and is the best path forward to generate recoveries for the estate's creditors, and its acceptance therefore represents the sound exercise of her business judgment.[25] As noted, the Committee supports the sale to MetaGate. Mr. Scribner and Parsons Behle assert the Trustee should proceed with an auction to determine the highest and best offer.[26]

## III. ANALYSIS

Section 363(b)(1) of the Bankruptcy Code provides that a trustee, "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate."[27] The sale of a percentage interest in the proceeds of the estate's causes of action is a

[25] The Trustee also notes that approval of funding must occur on a tight timeframe. Under § 549(d), the Trustee must start actions to avoid unauthorized post-petition transfers within two years of the date of the transfer. These § 549 deadlines are currently expiring on a rolling, daily basis. Section 546(a)(1) generally bars Chapter 5 avoidance actions after the later of (a) two years after entry of the order for relief, or (b) one year after the appointment of the first trustee. The Trustee was appointed on May 8, 2026. Because the Trustee was appointed within the initial two-year window, the absolute deadline to commence these avoidance actions is one year from her appointment—specifically, May 2027.

[26] Mr. Scribner asserted that the Trustee did not ask him for more specific favorable terms, but other than acknowledging he was going to provide additional financial information, Mr. Scribner did not propose any additional concessions in his offer.

[27] 11 U.S.C. § 363(b)(1).

sale of estate property outside the ordinary course of business.[28]A trustee may sell estate property outside the ordinary course if there is a sound business reason, adequate notice, a fair price, and good faith.[29] Courts give "great judicial deference" to a trustee's choice of the winning bid, and "highest and best" does not mean the largest number.[30]

To evaluate whether a transaction satisfies the business judgment standard, courts generally look to three factors: "[1] evidence of 'any improper or bad motive,' [2] whether 'the price is fair and the negotiations or bidding occurred at arm's length,' and [3] whether the trustee followed 'adequate procedures, including proper exposure to the market and accurate and reasonable notice to all parties in interest.'"[31] Estate fiduciaries, like the Trustee, are not required "to mechanically accept a bid with the highest dollar amount. [They] are permitted, and in fact are encouraged, to evaluate other factors such as contingencies, conditions, timing, or other uncertainties in an offer that may render it less appealing."[32]

---

[28] If the transaction is otherwise classified as "use" of property of the estate within the meaning of Section 363(b)(1), the same authorization is required.
[29] *In re Med. Software Sols.*, 286 B.R. 431, 439–40 (Bankr. D. Utah 2002); *Allen v. Absher (In re Allen)*, 607 F. App'x 840, 843 (10th Cir. 2015) (unpublished).
[30] *In re Mountain States Rosen, LLC*, 619 B.R. 750, 753–54 (Bankr. D. Wyo. 2020) (deferring to debtor's choice of winning bid over an insider bidder's objection and discounting the uncertain, non-cash part of the losing bid) (quoting *In re Bakalis*, 220 B.R. 525, 532–33 (Bankr. E.D.N.Y. 1998)).
[31] *In re Allen*, 607 F. App'x at 843 (quoting *In re Castre, Inc.*, 312 B.R. 426, 428 (Bankr. D. Colo. 2004)).
[32] *In re Mountain States Rosen, LLC*, 619 B.R. at 754-55 (citing *In re Family Christian, LLC*, 533 B.R. 600, 622 (Bankr. W.D. Mich. 2015) *and In re 160 Royal Palm, LLC*, 600 B.R. 119, 130 (S.D. Fla 2019), *aff'd* 785 F. App'x 829 (11th Cir. 2019)).

A. *Business Judgment Standard*

1. *Motive*

The Trustee asserts she is entering into this arm's-length transaction with MetaGate in good faith to maximize value for the estate for the benefit of all creditors. No party asserted an improper motive on the Trustee's, MetaGate's, or Mr. Song's behalf.

2. *Fair Price*

While Mr. Scribner's offer is higher than MetaGate's on paper, that does not account for additional litigation recoveries that MetaGate's funding may unlock down the road. According to the Trustee, in her business judgment, the MetaGate bid is likely to result in a greater recovery for the estate. Under her recovery analysis, the Trustee estimates that successful prosecution of the identified claims would yield an approximate return of $15,810,3104 to the estate. Even a 50% recovery could return $6,905,155 for the estate, both of which amounts exceed Mr. Scribner's offer.

To be sure, MetaGate's offer is not without risk. Its recovery for the estate, and unsecured creditors in particular, is founded upon litigation—the outcome, duration, and expense of which the Trustee must weigh in the balance. Any litigation carries the risk of little to no recovery, but the Trustee counters this risk is less than the risk Mr. Scribner's offer poses due to the uncertainty regarding his ability—and his right to invoke a setoff and potentially refuse—to make the future payments, which are spread out over three and one-half years.

Moreover, MetaGate's proposal, as modified on the record at the October 20 hearing, allows the Trustee to commence the contemplated litigation quickly. As noted, it provides $1

million to the estate immediately to compensate professionals for work they have already done and provide resources to begin to pursue claims on the estate's behalf.

At the end of the day, the Trustee actively negotiated and compared MetaGate's proposal against competing proposal frameworks from Wealth Union and Mr. Scribner. She determined the negotiated MetaGate proposal offered superior economic terms, robust downside protection through non-recourse funding, and a viable, committed funding path to actual recoveries. In contrast to Mr. Scribner's offer, MetaGate is purchasing only a passive economic interest in litigation outcomes, not control over the litigation.

These factors—the conditions of the offers, the risks of each, their different potential estate recoveries, and the timelines necessarily imposed by their structures—are ones that the Trustee was well within her business judgment to consider in addition to absolute dollar value to determine whether an offer provided a fair price. The Court concludes the Trustee properly exercised her business judgment in weighing the various factors to determine that MetaGate's offer is preferable to Mr. Scribner's.

3. *Notice/Procedure*

By filing the Notice of Sale Agreement[33] and establishing a seven-day window for competing bids, the Trustee has further ensured proper market exposure. The Court held a hearing prior to issuing the Bidding Procedures Order, and the parties negotiated additional

[33] As defined in the Court's *Order (I) Approving Bidding Procedures and Bid Protections, (II) Scheduling a Sale Hearing and Related Objection and Response Deadlines, (III) Approving the Form and Manner of Notice, and (IV) Authorizing Entry Into the Definitive Agreement* (the "Bidding Procedures Order"), Doc. No. 591, ¶ 6.

terms and language to make the bidding procedures less stringent and encourage others to participate in the bidding. The bidding procedures therefore ensured the ultimate price and terms of the transaction were validated by the market. Only one other party submitted a bid and, as explained previously, the Trustee determined it was not higher and better than MetaGate's proposal.

The objecting parties assert it was error for the Trustee not to conduct an auction. The bidding procedures required an auction only if the Trustee first found that the competing bid was higher and better, which she did not.[34] An auction may in theory result in a better offer for the estate, but only if Mr. Scribner makes an offer that surpasses MetaGate's present offer, which is the highest and best. Mr. Scribner did not provide any evidence he intended to improve his offer at auction, however, bringing into question the utility of holding an auction given the costs to the estate of doing so. There is nothing in the record to indicate that any more favorable terms could be obtained through an auction and, even if so obtained, that they would exceed the cost to the estate in conducting an auction and evaluating those terms. On the record before it, the Court concludes that an auction, which costs the Trustee time she could better devote to advancing the estate's claims, is not warranted.

B. *Good Faith*

Section 363(m) of the Bankruptcy Code protects the validity of a sale to a good-faith purchaser. The purchaser here, MetaGate, is entitled to such protections. No party asserts

[34] *See* Bidding Procedures Order, ¶ 9; Amended Term Sheet § 4(e).

that Mr. Song, through MetaGate, is not acting in good faith. Instead, the question is what proposal produces the best result for the estate.

The Trustee has fully disclosed MetaGate's and Mr. Song's connections to the estate and the material terms of the funding arrangement.[35] The parties negotiated less restrictive bidding procedures to encourage competing bids. The resulting market exposure supports the Trustee's assessment of the transaction's price and terms. No party alleged collusion, hidden agreements, or any attempt to take unfair advantage of other bidders. MetaGate has made additional concessions for the benefit of the estate to expedite funding.

The Court finds that the transactions contemplated by MetaGate are undertaken in good faith, as that term is used in § 363(m) and that MetaGate is entitled to the protections this section affords.

C. *Rule 6004(h) Waiver*

Rule 6004(h) stays an order authorizing the use, sale, or lease of property until the expiration of 14 days after entry of the order, unless the court orders otherwise. The Trustee requests an order granting the Sale Motion be effective immediately upon entry.

Cause exists to waive the 14-day stay. The estate is time-pressed to investigate, preserve, and prosecute its Chapter 5 causes of action before the applicable statutes of limitation expire. Waiving the stay will not prejudice any party in interest, as all parties had

[35] *See Matter of RE Palm Springs II, L.L.C.*, 65 F.4th 752, 765 (5th Cir. 2023) (When considering one's status as a good faith purchaser, "[c]ourts properly look to the transparency of the process as indicative of one's intent.").

the opportunity to object during the notice and bidding periods and submit competing bids of their own. Immediate consummation of the transaction is important to maximize the value of the estate's time-sensitive claims for the benefit of creditors.

## IV. CONCLUSION

The Court concludes that the Trustee has exercised prudent business judgment in connection with the proposed transaction with MetaGate. The Trustee's acceptance of the MetaGate proposal appears reasonable and in the best interests of the creditors of Debtor's bankruptcy estate. Accordingly, the Court will grant the Sale Motion and approve the transaction with MetaGate. The separate Order and Judgment will be issued in accordance with this Memorandum Decision.

__________________________END OF DOCUMENT__________________________

**______ooo0ooo______**

**DESIGNATION OF PARTIES TO RECEIVE NOTICE**

Service of the foregoing **MEMORANDUM DECISION** shall be served to the parties and in the manner designated below.

**By Electronic Service:** I certify that the parties of record in this case as identified below, are registered CM/ECF users:

| | |
|---|---|
| James W. Anderson | jwa@clydesnow.com, gmortensen@clydesnow.com |
| Laura Elizabeth Baccash | laura.baccash@whitecase.com, mco@whitecase.com |
| Mark D. Bloom | mark.bloom@bakermckenzie.com |
| Simeon J Brown | sbrown@parsonsbehle.com |
| Deborah Rae Chandler | dchandler@aklawfirm.com |
| Alexander Sun Chang | achang@parsonsbehle.com |
| P. Matthew Cox | mcox@spencerfane.com, tking@spencerfane.com |
| Austin Egan | austin@stavroslaw.com |
| Carson Heninger | heningerc@gtlaw.com, carson-heninger-5642@ecf.pacerpro.com, Candy.Long@gtlaw.com |
| Samuel P. Hershey | sam.hershey@whitecase.com, mco@whitecase.com |
| Annette W. Jarvis | jarvisa@gtlaw.com, longca@gtlaw.com |
| Michael R. Johnson | mjohnson@rqn.com, docket@rqn.com;ASanchez@rqn.com, RQN@ecfalerts.com |
| Peter J. Kuhn | Peter.J.Kuhn@usdoj.gov, Lindsey.Huston@usdoj.gov, Rinehart.Peshell@usdoj.gov;Rachelle.D.Hughes@usdoj.gov, Brittany.Dewitt@usdoj.gov |
| Trevor J Lee | tlee@mc2b.com, landerson@mc2b.com,asomers@jvk-law.com |
| Artur Machalski | artur.machalski@gmail.com |
| Elliott D. McGill | emcgill@parsonsbehle.com, proney@parsonsbehle.com, ecf@parsonsbehle.com |
| Darren B. Neilson | dneilson@parsonsbehle.com |
| Christopher L. Perkins | cperkins@eckertseamans.com |
| Gregory F. Pesce | gregory.pesce@whitecase.com, mco@whitecase.com |
| Walter A Romney, Jr. | war@clydesnow.com, gmortensen@clydesnow.com |
| Brian M. Rothschild | brothschild@parsonsbehle.com, ecf@parsonsbehle.com, docket@parsonsbehle.com |
| Austin Cameron Sabin | asabin@mc2b.com |
| Jeffrey Weston Shields | jshields@rqn.com, 5962725420@filings.docketbird.com, docket@rqn.com;ecasaday@rqn.com |
| Angela J. Somers | asomers@reidcollins.com |

| | |
|---|---|
| Engels Tejeda | ejtejeda@hollandhart.com, slclitdocket@hollandhart.com, intaketeam@hollandhart.com;jjbutton@hollandhart.com |
| Landon S. Troester | lst@clydesnow.com, rcondos@clydesnow.com |
| U.S. Trustee | USTPRegion19.SK.ECF@usdoj.gov |
| Melinda Willden | melinda.willden@usdoj.gov, Lindsey.Huston@usdoj.gov, Rinehart.Peshell@usdoj.gov;Rachelle.D.Hughes@usdoj.gov, Brittany.Dewitt@usdoj.gov |

**By U.S. Mail:** In addition to the parties of record receiving notice through the CM/ECF system, the following parties should be served notice pursuant to Fed. R. Civ. P. 5(b).

- Nikita Ash
  1221 Avenue of the Americas
  New York, NY 10020-1095

- Adam Brewer
  1575 N 370 E
  Pleasant Grove, UT 84062

- Colonel Michael D. Brewer
  9006 E Cullerton Circle
  Tucson, AZ 85708

- Colonel Michael D. Brewer
  8901 Beauchamp Dr
  Alexandria, VA 22309

- Kylie Brewer
  1575 N 370 E
  Pleasant Grove, UT 84062

- Song Brewer
  9002 E. Commanders Cir.
  Tucson, AZ 85708

- CFO Solutions, LLC dba Ampleo
  13601 W McMillan Rd #102 PMB 320
  Boise, ID 83713

- Kathleen Conger
  13819 S Vestry Rd.
  Draper, UT 84020-7531

- Kathleen Conger
  111 East Broadway 11th Floor
  Salt Lake City, UT 84111

- Linda Daily
  4 Dutch Lane
  Bridger, MT 59014

- Chieli Dustin
  653 West Dunning Ct
  Draper, UT 84020

- Kyle Ferrier
  300 South Biscayne Blvd. Suite 4900
  Miami, FL 33131

- Nissa Beth Gay
  33 Live Oak Dr
  Ventura, CA 93001

- Oliver Goretzki
  4146 W Kent Drive
  Chandler, AZ 85226

- Nicholas Kennedy
  1900 N. Pearl Street Suite 1500
  Dallas, TX 75201

- Mark Nelson
  14175 Golf Parkway
  Brookfield, WI 53005-7916

- Christopher Nuttall
  607 Louisiane Circle
  Bellevue, NE 68005

- William Pangman
  3564 Sabaka Trail
  Verona, WI 53593

- Gabriel Rodriguez
  511 Madeira Avenue
  Coral Gables, FL 33134

- Amy Zilka
  5025 Crown St
  Minnetonka, MN 55345