Angela J. Somers
Jonathan Zweig
**Johnson Van Kwawegen LLP**
485 Madison Ave. | 15th Floor
New York, NY 10022
asomers@jvk-law.com
Jonathan@jvk-law.com

Trevor J. Lee (16703)
**MANNING CURTIS BRADSHAW & BEDNAR PLLC**
201 S. Main Street, Suite 750
Salt Lake City, Utah 84111
(801) 363-5678
tlee@mc2b.com

*Counsel for Angela J. Somers, Chapter 11 Trustee*

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF UTAH

| | |
|---|---|
| In re:<br>**POWER BLOCK COIN, LLC**,<br>*Debtor.* | Case No. 2:24-bk-23041-CDP<br>Chapter 11<br>Hon. Cathleen D. Parker |

**TRUSTEE'S MOTION FOR ENTRY OF AN ORDER: AUTHORIZING (I) THE SALE OF CRYPTO OUTSIDE OF THE ORDINARY COURSE OF BUSINESS; (II) USE OF CRYPTO PROCEEDS AND ADDITIONAL CASH IN THE ESTATE'S POSSESSION OUTSIDE OF THE ORDINARY COURSE OF BUSINESS; AND (III) GRANTING RELATED RELIEF**

Angela J. Somers, the Chapter 11 Trustee (the "**Trustee**") of Power Block Coin, LLC (the "**Debtor**" or "**SmartFi**"), files this motion (the "Motion") for an order under sections 105(a), 363(b) and 541 of the Bankruptcy Code (I) authorizing the Trustee to sell crypto in the estate's Fireblocks account outside of the ordinary course of business, or in the alternative,

pursuant to Bankruptcy Code Section 363(f), free and clear of any interest proven under section 363(p) of the Bankruptcy Code; and to use the proceeds of the Fireblocks crypto and additional cash crypto proceeds the Trustee has recovered, outside the ordinary course of business; and (II) granting related relief. The Motion is supported by the Declaration of Angela J. Somers (the "**Somers Declaration**") and the Declaration of James P. Brennan from J.S. Held LLC ("**J.S. Held**"), advisor to the Trustee (the "**Brennan Declaration**"), filed herewith.

# TABLE OF CONTENTS

STATEMENT OF THE ISSUES....4

INTRODUCTION....4

JURISDICTION AND VENUE....7

STATEMENT OF FACTS....7

I. SMARTFI'S CHAPTER 11 CASE AND THE TRUSTEE'S APPOINTMENT AND ACTIVITIES....**Error! Bookmark not defined.**

II. THE DEBTOR'S BUSINESS AND THIRD PARTY PROVIDERS....10

III. THE DEBTOR'S COLLAPSE....12

IV. ALL CRYPTO IS ESTATE PROPERTY THROUGH THE TERMS OF USE OR COMMINGLING....14

BASIS FOR RELIEF....21

I. Summary of Argument....**Error! Bookmark not defined.**

II. Legal Standard Regarding the Scope of the Debtor's Estate....22

III. SmartFi's Terms of Use Made Clear That All Crypto Transferred by Customers Became Property of SmartFi....24

IV. The Language of SmartFi's TOU Precludes the Existence of a Trust Relationship....26

V. The Crypto Transferred to SmartFi Cannot be Traced as a Result of Extensive Commingling....27

VI. The Court Should Authorize the Sale and Use of the Fireblocks Crypto, Its Proceeds and the Recovered Crypto Proceeds under Section 363(b)....29

VII. No Objecting Party Can Prove a Right Pursuant to Section 363(p)....30

NOTICE AND OBJECTION PROCEDURES....30

CONCLUSION....31

## STATEMENT OF THE ISSUES

1. Whether the Trustee may sell the estate's Fireblocks Crypto and use its proceeds and the Recovered Crypto Proceeds outside the ordinary course of business under 11 U.S.C. § 363(b), where (i) all crypto was turned over to the Debtor pursuant to Terms of Use (defined below) that transferred ownership of deposited crypto to SmartFi; (ii) the Debtor so thoroughly commingled customer crypto and cash that no customer can identify and trace any crypto or cash asset; (iii) the Debtor's Statement of Financial Affairs lists no customer property the Debtor held for others; and (iv) no party has an interest in this estate property nor can any party bear its burden under Section 363(p).

2. Whether the Court should waive the 14-day stay under Bankruptcy Rule 6004(h) when crypto prices fluctuate rapidly and most of the estate assets are crypto.

## INTRODUCTION

3. The Trustee was appointed in this case after the Official Committee of Unsecured Creditors and the U.S. Trustee repeatedly raised concerns about the Debtor's actions. The Court found that the appointment of a trustee who could impartially investigate these activities was in the best interests of creditors.

4. Since her appointment in May 2026, the Trustee has engaged in the necessary investigation, which is ongoing.[1] The Trustee has worked extensively with her professionals to understand SmartFi's business and assets, and the complex issues at play. The Trustee also sought to recover crypto assets of the estate, and through this Motion, seeks to sell and utilize those assets.

---

[1] The Trustee is investigating impermissible post-petition transfers of crypto and fiat to the Debtor's officers and others in violation of section 549 of the Bankruptcy Code and transfers to insiders in violation of sections 544, 547 and/or 548. The Trustee is also investigating the recovery of assets transferred to third-party platforms, exchanges, brokers, and related entities.

5. Most of the crypto transferred to SmartFi by customers, through either its Hosting or Lending Business (defined below), was transferred pursuant to the Terms of Use agreements ("**TOU**" or "**Terms of Use**"). *See* Brennan Declaration ¶¶ 24, 26–27. The Terms of Use provided that the customer granted SmartFi "all right and title to [the] Digital Assets, *including ownership rights*." (emphasis added). No trust relationship existed between SmartFi and these customers. The Terms of Use state: "[t]hese Terms and the holding of Digital Asset relationship does not create a fiduciary relationship between us and you[.]"

6. When crypto was transferred by borrowers to serve as collateral under loan agreements (as part of its Lending Business), it was hopelessly commingled with the Debtor's other crypto. All crypto of SmartFi was sent to a Customer Deposit Address,[2] which was swept into one or more company-controlled commingled omnibus wallets or directly used to complete the Debtor's transactions.[3] The omnibus wallets contained pooled assets received from other Customer Deposit Addresses that were used to facilitate SmartFi's transactional operations, including the payment of "gas fees" (*i.e.*, transaction costs on the Ethereum blockchain as explained below and in the Brennan Declaration ¶¶ 15, 39–41). Commingled and untraceable crypto like that of SmartFi constitutes estate assets.

7. Crypto that remained in a customer deposit address either (i) represented an overpayment by SmartFi and was crypto sent back to SmartFi by the customer; or (ii) was attributed substituted value in the Debtor's omnibus wallet, which the customer utilized to make

[2] SmartFi created a unique deposit address for each type of crypto. A customer who wished to use the SmartFi platform transferred crypto into these customer deposit address/wallets ("**Customer Deposit Addresses**"). This is technically a blockchain deposit address.

[3] Certain cryptocurrencies cannot be held or transferred using the same deposit address because they operate on different blockchain networks. Thus, if a customer wants to deposit different kinds of crypto, such as Bitcoin and Ethereum, SmartFi must create separate deposit wallet addresses: one for BTC and another for ERC-20 tokens

transactions or withdrawals.[4] Regardless of the situation, all crypto SmartFi received became part of SmartFi's operational asset pool. Part 11 of the Debtor's Statement of Financial Affairs lists no "Property the Debtor Holds or Controls That the Debtor Does Not Own." Thus, such crypto is also property of SmartFi.

8. After her appointment, the Trustee obtained possession of certain estate crypto ("**Fireblocks Crypto**") in a Fireblocks LLC ("**Fireblocks**") account[5] and also recovered the proceeds of other crypto from the commencement of an adversary proceeding ("**Recovered Crypto Proceeds**"). The Trustee seeks authority to sell the Fireblocks Crypto, and to use the proceeds of the Fireblocks Crypto, together with the Recovered Crypto Proceeds, to administer the estate, including to make the payments due to MetaGate LLC (the "Purchaser") under the Prepaid Forward Purchase Agreement the Court approved on October 29, 2026 (Dkt. No. 624) (the "PFPA").

9. Under Section 1106(a) of the Bankruptcy Code, the Trustee must "collect and reduce *to money the property of the estate* for which such trustee serves. . ." [6] Selling the Fireblocks Crypto does exactly that. Crypto prices are volatile, and the estate needs cash to pay Trustee expenses incurred primarily in pursuit of claims, and the Purchaser's interest. The Debtor's schedules list no secured creditors, no party has filed a secured claim, and the Debtor's Statement of Financial Affairs states that it holds no property for anyone else.

---

[4] The customer was allowed to use the crypto value in the omnibus wallet to purchase, sell, or swap crypto, convert crypto to fiat, or transfer crypto or fiat to external cryptocurrency wallets and bank accounts.

[5] The Debtor relied on a crypto custody provider, Fireblocks. A cryptocurrency custodian is the entity or infrastructure responsible for safeguarding digital assets by securing the private keys that control them. Because control of private keys equals control of the assets, institutional custodians provide not just storage but a full framework for security, governance, and transaction control.

[6] Section 1106(a) of the Bankruptcy Code incorporates section 704(a).

10. Thus, because the Fireblocks Crypto and Recovered Crypto Proceeds are the estate's property, not subject to any encumbrances, the Trustee should be allowed to sell and use this property. In the highly unlikely event that a party establishes a lien under section 363(p), the Trustee seeks to sell the Fireblocks Crypto and use the Recovered Crypto Proceeds free and clear of that interest under Section 363(f), with the interest attaching to the proceeds.[7]

## JURISDICTION AND VENUE

11. This Court has jurisdiction over this motion under 28 U.S.C. §§ 157 and 1334.

12. This is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

13. Venue is proper in this district under 28 U.S.C. §§ 1408 and 1409. The statutory predicates for the relief sought are 11 U.S.C. §§ 105(a), 363(b), (f), and (p), and 541, and Bankruptcy Rules 2002, 6004, and 9014.

## STATEMENT OF FACTS

### I. SMARTFI'S CHAPTER 11 CASE AND THE TRUSTEE'S APPOINTMENT AND ACTIVITIES

14. The Debtor, doing business as SmartFi, was a Utah limited liability company that operated an online platform offering cryptocurrency exchange, lending, savings, and related digital-asset financial services—somewhat similar to an online bank for cryptocurrency.

15. Due to the Debtor's reckless business practices and insider deals, it could not meet demands for the return of crypto by customers. On June 20, 2024 (the "**Petition Date**"), the Debtor filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") in this Court, commencing the above-captioned bankruptcy case (the "**Bankruptcy Case**") (Case No. 24-23041, the "**BK Dkt.**").

---

[7] Though the Trustee believes no claim can exist, if a party timely objects and proves a lien or encumbrance, the Trustee will reserve enough of the proceeds to cover it until the Court resolves the objection.

16. The Debtor's case has been adversarial, and parties-in-interest have consistently contested and objected to the actions of the Debtor and its professionals. The Debtor initially and improperly elected to proceed under subchapter V of chapter 11, which the Court rejected in favor of a regular chapter 11 case.[8]

17. About two months later, the Court denied the Debtor's motion to extend exclusivity because (a) the Debtor failed to disclose or address pending litigation over the Solara Property,[9] on which a $2 million lien had been placed; (b) Mr. Tilton acted on both sides of the Solara transaction; and (c) "the Debtor ha[d] not shown that it ha[d] the ability to operate [its] estate in a way that's beneficial to creditors with transparency and good faith."[10]

18. The Debtor filed its First Amended Plan of Reorganization (the "**Debtor's Plan**")[11] on December 16, 2024. The Committee filed its own competing plan on January 30, 2025,[12] followed by an amended version of that plan on March 7, 2025.[13]

19. On October 21, 2025, the Committee also filed a Motion to Appoint Chapter 11 Trustee (the "**Motion for Chapter 11 Trustee**").[14] Among the Committee's concerns were various impermissible post-petition transfers made by the Debtor under the guise of returning crypto to customers. The Debtor responded to the Committee's Motion for Chapter 11 Trustee

[8] [BK Dkt. 190.]

[9] This is the real property in Toquerville, Utah. This property was acquired through foreclosure by SmartFi Toquerville, LLC, now known as Solara Communities, LLC.

[10] BK Dkt. No. 243 audio file at 21:45.

[11] [BK Dkt. No. 242]

[12] [BK Dkt. No. 254]

[13] [BK Dkt. No. 273, 274]

[14] [BK Dkt. No. 413]

by filing a motion to convert the case to Chapter 7 (the "**Conversion Motion**") on November 7, 2025.[15]

20. On March 31, 2026, in the face of concerns about inaccurate financial reporting, commingled assets, conflicts of interest, and improper transfers, the Court entered a Memorandum Decision concluding that the appointment of a chapter 11 trustee was in the best interests of creditors.[16]

21. On May 8, 2026, the Trustee was appointed. With the assistance of J.S. Held, her financial and crypto advisor, as well as her counsel, she began an extensive investigation of the conduct of the Debtor, which is ongoing.

22. The Trustee took possession of SmartFi's records, which are incomplete and inaccurate.[17]

23. The Trustee has also identified and demanded turnover of estate assets. After a demand for turnover, the Debtor admitted to having approximately $210,000 of crypto[18] in a Fireblocks account, despite earlier representations to the contrary.[19] The Trustee took possession of the Fireblocks account. Thereafter, approximately $440,000 more crypto was discovered in various ancillary accounts. This crypto collectively is the Fireblocks Crypto. *See* Somers Declaration ¶ 2.

---

[15] [BK Dkt. No. 422, 433 at 6–7, 25].

[16] [BK Dkt. No. 482.]

[17] The Debtor claimed to use its ledger to track crypto and fiat transactions along with the amounts owed to customers, but the ledger has incomplete data. The Debtor also utilized QuickBooks as its accounting platform, but audited financial statements were never completed due to uncertainty about accounting treatment. After the Debtor's primary bank accounts were closed in December 2023 (the Debtor claimed that it had been de-banked), relatively few transactions were recorded in the Debtor's QuickBooks. *See* Brennan Declaration ¶ 6.

[18] The price of crypto varies considerably from day-to-day, and thus this is a varying value as is the other crypto at Fireblocks.

[19] The Debtor further claimed certain crypto turned over to the Trustee was customer crypto, but the Debtor and its counsel could not identify customers nor explain the legal theory on which they based this conclusion.

24. The Trustee also started an adversary proceeding against Aaron Tilton, Brad Jones, and the Coinbase entities in this Court on June 24, 2026.[20] After the complaint was filed, Aaron Tilton and Brad Jones agreed to return the $240,000 transferred as set forth in the Notice of Dismissal filed in connection with that case.[21] Mr. Tilton and Mr. Jones claimed the money they possessed (but did not disclose) was the proceeds of customer crypto that they intended to give to a non-specified customer, but instead had conveniently kept. These funds are the Recovered Crypto Proceeds. *See* Somers Declaration ¶ 3.

25. Pursuant to this Motion, the Trustee seeks to sell the Fireblocks Crypto out of the ordinary course of business and use those proceeds, as well as the Recovered Crypto Proceeds, also out of the ordinary course of business. Since, as shown herein, the crypto and fiat were and are property of the estate, the Trustee has a right to sell and use it.

## II. THE DEBTOR'S BUSINESS AND THIRD PARTY PROVIDERS

26. A background on crypto terms that is helpful for a review of the section below can be found in the Brennan Declaration at ¶¶ 7–15.

### *a. The Debtor's Business*

27. As discussed above, SmartFi operated an online platform offering crypto financial services.

28. The Debtor described itself as a "crypto-based financial services"[22] company that had two core lines of business. First, it hosted and facilitated customers' crypto transactions through an online platform and charged fees for those transactions (the "**Hosting Business**").

---

[20] *Angela J. Somers as Chapter 11 trustee of Power Block Coin, LLC v. Coinbase Global Inc.; Coinbase Inc.; Coinbase Financial Markets, Inc; Aaron Tilton; and Brad Jones*, Adv. Pro. 26-02122 (Bankr. D. Utah). [BK Dkt. No. 526].

[21] *Notice of Dismissal with Prejudice of Defendants Aaron Tilton and Brad Jones*, [Adv. Pro. 26-02122 Dkt. 2]

[22] Declaration of Aaron Tilton in Support of First Day Relief ¶¶ 4–8, dated June 20, 2024 [BK Dkt. No. 8] (the "Tilton Declaration").

Second, the Debtor took cryptocurrency from customers and lent it out or otherwise deployed it to generate a return (the "**Lending Business**").

29. The Hosting Business was a platform for customers to deposit, trade, and withdraw crypto. The Debtor provided an integrated platform through which customers deposited crypto, engaged in spot trading or conversion transactions, and requested SmartFi repay them by withdrawing assets either to external blockchain addresses or to linked financial accounts.

30. The Lending Business operated like an online crypto bank by earning money on customers' crypto while SmartFi was holding that crypto. Customers transferred their crypto into "SmartINTEREST" accounts held by the Debtor, and in turn earned interest (essentially a high-yield crypto savings account). Once they did, the Debtor would try to make money on that crypto by trading it or lending it out. The Debtor's profit was the money it could make trading customers' crypto, in addition to the interest customers paid on loans, minus the interest the Debtor paid to customers who deposited into SmartINTEREST accounts.

31. In addition to offering SmartINTEREST accounts, the Lending Business also offered Crypto-Backed Loans, which were a smaller part of SmartFi's business. Customers could borrow U.S. dollars from the Debtor by depositing crypto as collateral.

32. SmartFi relied on other crypto companies to execute and facilitate aspects of its business.

*b. <u>Third Party Providers</u>*

33. The Debtor provided the customer-facing platform and account infrastructure, while relying on third-party liquidity providers ("**LPs**")[23] to actually execute trades, source

---

23

market liquidity, and facilitate conversions between crypto and fiat. *See* Brennan Declaration ¶ 16.

34. Similarly, the Debtor relied on a crypto custody provider, Fireblocks.[24] A crypto custodian like Fireblocks is the entity or infrastructure responsible for safeguarding digital assets by securing the private keys that control them. Fireblocks organizes assets into vaults and vault accounts,[25] which allow platforms like the Debtor to keep custody of customer balances while holding assets in a unified custody environment. This allowed the Debtor to accept deposits, process trades and withdrawals, and interact with exchanges or liquidity providers, while Fireblocks provided the secure, programmable backend. *See* Brennan Declaration ¶ 17.

35. Though the Debtor used Fireblocks, the Debtor intended to internally track the crypto transactions itself using a "Ledger" maintained in a SQL database—an enterprise-grade, structured data system capable of recording, organizing, querying, and analyzing transactions, substantially exceeding the functionality of a conventional spreadsheet. The aim was to track the amount of crypto transferred by a customer for repayment purposes. Unfortunately, the SQL records were so poorly maintained that they are an unreliable tracking system.[26] *See* Brennan Declaration ¶ 21.

## III. THE DEBTOR'S COLLAPSE

### *a. The Debtor Stripped Itself of Assets and Could Not Endure Market Fluctuations*

[24] An example of an LP is B2C2.

[25] SmartFi used Fireblocks beginning in approximately March 2021. Prior to that, SmartFi used a combination of a Bitcoin Core instance (one running copy of Bitcoin Core, the main open-source software for the Bitcoin network) and cold storage to hold and process digital assets.

[26] Each vault account can hold multiple asset wallets and addresses, enabling scalable, omnibus-style custody with internal tracking.

36. The Debtor was wholly owned by Blue Castle Holdings, Inc. ("Blue Castle"),[27] which also managed the Debtor's business. The Debtor had no employees, and Blue Castle performed almost all operations for the Debtor.

37. In 2022, crypto markets began fluctuating. *See* Tilton Declaration ¶¶ 10–11. As SmartFi's distress increased, rather than raising capital, the Debtor's officers/directors and managers transferred a substantial portion of the Debtor's assets into long-term non-arm's-length insider loans and investments that could not be readily liquidated or recalled to meet liquidity demands.

38. More specifically, the Debtor funneled liquid assets into illiquid insider-controlled ventures, including entities that owned real estate. This included (i) transfers to Zions Landing/SmartFi Toquerville, LLC of $17.4 million; (ii) a $1,400,000 transfer to Blue Castle and a $751,000 transfer to Blue Castle/RE Developers; and (iii) a $1,768,830.05 transfer to SmartFi Lending LLC. As a result, funds were unavailable to satisfy customer withdrawals and other obligations.

39. The Debtor also lost liquidity by making a series of additional transfers to EnergyPath Corporation (owned by Tom Retson), At Manager/At Management (owned by Tilton), Brad Jones, Robert Graber, Mountain View Title and Escrow (connected to Solara), all related people or entities.

40. Other transfers, including to GS Partners ($79 million),[28] remain unexplained and appear to reflect substantial value being transferred out of the Debtor without any identifiable benefit or business purpose.

---

[27] The Trustee's crypto advisors have attempted to verify the Ledger with bank statements and on-chain data, and in many cases, the Ledger is inconsistent with those sources. *See* Brennan Declaration ¶ 6.

41. Not surprisingly, the Debtor had few assets on the Petition Date. The Debtor claimed to hold less than $30,000 in liquid assets, but it had taken crypto of well over $100 million from customers.

42. The Debtor also utilized omnibus accounts for crypto and fiat assets that held both customer assets and the Debtor's own assets. Customer assets were thus commingled with the Debtor's assets, such that ownership of particular assets cannot be determined. Examples of the extensive commingling are set forth in the Brennan Declaration and discussed in more detail later herein. At best, the Debtor pooled and used customers' crypto to try to earn profit, including through deals and transactions with insiders and affiliate entities. At worst, the Debtor's officers and directors simply took the crypto hoping the pooling would mask their activity, which the Trustee continues to investigate.

43. Regardless of the purpose, the Debtor's commingling of crypto and fiat assets in omnibus accounts was extensive.

## IV. ALL CRYPTO IS ESTATE PROPERTY THROUGH THE TERMS OF USE OR COMMINGLING

44. All crypto deposited with the Debtor is the Debtor's property because: (1) by operation of law, the Debtor's Terms of Use established the crypto as property of the estate upon deposit with the Debtor; (2) as a practical matter, the Debtor commingled crypto in a way that rendered it property of the estate; and (3) the Debtor admitted in its Statement of Financial Affairs that it did not hold property in trust for any customer. This position is underscored by testimony offered throughout this case by Brad Jones that SmartFi's "assets are available for SmartFi to use at its discretion... whether it'd be liquidated to fund operations, whether it be put

---

[28] Blue Castle is owned by Transition Power Development ("TPD"), which is majority owned by Aaron Tilton ("Tilton"), with Tom Retson, SmartFi Chief Operating Officer, owning a minority interest.

on deposit with another third party to earn interest ourselves."[29] He added: "Those assets are available for SmartFi to use at its discretion."[30]

*a. <u>The Debtor's Terms of Use Render Deposited Crypto Property of the Estate</u>*

45. A customer would sign up to use the SmartFi platform by agreeing to the Terms of Use offered by SmartFi. Users who signed up for a SmartFi Account through <u>www.smartfi.com</u> were asked to enter their name, email address, mobile phone number, and password, and were required to check a box agreeing "to all policies and terms set by SmartFi." *See* Brennan Declaration ¶ 23.

46. This was done by clicking through the steps provided for on the SmartFi website. Once electronically signed and agreed to, a contract was created that bound SmartFi and the customer. Prominently displayed in the second paragraph of the TOUs was the following:

> We may make changes to the Terms from time to time. If we do this, we will post the changed Terms on the Site and will indicate at the top of this page the date the Terms were last revised. You understand and agree that your continued use of the Service or the Site after we have made any such changes constitutes your acceptance of the new Terms.[31]

All the TOU agreements were governed by Delaware law.[32]

47. SmartFi had various TOU from 2020 to 2023, after which it did not take new customers. Each customer who remained a customer after the revised TOU were adopted by SmartFi was subject to those modified terms.[33] The TOU from 2020 to 2023 were almost

[29] In total, $79 million was transferred to GS Partners. At the Creditors' Committee's urging, a claim was filed by the Debtor against GS Partners in its settlement program for $52 million. See https://www.gsbsettlement.com/
[30] Deposition of Brad Jones, page 66, lines 6–16.

[31] *Id*., page 66, lines 6–9.

[32] All TOUs had nearly identical language.

[33] The agreement provided that "[b]y visiting or using the Site and/or the Service, you agree that the laws of the state of Delaware, without regard to any principles of conflict of laws that would require or permit the application of the laws of any other jurisdiction, will govern these Terms." Section 12.9 of the TOU.

identical, in particular as to "Section 3.2 Consent to use your Digital Assets," quoted below from the January 15, 2021 version:

> In consideration for the rewards earned on your SmartFi Wallet and the use of our Services, ***you grant the Company***, subject to applicable law and for the duration of the period during which the Digital Assets are available through your SmartFi Wallet, ***all right and title to such Digital Assets, including ownership rights***, and the right, without further notice to you, to hold such Digital Assets in the Company's own virtual wallet or elsewhere, and to pledge, re-pledge, hypothecate, rehypothecate, sell, lend, or otherwise transfer or use any amount of such Digital Assets, separately or together with other property, with all attendant rights of ownership, and for any period of time, and without retaining in the Company's possession and/or control a like amount of Digital Assets or any other monies or assets, and to use or invest such Digital Assets. You acknowledge that with respect to Digital Assets used by the Company pursuant to this paragraph:
>
> (i) You may not be able to exercise certain rights of ownership;
> (ii) The Company may receive compensation in connection with lending or otherwise using Digital Assets in its business to which you have no claim or entitlement;
> (iii) The Company borrowers may default partially or entirely, which can result in partial or total loss of your Digital Assets. In that event, you authorize the Company to use Digital Assets to absorb the losses;
> (iv) The Company may use your Digital Assets as collateral to borrow other digital or fiat assets in different jurisdictions around the world. While such borrowing are for the purpose of optimizing the returns to all members, the Company may experience losses or partial recovery of such collateral in certain situations; and
> (v) The Company may lend your coins to exchanges, hedge and other counterparties, which may provide full or partial collateral for any coin or fiat loan.

(emphasis added). In May 2022, this section changed slightly but its substance was not altered.[34] *See* Brennan Declaration ¶¶ 26–27. The set-off and security rights in Section 3.3, which were belt-and-suspenders provisions that backed the Debtor's ownership rights, were also similar among the versions of the TOU.

48. Section 6.1 of the TOU provided that the agreement did not create a fiduciary relationship: "[t]hese Terms and the holding of Digital Asset relationship does not create a

---

[34] The Trustee does not currently intend to pursue actions against customers subject to the November 28, 2020 TOU. Therefore, the terms of this agreement are not encompassed in this analysis.

fiduciary relationship between us and you[.]"[35] Moreover, in all capital letters, the TOU provided: "DIGITAL ASSETS IN YOUR SMARTFI WALLET ARE NOT HELD BY THE COMPANY AS A CUSTODIAN OR FIDUCIARY."

49. While the crypto was SmartFi's property, Section 2.2 of the Terms of Use allowed customers to "withdraw [their] Digital Currency by sending it to a different blockchain address." In other words, the agreement was tantamount to an unsecured crypto loan by the customer to SmartFi, payable on demand. As a result, once transferred to SmartFi, the crypto was SmartFi's property to use essentially any way it wished as reflected in the TOU. No trust relationship was established, or even contemplated, because the TOU expressly transferred ownership rights to SmartFi and disclaimed any fiduciary or custodial relationship. Although the customer was entitled to request repayment of the crypto or its value, if there were not enough crypto or funds available for such repayment, the customer had no more than an unsecured claim.

*b. The Loan Agreements*

50. SmartFi entered into various loan agreements (the "**Loan Agreements**") with borrowers to whom it lent money ("**Borrowers**"). Under the Loan Agreements, the Borrowers would borrow fiat money from SmartFi and transfer crypto to SmartFi to secure the loan. All the Loan Agreements were governed by Utah law. *See* Brennan Declaration ¶ 28.

51. While these Loan Agreements did not contain the language of the TOU in which title to the asset passed to SmartFi, all the crypto of the Borrowers was commingled with that of customers who did transfer crypto under the TOU, and with the Debtor's crypto, as explained below. While the Borrowers lost their ability to identify their crypto, the Borrowers generally

---

[35] The May 1, 2022 version changed clause (i) to read: "i. You may not be able to exercise certain rights of ownership related to the Digital Assets during the term of services[.]"

maintained a set-off or recoupment right to the extent of the crypto they transferred as collateral (provided transfer of the crypto is supported by the reliable parts of the Debtor's books and records, meaning verified by third-party sources). Thus, although the crypto of the Borrowers cannot be identified and is property of the Debtor's estate, Borrowers can generally offset amounts owed with the amount of their collateral the Debtor retained.

*c. The Debtor Commingled Deposited Crypto*

52. Because all of the Debtor's crypto and cash were commingled, no SmartFi-held crypto can be traced to specific customer deposits.

53. Commingled, fungible property held by a debtor loses its separate identity and cannot be traced to any particular claimant. SmartFi created a unique deposit address for each type of crypto a customer wished to transfer into these Customer Deposit Addresses. The Customer Deposit Addresses functioned as temporary intake points within the Debtor's custody system, not as persistent segregated custody wallets. *See* Brennan Declaration ¶¶ 22, 29. The Brennan Declaration describes in great detail all the ways in which the Debtor commingled crypto. These include the following:

54. **Sweep into an Omnibus Wallet**: SmartFi maintained crypto in company-controlled wallets rather than in segregated customer wallets. Upon receipt of the crypto in the Customer Deposit Addresses, SmartFi would transfer the assets from the Customer Deposit Addresses into one or more commingled SmartFi omnibus wallets ("**Omnibus Wallets**") through a "sweep" process. Assets held in the Omnibus Wallets were pooled with assets received from other Customer Deposit Addresses and used to facilitate SmartFi's custodial and transactional operations. The Omnibus Wallets' assets were thus managed as part of a pooled platform balance. *See* Brennan Declaration ¶¶ 29, 36.

55. **Accounting Model Records and On-Chain Movement Obscured**: SmartFi's blockchain's accounting model recorded asset movements and ownership interests on-chain in a manner that obscures individual attribution.[36] The Debtor's custody practices involved consolidating crypto deposited by numerous customers into shared Omnibus Wallets and using those pooled assets to satisfy customer withdrawals. As a result, the specific crypto deposited by a particular customer (such as an identifying UTXO number for Bitcoin) could no longer be distinguished from crypto deposited by other customers. *See* Brennan Declaration ¶¶ 14, 30, 36.

56. **Repurposing**: The Debtor also commingled crypto by repurposing: using one customer's deposited crypto to fund another customer's withdrawal.[37] Examples include the Debtor combining crypto deposited by various customers to satisfy another customer's request. Crypto deposited by one customer was also routinely combined with crypto deposited by other customers and with assets held in the Debtor's Omnibus Wallets to fund other customers' withdrawals, pay network fees, and lend, trade, or invest. *See* Brennan Declaration ¶¶ 32–35. Because deposited crypto lost its separate identity through these repeated consolidation and spending transactions, it cannot be traced. *See* Brennan Declaration ¶ 36.

57. **Account-Based Blockchain Networks**: The same commingling described above also occurred with crypto held on account-based blockchain networks, including assets such as USDT and USDC. Customer deposits were received at individual deposit addresses, funded where necessary for network fees, and then swept or attempted to be swept into company-controlled Omnibus Wallets. Once those balances were commingled, the assets originally

---

[36] That section further made clear that the account was not a savings or checking account, was not covered by insurance and that SmartFi could do whatever it wanted with the crypto—sell, pledge, assign, hypothecate, commingle, use, etc.

[37] An on-chain transfer is a transaction that is recorded directly on a blockchain and validated by the network's consensus mechanism. The transfer is publicly visible on the blockchain, creates an immutable transaction record, and typically requires payment of network fees (such as gas fees on Ethereum). By contrast, an off-chain transfer occurs outside of the blockchain itself, usually within the internal ledger of an exchange, custodian, or platform.

deposited by any individual customer became indistinguishable from those attributable to other customers. *See* Brennan Declaration ¶¶ 37–38.

58. **SmartFi *Gas Fees***: SmartFi also commingled assets to avoid gas fees. A "gas fee" is a processing fee charged by the Ethereum network to carry out a transfer, which is comparable to a postage or toll required to move something from one place to another. The Debtor's use of Omnibus Wallets reduced the number of on-chain transactions it needed to perform and thereby reduced the total gas fees incurred in operating its platform. *See* Brennan Declaration ¶¶ 39–41.

59. **Overpayments and Substitutions:** On occasion, a customer was overpaid and needed to return crypto. In that event, the overpayment was transferred back from the customer to the Customer Deposit Addresses for SmartFi to withdraw and use. SmartFi also substituted customer-deposited crypto with crypto in the Omnibus Wallet and gave the customer a corresponding credit, which also commingled crypto. *See* Brennan Declaration ¶¶ 42–43.

60. Thus, the individually assigned wallet addresses, used when the customer originally transferred crypto to SmartFi, functioned as temporary transaction points rather than long-term segregated custody accounts. The Debtor's systems routinely swept customer assets into company-controlled Omnibus Wallets, used pooled assets to satisfy customer withdrawals, funded transaction fees through centralized Gas Station wallets,[38] and repeatedly attempted to transfer assets into the Debtor's commingled Omnibus Wallets when initial sweep attempts failed. *See* Brennan Declaration ¶ 44.

61. These practices occurred across UTXO-based (e.g., Bitcoin) and account-based blockchain (e.g., Ethereum) networks. As a result, customer assets were consistently aggregated, transferred, and utilized together without maintaining a separate on-chain identity for any

[38] The Trustee intends to investigate whether SmartFi can be determined to be a Ponzi Scheme by this Court.

particular customer's deposited cryptocurrency. Customer assets were held and managed within a commingled custody structure rather than a system of persistent customer-specific segregation. *See* Brennan Declaration ¶¶ 44–46.

62. These practices of SmartFi resulted in the total commingling of crypto that cannot be traced to any particular customer. *See* Brennan Declaration ¶ 50.

*d. Commingling of Cash and Fiat*

63. The Debtor also did not maintain customer cash in segregated accounts belonging to or for the benefit of that individual customer. *See* Brennan Declaration ¶ 47. For example, customer funds from accounts at Capital Community Bank labeled "for the benefit of customers" were pooled in shared bank accounts there that also held the Debtor's own funds, such as its operating account. *See* Brennan Declaration ¶ 48. The same occurred in Blue Castle accounts. *See* Brennan Declaration ¶ 49. The Debtor routinely transferred funds among its omnibus bank accounts, resulting in further commingling of customer and non-customer funds.

## BASIS FOR RELIEF

## I. SUMMARY OF ARGUMENT

64. The Trustee can sell and use estate property outside the ordinary course of business when the Trustee has a sound business purpose, and there is adequate notice, a fair price, and good faith. Each requirement is met here. The Trustee will sell through commercially reasonable means at market prices, and will not knowingly sell to an insider, and notice will go by mail to all scheduled creditors, claimants, and parties that have requested notice, and by publication to all other customers.

65. The Fireblocks Crypto and the Recovered Crypto Proceeds are estate property on any of three grounds. First, the Terms of Use, which are enforceable contracts governed by Delaware law, gave SmartFi "all right and title" to deposited crypto, "including ownership

rights," and disclaimed any fiduciary or custodial relationship. *In re Celsius Network LLC* held that the same language transferred ownership of deposited crypto to the debtor. Second, apart from the contract, SmartFi swept, pooled, and reused customer crypto and cash so thoroughly that no customer can trace any asset, and a claimant who cannot trace its property holds only an unsecured claim against the estate and must share ratably. Third, the Debtor told the Court in its Statement of Financial Affairs that it held no property for anyone else.

66. No party can meet its burden of proof under section 363(p)(2) because there is no lien, interest, or encumbrance on this estate property. The estate bears the risk of price swings until the crypto is sold, and thus this Court should waive the 14-day stay under Bankruptcy Rule 6004(h).

## II. LEGAL STANDARD REGARDING THE SCOPE OF THE DEBTOR'S ESTATE

67. Under Section 363(b), the Trustee may use or sell property of the estate out of the ordinary course of business. The Bankruptcy Code defines the debtor's estate to include "all legal or equitable interests of the debtor in property as of the commencement of the case," "wherever located and by whomever held." 11 U.S.C. § 541(a).[39]

68. The expansive definition of estate property includes property recovered under Section 550 (through Sections 547, 548, and 549), any "interest in property preserved for the benefit of or ordered transferred to the estate under section 510(c) or 551," as well as "product, offspring, rents, or profits of or from property of the estate." 11 U.S.C. § 541(a)(3), (4), (6).

[39] Gas Station wallets are centrally funded operational wallets used to send small amounts of ETH to Customer Deposit Addresses so those addresses can pay Ethereum network fees when tokens are swept into SmartFi's Omnibus Wallets.

69. Section 105(a) of the Bankruptcy Code further provides bankruptcy courts with broad equitable powers to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions" of the Bankruptcy Code. 11 U.S.C. § 105(a).

70. Bankruptcy courts are empowered to "deal efficiently and expeditiously with all matters connected with the bankruptcy estate." *In re Hafen*, 616 B.R. 570, 578 (B.A.P. 10th Cir. 2020) (quoting *Celotex Corp. v. Edwards*, 514 U.S. 300, 308 (1995)). To achieve this, "a bankruptcy court has jurisdiction over disputes regarding alleged property of the bankruptcy estate at the outset of the case. The jurisdiction to determine what is property of the bankruptcy estate lies exclusively with the bankruptcy court." *Id.* (quoting *Gardner v. United States (In re Gardner)*, 913 F.2d 1515, 1518 (10th Cir. 1990)). *See also In re First Assured Warranty Corp.*, 383 B.R. 502, 541 (Bankr. D. Colo. 2007) ("dispute[s] over whether an asset is property of a debtor's estate should and must be resolved in favor of [the bankruptcy court's] jurisdiction."); *In re Affirmative Ins. Holdings, Inc.*, 565 B.R. 566, 583 (Bankr. D. Del. 2017) ("the bankruptcy court always has jurisdiction to determine what is, or is not, property of the bankruptcy estate" and "matters requiring a declaration of whether a certain asset comes within the definition of property of the estate, as set forth in section 541 of the Bankruptcy Code, are core proceedings") (internal quotations omitted).

71. Because (1) SmartFi owned all customer crypto transferred to it, (2) no trust relationship existed between SmartFi and its customers, and (3) the crypto at issue cannot be traced as a result of SmartFi's extensive commingling, it is estate property that the Trustee can sell and use.

72. Whereas the interpretation of the contract is generally a question of state law, commingling and distribution of estate assets in a federal bankruptcy proceeding is exclusively a

question of federal law. *Goldberg v. New Jersey Lawyers' Fund for Client Prot.*, 932 F.2d 273, 280 (3d Cir. 1991) (quoting *Connecticut Gen. Life Ins. Co. v. Universal Ins. Co.*, 838 F.2d 612, 618 (1st Cir. 1988)).

## III. SMARTFI'S TERMS OF USE MADE CLEAR THAT ALL CRYPTO TRANSFERRED TO IT BY CUSTOMERS BECAME PROPERTY OF SMARTFI

73. The TOUs were binding contracts under Delaware law, which provides that a valid contract exists when "(1) the parties intended that the contract would bind them, (2) the terms of the contract are sufficiently definite, and (3) the parties exchange legal consideration." *Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1158 (Del. 2010). Utah law is similar. *See Cea v. Hoffman*, 2012 UT App 101, ¶ 24, 276 P.3d 1178, 1185 (Utah Ct. App. 2012).

74. These requirements are no different for electronic contracts.[40] "Even in the age of the Internet, mutual manifestation of assent is essential in contract formation. Basic contract law principles indicate that consumers are bound by an online agreement if they have reasonable notice of the terms and affirmatively manifest assent to those terms." *Route App, Inc. v. Heuberger*, No. 2:22-CV-291-TS-JCB, 2022 WL 2316377, at *2 (D. Utah June 28, 2022). *See also Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393, 403 (2d Cir. 2004) ("While new commerce on the Internet has exposed courts to many new situations, it has not fundamentally changed the principles of contract."); *Berkson v. Gogo LLC*, 97 F. Supp. 3d 359, 385 (E.D.N.Y. 2015).

75. So long as an agreement that customers click through "gives a consumer reasonable notice of its terms and the consumer affirmatively manifests assent to the terms, the consumer is bound by the terms." *Hancock v. Am. Tel. & Tel. Co.,* 701 F.3d 1248, 1256 (10th

---

[40] The Bankruptcy Court's jurisdiction is similarly broad, extending to "all the property, wherever located, of the debtor as of the commencement of such case, and of property of the estate." 28 U.S.C. § 1334(e)(1).

Cir. 2012); *see also Newell Rubbermaid Inc. v. Storm*, 2014 WL 1266827, at *1 (Del. Ch. Mar. 27, 2014) (granting TRO; enforcing a similar agreement under Delaware law).

76. SmartFi's TOU contained an offer (the terms listed), acceptance (a customer's affirmative assent to the terms), and consideration (use of SmartFi's services in exchange for the transfer of a customer's crypto). *See supra* Part IV.

77. Importantly, the TOUs were not invalidated by any updates. As established, assenting to the TOU "constitute[d] [customer's] acceptance of the new Terms." *See supra* Part IV. Clickwrap agreements like these TOUs are regularly enforced, and a customer will be subject to modifications if the original agreement "allowed the Debtors' modification of the contract terms." *In re Celsius Network LLC*, 647 B.R. 631, 654 (Bankr. S.D.N.Y. 2023). In such cases, "continued use of the platform. . . constitutes consent to the amended Terms of Use." *Id*.

78. Where a contract is unambiguous, its terms are given the plain meaning of the language contained on the face of the document. *Osborn*, 991 A.2d at 1159–60; *Anthony v. United States*, 987 F.2d 670, 673 (10th Cir. 1993) (citing *Republic Resources Corp. v. ISI Petroleum West Caddo Drilling Program 1981*, 836 F.2d 462, 465 (10th Cir. 1987)).[41]

79. *Celsius* is directly on point on the operative question, and the contractual language is nearly identical. There, account holders agreed to grant Celsius "all right and title to such Digital Assets, including ownership rights," together with the right to "pledge, re-pledge, hypothecate, rehypothecate, sell, lend, or otherwise transfer" those assets. The court held that this language formed a valid and enforceable contract transferring ownership of the deposited cryptocurrency, with the result that the assets were property of the estate rather than customer property. 647 B.R. at 656–57.

[41] This principle is consistent with federal law. *See* 15 U.S.C. § 7001(a)(1) ("a signature, contract, or other record relating to such transaction may not be denied legal effect, validity, or enforceability solely because it is in electronic form.").

80. SmartFi's Section 3.2 uses the same construction, granting SmartFi "all right and title to such Digital Assets, including ownership rights," and the same enumerated rights to "pledge, re-pledge, hypothecate, rehypothecate, sell, lend, or otherwise transfer or use any amount of such Digital Assets." The same result follows here.

81. While the TOUs were nearly uniform, the original TOU also permitted changes to its terms and made clear that continued use would result in continued enforceability. *See supra* Part IV.

82. It is thus clear that all crypto transferred by customers to SmartFi is estate property.

## IV. THE LANGUAGE OF SMARTFI'S TOU PRECLUDES THE EXISTENCE OF A TRUST RELATIONSHIP

83. Because no trust relationship can be shown, the crypto that customers transferred cannot be exempted as trust assets and they remain part of the estate.

84. "[T]he burden rests upon the claimant to establish the original trust relationship [by] prov[ing] his title, identify[ing] the trust fund or property, and where the fund or property has been mingled with the general property of the debtor, the claimant must sufficiently trace the property." *In re Hedged-Invs. Assocs., Inc.*, 48 F.3d 470, 474 (10th Cir. 1995) (quoting 4 *Collier on Bankruptcy,* ¶ 541.13, at 541-76 to 79 (15th ed. 1994)). While bankruptcy courts recognize—as a narrow carveout to the otherwise expansive debtor's estate—that "[p]roperty subject to a trust is not [estate] property," no such showing can be made here. *In re DC Energy, LLC*, 555 B.R. 786, 790 (Bankr. D.N.M. 2016) (quoting *In re Lucas*, 300 B.R. 526, 533 (B.A.P. 10th Cir. 2003)).

85. Any attempt to characterize SmartFi's customers as retaining ownership of the crypto in SmartFi's possession fails; as discussed *supra*, SmartFi's TOUs explicitly noted that

SmartFi obtained "ownership rights" over those assets and SmartFi disclaimed any fiduciary relationship. *See supra* ¶ 3 and Part IV. In particular, SmartFi's TOUs provided that "neither these Terms nor the holding of Digital Assets creates a fiduciary relationship between us," and they specifically stated "DIGITAL ASSETS IN YOUR SMARTFI WALLET ARE NOT HELD BY THE COMPANY AS A CUSTODIAN OR FIDUCIARY." Rather, the TOUs' terms show that customer crypto was subject to a valid and enforceable contract that demarcated the assets as ***property of the Debtor***—not as being held in trust. *See supra* Part IV.

86. That specific contractual language is reinforced by the default rule that no fiduciary relationship—and thus no trust—exists without express provisions to that effect. "[T]he relationship of debtor to creditor that results from contract is not fiduciary in nature. . . [w]hen a trust is created there is a fiduciary relationship between the trustee and the beneficiaries. . . [but a] debtor does not as such stand in a fiduciary relationship to his or her creditors." *In re Luna*, 406 F.3d 1192, 1204–05 (10th Cir. 2005) (quoting Restatement (Third) of Trusts § 5 cmt. k). *See also Joseph v. Stone (In re Stone)*, 91 B.R. 589, 593 (D. Utah 1988) (holding that a "fiduciary relationship" does not encompass ordinary commercial relationships like a "debtor/creditor").

87. For these reasons, the crypto in the Debtor's possession is not exempted from the estate by virtue of being held in trust.

## *V.* THE CRYPTO TRANSFERRED TO SMARTFI CANNOT BE TRACED AS A RESULT OF EXTENSIVE COMMINGLING

88. Even if SmartFi and its customers/creditors intended for a trust or fiduciary relationship to exist (they did not), those parties would still be unable to demonstrate the existence of a trust relationship. This is because parties seeking to establish a fiduciary relationship "must sufficiently trace the property" that was held in trust. *In re Hedged-Invs. Assocs., Inc.*, 48 F.3d at 474. Because such tracing is not possible here due to the commingling

described above, crypto deposited by customers, pursuant to both the Hosting Business and the Lending Business, is property of the estate regardless of whether it is subject to the TOUs.

89. To protect the interests of secured and unsecured creditors, federal law requires that parties claiming an interest in trust funds bear the burden of identifying and tracing trust property. *In re Columbia Gas Systems Inc.*, 997 F.2d 1039, 1063 (3d Cir. 1993); *see also In re Dameron*, 155 F.3d 718, 723 (4th Cir. 1998) ("…tracing is an issue of federal rather than state law."). "[W]here the fund or property has been mingled with the general property of the debtor, the claimant must sufficiently trace the property." *In re Hedged-Invs. Assocs., Inc.*, 48 F.3d at 474.

90. Extensive commingling defeats the ability to trace any asset. *See Hedged-Invs.*, 48 F.3d at 474 (holding that because of commingling, the parties could "not claim trust funds of the bankrupt estate because there is no way to trace those funds."); *In re Crocker Companies, Inc.*, No. 2:05-CV-599 TS, 2007 WL 3333274, at *4 (D. Utah Nov. 8, 2007) (holding that a depositor "must be able to trace his funds in order to maintain his property."); *In re Furr's Supermarkets, Inc.*, 485 B.R. 672, 716 (Bankr. D.N.M. 2012) ("If the proceeds have been dissipated or if the beneficiary cannot trace the property, the beneficiary has only a general unsecured claim against the trustee.") (summarizing Restatement (Second) of Trusts § 202(2) (1959)).

91. Such commingling occurred here. By (i) transferring individual customer deposits into commingled SmartFi Omnibus Wallets, (ii) using various customers' deposits to fund other customers' withdrawals, (iii) aggregating customer deposits without regard for or recording those particular cryptocurrencies' origins, (iv) paying "gas fees" from the commingled wallets, and (v) transferring money between customer-designated funds and company operating funds, the

Debtor commingled crypto and fiat assets deposited by SmartFi's customers such that they became hopelessly unidentifiable and untraceable. *See supra* Part IV.

92. As no specific customer's crypto can be traced, all the crypto was property of the Debtor and became property of the estate upon the filing of the Chapter 11 petition.

## *VI.* THE COURT SHOULD AUTHORIZE THE SALE AND USE OF THE FIREBLOCKS CRYPTO, ITS PROCEEDS AND THE RECOVERED CRYPTO PROCEEDS UNDER SECTION 363(b)

93. Section 363(b)(1) allows a trustee, "after notice and a hearing," to "use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). Courts in this district approve a sale outside the ordinary course when the trustee shows a sound business purpose, adequate notice, a fair price, and good faith. *In re Med. Software Sols., LLC*, 286 B.R. 431, 439–40 (Bankr. D. Utah 2002).

94. Each of those elements is met here. The Trustee is not running a business, and continuing to hold crypto would constitute a bet on its price, which swings widely from day to day. Selling the Fireblocks Crypto now (or at a time to be determined by the Trustee in the exercise of her business judgment) locks in the value for creditors. The estate also needs cash to pay administrative expenses and to make the payments due to the Purchaser under the PFPA. The Trustee will sell the crypto through commercially reasonable means based on market conditions, so the price will be fair. She will not knowingly sell to an insider. And notice will be provided to all creditors and customers, as described below. *See* Somers Declaration ¶¶ 4–6.

95. The Trustee also asks for authority to use the Recovered Crypto Proceeds and the proceeds of the Fireblocks Crypto to administer the estate, including to pay allowed administrative expenses and the amounts due under the PFPA. That use is also outside the ordinary course, and it rests on the same business reasons.

96. The Trustee also asks the Court to waive the 14-day stay under Bankruptcy Rule 6004(h). Crypto prices can move sharply in two weeks, and the estate bears that risk until the crypto is sold.

### *VII.* NO OBJECTING PARTY CAN PROVE A RIGHT PURSUANT TO SECTION 363(p)

97. The Debtor represented to the Court in its Statement of Financial Affairs that it held no property for anyone else. *See supra* ¶ 7. The Debtor's schedules list no secured creditors, and no party has filed a secured claim asserting a lien or security interest in any identified specific crypto. In any hearing under section 363, "the entity asserting an interest in property has the burden of proof on the issue of the validity, priority, or extent of such interest." 11 U.S.C. § 363(p)(2). *See Morris v. Kasparek (In re Kasparek)*, 426 B.R. 332, 340 (B.A.P. 10th Cir. 2010) (party "contesting record title and asserting full equitable title to the Property … had the burden of proving the validity and extent of his equitable interest"); *In re DeSoto*, 181 B.R. 704, 706–07 (Bankr. D. Conn. 1995) (objectors who argued the property was not property of the estate bore the burden under what is now section 363(p)(2)). While no party can prove an interest in the crypto, in the alternative, the Court should authorize the sale free and clear of any such interest under section 363(f)(4) because the interest "is in bona fide dispute." 11 U.S.C. § 363(f)(4). Any interest a party proves would attach to the proceeds.

## NOTICE AND OBJECTION PROCEDURES

98. The Trustee will serve this Motion and the Notice of Motion and Notice of Hearing filed with this Motion by first-class mail, and by email where an address is known, on: (a) the Office of the United States Trustee for Region 19; (b) counsel to the Official Committee of Unsecured Creditors; (c) the Debtor and its counsel; (d) all creditors listed in the Debtor's schedules, as amended, and all parties that have filed a proof of claim, at their addresses on the

Court's creditor matrix; (e) all parties who have filed a notice of appearance or requested notice under Bankruptcy Rule 2002; and (f) all parties known to have asserted an interest in crypto the Debtor held. For all other customers, including customers who are not scheduled and have not filed a proof of claim, the Trustee will publish a summary notice in *The Salt Lake Tribune*. The Debtor's website no longer hosts the case docket, so the Trustee cannot post filings there or email customers a link to them as the Order Limiting Notice and Establishing Notice Procedures [Dkt. No. 42] contemplated. Instead, the summary notice tells customers how to get the Motion, and copies of the Motion and declarations are available from counsel on request and on the Court's docket.

99. Objection will be due in accordance with the Notice of Motion. The Notice of Motion and the summary notice will tell customers, in plain language, that anyone who claims to own any of the Fireblocks Crypto or the Recovered Crypto Proceeds must object by the deadline or be bound by the Court's order.

## **CONCLUSION**

The Trustee respectfully requests an order (a) authorizing the Trustee to sell the Fireblocks Crypto and to use those sale proceeds and the Recovered Crypto Proceeds outside the ordinary course of business; (b) waiving the 14-day stay under Bankruptcy Rule 6004(h); and (c) granting any further relief as is just and proper.

Date: November 18, 2026

Respectfully submitted,

**Johnson Van Kwawegen LLP**

*/s/ Angela J. Somers*
Angela J. Somers
Jonathan Zweig

*Counsel for*
*Angela J. Somers, Chapter 11 Trustee*

**MANNING CURTIS BRADSHAW & BEDNAR PLLC**

/s/ *Austin C. Sabin*
Trevor J. Lee
Austin C. Sabin
*Counsel for*
*Angela J. Somers, Chapter 11 Trustee*