Angela J. Somers
Jonathan Zweig
JOHNSON VAN KWAWEGEN LLP
485 Madison Ave. | 15th Floor
New York, NY 10022
asomers@jvk-law.com
jonathan@jvk-law.com

Trevor J. Lee (16703)
Brett C. Gilmore (17371)
Austin C. Sabin (19667)
MANNING CURTIS BRADSHAW & BEDNAR PLLC
201 S. Main Street, Suite 750
Salt Lake City, Utah 84111
(801) 363-5678
tlee@mc2b.com
bgilmore@mc2b.com
asabin@mc2b.com

*Counsel for Angela J. Somers, Chapter 11 Trustee*

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF UTAH**

| | |
|---|---|
| In re:<br><br>**POWER BLOCK COIN, LLC,**<br><br>Debtor. | Case No. 2:24-bk-23041-CDP<br><br>Chapter 11<br><br>Hon. Cathleen D. Parker |

# DECLARATION OF JAMES P. BRENNAN IN SUPPORT OF TRUSTEE'S MOTION TO SELL CRYPTO AND USE CRYPTO PROCEEDS AND CASH OUTSIDE THE ORDINARY COURSE OF BUSINESS

I, James P. Brennan, declare under 28 U.S.C. § 1746 as follows:

## I. Introduction

1. I am a Senior Managing Director at J.S. Held LLC ("J.S. Held"), the financial and crypto advisor to Angela J. Somers, the Chapter 11 trustee (the "Trustee") of Power Block Coin, LLC d/b/a SmartFi (the "Debtor" or "SmartFi"). The Court approved J.S. Held's employment as of June 2, 2026. I submit this declaration in support of the Trustee's motion to sell the Fireblocks

Crypto and to use its proceeds and the Recovered Crypto Proceeds outside the ordinary course of business (the "Motion").[1]

2. Prior to working at J.S. Held, I held positions at other investigations firms, including FTI Consulting, Alvarez & Marsal, and Kroll. In these positions, I managed teams responsible for investigations involving anti-money laundering ("AML"), terrorist financing, Ponzi schemes, asset theft, and other fraudulent activities, as well as asset-tracing and recovery.

3. I specialize in accounting, forensic investigations, and disputes involving complex financial transactions, and a significant portion of my practice involves advising on crypto-related matters. I am routinely retained to investigate financial crimes, including performing flow-of-funds analyses that trace money through crypto wallet addresses and bank accounts. In this work, I use blockchain records and bank records to reconstruct how funds moved.

4. I hold both a B.S. and an M.S. in accounting from St. John's University. I am a Certified Fraud Examiner and a Certified Bitcoin Professional.

5. The statements in this Declaration are based on my personal knowledge and on work that J.S. Held professionals performed under my supervision. That work included reviewing the books and records the Debtor turned over to the Trustee, including its internal "Ledger" database, its QuickBooks files, bank statements, records from its custody provider, its Terms of Use, and its loan agreements, and comparing those records with public blockchain data and other third-party sources. If called to testify, I would testify to these facts.

6. The Debtor provided records that were incomplete and based on my review were unreliable. The Debtor tracked customer balances in a so-called Ledger, which was merely a SQL database, but the Ledger has incomplete data. Additionally, the Debtor used QuickBooks as

[1] Capitalized terms not defined in this declaration have the meanings given in the Motion.

its accounting platform, but it never completed audited financial statements. After the Debtor's primary bank accounts were closed in December 2023, relatively few transactions were recorded in QuickBooks. I attempted to verify the Ledger against bank statements and on-chain data, and have been unable to do so. Therefore, I have utilized and relied upon third-party sources, such as blockchain data and bank statements, wherever possible.

## II. Crypto Terms

7. Cryptocurrency ("crypto") is a form of digital money that exists only as electronic records. Its value generally rises and falls with supply and demand. Bitcoin ("BTC") and Ether ("ETH") are two of the most widely recognized cryptocurrencies, but many others exist. Some crypto, called "stablecoins," are designed to hold a steady value of about one U.S. dollar per unit. Examples include USD Coin ("USDC") and Tether ("USDT"). SmartFi customers transferred mainly BTC, ETH, USDC, and USDT to SmartFi.

8. Transfers of crypto are recorded on a shared electronic ledger called a "blockchain," which many computers maintain at the same time.[2] Different cryptocurrencies operate on different blockchains. BTC, for example, operates on the Bitcoin blockchain, while USDT and USDC are issued and transferred on the Ethereum blockchain and other networks.

9. Crypto is held in "digital wallets." A digital wallet is not a physical object; it is an electronic account used to hold, send, and receive crypto. A SmartFi customer typically had its own digital wallet (an "external wallet") before it sent crypto to SmartFi.

---

2

A blockchain is a shared, decentralized digital ledger that records transactions across a network of computers. Once data is written and added to the chain, it cannot be changed or deleted without altering every copy across the entire network.

10. Each wallet has a "public address" (sometimes called a "public key"), which is a string of letters and numbers visible to anyone on the blockchain, much like a bank account number. The public address identifies the wallet and is how users send crypto to it.

11. Each wallet also has a "private key," which is a secret code needed to move crypto out of the wallet, much like a password used to send money from a bank account. Whoever holds the private key controls the crypto in the wallet. Unlike the public address, the private key is not visible on the blockchain and must be kept secret.[3]

12. Wallets are either custodial or non-custodial. A custodial wallet is held and managed by a third party, such as an exchange or platform, which controls the private keys. A non-custodial wallet is controlled by its owner. Beginning with its January 15, 2021 Terms of Use, SmartFi's customer wallets were custodial: SmartFi, through its custody provider, held the private keys, and its customers did not.[4]

13. An "on-chain" transfer is recorded directly on a blockchain, is publicly visible, creates a permanent record, and usually requires payment of a network fee. An "off-chain" transfer happens outside the blockchain, usually within the internal ledger of an exchange, custodian, or platform such as SmartFi.

14. Blockchains record ownership in one of two ways. Bitcoin and several other cryptocurrencies SmartFi held use an "Unspent Transaction Output" ("UTXO") model, in which ownership is represented by discrete transaction outputs recorded on the blockchain. When those outputs stay separate, they can generally be identified and traced through later transactions. Ethereum uses an "account-based" model, in which the blockchain records a running balance for

---

[3] Some wallets require more than one approval before crypto can be moved, a security feature called "multi-signature."

[4] SmartFi Terms of Use, January 15, 2021 [PBC512–PBC538].

each address rather than discrete outputs. USDT and USDC on Ethereum follow the account-based model.

15. A "gas fee" is a processing fee charged by the Ethereum network to carry out a transfer, much like postage or a toll. To move tokens out of an Ethereum address, the address must hold enough ETH to pay the gas fee.

**III. How SmartFi Held and Tracked Crypto**

16. SmartFi provided the customer-facing platform and account infrastructure, but it relied on third-party liquidity providers to execute trades, source market liquidity, and convert between crypto and U.S. dollars.

17. Beginning in approximately March 2021, SmartFi used Fireblocks LLC ("Fireblocks") as its crypto custody provider. Fireblocks secures the private keys that control digital assets and organizes those assets into vaults and vault accounts. Each vault account can hold multiple asset wallets and addresses, which lets a platform like SmartFi hold customer balances in a single, omnibus-style custody environment. This structure let SmartFi accept deposits, process trades and withdrawals, and deal with exchanges and liquidity providers, while Fireblocks provided the secure back end.

18. Prior to approximately March 2021, SmartFi did not use Fireblocks as part of its digital-asset custody infrastructure. Instead, SmartFi used a combination of a Bitcoin Core ("BTC Core") instance and cold storage to hold and process digital assets. The BTC Core instance was specific to Bitcoin, while the cold-storage arrangement was not limited to Bitcoin and provided access to multiple types of digital assets, including BTC, ERC-20 tokens, and other cryptocurrencies. Beginning in approximately March 2021, SmartFi transitioned to Fireblocks as part of its digital-asset custody infrastructure.

19. With respect to the pre-Fireblocks period, I was not provided with the underlying BTC Core instance or a copy of the associated Bitcoin wallet or node data. Rather, the records available to me concerning the BTC Core instance consisted of spreadsheets reflecting Bitcoin activity associated with that system. Accordingly, my analysis of activity conducted through the BTC Core instance is based on those spreadsheet records and does not constitute a direct examination of the historical BTC Core instance itself.

20. SmartFi also used cold storage during the pre-Fireblocks period to hold multiple types of digital assets. The cold-storage arrangement was not limited to Bitcoin. For that cold storage, I was provided with the applicable private key, which provided access to BTC, ERC-20 tokens, and other digital assets associated with the cold-storage arrangement. Using the private key, I identified the associated blockchain addresses and reconstructed available transaction activity from the applicable public blockchains. For Bitcoin, this included reconstructing the Bitcoin addresses associated with the private key and identifying the corresponding transactions recorded on the Bitcoin blockchain. Unlike the BTC Core analysis, which is dependent on the spreadsheet records provided to me, the cold-storage analysis could therefore be independently compared against and reconstructed from transaction histories recorded on the applicable public blockchains.

21. SmartFi tried to track customer crypto itself in the Ledger, a SQL database that can record, organize, and analyze transactions far beyond what a spreadsheet can do. The Ledger was meant to track how much crypto each customer had transferred, in an attempt to record what SmartFi owed a particular customer. But the Ledger was so poorly maintained that it is not a reliable record of customer balances.

22. SmartFi created a unique deposit address for each customer and each type of crypto the customer wanted to send (the "Customer Deposit Addresses"). Crypto on different blockchains cannot share an address, so a customer depositing both BTC and Ethereum-based tokens had a separate address for each. As explained below, these addresses were temporary intake points, not segregated custody wallets.

## IV. How the Terms of Use and Loan Agreements Worked in Practice

23. A customer opened a SmartFi account online by entering a name, email address, mobile phone number, and password, and checking a box agreeing "to all policies and terms set by SmartFi."[5]

24. In practice, a customer who accepted the Terms of Use sent crypto from its customer-controlled external wallet to its Customer Deposit Address at SmartFi. From then on, what the customer had was a balance on SmartFi's platform (an entry in the Ledger showing what SmartFi owed it), not particular coins set aside for it. SmartFi moved the crypto into its own wallets and used it as it saw fit, including funding other customers' withdrawals, paying network fees, and lending, trading, or investing; when a customer asked to withdraw, SmartFi paid from whatever pooled crypto was available.

25. Borrowers under SmartFi's loan agreements posted crypto as collateral the same way, by sending it to a Customer Deposit Address. That collateral went through the same sweep and pooling process described below. I have not found any wallet in which SmartFi held a borrower's crypto apart from other crypto.

26. I reviewed the versions of SmartFi's Terms of Use that the Debtor produced and other versions available to me. SmartFi posted seven customer-facing versions between

[5] How to create An Account on SmartFi [PBCJS_00004258-4267]; SmartFi Member Sign Up webpage from web archive, https://web.archive.org/web/20210928141927/https://portal.smartfi.com/signup [PBCJS_00004258-4259].

November 28, 2020 and May 1, 2022. In the following chart, I attempt to demonstrate the key changes between versions:

| Version and date | Bates[6] | Main changes |
|---|---|---|
| 1. November 28, 2020 | PBC426–452 | Original "Power Block Wallet" terms. Described the wallet as non-custodial. |
| 2. January 15, 2021 | PBC512–538 | Rebranded to SmartFi. Changed to a hosted, custodial wallet. |
| 3. April 26, 2021 | PBC483–511 | No substantive change. |
| 4. June 24, 2021 | PBC539–565 | Changed when deposits settle (§ 4.1). |
| 5. July 26, 2021 | PBC566–595; PBC669–698 | No substantive change. |
| 6. December 30, 2021 | PBC394–425 | Added a Buy Back Guarantee for SmartFi's token (§ 3.4). |
| 7. May 1, 2022 | PBCJS_00004268-4308 | Revised § 3.1 (investment products) and clause (i) of § 3.2. |

27. Every version grants SmartFi, in Section 3.2, "all right and title" to the customer's digital assets, "including ownership rights," and the right to pledge, lend, sell, or otherwise use them. Every customer-facing version I reviewed chooses Delaware law (Section 12.9). The documents produced at PBC597–632 and PBC633–668 are marked-up drafts with internal comments that would have changed the governing law to Utah. I have not seen a customer-facing version with those changes.

28. I also reviewed the Debtor's loan agreements with about 80 borrowers. Under these agreements, SmartFi lent money to the borrower, and the borrower posted crypto as collateral. Each loan agreement I reviewed says it is governed by Utah law. Some, including the

[6] The "PBC" numbers are the Bates numbers the Debtor stamped on these documents when it produced them in *Brown v. Power Block Coin, LLC*, No. 2:23-cv-00554 (W.D. Pa.). The Trustee received copies in the files of the Debtor's former counsel, Parsons Behle & Latimer. The Debtor's productions in other cases also used the "PBC" prefix, so these numbers refer only to the *Brown* production.

Innosilicon and BCRS2 agreements, name the courts in New York City as the place for disputes.[7]

## V. SmartFi Commingled Customer Crypto

29. When a customer sent crypto to SmartFi, it arrived at that customer's Customer Deposit Address. SmartFi then moved, or "swept," it from the Customer Deposit Address into one or more company-controlled omnibus wallets (the "Omnibus Wallets"), where it was pooled with crypto received from other Customer Deposit Addresses and used for SmartFi's custodial and transactional operations. The records show this was the ordinary path for customer deposits. SmartFi managed the Omnibus Wallets as one pooled platform balance.

30. Sweeping and pooling crypto makes it impossible to trace individual customer deposits on UTXO-based networks such as Bitcoin. SmartFi consolidated BTC deposited by many customers into shared Omnibus Wallets and used the pooled BTC to pay customer withdrawals. Once a customer's outputs were combined with other customers' outputs and spent together, the specific BTC that customer deposited could no longer be distinguished from BTC deposited by others.

31. Each customer had its own Customer Deposit Address. The chart below, based on SmartFi's records and the blockchain, shows a typical deposit: a customer sends BTC from its external wallet to its Customer Deposit Address.




[7] Example Agreements: Loan Agreement between Innosilicon and Power Block Coin, LLC, dated August 13, 2020 [PBCJS_00004260-4275]; Loan Agreement between BCRS2, LLC and Power Block Coin, LLC, dated April 22, 2020 [PBCJS_00004276-4291].

32. Further, SmartFi commingled crypto by using one customer's deposited crypto to fund another customer's withdrawal. In the transaction shown below, Customer C asked to withdraw 0.83 BTC. Rather than pulling that amount from Customer C's own deposit address, as would have been required had no commingling occurred, SmartFi funded the withdrawal by combining about 0.395 BTC deposited by Customer A, 0.0017 BTC deposited by Customer B, and 0.505 BTC drawn from an Omnibus Wallet, with a small remainder returned to that wallet.




33. In another transaction from SmartFi's records, shown below, SmartFi combined BTC deposited by seven different customers (Customers A through G) to pay a withdrawal requested by Customer H, and swept what was left into one of its Omnibus Wallets.




34. That transaction shows two kinds of commingling. First, SmartFi used crypto deposited by some customers to pay a different customer, so the tokens those customers deposited will never be returned to them. Second, SmartFi swept the rest of those customers' crypto out of their deposit addresses and into an Omnibus Wallet.

35. The table below shows the same transaction. SmartFi took BTC from seven customers' deposit addresses and sent all of it to just two places: Customer H's withdrawal and one of SmartFi's Omnibus Wallets.

| **Transaction party** | **BTC swept (UTXO count)** | **BTC received (UTXO count)** |
|---|---|---|
| Customer A | 0.08668718 (1) | 0 (0) |
| Customer B | 3.66370347 (3) | 0 (0) |
| Customer C | 0.15 (1) | 0 (0) |
| Customer D | 5.2498 (1) | 0 (0) |
| Customer E | 1.42297968 (2) | 0 (0) |
| Customer F | 0.09486274 (1) | 0 (0) |
| Customer G | 0.17 (1) | 0 (0) |
| Customer H | 0 (0) | 8.1385 (1) |

| Transaction party | BTC swept (UTXO count) | BTC received (UTXO count) |
|---|---|---|
| SmartFi ~qcp2 Wallet | 0 (0) | 2.69937491 (1) |
| Total | 10.83803307 (10) | 10.83787491 (2) |

36. This pooling and reuse of customer crypto happened again and again throughout SmartFi's operations. Crypto deposited by one customer was routinely combined with crypto deposited by other customers and with crypto already in the Omnibus Wallets. Because deposited crypto lost its separate identity through these repeated consolidation and spending transactions, it is not possible to conclude that any crypto later paid to a customer was the same crypto that customer deposited.

37. The same commingling happened with crypto on account-based networks, including USDT and USDC. SmartFi used the same custody model: customer deposits were received at individual Customer Deposit Addresses, funded with ETH where needed to pay network fees, and then swept, or attempted to be swept, into company-controlled Omnibus Wallets. The chart below shows several customers sending USDT from their external wallets to their Customer Deposit Addresses, ranging from hundreds to tens of thousands of USDT, and those balances then being swept into a single SmartFi Omnibus Wallet.



38. Once those balances were pooled in an Omnibus Wallet, the USDT attributable to one customer could not be distinguished from the USDT attributable to others. This pooling happened repeatedly across SmartFi's account-based operations. Because those assets were continuously aggregated, transferred, and used together, it is not possible to identify any token SmartFi later transferred as the same token a particular customer deposited.

39. These examples show that commingling was not an occasional byproduct of SmartFi's operations. It was a deliberate and recurring feature of SmartFi's custody model, built into both the structure of its wallets and the way it processed customer transactions. One reason was gas fees.

40. Pooling customer crypto in Omnibus Wallets reduced the number of on-chain transactions SmartFi had to make and so reduced the gas fees it paid. By using crypto from one customer to pay another customer's withdrawal, SmartFi could avoid transfers that would have been needed if each customer's crypto had stayed separate. Sweeping deposits from many Customer Deposit Addresses into shared Omnibus Wallets, rather than keeping separate balances for each customer, saved fees the same way.

41. SmartFi paid gas fees from central "Gas Station" wallets, which sent small amounts of ETH to Customer Deposit Addresses so the tokens there could be swept. This process depended on the constant movement and pooling of assets among Customer Deposit Addresses, Omnibus Wallets, and SmartFi's operational wallets. It was one more way customer assets became intertwined with other customers' assets and with assets SmartFi controlled.

42. On occasion, SmartFi overpaid a customer, and the customer returned the excess. In that event, the customer sent the overpayment back to its Customer Deposit Address for SmartFi to withdraw and use.

43. A small amount of crypto was sometimes left in a Customer Deposit Address. That crypto was not the crypto the customer used to do business with SmartFi. SmartFi gave the customer a matching credit and let the customer use that value from the Omnibus Wallet to buy, sell, or swap crypto, convert crypto to U.S. dollars, or transfer crypto or cash to external wallets and bank accounts. Either way, the crypto became part of SmartFi's operating pool, and each customer transaction was made from the commingled Omnibus Wallets.

44. The records reflect a consistent operating model. Customer crypto was deposited into individually assigned addresses, but those addresses worked as temporary transaction points, not long-term segregated custody accounts. SmartFi's systems routinely swept customer assets into company-controlled Omnibus Wallets, used pooled assets to pay customer withdrawals, funded transaction fees through central Gas Station wallets, and repeatedly tried again to move assets into the Omnibus Wallets when a first sweep failed.

45. These practices occurred on both UTXO-based and account-based networks. As a result, customer assets were repeatedly aggregated, transferred, and used together without any separate on-chain identity for a particular customer's crypto. The transaction records, wallet activity, Gas Station funding, sweep-cycle analysis, and Omnibus Wallet transfers together show that SmartFi held and managed customer assets in a commingled custody structure, not a system that kept each customer's assets separate.

46. Where assets stayed for a time in an individual Customer Deposit Address, the records indicate that this was generally the result of operational delays, failed sweep attempts, or processing exceptions, not a practice of keeping customer assets segregated. Customer assets lost any separate identity and became part of SmartFi's broader omnibus custody structure.

## VI. SmartFi Commingled Customer Cash

47. SmartFi did not keep customer cash in segregated accounts belonging to, or held for the benefit of, individual customers. Instead, customer funds were pooled in shared bank accounts that also held SmartFi's own funds, and SmartFi routinely moved funds among its omnibus bank accounts.

48. For example, from about May 2022 through December 2023, the Debtor had an omnibus account at Capital Community Bank ending in 7870 that was labeled "for the benefit of" its customers. During the same period, it had a separate account at Capital Community Bank ending in 7888 labeled as an "Operating Account." Despite these labels, the Debtor regularly transferred funds between the two accounts, commingling customer-designated funds with operating funds.

49. In December 2023, the Debtor's banking relationships ended and its bank accounts, including those at Capital Community Bank, were closed. The remaining funds were transferred to an existing account in the name of Blue Castle Holdings, Inc. ("Blue Castle"). After that, Blue Castle did not keep a separate account just for Debtor transactions; the Debtor's receipts and payments appear to have run through accounts Blue Castle also used for other activities. In July 2024, Blue Castle opened an account at Hillcrest Bank to pay the Debtor's operating expenses, but the records show that some Debtor expenses were still paid from other Blue Castle accounts after that.

## VII. Conclusion

50. Therefore, neither SmartFi, its customers, nor I can trace or segregate the crypto or cash transferred to SmartFi by any particular customer from the other commingled assets now

held by the Trustee, including the Fireblocks Crypto and the Recovered Crypto Proceeds, or otherwise attribute any portion of those assets to a particular customer or borrower.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on November 18, 2026.

/s/ *James P. Brennan (signed with permission)*__
James P. Brennan
Senior Managing Director, J.S. Held LLC